# Exhibit 1



November 19, 2019

Michelle Law, Esq.
Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Re: Mr. Wesley Purkey
DOB: 1/6/52

Dear Ms. Law:

Enclosed is my report concerning Mr. Wesley Purkey. This report was produced pursuant to your request, in order to assess Mr. Purkey's competency to work with counsel and to understand the basis for his execution. The opinions expressed in my report represent my professional opinion to a reasonable degree of psychiatric certainty, based upon my clinical interviews with Mr. Purkey and a review of relevant records you provided.

**Summary of Qualifications**

I am a medical doctor, who is licensed to practice medicine in Georgia since 2002. I am a psychiatrist in private practice with Comprehensive Psychiatric Services of Atlanta. I treat a wide variety of conditions including ADHD, Depression, Bipolar Disorder, Anxiety, Schizophrenia, Post-traumatic Stress Disorder, Panic Disorder, and Substance-related illnesses.

I earned my Doctor of Medicine degree from the State University of New York Health Science Center at Syracuse, and completed my residency at Emory University School of Medicine Department of Psychiatry and Behavioral Sciences where I was Chief Resident. I also completed a Forensic Psychiatry Fellowship at Emory University School of Medicine. I hold dual board certification as a Diplomate of Adult Psychiatry (AP) and Forensic Psychiatry (FP) of the American Board of Psychiatry and Neurology (ABPN).

Ex_1-000001

Re:  Wesley Purkey
Competency to be Executed

In addition to my private practice, I am an Adjunct Assistant Professor of Psychiatry at Morehouse School of Medicine and a Clinical Assistant Professor with the Emory University School of Medicine.

I am a Distinguished Fellow of the American Psychiatric Association. I have served as a consultant to various school systems in the Atlanta area, Emory University Hospitals, Georgia Tech Athletic Department, Georgia Composite State Board of Medical Examiners, the Federal Bureau of Investigation (FBI), the United States Armed Forces, and the Department of Defense (DoD). My *curriculum vitae* is attached.

I have experience testifying in criminal and civil cases nationwide. I perform independent medical examinations and medical record reviews for psychiatric malpractice and disability cases. I am able to provide professional opinions on an array of legal questions, including criminal and civil competencies, criminal responsibility (insanity defense), personal injury, medical malpractice, and fitness for duty.

**Additional Sources of Information:**

I conducted a face-to-face clinical interview of Mr. Purkey on November 8, 2019, at USP-Terre Haute, for approximately 2 hours. I had previously conducted an in-person interview of Mr. Purkey on September 8, 2016, for approximately 3 hours. I have also reviewed voluminous documentary evidence in this case, attached as an index.

**Notification of rights:**

At the outset of the evaluation, I reminded Mr. Purkey of the nature of this evaluation. This included informing him that his competency to be executed would be evaluated, that the evaluation was not confidential, and that anything he told me I might be asked to testify about in court.

**Referral questions:**

I have been asked to evaluate Mr. Purkey in light of the standard for competency to be execution under *Ford v. Wainwright* and *Panetti v. Quarterman*, namely, whether Mr. Purkey has a rational understanding of the basis for his execution. I have also been asked to evaluate whether Mr. Purkey is competent to work with counsel.

**History of Presenting Problem:**

Mr. Purkey is a 67-year old white male currently under sentence of death at the USP Terre Haute. He was diagnosed in 2017 with progressive dementia and, since that time, his legal team reported a noticeable decline in memory, agitation, and his ability to work

Ex_1-000002

Re:  Wesley Purkey
Competency to be Executed

with counsel. The investigators on his defense team have reported instances where he is unable to remember important people, like his ex-wife, forgets important life events, and cannot remember or uses the wrong words. He repeats the same story in the same conversation, often using the exact same phrases. He describes, and is committed to, false memories – like a 13 to 14-hour deliberation period by his capital jury at the guilt phase, which in fact was only a 2 hour period. They report that this decline has accelerated in the last year and that he is visibly fatigued and frail in meetings, often persistently stuttering and slurring words. His hands shake and his balance is noticeably impaired. They describe that his thought processes are highly tangential and that he is fixated on retaliation by prison guards.

A review of the records indicated a number of longstanding significant psychiatric symptoms as well as a number of serious mental health diagnoses, including Schizophrenia Reaction, Schizo-Affective Type, Depression, Psychosis, and Bipolar Disorder. Mr. Purkey has also experienced a number of serious head injuries.

In 2016, Dr. Frederic Sautter diagnosed Mr. Purkey with lifelong complex-PTSD (Post-Traumatic Stress Disorder) as a result of severe trauma from his experiences of extreme physical, sexual, and emotional abuse throughout his childhood and adolescence, and Major Depressive Disorder secondary to his PTSD. I was retained by Mr. Purkey's counsel that same year to evaluate how Mr. Purkey's history of traumatic brain injury and substance abuse affect and interact with his complex-PTSD, and how this history, along with Mr. Purkey's bio-psycho-social history, affected his then-current functioning. I interviewed Mr. Purkey for these purposes at USP-Terre Haute on September 8, 2016, for three hours. I concluded that Mr. Purkey's history was consistent with a complex-PTSD diagnosis. I also concluded that it should be anticipated that Mr. Purkey would be "hard to work with" because of his complex-PTSD. At the time of my evaluation in 2016, I was not asked to assess or opine on Mr. Purkey's competency to be executed or other potential psychiatric diagnoses.

In my meeting with Mr. Purkey on November 8, 2019, Mr. Purkey voiced his belief that he is going to be executed in retaliation for his legal work. Mr. Purkey's psychotic thought process was evident in our conversation. He was tangential and he voiced paranoid delusions.

Much of the discussion of his working relationship with counsel was convoluted, confusing, and overtly paranoid. He was unable to shift topics in discussion and perseverated throughout my meeting with him.

*Social History*:

Mr. Purkey suffered pervasive and extraordinary childhood physical, sexual, and emotional abuse. Both of his parents were alcoholics, and institutional records describe

3

Ex_1-000003

Re: Wesley Purkey
Competency to be Executed

the home as violent, dirty, and chaotic. Mr. Purkey's father was physically abusive to his wife, often in the presence of Wes and his brother. He was also physically abusive to Mr. Purkey, beginning when he was 5 years old. His parents divorced when he was 9 years old.

In addition to significant physical abuse by his father, his mother began sexually abusing him around the age of 10, a period of abuse which did not end until he was 22. His mother made him sleep with her as a boy and inappropriately touched his genitals. She would instruct him to stimulate her sexually and penetrate her with a hairbrush. As he grew older, she would force him to perform oral sex on her, would stimulate him to orgasm, and forced him to have intercourse with her. His maternal grandmother sexually exploited him and his brother by walking around the house naked in front of them and making them watch her shower.

His mother was frequently gone from the house for several days at a time and was openly promiscuous with men in the home.

Mr. Purkey was also sexually molested by a parish priest from his church, from ages 11-13. He became even more isolated and fearful. Mr. Purkey attended a Catholic school where he was punished and humiliated for his stuttering. Mr. Purkey received low grades and he ultimately dropped out of school in the ninth grade.

Mr. Purkey's onset of alcohol use was at a young age, 10 years, and his drug abuse began at age 14. There is contemporaneous documentation of Mr. Purkey's persistent alcohol and drug use into adulthood, including use of methamphetamines, cocaine, and heroin.

Mr. Purkey had two serious relationships, with his ex-wives Claire Berry and Jeanette Broyles. He had a child with Ms. Berry, Angie Purkey, with whom Mr. Purkey maintains a close relationship. Both of his former wives were also heavy drug users.

Velma Purkey, Ms. Purkey's mother, died of cancer when Mr. Purkey was 29 years old. Jack Purkey, Mr. Purkey's father, committed suicide when Wes Purkey was 32 years of age.

Mr. Purkey has been incarcerated most of his adult life, including continuous periods from 1970 to 1972, from 1977 to 1980, from 1981 to 1997, and then from 2000 to the present.

***Medical and Psychiatric History:***

Extensive and contemporaneous records show that Mr. Purkey has a long history of head injuries. He was in serious automobile related accidents involving a loss of consciousness in March of 1968, April of 1968, and in 1972. He had a major fracture of his face from a

4

Ex_1-000004

Re:  Wesley Purkey
Competency to be Executed

fight with the Wichita Police in 1976, and he was attacked in prison with a lead pipe. Mr. Purkey reported to me in our 2016 meeting that he was struck in the head more than 10 times in his life.

Mr. Purkey's speech was severely delayed as a child. He did not begin speaking until age 6. A medical evaluation from 1971 reports that Mr. Purkey "had 'polio,' which effected the use of his left leg 'he drug it around.'"

Beginning in childhood and continuing through his arrest for these charges, Mr. Purkey was referred for psychiatric treatment and in-patient hospitalization because of his delusions, hallucinations, bizarre behaviors, paranoia, anxiety and depression. He sought psychiatric assistance and treatment on multiple occasions. In 1971, at 19 years of age, Mr. Purkey was diagnosed with Schizophrenia Reaction, Schizo-Affective Type, and Depression; in 1998 with Psychosis; in 1999 with Bipolar Disorder. He has attempted suicide on multiple occasions.

Mr. Purkey's evaluations and psychiatric treatment history include:

- 1966, at 14 years of age, Wes Purkey was referred to the Wichita Psychiatric Center for headaches, dizziness, blackouts and behavior issues. He was referred for an EEG for possible "temporal lobe syndrome" or tumor. The images were suggestive of possible impairment in the left frontal and temporal region.

- 1968, at 16 years of age, Wes Purkey was admitted to St. Francis Hospital "disheveled and dirty- shaking and nervous." He reported experiencing blackouts and amnesia.

- 1971, at 18 years of age, Wes Purkey was sent to the Kansas State Reception and Diagnostic Center ("SRDC") where he was diagnosed by the Kansas Department of Corrections with Schizophrenia Reaction, Schizo-Affective Type, Depressed superimposed upon a pre-existing antisocial personality. Treatment notes reported he had a "wild, bizarre" expression on his face; noted that while he doesn't appear to be actively hallucinating and reports no delusional thinking he appears to be minimizing symptoms; and described "weird and unpredictable behavior" that is "often impulsive." He was treated with Mellaril, a drug prescribed for schizophrenia.

- 1972, at 20 years of age, Mr. Purkey was admitted for an acute concussion and the treatment team noted that Mr. Purkey "has had a severe emotional unstable background, both genetic and environmental" and recommended that Mr. Purkey see a psychiatrist, noting that he "needs psychiatric treatment much and has needed it for some time." Mr. Purkey checked out of the hospital against medical advice.

5

Ex_1-000005

Re:  Wesley Purkey
Competency to be Executed

- 1972, after his concussion, Mr. Purkey was admitted to Larned State Hospital for treatment, because of his "bizarre" behavior, where he remained for four months. Mr. Purkey was administered Sinequan (a tricyclic antidepressant) and Thorazine (an antipsychotic) while there.

- 1976, Mr. Purkey was admitted to the Wesley Medical Center in January 1976 for an overdose, believed to be from alcohol and Tranxene, an alcohol withdrawal medication. "It took approximately 18 hours for the patient to wake up, be coherent and to carry on an intelligent conversation." Before he was awake, he was confused and hallucinated.

- 1976, Mr. Purkey was again evaluated by the Kansas Department of Corrections at the SRDC. He admitted auditory and visual hallucinations but blamed them on drug use. He showed signs of distrust of others and attempted to conceal his internal anxiety.

- In 1979, Mr. Purkey cut his wrists and reported feeling anxious and depressed. Mr. Purkey was taking Sinequan and Valium.

- In May 15, 1981, Mr. Purkey was again evaluated by the Kansas Department of Corrections at the SRDC. The SRD evaluator did not assign Mr. Purkey a diagnosis but noted that Mr. Purkey appeared to be holding two conversations at the same time, in different voices:  "At times in his inability to speak out his mind he whispers at the same time he makes efforts to lets himself be heard. He whispered in an entirely different conversation from what he was talking aloud." The evaluator noted, similar to prior evaluators, that Mr. Purkey "tried hard to hide his emotions."

- In May of 1998, Mr. Purkey was admitted to Via Christi Hospital and was diagnosed with Psychosis not otherwise specified after ruling out psychosis due to substance abuse. Mr. Purkey described a host of delusional and paranoid beliefs, including that "there were people were on the roof last night spraying a chemical in his room," that "prior to [his] arrival [at the hospital] the chemical was activated by a beam," and that "and  that people "are planning to kill [him]". His wife brought him to the emergency room because he "started to act paranoid and told [her] that somebody is trying to poison him, he also woke up his wife saying that while he was asleep he was sprayed with a poisonous mist several times and now his blood has poison in it...He also told his wife that his house is wired and 'they' can see his wife and children and himself all the time." While at the emergency room, he was "extremely anxious and suspicious of everybody." During an evaluation with a physician, "he suddenly got up and left the room saying they 'are spraying me with their mist,' and he started to rub his skin

6

Re:  Wesley Purkey
Competency to be Executed

vigorously as he stated he could feel the thin layer of the mist that is penetrating his skin and entering his blood stream." He was assessed with incoherent and tangential speech, delusions, illogical racing bizarre paranoid thought content and perceptions, auditory and visual hallucinations. Mr. Purkey denied past psychiatric history.

- In September of 1998, Mr. Purkey was admitted to the Kansas University Medical Center. Although Mr. Purkey later characterized this admission as for a heart attack induced by Ritalin and methamphetamine, and poisoning by his wife, the toxicology screen was negative, other than for dehydration.

- In 1999, at Larned State Hospital, Mr. Purkey was diagnosed with Depressive Disorder NOS and Antisocial Personality Disorder. The nursing personnel indicated that Mr. Purkey "would become angry easily."

- In 2002, the Bureau of Prisons medical personnel diagnosed Mr. Purkey with Bipolar Disorder and prescribed Klonopin, Depakote, Buspar, and Tegretol/ Carbamezepine, anti-anxiety and anti-seizure medications, often used to treat Bipolar disorder and seizures.

Mr. Purkey was out of prison for relatively brief periods of time, including in the late 1990s from 1997 until his arrest in 1999. During this period, Mr. Purkey became fixated on his delusional beliefs about an extensive poisoning conspiracy. A psychiatric evaluation from 1999 described his ex-wife's account that Mr. Purkey called the KBI to report that "chemicals were coming through the vents and ceiling and had planted something in his chest and were using remote things to increase it." She reported that he got that way when he was on drugs but he stays the same even "when he doesn't have nothing in his system."

Mr. Purkey remained fixated on the poisoning conspiracy for years. When he felt his lawyers had inadequately investigated this poisoning, he responded by contacting – without counsel – the FBI to confess to the murder of Jennifer Long.

Dr. Sautter evaluated Mr. Purkey in 2016 and diagnosed him with complex-PTSD, a diagnosis that I confirmed that same year. Mr. Purkey's psychiatric history and head injuries increased his risk for PTSD. Dr. Sautter identified eleven separate categories of traumatic events: (1) repeated physical assaults by his father; (2) witnessing of the repeated physical assaults of his mother by his father; (3) humiliation and verbal threats by his father to himself; (4) witnessing verbal threats of violence from his father to his mother; (5) sexual abuse by his mother; (6) sexual abuse by a priest over a period of three years; (7) childhood sexual abuse by a teen, a friend of his older brother's; (8) molestation by prostitutes at his father's request; (9) physical beatings by his older brother; (10) car accidents with head traumas and loss of consciousness; and (11)

7

Ex_1-000007

Re:  Wesley Purkey
Competency to be Executed

emotional and physical abuse from the staff at his school. Dr. Sautter administered the Clinician Administered PTSD Scale (CAPS); the PTSD Checklist (PCL), and the Structured Clinical Interview for DSM-IV-R (SCID). Mr. Purkey's results on this testing were consistent with the long-documented history of symptoms of avoidance and significant problems with emotional regulation. The results supported a diagnosis of complex-PTSD. Mr. Purkey's clinical interview reported symptoms of psychosis, including paranoid thinking, visual hallucinations and disordered, illogical thoughts.

Dr. Sautter's findings were consistent with my evaluation of Mr. Purkey in 2016 for the interaction of his brain injuries and PTSD. In our 2016 interview, he described himself as an anxious and "on edge" child. There was no adult in his life he could confide in or trust so he learned to cope by abusing illicit drugs. By the time he was a teenager, Mr. Purkey was regularly using alcohol, sniffing paint thinner and taking sedatives to calm himself and keep him "numb." As his moods would vacillate in response to life stressors, so would his substance use. In other words, under times of greater stress, Mr. Purkey's substance use would similarly increase in order to quell his emotions. The use of substances to treat oneself is called "self-medication," and it is common in my experience for traumatized individuals to turn to substances to "numb" or "quell" their internal mood states. Although substance use can certainly become its own problem, failure to identify and understand the traumatic underpinnings of substance use leads to treatment failure.

As Dr. Sautter's April 26, 2018 report details, Mr. Purkey had been diagnosed on multiple occasions with personality disorders, including Antisocial Personality Disorder. None of the evaluators had first ruled out PTSD, the more appropriate diagnosis, despite the fact that Mr. Purkey had reported symptoms and completed testing suggestive of a PTSD diagnosis.

**Prior Neuropsychological Testing**

Neuropsychological testing in 2003 and in 2016 shows evidence of brain damage, particularly frontal lobe damage, and indicates learning and memory deficits. This brain damage further limits Mr. Purkey's capacity to regulate his thoughts, emotion, and behavior, which has significantly deteriorated over time. In all of the neurological testing, the examiners found that Mr. Purkey put forth good effort.

In addition, Mr. Purkey had brain imaging from 2003 that revealed temporal lobe abnormalities, consistent with the deficits observed in neurological testing. The report indicated moderate to marked decrease activity in the temporal lobes and potential deficit functioning in the right parietal and frontal lobes. These damaged areas of his brain are responsible for effective weighing and deliberating, working memory, emotional regulation, impulse inhibition, freedom from perseveration, and understanding the future consequences of their behavior. If one conceptualizes the frontal lobes as the major inhibitory mechanisms in the brain, i.e., the "brakes," one can see how damage to this

8

Ex_1-000008

Re:  Wesley Purkey
Competency to be Executed

area would negatively impact behavior. Traumatized individuals will often react to stressors, even neutral stimuli, as threatening when they are not. Over-reaction with impulsiveness is more often the rule rather than the exception. The combination of hypersensitivity to stress, substance abuse (which causes disinhibition), and faulty "brakes" is a recipe for disaster. It makes it far more likely that bad outcomes will result from emotionally stressful or threatening environments.

On September 29, 2019, I ordered brain image testing of Mr. Purkey to further assess his current frontal lobe and executive function deficits, a recommendation based on the more recent neuropsychological testing. Specifically, I ordered an MRI w/ and w/o contrast, PET scan (brain), and a DTI scan (brain), in light of Mr. Purkey's history of cognitive deficits and the need to rule out an intracranial process. As of the date of this report, such testing has not yet been performed.

**Dementia**

In 2017, Mr. Purkey was diagnosed with the beginning stages of dementia, likely Alzheimer's disease. An update in 2018 indicated that patterns of change observed by Mr. Purkey's defense team since the initial diagnosis were consistent with progression of a cortical dementia, and that Mr. Purkey was not receiving the required standard of care for a person with dementia. It was anticipated that, without proper medical care, Mr. Purkey would decline further and faster, given his multiple risk factors and the initial test findings.

Three of the most important risk factors for dementia -- age, family history and head injuries -- are all present in Mr. Purkey's case. There is a significant presence of neurodegenerative disease later in life among several family members on both the maternal and paternal sides of Mr. Purkey's family.

**Longstanding Delusional and Paranoid Thinking**

In addition to Mr. Purkey's longstanding poisoning delusions, he has for many years adhered to a delusional belief system that the guards and prison are engaged in systemic retaliation against him for his legal work. Mr. Purkey has been a prolific filer of legal grievances and pro se lawsuits. A review of these grievances from 2010 to today shows the breadth and depth of his fixed belief that a host of actions (including the search of his cell, granting of library privileges, denial of library privileges, shortening his rec time, nighttime bed checks, discharge from the library, denial of a religious diet request, throwing away or tearing up legal material, and cursing by guards) were carried out against Mr. Purkey in "retaliation" for his legal work on behalf of himself and other prisoners. These grievances are repetitive and tangential, often lacking coherence and at times in direct contravention to each other.

9

Ex_1-000009

Re: Wesley Purkey
Competency to be Executed

In several instances, Mr. Purkey describes cursing or negative reactions by guards, attorneys, or other individuals that did not occur. John Fox, one of the mitigation investigators from his case, describes an incident where Mr. Purkey complained bitterly about a guard for an incident that Mr. Fox, although present, saw no sign had occurred. Elizabeth Vartkessian, another mitigation investigator, recounted how Mr. Purkey said that another lawyer had told him "F-ck you," and that Mr. Purkey said this reminded him of her. Neither Dr. Vartkessian nor the lawyer had ever said that to Mr. Purkey. In yet another example, Mr. Purkey complained in one of his grievances from this year that in retaliation for his legal work "all visitors" would be, and had been, denied. In fact, he had had a number of visitors in that period.

One of the manifestations of Mr. Purkey's paranoia is difficulty in working with his counsel. Mr. Purkey has attempted to fire a long list of his attorneys, and he is often suspicious that they are working against him. Throughout his federal case, he has demonstrated rigid ideas about the best claims, and was not able to accept or process the contrary opinions of his lawyers. He focuses on minor or irrelevant details and is not able to change topics. In one example, he became angry with his prior counsel for not litigating the fact that his potato chips were stale.

His commitment to false memories that relate to his case also impaired his ability to work with counsel. He insisted that his lawyers research the jail logs to prove that his trial counsel did not prepare him to testify. When the jail logs suggested the opposite, Mr. Purkey insisted that the jail logs were false. Mr. Purkey has repeatedly stated that he believes his current counsel have lied to him and are working against him. Mr. Purkey makes requests of this legal team, and then becomes angry at them for not fulfilling the requests, not remembering that his counsel had already done so. Alternatively, he is angry and distrustful of his legal team because he believes they have made a promise they did not in fact make.

**Behavioral Observations and Mental Status:**

At the outset of my 2019 interview with Mr. Purkey, I observed a significant deterioration in his physical appearance and demeanor from my last visit with him in 2016. Mr. Purkey looked to have aged considerably. In addition, the right side of his face is no longer symmetrical with the left side, and only the left side of Mr. Purkey's face moves when he smiles, as if he had suffered a stroke at some point. He denied any feelings of weakness or pain. Mr. Purkey began stuttering immediately at the beginning of our visit and slurring his words. In addition, he had significant trouble pronouncing words, even easy words. He could not pronounce the word "Alzheimer's." I do not recall any of this happening when I last visited Mr. Purkey in 2016. Throughout my visit, Mr. Purkey repeated himself and reiterated the same things over and over. Mr. Purkey's affect was noticeably flatter compared to the 2016 evaluation.

10

Re:  Wesley Purkey
Competency to be Executed

Mr. Purkey perseverated, rambled and displayed tangential thoughts. Notably, I did not bring money with me to purchase food during the visit, a fact that Mr. Purkey became irrationally and unreasonably fixated on. He was not able to change the topic for several minutes, rambling about his attorneys and threatening to end the visit.

When I was finally able to shift the topic to Mr. Purkey's execution, Mr. Purkey first stated that he knew what an execution was and said that he accepted that he was going to be executed for the murder of Jennifer Long. Mr. Purkey told me that he did not need my help with his case and that he didn't have any mental health issue. I asked Mr. Purkey about his legal filings and grievances, and he attempted to minimize their significance, saying they were not a big deal. It became clear that Mr. Purkey was attempting to "fake good" at the outset of our interview.

As the visit continued, however, Mr. Purkey began to talk about the "real reason" he was going to be executed. He told me that he was actually being executed because he is filing lawsuits for other people's cases. "I've helped so many people here. The lawyers suck. No one advocates for the inmates, they need me." Mr. Purkey described how he is the reason other prisoners are getting things filed in their case. He reports that the guards have told him that they know his legal filings are the reason for his execution, something they tell him all the time. It was clear in our conversation that Mr. Purkey sincerely believes these conversations with the correctional officers have occurred.

When I inquired further, Mr. Purkey also told me that he was given a date for execution unfairly and for reverse discrimination. He told me that we didn't need to talk about this because I could just read his filings. He was fixated that the guards also believed that his selection was unfair. He had brought some papers with him and he wanted to show me the filing as proof of the guards' conversations and the truth of the reasons for his execution. When he tried to take out his papers he was disorganized and confused, and couldn't find the papers he wanted. He blamed his lawyers for this problem.

Mr. Purkey's comments were not self-serving and he was not able to see the big picture. He said he would be happy if his lawyers stopped his execution but he is not okay with his attorneys raising any mental health issues. He expressed distrust and dislike of his attorneys.

Throughout the evaluation, Mr. Purkey wanted to talk only about what he sees as the important issues:  the retaliation for his legal work, the government's eagerness to be rid of him and his successful litigation, the unfair selection of his case, and the fact that the guards can corroborate these wrongful bases for his execution.

**Opinions Regarding Competency to be Executed and Ability to Work with Counsel**

In my opinion, to a reasonable degree of medical certainty, at the time of the evaluation,

11

Ex_1-000011

Re:  Wesley Purkey
Competency to be Executed

Mr. Purkey lacked a rational understanding of the basis for his execution. While Mr. Purkey can recite the fact that his execution is for the murder of Jennifer Long, he lacks rational understanding of that fact. This is an example of parroting, rather than having a rational understanding. He lacks a true understanding or rationality that the murder is the basis for his execution. Instead, Mr. Purkey has a fixed belief that he is going to be executed in retaliation for his legal work, to prevent him from being a hassle for the government. This prevents him from having a rational understanding of the purpose of his execution. This belief is part of his long-standing delusions about the "conspiracy" of retaliation.

Mr. Purkey not only sees retaliation where it doesn't exist in his paranoia, but he also has a false understanding of the success of his legal work. Mr. Purkey cited, as an example of his legal skills, *Purkey v. Green*, a case that was dismissed. He has repeatedly filed pro se motions that worked to undermine, not advance, his legal case.

The lack of rationality from Mr. Purkey's delusional thoughts and paranoia are compounded by the deterioration of his brain from his dementia. As his brain deteriorates, the problems of paranoia worsen and become a self-reinforcing cycle. The paranoia makes it hard for him to deliberate and weigh new information. He does not trust anyone, and that distrust is heightened by his memory failings and complex PTSD. He lacks the ability to know who is trying to hurt and who is trying to help him.

Mr. Purkey's brain damage, dementia and delusions prevent him from working with counsel or working for his own interests. Mr. Purkey's irreversible brain damage, which affects his executive functioning and decision-making, causes him to perseverate on irrational thoughts and irrelevant issues and he becomes very agitated when others try to reason with him.

Mr. Purkey took pains to attempt to hide his symptoms and deny that his mental health is an issue. The fact that Mr. Purkey attempted to say that he understands the basis for his execution is consistent with his long history of attempting to "fake good" and minimize his psychiatric symptoms, including in evaluations in 1976, in 1981, and in 1998. Anosognosia, or lack of insight into the illness, is a key feature of schizophrenia, as are paranoid delusions. Both work together to prevent a Schizophrenic patient from revealing their illness. In short, Mr. Purkey denies that he is mentally ill because he truly believes that he is not based on the veracity of his delusions.

I considered the possibility that Mr. Purkey malingered his impairments but in my opinion, he did not. In my evaluations and in the records I reviewed, Mr. Purkey's presentation has remained consistent in all important respects for a number of years. He has a long and well documented history of psychotic behaviors, treatments, and diagnoses. He does not want to be found incompetent to proceed and minimized his psychiatric symptoms with me, something that he has consistently done throughout his

12

Ex_1-000012

Re:  Wesley Purkey
Competency to be Executed

psychiatric history. It is my opinion Mr. Purkey is not malingering.

The underlying brain damage and mental illness he has are long-standing, irreversible, and will continue to deteriorate as his dementia progresses.

If you have any questions about this report, I would be happy to answer them. Please feel free to telephone me at 404.939.6636.

Sincerely,

Bhushan S. Agharkar, M.D., D.F.A.P.A.
Distinguished Fellow, American Psychiatric Association
Diplomate, American Board of Psychiatry and Neurology, with Added Qualifications in Forensic Psychiatry

13

Ex_1-000013

# Exhibit 2

# Bhushan S. Agharkar, M.D.

**Mailing Address**
**4062 Peachtree Road NE, Suite A-203**
**Atlanta, Georgia 30319**
**404.939.6636**
**agharkarmd@gmail.com**

**Professional Experience:**

Comprehensive Psychiatric Services of Atlanta, July 2005-present
Atlanta, GA 30319
Private Practice

Emory University School of Medicine, July 2005-present
Atlanta, GA 30322
Adjunct Assistant Professor

Morehouse School of Medicine, August 2005-present
Atlanta, GA 30310
Assistant Professor
Associate Residency Training Director, 2005-2011
Course Director, *Patient Evaluation and Treatment I and II*, 2005-2013
Course Director, *Business of Medicine*, 2005-2013
Course Director, *Forensic Psychiatry*, 2005-present
Course Director, *Applied Clinical Psychopharmacology*, 2014-present
Faculty Advisor, *Resident Journal Club*, 2005-2011
Member, *Residency Training and Admissions Committee*, 2005-2011

University of Denver School of Law, Denver, CO
Guest Lecturer, 2019-present

University of Texas School of Law, Austin, TX
Guest Lecturer, 2016-present

Emory University School of Law, Atlanta, GA
Guest Lecturer, 2015-present

Forefront Behavioral Telecare, December 2009-present
Founder and Director of Physician Network Development

Georgia Tech Student Health Services, March-May 2007, September 2008-
Atlanta, GA 30313                                    February 2009
Staff Psychiatrist

Ex_2-000014

Georgia State University Student Health Services, August 2007-June 2008
Atlanta, GA 30303
Staff Psychiatrist

Skyland Trail, July 2006-January 2007
Atlanta, GA 30319
Interim Medical Director

DeKalb Community Service Board, July 2005-February 2007
Decatur, GA 30031
Staff Psychiatrist

**Education:**

Emory University School of Medicine, 2004-2005
Department of Psychiatry and Behavioral Sciences
Atlanta, GA 30322
Forensic Psychiatry Fellowship

Emory University School of Medicine, 2000-2004
Department of Psychiatry and Behavioral Sciences
Atlanta, GA 30322
Adult Psychiatry Residency
Chief Resident at Emory University Hospitals, 2003-2004

State University of New York Health Science Center at Syracuse, 1996-2000
Syracuse, NY 13210
Doctor of Medicine degree, May 2000

Case Western Reserve University (CWRU), 1993-1997
Cleveland, OH 44106
Grade Point Average 3.83 (A= 4.00)
BA in Psychology, senior *in absentia* privilege
Magna Cum Laude

**Certification and Licensure:**

Diplomate in Forensic Psychiatry, American Board of Psychiatry and Neurology, 2007, Re-certified 2017
Diplomate in Adult Psychiatry, American Board of Psychiatry and Neurology, 2005, Re-certified 2015
Georgia Medical License, 2002
United States Department of Defense TS/SCI Security Clearance, active
Certified Mediator, California State University, Sacramento, 2008

2

Ex_2-000015

**Research Experience and Publications**:

·   "Developmental Impairments in Moral Competence as Mitigation in Capital Cases" Walker, R., Clark, J., Monahan, E.C., Shechet, A., Agharkar, B., Kheibari, A., & Victor, G. [Journal of Behavioral Sciences and the Law 2018; 36:437–456]

·   "Traumatic Brain Injury in Criminal Litigation" Stacey Wood, JD, and Bhushan S. Agharkar, MD [84 UMKC L. Rev. 411, Winter 2015]

·   "Delusions and False Memories: Roadblocks to Competency to Stand Trial" Lloyd Warford, JD, and Bhushan S. Agharkar, MD [82 UMKC L. Rev. 389, Winter 2014]

·   "Advantages of DSM-5 in the Diagnosis of Intellectual Disability: Reduced Reliance in IQ Ceilings in *Atkins* (Death Penalty) Cases" Nancy Haydt, JD, Stephen Greenspan, PhD, and Bhushan S. Agharkar, MD [82 UMKC L. Rev. 359, Winter 2014]

·   "Ethnic and Cultural Factors in Identifying Fetal Alcohol Spectrum Disorders" George W. Woods, MD, Stephen Greenspan, PhD, and Bhushan S. Agharkar, MD, Journal of Psychiatry and Law, Spring 2011

·   "Improving Cognition and Treatment Outcomes in Schizophrenia" Bhushan S. Agharkar, MD [The Psychiatry Report 2004; 2(1): 24-34]

·   "Violence While on SSRIs – a Litigation Perspective" poster presentation at American Academy of Psychiatry and the Law conference, October 22, 2004

·   "Prescribing Conventional Antipsychotics at Two Veterans Administration Hospitals: Are There Geographical Differences?" Prakash S. Masand, MD, Monica Arora, MD, Thomas L. Schwartz, MD, Anil Sharma, MD, Xiaohong Wang, MD, Subhash Bhatia, MD, Jacob Manjooran, MD, William Hardoby, MD, Subhdeep Virk, MD, Daniel J. Kuhles, MPH, Bhushan Agharkar, BA, and Sanjay Gupta, MD [CNS Spectrums 2001; 6(11): 894-896]

·   "Prescribing Conventional Antipsychotics in the Era of Novel Antipsychotics: Informed Consent Issues" Prakash S. Masand, Thomas L. Schwartz, Xiaohong Wang, Daniel J. Kuhles, Sanjay Gupta, Bhushan Agharkar, Jacob Manjooran, M. Ahmad Hameed, William Hardoby, Subhdeep Virk, and Bradford Frank. [Am J Ther 2002 Nov-Dec; 9(6):484-7]

·   Research Assistant in Neuropsychiatry laboratory working on the solubilization of the 5-HT2A receptor under Brian Roth, M.D., Ph.D., at Case Western Reserve University (20 hrs/wk, fall 1995)

3

Ex_2-000016

· Summer Research Fellow in Retrovirology lab under Bernard Poiesz, M.D., at SUNY HSC at Syracuse (40 hrs/wk, 5/1995-8/1995)

· Research Assistant at CWRU, Department of Neurology, Division of Clinical Research (3-5 hrs/wk,1993-1994)

**Presentations:**
· *Telehealth Modalities to Facilitate Evaluations Globally as well as in Use by Legal Teams for Case Coordination*, International Academy of Mental Health and the Law, Vienna, Austria, July16, 2015
· *Update on Post-Traumatic Stress Disorder*, Continuing Medical Education lecture, Sixth Annual Mental and Behavioral Health Symposium, Baptist Health South Florida, Miami, FL, March 8, 2014
· *Dealing with the Difficult Patient*, Continuing Medical Education lecture, Primary Care Medicine and Neurology Update for the Primary Care Provider, Chattanooga, TN, June 26, 2010
· *Conflict Prevention and Dispute Avoidance through Teambuilding: Can it be transferred to legal/medical teams?*, International Academy of Mental Health and the Law, New York, NY, July 2, 2009
· *Understanding and Treating Bipolar Disorder*, Continuing Education lecture, Pine River Psychotherapy Associates, Atlanta, GA, October 27, 2008
· *Risk Management Issues in Psychiatry*, Grand Rounds, Morehouse School of Medicine, Department of Psychiatry and Behavioral Sciences, Atlanta, GA, February 27, 2008
· *Suicide and Violence Risk Assessment*, Grand Rounds, Morehouse School of Medicine, Department of Psychiatry and Behavioral Sciences, Atlanta, GA, January 23, 2008
· *Suicide Risk Assessment*, Nepalese Association in Southeast America Convention, Atlanta, GA, September 1, 2007
· *Schizophrenia*, Continuing Education lecture, United Behavioral Healthcare, Atlanta, GA, September 28, 2006

**Consultations:**
· United States Department of Defense
· United States Armed Forces
· National Law University, Delhi, India
· 392nd District Court of Henderson County, Texas
· The Clemency Project 2014
· City of Little Rock
· Atlanta Journal Constitution
· Georgia State University
· Federal Bureau of Investigation
· Fulton County Sheriff's Department

4

Ex_2-000017

· Cobb County School District
· Emory University Hospitals
· Georgia Composite State Board of Medical Examiners
· Georgia Tech Athletic Department
· Arizona Medical Board

**Professional Society Memberships:**
· American Neuropsychiatric Association
· American Association on Intellectual and Developmental Disabilities
· American Psychiatric Association
· American Academy of Psychiatry and the Law
· Georgia Psychiatric Physicians Association
· American Association of Directors of Psychiatric Residency Training, 2005-2011
· International Academy of Mental Health and the Law
· American Psychological Association, Division 33

**Awards and Honors**:
· Distinguished Fellow, American Psychiatric Association, 2015
· Fellow, American Psychiatric Association, 2011
· Phi Beta Kappa
· Honorable Mention, The Joe and Hope Skobba Memorial Award Resident Research Competition, 2005
· Emory University Department of Psychiatry Resident Teaching Award, 2004
· State Farm Foundation Scholarship Recipient (through National Merit Scholarship Corporation), 1993-1997
· Presidential Scholarship Recipient at Case Western Reserve University, 1993-1996
· Psi Chi, National Honor Society in Psychology
· Dean's High Honors List at CWRU, 1993-1996
· Who's Who in American Colleges and Universities, 1996
· USAA All-American Scholar-Athlete, 1995

**Leadership, Teaching, and Volunteer Activities**:
· Georgia Psychiatric Physicians Association (GPPA) Trustee 2006-2007, 2008-2011
· GPPA Ethics Committee, Member 2007-present
· GPPA Distinguished Fellow Nominating Committee, Member 2016-present
· Review Editor, *Frontiers in Forensic Psychiatry,* 2011-present
· Georgia Composite State Board of Medical Examiners, Peer Reviewer, November 2008-present
· Arizona Medical Board, Outside Medical Consultant, 2019-present
· National Institute of Trial Advocacy Training, Golden Gate University School of Law, San Francisco, California, 2008
· The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento, CA, Member 2008-present

Ex_2-000018

- National Institute of Trial Advocacy Training, Georgia State Law School, Atlanta, Georgia, 2007
- American Academy of Psychiatry and the Law *Private Practice* Committee, Member 2007-2010
- American Academy of Psychiatry and the Law *Forensic Training of Psychiatry Residents* Committee, Member 2007-2010
- American Academy of Psychiatry and the Law *Early Career Development* Committee, Member 2007-2010
- Skyland Trail, Professional Advisory Board, Member 2006-2009
- GPPA Board of Trustees Public Affairs Committee, Chair 2005-2011
- GPPA Board of Trustees Early Career Psychiatrists Committee, Chair 2004-2011
- GPPA co-representative to the Medicare Carrier Advisory Committee, 2003-2004
- Developed, organized and taught weekly seminar series in psychodynamic psychotherapy for medical students in Emory Psychiatry rotations, 2003-2004
- APA ECP Advocacy/Leadership Fellow, 2004
- Emory MIT Trustee to the GPPA Board of Trustees, 2003-2004
- Emory Psychiatry Residents Political Action Committee, Chair 2002-2003
- Blackwell Science Publications, Reviewer 2001-present
- Co-editor of BMM's *Vritta*, national Marathi youth newsletter, 1998
- Judo, Brown belt

6

Ex_2-000019

# Exhibit 3



# JONATHAN DERIGHT, PHD, ABPP
### BOARD CERTIFIED CLINICAL NEUROPSYCHOLOGIST

## FORENSIC NEUROPSYCHOLOGICAL EVALUATION

| | |
|---|---|
| **EXAMINEE:** | Wesley Purkey |
| **REFERRAL SOURCE:** | Michelle Law, Esq. |
| **DATE OF EXAMINATION:** | August 09, 2019 |
| **DATE OF REPORT:** | November 21, 2019 |
| **DATE OF BIRTH:** | January 06, 1952 |
| **EXAMINER:** | Jonathan DeRight, PhD, ABPP-CN |

## SUMMARY

Mr. Wesley Purkey is a 67-year-old man who is currently under sentence of death at the USP Terre Haute. He has an extensive history of psychological trauma, psychiatric diagnoses, and head injuries and was diagnosed with a progressive dementia in 2017. In 2003, a brain scan indicated abnormalities in the area of the brain involved in memory and typically implicated in Alzheimer's disease. His thinking abilities have been tested three times since then, and his test scores in areas of memory, language, and problem solving have considerably declined. For example, on two measures of memory, he was only able to recall half of the information that he was able to recall on the same tests three years ago, and his ability to recall facts from long-term memory also showed appreciable decline. Mr. Purkey's neuropsychological test results, combined with his clinical history and behavioral observations, are strongly indicative of probable Alzheimer's disease dementia with documented decline. Worsening physical symptoms, such as incontinence, indicate evidence of progression through the typical stages of the disease which, among others, can lead to more marked problems with confusion, delusions, paranoia, problems with communication, and recall for personal details.

## BASIS OF EVALUATION

- Records reviewed:
    - Death Certificate of Larry Gene Hamilton dated 12/07/1949
    - Death Certificate of Anna L. Haberthier dated 04/02/1952
    - Death Certificate of Nancy Ida Purkey dated 07/28/1960
    - Death Certificate of William Haberthier dated 11/21/1967
    - Death Certificate of Roy Allen Purkey dated 02/20/1968
    - Larned State Hospital, Release summary of Wesley Purkey dated 03/30/1973
    - Death Certificate of Carrie Anna Burke, dated 08/18/1980
    - Oregon State Hospital, Correctional treatment records of Wesley Purkey dated 11/27/1986 to 04/27/1989
    - Stephen Peterson, MD, Diagnostic Interview Report of Wesley Purkey dated 04/19/2000
    - Bruce A Leeson, PhD, Psychological Assessment of Wesley Purkey dated 01/05/2003
    - Stephen Peterson, MD, Diagnostic Interview Report of Wesley Purkey dated 08/13/2003
    - University of Kansas Medical Center, Radiology Report of Wesley Purkey dated 10/03/2003

1464 Ingleside Ave
MCLEAN
VA 22101

JDERIGHTPHD@GMAIL.COM
703-680-4200 X 112

4320 Prince William Pkwy # 109
WOODBRIDGE
VA 22192

Ex_3-000020

- o David F. Preston, MD, PET and MRI scan results of Wesley Purkey dated 10/17/2003
- o Declaration of Mark D. Cunningham, PhD, ABPP dated 10/14/2007
- o Declaration of Dr. Rex Newton dated 10/15/2007
- o Bhushan S. Agharkar, MD, psychiatric evaluation of Wesley Purkey dated 01/18/2007
- o Declaration of Marguerite Hotchkiss dated 01/25/2008
- o Robert Ouaou, PhD, Forensic Neuropsychological Evaluation of Wesley Purkey dated 04/24/2017
- o Frederic Sautter, PhD, Mental Health Evaluation of Wesley Purkey dated 04/26/2018
- o Robert Ouaou, PhD, Forensic Neuropsychological Evaluation Note dated 10/26/2018
- o Declaration of Debbie Prothero dated 08/12/2019
- o Declaration of Russ Prothero dated 08/12/2019
- o Declaration of John D. Fox dated 11/06/2019
- o Declaration of Elizabeth Vartkessian, PhD dated 11/15/2019
- o Bhushan S. Agharkar, MD, psychiatric evaluation of Wesley Purkey dated 11/19/2019
- Clinical Interview and Mental Status Exam of Wesley Purkey on August 09, 2019
- Administration of the following psychological and neuropsychological assessments: Dot Counting Test (DCT); Green's Word Memory Test (WMT);  Mini Mental State Exam (MMSE); Hopkins Adult Reading Test (HART); select subtests of the Wechsler Adult Intelligence Scale, 4th Edition (WAIS-IV); Wechsler Abbreviated Scale of Intelligence, 2nd Edition (WASI-II); select subtests of the Woodcock Johnson Tests of Achievement, 4th Edition (WJ-IV); Grooved Pegboard Test (GPT); Finger Tapping Test (FTT); Symbol Digit Modalities Test (SDMT); Salthouse Perceptual Comparison Test (PCT); D-KEFS Trail Making Test; D-KEFS Design Fluency Test; D-KEFS Color-Word Interference Test; Modified Wisconsin Card Sorting Test (M-WCST); Calibrated Ideational Fluency Assessment (CIFA); Boston Naming Test, 30-item (BNT-30); Auditory Naming Test (ANT); D-KEFS Verbal Fluency; Logical Memory subtest of the WMS-IV; Brief Visuospatial Memory Test, Revised (BVMT-R); California Verbal Learning Test - 2nd Edition; Advanced Clinical Solutions – Faces subtest; Clock Drawing Test; Rey Complex Figure Test (RCFT); & embedded measures of performance validity.

At the beginning of this evaluation, I reviewed with Mr. Purkey (a) the nature and purpose of the examination, (b) the limits of confidentiality, (c) the nature of only a limited doctor-patient relationship that does not include treatment, (d) that his participation in this evaluation was voluntary, and (e) that I would be administering one or more tests to help assess his truthfulness during the course of the examination.

## BACKGROUND[1]

### *Family and Social History*

Mr. Purkey's family medical history is notable for severe alcohol and substance abuse in several family members as well as several diagnoses of dementia (e.g., Alzheimer's disease, "organic brain syndrome," "senility") in his family members that are corroborated by death certificates. Records indicate that his mother had a history of multiple psychiatric admissions for alcoholism, depression, and personality disorder. His mother died of cancer at age 49 and his father committed suicide at age 59. Mr. Purkey is the only child of

---

[1] Due to voluminous records in this case that have been well-covered elsewhere, only a synopsis will be presented here. Exclusion of information in this section does not imply lack of importance. The following section includes information both from a clinical interview with Mr. Purkey and past records.

his biological parents; he has one half-brother who was born during a brief time when his parents were divorced before they later remarried.

Records indicate that Mr. Purkey's home life was "total anarchy" during his childhood. His aunt recalled that his family home often smelled of liquor and cigarettes and that his mother was only concerned with "drinking and men." Mr. Purkey's aunt indicated that his mother would often leave for almost a week at a time. As described below, Mr. Purkey was sexually and physically abused and was emotionally neglected during his childhood by several actors. Mr. Purkey's parents were often drinking heavily and provided him with alcohol at a very young age. Records describe an occasion in which Mr. Purkey's mother threw whiskey in his face and told him to "shut the fuck up" in response to his stuttering. It was recommended that Mr. Purkey receive psychiatric treatment (see below) but his mother did not wish for him to receive treatment. When his great aunt later gained custody of him, she advocated for treatment but other factors still impeded Mr. Purkey's ability to obtain the inpatient treatment that was suggested, and he remained under-treated. His maternal aunt raised him for the remainder of his childhood, but she died on the day of his parole in 1980.

### *Developmental, Educational, and Occupational History*

Records indicate that Mr. Purkey was likely exposed to alcohol in utero. He was noted to have delayed speech development and a stuttering disorder from a young age. In a declaration, his paternal aunt indicated that Mr. Purkey could not speak until he was 6 years old and communicated by pointing and grunting until then. He dropped out of school in the 9th grade but later earned his GED. He obtained an Associate degree in literature and certification as a master plumber while he was incarcerated. Mr. Purkey primarily worked in construction and as a plumber.

### *Medical History*

Records indicate that Mr. Purkey experienced a head injury that led to a headache and blurred vision in 1968. Medical records indicate a change in behavior, including more impulsive and immature behaviors, following this accident. An EEG was initially indicative of abnormal activity in the left frontal and temporal regions of his brain, though a repeat EEG a year later was read as normal. He was involved in another motor vehicle accident in which he was hit by an 18-wheeler on the highway later that year and was diagnosed with a concussion. Records indicate that he began to have academic and social problems in school following this incident as well. He was involved in another motor vehicle accident a month later, though no neurological workup was done following this accident. In 1972, he was working under the hood of a car when it was rear-ended, leading him to lose consciousness for several minutes and be diagnosed with a concussion. In 1974, he was noted to have been impulsive, dependent, disregard social rules, and showed "signs of organic deterioration" with little insight. His behavior change was still noted in 1976, and he also overdosed and experienced posttraumatic amnesia that same year. He has been in several fights throughout his life, many of which were reported to have led to head injuries.

In 2003, Mr. Purkey underwent an FDG PET scan and brain MRI. The PET scan was read as showing a marked reduction of activity in both temporal lobes, including the hippocampus and amygdala[2], and

---

[2] The temporal lobes, particularly parts of the limbic system such as the hippocampus and amygdala, are perhaps the most important regions of the brain for memory storage and retrieval.

Ex_3-000022

noticeable anatomical changes in the same on the MRI scan along with a mild decrease in activity in the cerebellar vermis[3].

### *Mental Health and Substance Abuse History*

As early as 1986, Mr. Purkey disclosed being sexually abused on a questionnaire. Mr. Purkey's trauma history is significant for sexual abuse by his mother, physical abuse from his father, and emotional neglect from both parents. He was also sexually assaulted by his half-brother's friend and a priest, and records indicate that he was "molest[ed] by prostitutes at his father's request." He experienced many boundary violations as a child by witnessing his mother have sexual activity with numerous individuals (some of whom introduced him to alcohol at a young age) and having limited parental oversight. Mr. Purkey's mother engaged him in sexual activity between the ages of 8 and 22 and that he was diagnosed with "severe psychosexual problems" at the age of 16. Records also indicate that his parents had sex with the door open and would walk around the house in various stages of undress after having sex. On at least one occasion, Mr. Purkey witnessed his father dragging his mother by her hair down the hallway while she was completely naked. Several records indicate the sexual abuse experienced by Mr. Purkey from his mother in great detail, including penetration of her vagina with his fingers and the handle of a hair brush, rubbing lotion on her breasts and genitalia, performing cunnilingus, and having sex. When Mr. Purkey was 11 years old, he was reportedly abused by an older friend of his brother who was living in his home. This reportedly occurred multiple times and he stated that he would wake up to this person performing fellatio on him.

Mr. Purkey exhibited several conflicting emotions and behaviors as a child, such as vacillating between preoccupation with rule adherence and complete disregard for rules, moral inflexibility followed by illegal activity, and identification with authority followed by rebellion. He was diagnosed with severe passive-aggressive personality disorder at the age of 14 and he did not receive treatment at that time, partially due to his mother's reticence to believe in psychiatric treatment. His great aunt eventually took guardianship of him and encouraged him to seek treatment. In 1972 (age 20), he was diagnosed with "schizoaffective psychosis superimposed on an antisocial personality," though he was given a fair prognosis for his ability to adjust to society and relate to others.

Mr. Purkey has been diagnosed with cocaine-induced psychotic disorder with delusions, dysthymic disorder, polysubstance dependence (psychostimulants, alcohol, and hallucinogens), and personality disorder with antisocial[4], obsessive-compulsive, dependent, and paranoid features. He was later diagnosed with ADHD and borderline personality disorder as well. Rex Newton, PhD—a mental health counselor who worked with Mr. Purkey—stated that he believed Mr. Purkey "received very little assistance to overcome the huge emotional barriers that were created for him in early childhood by his own family, and he fell through the proverbial cracks of all our social services."

Records indicate that Mr. Purkey's substance use history is extensive and began in adolescence. He first used intravenous drugs at a very young age and recalled his first time doing so as the first time that he was ever happy as a child. He continued to use these substances throughout his adolescence and began to experience

---

[3] The cerebellar vermis has also been implicated in the Alzheimer's disease process (e.g., Mavroudis, I.A. et al. (2013). Dendritic and spinal pathology of the Purkinje cells from the human cerebellar vermis in Alzheimer's disease. *Psychiatria Danubina, 25*(3), 221-226).

[4] Dr. Peterson, in his 2003 report, indicated that Mr. Purkey "demonstrated considerable victim empathy and openness to interpersonal change," contrary to the typical antisocial personality.

Ex_3-000023

paranoia and psychosis around the time as well. He used drugs heavily—including 32 years of intravenous drug use—and has experienced seizures, panic attacks, hallucinations, and delusions. Among other delusions, a frequent theme of being poisoned by others occurred as a side effect of his substance use. He used alcohol heavily beginning in his teens as well and underwent a detox program for alcohol when he was 14 years old. He reported that he "drank to block out things" that were going on during his childhood. Records indicate that he identified drug use as a source of "security" and that he did not have any other sources of security in his life.

Mr. Purkey often exhibited symptoms of depression while on or withdrawing from substances, though records indicated that he continued to experience depressive symptoms even when he did not have access to drugs. He has overdosed in the past and has made suicide attempts, one of which occurred following the last sexual encounter that he had with his mother in his early 20s. In 2008, Mr. Purkey underwent a comprehensive evaluation by Dr. Sautter that included the CAPS[5], and he was diagnosed with complex PTSD[6].

In addition to depressive symptoms, Mr. Purkey also developed psychotic symptoms. As early as 1988, he began to have hallucinations about delusions about being poisoned by a mist sprayed in the air, and this same delusion has been mentioned numerous times in his records decades apart. He has also frequently been paranoid about being poisoned as part of a conspiracy among several people in his life, including his ex-wife and friends. Due to this paranoia, he was so scared that he attempted to "camouflage" himself and hide. Records also indicate that Mr. Purkey believed that the FBI, DEA, and KBI were part of a conspiracy to kill him and that the BOP was undertaking drastic measures to keep him quiet in retaliation for pro se lawsuits that he filed. In 2002, it was noted that his "condition was continuing to deteriorate to the degree he could not assist counsel." According to Dr. Peterson's 2003 evaluation, Mr. Purkey frequently produced several pages of legal writing in which he claimed to know more than his attorney and became irate when his attorney did not follow through with his recommendations.

### History of the Present Condition

Mr. Purkey has undergone several evaluations that involved cognitive testing over his many years of institutionalization. He was found to have poor reading skills but an average IQ at the ages of 20 and 30. In 1999, his IQ was found to be in this same range and a screening for cognitive impairment "revealed no indication of gross dysfunction."

Records document Mr. Purkey mentioning concerns about memory loss beginning in 2003. Around that time, Dr. Bruce Leeson performed a psychological evaluation on Mr. Purkey. Mr. Purkey performed normally on measures of symptom and performance validity, indicating that the assessment produced interpretable results. He was noted to have performed relatively poorly on spatial tasks as compared with verbal tasks. Dr. Leeson also concluded that Mr. Purkey's test results indicated "a subtle but consistent pattern of deficits that are likely reflective of frontal lobe dysfunction." This was primarily based on problems comprehending task instructions and making impulsive errors. Mr. Purkey exhibited broadly normal memory scores but performed poorly on a test of olfaction (smell). Dr. Leeson concluded that Mr. Purkey's test results were indicative of frontal lobe impairment, though the cause of such impairment was not clear.

---

[5] The gold-standard assessment tool for comprehensive diagnosis of PTSD
[6] Complex PTSD typically involves individuals who have been exposed to repeated and/or multiple sources of trauma.

In 2017, Dr. Robert Ouaou conducted a forensic neuropsychological evaluation of Mr. Purkey. Dr. Ouaou administered several measures of performance validity, all of which were in the normal range and indicated valid and interpretable cognitive test scores. As in his previous evaluation, a significant difference was found between verbal and non-verbal IQ Indices. Dr. Ouaou stated that Mr. Purkey's test results indicated significant learning and memory deficits along with relative weakness on his non-dominant side and mild executive dysfunction. Mr. Purkey exhibited declines on measures of memory and executive functioning as compared with the 2003 evaluation. Dr. Ouaou concluded that Mr. Purkey's deficits were most likely related to a combination of PTSD, traumatic brain injury, fetal alcohol exposure, and early signs of dementia. A year later, Dr. Ouaou updated his report to document concerns from Mr. Purkey's defense team that his physical, cognitive, and psychiatric conditions seemed to have been drastically worsening. Dr. Ouaou opined that these changes were consistent with the progression of a cortical dementia, such as Alzheimer's disease, and that Mr. Purkey would continue to decline further without proper medical care.

Since Dr. Ouaou's 2017 evaluation, Mr. Purkey has been described as showing rapid and noticeable physical and cognitive decline by members of his legal team that meet with him regularly. Specifically, he was noted to have made progressively worsening paraphasic[7] errors. Declarations from two of his mitigation specialists have highlighted specific instances of this (e.g., "per batim" for "verbatim," "egrevious" for "egregious," and "abolish" instead of "admonish." At other times, he pronounced these words correctly, indicating that he knew the words. Mr. Purkey has also been noted to use canned phrases (e.g., "crazy as a fox") more often, even when they did not make sense in the context of his sentence. His speech has been noted to become more tangential in recent years and he was described as seemingly forgetting what he was talking about mid-sentence. His stuttered has been perceived to have worsened in recent years as well. Mr. Purkey has remained paranoid about others working against him, and this continues to extend to his defense team at times.

With regard to memory, Mr. Purkey's mitigation specialists described progressively worsening memory in Mr. Purkey. Specifically, Ms. Vartkessian stated that Mr. Purkey began to have difficulty recalling details from his history and recalling names and dates, including that of his current lawyer at times. His physical condition has been described to have worsened precipitously over the past year as well. He has begun to show signs of worsening balance and appears to be incontinent for urine, as evidenced by his need to "empty his pee bag" at a recent visit. Dr. Agharkar noted new-onset asymmetry in his face that may be indicative of past stroke or mini-stroke. Dr. Agharkar ordered follow-up neuroimaging, including MRI, PET scan, and DTI scans, on 09/29/2019, but this has not yet been completed.

## FINDINGS

### *Mental Status and Behavioral Observations:*

Mr. Purkey was evaluated in a contact visit room at the Terre Haute USP facility. He was unshackled for completion of cognitive tests. His gait appeared slightly unsteady, though this was difficult to evaluate in detail due to the short walk to the table after his leg shackles were removed. He was dressed in standard issued attire and appeared to be adequately groomed. His speech was notable for paraphasic errors at times (e.g., "preludes" for "Quaaludes" several times), and he tended to be tangential as he told stories that ended up having no clear connection to where he started. He was generally engaged in the evaluation and was cooperative, though there were times in which he exhibited drastic mood changes in response to certain

---

[7] Incorrect word selection or incorrect production of sounds within a word (e.g., "prencil" for "pencil" or "pen" for "pencil").

questions or statements. By the end of the evaluation, he appeared to be extremely fatigued and frustrated with his perceived performance. He reported his mood to be "alright" and his affect was generally congruent with his mood. He did not appear to be responding to internal stimuli[8] and he made vague references to conspiracies against him, though this was not the focus of the present assessment.

The MMSE is a cognitive screening measure for cognitive impairment and includes tasks such as knowing the date, performing simple math, remembering three words, and following instructions. Screening measures like the MMSE are akin to an airport metal detector; they are somewhat crude instruments that are able to be widely used to identify those in need of more comprehensive monitoring. Scores below 26 out of 30 are considered to be indicative of likely cognitive impairment, and Mr. Purkey scored a 24 out of 30 on this measure. He was two days off on the date, was unable to remember three words minutes after repeating them back to me minutes earlier, inaccurately repeated a short sentence, and incorrectly followed a command that had three steps.

Not only did Mr. Purkey not know the date on the day of the evaluation, he also did not know the exact date of his scheduled execution. He was impulsive (i.e. disinhibited) during certain tests, as he would attempt to begin before instructions were completed. His copy of a complex geometric figure was highly disorganized, while his delayed recall of this figure was more organized.  He made several rule violation errors (i.e. incorrectly following task instructions) across different tasks.

### *Test Validity[9]:*

Mr. Purkey was administered several stand-alone measures and embedded measures of performance validity throughout the assessment. He performed below the usual cutoffs on the WMT, but his profile was consistent with a genuine memory impairment profile (GMIP), which is typical in someone with a history of Alzheimer's disease. His performance on the DCT showed no indication of malingering or response bias, and he also passed several measures of performance validity that were embedded into other cognitive tests. Thus, the following results can be considered to be a valid reflection of Mr. Purkey's current abilities and do not show an indication that he was malingering or attempted to curate the results in any way.

### *Neuropsychological Testing[10]:*

Mr. Purkey's baseline (i.e. premorbid) IQ was found to be in the average range and consistent with past estimates and IQ scores. As in prior evaluations, his visual pattern recognition was weaker than his abilities tasks involving verbal information. Several measures were able to be administered to provide direct

---

[8] E.g., outwardly responding to voices or other hallucinations

[9] If results of questionnaires and cognitive tests are to be used to make important decisions and conclusions, it is important to ensure the accuracy of the test results, such that lack of engagement, symptom denial, or purposeful incorrect or symptomatic responses (i.e. malingering) can be ruled out. This is primarily performed by administering assessments designed to measure performance and symptom validity, examining score profiles within tests designed to measure other abilities, and monitoring unusual test behaviors or performances that are drastically inconsistent with known neurological conditions. To assess performance and symptom validity, I selected stand-alone measures, embedded measures, and cut off scores a priori.  I chose widely accepted measures with strong sensitivity (i.e. ability to "rule in" a condition with a positive score) and specificity (i.e. ability to "rule out" a condition with a negative score) rates and conducted a false positive rate analysis to rule out conditions that could create inaccurate validity testing results.

[10] Cognitive test results are summarized here. A complete table of the neuropsychological test results is provided in an appendix at the end of this report.

Ex_3-000026

comparisons to those used in previous evaluations. Notable changes from past assessments included significant worsening of his abilities to learn and recall details of a story and a design, recognize words from a list that was read to him several times, recall historical, scientific, and geographic facts that he knew previously, and right hand speed and dexterity. He also performed poorly on select measures of executive functioning[11], facial memory, processing speed, clock drawing, and confrontation naming[12]. He was previously administered the full version of the Wisconsin Card Sorting Test (WCST) and performed normally on it, whereas he performed in the impaired range on the modified, easier version that was administered in the present assessment. Mr. Purkey otherwise performed in the broadly normal or better range across measures of hand speed, attention, processing speed, executive functioning, verbal fluency, memory, and spatial abilities[13].

## FORMULATION AND OPINIONS

Mr. Wesley Purkey is a 67-year-old man who is currently under sentence of death at the USP Terre Haute. Mr. Purkey has an extensive history of psychological trauma, psychiatric diagnoses, and head injuries and was diagnosed with a progressive dementia in 2017. Although he was not diagnosed with dementia until 2017, he has exhibited gradual signs of cognitive, psychiatric, and physical decline since 2003. At that time, he underwent imaging of his brain that indicated dysfunction in the temporal lobes, especially the areas involved in memory. Cognitive testing was completed in 2003 and results were interpreted to indicate frontal lobe damage. It is also notable that Mr. Purkey performed poorly on a test of smell recognition at this time, as olfaction has been shown in research to be a robust indicator of early cognitive decline[14].

Results from the present evaluation document objective decline and impairment in areas typically affected by Alzheimer's disease, including memory, naming, and executive functioning. Mr. Purkey knew significantly fewer facts about history, science, and geography than he did three years ago; while in 2016 he performed worse than 63% of others his age, he performed worse than 91% on the present assessment, which is a drastic change on this test. He was only able to correctly name 22 out of 30 objects, which is worse than 98% of his peers; 95% of his peers are able to name 25 or more words on this test. He recalled half as many details from a short story than he did in 2016, which is worse than 98% of his peers, and half as many details from a complex figure than he did in 2016, which is worse than over 99% of his peers. He performed exceptionally poorly on a task of problem solving that required him to learn unstated rules, whereas he previously performed normally on a more difficult version of the task, and he recalled less information on a task of facial memory than 99.9% of his peers, while an average person his age recalls twice as much information on this task.

---

[11] Executive functions are cognitive abilities necessary for complex goal-directed behavior and adaptation to a range of environmental challenges and demands, including the ability to plan and anticipate outcomes and to direct attention resources to meet the demands of non-routine events.

[12] Naming task in which pictures are presented visually

[13] It would be unusual, even for someone who is extremely impaired, to perform poorly on all measures administered; that is, it is expected that many test scores will be in the normal range. Similarly, not all areas would be expected to decline over time in a progressive dementia such as Alzheimer's disease.

[14] E.g., Kamath, V., Chaney, G-A., DeRight, J., & Onyike, C.U. (2018). A meta-analysis of neuropsychological, social cognitive, and olfactory functioning in the behavioral and language variants of frontotemporal dementia. *Psychological Medicine, Dec 6, 1-12.*

Mesholam, R.I., Moberg, P.J., & Mahr, R.N. et al. (1998). Olfaction in neurodegenerative disease: A meta-analysis of olfactory functioning in Alzheimer's and Parkinson's diseases. *Archives of Neurology, 55*(1), 84-90.

These findings are bolstered by observations made during this evaluation and progressively worsening cognitive symptoms—such as paraphasic word errors, effortful or impaired recall of previously well-known information, incontinence, and delusions—noted by others. These are very common symptoms of progressing Alzheimer's disease and have been described consistently by multiple individuals across time. Mr. Purkey's evolution of symptoms map onto the typical progression seen in Alzheimer's disease[15]. For example, early stages of the disease are marked by relatively normal functioning other than problems finding words, remembering recent information, or organizing oneself, which began in Mr. Purkey over a decade ago. As Alzheimer's disease progresses, individuals with the condition often begin to forget details of their own personal history, feel unusually moody or withdrawn, are confused about what day it is, become suspicious and paranoid, and begin to have problems controlling bladder and bowels.

As his disease continues to progress, Mr. Purkey is expected to need extensive medical care, be vulnerable to infections, have increasing confusion, and lose awareness of his surroundings. It is likely that other aspects of his past, including severe trauma, extensive drug use, and several head injuries, also contribute to cognitive difficulties, but these conditions would not be expected to fully account for the cognitive profile and course of symptoms exhibited by Mr. Purkey.

## CONCLUSIONS

In conclusion, it is my professional opinion, based upon multiple sources of information including neuropsychological testing, clinical interview, and record review, to a reasonable degree of neuropsychological certainty, that Mr. Purkey is appropriately diagnosed with Alzheimer's disease. He meets widely used research-based criteria[16] for dementia  due to symptoms that: 1) interfere with his usual activities, 2) represent a decline from previous levels of functioning, 3) are not explained by delirium or major psychiatric disorder, 4) comprise cognitive impairment based on interview and testing, and 5) involve deficits in learning, language, and behavior. Based on his gradual onset of symptoms, evidence of progressively worsening of cognition from his baseline, amnestic presentation in testing, lack of obvious competing conditions—such as stroke or dementia with Lewy bodies—qualify him for probable Alzheimer's disease dementia with documented decline.

The conclusions, opinions, and recommendations contained in this report are based on information that was available at the time of this report's preparation.  Should additional information be forthcoming from any source, these conclusions, opinions, and recommendations are subject to review and revision.

Respectfully,

_____
Jonathan DeRight, PhD, ABPP
Board Certified Clinical Neuropsychologist

Attachment: Appendices

---

[15] E.g., Smith, G.E., & Bondi, M.W. (2008). Normal aging, mild cognitive impairment, and Alzheimer's disease. In J.E. Morgan & J.H. Ricker (Eds.), *Textbook of Clinical Neuropsychology*. New York:Taylor and Francis Group.

[16] McKhann et al., 2011. The diagnosis of dementia due to Alzheimer's disease: Recommendations from the National Institute of Aging-Alzheimer's Association workgroups on diagnostic guidelines for Alzheimer's disease. *Alzheimer's and Dementia, 7,* 263-269.

## APPENDICES

TABLE OF TEST RESULTS[17]:

*** The numeric data presented below is intended only for use by qualified professionals and should not be interpreted without consideration of all the information that is contained in the rest of the neuropsychological report. ***

| Adj | Domain | Test Name | Raw | Standard Score | Percentile | Range | Val |
|---|---|---|---|---|---|---|---|
| | **Performance/Symptom Validity** | ----- | | | | | |
| -- | | Dot Counting Test | | | | | |
| | | E-Score | 11 | -- | -- | See Text | |
| -- | | WMT | | | | | |
| | | IR | 87.5 | -- | -- | See Text | |
| | | DR | 70 | -- | -- | See Text | |
| | | CNS | 72.5 | -- | -- | See Text | |
| | | MC | 30 | -- | -- | See Text | |
| | | PA | 30 | -- | -- | See Text | |
| | | FR | 20 | -- | -- | See Text | |
| | **Cognitive Screening** | ----- | | | | | |
| -- | | Mini Mental State Exam (MMSE) | | | | | |
| | | Total Score | 24 | -- | -- | See Text | |
| | **Premorbid Estimate** | ----- | | | | | |
| ASRE | | HART | | | | | |
| | | Total Correct | 13 | 95 | 37 | Average | |
| | **Psychometric Intelligence** | ----- | | | | | |
| A | | WAIS-IV | | | | | |
| | | Perceptual Reasoning | 26 | 92 | 30 | Average | |
| A | | WASI-II | | | | | |
| | | Vocabulary | 39 | 102 | 54 | Average | |
| | | Matrix Reasoning | 13 | 90 | 24 | Low Average | |

[17] "Val" refers to measures of performance validity, with P signifying a "pass" and F signifying a "fail." A single pass or fail does not constitute a decision on the validity of the overall assessment; please refer to the test validity section for more details. For adjusted scores, A = age, S = sex, R = race, E = education, and P = estimated premorbid IQ. Validity measures and score adjustments were selected a priori.

Ex_3-000029

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Full Scale-2 | 94 | 94 | 34 | Average | |
| | **Achievement** | ----- | | | | | |
| A | | WJ-IV | | | | | |
| | | Sentence Reading Fluency | 59 | 95 | 37 | Average | |
| | | Math Facts Fluency | 110 | 103 | 58 | Average | |
| | **Motor** | ----- | | | | | |
| ASREP | | Grooved Pegboard | | | | | |
| | | Dominant Hand | 109 | 85 | 16 | Low Average | |
| | | Nondominant Hand | 102 | 91 | 27 | Average | |
| ASRE | | Finger Tapping Test | | | | | |
| | | Dominant Hand | 51.8 | 126 | 96 | High | P |
| | | Nondominant Hand | 41.4 | 100 | 50 | Average | |
| | **Attention/Working Memory** | ----- | | | | | |
| A | | Digit Span (WAIS-IV) | | | | | |
| | | Total Score | 22 | 90 | 25 | Average | |
| ASREP | | Digit Span | | | | | |
| | | Longest span forward | 5 | 88 | 21 | Low Average | |
| | | Longest span backward | 4 | 94 | 34 | Average | |
| | | RDS | 8 | -- | -- | See Text | P |
| | **Processing Speed** | ----- | | | | | |
| AE | | SDMT | | | | | |
| | | Written | 28 | 91 | 28 | Average | |
| | | Oral | 33 | 88 | 21 | Low Average | |
| ASREP | | Salthouse PCT | | | | | |
| | | Letters | 15 | 79 | 8 | Borderline Low | |
| | | Patterns | 30 | 96 | 38 | Average | |
| A | | D-KEFS Trail Making Test | | | | | |
| | | Visual Scanning | 22 | 110 | 75 | High Average | |
| | | Number Sequencing | 89 | 60 | <1 | Extremely Low | |
| | | Letter Sequencing | 56 | 95 | 37 | Average | |
| | | Number-Letter Switching | 74 | 115 | 84 | High Average | |
| | | Motor Speed | 28 | 110 | 75 | High Average | |
| | **Executive Functioning** | ----- | | | | | |
| A | | D-KEFS Design Fluency | | | | | |

Ex_3-000030

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Filled Dots | 12 | 120 | 91 | High | |
| | | Empty Dots | 13 | 115 | 84 | High Average | |
| | | Switching | 9 | 115 | 84 | High Average | |
| A | | D-KEFS Color-Word Interference | | | | | |
| | | Color Naming | 33 | 100 | 50 | Average | |
| | | Word Reading | 27 | 95 | 37 | Average | |
| | | Inhibition | 73 | 95 | 37 | Average | |
| | | Inhibition Switching | 57 | 115 | 84 | High Average | |
| ASREP | | M-WCST | | | | | |
| | | Categories Completed | 2 | 66 | 1 | Extremely Low | |
| | | Perseverative Errors | 7 | 81 | 10 | Low Average | |
| | | Total Errors | 20 | 84 | 14 | Low Average | |
| | **Language/Verbal Abilities** | ----- | | | | | |
| ASREP | | CIFA | | | | | |
| | | S/P | 11, 12 | 99 | 46 | Average | |
| | | Animals/Supermarket | 23, 19 | 108 | 69 | Average | |
| ASREP | | BNT-30 | | | | | |
| | | Total Correct | 22 | 69 | 2 | Extremely Low | |
| AE | | Auditory Naming Test | | | | | |
| | | Total Correct | 47 | 88 | 21 | Low Average | |
| A | | Information (WAIS-IV) | | | | | |
| | | Total Score | 8 | 80 | 9 | Low Average | |
| A | | D-KEFS Verbal Fluency | | | | | |
| | | FAS | 33 | 95 | 37 | Average | |
| | | Category | 38 | 105 | 63 | Average | |
| | | Category Switching | 11 | 100 | 50 | Average | |
| | **Learning/Memory** | ----- | | | | | |
| A | | Logical Memory (WMS-IV) | | | | | |
| | | Immediate Recall | 21 | 90 | 25 | Average | |
| | | Delayed Recall | 7 | 70 | 2 | Borderline Low | |
| | | Delayed Recognition | 20 | -- | 10-16 | Low Average | P |
| ASREP | | BVMT-R | | | | | |
| | | Total Recall | 11 | 85 | 16 | Low Average | |
| | | Learning | 3 | 94 | 34 | Average | |

Ex_3-000031

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Delayed Recall | 5 | 84 | 14 | Low Average | |
| | | Retention % | 100 | 105 | 62 | Average | |
| | | Recognition | 6 | 114 | 82 | High Average | P |
| ASRE | | CVLT-II | | | | | |
| | | Trial 1 | 5 | 96 | 38 | Average | |
| | | Trial 5 | 8 | 91 | 27 | Average | |
| | | Trials 1-5 Total | 33 | 90 | 24 | Low Average | |
| | | Short Delay Free Recall | 5 | 90 | 24 | Low Average | |
| | | Long Delay Free Recall | 6 | 94 | 34 | Average | |
| | | Recognition Discriminability | 1 | 25 | <1 | Extremely Low | |
| | | Forced Choice | 16 | -- | -- | -- | P |
| A | | ACS Faces | | | | | |
| | | Faces I | 63 | 80 | 9 | Low Average | |
| | | Faces II | 10 | 55 | <1 | Extremely Low | |
| | | Content | 30 | 80 | 9 | Low Average | |
| | | Spatial | 33 | 80 | 9 | Low Average | |
| | **Visuospatial** | ----- | | | | | |
| A | | Block Design (WAIS-IV) | | | | | |
| | | Total Score | 20 | 80 | 9 | Low Average | |
| A | | Matrix Reasoning (WAIS-IV) | | | | | |
| | | Total Score | 12 | 95 | 37 | Average | |
| A | | Visual Puzzles (WAIS-IV) | | | | | |
| | | Total Score | 13 | 105 | 63 | Average | |
| ASREP | | Clock Drawing | | | | | |
| | | Request | 4 | 88 | 21 | Low Average | |
| | | Copy | 4 | 57 | <1 | Extremely Low | |
| | | Rey Complex Figure | | | | | |
| ASREP | | Copy | 19.5 | 66 | 1 | Extremely Low | |
| ASREP | | Time | 94 | 129 | 97 | Extremely High | |
| A | | Immediate Recall | 10 | 40 | 16 | Low Average | |
| A | | Delayed Recall | 4 | 23 | <1 | Extremely Low | |
| A | | Delayed Recognition | 21 | 54 | 66 | Average | |
| -- | | Effort Equation | 82.5 | -- | -- | See Text | P |

Ex_3-000032



*Note*. Standard scores have a mean of 100 and a standard deviation of 15. Only standardized scores are represented in this graph. Light grey shading includes scores in the borderline range (lower than 92 to 98% of others) and dark grey shading includes scores in the extremely low range (lower than 98 to >99% of others). ACH = Achievement, ATT = Attention, PS = Processing Speed, EXEC FX = Executive Functioning, LAN = Language, MEM = Memory, VS = Visuospatial.

A visual depiction of the percentile system is shown below. The bottom left represents the 1st percentile, such that this score would be lower than all other people shown on the graph. The opposite is true for the top right corner, in which an individual scoring greater than the 99th percentile scores higher than all others shown in the chart. Similar logic can be used for the 8th and 91st percentiles as shown in the chart, as well as any other in between.



# Exhibit 4

# JONATHAN DERIGHT, PHD, ABPP-CN

## CONTACT

| | |
|---|---|
| **Offices** | McLean, VA<br>1464 Ingleside Ave / McLean, VA 22101 |
| | Woodbridge, VA<br>4320 Prince William Pkwy #109 / Woodbridge, Virginia 22192 |
| **Mailing** | 1390 Chain Bridge Rd # 85 / McLean, VA / 22101 |
| **Phone** | 703-680-4200 x 112 (office)<br>703-957-7300 (direct)<br>844-238-6630 (fax) |
| **Email** | jderightphd@gmail.com |

## EDUCATION

**2014 – 2016**   **Postdoctoral Fellowship in Clinical Neuropsychology**
The Johns Hopkins University School of Medicine
Baltimore, Maryland

**2008 – 2014**   **Doctor of Philosophy in Clinical Psychology**
Syracuse University (APA Accredited)
Syracuse, New York

**2008 – 2011**   **Master of Science in Clinical Psychology**
Syracuse University (APA Accredited)
Syracuse, New York

**2004 – 2008**   **Bachelor of Science in Neuroscience**
University of Rochester
Rochester, New York

## LICENSURE & CREDENTIALING

**2019 – Present**   **Diplomate, American Board of Professional Psychology - Clinical Neuropsychology**
Certification Number: 8900

**2016 – Present**   **Commonwealth of Virginia**
License Number: 0810005431

**2016 – Present**   **District of Columbia**
License Number: PSY1001167

**2016 – Present**   **State of Maryland**
License Number: 05722

**2016 – Present**   **National Register Health Service Psychologist**
Registrant Number: 55393

Ex_4-000034

*Jonathan DeRight, PhD, ABPP-CN*

## CLINICAL EXPERIENCE

**2016 – Present**   **Clinical and Forensic Neuropsychologist,**
Woodbridge Psychological Associates, PC
McLean, Virginia / Woodbridge, Virginia

**2014 – 2016**   **Postdoctoral Fellow,** Division of Medical Psychology
Department of Psychiatry, Division of Medical Psychology
The Johns Hopkins University School of Medicine, Baltimore, Maryland
Director: Jason Brandt, Ph.D., ABPP-CN

**2013 – 2014**   **Predoctoral Intern**, Psychology Internship Program – Adult Track
Department of Psychiatry and Behavioral Sciences
SUNY Upstate Medical University, Syracuse, New York
Director: Roger Greenberg, Ph.D.

**2012 – 2013**   **Forensic Psychology Extern**, Central New York Psychiatric Center
New York State Office of Mental Health, Marcy, New York
Director: Nichole Marioni, Ph.D., ABPP-FP

**2010 – 2013**   **Psychology Extern**, Psychological Services Center
Syracuse University Department of Psychology, Syracuse, New York
Director: Kevin Antshel, Ph.D.

**2011 – 2012;**   **Neuropsychology Extern**, Neuropsychology Assessment Program
**2009 – 2010**   Department of Physical Medicine & Rehabilitation
SUNY Upstate Medical University, Syracuse, New York
Director: Dominic Carone, Ph.D., ABPP-CN

**2004 – 2007**   **Medical Assistant**, Emergency Department
Newark-Wayne Memorial Hospital, Newark, NY

## ADDITIONAL TRAINING EXPERIENCES

**2017**   **Mental Competency in Immigration Review**
**Sterling Medical/U.S. Department of Justice Initiative, Baltimore, Maryland**
1-day training: Preparation for mental competency assessments to assist the DOJ
Executive Office of Immigration Review (EOIR)

**2016**   **Institute of Law, Psychiatry and Public Policy, University of Virginia**
5-day training: Adult Basic Forensic Evaluation required according to Code of
Virginia §19.2-169.1 regarding evaluation of trial competence and § 19.2-169.5
regarding evaluation of sanity at the time of the offense

**2016**   **Institute of Law, Psychiatry and Public Policy, University of Virginia**
2-day training: Conducting Mental Health Evaluations for Capital Sentencing
Proceedings

## RESEARCH EXPERIENCE

**2014 - 2016**   **Research Fellow,** Division of Medical Psychology
Department of Psychiatry

*Page 2 of 5*

Ex_4-000035

*Jonathan DeRight, PhD, ABPP-CN*

The Johns Hopkins University School of Medicine, Baltimore, Maryland
Principal Investigators: Jason Brandt, PhD, David Schretlen, PhD & Vidya Kamath, PhD

**2008 – 2013**     **Research Associate,** Psychophysiology Lab
Department of Psychology
Syracuse University, Syracuse, New York
Principal Investigator: Randall Jorgensen, Ph.D.

**2010 – 2012**     **Research Associate,** Translational Neuroscience Lab
Department of Psychology
Syracuse University, Syracuse, New York
Principal Investigator: Stephanie Cacioppo, Ph.D.

**2006 – 2008**     **Research Assistant,** Alzheimer's Disease Lab
Department of Brain and Cognitive Sciences
University of Rochester, Rochester, New York
Principal Investigator: Robert Chapman, Ph.D.

**2007**     **Research Assistant,** Molecular Biology Lab
Burnett School of Biomedical Sciences
University of Central Florida, Orlando, FL
Principal Investigator: Ella Bossy-Wetzel, Ph.D.

**2004 – 2006**     **Patient Enroller**, Emergency Department
Strong Memorial Hospital, Rochester, NY

## PEER-REVIEWED PUBLICATIONS

Kamath, V., Chaney, G-A., **DeRight, J.**, & Onyike, C.U. (in press). A meta-analysis of neuropsychological, social cognitive, and olfactory functioning in the behavioral and language variants of frontotemporal dementia. Accepted by *Psychological Medicine.*

**DeRight, J.,** Jorgensen, R.S., & Cabral, M. (2015). Composite cardiovascular risk scores and neuropsychological test performance: A meta-analytic review. *Annals of Behavioral Medicine, 9*(3), 344-357. doi:10.1007/s12160-014-9681-0

**DeRight, J**. & Jorgensen, R.S. (2015). "I just want my research credit": Frequency of suboptimal effort in a non-clinical healthy undergraduate sample. *The Clinical Neuropsychologist, 29*(1), 101-117. doi:10.1080/13854046.2014.989267

**DeRight, J.** & Carone, D.A. (2015). Assessment of effort in children: A systematic review. *Child Neuropsychology, 21*(1), 1-24. doi:10.1080/09297049.2013.864383

## BOOK CHAPTERS

**DeRight, J.** (2019). History of "frontal" syndromes and executive dysfunction. In *Frontiers in Neurology and Neuroscience, Volume 44.* doi:10.1159/000494957

## MANUSCRIPTS IN PREPARATION

**DeRight, J.** & Schretlen, D.J. (in prep). Dimensional measurement of "effort" on neuropsychological testing.

*Page 3 of 5*

Ex_4-000036

*Jonathan DeRight, PhD, ABPP-CN*

## POSTER PRESENTATIONS

Chaney, G.A., **DeRight, J**., Aita, S., Onyike, C., & Kamath, V. (2017, February). *A meta-analysis of neuropsychological functioning, social cognition, and olfaction in the frontotemporal dementias*. Poster presented at the 45th International Neuropsychological Society Conference, New Orleans, Louisiana.

Bagger, J., **DeRight, J.,** & Brandt, J. (2017, February). *The Effect of Generation Gap on Informant Ratings using the IQCODE in a General Population Sample*. Poster presented at the 45th International Neuropsychological Society Conference, New Orleans, Louisiana.

**DeRight, J**. & Jorgensen, R.S. (2012, November). *Composite cardiovascular risk scores and neuropsychological test performance: A meta-analytic review*. Poster presented at the 32nd National Academy of Neuropsychology Conference, Nashville, TN.

**DeRight, J.,** Jorgensen, R.S., Lewandowski, L., & Ortigue, S. (2011, November). *The effects of feedback, state anxiety, and gender on neuropsychological test performance.* Poster presented at the 31st National Academy of Neuropsychology Conference, Marco Island, Florida.

## INVITED TALKS

**DeRight, J.** (2018, April). *A primer on neuropsychological evaluations following stroke.* Sentara Northern Virginia Medical Center.

**DeRight, J.** (2017, February). *Beyond classification: Dimensional measurement of effort in neuropsychology.* James Madison University, graduate course in neuropsychological assessment.

Schretlen, D.J. & **DeRight, J**. (2016, June). *Reconsidering the clinical implications and assessment of cognitive effort in neuropsychology.* CE Workshop at the 2016 American Academy of Clinical Neuropsychology Annual Meeting, Chicago, Illinois.

**DeRight, J.** & Puente, A.N. (2016, February) *Differential diagnosis of dementia*. Kennedy Krieger Institute Neuropsychology Continuing Education Lecture Series, Baltimore, MD.

## TEACHING EXPERIENCE

| | |
|---|---|
| **2017 – 2018** | **Neuropsychology Extern Supervisor** *Woodbridge Psychological Associates, PC* |
| **2015 - 2016** | **Neuropsychology Extern Supervisor** *Johns Hopkins University School of Medicine* |
| **2015** | **MCAT Instructor** *Odyssey Program; MCAT Preparatory Course* Krieger School of Arts and Sciences, The Johns Hopkins University |
| **2014;** **2013** | **Adjunct Professor** *COU 646: Assessment in Counseling* (graduate course) Department of Counseling and Human Services, Syracuse University |
| **2008 – 2014** | **Kaplan "Elite" Teacher** *GRE and GMAT Course Instructor* Kaplan Inc. |
| **2008 – 2010** | **Teaching Assistant** *Foundations of Human Behavior* (undergraduate course) Department of Psychology, Syracuse University |

*Page 4 of 5*

Ex_4-000037

*Jonathan DeRight, PhD, ABPP-CN*

## SERVICE

| | |
|---|---|
| **2016 – Present** | **Executive Board Member,** Sharon McGowan Breast Health Fund |
| **2009 - 2013** | **Student Volunteer**, National Academy of Neuropsychology Conference |
| **2013** | **Admissions Recruitment Coordinator**, Department of Psychology, Syracuse University |
| **2012 – 2013** | **Clinical Student Representative**, Psychology Action Committee, Department of Psychology, Syracuse University |

## AD-HOC REVIEWER

| | |
|---|---|
| **2018** | Archives of Clinical Neuropsychology, The Clinical Neuropsychologist |
| **2017** | Applied Neuropsychology, European Journal of Neurology |
| **2016** | The Clinical Neuropsychologist, Archives of Clinical Neuropsychology, BMJ Open, European Journal of Neurology, Applied Neuropsychology |
| **2015** | Journal of Experimental Social Psychology |
| **2014** | Journal of Clinical and Experimental Neuropsychology (student-reviewer) |

## PROFESSIONAL AFFILIATIONS

| | |
|---|---|
| **2009 – Present** | National Academy of Neuropsychology (NAN) |
| **2011 – Present** | International Neuropsychological Society (INS) |
| **2013 – Present** | American Academy of Clinical Neuropsychology (AACN) |
| **2018 – Present** | American Psychological Association (APA) |
| **2018 – Present** | American Psychology-Law Society (Division 41) |

## HONORS AND RECOGNITION

| | |
|---|---|
| **2016** | Early Career Psychologist Credentialing Scholarship |
| **2012** | National Academy of Neuropsychology Student Poster Award |
| **2008** | Shari & Joel Beckman Scholarship |
| **2004** | New York Lottery "Leaders of Tomorrow" Award |
| **2004** | Bausch & Lomb Honorary Science Award |

Ex_4-000038

# Exhibit 5

## DECLARATION OF ELIZABETH VARTKESSIAN, PH.D.

I, Elizabeth Vartkessian, declare and state the following:

### QUALIFICATIONS

1. I have worked as a mitigation specialist for capital defense teams since 2004 in both trial and post-conviction cases. In the last 15 years, I have conducted mitigation investigations in nearly 40 death penalty cases. I have worked on federal capital cases originating in the 2nd, 3rd, 4th, 5th, 6th, 8th, and 9th circuits and state capital cases originating in Alabama, Arkansas, Georgia, Florida, Texas, Louisiana, Oklahoma, Pennsylvania, and South Dakota. I have provided a copy of my *curriculum vitae*, which outlines the trainings I have attended or taught, publications authored, and other relevant work as it relates to conducting mitigation investigation in capital cases.

2. I am the founding Executive Director of Advancing Real Change, Inc. (hereinafter, ARC) a national not-for-profit organization conducting mitigation investigation in criminal cases across the country. In addition to direct casework, we provide training and consultation to defense teams regarding best practices in mitigation investigation, development and courtroom presentation and litigation.

3. Throughout my career, by virtue of my training and experience, I have developed a knowledge and understanding of mental illnesses and impairments, cognitive disorders, PTSD, and related symptomology. As detailed in my CV, since 2005 I have attended over 50 training seminars related to identifying signs and symptoms of mental illness and trauma, working with clients with mental illness specifically, understanding and working with clients with delusions, paranoia, intellectual disability, and other impairments.

### BACKGROUND OF INVOLVEMENT

4. My office was retained by the Federal Defender in the Western District of Missouri to conduct the mitigation investigation for Mr. Purkey's post-federal habeas proceedings in October 2014. I was the lead mitigation specialist from that time until December 2015, when I took a medical leave due to an automobile accident. In order to ensure that work on Wes's case

1

*EV* (Initial)

continued, John Fox, another ARC mitigation specialist, assumed the lead mitigation role. I returned to full-time employment, John remained in that position with me in a supporting role. I resumed the lead mitigation specialist role in May of 2018 after John left the firm.

5. I met Wes for the first time on February 3, 2015. Since then, I have visited in person with Wes 24 times, with my longest visit lasting up to six hours. Wes corresponded with me in writing during this time as well. I have been asked by Wes's current counsel Rebecca Woodman and Michelle Law to provide details of my observations of his mental and physical health from the start of my involvement in his case to the present day, a period of approximately five years.

6. Wes has resisted discussions about his mental health with his defense team. When talking about the need to provide the court with full information about his functioning, Wes responds that he takes responsibility for his actions – not recognizing that those two things are not mutually exclusive. This resistance towards even discussing his functioning has only increased in the last two years, since receiving a diagnosis of dementia. Wes has flatly stated that he does not want to be found incompetent, though my observations lead me to believe that he is.

## MENTAL HEALTH OBSERVATIONS

### Delusions and Paranoia

7. Early in my involvement, Wes began exhibiting delusional thinking. The first delusions he shared with me were about his belief that he was being poisoned. Wes believed that, between January and October 1998, drugs were being sprayed into his room from the ceiling and that someone was poisoning his food and cigarettes. Like many delusions, there was a kernel of truth. Wes's ex-wife Jeannette had in fact added rat poison to his intravenous drugs. However, Wes was certain that it was a broader conspiracy, and that his other ex-wife (Claire) and several friends were involved in poisoning him over a long period of time as well. For example, on March 9, 2015 he told me that the people who poisoned him were camouflaged and trying to hide, and that he was living out in the country so that there was no one to observe what was happening to him. He believed that the FBI, DEA, and Kansas Bureau of Investigation (KBI) were a part of the conspiracy to kill him. At various points he also mentioned that

2

*EV* (Initial)

Ex_5-000040

Jeannette's three sons, who were all children at the time, were also involved in poisoning him. Wes mentioned that he couldn't remember how or why he decided to call the KBI, but he called several times.

8. Likewise, Wes has expressed throughout the last five years a consistent belief that there exists a grand conspiracy against him. The main components of this conspiracy are that he is being singled out by the Bureau of Prisons (BOP) in retaliation for filing lawsuits and grievances on behalf of himself and other prisoners addressing the conditions of death row. Wes falsely believes that his filings have had a monumental impact in preventing correctional officers from depriving prisoners of their constitutional rights, and therefore the prison staff have developed a "retaliatory animus" against him. Some evidence of this retaliation, according to Wes, is that the prison has restricted his visitation, email, and his access to a microwave and has written him up for contraband. Wes perceives that this retaliation is something that he experiences because the BOP wants to keep him quiet and stop him from revealing numerous instances of BOP staff violating BOP policies.

9. One example can be seen in an affidavit Wes wrote in connection to a grievance on 11/07/2018: "SCU Unit Manager Thomas and Case Worker Sutton have reiterated and clarified that because of my *sedulous and assiduous filing of administrative remedies, and as well as for assisting other inmates in filing of such in turn and aiding other inmates in preparing and filing litigation naming* Thomas as a named defendant in such litigation that any and all visitors that I request visitation with will be denied, and they have maintained this tactic policy on different occasions denying requested visitors without reason given". In reality, Wes had a number of visitors during that period of time.

10. These 2018 views are consistent with his historical record. An August 10, 2000 declaration reflects the same delusional beliefs about prison officials conspiring against him. In a grievance filed against the Kansas Department of Corrections, Wes complained that officers had issued a disciplinary write up against him because they wanted to destroy grievances he had filed about the unsanitary conditions, denial of basic necessities, and extreme heat. Wes wrote that the unit team management was aware of "the continuing harassment and refuses to take any initiative to stop it" and that the unit team was clearly "doing everything they can to impede and thwart me from seeking redress of these issues through the grievance process." The unit

3

_EV_ (Initial)

team's response pointed out that Wes did not offer any evidence to support his allegation that he was being targeted or singled out for harassment: "you have never mentioned the allegation that grievances were being destroyed to unit team staff, despite the fact that you have contact with them on a daily basis. You also offer absolutely no evidence supporting your allegation that UT staff are aware of AND covering up staff misconduct. Every allegation made regarding staff conduct is investigated and appropriate action taken. No further action deemed necessary for this complaint."

11. Wes often provides me with his grievances so I can make copies of the forms and send them out for him. Wes does this because he believes the BOP staff are destroying his grievances and that if he does not provide the materials to me the grievances will not get filed. I have noticed that the grievances are rigidly and narrowly focused on Wes's views that the prison is covering up its misdeeds, retaliating against Wes for his efforts to expose the truth, and engaging in a campaign of retaliation against Wes to stop him from assisting inmates with lawsuits.

12. Wes has repeatedly said that "picking up his Bic" is the only way for changes to happen within the prison. He views himself as the only one able to effect change for the other inmates. Likewise, he has stated that the other inmates are not strong enough to handle the retaliation he experiences in order to safeguard the protections inmates are supposed to be afforded.

13. Since Wes received an execution date I have seen him four times (July 31, August 16, September 10, and October 9). Each time he has noted that he is facing an execution date because of his use of the grievance process and because of his efforts to file lawsuits about the conditions of confinement. The first time Wes mentioned this, I was struck by the fact that just a few weeks before Wes had filed a petition requesting that he be executed. He did not attribute his petition as even remotely connected to him receiving a date. Nor did he express a desire to actually be executed. There is a clear disconnect between the reality of his execution and his own perceptions around it.

### Speech Deficits and Inability to Communicate Effectively

14. From the first time I met with Wes in February 2015, I noticed that he often mispronounced words and that these mistakes were not consistent. For example, while Wes sometimes says or writes, "per batim" instead of

4                                                       (Initial)

Ex_5-000042

"verbatim," "egrevious" instead of "egregious," and "toleracy" instead of "tolerance," he occasionally pronounces the words correctly. Sometimes when Wes uses a word that does not exist, such as "prociforus," it is impossible to determine even with context what word he meant to say instead. Wes makes these mistakes both orally and in writing, and they have become increasingly frequent with the passage of time. As recently as October 31, 2019 I received a letter from Wes in which he misspelled the name of George Kouros, an attorney with whom Wes is in frequent contact. He spelled George's last name as Kourose. In July of 2019, Wes sent me a letter in which he even spelled my last name incorrectly, spelling it "Vartessian" instead of "Vartkessian," which he has never done before.

15. Wes frequently uses words and phrases incorrectly. Sometimes he conflates two existing words that sound alike. For example, he has said "abolish" instead of "admonish," "refugee" instead of "refuge," "exist" instead of "existence," "affording" instead of "forwarding," and "under" instead of "unless." Other times he mixes up words that do not sound similar at all. For instance, described himself as "stamped Catholic" instead of "raised Catholic." Wes's difficulties finding the right words and putting them together in a coherent sentence often prevent him from having constructive communication with me and other members of his defense team.

16. Wes's speech is often tangential, jumping from topic to topic without any transition. It is common for him to begin an anecdote and divert to several other topics before reaching a conclusion to his original story. Sometimes Wes tells half a story and then moves on to a new topic without ever returning to the first, leaving the story unfinished. Wes is easily distractible and it does not seem possible for him to think and speak linearly. Beginning in 2017, I started to suspect that Wes's tangential manner of speaking was related to his poor memory. Sometimes it seemed like he would forget what we were talking about in mid-sentence, and then try to guess what the conversation was about at various points.

17. In having conversations with Wes, I often felt as if he had a repertoire of prepackaged phrases that he would use repetitively, like "lucrative endeavor," "a blind man in sunglasses could see that," and "crazy as a fox." Wes uses these phrases with such frequency that the context is often hard to place.

18. On May 13, 2015, Wes and I discussed his stuttering. He told me he used to

5

_____ (Initial)

Ex_5-000043

stutter so badly that it was hard for people to understand what he was trying to say. As child, whenever Wes stuttered, his father would throw him up against the wall and punch him. He said his mother did not have any patience for him either, and described a Thanksgiving dinner in which he struggled to say "pass the gravy." His mother reacted by throwing vodka in his face and screaming at him, "If you can't talk correctly then shut the fuck up." Since his childhood, Wes learned various speech therapy techniques from professionals at the Institute of Logopedics and within the Oregon State Prison system that greatly reduced his stuttering. Given that Wes has a long history of stuttering and has learned techniques to minimize this deficit, I have taken particular note of the times he is unable to control his stutter.

19. During my earliest meetings with Wes in 2015, he started to stutter only when fatigue set in around four or five hours into a visit. Since then, however, Wes's stuttering has started progressively sooner into each of our meetings. The same speech exercises that were previously effective no longer work. During several visits in 2017, Wes began to slur his words. This occurred within the first hour and a half of our conversation. Now, Wes begins stuttering and slurring his words within five minutes of our visits.

20. Wes no longer has the stamina to handle conversations lasting as long as when I first joined his case. In the early days, I would often visit Wes two days in a row, and speak with him for five to six hours straight each day. In 2017, Wes began to look especially tired when he arrived for my visit the second day. Now, I avoid scheduling visits back to back, and I have greatly shortened the length of my visits.

## Memory Problems

21. Wes has struggled with both memory retention and recall, a problem that continues to progressively worsen with the passage of time. Wes acknowledges that he doesn't have a good memory. He has said that he "get[s] a glimpse of a memory, like looking through a little window or through little gaps in time, but [he] can't remember much about [his] life. [He couldn't] remember good times at all, just the bad."

22. During my first visit with Wes on February 3, 2015, he shared the story of when another prisoner stabbed him in the neck while he was serving time

6                                                        ∂√ (Initial)

in Oregon in 1988. Wes could not recall the name of the person who stabbed him, even though Wes was placed in segregation immediately after being treated at a hospital for refusing to disclose his attacker's name. During that same visit, Wes told me he knew he was divorced because he remembered being served with papers, but he couldn't recall when or how it happened. It is important to note that Wes has been married and divorced two times.

23. After just three visits with Wes, I noticed that he began recycling a number of stories that he forgot he had already shared. Each time he retold a story, he told it using the same exact words and phrases as his first recitation. Sometimes Wes would even retell the same stories within the span of one visit. For example, during a visit with Wes in May 2015, he described a phone call in which he told his daughter Angie that I was younger than her. During the visit, he relayed the story twice, each time acting as if it was the first time I was hearing this information.

24. The stock narratives that Wes tells include three to four stories about the lawsuits he had engaged in against the Kansas Department of Corrections for its use of box car cells. Wes tells the same story about how he was represented by Sly James, the former Mayor of Kansas City in one of the suits. Wes tells this story, completely unprompted, as if he is reading from a script. In actuality, Wes was not represented by Sly James, but another attorney for the same office.

25. The more I met with Wes, the more apparent his memory failures became. During several visits, Wes struggled to recall significant details about his relationships with friends and family. For example, Wes forgot how he met and developed a relationship with his ex-wife Claire Gaida. He also could not remember much about his relationship with Peggy Noe, a lifelong friend with whom he was especially close. First Wes described meeting Peggy in sixth grade. Later in the same conversation, Wes said he met her in second grade, as if he did not remember just telling me they met in middle school.

26. During my visit on March 12, 2019, Wes forgot the dates of his grandchildren's birthdays, which he had never done before. He also started the conversation by telling me about his grandson's new girlfriend from El Paso. A few minutes later, he told me she was from Tucson, forgetting he had just said it was El Paso.

7

_(Initial)

27. In a letter on May 13, 2019, Wes asked me to send him information on his mother's "birthday and death, and where she was buried at, as well as birth's or the babies lost." Over the years Wes had spoken with me about her birthday and visiting his mother's grave. I know Wes was aware of when his mother died because he sought permission from the prison to visit her in the hospital just before her death. The fact that Wes asked me for these details was especially noteworthy because he used to know all of the information he was requesting.

28. During my visit on May 12, 2015, Wes could not recall several details about the car accident that left a permanent and noticeable bump on his head, including which hospital he received treatment from, how long he was in the hospital, or the fact that he lost consciousness.

29. During my visit the following day, Wes told me that his grandmother died when he was a teenager and left something for him in her will, but not for his brother Gary. He said this made sense since Wes was her grandson and Gary was not, which was not true. It took Wes several minutes to realize that his brother was also his grandmother's grandson. Even then, Wes did not remember why he was included in his grandmother's will when his brother was not.

30. In the time that I have known Wes, he has struggled to recall names. For example, he could not recall the names of Aline Pryor (his attorney for a previous criminal charge), Detective Howard (who investigated the crime for which he was convicted, and testified at Wes's trial), and Stormy (his mother's Siamese cat whom he frequently played with growing up). He also confused the title of "Hamilton" the musical by calling it "Jefferson". At one point, Wes repeatedly told me to watch the movie "Sully," which he later started referring to as "Scully." More recently, however, I have been increasingly surprised by the names Wes has had trouble remembering or could not recall at all. For example, he has both forgotten his aunt Marguerite's name and called her by his mother's name. He has repeatedly forgotten the name of his current counsel, Rebecca Woodman, and sometimes called her Teresa, the name of a previous attorney. He has also repeatedly forgotten the name of his current counsel Michelle Law. In fact, in a declaration Wes wrote in January of 2019 he referred to Michelle as Mr. Law. In January of this year, Wes told me that last time he talked to his niece, whom he adores, he had to say "*tell your daughter* I said

8                                                        _____ (Initial)

Ex_5-000046

congratulations" instead of "tell Britney" because he could not remember Britney's name.

31. Based on my conversations with Wes, he does not have an accurate recollection of his 2003 capital trial. For example, Wes could not remember when his trial occurred or whether his trial attorney questioned jurors individually or as a group. He also struggled to remember who testified at his trial, and could not remember the name of Dominick Geniuk, the penalty phase witness who testified about Wes's work mentoring young prisoners. Additionally, on at least four separate occasions (March 9, 2015; February 17, 2017; May 17, 2017; January 17, 2019), Wes affirmatively stated that his jury spent 13-14 hours deliberating his guilt. In reality, his jury deliberated for just two and a half hours.

32. When Wes holds a wrong belief or memory, I am often unable to change that belief – even with evidence. Often, my efforts to correct Wes are met by him with anger and frustration. In the above example about the duration of deliberations, I provided Wes with the transcripts of the trial to show that his memory was incorrect. On that particular occasion, Wes retreated temporarily from his position. But the next time he discussed his jury, he again maintained that jury deliberations were 13-14 hours. This fixed false memory is directly connected to his inability to understand the facts from the crime and trial. For example, according to Wes, the "inordinate amount of time" the jury deliberated is evidence that the jurors were wrestling with finding him guilty because of the information Wes provided them in his testimony at trial.

33. Wes's inaccurate recollection of his trial has created problems for his current defense team. Wes continuously threatened to fire his attorneys, Rebecca and Michelle, if they did not litigate that his trial lawyer Fred Duchardt told him to lie on the stand when he testified at his trial. Accusing an officer of the court of suborning perjury is a serious allegation and Wes's attorneys did not have the evidence to lodge such a claim. Wes became fixated on how the visitation logs would prove that his trial attorneys did not prepare him to testify. After obtaining the logs we could see that counsel had actually visited with Wes the day before his testimony. Rather than accepting that evidence, Wes immediately determined that trial counsel had lied on the timesheet and that the logs were not true.

34. Wes has on a number of occasions said that he believes his current

9

_____ (Initial)

attorney, Rebecca Woodman, is secretly cooperating with his trial counsel. When Rebecca did not file the litigation described above, for example, Wes intimated that it was because Rebecca was friends with Ms. O'Sullivan and had no incentive to tell the truth. Wes continues to believe that Rebecca is collaborating against him on this point. Wes has also continuously conflated Laura O'Sullivan, trial counsel in his capital case, with Aline Pryor, counsel in the Mary Ruth Bales case, and at times uses their names interchangeably.

35. Wes's thinking becomes extremely fixed when he perceives that someone does not believe what he is saying. He is not able to understand that differences can be due to interpretation. There is no ability to agree to disagree with Wes. If one does not come around to his view Wes interprets it as that person acting against him.

36. Wes told me he struggles on a daily basis to remember whether or not he took his hypertension medication. He has noted that he cannot often remember what he was doing in his cell, meaning that he will find himself standing in his cell as if he was about to look for something and cannot recall what he had intended to do. This problem appears to have gotten worse in the last 12 to 18 months, and he has raised the issue with me much more frequently.

37. In speaking with Wes, it is often difficult to ascertain whether my difficulties in understanding him are due to his memory failures or his problems conveying information. For example, during a visit on February 4, 2015, Wes said that Terre Haute offered "a diabetic diet via facsimile only." During another visit on March 10, 2015, he told me his granddaughter Haley did not want to visit him because "she didn't want to do math."

38. During a visit in 2018, Wes could not recall the term PTSD, even though we had previously discussed PTSD in depth. Just a year before, Wes told me that he never believed PTSD was real. He then started talking about how he blew his head off while his bed wasn't made and there were bottles everywhere. He then repeated the question "Why couldn't he come up?" I could not make sense of what Wes was saying.

39. Recently, Wes forgot to prepare for and bring materials with him to our legal visit. As usual, I had sent Wes a letter letting him know what day I

10                                                    ____ (Initial)

would be visiting. When I showed up for the visit, Wes was surprised because, though he knew I planned to see him that day, he had forgotten what day of the week it was.

40. In Wes's correspondence he will often ask for copies of the same document multiple times. When I provide the documents he will forget having asked for the materials and/or sometime later say that I never provided the materials to him and become very upset. By May of 2016, I started sending letters back to Wes that detailed when he asked for the materials and what I was sending back so he would have a document verifying the completion of the task.

41. Wes regularly expresses the belief that Rebecca and Michelle have promised to perform a task, when, in actuality, they did not. For instance, recently, Wes was incensed that Michelle did not pay Wes back for copies he made of medical records. This came up in the last visit I had with Wes in October 2019. Wes repeatedly called Michelle a son-of-a-bitch and a liar. After I left the prison, I spoke with Michelle who confirmed that she had not told Wes that she would reimburse him for the cost of the copies.

42. The October 2019 visit with Wes lasted less than 20 minutes. When I arrived, Wes was told that I was getting him items from the vending machine. I could hear him say, "there is just one of them". When I walked in Wes said that Michelle and Rebecca were supposed to be there. I had told Wes that I was coming alone. I explained that they were working on a reply brief in his case. He was furious that they were not with me. I offered to write down all he wanted to go over and share it with them. Wes declined, noting that doing so would just give the appearance that they were working on his case, another paranoid and conspiratorial belief. I reminded him that they were coming to see him with a draft the next week and told him the date. Wes stated that the date they were coming was the day before the reply was due, which was incorrect. I corrected Wes and he became irate and terminated the visit.

43. Losing the ability to recall basic information such as the name of his aunt or his niece's daughter has been especially chilling for Wes. He watched several family members die of dementia and is aware of the painful end that comes with the disease. Wes has mentioned several times that he would prefer death to having to experience dementia to the end. Wes's ability to communicate and write has been a source of purpose for him. As

11

$\not\!\!P\!\!\sqrt{}$ (Initial)

such, he has tried very hard to minimize the lapses in his memory though at this stage he cannot mask the decline as effectively as he once could.

44. Wes's memories are often inaccurate reflections of exchanges that have taken place. As a recent example, Wes told me about a conversation he had with attorney George Kouros, who has previously assisted Wes in several civil lawsuits. Wes described George as "passionately [telling him] 'just fuck you Purkey.'" When relaying the conversation to me, Wes told me during the exchange he wanted to tell George "now you are starting to sound like Liz." I have never spoken to Wes that way and believe that George did not speak to Wes that way either. I had spoken with George about this exchange previously and he had described the exchange much differently.

**Additional Signs of Cognitive and Physical Impairment**

45. The first time I met Wes in February 2015, I was accompanied by Jeremy Isard, another mitigation specialist from my office. When Jeremy wrote his name on a piece of paper and handed it to Wes, Wes asked him to clarify the spelling because he mistook the "A" in "Isard" for an "L." Jeremy's handwriting was perfectly legible, and I did not see how Wes could confuse the two letters from what Jeremy had written. Afterwards, Wes rewrote Jeremy's name, spelling his first name "Jemery."

46. Ever since my first meeting with Wes in February 2015, he has been paranoid that prison officials were targeting him to prevent his work filing grievances and lawsuits on behalf of fellow prisoners. During our first meeting, Wes complained that the prison's visitation policy restricting visits to those who had a previous relationship with the prisoner was selectively applied to him. He was convinced the prison rejected his request for a visit from his Scottish pen pal because he was "being singled out since [he was] the least favorite camper of the administration." Wes's paranoia has only become more deeply engrained in his thinking since I first met him.

47. On December 7, 2017, Wes told me the prison staff fired him from his job at the law library because they knew about and did not approve of the lawsuits he brought against the Wyandotte County Jail over a decade ago. He was convinced the prison staff lied when they told him the reason for his termination from the law library was because of his typing errors.

12                                                      ℰ𝒱 (Initial)

According to Wes, this explanation was a cover up for the truth—they wanted him to stop "pushing his pen in the wrong direction" and filing lawsuits to improve prison conditions. Wes told me that despite the prison staff's intimidation, he was not going to stop because his lawsuits are helping inmates, and specifically referred me to *Purkey v. Green I* and *Purkey v. Green II*. In reality, Wes's claims in *Green I* were dismissed for failure to raise a claim and *Green II* was dismissed on summary judgment. One such claim included the allegation that jail employees put Wes in segregation and incited other inmates to harm him in retaliation for his attempts to file grievances and lawsuits against jail employees.

48. During my first visit with Wes he told me that ever since he was hit by an 18-wheeler on the highway in 1968 he suffers from frequent headaches in the form of sharp pains in the front of his head. He also gets dizzy whenever he rolls over or leans back. His dizziness is especially bad when he lays down on his back.

49. During the same visit, Wes described the lines as "jumping" when he reads. Since that time, Wes's ability to read in my presence has also declined. When I first started visiting with Wes he would read documents to me before handing the papers over for my review. Within the last two years Wes started handing documents to me without reading them aloud first. After he passes the materials he will often ask me to read it to him. His handwriting, which was once legible, is now almost impossible for me to read, I have to take time and decipher the words. Wes himself has trouble reading his own handwriting and it takes time in visits for him to try and figure out what he has written. Likewise, Wes often gives me handwritten documents to read during our visits and I have noticed that in his writings there are often pages of documents that simply list words. When asked about the words on the page Wes will shake his head as if to indicate he doesn't know why he wrote them.

50. Wes has told me that he talks to pictures in his cell. He has mentioned in passing that he catches himself speaking aloud in his cell to no one.

51. In May 2015, I noticed Wes starting to have trouble controlling his body. During some visits, the muscles in his chest seemed to be constantly and involuntarily flexing. Beginning in 2017, I started opening Wes's drinks and snack wrappers for him because his hands were shaking too much to do

13

____ (Initial)

it himself. Wes also seemed to be getting clumsier, as I noticed him periodically misjudge the location of the table and hit his leg against it—a problem he did not have before. Over the course of my last few visits, Wes has visibly aged. His chest, which had always been very muscular, looked saggy. He looked gaunt and appears to have lost a considerable amount of weight in a short period of time. This rapid decline in his physical appearance has been extremely pronounced since Wes was moved to the execution range. During my last three visits between August and October 2019 Wes has repeatedly stated that he is tired, which is unusual for him to say. During my last visit with Wes on October 9, 2019 he appeared unable to hold his composure and swayed as he stood. He banged the table between us accidently. I thought that at one point he might fall over because his balance appeared to be off.

52. During my visit with Wes on September 10, 2019 I became aware that he was urinating in a bag when he told me that he needed to empty his "pee bag." I had never known Wes to do this before. I learned that he had fashioned something he could use to relieve himself while we were in a legal visit. This struck me as especially troubling given the fact that there was a correctional officer outside our visiting room who could take him to the bathroom. Wes has never had to wait longer than five minutes to be escorted from the visiting room to the bathroom when he has asked in the past. It is my belief that Wes is experiencing incontinence and cannot wait to be taken to the bathroom.

53. On February 16, 2017, the emergency alarm went off within thirty minutes of the start of my visit with Wes. While the sirens stopped after about ten minutes, the flashing lights never ceased. Wes could not get past this. Though I tried to continue our conversation, the flashing lights were distracting Wes beyond his ability to control his frustration. He abruptly stopped talking to go ask the staff to cover the light and shout that he would file a grievance.

54. Less intense disruptions have also caused Wes to lose focus. In the last two years especially I have observed Wes become distracted to the point where he has stood up from our visits mid conversation to see what was happening outside of the room. The sounds were often those of doors opening and closing, officers walking past, or keys jingling – all common sounds for the inside of a prison.

14

_EV_ (Initial)

55. Wes used to prolifically create artwork, especially yarn work. I have noticed that this has decreased remarkably over the last two years. Wes barely crafts any blankets, handbags, hats, or toys compared to how active he was in 2015-2017.

## Inability to Work with his Defense Team

56. Wes frequently vacillates in his instructions to the legal team. At times when Wes has been clear about material he does not want the team to litigate, we could not have a rational discussion about it because his frustration and concreteness would get in the way. Other times, he would tell us that we were allowed to include certain information.

57. Wes's anger escalates often and quickly, sometimes in ways that I can anticipate and other times without any obvious trigger. On July 31, 2018, Wes explained that when he gets angry, he is not able to think. He described his episodes of anger as if he was having an out-of-body experience standing by, watching himself unravel and act in ways he did not understand.

58. Wes's memory failures have created tension between him and the defense team, particularly when he misremembers what we have communicated to him. Wes becomes very frustrated when events do not occur as he expected they would, so these constant misunderstandings create huge issues for Wes's ability to cooperate effectively with his team. Moreover, when Wes cannot convince members of his team of his point of view, he sees that as evidence that they are actively working against him. The instances in which he has attempted to fire Rebecca and Michelle are often connected to Wes's inability to convince them to see what he is saying as accurate, or to rationally understand their perspective.

59. Wes demonstrates extremely fixed thinking and this has been the cause of much of his frustration. For instance, Wes became especially agitated on May 16, 2017. I started the visit by sharing records we had collected as a part of the investigation into his case related to his aunt's husband, John, whom Wes had never met. Wes wanted to keep the documents related to John's personal history. I reminded Wes that we had reached an agreement about him getting such materials and that I wouldn't be leaving the papers with him that day. Wes's entire body language changed within seconds from being open to looking extremely tense. All his muscles seemed to be

15                                                    ____ (Initial)

Ex_5-000053

flexed and his face looked both angry and confused. He became irrational stating that the records about John that he had just seen for the first time that day meant more to him than life itself. I asked if the records meant more to him than his own life and he said they did. I explained that I was not trying to keep the records from him, but that I could not leave the records that day. This frustrated him further. He stood up, his face turning red, and snapped that he didn't care if the prison found the records. After I tried further explaining my rationale, he cussed me out, threw his materials into a bag, told me he did not want to see me again, and called for the guard to escort him out of the visitation room. The visit was over within 30 minutes.

60. Wes repeatedly threatened to have his attorneys, Rebecca Woodman and Michelle Law removed from his case. Wes has maintained throughout the last four years that he never gave permission for Rebecca and Michelle to work on his case, which is not accurate. Wes repeatedly brings this up when he is frustrated. Likewise, Wes will say that he is more knowledgeable on death penalty litigation because this is Michelle and Rebecca's first death penalty case and although they are smart women, he has done extensive research on the topic. Wes's belief that his is the first capital case that Rebecca and Michelle have worked on is false. I have corrected Wes about this several times over the years and yet it continues to be something he states as a matter of fact at various points.

61. Wes is paranoid about attorneys. Though it would be rational for Wes to have a healthy skepticism of some lawyers given his experiences with his capital trial counsel, who filed a 117-page affidavit post-conviction essentially justifying every single potential issue that could have been brought up to allege ineffectiveness, Wes's views are not rational. For example, Wes continues to hold on to the false belief that Rebecca and Michelle do not want to file certain claims related to conditions of confinement because they actually want him to die. When they do not do as he says, Wes internalizes that decision as evidence of their desire to cause him harm and, more specifically, for him to be executed. In this way, he sees them as part of the conspiracy against him and his efforts to litigate against the prison.

62. Likewise, when Wes does not understand the law Rebecca and Michelle have tried to explain to him, he accuses them of lying to him. On May 12, 2015, for example, Wes accused Rebecca of lying and deceiving him about

16

$\mathcal{EV}$ (Initial)

the filing deadlines for his petition and blamed Michelle for being a passive accomplice. In reality, Wes just did not understand Rebecca's explanations of the statute regarding filing deadlines. As a result, Wes drafted a motion to fire both Rebecca and Michelle, though he did not file it. In September 2019, Wes told me that he removed both Rebecca and Michelle from his visit list because of their "repeated and protracted lies for a five year period." He accused them have having a hidden agenda. Wes more recently filed a motion requesting to go *pro se* again for similar reasons. Wes has a long history of filing and withdrawing pro se motions, so much so that the clerks of the courts Wes routinely files in have acknowledged this behavior as a sign of mental illness.

63. Wes believes that those on death row, as well as himself, are being represented by attorneys who do not have the interests of their clients in mind. He has made efforts to get other inmates to file grievances and suits. Attorneys for other inmates have contacted our team to ask us to try and persuade Wes to stop trying to litigate on behalf of their clients. Wes truly believes that he is capable of adequately representing himself and others in complex litigation even though he has failed to successfully litigate far less complicated cases.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this 15th day of November, 2019.

Elizabeth Vartkessian, Ph.D.

17                                                  _EV_ (Initial)

Ex_5-000055

# Exhibit 6

# CURRICULUM VITAE

**Elizabeth S. Vartkessian, Ph.D.**
309 N. Charles St., 3rd floor
Baltimore, MD 21201
Phone: (281) 217-0946   esv@advancechange.org

## EDUCATION

2012     Ph.D. in Law (DPhil)
University of Oxford, St. Hilda's College—Oxford, England

2004     M.S. in Comparative Social Policy (M.Sc.)
University of Oxford, St. Antony's College—Oxford, England

2003     B.A., Political Science; B.A., Philosophy; Minor, Africana Studies, *Magna Cum Laude*
George Washington University, Washington D.C.

## PROFESSIONAL EXPERIENCE

2014-Present   *Founding Executive Director*, Advancing Real Change, Inc. (ARC, Inc.), Baltimore, Maryland.
ARC, Inc. promotes justice by ensuring that the life histories of people charged with crimes are at the forefront of their cases. ARC, Inc. engages in casework, provides training and consulting services to legal teams regarding the best practices of life history investigations.

In addition to working as a mitigation specialist further tasks as the Executive Director include:

- Managing daily office operations of 10 full-time staff.
- Providing direct supervision to all mitigation and records collection specialists.
- Engaging and reporting to the Governing Board of Directors.
- Overseeing office finances.
- Leading fundraising efforts.
- Engaging in coalition building and community outreach.
- Providing training and consultation services to defender organizations and private bar attorneys.
- Licensed as a Private Detective in Maryland, number 101-24647.

2010-2014   *Mitigation Specialist*, private consulting services for capital and cases involving juvenile life sentences.

- Built a successful private mitigation practice.
- Engaged in networking including identifying clients and marketing.
- Ran daily operations, including budgeting, invoicing, accounting, and collection of payments.

1

Ex_6-000056

**CURRICULUM VITAE**

- Obtained a private investigator license in New York.
- Trained as a Defense Victim Outreach Liaison.

2004-2010   *Mitigation Specialist*, The Gulf Region Advocacy Center, Houston, Texas.
Life history investigator for death penalty cases at trial and post-conviction stages.
Regular tasks included:

- Providing expert testimony regarding the standard of care for the development and presentation of mitigating evidence in death penalty cases.
- Interviewing the client for the purpose of preparing a social history.
- Identifying, locating, and interviewing family, friends, and other witnesses for the purpose of preparing a social history.
- Collecting and evaluating birth, medical, education, social welfare, employment, incarceration, military, and other records of clients and family members for the construction of a social history.
- Investigating and researching issues related to medical history; prenatal, pediatric and adult health; exposure to harmful substances *in utero* and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religion, gender and sexual orientation; ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.
- Working with the client's family, community, and clergy in the development of other favorable evidence for the client.
- Analyzing information gathered in investigation to determine potential expert witness consultations.
- Writing memoranda analyzing the factual information obtained from witnesses and historical documents in light of the principles discerned from the professional literature.

## INVITED GUEST LECTURES, PRESENTATIONS, AND TRAINING SESSIONS

2019   Advancing Real Change, Inc.: *Mitigation Training Series*. Curriculum coordinator and plenary session speaker topic TBD. Houston, Texas. December 6-8 (confirmed).

2019   Federal Death Penalty Strategy Session, Closing Comments: Thoughts on Pleas and Deauthorization. San Diego, California. November 14-16 (confirmed).

2019   *Bring Your Own Case* training, Curriculum coordinator and faculty member. Supported by National Association of Criminal Defense Lawyers and a grant from the Bureau of Justice. Tallahassee, Florida. November 8-10.

Ex_6-000057

**CURRICULUM VITAE**

2019    Arkansas Association of Criminal Defense Lawyers: *Death Penalty Conference*. Plenary session speaker, Ethics of Mitigation Investigation. Rogers, Arkansas. October 25-26.

2019    Louisiana State Public Defender, Faculty member and plenary session speaker for capital and *Miller/Montgomery* tracks, topics "Mitigation's Power and Purpose", "Assets-Based Mitigation Evidence", "Identifying Trauma". Kenner, Louisiana. October 23-25.

2019    University of Texas, Capital Punishment Clinic: Tools for Organizing Casework. Austin, Texas. September 18.

2019    Authorized Case Consultation and Training. Federal Resource Counsel, "Capital Jury Selection". St. Louis University School of Law. June 6-8.

2019    Advancing Real Change, Inc.: *Baltimore Training Series*. Curriculum coordinator and plenary session speaker, "Mitigation 101". May 16-18.

2019    Bellarmine University, Topic: "Capital Mitigation" (by video). April 10.

2019    Amicus U.S. Death Penalty Training, "Mitigation 101", "Working with Clients", "Investigating and Litigating Mental Health and Trauma", and "Getting in the Door and Conducting Witness Interviews". London, England. March 23-24.

2018    The Virginia Bar Association, 26th Annual Capital Defense Workshop, plenary session speaker, "School to Prison Pipeline as Mitigation". Richmond, Virginia. November 16.

2018    26th Annual Federal Death Penalty Strategy Session, plenary speaker "Preparing for Authorization". Tampa, Florida. November 7-9.

2018    Amicus U.S. Death Penalty Training, "Mitigation 101", "Common Claims and How to Prepare Evidence", Unearthing Records that Will Change the Face of a Case", "Working with Clients", "Identifying Signs and Symptoms of Mental Health and Trauma", and "Getting in the Door and Conducting Witness Interviews". London, England. November 3-4.

2018    Louisiana State Public Defender, Faculty member and plenary session speaker, "Working with Experts", "Capital Jury Project: Findings and Application", and "Developing Themes and Theories in Juvenile Cases". Kenner, Louisiana. October 24-26.

2018    University of Texas, Capital Punishment Clinic: Tools for Organizing Casework. Austin, Texas. September 19.

3

Ex_6-000058

## CURRICULUM VITAE

| | |
|---|---|
| 2018 | Office of the Public Defender in the Ninth Circuit, Sentencing Strategies Seminar, plenary session speaker, "Preparing for Your Penalty Phase and Sentencing". Orlando, Florida. August 6-7. |
| 2018 | Miami Public Defender, in-house training. Case management and document processing. Miami, Florida. May 7-9. |
| 2018 | University of Texas, Capital Punishment Clinic: Mitigation Advocacy. Panelist discussing empirical assessments of successful mitigation in capital and non-capital cases. Austin, Texas. April 7-8. |
| 2018 | Advancing Real Change, Inc.: *Baltimore Mitigation Training*. Curriculum coordinator and plenary session speaker, "Mitigation: The Heart of Criminal Defense," and "Forward-looking Mitigation and Re-entry". Baltimore, Maryland. March 16-18. |
| 2018 | American Civil Liberties Union, *Bring Your Own Case Training*. Faculty member and plenary session speaker, "What Must Be Done in Every Case: Mitigation Investigation". Perdido Beach, Alabama. February 28-March 2. |
| 2018 | Alabama Criminal Defense Lawyers Association: *Capital Training*. Plenary Speaker, "Basics of Case Organization and Tools of the Mitigation Trade", and "Compelling Narratives: Mitigation Themes and Theories" Birmingham, Alabama. January 18-20. |
| 2017 | Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Themes and Theories". Lafayette Hill, Pennsylvania. November 29-December 2. |
| 2017 | Amicus U.S. Death Penalty Training, "Mitigation 101", "Common Claims and How to Prepare Evidence", Unearthing Records that Will Change the Face of a Case", and "Getting in the Door and Conducting Witness Interviews". London, England. November 4-5. |
| 2017 | Louisiana State Public Defender, Faculty member and plenary session speaker, "Ethical Obligations of the Mitigation Investigation", "Mitigation in *Miller* cases", and "Capital Juror Research". Kenner, Louisiana. October 18-20. |
| 2017 | Virginia Correctional Association: *Stop Blocking the Exit*. Panelist, "Struggles and Success of the Journey Home". Williamsburg, Virginia. October 12. |
| 2017 | Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. October 11. |

4

Ex_6-000059

**CURRICULUM VITAE**

2017      Federal Criminal Defense Seminar, Administrative Offices of the U.S. Courts. "Mitigation Investigation and Mental Health Evidence". Philadelphia, Pennsylvania. August 24.

2017      The Gulf Region Advocacy Center: *Mitigation Skills Training*. Faculty member and plenary session speaker, "Records Collection". Houston, Texas. August 7-9.

2017      Habeas Assistance and Training Counsel Project: *Fourteenth Annual National Seminar on the Development and Integration of Mitigation Evidence*. "Basics of Case Organization and Tools of the Mitigation Trade". Baltimore, Maryland. April 7.

2017      Florida Defender Organization: Topic: "Compelling Narratives: Mitigation Themes and Theories" (by videoconference). March 24.

2017      Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. March 23.

2017      Yale School of Management: *Yale Philanthropy Conference*. Invited panelist, "A Public Voice: Rethinking How Advocacy Supports Mission". New Haven, Connecticut. February 24.

2017      Advancing Real Change, Inc.: *Baltimore Mitigation Training*. Curriculum coordinator and plenary session speaker, "Best Practices of Mitigation Investigation," and "Forward-looking Mitigation". Baltimore, Maryland. February 10-11.

2017      Yale School of Law: *Educational Opportunity and Juvenile Justice Clinic*. Topic: records collection and interviewing basics for mitigation development. Guest speaker. New Haven, Connecticut (by videoconference). January 31.

2016      Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Themes and Theories". Lafayette Hill, Pennsylvania. December 15-17.

2016      Michigan State Appellate Defender: *Juvenile Life Mitigation Training*. Curriculum coordinator and plenary session speaker, "Best Practices of Mitigation Investigation". Detroit, Michigan. December 8-9.

2016      Louisiana State Public Defender: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Walk a Mile in My Shoes: A Day in the Life of Your Client". Baton Rouge, Louisiana. October 19-21.

5

Ex_6-000060

**CURRICULUM VITAE**

2016            University of Baltimore, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Baltimore, Maryland. April 25.

2015            Maryland Office of the Public Defender, *Summer Law Clerk Training*. Plenary session speaker, "Mitigation: The Heart of Criminal Defense". Baltimore, Maryland. May 27.

2015            Habeas Assistance and Training Counsel Project: *Twelfth National Seminar on the Development and Integration of Mitigation Evidence*. "Basics of Case Organization and Tools of the Mitigation Trade". Baltimore, Maryland. April 12.

2015            Arizona Capital Representation Project: *Bring Your Own Case Training*. Faculty member Phoenix, Arizona. April 1-3.

2015            University of Maryland, School of Law: *Social Work and Law*. Topic: social work assessments and sentencing determinations. Guest speaker. Baltimore, Maryland. March 30.

2015            Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. March 19.

2015            Administrative Offices of the U.S. Courts: *Fourth Annual Capital Mitigation Skills Workshop*. Faculty member and plenary session speaker, "Basics of Case Organization and Tools of the Mitigation Trade", Kansas City, Missouri. January 15-18.

2014            Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Themes and Theories". Lafayette Hill, Pennsylvania. November 20-22.

2014            Arkansas Association of Criminal Defense Lawyers: *Death Penalty Conference*. Plenary session speaker, "Records Collection" and "What Matters to Capital Jurors". Rogers, Arkansas. October 31-November 1.

2014            Oregon Capital Resource Center: Plenary session speaker, "Capital Jurors and Mitigation Evidence". Gleneden Beach, Oregon. October 10-11.

2014            Florida Death Penalty Training Program: *Life Over Death*. Plenary session speaker, "What Matters to Capital Jurors". Orlando, Florida. September 5.

2014            The Gulf Region Advocacy Center: *Bring Your Own Case Training*. Plenary session speaker, "Capital Jurors and Mitigation Evidence"; "Developing the Social History"; "Effective Team Work". Faculty member. St. Louis, Missouri. August 15-17.

6

Ex_6-000061

**CURRICULUM VITAE**

2014          Atlantic Center for Capital Representation: *Mitigation Skills Training*. Planner and faculty member. Philadelphia, Pennsylvania. August 8-9.

2014          University of Baltimore, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Baltimore, Maryland. June 10.

2014          Maryland Office of the Public Defender, Summer Law Clerk Training. Plenary session speaker, "Mitigation: The Heart of Criminal Defense". Baltimore, Maryland. May 28.

2014          Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. February 27.

2013          The Gulf Region Advocacy Center: *Mitigation Skills Training*. Faculty member. Houston, Texas. November 20-22.

2013          Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member. Lafayette Hill, Pennsylvania. September 25-28.

2013          University of Baltimore, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Baltimore, Maryland. May 28.

2013          Oregon Capital Resource Center: Plenary session speaker, "Capital Jurors and Mental Health Mitigation Evidence". Portland, Oregon. April 19-21.

2013          University at Albany, School of Criminal Justice: *Qualitative Research Methods*: Topic: intensive interviewing techniques and conducting field research. Guest speaker. Albany, New York. January 22.

2012          University at Albany, School of Criminal Justice: *Law and Psychology*: Topic: the role of mitigation evidence in juror decision-making in capital cases. Guest speaker. Albany, New York. October 31.

2012          Idaho Federal Defenders Annual Training Seminar: Plenary session speaker, "Capital Jurors and Mitigation Evidence". Boise, Idaho. September 13.

2012          Habeas Assistance and Training Counsel Project: Ninth National Seminar on the Development and Integration of Mitigation Evidence. Plenary session speaker, "Capital Jurors and Mitigation Evidence". Atlanta, Georgia. April 28.

2008          Reprieve U.K. *Death Penalty Investigators Training*. Faculty member. London, England. March 29-30.

7

Ex_6-000062

**CURRICULUM VITAE**

| | |
|---|---|
| 2007 | Reprieve U.K. *Death Penalty Investigators Training*. Faculty member. London, England. April 21. |
| 2007 | National Consortium for Capital Defense Training funded by the Bureau of Justice Assistance: *Capital Defense Mitigation Issues*. Faculty member. Plano, Texas. March 23-24. |
| 2007 | The Gulf Region Advocacy Center: *Mitigation Skills Training*. Faculty member. Houston, Texas. January 19-21. |
| 2006 | Texas Criminal Defense Lawyers Association: *Mitigation Training*. Faculty member. Dallas, Texas. April 20-21. |
| 2005 | Capital Unit of the Oklahoma City Public Defenders Office: *Conducting Mitigation Investigation*. Faculty member. Oklahoma City, Oklahoma. September 20-23. |

**PROFESSIONAL TRAININGS AND CONFERENCES ATTENDED**

| | |
|---|---|
| 2019 | NAACP Legal Defense Fund, Inc. 40th Annual Capital Punishment Training Conference. Tarrytown, New York. July 11-14. |
| 2019 | Authorized Case Consultation Training, Federal Resource Conference. Atlanta, Georgia, January 22-24. |
| 2015 | Post-2255 Litigation and Advocacy, Federal Capital Habeas Project Training Conference. Philadelphia, Pennsylvania, July 21-22. |
| 2015 | NAACP Legal Defense Fund, Inc. 36th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 9-12. |
| 2014 | Defense Initiated Victim Outreach Training, sponsored by the Administrative Offices of the U.S. Courts. Santa Clara, California. September 15-19. (by application). |
| 2014 | NAACP Legal Defense Fund, Inc. 35th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 17-20. |
| 2014 | Eleventh National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases sponsored by the Administrative Offices of the U.S. Courts. Philadelphia, Pennsylvania. March 27-30. |
| 2013 | Eighteenth Annual National Federal Habeas Corpus Seminar sponsored by the Administrative Offices of the U.S. Courts. Cleveland, Ohio. August 15-18. |

Ex_6-000063

## CURRICULUM VITAE

| 2013 | NAACP Legal Defense Fund, Inc. 34th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 11-14. |
|---|---|
| 2013 | Tenth National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases sponsored by the Administrative Offices of the U.S. Courts. Baltimore, Maryland. April 4-7. |
| 2011 | Law and Society Annual Meeting, San Francisco, California. June 2-5. |
| 2011 | Vermont Law School Symposium, New Perspectives on Capital Punishment, South Royalton, Vermont. February 11. |
| 2009 | NAACP Legal Defense Fund, Inc. 30th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 9-12. |
| 2008 | Law and Society Annual Meeting, Montreal, Quebec. May 29-June 1. |
| 2006 | Mitigation Seminar sponsored by the Habeas Assistance and Training Counsel: The Development and Integration of Mitigation Evidence in Capital Cases. Washington D.C. April 27-30. |
| 2006 | Third National Forensics Seminar sponsored by The Habeas Assistance and Training Counsel. San Antonio, Texas. January 26-29. |
| 2006 | National Consortium for Capital Defense Training funded by the Bureau of Justice Assistance. Plano, Texas. January 11-14. |
| 2005 | National Association of Criminal Defense Lawyers Death Penalty Seminar. Oklahoma City, Oklahoma. September 30-October 2. |
| 2005 | A Fighting Chance: Themes and Theories of Mitigation Investigation. New Orleans, Louisiana. June 1-3. |
| 2005 | Records collection, Juror and Witness Interviews and Legal Aspects of Investigative Work. Houston, Texas. April 12-14. |
| 2005 | National Legal Aid and Defender Association: Life in the Balance. New Orleans, Louisiana. March 18-22. |
| 2005 | Capital and Mental Health Seminar. Houston, Texas. February 23-25. |

## ACADEMIC POSITIONS

| 2013-present | *Research Fellow*, School of Criminal Justice, University at Albany |
|---|---|
| 2012-2013 | *Adjunct Professor*, School of Criminal Justice, University at Albany |

9

Ex_6-000064

# CURRICULUM VITAE

Introduction to Criminal Justice Processes

2010-2011      *Discussion Leader*, School of Criminal Justice, University at Albany
Introduction to Criminal Justice Processes
Introduction to Criminology

## PUBLICATIONS

2019      Vartkessian, Elizabeth S., "Including Assets-Based Mitigation in Sentencing" ***Criminal Justice Policy Review***. Published on-line (August 9) ahead of print, https://journals.sagepub.com/doi/10.1177/0887403419866887.

2018      Sean O'Brien, Elizabeth S. Vartkessian, and Marla Sandys "Psychological Defenses and Mitigation" in ***Forensic Science Reform: The Psychology and Sociology of Wrongful Convictions***. Wendy J. Koen and Michael Bowers (Eds). Elesevier.

2018      Riner, Robin and Elizabeth S. Vartkessian. "Showing Humanity: How Defense Attorneys Use Mitigation Narratives to Advocate for Clients" in ***Language & Social Justice: Case Studies on Communication & the Creation of Just Societies***.

2018      Vartkessian, Elizabeth S. (July 12). "All Serious Crimes Deserve Podcast-Style Scrutiny" Published by ***The Baltimore Sun***, Retrieved from: http://www.baltimoresun.com/news/opinion/oped/bs-ed-op-0713-curtis-flowers-20180711-story.html.

2017      Vartkessian, Elizabeth S. (April 27). "The Tragic Life and Cruel Execution of Ledell Lee" Published on-line by ***The Marshall Project*** and ***Vice News***, Retrieved from: https://www.vice.com/en_us/article/the-tragic-life-and-cruel-execution-of-ledell-lee.

2017      Sandys, Marla, Elizabeth S. Vartkessian, Heather Pruss, and Sarah Walsh, "Setting the Stage and Listening to What Jurors Have to Tell Us About Mitigation" in Edward Monahan and Jim Clark (Eds.) *Mitigation in Capital Cases: Understanding and Communicating the Life Story*. ***American Bar Association***.

2017      Vartkessian, Elizabeth S., Jonathan Sorenson, and Christopher E. Kelly. "Tinkering with the Machinery of Death: Juror Decision-Making in Texas Death Penalty Trials During Two Statutory Eras" ***Justice Quarterly***. 34(1): 1-24.

2014      Bowers, William, Christopher E. Kelly, Ross Kleinstuber, Elizabeth S. Vartkessian, and Marla Sandys. "The Life or Death Sentencing Decision: It's at Odds with Constitutional Standards, Is it Beyond Human Ability?" in James R.

10

Ex_6-000065

# CURRICULUM VITAE

Acker, Robert M. Bohm, and Charles S. Lanier (Eds.) *America's Experiment with Capital Punishment*. Carolina Academic Press.

2012      Vartkessian, Elizabeth S. "What One Hand Giveth, the Other Taketh Away: How Future Dangerousness Corrupts Guilt Verdicts and Produces Premature Punishment Decisions in Capital Cases." *Pace Law Review*. 32: 447-543.

2011      Vartkessian, Elizabeth S. and Jared P. Tyler. "Legal and Social Exoneration: The Consequences of Michael Toney's Wrongful Conviction." *Albany Law Review*. 75: 1467-1498.

2011      Vartkessian, Elizabeth S. "Dangerously Biased: How the Texas Capital Sentencing Statute Encourages Jurors to be Unreceptive to Mitigation Evidence." *Quinnipiac Law Review*. 29: 237-288.

## WORKS IN PROGRESS

Vartkessian, Elizabeth S., Christine Land, and Alice Gould, "How Evidence of Mental Illness Becomes Aggravating: An Analysis of Texas Capital Cases" (Manuscript)

## RESEARCH EXPERIENCE

2017-present   *Co-investigator with Scott Sundby*
Capital Jury Project, Arizona data collection

2010-2013   *Visiting Researcher*, School of Criminal Justice, University at Albany, State University of New York
Capital Jury Project

2008-2010   *Primary Investigator*, Research Foundation of the State University of New York, Hindelang Criminal Justice Research Center
Capital Jury Project, Texas data collection

## SCHOLARSHIPS, GRANTS, AND AWARDS

2018      Resolution by the City Council of Baltimore recognizing ARC, Inc.'s work

2017      United States Human Rights Network, Human Rights Builders Award (for ARC, Inc.'s work to bring empathy to the justice system)

2015      J.M. Kaplan Social Innovation Prize Awardee (private foundation grant to support the work of ARC, Inc.)

2014      Research Affinity Group (private foundation grant)

2010      Research Affinity Group (private foundation grant)

Ex_6-000066

**CURRICULUM VITAE**

| 2009 | Criminology Department, Oxford University (partial tuition) |
| 2009-2008 | St. Hilda's Graduate Student Scholarship (partial tuition) |
| 2008 | Alpha Delta Pi Foundation (academic, philanthropic, and social society grant) |
| 2008 | Law and Society Graduate Students Workshop Grant |
| 1999-2003 | George Washington University's Presidential Scholarship |

## ACADEMIC PAPERS PRESENTED

| 2018 | Vartkessian, Elizabeth S. and Kaylesh Ramu, Paper entitled "*Improving Outcomes in Juvenile Life Without Parole Resentencings: A Preliminary Analysis of National Transcripts*" Legal Services for the Indigent: The Impact of Policy Changes, The American Society of Criminology, Atlanta, Georgia. |
| 2017 | Vartkessian, Elizabeth S., Paper entitled "*Mitigation's Role in Criminal Defense*" Legal Services for the Indigent: Social Work, Mitigation, and Holistic Defense, The American Society of Criminology, Philadelphia, Pennsylvania. |
| 2017 | Vartkessian, Elizabeth S., Paper entitled "*Capital Juror's Response to Mental Health Evidence: Context Matters Most*" International Academy of Law and Mental Health, Prague, Czech Republic. |
| 2013 | Vartkessian, Elizabeth S. and Christopher E. Kelly, Paper entitled *"Capital Improvements? Juror Decision-Making in Texas Death Penalty Trials Before and After Penry v. Lynaugh"* Law and Society Association, Boston, Massachusetts. |
| 2011 | Acker, Jim, William J. Bowers, Andrew L.B. Davies, Elizabeth S. Vartkessian, and Kay Lang, Paper entitled *"Families and Friends of Homicide Victims: Violent Bereavement and Adaptation"* The American Society of Criminology, Washington D.C. |
| 2011 | Vartkessian, Elizabeth S., Paper entitled *"What One Hand Giveth, the Other Taketh Away: How Future Dangerousness Corrupts Guilt Verdicts and Produces Premature Punishment Decisions in Capital Cases"* School of Criminal Justice, University at Albany. |
| 2011 | Bowers, William J.,Wanda Foglia, Elizabeth S. Vartkessian, Marla Sandys, and Christopher E. Kelly, Paper entitled *"The Receptivity of Courts to Empirical Evidence of How Jurors Decide Death Penalty Cases: The Capital Jury Project (CJP) as a Case Study"* Michigan State Law School Symposium, East Lansing, Michigan. |

12

Ex_6-000067

## CURRICULUM VITAE

2010        Vartkessian, Elizabeth S., Paper entitled *"Fatal distraction: Does the Texas capital sentencing statute discourage the consideration of mitigating evidence?"* Law and Society Annual Meeting, Chicago, Illinois.

2009        Vartkessian, Elizabeth S., Paper entitled *"Persuasive Mitigation Evidence in Texas Capital Cases"* Law and Society Annual Meeting, Denver, Colorado.

2008        Vartkessian, Elizabeth S., Paper entitled *"Making the Case for Life: Patterns of Successful Mitigation Evidence Presented to Capital Juries in Texas"* St. Hilda's College, Oxford University.

## BOARD MEMBERSHIPS

2008-Present   Governing Board of the Gulf Region Advocacy Center
A non-profit law office committed to providing quality defense services to indigent defendants facing capital charges primarily in Texas and throughout the south.

## REVIEWER

Justice Quarterly
Punishment and Society

13

Ex_6-000068

# Exhibit 7

## DECLARATION OF JOHN D. FOX

I, John D. Fox, declare and state the following:

### QUALIFICATIONS

1.  I am a mitigation specialist with 14 years of experience working on cases in state and federal jurisdictions throughout the United States. Over the years, I have performed mitigation work on capital cases in the following jurisdictions: Texas, Florida, Missouri, Ohio, Pennsylvania, Louisiana, Maryland, and Massachusetts.

2.  My experience includes work at the trial, state post-conviction, and federal habeas phases of the proceedings.

3.  In 2014, my colleague Dr. Elizabeth Vartkessian and I co-founded Advancing Real Change, Inc., (ARC) a non-profit organization aimed at providing mitigation services nationwide to criminal defendants facing the most severe penalties. A substantial portion of ARC's caseload is devoted to defendants charged with or convicted of capital crimes. I served as ARC's Deputy Director for four years until May 2018, when I established a solo practice providing mitigation services to Federal Public Defender offices.

4.  I possess a Master's Degree in Social Work from New York University's Silver School of Social Work with a focus on direct clinical social work practice. My studies included learning to recognize and diagnose signs and symptoms of mental illness and other disorders as chronicled in the American Psychiatric Association's Diagnostic and Statistical Manuals.

5.  I have developed curricula and served as faculty for numerous seminars dedicated to teaching lawyers, mitigation specialists, and other members of the capital defense team how to recognize, identify, and document signs of mental illness and cognitive impairment.

6.  I have extensive experience working with clients who are impaired by a wide range of mental health conditions, including but not limited to dementia, traumatic brain injury, complex trauma, and PTSD.

JDF (Initial)

Ex_7-000069

7. A more detailed recitation of my education, training, and experience can be found in my *curriculum vitae*, which is attached.

## OBSERVATIONS OF WESLEY PURKEY'S COGNITIVE DECLINE

8. I was the lead mitigation specialist for Mr. Wesley Purkey's federal habeas investigation from September 2015 to May 2018. I initially became involved as a replacement for mitigation specialist Dr. Elizabeth Vartkessian, who had to step away from Wes's case for a period of about three months to recover from a serious car accident. When Dr. Vartkessian rejoined Wes's defense team in January 2016, I continued to function as the lead mitigation specialist with Dr. Vartkessian's assistance until May of 2018, when I took another position.

9. During the nearly four years I worked on Wes's case, I met with him in person about 25 times, with each meeting lasting between two and six and a half hours. While Wes exhibited clear signs of cognitive impairments from our first meeting, these signs only became more pronounced in both frequency and degree throughout the course of our professional relationship. Beginning in 2018, I witnessed Wes deteriorate more and more, both mentally and physically, with just about every visit.

10. From the first day I met Wes, it was obvious to me that he had significant memory impairments, in terms of both retention and recall. It was not unusual for him to take several minutes to remember the names of people and places with which he was intimately familiar. Sometimes he would conflate two names. Other times he forgot names altogether. For example, he often conflated the names of his ex-wives and his defense attorneys. He forgot the names of longtime childhood friends and mitigation witnesses, Michael Gilstrap and Clayton Logan. He also was unable to recall a number of prior defense experts and team members, including Dr. Mark Cunningham, Dr. Frederic Sautter, and attorney Albert Grauberger.

11. In September of 2015, I brought Wes a number of life history photographs I obtained from friends and family members, and asked him to identify the individuals in the pictures. One photograph was signed by "Stephen" and included the personal note, "To my good friend Wes. May all your dreams come through [sic]." Wes had no recollection who the man and child were in the picture and could not identify how it came to be in his possession. Another

2

JDF (Initial)

Ex_7-000070

photograph said "to Mr. and Mrs. Purkey," yet Wes did not know who the woman was in the picture. When I showed Wes a photograph of his ex-wife Jeanette Broyles and her family, Wes was unable to recall whose family was in the picture. I also showed Wes a photograph of himself and two friends who lived in the same housing unit at Lansing Correctional Facility—Wes only remembered the first name of one of the men and could not remember anything about the other.

12. In addition to forgetting people and names, Wes frequently forgot or misremembered significant events and details of his own life. For instance, Wes had no memory of being charged with stealing a car in Sedgwick County in 1976.

13. In April of 2017, Wes informed me that his niece, Tanya Bramman, was having surgery. He was unable to recall what kind of surgery or the reason for it. This event stood out to me because he and Tanya are quite close, communicating monthly during the period of time I was visiting Wes.

14. In June 2016, Wes described a phone call he recently had with his daughter Angie, the person who means the most to him in this world. Angie told Wes that her mother (Wes's ex-wife, Claire) was telling people that her sixth grade sweetheart Richard was Angie's father—not Wes. The phone call was abruptly disconnected, and when Wes tried calling back the call did not go through. Wes worried that Angie thought he purposefully hung up on her and desperately wanted to alleviate any doubt in Angie's mind that he was in fact her biological father. He wanted to know how much a paternity test cost, and asked me to contact Angie about the phone issues and ensure she was not mad at him. Ten months later, Wes told me the same story with slightly different, but significant details. First, Wes said the phone call occurred not in June but December, specifically a couple weeks before Christmas. Second, Wes told me he deliberately hung up on Angie even though he knew it was wrong, because he was so angry that Claire would lie to her about something as serious as the identity of her father. Immediately after the call, Wes angrily mailed Angie a letter telling her he hopes she finds her real dad. Each time Wes shared conflicting versions of events, he genuinely believed the version he was telling at the time was the truth. When Wes retold this story in April of 2017, it seemed as if he did not recall our discussion about it in June of the previous year.

3                                                                    JDF (Initial)

Ex_7-000071

15. Wes regularly became fixated on minor details or false beliefs. In January 2018, Wes complained that the prisoners were receiving defective music, specifically referring to one song in particular that was supposed to be 10 minutes long but only plays for five minutes. According to Wes, this song had been defective for years and Wes planned to file a grievance about it. He had already emailed the prison staff about the issue and planned to file a Freedom of Information Act request to find out exactly how many prisoners had wasted money on this song. When I asked Wes the name of the song, he paused for a long time as though he was straining to think, and then told me he could not think of it. The next day, towards the end of my visit, Wes brought in a post-it note saying the name of the song he could not previously remember was called "Battery" by Ensiferum and that it was 10 minutes and 43 seconds long. When I later researched this song, I found versions of it that were only 5 minutes and 13 seconds long.

16. Wes frequently retold stories to me, forgetting he had already shared the information with me several times before. He repeatedly told me the same stories about his loving relationship with his daughter Angie, conversations he had with pen pals, and his mentorship of troubled youth while in the Kansas Prison system. One of the topics Wes revisited repeatedly was how he was poisoned by his ex-wife Claire, Troy and Beth Bong, and Jack Treat. Wes believed they were working as "Narcs" for the Kansas Bureau of Investigation, which is how they were able to get "experimental equipment" that they used to poison him and why the phone line was cut when he tried to report the poisoning to the police. Wes's wife at the time, Jeannette, was actually poisoning him, which only fueled Wes's belief that his ex-wife Claire was poisoning him, too. Wes was often fixated on proving Claire poisoned him and frequently demanded that his defense team investigate it further.

17. Wes's memory problems regularly interfered with his ability to cooperate with his defense team. He frequently accused me and the other members of his team of deceiving him and not following through with our promises or his demands. At one point, Wes commented that if he was as lackadaisical in the legal cases he was working on for two guys on his unit, they would have killed him by now. But these accusations were often fueled by Wes's failure to remember investigation and litigation updates the team had already given him. For instance, in November of 2015, Wes lamented to me that the team did not inform him about interviews, even though his attorneys Rebecca Woodman and Michelle Law had already given him the information he requested.

4

JbF (Initial)

18. Wes frequently vacillated in his moods and opinions. During a visit in July of 2015, Wes berated me for thirty minutes, calling the work Dr. Vartkessian and I were doing to locate and interview specific witnesses a "fishing expedition" and a waste of time. In the next breath, he told me he appreciated everything we were doing on his case, that the witness interviews were crucial, and that he thinks we should definitely continue our efforts even after the filing.

19. In January of 2018, Wes requested to see images from his PET scan. However, when I gave Wes the images during our meeting the next day, he had forgotten he had requested them and had no idea why I was giving them to him.

20. During my early visits with Wes, I noticed he started to stutter a couple times towards the end of particularly long visits. I initially took this as a sign of fatigue. But as time passed, Wes started stuttering much earlier into each visit. His stutters were not only more frequent, but also more severe. It was as though he was struggling to find the words he wanted to use.

21. From our first meeting, Wes periodically mispronounced words. Some words he routinely struggled with, such as "conjugation," "scholastic," and "participle." For other words, there was no consistency on whether Wes pronounced the word correctly or incorrectly. It seemed that Wes struggled with pronunciation more frequently when he was tired, agitated, or anxious.

22. In addition to pronunciation difficulties, Wes had issues using the correct words to convey information. Sometimes he conflated two real words, such as when he said "sporadic," instead of "spontaneous" or "serious" when he meant to say "Siri." As another example, he called the book he had been engrossed in reading "Several Disobediences," when the title was actually "Civil Disobedience." While it was sometimes easy to understand what Wes meant to say, more often than not his difficulties with properly conveying information impeded my ability to follow what he was saying.

23. Occasionally, Wes would not be able to come up with any term, correct or incorrect, to convey what he wanted to say. As one example, he could not remember the term thumb drive, which he had used on previous occasions. After struggling for some time to remember the word, he resorted to describing it instead by calling it "that little thing that would let [him] come and go with all [his] documents."

5                                                          JDF (Initial)

24. Additionally, Wes spoke in a very fragmented and tangential manner without segues to new topics, making it difficult to follow what he was saying. Wes's difficulties with retention, recall, and conveying information created barriers to effective communication and cooperation with his defense team.

25. Wes was constantly paranoid that various prison officials were trying to harm him in retaliation for his "jailhouse lawyering." In April of 2017, Wes told me, "I have a lot of partners buried in holes with little numbers on them. Any jail I have ever been to where inmates have created a stir, they've been labeled troublemakers. Retaliation always follows. The retaliation is always worse than the initial act."

26. Wes's paranoia also increased over time. In October of 2015, Wes told me he was worried that the BOP was listening to his phone calls. Wes's evidence for this belief was an officer had asked him if he wanted a legal visit prior to my arrival. Wes interpreted this as a sign that the officers were up to something. During the visit, Wes then explicitly asked me to document that the same officer walked down the hallway behind him to the visiting room and coughed. He also accused the officer of giving him a dirty look, which I did not see. Another time, in October of 2016, Wes handed me a letter he had received from his attorney Rebecca Woodman and pointed to specific language he did not understand. He pointed to the line, "I finally retrieved your letter…" He was stuck on what he perceived to be equivocation and deception.

27. Throughout my meetings with Wes, he exhibited a decline in his ability to comprehend and analyze information. During a visit in November of 2015, Wes verbally noted that the apple pie he was opening in his hands was chocolate flavored. After inspecting the package a second time, he stopped, corrected himself, and called himself a dummy for not realizing it was apple.

28. During a visit in August of 2015, Wes explained that when he reads words on a page, they "blink on and off" and are "flashing".

29. When I first started meeting with Wes in 2015, he was easily agitated and quickly spiraled with increasing aggression until his anger dissipated into thin air – very much like a tornado. As time passed, he had less energy and seemed much less frenetic than prior visits. The worst episode I observed, however, was in 2018 when I gave Wes a copy of his ex-wife Jeanette's declaration. Wes's anger accelerated rapidly. His hands were shaking as he held the

6                                                JDF (Initial)

declaration, which he then ripped up and threw on the table. At one point, Wes commented that Jeanette's lies made him sound insane. Wes's response reminded me of my other mentally ill clients when I have had to confront them with their delusions.

30.    Wes has not been on any medication for his mental health since entering USP Terre Haute. He has made several requests that the BOP put him back on the medication regime he was on during his trial, but the BOP repeatedly refuses his requests. Wes told me that the medication helped him to maintain control; he was better able to sense when he was beginning to lose control. Without his medication, he lacks this awareness.

31.    Just as Wes was about to walk out of the door of the visitation room at the end of a visit in October 2016, he told me he started getting nosebleeds on and off for the last year or year and a half. The bleeds tend to last two to three minutes, but Wes refused to raise the issue with the medical staff because he does not trust the care he receives from them. He told me he would have to bleed for an hour before he reported the problem to medical.

32.    In March of 2016, Wes brought a bag to our visit so he could urinate in it undetected under the table in case the officers were too slow to escort him to the bathroom. It should be noted that he was in handcuffs. Whether this was a sign of incontinence, dementia, paranoia, or inability to perceive social constructs, it was a signal of Wes's deterioration. It is not something that I would have imagined Wes doing when I initially became involved in his case.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this 6th day of November, 2019.


John D. Fox

7

JDF (Initial)

Ex_7-000075

Exhibit 8

# CURRICULUM VITAE

## John D. Fox, MSW

711 Boundary Avenue
Silver Spring, MD 20910
Phone: (617) 519-1235; johndavidfox@gmail.com

## PROFESSIONAL EXPERIENCE

Present,
2014-2015,
2011-2012

*Mitigation Specialist*, private practice offering consulting services on capital and non-capital cases.
Regular tasks include:
- Collaborating with attorneys and other defense team members on case theory and strategy.
- Developing comprehensive, thorough life history investigations to be used in the defense of capital defendants facing capital punishment (*see below under GRACE for more details*).
- Running daily operations, including budgeting, invoicing, accounting, and collection of payments.

2015-2018

*Co-founder and Deputy Director*, Advancing Real Change, Inc. (ARC, Inc.), Baltimore Maryland.
- ARC, Inc. is a non-profit human rights organization dedicated to conducting thorough life history investigations in capital and juvenile cases, and expanding their use into other criminal cases involving harsh penalties. In addition to its casework, ARC, Inc. provides training and consulting services to defense teams regarding the best practices of life history investigations.

2013-2014

*Social Worker*, The Bronx Defenders, Bronx, NY
Member of the criminal defense practice.
Regular tasks included:
- Conducting pre-pleading investigations through client and collateral contact interviews and record collection in order to submit written advocacy memoranda, and provide oral advocacy to prosecutors for the purposes of negotiating and attaining better sentencing results for clients.
- Collaborating with criminal defense attorneys on case theory and strategy.
- Providing clients and their families with supportive counseling, crisis intervention, and linkage to various community supports and services.

2005-2010

*Mitigation Specialist*, Gulf Region Advocacy Center (GRACE), Houston, TX.
Life history investigator for death penalty cases at trial and post-conviction stages.
Regular tasks included:
- Conducting comprehensive life history investigations through detailed record collection and interviews with life history witnesses for purpose of developing bio-psycho-social histories in preparation for trial and post-conviction petitions in

1

Ex_8-000076

capital cases.

- Preparing life history witnesses for testimony during trial and post-conviction hearings.
- Conducting appropriate research and investigation into topics related to mental health, trauma, chemical dependency, environmental toxins, maltreatment and neglect, religion, family systems, and other factors relevant to clients' life histories and development.
- Drafting documents used to organize the presentation of mitigating factors at trial and in post-conviction hearings.
- Working closely with the Mexican Capital Legal Assistance Program (MCLAP), tracking Capital Murder eligible Mexican Nationals' cases in Texas and other southern states.
- Co-created, implemented, and managed the Golden Hour Project in October 2006 for the Mexican Capital Legal Assistance Program (MCLAP), designed to collect mitigation evidence for the purpose of negotiating plea bargains for Mexican Nationals facing possible death sentences.
- Training of new staff and interns in the organizational and investigative methods of the office.

## INVITED GUEST LECTURES, PRESENTATIONS, AND FACULTY MEMBER

2018    Advancing Real Change, Inc.'s Baltimore Mitigation Training Series, Plenary session speaker, Plenary session speaker, "Advanced records collection". Baltimore, MD. March 16-18.

2018    Finegan, Henderson, Farabow, Garrett & Dunner, LLP JLWOP Training, Plenary session speaker, "Records collection and analysis" and "Understanding and uncovering client trauma". Washington, DC. January 17.

2017    Advancing Real Change, Inc.'s In-house Training, Speaker, "Interviewing for trauma and mental health". Baltimore, Maryland. August 28.

2017    Mitigation Skills Training at the Law Offices of the Public Defender – Riverside County, Speaker, "Investigating intellectual disability and adaptive deficits". Riverside, CA. August 23.

2017    Bryan R. Shechmeister Death Penalty College, Faculty member. Santa Clara University School of Law, Santa Clara, CA. July 29 to August 3.

2017    Federal Capital Habeas (§ 2255) Project Conference, Panelist, "How to Get More Information into Your Case". Philadelphia, Pennsylvania. May 18-20.

2017    Advancing Real Change, Inc.'s Baltimore Mitigation Training Series, Plenary session

2

Ex_8-000077

speaker, "Unearthing the Records that Will Change the Face of the Case". Moderator, "Developing the Narrative: Case Themes and Theories for Public Defenders". Panelist, "Resolving Cases with Mitigation". University of Baltimore School of Law, Baltimore, MD. February 10-11.

2016    Mental Health Mitigation Skills Training. Plenary session speaker, "Talking about Signs and Symptoms of Mental Illness with Witnesses" and "Building Mental Illness Narrative through Records & Research". Faculty member. Scripps College, Claremont, CA. June 28-29.

2016    JLWOP Mitigation Training. Plenary session speaker, "Introduction to Record Collection" and "The World of Records". Faculty member.  Philadelphia, PA. April 8-9.

2016    California Attorneys for Criminal Justice and California Public Defenders Association's Capital Case Defense Seminar. Plenary session speaker, "Background Investigations: Researching Experts, Lawyers, Law Enforcement Officers, and Agencies". San Diego, CA. February 12-15.

2009    The Gulf Region Advocacy Center: *Mitigation Skills Training.* Faculty member and trainer. Houston,  TX. June 13-15.

2008    Texas Criminal Defense Lawyers Association: *Mitigation Training.* Plenary session speaker, "Scorched Earth Record Collection" and "Introduction to Masterdocs". Faculty member. Lubbock, Texas. August 14-15.

2007    Mexican Capital Legal Assistance Program: *Mitigation Skills Training.* Plenary session speaker, "Scorched Earth Record Collection" and "Introduction to Masterdocs". Houston, Texas. June 22-24.

## EDUCATION

2013    Master in Social Work (MSW)
Silver School of Social Work at New York University, New York City, NY

2005    B.A., Theology; B.A. Philosophy, *Cum Laude*
Boston College, Chestnut Hill, MA

## SCHOLARSHIPS AND AWARDS

2012      Silver School of Social Work, New York University (half tuition)

2011      Silver School of Social Work, New York University (half tuition)

Ex_8-000078

# Exhibit 9

## Naples Neuropsychology, P.A.

### Robert H. Ouaou, Ph.D.

Neuropsychological Assessment                    Clinical and Forensic Psychology

## FORENSIC NEUROPSYCHOLOGICAL EVALUATION

**NAME:**            WESLEY PURKEY
**AGE:**             65
**EDUCATION:**       9 years
**DATE OF BIRTH:**   0▇▇▇▇▇▇

**DATE(s) OF EXAM:**    10/11/2016 & 10/12/2016

**DATE OF REPORT:**    04/24/2017

### REFERRAL QUESTION

Mr. Wesley Purkey is a single, 65-year-old[1] right handed male who was referred to me by his defense counsel. The purpose of this evaluation was to assess Mr. Purkey's current neurocognitive functioning in relation to a history of traumatic brain injury.

I am a psychologist licensed in the state of Florida with specialized training in neuropsychology. I have a subspecialty in evaluating patients with dementia. I was previously Vice President of the advisory board for the American Alzheimer's Association in Florida. A copy of my curriculum vitae accompanies this report.

Mr. Purkey underwent several hours of interview and neuropsychological assessment on 10/11/2016 & 10/12/2016 at the United States Penitentiary in Terre Haute, IN, including a comprehensive neuropsychological test battery. Mr. Purkey was made aware of the nature of this evaluation. He was told that he was waiving his rights to confidentiality, and that I have been authorized to provide an evaluation, not treatment. He was also made aware that I would be reviewing relevant records and potentially speaking with third party sources. Mr. Purkey was evaluated in a private exam room that was free from visual or auditory distractions.

### RELEVANT RECORDS REVIEWED

Bruce Leeson penalty phase testimony and raw data
Bruce Leeson report 2003-01-05
Dan Martel penalty phase testimony
Dan Martel report 2003-11-11
David Preston penalty phase testimony

---

[1] At the time of my interviews of Mr. Purkey, he was 64 years old.

801 Anchor Rode, Suite 106 • Naples, FL 34103 • Phone: 239.262.3007 • Fax: 239.263.3001
Neuropsych@me.com

**000762**

Wesley Purkey
04/24/2017
NEUROPSYCHOLOGICAL ASSESSMENT
Page 2 of 11

David Preston letter to defense attorney 2003-10-17
UKMC Radiology Report 2003-10-03
Results of PET and MRI scans performed on Wesley Purkey
Helen Mayberg penalty phase testimony
Helen Mayberg summary findings 2003-11-09
Park Dietz psychological evaluation 2003-10-07
Transcript of interview of Wesley Purkey by Park Dietz 2003-09-15 and 09-16
(actual video also included)
Park Dietz penalty phase testimony
Stephen Peterson report 2000-04-19
Stephen Peterson report 2003-08-13
Stephen Peterson penalty phase testimony
Stephen Peterson post-conviction declaration
Brain scan images of Wesley Purkey
MMPI Scales and WAIS Full Scale 1970-1971 KDOC
Shipley and Jesness Tests KDOC 1975
Bender Gestalt at age 48 KDOC
Wesley Purkey's s school records from Wichita diocese
Wesley Purkey's 1st grade school records Christ the King
Clinical services report 07/20/1994 KDOC
GED test scores 10/21/1974
Group IQ scores 05/11/1981 KDOC
Iowa State Penitentiary testing August 1983
IQ scores age 22 (circa 1974) KDOC
Family Cheat Sheet (updated 08/17/2016)
Wesley Purkey admission for head injury age 18
Wesley Purkey hospital admittance 09/13/1998 chest pain KUMC
Wesley Purkey Psychiatric evaluation 05/24/1971 KDOC
Wesley Purkey's Larned State Hospital records (two admissions)
Death certificate Carrie Anna Burke
Death certificate Anna Haberthier
Death certificate William Haberthier
Death certificate Nancy Ida Purkey
Death certificate Larry Gene Hamilton
Death certificate Roy Allen Purkey
Declaration of Debbie Prothero 03/02/2008
Declaration of Gary Hamilton (brother)
Declaration of Rex Newton, PhD

**RELEVANT HISTORY**
The following history is based on interviews with Mr. Purkey as well as review of relevant declarations from collateral witnesses, medical, education and legal records.

**000763**

Ex_9-000080

Wesley Purkey
04/24/2017
NEUROPSYCHOLOGICAL ASSESSMENT
Page 3 of 11

Currently, Mr. Purkey complained of progressive anterograde memory problems and gave multiple examples, such as forgetting to take his daily medications and having conversations with others.

**Past Medical History**
Mr. Purkey has a history of enumerable blows to the head of varying severity beginning in childhood as a result of severe physical abuse. He stated that he also started playing football in early childhood in youth leagues and in school, and sustained multiple blows to the head. Concerning the childhood physical abuse, he stated that his father repeatedly struck his head and threw him headfirst into walls. At age 14, Mr. Purkey was admitted to St. Francis Hospital in Wichita, Kansas, for inpatient psychiatric services due to a complaint of severe headaches and ongoing dizziness. At this time, he underwent an electroencephalogram that was suggestive of possible impairment in the left frontal and temporal regions. At age 20, the medical record reflects a history of head injury with significant loss of consciousness. This occurred while he was doing engine work on a vehicle on the side of a road and another vehicle struck him. He was diagnosed with a cerebral contusion. Medical records from Wesley Medical Center indicate that in 1976, Mr. Purkey overdosed and suffered a period of posttraumatic amnesia. There are notations of another hospital admission to St. Francis in 1976 when he sustained a head injury during an altercation with police. X-rays showed a possible greenstick fracture[2] to his skull. Department of Corrections records also note additional head injuries. These include a blow to the head with a pipe and a head injury on 1/12/2001 when Mr. Purkey fell from the top of a trashcan, subsequently hitting his head on the cement floor below. He had been replacing a light bulb as part of his regular work duties. In addition to the above documented head injuries, Mr. Purkey stated that he was involved in further serious motor vehicle accidents that resulted in head injuries.

Imaging of Mr. Purkey's brain from 2003 showed temporal lobe abnormalities – the area associated with memory functioning and dementia. Specifically, the imaging report indicated moderate to marked decreased activity in both temporal lobes and noted that this finding is often associated with previous head injury and might be related to memory dysfunction. Additionally, the 2003 imaging report indicated deficient functioning in the right parietal and frontal lobe areas.

He underwent neuropsychological testing by Bruce Leeson, Ph.D. on 1/05/2003 that indicated findings (especially executive functions) that were consistent with brain damage. Memory testing at that time was interpreted as normal.

---

[2] A greenstick fracture occurs when a bone bends and cracks, instead of breaking completely into multiple pieces.

000764

Ex_9-000081

Wesley Purkey
04/24/2017
NEUROPSYCHOLOGICAL ASSESSMENT
Page 4 of 11

Psychologist Daniel Martell, Ph.D., opined about Dr. Leeson's test results in 11/2003. Specifically, Dr. Martell interpreted the raw data scores of Dr. Leeson's evaluation as essentially within normal limits with mild weaknesses on tests of social comprehension and on the block design subtest of the WAIS-III. Additionally, he observed that there was mild to severe impairments on the Test of Variable Attention (TOVA) suggestive of deficits that would warrant further evaluation. However, Dr. Martell did not administer any tests of cognitive functioning, nor did he meet with Mr. Purkey.

**Current Medications**
Mr. Purkey takes daily medication for high blood pressure.

**Family Medical History**
His direct family history is positive for neurological disorders including cerebral hemorrhages, organic brain syndrome, and dementia. There is a maternal and paternal history of alcoholism.

**Past Psychiatric History**
Mr. Purkey has a history of childhood trauma and as a child developed headaches, vomiting, blackout spells, and dizziness. He was treated as an inpatient at St. Francis hospital from his first admission at age 14. At that time, and in future inpatient stays including at age 17, he was prescribed several antipsychotic medications including Promazine, Mellaril, Sparine, Klonopin, and Thorazine. He continued treatment at St. Francis into adulthood.

Mr. Purkey has a history of polysubstance abuse. He began abusing alcohol at age 12 and heroin at age 14. Other substance abuse included amphetamines and cocaine.

**Developmental History**
Mr. Purkey was born to an alcoholic mother. His childhood environment was extremely abusive. He stated that he could not count the number of times that his father beat him or hit his head. He denied being in special education classes or being evaluated for learning disabilities. Mr. Purkey dropped out of school during the 9th grade. He worked in construction and had temporary jobs. He learned plumbing skills in prison in 1997 and worked as a plumber until his arrest.

**PROCEDURES**
The patient was administered a battery of neuropsychological tests. Tests that are currently available are highly accurate, standardized instruments. They are validated through clinical trials, adhering to stringent, objective measures. Neuropsychological tests provide quantifiable results that indicate the amount of

**000765**

Ex_9-000082

Wesley Purkey
04/24/2017
NEUROPSYCHOLOGICAL ASSESSMENT
Page 5 of 11

deviation from base-line norms. Through a comparison of patient responses to established norms, the clinician can determine the scope and severity of cognitive impairments.  This data can provide information leading to the diagnosis of a cognitive deficit or to the confirmation of a diagnosis, as well as to the localization of organic abnormalities in the central nervous system (CNS).

### *Measures of Symptom Effort/Malingering:*
Test of Memory Malingering (TOMM)
California Verbal Learning Test – 2nd Edition (CVLTII) Forced Choice
WAIS-IV Embedded Measures (e.g. reliable digits)
ACS Effort Test

### *Measures of Cognitive/Intellectual Functioning:*
ACS Test of Premorbid Functioning
Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV)
- Block Design
- Similarities
- Digit Span
- Matrix Reasoning
- Vocabulary
- Letter Number Sequencing
- Symbol Search
- Visual Puzzles
- Information
- Coding
- Symbol Search-Coding

Wechsler Memory Scale - Fourth Edition (WMS-IV)
- Logical Memory I & II
- Visual Reproduction I & II
- Verbal Paired Associates I & II
- Designs I & II

California Verbal Learning Test – 2nd Edition (CVLT-II)
Delis Kaplan Executive Function System (D-KEFS)
- Verbal Fluency
- Color Word Interference
- Trail Making Tests
- Design Fluency Test
- Proverbs

Rey Complex Figure Test (RCFT) Copy and Memory Test
Halstead Reitan Neuropsychological Test Battery
- Finger Tapping

Woodcock-Johnson III Tests of Achievement
- Reading Fluency

**000766**

Ex_9-000083

Wesley Purkey
04/24/2017
NEUROPSYCHOLOGICAL ASSESSMENT
Page 6 of 11

Math Fluency
Wisconsin Card Sorting Test (WCST)

## EXAMINATION RESULTS

### SYMPTOM VALIDITY/MALINGERING
When testing subjects there is the possibility that they may try to exaggerate their cognitive and psychiatric impairments.  In order to determine if this was the case I administered tests that are designed to reveal less than genuine performance on the part of the test subject.  On multiple tests of effort and motivation Mr. Purkey performed within normal limits.  Thus, the current evaluation is considered to be a valid profile of Mr. Purkey's neuropsychological functioning.

### INTELLECTUAL FUNCTIONING
On a verbal reading task (TOPF) designed to estimate an individual's intellectual ability prior to any type of neurological disease or insult, Mr. Purkey scored in the *Low Average Range*, receiving a Standard Score of 86.

### WAIS-IV SCORES

WAIS-IV Full Scale IQ:
*86 (18th Percentile; Low Average Range)*

Verbal Comprehension:
*95 (37th Percentile; Average Range)*

WAIS-IV Perceptual Reasoning:
*86 (18th Percentile; Low Average Range)*

WAIS-IV Working Memory:
*92 (30th percentile; Average Range)*

WAIS-IV Processing Speed:
*84 (14th Percentile; Low Average)*

Mr. Purkey was administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV), from which his IQ scores were derived.  The Full Scale IQ is the aggregate of the index scores and is usually considered to be the most representative measure of global intellectual functioning.  The patient's general cognitive ability is in the *Low Average* range of intellectual functioning.  His overall thinking and reasoning abilities exceed those of approximately 18% of adults his age.  His true Full Scale IQ score falls between 82 - 90 within a Confidence Interval of 95%.

**000767**

Ex_9-000084

Wesley Purkey
04/24/2017
NEUROPSYCHOLOGICAL ASSESSMENT
Page 7 of 11

The Verbal Comprehension score is a measure of acquired knowledge, verbal reasoning, and comprehension of verbal information.  His verbal reasoning abilities, as measured by the index, are in the *Average* range and above those of approximately 37% of his peers.

The Perceptual Reasoning score provides an indication of an individual's nonverbal reasoning, spatial processing skills, attentiveness to detail, and visual-motor integration.  His nonverbal reasoning abilities, as measured by the index, are in the *Average* range and better than those of approximately 18% of his peers.

There was a significant difference between verbal and non-verbal IQ indices.

**COGNITIVE FUNCTIONS**

**Attention/Concentration**
*Immediate Memory Span*: Mr. Purkey demonstrated inconsistent performance on measures of immediate memory.  He was able to repeat up to 6 digits forward on the WAIS-IV Digit Span, which is in the expected range.

His recall of the initial list of words from the CVLT-II was in the average range relative to age-matched peers (45th percentile).  His recall of a 2nd, interference list, was in the low average range (16th percentile).

*Focused & Flexible Attention*: Completion time for tasks requiring motor speed, sequencing, and visual search were in the average ranges compared to age and education matched peers. When these tasks were made more complex by requiring that he alternate cognitive sets (DKEFS – Letter Number Switching), he performed within the average range (50th percentile).

*Processing Speed*:  The Processing Speed Index from the WAIS-IV provides a measure of Mr. Purkey's ability to quickly and correctly scan, sequence, or discriminate simple visual information.  This composite also measures short-term visual memory, attention, and visual-motor coordination.  His performance on tasks measuring processing speed is better than 14% of his age-mates (Processing Speed Index = 86 on the WAIS-IV; Low Average).  Performance on the WJ-III tests of fluency were low average (11th and 20th percentiles).

*Working Memory:* The Working Memory Index of the WAIS-IV is a measure of an individual's ability to hold information temporarily in memory for the purpose of using that information to perform a specific task. Working memory (i.e., a higher level attentional ability) is an important prerequisite of many cognitive abilities

**000768**

Ex_9-000085

Wesley Purkey
04/24/2017
NEUROPSYCHOLOGICAL ASSESSMENT
Page 8 of 11

such that inadequate working memory skills will likely affect an individual's ability to perform other mental operations efficiently.  Mr. Purkey's ability to hold auditory and visual–spatial information in temporary storage was in the average range on the WAIS-IV (WAIS –IV Wkg Mem Index = 92) and greater than 30% of his age matched peers. He was able to repeat a maximum of 2 digits backwards, which is in severely impaired range relative to age-matched peers.

**LEARNING/MEMORY**

**WMS-IV Index Scores**
Auditory Memory          74 (Moderately Impaired  – 4th percentile)
Visual Memory            67 (Severely Impaired – 1st percentile)
Immediate Memory         73 (Moderately Impaired – 4th percentile)
Delayed Memory           61 (Severely Impaired – Less than 1st percentile)

See chart below reflecting total performance on the California Verbal Learning Test-2nd Edition (CVLT-II):



000769

Ex_9-000086

Wesley Purkey
04/24/2017
NEUROPSYCHOLOGICAL ASSESSMENT
Page 9 of 11


Total list learning on the CVLT-II was in the mildly impaired range (7th percentile) compared to age matched peers.  Initial learning of the list was impaired.

Word-list recall following a brief delay and presentation of a second interference list was in the low average range (16th percentile).  His performance was moderately impaired at short delayed cued recall (2nd percentile).  Mr. Purkey recalled 4 words following a 20-minute delay, which was within the impaired range (7th percentile).  His performance did not improve significantly with cues (2nd percentile).

Recall memory from the Rey Complex Figure Test was impaired at short delay (3rd percentile) and long delay (7th percentile) relative to age matched peers.

**Recognition**
Word-list recognition on the CVLTII and WMS-IV was within impaired limits.  He was not able to adequately discriminate between learned and non-learned information.

**Language**
A global index of verbal comprehension from the WAIS-IV was in the average range and at the 37th percentile.  Semantic verbal fluency was relatively impaired. Lexical verbal fluency was in the average range.

**Spatial Analysis/Synthesis**
Mr. Purkey's score on the WAIS-IV Block Design test was in the low average (9th percentile) range compared to age matched peers. Matrix reasoning from the WAIS-IV was in the average range (37th percentile).  His ability for visuospatial praxis on the Rey Complex Figure was within impaired limits.

**Reasoning/Problem Solving/Executive Function**
Executive functions are those neuropsychological processes that allow an individual to plan, initiate, program, sequence, and maintain goal-directed behavior, especially under novel circumstances.  These complex cognitive functions also allow an individual insight into the intent of their behavior. Executive functions allow an individual to alter her/his behavior in order to meet the demands of a task or inhibit nonproductive behavior.  Executive functions are affected by global traumatic brain injury as well as focal injuries to the frontal lobes of the brain.

On a measure of verbal reasoning and abstraction (Similarities) Mr. Purkey scored within the average range (37th percentile).  His performances on several subtests of the Delis Kaplan Executive Function System (DKEFS) were within the

**000770**

Ex_9-000087

Wesley Purkey
04/24/2017
NEUROPSYCHOLOGICAL ASSESSMENT
Page 10 of 11

expected range (Trail Making Test, Verbal Fluency Category Switching, Color-Word Interference Test).  He did show relative deficits on the DKEFS in semantic verbal fluency and proverbs.  His performance on the WCST was well within normal limits.

**MOTOR**
A measure of fine motor speed and dexterity revealed relative left sided weakness (Grooved Pegboard; Dominant Hand = 50th percentile, Non-Dominant Hand = 27th percentile).

**SUMMARY OF COGNITVE TESTING**
Mr. Purkey completed a comprehensive neuropsychological test battery.  My review of raw data from a previous examination showed that the previous examination failed to integrate PET imaging of Mr. Purkey's brain and failed to include some important neuropsychological measures.

On the current examination, Mr. Purkey put forth maximum effort on measures associated with malingering or feigning cognitive impairment (i.e. measures of memory, attention, executive functions, intellectual disability).  He passed all indicators that he was giving genuine effort and the results are considered to be a valid and comprehensive summary of his intellectual and cognitive functioning.

Mr. Purkey exhibited cognitive deficits that are found in patients with acquired neurological injury and/or disease.  On objective measures of cognitive functioning, he demonstrated significant learning and memory deficits.   He demonstrated relative motor weakness on the non-dominant side indicating possible right hemispheric deficits as well as mild impairments on some measures of executive functioning.

The current cognitive test findings clinically corroborate the 2003 neuroimaging conducted on Mr. Purkey's brain.  Cognitive tests, most of which were available in 2003, showed deficiencies that were related to the functions of the temporal cortex (memory) as well as neuroanatomical areas associated with the frontal lobes.  The regions in the brain that are related to the cognitive deficits on exam were found to be abnormal on a 2003 PET scan.

When compared to the 1/5/2003 test data of Dr. Leeson, Mr. Purkey showed significant declines on the Wechsler Memory Scale and impairments on other memory measures that were not administered in 2003.  Additionally, he showed impairments on the Delis Kaplan Executive Functioning Systems that were also exhibited in 2003.

**000771**

Ex_9-000088

Wesley Purkey
04/24/2017
NEUROPSYCHOLOGICAL ASSESSMENT
Page 11 of 11

**FORMULATION**

My overall assessment of Mr. Purkey is that he demonstrated objective indicators on current testing of acquired brain damage related to traumatic brain injuries, dementia, possible posttraumatic stress disorder (PTSD), and possible Fetal Alcohol Syndrome (FASD).

It is abundantly clear, based on my review of the records and the impairments on current neuropsychological testing, that Mr. Purkey has been plagued with episodes of emotional dyscontrol and behavioral disinhibition since childhood.  It appears that these problems are a product of multiple head traumas sustained since childhood and possible PTSD that was self-medicated with multiple substances beginning during key periods of neurological development.

The behavioral consequences of his traumatic brain injuries, psychiatric illness, and polysubstance use contributed to significantly modulating his behavior at the time of the offense.

Further, these patterns of cognitive deficits, his medical history, possible PTSD and FASD, and family medical history strongly suggest that Mr. Purkey is currently suffering from the beginning stages of a cortical neurodegenerative disease, such as dementia.  The most commonly diagnosed dementia is Alzheimer's disease (AD), which is likely in Mr. Purkey's case considering his multiple risk factors and current symptoms. As Mr. Purkey's disease progresses, the AD pathophysiological processes in the brain will lead to significant cognitive and functional declines that require specialized medical treatment and care. The average life expectancy after diagnosis is eight to ten years.  However, in some cases it is as short as three years or as long as twenty years.

These opinions are given with a reasonable degree of neuropsychological certainty.

_____
Robert H. Ouaou, Ph.D.
Florida Licensed Psychologist (PY6868)
Neuropsychologist

**000772**

Ex_9-000089

# Exhibit 10



**Tulane University**

Frederic Sautter, Ph.D.
Department of Psychiatry and Behavioral Science
1440 Canal St.,   TB48
New Orleans, Louisiana 70112
(504) 988-5405  Fax (504) 988-4270

April 22, 2018

## Psychological Evaluation

**Defendant:** Wesley Ira Purkey
**Examiner:** Frederic J. Sautter, Ph.D.
**Date of Assessment:** 11-16-16; 11-17-16
**Location:** The United States Penitentiary, Terre Haute Indiana

## Professional Credentials

I am a clinical psychologist licensed in the State of Louisiana with specialized training in posttraumatic stress disorder (PTSD). I am currently a Professor of Clinical Psychiatry at the Tulane Health Science Center in the Department of Psychiatry and Behavioral Science. I am also the Program Manager of the Family Mental Health Program at the Southeast Louisiana Veterans Health Care System (SLVHCS). Before assuming that position I was a clinical psychologist in the PTSD Program for fifteen years. I also conduct research on post-traumatic stress disorder. My research has been funded by the Department of Veterans Affairs and National Institutes of Health (NIH). I have been funded by the Department of Veterans Affairs to conduct two randomized clinical trials of PTSD Treatments. A copy of my curriculum vitae is included in the Appendix.

## Basis of the Referral

The legal defense team of Mr. Wesley Ira Purkey requested that I conduct an evaluation of Mr. Purkey to assist the court's ability to understand his state of mind at the time of the crime and to help the court identify any mitigating mental health factors that may prove relevant to Mr. Purkey's sentencing. They also requested that I conduct an analysis of the mental health evidence and expert evaluations that were presented at the time of Mr. Purkey's prosecution for the homicide of Jennifer Long on January 22, 1998. This analysis can be found in a separate report.

## Methods

Clinician Administered PTSD Scale (CAPS), PTSD Checklist – Civilian Version (PCL-S), Structured Clinical Interview for DSM-IVR (SCID), Life Events Checklist; Child Trauma Questionnaire (CTQ), Trauma-Symptom Inventory-Second Edition (TSI-2), Miller Forensic Assessment Symptoms Test (M-FAST), Unstructured Clinical Interview.

Ex_10-000090

## Sources of Information

Clinical interviews and assessments conducted with Wesley Purkey on November 16th and 17th of 2016. A complete list of sources of information is included in the Appendix. This list includes declarations from collateral sources of information that had observed Wesley Purkey's past behavior; medical reports that included information relevant to Wesley Purkey's mental health; records from correctional facilities where Wesley Purkey has been incarcerated that contain information relevant to his mental health; educational records that contain information relevant to his mental health; and legal records including reports provided to the court that contain information relevant to Mr. Purkey's mental health. This examiner had explained to Mr. Purkey that the information he provided to me would not be considered confidential and that anything he reported to me might be included in my report or testimony.

## Behavioral Observations

Interviews and an assessment were conducted with Wesley Purkey on November 16th and 17th of 2016 at the United States Penitentiary at Terre Haute, Indiana. The first assessment session lasted six hours and 30 minutes and the second assessment session lasted four hours. During both assessment sessions, Mr. Purkey was dressed in prison issued attire and behaved in a socially appropriate manner. He was able to provide information about his mental health. His performance on tests of malingering and exaggeration of psychopathology administered by this examiner and other expert examiners indicated that he was not exaggerating his psychological problems. His responses to questions about his mental health provided information that was consistent with his behavior and with data provided by other respondents.

During the first part of the first interview Mr. Purkey appeared anxious. He waited for the examiner to ask questions before providing information. He was able to communicate facts and respond to questions about past emotions and behaviors. Although he showed symptoms of mental illness, these symptoms did not appear to affect his ability to provide the examiner with information. It was possible to establish a good rapport with Mr. Purkey so that a productive series of interviews and assessments could be conducted.

As the first interview continued, Mr. Purkey became more relaxed and actively participated in the assessment. He started to volunteer information when it seemed appropriate. He was not unusually defensive, but when asked about the abusive aspects of his childhood he became overwhelmed with emotion. The two topics that elicited the most intense emotions from Mr. Purkey were the killing and dismemberment of Ms. Long and the sexual abuse he suffered from a priest. He was not able to discuss the dismemberment of Ms. Long. He became distraught with emotion as he communicated his shame for killing Ms. Long and the fact that his behavior deprived his daughter and grandchildren of having a supportive parent or grandparent. He wept when talking about his missing his daughter.

2

000267

Ex_10-000091

Mr. Purkey described a history of extensive childhood emotional, physical and sexual abuse and reported behaviors that caused him shame and anger. On one occasion toward the end of the first day's examination he told the examiner "You have no idea how hard it is to talk about what my father did to me" as he wept with tears streaming down his face on to his drenched shirt. Mr. Purkey appeared depressed and sullen as he described his own emotional pain when talking about his hurting other people and neglecting his own child.

**Background Information**

Wesley Ira Purkey was born on ████████████ to Jack and Velma Purkey. He is the youngest of two children. His father is reported to have committed suicide when Wesley Purkey was 32 years old and his mother died of pancreatic cancer when he was 29 years old. The Purkey family shows a history of psychiatric problems and it is documented through declarations from family, friends and other sources that this created levels of psychological adversity and physical, emotional, and sexual abuse that devastated a child that was provided low levels of emotional, financial, and material support and few role models for healthy behavior. While limited information about Wesley Purkey's physical, emotional and sexual abuse were presented at Mr. Purkey's 2003 murder trial, witnesses and informants have stepped forward to report that Mr. Purkey was sexually abused from the age of nine through twenty-two by his mother and by others. Current evidence indicates that Mr. Purkey told his therapist about his sexual abuse as early as 1987 validating his current descriptions of intensive sexual abuse as well as high levels of emotional and physical abuse over that same period.

Given Mr. Purkey's extensive early life exposure to traumatic stress and abuse it is hardly surprising to learn that many of his adult behavior problems began during his childhood and adolescence. Records indicate he performed poorly in school and showed increasing problems controlling his emotions and behavior as he grew older. He described increasing anxiety and depression as a child and at the age of thirteen Mr. Purkey reported starting to abuse drugs and alcohol. His report to me during my interview and supporting records show that this alcohol and substance abuse exacerbated his behavior problems and adversely affected his academic and social development. The impact of alcohol and drugs was sufficiently devastating as to culminate in Mr. Purkey's quitting school prior to completing the ninth grade. He described his efforts to earn a living in his community, but his alcohol abuse and behavior problems became barriers to employment as he reported that he rarely stayed at one job for more than six months. As he grew older he became engaged in criminal behavior to support his growing addictions and committed several burglaries and other forms of robbery to support his addictions. This growing dependence on alcohol and drugs interfered with his efforts to adjust to his environment and signaled the onset of a problem that would remain a destructive factor for the rest of his life.

Mr. Purkey's growing alcohol and drug dependence coupled with his reported exposure to interpersonal trauma during his childhood and adolescence appear to have played significant

3

000268

Ex_10-000092

roles in his committing increasing interpersonal violence as he continued to commit more crimes as he grew up. His reports during the interview process were that these instances always occurred when young Purkey was intoxicated and when he reported emotions related to his earlier experiences with abuse. My perception that his earlier abuse played a role in his increasingly angry behavior is consistent with studies showing that children who are exposed to domestic violence and interpersonal trauma develop delinquent behavior during adolescence and interpersonal violence and antisocial behavior as adults.[1] Mr. Purkey was arrested for burglary and rape and other assaultive behaviors several times during his twenties and early thirties and was sentenced to periods of increasing incarceration until finally sentenced to a term of 15 years to life in prison when he was in his mid-thirties. Then, at the age of forty-five, Mr. Purkey was released from prison and in less than two years was arrested for committing a homicide. These sequences of drunken trauma-related assaults and attempts to secure money for alcohol and drugs that invariably led to longer and longer incarcerations became the defining characteristic of his life.

These patterns of emotionally driven self-destructive behavior continued to rule his life even after his incarceration as he awaited his 2003 capital trial. Mr. Purkey told me his emotions were increasingly intense as he continued to use drugs and showed severe problems with emotional control. He reported frequent trauma memories and mood swings. It is reported that he showed explosive anger, insomnia, agitation, depression, racing thoughts, and an inability to engage in normal social behavior as he awaited trial. His behavior was self-destructive and he admitted to me during his interviews that he could not control himself. He reported verbally aggressive behavior with police officers, jail staff, and even members of his own legal team. He was emotionally dysregulated, impulsive and suspicious of the intentions of other people. Mr. Purkey showed periods of medical compliance followed by periods of noncompliance and an inability to work with his legal team in a consistently helpful way. These emotionally driven behaviors continued up to the days of his 2003 capital trial.

This psychologist was hired by his current legal team to evaluate the mental health information provided to the court at Mr. Purkey's 2003 capital trial. I was also asked to assess his mental health and to report whether trauma-related disorders such as PTSD or other psychological abnormalities might have influenced Mr. Purkey's behavior when he committed the homicide that he was tried for at his 2003 trial.

## Trauma Assessment

### Assessment of Malingering

Before the findings of this assessment can be used to determine if Mr. Purkey suffers from a mental disorder, it must be established that he was truthful in his reporting of psychological symptoms and traumatic events during the assessment. The Miller Forensic Assessment of

---

[1] Wilson, Stover, & Berkowitz (2009). The relationship between childhood violence exposure and juvenile antisocial behavior. *Child Psychology and Psychiatry*, 7: 769-779.

4

000269

Ex_10-000093

Symptoms Test (M-FAST) is a test that was designed to measure the exaggeration or distortion of symptoms (i.e. "malingering") in forensic populations. It contains seven (7) primary scales that are designed to identify individuals who endorse single items, or combinations of items, that are unlikely to be reported by individuals who have a valid psychological disorder. All seven of Mr. Purkey's scale scores fell within the "Honest" range, indicating that it is highly unlikely that he was malingering. These data support the validity of the assessment findings and show that Mr. Purkey was not distorting his responses to the questions posed to him during this assessment.

The Trauma Symptom Inventory (TSI) also contains Validity Scales that provide information about exaggeration and minimization of trauma. On the TSI Validity Scales Mr. Purkey did not show any signs of under-reporting trauma symptoms as he reported a symptomatic response on all six Response Level (RL) items and his score of 9 on the Atypical Response (ATR) scale falls at the mean (M 9.38; SD 4.14) for a standardization sample of incarcerated people with PTSD. These scores indicate he was not endorsing levels of trauma problems that suggest symptom exaggeration. This finding, together with the data from the M-FAST indicates that he is responding without exaggeration and shows no sign of feigning a psychiatric disorder. In addition, Robert Ouaou, Ph.D., who assessed Mr. Purkey's neuropsychological functioning during the same approximate time that this evaluation was conducted, also determined that Mr. Purkey did not appear to exaggerate his psychological difficulties.

**PTSD Risk Factors**
**Family History of Psychiatric Disorder**
Family history data was reviewed to estimate Mr. Purkey's familial vulnerability to psychiatric problems. This is important because a family history of psychiatric disorder increases a vulnerability to PTSD and other trauma-related conditions[2] and because high levels of family distress increase PTSD.[3] This information was provided to the examiner by Mr. Purkey and was supplemented by medical records, mental health reports and signed declarations from key relatives, acquaintances, and clinicians with information about the mental health problems experienced by Mr. Purkey's family members.

Family history information indicates that Mr. Purkey's first- and second- degree relatives show a preponderance of alcoholism, domestic violence, and child abuse. This is important because alcohol intoxication increases risk for domestic violence.[4] Both of Mr. Purkey's parents were

---

[2] Breslau, N. (2009). The epidemiology of trauma, PTSD, and other posttrauma disorders. *Trauma, Violence, & Abuse, 10*(3), 198-210.

[3] Pietrzak, R. H., Johnson, D. C., Goldstein, M. B., Malley, J. C., Rivers, A. J., Morgan, C. A., & Southwick, S. M. (2010). Psychosocial buffers of traumatic stress, depressive symptoms, and psychosocial difficulties in veterans of Operations Enduring Freedom and Iraqi Freedom: the role of resilience, unit support, and postdeployment social support. *Journal of Affective Disorders, 120*(1), 188-192.

[4] Costa, B. M., Kaestle, C. E., Walker, A., Curtis, A., Day, A., Toumbourou, J. W., & Miller, P. (2015). Longitudinal predictors of domestic violence perpetration and victimization: A systematic review. *Aggression and Violent Behavior, 24*, 261-272.

5

Ex_10-000094

alcohol dependent individuals who committed acts of domestic violence and child abuse with regularity; this couple directed violent behavior toward each other and toward their children as their alcohol intoxication fueled their aggression and violence. This familial pattern of alcoholism and domestic violence was associated with familial depression as Mr. Purkey's mother, half-brother (maternal), and daughter have all been treated for major depression. Because the presence of domestic violence and psychiatric disorder in a family is associated with an increased risk for posttraumatic stress, we may infer from this family information data that Mr. Purkey was vulnerable to developing PTSD and that his victimization to extensive physical, emotional and sexual abuse, and observed abuse in others, would further increase his risk for PTSD and trauma-related disorders like alcohol abuse and dependence and depression.[5]

**Identification of Childhood Adversity**

Childhood adversity was assessed because it has been established that both childhood adversity and childhood trauma exposure increase a child's risk for developing PTSD and trauma-related disorders as an adult.[6] This is relevant for this assessment because the examiner had learned that there was a likelihood that Mr. Purkey was exposed to high levels of psychological adversity as a child and adolescent. This childhood adversity is important because early life adversity affects a child's brain development thus increasing the child's vulnerability to developing mental disorders and posttraumatic stress while limiting the child's intellectual development and coping skills.[7] During his childhood and adolescence Mr. Purkey was exposed to the following adversities:

(1) Economic deprivation affected his opportunities for education and limited Mr. Purkey's access to the kinds of mental health and special education programs that might have identified some of his early problems and secured remediation and therapy that would have allowed him to overcome some of his early life brain and behavior deficits.

(2) The lack of acceptable medical and mental health care was damaging to Mr. Purkey who was confronted with a range of mental health and medical challenges as a child and young person. It has been reported that Mr. Purkey showed behavioral signs of Fetal Alcohol Effects and symptoms of polio when he was five years old. Mr. Purkey would have benefited from sound neurological care as he experienced possible traumatic brain injuries after being involved in serious motor vehicle accidents at the ages of sixteen and twenty years of age. There are also reports of neurological tests that indicate that Mr. Purkey experienced deficits in brain

---

[5] McLaughlin, K.A. et al. (2010) Childhood adversity, adult stressville events, and risk of past-year psychiatric disorder: A test of the stress sensitization hypothesis in a population-based sample of adults. *Psychological Medicine*, 40 (10): 1647-1658.

[6] McLaughlin, K.A. et al. (2010) Childhood adversity, adult stressville events, and risk of past-year psychiatric disorder: A test of the stress sensitization hypothesis in a population-based sample of adults. *Psychological Medicine*, 40 (10): 1647-1658.

[7] Carrion, V. G., & Wong, S. S. (2012). Can traumatic stress alter the brain? Understanding the implications of early trauma on brain development and learning. *Journal of Adolescent Health, 51*(2), S23-S28.

6

000271

Ex_10-000095

functioning as early as his teenage years. This suggests that Mr. Purkey may have experienced life-changing benefits if he had received more intensive diagnostic testing and treatments during childhood and early adolescence.

(3) Despite the fact that records document Mr. Purkey's early life depression and trauma exposure, he was never provided an evidence-based treatment for depression (e.g., Cognitive Behavioral Therapy for Depression) nor did he ever, as a child or as an adult, receive a trauma assessment or an evidence-based PTSD treatment (e.g., Prolonged Exposure (PE), Cognitive Processing Therapy (CPT)). This lack of assessment and treatment had a significant negative impact on his psychological functioning.

(4) Mr. Purkey grew up in a family environment that modeled alcohol abuse, sexual exploitation and aggression, thus exposing him to models that normalize those unhealthy behaviors and increase   tolerance of behaviors that increase his risk of developing psychological problems and self-destructive coping mechanisms. He was never provided with healthy male role models regarding the difference between assertive behavior and aggression, healthy ways to cope with stress, healthy sexual behavior and the importance of respecting women, and the respectful treatment of women. Instead, his home environment modeled unhealthy attitudes regarding sexuality as he reports that his father frequently brought prostitutes into the home and even encouraged one of them to sexually abuse Mr. Purkey. It has been reported that young Purkey's mother encouraged men to engage in sexual behavior with her in front of her son, and both of his parents regularly abused alcohol in front of their children and encouraged young Purkey to drink to intoxication before he was of legal age to drink alcohol. Mr. Purkey lacked exposure to healthy adult male role models that would have taught him to avoid alcohol and drugs and unhealthy sexual behaviors and encouraged him to engage in healthy prosocial behaviors.

(5) Mr. Purkey was raised in a family system that consisted of multiple generations of alcoholism, mood disorder, violence, and child emotional, physical and sexual abuse. The preponderance of these mental health problems occurred within a family system that lacked social structures that reinforced the importance of psychological boundaries, emotional self-control, and the desirability of responsible behavior. Growing up in a family with apparent multigenerational trauma and adversity and being directly exposed to familial trauma significantly increases risk for several different trauma-related disorders and limits the development of healthy coping behaviors.

(6) Mr. Purkey was raised by two parents that had no knowledge of the importance of consistent and competent parenting practices that encourage offspring behavioral self-control and emotional self-regulation. Instead, their "parenting practices" encouraged sexual incest and domestic violence and promoted attitudes and behaviors that promote mental illness, pathological adult relationships, and domestic violence.

7

000272

Ex_10-000096

(7) The ability to disclose and discuss emotions, vulnerabilities, and challenging life experiences with another human being was never modeled in the Purkey family. The reported fact that Mr. Purkey's mother sexually abused him from the approximate ages of nine through fifteen and continued to engage in illicit sexual behavior with him during his young adult life prevented him from disclosing his personal psychological history and his uncomfortable emotions to other people. One implication of this incestuous pattern of sexual abuse is that Mr. Purkey could never request mental health treatment because it would mean that he would have to disclose that he remained in an ongoing sexual relationship with his mother. He was not freed of that abusive bond until he was living in a jail; but because reporting child sexual abuse in a penitentiary often leads to sexual victimization in prison systems Mr. Purkey could not ask for mental health treatment. This meant he could never receive help in trying to confront his own trauma issues.

(8) Mr. Purkey suffered a stuttering problem that made him an easy target of frequent ridicule and abuse from others, including adults. Mr. Purkey's stuttering left him constantly fearing that he would be targeted for abuse. It was a source of great anxiety and emotional distress and played an important role in his inability to maintain attendance in school, ultimately leading him to drop out in the ninth grade.

(9) Research on posttraumatic stress has shown that one of the most damaging aspects of trauma are the ways that trauma changes a person's beliefs and attitudes about the world. People who have endured trauma and adversity often suffer damage to their beliefs about how the world works that undermine their ability to maintain good mental health and leave them unable to believe that life will treat them fairly. The emotional, physical, and sexual abuse suffered by Mr. Purkey when he was victimized by his mother and priest dampened his expectations of safety, trust, and loyalty making it difficult for him to experience hope about his future.

**Exposure to Traumatic Events**
An important part of the PTSD Assessment is to determine whether Mr. Purkey was exposed to traumatic stress as trauma, as it is a necessary condition for developing PTSD. This is because trauma exposure causes PTSD. This is accomplished in two ways. First, Mr. Purkey's exposure to traumatic events sufficiently severe as to cause PTSD was measured through administration of the Life Events Checklist which helps the examiner to identify traumatic life events that meet DSM-IV-TR PTSD Criteria A for trauma that have been experienced by Mr. Purkey. Second, because Mr. Purkey was reported to have experienced childhood trauma, I administered the Childhood Trauma Questionnaire (CTQ), an instrument that has been shown to measure childhood trauma in vulnerable populations. It is used in combination with other sources of information about abuse and neglect and within the context of measures of malingering to make clinical determinations regarding abuse and neglect. The CTQ yields measures of Childhood

8

000273

Ex_10-000097

Emotional Abuse, Childhood Physical Abuse, Childhood Sexual Abuse, Childhood Emotional Neglect, and Childhood Physical Neglect.

Administration of the Childhood Trauma Questionnaire (CTQ) indicated that Mr. Purkey shows extremely high levels of exposure to childhood physical abuse, emotional abuse and sexual abuse as well as extremely high levels of childhood emotional neglect and childhood physical neglect. All of Mr. Purkey's CTQ scale scores for childhood abuse and neglect fell within the "Severe Range" of abuse and neglect. These scores are shown in the table below:

| CTQ Scale | Childhood Abuse | | | Childhood Neglect | |
|---|---|---|---|---|---|
| | Emotional | Physical | Sexual | Emotional | Physical |
| Score | 24 | 18 | 20 | 23 | 20 |
| Severity | Severe | Severe | Severe | Severe | Severe |
| Percentile* | 99% | 95% | 95% | 99% | 99% |

*Percentile relative to a comparison sample of individuals with serious mental health disorders.

Trauma exposure was also measured by administering the Life Events Checklist. This instrument allows the examiner to identify the traumatic life events experienced by Mr. Purkey that met DSM-IV-TR Criteria A for "Traumatic Events" that may cause posttraumatic stress disorder. These traumatic events were as follows:

(1) Physical assaults administered to Mr. Purkey by his father from the approximate age of five to the age of twelve. The most frequent and intense beating occurred between the ages of six and ten with less frequent abuse occurring over the next two years. These included beatings with the father's open hands, fists, and whippings with his belt. These were of sufficient severity as to cause Mr. Purkey intense pain and often left bruises or caused bleeding. They clearly met DSM-IV-TR criteria for PTSD Criteria A Stressful Events.

(2) Mr. Purkey recalled observing his father commit physical assaults on his mother from the time he was five years old through the age of ten, with less frequent assaults observed over the next two years. Mr. Purkey's father was reported to throw household objects and furniture at his wife as he threatened to harm or kill her, and on several occasions chased her as she tried to escape from him before he had opportunity to act on his verbal threats. Mr. Purkey reported on one occasion he watched his father thwart one of his mother's escape attempts and dragged her down the hall by her hair as she screamed for help. These beatings often occurred several times a week. They were of sufficient severity as to cause Mr. Purkey to fear for his mother's life. They clearly met DSM-IV-TR criteria for PTSD Criteria A Stressful Events.

(3) Mr. Purkey endured humiliation and verbal threats of physical violence from his father on a frequent basis from the age of five through the age of ten, with less frequent abuse reported over the next two years. These threats left Mr. Purkey afraid for his life as he worried that brutal

9

000274

Ex_10-000098

physical attacks that could cause him bodily harm might be forthcoming in the future. They clearly meet DSM-IV-TR criteria for a PTSD Criteria A Stressful Events.

(4) Mr. Purkey witnessed his father direct verbal threats of violence to his mother. These verbal threats occurred almost daily from the time Mr. Purkey was five years old through the age of ten, with less frequent verbal threats witnessed over the next two years. He reported that these threats were often remarkable for their intensity. These traumas clearly met DSM-IV-TR criteria for PTSD Criteria A Stressful Events.

(5) Mr. Purkey endured sexual abuse from his mother from the age of nine through the age of twenty-two. This sexual abuse initially included his mother inappropriately touching his genitals and having Mr. Purkey sleep with her and manually stimulate her sexually or penetrate her with a hairbrush. As Mr. Purkey grew older, the sexual abuse included his mother instructing him to perform cunnilingus on her and engage in sexual intercourse with her. This sexual abuse clearly met DSM-IV-TR criteria for PTSD Criteria A Stressful Events.

(6) Mr. Purkey reported that he was sexually abused by a priest from the community church on many occasions over a three-year period. This sexual abuse was devastating because the priest was an authority figure who was revered by everyone in the community. This sexual abuse occurred from the age of eleven through thirteen and the memory of this abuse remains one of the most upsetting trauma-related memories that even today intrude into Mr. Purkey's conscious mind daily. This sexual abuse clearly met DSM-IV-TR criteria for fourteen years of continual PTSD Criteria A Stressful Events.

(7) Mr. Purkey reported that he was sexually abused when he was eleven years old by a friend of his older half-brother named "Hup" who would enter his bedroom at night and perform fellatio on him. This sexual abuse clearly met DSM-IV-TR criteria for fourteen years of continual PTSD Criteria A Stressful Events.

(8) Mr. Purkey reported that when he was approximately twelve years old that on several occasions his father commanded prostitutes to molest him as they climbed on top of him as he pretended to lay asleep in bed and stimulated his genitals and performed fellatio on him. He reports this made him feel unsafe and "in danger" as he was a small boy that feared assault and sexual abuse. These attacks clearly met DSM-IV-TR criteria for PTSD Criteria A Stressful Events.

(9) Mr. Purkey reported to me and to collaterals that he was physically beaten and abused by his older half-brother Gary Purkey who struck him and severely beat him on several occasions. He reported beatings when he was 10-12 years of age that left him bloodied and concerned that he might have been injured. These attacks met DSM-IV-TR criteria for PTSD Criteria A Stressful Events.

10

000275

Ex_10-000099

(10) Mr. Purkey was involved in two motor vehicle accidents each of which left him in need of medical care at St. Francis Hospital in Wichita, Kansas. The accidents occurred when Mr. Purkey was sixteen and twenty years of age, and both accidents caused a loss of consciousness and may have caused traumatic brain injury. The accident that he was involved in at the age of sixteen is reported to have left him unconscious for up to 48 hours. Four years later, Mr. Purkey was involved in a second serious motor vehicle accident that led to a brief period of loss of consciousness. These serious motor vehicle accidents led Mr. Purkey to fear for his life. Each of these events meet DSM-IV-TR PTSD Criteria A for "Traumatic Events".

(11) Mr. Purkey reported that he was the victim of emotional and physical abuse from nuns who served as educational and religious staff at St. Joseph's Catholic School, a neighborhood parochial school in Wichita that Mr. Purkey attended for seven years from the ages of seven through fourteen. During that time Mr. Purkey and several informants, most notably a classmate named Don Aaron, report that the nuns emotionally abused Wesley for his stuttering problem as they mercilessly ridiculed and humiliated him. The nuns practiced corporal punishment and hit and whipped Mr. Purkey for his perceived transgressions; unfortunately, they viewed Mr. Purkey's stuttering problem as an indication of misbehavior and purposely embarrassed him in front of classmates and beat him on several occasions. Mr. Purkey felt that his physical integrity was in danger and that he might suffer permanent physical injury. These events meet DSM-IV-TR PTSD Criteria A for "Traumatic Events".

## Assessment of PTSD Symptoms

The Clinician Administered PTSD Scale (CAPS), the PTSD Checklist (PCL), and the Structured Clinical Interview for DSM-IV-R(SCID) were used to determine if Mr. Purkey meets DSM-IV-TR diagnostic criteria for PTSD. A diagnosis of PTSD by DSM-IV-TR criteria requires the following: the individual must have been exposed to a traumatic event that meets DSM-IV-TR Criteria A for a traumatic event and show evidence of re-experiencing the trauma (Criterion B), avoidance of trauma reminders and numbing of trauma-related emotions (Criteria C), and show hyperarousal symptoms (Criterion D). The symptoms of reexperiencing, avoidance and numbing, and hyperarousal must occur when the individual is reminded of or exposed to stimuli that are associated with the Criteria A traumatic event. These symptoms should show a duration exceeding one month (Criteria E) and cause clinically significant levels of distress (Criteria F).

The data from the Life Events Checklist showed that Mr. Purkey was exposed to numerous events that met DSM-IV-TR Criteria A for traumatically stressful events. Data from the Structured Clinical Interview of DSM-IV-TR (SCID) showed that Mr. Purkey met Criteria B for PTSD as he showed intrusive memories of his trauma, distressing dreams, flashbacks of his trauma, and high levels of emotional distress and physiological reactivity when exposed to trauma-reminders. Mr. Purkey also showed signs of avoidance of trauma reminders and

11

000276

Ex_10-000100

emotional numbing as he reported avoiding trauma-related thoughts and emotions, traumatic forgetting, loss of interest in significant activities when reminded of trauma, and feelings of detachment and emotional numbing associated with trauma-related stimuli. These responses indicate that Mr. Purkey met Criteria C for PTSD. Administration of the SCID indicated that Mr. Purkey met criteria for Criteria D for PTSD as his SCID responses showed the presence of insomnia, irritability, concentration problems, hyper-vigilance in addition to hyper-startle responses to trauma-related cues. He experienced these PTSD symptoms over periods of time that far exceeded one month (Criteria E) and these symptoms elicited extremely high levels of distress showing that he met PTSD Criteria F. These SCID data show that Mr. Purkey met DSM-IV-TR diagnostic criteria for posttraumatic stress disorder (PTSD) at the time of this evaluation.

The Clinician Administered PTSD Scale (CAPS) was also administered to Mr. Purkey to determine the extent to which his symptom presentation suggests a PTSD diagnosis and to measure the intensity of his PTSD symptoms. Administration of the CAPS showed Mr. Purkey meets all diagnostic criteria for PTSD with high levels of PTSD in each of the three PTSD symptom clusters (re-experiencing, avoidance and numbing, and hyperarousal). Mr. Purkey's CAPS scores are shown in Table 4 on page 13.

An inspection of the Table reveals unusually high scores in the "Avoidance and Numbing" area. This is important because avoidance and numbing in people who have been exposed to trauma predicts the development of chronic PTSD. The use of drugs and alcohol is one way that people with PTSD often avoid experiencing trauma-related emotions, as intoxication with alcohol and drugs with sedating properties often numb a person to their emotional pain thus facilitating the avoidance process. The high levels of avoidance explain, in part, why other assessors did not detect Mr. Purkey's trauma exposure and PTSD; trauma survivors who show high levels of avoidance and numbing typically go to great lengths to avoid disclosing and discussing their traumatic experiences and their memories of those experiences. Mr. Purkey's CAPS score of 94 shows that his CAPS score falls within the "Extreme PTSD Severity" range, the most highly symptomatic CAPS classification for PTSD scores.

**Summary**
Data collected using the Clinician Administered PTSD Scale (CAPS) was consistent with data collected with the PTSD Checklist, a self-report measure of PTSD, and the SCID; data from all three instruments indicated that Mr. Purkey met DSM-IV-TR criteria for PTSD at the time of the assessment. Both the SCID and CAPS yield a "lifetime" diagnosis and both showed that Mr. Purkey met DSM-IV-TR criteria for PTSD over the one-month period that preceded the murder of Ms. Long in 1998. Furthermore, Mr. Purkey's scores on the Trauma Symptom Inventory (TSI) validated a PTSD diagnosis and showed significant problems in emotion regulation with extreme elevations on the internal avoidance scale. Those elevations indicate a marked propensity for Mr. Purkey to avoid trauma-related thoughts and emotions. This finding supports

12

000277

Ex_10-000101

the hypothesis that Mr. Purkey's drug abuse functions to help him to avoid trauma-related emotions and memories, suggesting his drug use is secondary to PTSD.

| Table 4: Clinician Administered PTSD Scale (CAPS) | | |
|---|---|---|
| **DSM IV TR Criteria** | **Symptom (Y/N)** | **Intensity (0-8)** |
| **Criteria A: Exposure to Traumatic Events** | YES | |
| **Criteria B: Re-experiencing** | | |
| Intrusive Memories | YES | 6 |
| Distressing Dreams | YES | 4 |
| Flashbacks | YES | 3 |
| Cued Psychological Distress | YES | 7 |
| Cued Physiological Reactions | YES | 4 |
| At Least Two Symptoms Meet Criteria? | **YES** | **24** |
| **Criteria C: Avoidance/Numbing** | | |
| Avoid Internal Reminders | YES* | 7 |
| Avoid External Reminders | YES* | 7 |
| Inability to Recall | YES* | 6 |
| Diminished Interest | NO | 6 |
| Detachment | YES* | 7 |
| Numbing | YES* | 6 |
| Foreshortened Future | NO | 6 |
| Symptoms Meet Criteria? | **5/7 Yes** | **45** |
| **Criteria D: Hyperarousal** | | |
| Insomnia | YES* | 6 |
| Irritability | YES* | 5 |
| Concentration | YES* | 4 |
| Hypervigilance | YES* | 6 |
| Hyper startle | YES* | 4 |
| Symptoms Meet Criteria? | **5/5 Yes** | **25** |
| Total Meets DSM-IVR PTSD Criteria? (PTSD Intensity Cutoff 45) | **YES** | **94** |

**Assessment of other Major Mental Disorders**

**SCID-Mood Disorders Module**

The Structured Clinical Interview for DSM-IV-TR Disorders (SCID) was administered to Mr. Purkey to assess for the presence of Axis I disorders. Data from the Mood Disorders Module indicated that he did not meet diagnostic criteria for major depression at the time of the assessment, but that he did experience a significant number of major depressive episodes in the past, with his first major depressive episode occurring when he was ten years old; Mr. Purkey did not remember a time in his childhood when he was not experiencing significantly depressed affect. He related his depression as occurring in response to his physical and sexual abuse and to his exposure to his father's beatings of his mother. His major depressive episodes have been characterized by depressed mood, weight loss, insomnia, psychomotor retardation, feelings of

13

000278

Ex_10-000102

worthlessness and diminished concentration. This interview indicated that he meets lifetime criteria for <u>Major Depressive Disorder</u> but that he did not meet full DSM-IV-TR criteria for major depression at the time of the evaluation. He was experiencing a major depressive episode in the time prior to the homicide and it appears that his depression increases when he experiences PTSD re-experiencing symptoms. Administration of the SCID to Mr. Purkey established that his major depression is a secondary condition to his posttraumatic stress disorder as the onset of his major depression did not occur until after his onset of PTSD and his depressive episodes typically occur after he has experienced an increase in re-experiencing symptoms. Data from the SCID did not support a diagnosis of mania, hypomania, or bipolar disorder.

**SCID-Anxiety (and Trauma) Disorders Module**

Data from the Trauma Module (Anxiety Disorder Module of DSM-IVR SCID) has been presented in the "Assessment of PTSD" section of this document. Data from the SCID yielded a diagnosis of current and lifetime PTSD. There were symptoms of panic and generalized anxiety that were better accounted for by Mr. Purkey's PTSD than by Generalized Anxiety Disorder or a Panic Disorder. Mr. Purkey did not meet DSM-IV-TR diagnostic criteria for any other Anxiety Disorders.

**SCID-Psychotic Disorder Module**

Data from the SCID indicated that Mr. Purkey did report infrequently experiencing psychotic symptoms for periods of time as an adult. They usually occurred when Mr. Purkey was either extremely intoxicated or was experiencing high levels of emotion dysregulation and was depressed or dysphoric. Emotion dysregulation was likely to occur when Mr. Purkey was triggered by reminders of sexual abuse and experienced depression. He appears to respond to dysregulation by becoming impulsive and experiencing an increase in his sexual urges. Increases in sexual behavior then trigger further increases in PTSD and depression. Mr. Purkey may become vulnerable to transient psychotic symptoms when his depression and hyper-sexuality interact with his impulsivity to increase alcohol and drug abuse. This interaction of increasing mood, impulsivity, and posttraumatic stress elevating his cravings for alcohol and drugs may create a perfect storm of complex PTSD that puts Mr. Purkey at high risk for intimate partner violence.

The transient psychotic symptoms infrequently experienced by Mr. Purkey co-occurred with changes in mood, thus they appear to be symptoms of an affective psychosis. These transient psychotic symptoms are usually co-occuring with substance abuse or alcohol intoxication. When intoxicated and emotionally dysregulated Mr. Purkey reported paranoid thinking, some visual hallucinations, and disordered (illogical) thoughts. These symptoms were not reported to me as symptoms that occur while Mr. Purkey is sober or not emotionally dysregulated and experiencing high levels of posttraumatic stress. His brief experiences of affective psychoses

14

000279

Ex_10-000103

may be a result of intoxication or a drug-induced delirium or may be related to Mr. Purkey's reported frontal-temporal lobe abnormalities.[8]

**Assessment of Alcohol and Substance Use Behaviors and Disorders**

Administration of the Substance Abuse Module of the SCID revealed that Wesley Purkey reported a lifetime history of alcohol and substance abuse. Emotion dysregulation problems have been shown to moderate the relationship between PTSD and substance abuse.[9] Mr. Purkey met DSM-IV-TR criteria for Polysubstance Dependence Disorder and Alcohol Dependence Disorder.

**Assessment of Complex PTSD**

Most of the trauma endured by Mr. Purkey occurred between the age of five and early adulthood, with his first exposure to sexual abuse occurring when he was approximately nine years old. He recalls, for example, that his head was battered through a wall when he was six years old and that he was beaten by his father and observed domestic violence for as long as he can recall. Collateral information validates Mr. Purkey's physical abuse by his mother and father beginning when Mr. Purkey was five years old. Mr. Purkey was sexually molested by his mother from the age of nine through early adulthood. According to his reports this insidious sustained sexual abuse did not terminate until Mr. Purkey started his life of incarceration in his early twenties. He explained that his abuse was a function of his loyalty to his mother. Because clinical and epidemiological research show that early life trauma is predictive of the complexity and severity of adult PTSD symptoms it was important to measure these complex forms of trauma symptoms in Mr. Purkey.

The Trauma Symptom Inventory is a self-report instrument that was developed in part to measure those aspects of posttraumatic stress that are associated with complex forms of PTSD. Data from the Traumatic Symptom Inventory (2nd Edition) indicated that Mr. Purkey showed significant elevations on scales that measure trauma-related hyperarousal, trauma-related re-experiencing and intrusions, and defensive avoidance of trauma reminders. These scales measure the primary PTSD symptoms and they validate the PTSD diagnosis as ascertained with the Clinician Administered PTSD Scale (CAPS), PTSD Checklist (PCL), and the SCID. Data from the TSI-2 also showed that Mr. Purkey evidenced high levels of guilt and shame and high levels of suicidal ideation.

Regarding complex PTSD symptoms the TSI data indicated that Mr. Purkey shows externalization symptoms that are often associated with early life trauma exposure. Individuals

---

[8] Finding from expert report of Dr. Robert Ouaou.

[9] Tull, M. T., Bardeen, J. R., DiLillo, D., Messman-Moore, T., & Gratz, K. L. (2015). A prospective investigation of emotion dysregulation as a moderator of the relation between posttraumatic stress symptoms and substance use severity. *Journal of Anxiety Disorders, 29,* 52-60.

15

000280

Ex_10-000104

that show elevated scores on this scale are prone to responding to internal distress by engaging in self-destructive and aggressive behaviors. As indicated previously, these symptoms are a distinctive aspect of Mr. Purkey's core psychological problems.  This pattern of scores suggests that Mr. Purkey experiences high levels of complex posttraumatic stress because of his exposure to trauma throughout his childhood. These findings are important because they are consistent with his history of emotion regulation problems and intoxication and Mr. Purkey's long-standing history of emotionally fueled aggression and self-destructive behavior. These behaviors are all characteristic of complex PTSD.

**Summary of Assessment Findings**
Data collected with the Clinician-Administered PTSD Scale (CAPS), PTSD Checklist (PCL), and the Structured Clinical Interview for DSM-IV-TR indicate that Wesley Purkey DSM-IV-TR met current and lifetime diagnostic criteria for Posttraumatic Stress Disorder (PTSD). In addition, Mr. Purkey met lifetime criteria for Major Depressive Disorder. He did not meet full criteria for a major depressive disorder at the time of the assessment. Mr. Purkey also met DSM-IV-TR lifetime criteria for Alcohol Dependence Disorder and a Polysubstance Dependence Disorder though he was no longer using alcohol or drugs as an incarcerated prisoner.  When highly intoxicated Mr. Purkey reported experiencing dramatic changes in mood and marked cognitive problems; at those times it is likely that a diagnosis of a delirium-related psychotic disorder would be appropriate.

**Psychological Factors Affecting Wesley Purkey at the Approximate Time of the Homicide**
The results of this assessment clearly indicate that Mr. Purkey meets DSM-IV-TR Criteria for PTSD and they indicate that he suffered from increased PTSD at the time of the homicide. My assessment shows that Mr. Purkey developed posttraumatic stress disorder (PTSD) secondary to his exposure to extensive childhood emotional and physical abuse and that his posttraumatic stress has continued to affect him throughout his adult life. It has been established that a history of repeated childhood physical abuse stimulates the development of a syndrome called complex PTSD which is characterized by problems in emotion regulation, relationship problems, and is often associated with alcohol and drug abuse. In fact, 60% of all people with PTSD meet criteria for an alcohol or drug abuse disorder at some point in their adult lives. [10]

The high comorbidity of PTSD and substance abuse is attributable to the fact that people with posttraumatic stress disorder show a very high risk for psychoactive drug abuse, with data showing increasing PTSD predicts increasing abuse of psychoactive medication.[11] This self-medication phenomenon is particularly severe with PTSD because **avoidance of trauma-related memories and suppression of emotional pain** increases psychological discomfort and PTSD.

---

[10] Kessler, R. C., Sonnega, A., Bromet, E., Hughes, M., & Nelson, C. B. (1995). Posttraumatic stress disorder in the National Comorbidity Survey. *Archives of general psychiatry*, *52*(12), 1048-1060.
[11] Chilcoat, H. D., & Breslau, N. (1998). Posttraumatic stress disorder and drug disorders: testing causal pathways. *Archives of General Psychiatry*, *55*(10), 913-917.

16

000281

Ex_10-000105

Results of my assessment show that Mr. Purkey evidences high levels of avoidance behavior as measured by the Clinician-Administered PTSD Scale (CAPS), the PTSD Checklist (PCL), and the Trauma Symptom Inventory (TSI-2), all psychometrically valid measures of core PTSD symptoms. These findings show that Mr. Purkey's posttraumatic stress may increase his drive to self-medicate through drug use; his need for drugs would therefore intensify as his PTSD increases, as indicated by his self-report. Data from the TSI-2 indicate that his avoidance of internal anxiety and fear may have been channeled into aggressive behavior toward others showing the destructive influence of his childhood emotional, physical and sexual abuse.

The increase in Mr. Purkey's drug intoxication and posttraumatic stress in the days prior to the homicide were especially ominous signs because intoxication has been shown to dramatically increase intimate partner violence in people with PTSD.[12] It is likely that the intoxication and delirium experienced by Mr. Purkey clouded his sense of reality and the fact that his most devastating early life trauma involved sexual trauma may have further obscured the boundaries between the past and the present. This hypothesis is supported by data on the TSI-2 which suggest the presence of dissociative symptoms. The powerful synergistic effect of PTSD hyperarousal and the disinhibition caused by alcohol and drug intoxication have been shown in the clinical research literature to be one of the most dangerous aspects of PTSD.

Wesley Purkey's increased risk for violence would be expected to be especially pronounced because of his recently identified frontal lobe deficits. These neurobiological deficits would be expected to limit his capacity to inhibit anger and aggressive emotions and impulses. The combination of increasing PTSD and drug use in a person with frontal lobe damage created a psychological "perfect storm" of violence risk factors and predicted a dramatically increased risk of violent behavior under the circumstances that were evident at the time of the Long homicide.

**Conclusions**

After conducting a thorough analysis of Mr. Purkey's history of exposure to psychological adversity and traumatic events and assessing the PTSD he developed because of his exposure to sexual abuse and other highly traumatic life events, I can state with a high degree of scientific certainty that Mr. Purkey developed a syndrome referred to as complex PTSD. The extraordinarily high levels of trauma and adversity endured over his childhood and adolescence interacted with Mr. Purkey's significant familial and environmental psychiatric risk factors to cause the development of complex PTSD in addition to mood (depression) and alcohol and drug dependence disorders. I can state with a high degree of scientific certainty that this interaction of severe complex PTSD with high levels of intoxication and an apparent delirium would greatly increase Wesley Purkey's risk for violent behavior.

---

[12] Costa, B. M., Kaestle, C. E., Walker, A., Curtis, A., Day, A., Toumbourou, J. W., & Miller, P. (2015). Longitudinal predictors of domestic violence perpetration and victimization: A systematic review. *Aggression and Violent Behavior, 24*, 261-272.

17

000282

Ex_10-000106

My assessment also indicated that when Mr. Purkey experienced high levels of posttraumatic stress and depression and became highly intoxicated before the homicide that his thinking became very disorganized. During my interview he described this disorganization as an inability to think and described thought blocking. On those occasions, his ability to process information and make logical decisions about his behavior were greatly diminished. Recent neuropsychological testing has shown evidence of frontal lobe abnormalities suggesting the strong possibility of traumatic brain injuries. Regardless of their etiology, Mr. Purkey reported thought disorganization and thought blocking as he experienced increasingly high levels of intoxication and PTSD before the murder of Jennifer Long. These problems apparently left him unable to control his aggressive behavior with Ms. Long ensuring that his conflict with her would lead to a tragic outcome.

Frederic Sautter, Ph.D.
Clinical Professor of Psychiatry
Tulane University Department of Psychiatry
New Orleans, Louisiana

18

000283

Ex_10-000107

# Exhibit 11

released from prison the year before the homicide was committed. This highlights the importance of using specialized PTSD testing assessment tools and testing instruments to determine the impact of traumatic stress on Wesley Purkey at his capital trial in 2003.

## Mental Health Information Available at Capital Trial of Wesley Purkey

### Mental Health Records

A considerable amount of information concerning Mr. Purkey's history of psychological problems was available at his 2003 capital trial. These include records from his treatment at St. Francis Hospital in Wichita when he was fourteen and records from Kansas State Reception and Diagnostic Center, Kansas State Industrial Reformatory, Kansas State Penitentiary, Oregon State and University of Kansas Hospitals, Lansing Correctional Facility, Iowa State and Oregon State Correctional facilities, Providence Medical Center, and Larned State Security Hospital. Psychological and Psychiatric Reports written respectively by Dr. Leesom, and Dr. Peterson and others were included in the medical records of the correctional facilities that housed Mr. Purkey over his more than twenty-five years of incarceration and they are reviewed in the next section. Records from St. Francis Hospital in Wichita, Kansas, indicated that when Mr. Purkey was fourteen years old he was admitted for inpatient psychiatric services after complaining of headaches and dizziness and exhibiting behavioral problems and mood changes secondary to a head injury. Medical records from St. Francis six years later reported a head injury after an altercation with police officer and reports from Wesley Medical Center describe posttraumatic amnesia after a drug overdose. These records together with Department of Corrections records indicate that Wesley Purkey endured a significant number of head injuries between the age of fourteen and twenty-one. These injuries were secondary to a history of physical abuse that Mr. Purkey reported included severe physical abuse from his father that included blows to his head, motor vehicle accidents, blows to his head during a physical altercation, and a fall at his workplace. Despite all these head injuries intensive neuropsychological testing and brain imaging to measure cognitive changes and traumatic brain injury were not conducted until 2003, after Wesley Purkey's Capital Trial.

Because Purkey spent most of his adult life incarcerated or serving probation, reports about his behavior were written primarily by staff of correctional facilities or probation officers who were tasked with evaluating his compliance with prison or probation rules in addition to checking on his physical and emotional safety. There was a lack of information from family members or acquaintances that had observed his behavior outside of a forensic setting. My review indicated that there was limited information available to the court about Mr. Purkey's psychological development or his history of psychological adversity and abuse. Data is lacking regarding his interpersonal behavior as it occurs outside of a prison, his family of origin issues, his trauma history, or his psychological strengths and potential for growth.

Prison and forensic reports available at the time of trial indicate the following types of psychopathology were observed in Mr. Purkey; externalizing child behavior problems, poor impulse control, antisocial behavior, anxiety, depression, anger problems, psychotic symptoms, social maladjustment, and explosive or violent behavior. There were many references to Mr. Purkey's long history of alcohol and drug abuse and it was observed that his use of alcohol and drugs had been associated with the commission of almost all his crimes and violent offenses.

3

000695

Ex_11-000108

Numerous prison records indicate that Wesley Purkey showed a persistent inability to control his emotions and impulses and when he showed aggression and violent behavior it was usually when he was intoxicated and in situations in which he perceived himself as being threatened. The fact that records reference the fact that Wesley Purkey showed signs or symptoms of several major psychiatric disorders (e.g., depression, anxiety, psychosis, alcohol and drug dependence) indicates that he suffered from serious psychological problems and required mental health treatment. The impact of traumatic brain injury from the many head injuries experienced by Mr. Purkey would be expected to amplify his other psychiatric symptoms, increase his vulnerability to posttraumatic stress and mood disorder, and increase the significant functional deficits normally associated traumatic injury (TBI)[5] [6].

**Summary**: Information from Mr. Purkey's treatment at St. Francis Hospital are important because they document significant early life emotional and physical abuse that were sufficiently severe as to cause physical and emotional damages that required inpatient psychiatric hospitalization. These injuries were associated with his onset of alcohol (10 years of age) and drug abuse (14 years of age) and with his first reported loss off emotional and behavioral control. Furthermore, the consequences of these head injuries have now been validated with neuropsychological and brain imaging data obtained in 2003 showing brain injuries in the frontal and temporal cortex that normally appear to be the result of previous or long-standing damage (see reports by Drs. Martel and Ouaua).

Information from prison and health records spanning several decades of Wesley Purkey's life consistently yield reports of persistent alcohol and drug abuse; an inability to control strong emotions; losses of emotional and behavioral control; and irritability and aggressive responses to threat. These symptoms and behaviors may be construed as evidence of alcohol and drug abuse or dependence disorders, mood disorders (depression; bipolar disorder), and post-traumatic stress disorder (hyperarousal, exaggerated responses to threat). These symptoms have been reported to occur in response to traumatic brain injuries (TBI) such as Mr. Purkey reported in 1968 and 1972 and to early childhood adversity and abuse, both of which were reported by several of Mr. Purkey's family members and friends. The fact that TBI and early childhood adversity and abuse have been shown to predict the development of posttraumatic stress disorder and other adult mental disorders suggests that it would be important to determine if Mr. Purkey suffers from PTSD as an adult. It is well documented that people with PTSD are at increased risk for a loss of emotional control, self-destructive behavior, and alcohol and substance abuse and dependence in adulthood[7].

**Psychiatric or Behavioral Assessments**

A review of the medical and correctional records that were provided by the Defense contained mental health information and at least thirty-one psychiatric and behavioral assessments or reviews that had been conducted between his twenty-first birthday and the 1998 murder of Jennifer Long. These records consisted of behavioral checks to ensure that prisoners were

---

[5] McMahon, P. J., Hricik, A., Yue, J. K., Puccio, A. M., Inoue, T., Lingsma, H. F., ... & Okonkwo and the TRACK-TBI investigators including, D. O. (2014). Symptomatology and functional outcome in mild traumatic brain injury: results from the prospective TRACK-TBI study. *Journal of Neurotrauma*, *31*(1), 26-33. .

[6] Jorge, R. E., & Arciniegas, D. B. (2014). Mood disorders after TBI. *Psychiatric Clinics*, *37*(1), 13-29.

[7] Read, J., Os, J. V., Morrison, A. P., & Ross, C. A. (2005). Childhood trauma, psychosis and schizophrenia: a literature review with theoretical and clinical implications. *Acta Psychiatrica Scandinavica*, *112*(5), 330-350.

4

000696

Ex_11-000109

compliant with rules and were not exhibiting behaviors associated with self-harm or harm of others and addressed general health issues. A review of those behavioral reports indicated that they were not structured to address mental health issues on the level of determining whether a prisoner should be assigned a psychiatric diagnosis, nor did they include attempts to evaluate prisoners' pre-incarceration histories. Mr. Purkey was never asked about traumatic experiences in his life and unless a psychological symptom was clearly related to his overall health or compliance it was not systematically evaluated and recorded.

By the time Mr. Purkey was tried for the capital murder of Jennifer Long in 2003 he had been the subject of sixteen psychological or psychiatric assessment reports. Of these sixteen assessments seven of which consisted of an interviewer-driven unstructured interviews that did not include any kind of structured assessment or the use of a standardized behavior or symptom rating scale or an assessment instrument. This means that the methods of these seven assessments did not meet any standards of scientific reliability or validity. These informal assessments reported that Mr. Purkey evidenced antisocial personality traits and did not suffer from a major mental disorder. Five of the sixteen reports indicated that Mr. Purkey had recently abused drugs and/or alcohol, but all emphasized that Mr. Purkey did not evidence a DSM-diagnosed Axis I psychiatric disorder.

The nine other Assessment Reports did include the administration of an empirically validated assessment instrument and six of these reports relied on a single actuarial assessment instrument (MMPI, MCMI, PAI). Only four of these six reports assigned Mr. Purkey a DSM-IV Axis I diagnosis [8] with four of them diagnosing Mr. Purkey with a polysubstance abuse or dependence disorder and one diagnosing Mr. Purkey with a depressive mood disorder. Three of the reports diagnosed Mr. Purkey as suffering from an Axis II Personality Disorder.

Despite reports of childhood adversity from relatives of Mr. Purkey, not one of the sixteen evaluations measured Mr. Purkey's exposure to traumatic stress. However, six of the assessments did include instruments that contained a scale designed to measure PTSD (see Table 1). Unfortunately, Mr. Purkey refused to complete the testing questions of Dr. Pietz and the scale administered by Mr. Doktor was not validated on a civilian sample thus it could not be used to diagnosis Mr. Purkey's PTSD. The report conducted by Dr. Scronce did not report a PTSD score nor did it include Mr. Purkey's test responses so that a PTSD score could be calculated by the reader.

The assessments conducted by the Kansas Department of Corrections and Drs. Leeson and Petersen included interpretable PTSD data, yet each of these reports failed to include the scores of the PTSD Scales in the body of the reports. All three clinicians did include the raw scores from the assessment which could be used to calculate Purkey's scores on the PTSD scales. The PTSD Scale Scores on all three tests yielded PTSD Scale Scores that surpassed the tests' diagnostic threshold for PTSD. This may be interpreted as meaning that all three tests indicated that there was evidence that Mr. Purkey met DSM-IV-TR criteria for PTSD at the time of those evaluations. These data are shown in Table 1 on page 6.

---

[8] DSM Axis I disorders are classified as "mental disorders" while Axis II disorders are classified a "personality disorders".

5

Ex_11-000110

Table 1. PTSD Scales Administered to Wesley Purkey

| Author and Location of Assessment | Instrument (PTSD Score) | PTSD DX |
| --- | --- | --- |
| Kansas Corrections Department | MMPI-2 (67) | YES |
| Leeson Assessment - Defense Atty | PAI (79) | YES |
| Pietz - Fed Bureau Prisons | (Test Refused) | ------ |
| Petersen – Defense Atty | PAI (72) | YES |
| Doktor – Department of Corrections | MMPI | Invalid |
| Scronce – Federal Medical Center | MMPI | No Report |

MMPI PTSD Scale (PK) cut-off for PTSD diagnosis is 65; PAI PTSD Scale (ARD-T) cut-off is 71; MCMI-III PTSD Scale (R) cut-off is 84. MMPI = Minnesota Multiphasic Personality Inventory; PAI = Personality Assessment Inventory; MCMI = Millon Clinical Multi-Axial Inventory.

The assessments conducted at the Kansas Department of Corrections and by Drs. Leeson and Petersen did not report that Mr. Purkey met DSM-IV-TR criteria for PTSD even though the PTSD scales contained in the testing instruments showed Mr. Purkey's scores surpassed the cut-off for a PTSD diagnosis, and even though the two testing instruments (MMPI, PAI) are among the most rigorously studied instruments in the field of psychology. This omitted finding was very important because information is now available to indicate that Mr. Purkey was exposed to sexual abuse from the age of nine through twenty-two years of age and was also exposed to over twenty years of emotional and physical abuse. Clinical studies have shown that high levels of childhood trauma and adversity interact with adult trauma to predict the development of PTSD in adulthood[9]. In addition, all six of the reports indicated that Mr. Purkey showed symptoms of depression and alcohol or substance abuse or dependency. This is important because it has been established in several epidemiological and clinical studies people with PTSD show a dramatically increased risk for developing depression and substance abuse disorders with approximately 50% of people with PTSD also showing a lifetime diagnosis of a depressive disorder or a substance abuse disorder. These six assessments all suggest that Mr. Purkey showed many of the chronic psychological problems (posttraumatic stress, depression, and alcohol and substance abuse) that are associated with childhood trauma exposure.

**Summary**: The assessments shown in Table 1 were available for Mr. Purkey's capital homicide trial and were discussed in the two expert reports presented to the court. Data provided in the reports by the Kansas Department of Corrections and Drs. Leeson and Petersen indicated PTSD scores associated with a PTSD diagnosis. Dr. Leeson noted symptoms of depression and his neuropsychological testing indicated the presence of frontal lobe deficits; Dr. Petersen indicated that Mr. Purkey showed signs of significant depression, emotion dysregulation, interpersonal deficits, and signs of frontal lobe deficits. Each of the reports acknowledged that Mr. Purkey suffered from a polysubstance abuse or dependence disorder while also showing signs of depression.

---

[9] McLaughlin, K. A., Conron, K. J., Koenen, K. C., & Gilman, S. E. (2010). Childhood adversity, adult stressful life events, and risk of past-year psychiatric disorder: a test of the stress sensitization hypothesis in a population-based sample of adults. *Psychological Medicine, 40*(10), 1647-1658.

6

000698

Ex_11-000111

The assessments of Drs. Pietz and Sconce and Mr. Doktor did not describe Mr. Purkey as showing pervasive signs of chronic posttraumatic stress and depression but they did report long-standing alcohol and drug problems as well as chronic personality problems. These reports did not provide an explanation of methods and one included an outdated version of the MMPI. These problems limit my ability to interpret their results.

The important point to be made about these evaluations is that they are the only assessment conducted with Mr. Purkey during his twenty years of incarceration that used scientifically valid assessment methods and the reports support diagnoses of polysubstance abuse or dependence and a mood disorder, and the three reports that included the administration of a standardized PTSD Scale each indicated that Purkey showed test responses that indicate the presence of PTSD. Despite reports that Mr. Purkey had experienced high levels of childhood adversity and traumatic stress not one of these reports included the use of a specialized PTSD assessment instrument to assess PTSD.

**Expert Witness Testimony**

Expert witnesses that testified at Mr. Purkey's capital trial included Dr. Petersen, who had previously conducted one of the assessments shown in Table 1, and Dr. Park Dietz, a well-known psychiatric forensic consultant and expert witness. Both experts acknowledged that Wesley Purkey suffered from a polysubstance use disorder, but Dr. Dietz argued that it was not possible to determine whether Mr. Purkey was simply abusing drugs (including crack and powder cocaine, methamphetamines, heroin, Ritalin, Quaaludes, and Nembutal) or whether he met diagnostic criteria for a polysubstance dependence disorder. Regardless of the specific diagnosis both Drs. Petersen and Dietz acknowledged that Mr. Purkey suffered from a diagnosable polysubstance abuse disorder and both acknowledged he experienced difficulties controlling his emotions. Thus, there is agreement between both experts and the more empirically-based assessments described on page seven in that all agree that Mr. Purkey suffers from a diagnosable polysubstance use problem and that Purkey shows deficits in emotional control or regulation.

**Contrasting Expert Views Regarding Posttraumatic Stress**

Petersen Expert Report: Dr. Petersen reported interview data and other records showing that Mr. Purkey had been exposed to childhood emotional, physical and sexual abuse over much of his childhood and adolescence. In his report he emphasizes that these types of adversities and trauma may be expected to have a devastating impact on Mr. Purkey. Dr. Petersen then reviewed test data showing that Mr. Purkey shows signs of frontal lobe dysfunction, chronic depression and emotion dysregulation, and interpersonal deficits. While Dr. Petersen did not review the numerous definitive scientific studies showing that childhood trauma exposure and sexual abuse predict complex PTSD problems such as self-destructive behavior, substance abuse problems, emotion dysregulation, and interpersonal problems, he might have also pointed out that individuals with PTSD and substance intoxication are at extremely high risk of domestic violence. It is important to note that in a post-conviction declaration Dr. Petersen has acknowledged that he did not conduct a structured assessment of either Mr. Purkey's exposure to trauma or his posttraumatic stress. Ironically, Dr. Petersen had obtained MMPI-II data supporting a diagnosis of PTSD, but he was apparently unaware that the MMPI-II includes a

7

000699

Ex_11-000112

PTSD Scale. Dr. Petersen did not administer any of the self-report and clinician-driven instruments that have been specifically developed to assess PTSD.

Dietz Expert Report: Dr. Dietz did not conduct a trauma or PTSD assessment that employed any of the instruments that are considered "Best Practices" by the International Society of Traumatic Stress Studies (ISTSS)[10] or other trauma experts[11]. Instead the expert report submitted by Dr. Dietz relied on a comprehensive review of all records and reports that were available regarding Mr. Purkey's mental health, Mr. Purkey's history of criminal behavior, and his own unstructured interview of Mr. Purkey. While this is standard practice for forensic experts, this method of assessing PTSD is not considered to be optimal within the community of professionals working with PTSD, as structured trauma assessments and instruments designed specifically for the diagnosis of PTSD are considered necessary components of a PTSD assessment. An unstructured clinical interview is not optimal when evaluating a disorder in which avoidance of disclosing key symptoms is the core characteristic of the diagnosis. People with trauma histories and PTSD seldom volunteer information related to their trauma, especially when their trauma involves early sexual abuse.  Furthermore Dr. Dietz, a noted forensic expert, did not include questions that clarify the relationship between behavioral PTSD symptoms and trauma-related memories and emotions and was therefore unable to determine whether many PTSD symptoms occurred within the context of trauma-related cognitions and emotions, essential information that is required to make a PTSD diagnosis. The interview that Dr. Dietz conducted with Mr. Purkey did not account for many of the unique characteristics of PTSD.

Dr. Dietz's expert report was remarkable in its comprehensive review of Mr. Purkey's history of evaluations while incarcerated over a thirty-year period, but a review of records in this case may be misleading regarding PTSD because most of the records reviewed were collected prior to the designation of PTSD as a valid psychiatric diagnosis. Prior to 1990 most mental health professionals simply did not know very much about PTSD and employees in the correctional system were not prepared to look for behaviors that were not commonly identified as elements of trauma psychopathology until the late 1980's. This lack of knowledge regarding PTSD accounts for the fact that some of the mental health practitioners that evaluated Wesley Purkey while he was incarcerated administered instruments that contained PTSD measures but were apparently unaware that these scales were included in the instruments. Table 1 identifies several assessments that used instruments that yielded PTSD scores, yet the assessment reports did include that important information about PTSD. As a result, Dr. Dietz was unable to comment on the potential importance of those significant PTSD measures. Given the omission of this important information it is not surprising that Dr. Dietz did not report that Mr. Purkey showed signs of PTSD.

It could be argued that if an assessment had previously been conducted by a clinician or expert with specialized experience with PTSD that Dr. Dietz would have been able to review that information and incorporate those findings in his own expert report. Unfortunately, there were not any records of PTSD assessments to be reviewed and Dr. Dietz did not conduct a PTSD

---

[10] Foa, E. B., Keane, T. M., Friedman, M. J., & Cohen, J. A. (Eds.). (2008). *Effective treatments for PTSD: practice guidelines from the International Society for Traumatic Stress Studies*. Guilford Press.

[11] Briere, John N., and Catherine Scott. *Principles of trauma therapy: A guide to symptoms, evaluation, and treatment (DSM-5 update)*. Sage Publications, 2014.

8

000700

Ex_11-000113