Case 2:19-cv-00414-JPH-DLP   Document 23-11   Filed 09/12/19   Page 44 of 50 PageID #: 3787

C A S E   S U M M A R Y

Re: PURKEY, Wesley Ira

Page: IIa.

<u>BACKGROUND INFORMATION</u>(continued):

but his father adopted Gary. Wesley was born, healthy, on 1-6-52. His development was within normal limits. He began stuttering at a very early age and received speech therapy at the Institute of Logopedics in Wichita, Kansas, during his early school years. Also, prior to his school years, according to his aunt, he experienced what she described as polio, which affected the use of one leg. He got along well within the family setting during his early childhood. In 1962, when Wesley was 10 years old, his mother again divorced his father. The mother was employed and became neglectful of the children. According to the aunt, the mother became openly promiscuous and often brought her male friends into the home for sexual situations. The patient's father and mother both were always very heavy drinkers and the mother continued to have drinking problems. Therefore, Mrs. Burke, a great aunt who had lived with the family for several years, asked Wesley's mother to leave the home, which she did. When Wesley was approximately 14, the court appointed his aunt as his legal guardian, as the whereabouts of the father were unknown. Wesley attended school thru the 8th grade, making average and below average grades.

During the 8th grade he was referred to the Wichita Psychiatric Center for evaluation because of his truancy and antisocial behavior at school, and primarily because of his physical complaints of headaches and dizziness for which his family physician could find no organic basis. He was subsequently admitted to St. Francis Hospital where a complete diagnostic checkup revealed that he was experiencing a serious personality disorder, centering around a psychosexual problem of identification. The recommendation was made that he be sent to BIS, but this was not carried thru. Therefore, Wesley began psychotherapy on an outpatient basis with Dr. F.C. Newsom in Wichita, Kansas. He was then referred to Dr. Paul G. Murphy, Ph.D.(Psychologist) where he remained in psychotherapy until his offense in 1970. Wesley also reports being in Lake Afton Boys Ranch for joy riding, car theft, etc". We have requested information from them but it has not yet been received. After he quit school prior to completing the 9th grade, he

WP909193
000347

CASE SUMMARY

Re: PURKEY, Wesley

Page: 2b.

BAC_KGR_OUND INFORMATION(continued):

entered Wichita Auto Mechanics School, which he attended for a short period of time.

He took the GED while at KSIR but missed passing by 2 points. Wesley's work experience

has consisted of unskilled, short-term, and odd jobs for very short periods of time.

He was employed at Wesley Hospital in Wichita, Kansas as a housekeeping technician

from 1-6-70 to 1-13-70. He voluntarily terminated this job, as he does most jobs, by sim

simply not reporting for work. They indicated that they might consider him for re-em-

ployment in the future if work were available. Wesley has never been married. He

would like to enter the military but his parole officer says not until his parole ends

in 7-1974. His health history includes a head injury which he sustained from an auto

accident in 1968, subsequent to which he was treated at St. Francis and St. Joseph

Hospital in Wichita. He denies excessive use of alcohol but says that when he does

drink it can become a problem. He admits to trying speed, marijuana, and hash at

parties. His half-brother, Gary is presently in the county jail for robbery. He

has served 1 year at KSIR for forgery, 2nd degree and attempted burglary and 1 year

at KSP for burglary.

Wesley's future plans include aide training at Vocational Rehabilitation and eventually

job placement in some area other than Wichita. His parole officer asks that he not be

returned to Wichita, indicating that Wesley gets along better away from his mother.

The parole officer related the following incident to this social worker, as an example.

On Christmas Eve, 1972, patient's mother brought a bottle of whiskey to his residence.

She talked him into drinking with her until he passed out. Then she went to the hospital

and accused him of raping her. The police talked with Wesley, but did not pursue

the charge, as the mother denied it when sober. Therefore, the parole officer, too,

wishes that Wes could work in Dodge City or elsewhere after his discharge from Larned

State Hospital.

KB:ccw
Dict,typed:1-10-73

Katherine Busse
Social Worker

WP909194

000348

Ex_13-000531

LSH-3190

SUMMARY OF HOSPITALIZATION
LARNED STATE HOSPITAL
Larned, Kansas

STAFF CONFERENCE NOTE
Page 1

IDENTIFICATION:

Patient ___ PURKEY, Wesley ___    Case Number 20,655 ___    Section & Adult Unit # 1    Building Pinel Bldg.

Date of Staffing ___ 1-12-73 ___    Attending were Marcos Lara, M.D.; Robert Yohman,

Psychologist: Katherine Busse, Social Worker; Kathleen Garner, PA I; Dorothy Young,

Adj. Therapist.

ADDITIONAL INFORMATION NOT INCLUDED IN CASE SUMMARY:

The patient is attending his assignment regularly. He also is quiet and cooperative

on the ward but he does not socialize with the other patients and could be considered

a loner.

SIGNIFICANT OPINIONS OF PARTICIPATING STAFF MEMBERS:

The patient seems to be an immature dependent individual who has some difficulty in

accepting responsibilities. He has a long record of inappropriate and illegal behavior.

000349

1 of 2

Ex_13-000532

## SUMMARY OF HOSPITALIZATION
## LARNED STATE HOSPITAL
Larned, Kansas

STAFF CONFERENCE NOTE, continued:

Page ___2___

Name ___PURKEY, Wesley___

Case No. ___20,655___

Section & Bldg. ___Adult Unit#1, Pinel Bldg.___

PROGNOSIS:

___Good.___

RECOMMENDATIONS:

1. He will be referred to Vocational Rehabilitation for TOWER testing to decide future placement.

ESTABLISHED DIAGNOSIS:

a. Physical ___Healthy male.___

b. Psychiatric ___Passive Aggressive Personality with Depressive Features.___
(Use official diagnostic nomenclature with code number)

Completed by:

___Robert Yohman___        ___Katherine Busse___        ___Kathleen Garner___        ___Dorothy Young___
Robert Yohman              Katherine Busse              Kathleen Garner              Dorothy Young
Psychologist               Social Worker                P A I                        Adj. Therapist
        (Title)

Ward Physician    Marcos Lara, M.D.        **000350**        Date ___1-12-73___
                                                             ML:ccw   Dict: 1-12-73;typed:1-29-73

2 of 2

Ex_13-000533

LSH-365

## SUMMARY OF HOSPITALIZATION
## LARNED STATE HOSPITAL
Larned, Kansas

CASE SUMMARY, continued:

Page___3___

Name_____PURKEY, Wesley_____

Case No.___20,655_____SectionAdult Unit # 1

Building_____Pinel_____

### SUMMARY OF MEDICAL HISTORY:

He has had the usual childhood diseases without complication. According to the patient he had meningitis when he was about 4 years old. He has a history of being unconscious twice for short periods of time. Tonsillectomy. Had a high fever when he was a child.

### AMINATIONAL DATA:

a. Physical & Neurological Examinations:___No pathological significant findings.___

b. Laboratory, X-ray & Special Examinations:__2hr pc blood sugar 77, BUN 7.0, Hgb. 15.4, MCHC 33.5, Hct. 43%. Urinalysis showed yellow color, hazy character, reaction 6.0, Albumin, Sugar and Acetone negative, WBC 10-12/hpf, bacteria occasional, occult blood negative. Serology was non reactive. Chest xray was reported as normal chest.

c. Psychiatric Examination:__Mr. Purkey is a 20 year old white male, single, Catholic, welder, with a ninth grade education who was admitted to this hospital on a voluntary basis because he was drinking and acting in a bizarre way in the community. Upon his admission he was cooperative, well oriented as to time, place and person. His thought content was centered in his problems with the law. He was somewhat depressed. He seemed to be a dependent individual who evidenced a poor judgment and now has some difficulties in accepting responsibilities. He admitted to being in KSIR for two years for burglary; he

000351
8 of 4

Ex_13-000534

C A S E   S U M M A R Y

Re: PURKEY, Wesley

Page: 4a.

PSYCHIATRIC EXAMINATION(continued):

ing responsibilities; however, he is quiet and cooperative on the ward.  He is

attending his assignment regularly but he does not socialize very much with the

other patients.

000352

Ex_13-000535

## SUMMARY OF HOSPITALIZATION
### LARNED STATE HOSPITAL
Larned, Kansas

CASE SUMMARY, continued:  
Page ~~2~~ 4

Name _____ PURKEY, Wesley _____  
Case No. __20,655__  Section __Adult Unit # 1__  
Building ____Pinel____

c. Psychiatric Examination, continued _also admitted to having been in jail two times after he_ left KSIR on 7-18-72 for drinking problems.  He was placed on the following medication upon admission: Sinequan 25mg TID, Thorazine 100mg q6h prn for agitation, Thorazine 50mg IM prn once a day AM or PM if patient refuses his regular medication.  Prior to the staff he was interviewed and he appeared clean in person and dress, long-haired, cooperative, well oriented as to time, place and person; no distortions of perception or hallucinatory experiences could be elicited.  His memory seemed to be preserved for all the events and his intelligence seemed to be average.  His thought process was logical, coherent, was in relation to his hospitalization and his problems with the law.  His mood was appropriate to the situation.  He admitted having been having several problems with the law and also he admitted to being jailed twice after he left KSIR because of drinking problems.  Mr. Purkey seems to be a very dependent individual, immature, with some difficulty in accept-

(see attached sheet)

DIAGNOSTIC IMPRESSION:

a. Physical ____ Healthy male. ____

b. Psychiatric ____ Passive Aggressive Personality with Depressive features. ____

RECOMMENDATIONS:

To be made at Staff Conference.

Pages 1 & 2  
Completed by: _____Kate Busse_____  
Katherine Busse  
Social Worker

_____ , M.D.  
Ward Physician  Marcos Lara, M.D.

Date _____  
(Title)  
WP009100  
**000353**  

Date ____ 1-12-73 ____  
ML:ccw    Dict: 1-12-73; typed: 1-29-73

4 of 4

Ex_13-000536

## LOGAN & PETERSON, P.C.

Forensic, Adolescent, and Adult Psychiatry

911 MAIN, SUITE 2330

KANSAS CITY, MISSOURI 64105-2009

(816) 842-2500

FAX (816) 842-9980

WILLIAM S. LOGAN, M.D.
STEPHEN E. PETERSON, M.D.

KANSAS OFFICE

4117 S. WOODBURY
TOPEKA, KS 66606-2147

### DIAGNOSTIC INTERVIEW REPORT

### Wesley Purkey
### 92-CR-2202

**INTRODUCTION AND PURPOSE:**

Mr. Wesley Ira Purkey is a 48-year-old ███████ ███████ married, Leavenworth, Kansas resident. He was charged with one count First Degree Murder in Wyandotte County Kansas for the October 28, 1998 bludgeoning death of 80-year-old Mary Ruth Bales (DOB: 4/14/26).

On August 17, 1999, Aline Pryor, defense attorney for Mr. Purkey, requested psychiatric evaluation for her client. The evaluation was to focus on presence or absence of mental disease at the time of the charge offense, and whether Mr. Purkey had the requisite state of mind. Attorney Pryor gathered numerous records for review. In February 2000, John M. Duma, took over the representation of Mr. Purkey. Attorney Duma forwarded additional information for review. Mr. Duma requested that this evaluation address issues relevant to sentencing such as mitigation, required mental state, and diagnosis.

**DESCRIPTION OF THE EVALUATION:**

Mr. Wesley I. Purkey was psychiatrically evaluated at the Wyandotte County Jail. This evaluation consisted of 9.0 hours of face-to-face psychiatric assessment, plus the completion of three paper-and-pencil psychologic tests (PAI-2, Shipley Institute of Living Scale, and MMPI-2). The interview sessions were divided in to 3.0 hours on December 7, 1999, 3.75 hours on March 15, 2000, and 2.25 hours on March 17, 2000. Mr. Purkey completed the PAI-2 and Shipley Institute of Living Scale on December 7, 1999. He completed the MMPI-2 on March 15, 2000.

Throughout, Mr. Purkey understood the usual doctor-patient relationship did not apply to this evaluation during a criminal court procedure. He had no questions about the lack of confidentiality, understanding that we would meet two or three times, that numerous records would be considered, that law enforcement records would be considered, and that anything learned during the evaluation would be communicated directly to his attorney. He also understood that if a report was generated, anything learned during the evaluation could be recorded in this report, the report could be reviewed by the prosecuting attorney, and any aspect of the evaluation information could be discussed in open court.

Mr. Purkey also understood he could refuse to answer any question with prejudice. Questions about the evaluation were welcomed at any time. Mr. Purkey was encouraged to speak with his attorney at any time.

000428

Ex_13-000537

Diagnostic Interview Report
Wesley Purkey
Page 2


The records reviewed during this psychiatric evaluation are listed in the
Index of Material.  A selected review of material is included in the report.
Due to the large number of psychiatric and law enforcement documents
regarding Mr. Purkey, additional records may be received after this report
and may be integrated into the overall opinion by way of selected addenda.


**INDEX OF MATERIAL:**
**A.     Larned State Hospital (LSH) medical records –**
1.     December 29, 1972 through February 4, 1999 Core History Update
       completed by George Strobel, LBSW.
2.     January 12, 1973 Summary of Hospitalization.
3.     May 4, 1973 Release Summary.
4.     February 1999 Medication/Treatment Record.
5.     February 4, 1999 Physical and Neurological Examination
6.     February 4, 1999 Integrated Psychiatric Intake Assessment.
7.     February 4 through March 24, 1999 Physicians Orders.
8.     February 5, 1999 Biophsychosocial Assessment completed by J.L.
       Fernando, MD-Team Leader.
9.     February 4 and March 11, 1999 Integrated Treatment Plans.
10.    March 5, 1999 Psychological Information record completed by Robert
       Huerter, LMLP.
11.    March 23, 1999 letter from Dara Johnson, MD to The Honorable R. Wayne
       Lampson and Forensic Evaluation Report completed by J.L.L. Fernando,
       MD.
**B.     Kansas City, Kansas Police Department (KCK PD) records –**
1.     October 28, 1998 (11:15) Offense Report completed by Officer S.W.
       Isaacson et al.
2.     October 28, 1998 (1145 hours) Investigative Addendum/Clearance
       Narrative completed by Lt. John Cosgrove.
3.     October 28, 1998 (1145 hours) Investigative Addendum/Clearance
       Narrative completed by Det. Howard.
4.     October 28, 1998 Investigative Addendum/Clearance Narrative completed
       by Det. R. Eskina.
5.     October 28, 1998 (1245 hours) Investigative Addendum/Clearance
       Narrative completed by Det. M. Shomin.
6.     October 28, 1998 Investigative Addendum/Clearance Narrative completed
       by Det. R. Eskina.
7.     October 28, 1998 (1344 hours) Witness Statement of Jessie Kueck.
8.     October 28, 1998 (1348 hours) Witness Statement of Betty Colston.
9.     October 28, 1998 Witness Statement of Phyllis Mallard.
10.    October 28, 1998 (1900 hours) Investigative Addendum/Clearance
       Narrative completed by Et. M. Shomin.
11.    October 28, 1998 (2300 hours) Investigative Addendum Clearance
       Narrative completed by Det. W.L. Howard.
12.    October 28, 1998 (2325 hours) KCK PD Consent to Search signed by
       Jeanette Purkey.
13.    October 28, 1998 Wyandotte County, Kansas Autopsy Report completed by
       Erik Krag Mitchell, MD.
14.    October 28, 1998 Regional Criminalistics Laboratory Physical evidence
       Inventory Report completed by Det. W.L. Howard, Jr.
15.    October 29, 1998 (0647 hours) Witness Statement of Jeanette Purkey.
16.    October 29, 1998 (1000 hours) Investigative Addendum/Clearance
       Narrative completed by Dr. W.L. Howard.
17.    October 29, 1998 (1025 hours) Interrogation:  Advice of Rights signed
       by Jeanette Purkey.
18.    October 29, 1998 (1029 hours) Suspect Statement of Jeanette Purkey

000429

Ex_13-000538

Diagnostic Interview Report
Wesley Purkey
Page 3

19.    October 29, 1999 (1055 hours) Witness Statement of Tammy Sue Sanders.
20.    October 29, 1998 (1145 am) Miranda Warning signed by Claire Guida.
21.    October 29, 1998 (1145 am) Suspect Statement of Claire Guida.
22.    October 29, 1998 (1147 )Interrogation:  Advice of Rights signed by Wes Purkey.
23.    October 29, 1998 (12:00 pm) State of Kansas, Wyandotte County Affidavit for Application for Warrant signed by Det. Mike Shomin KCK PD.
24.    October 29, 1998 Witness Statement of Laura Holly.
25.    October 29, 1998 Metro Squad Investigation Report completed by Detectives R. Eskina and W. Howard.
26.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Wall and Eskina.
27.    October 29, 1998 Metro Squad Investigation Report completed  by Detectives M. Casson and J. Rollwagen.
28.    October 29, 1998 Metro Squad Investigation Report completed by Detectives B. Howard and D. Tennis.
29.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Smith and Berger.
30.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Thompson and Boyer.
31.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Landon and Holbert.
32.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Eskina and Wall.
33.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Rollwagen and Casson.
34.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Smith and Berger.
35.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Boyer and Thompson.
36.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Smith and Berger.
37.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Casson and Rollwagen.
38.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Landon and Holbert.
39.    October 29, 1998 Metro Squad Investigation Report completed by Det. Holbert.
40.    October 29, 1998 Metro Squad Investigation Report completed by Detectives Landon and Holbert.
41.    October 29, 1998 Property Reports (recovered from 956 S 75th, Dodge Aries, Trash Dumpster, 6500 Kaw Drive, 646 Tenny, 303 Montana Court, Leavenworth, KS, 16876 Michaels Road, Leavenworth, KS, etc.
42.    October 29, 1998 Platte County Sheriff's Department report completed by Deputy Luther Solomon.
43.    October 29, 1998 Leavenworth County Sheriff Department Investigative Report Assist Outside Agency completed by R.H. Ewert.
44.    Search Warrant signed by Thomas Boeding Judge of the District Court.
45.    October 30, 1998 (0645 hours) Crime Stoppers Greater Kansas City Fact Sheet.
46.    October 29, 1998 Property Reports, crime scene, trash dumpster, Super 8 Motel.
47.    October 30, 1998 (0745 hours) Leavenworth County Sheriff Department Investigative Report (5 pages).
48.    October 29, 1998 (1:27 am) State of Kansas, County of Wyandotte Affidavit for Search Warrant signed by Randy Eskina, Det. KCK PD.

000430

Ex_13-000539

Diagnostic Interview Report
Wesley Purkey
Page 4

49.    October 29, 1998 1:27 am) District Court of Wyandotte County, Kansas
50.    October 30, 1998 Metro Squad Investigation Report completed by
       Detectives Thompson and Boyer.
51.    October 30, 1998 Metro Squad Investigation Report completed by
       Detectives Tennis and Howard.
52.    October 30, 1998 Metro Squad Investigation Report completed by
       Detectives Bill Wall and Randy Eskina.
53.    October 30, 1998 Metro Squad Investigation Report completed by
       Detectives Smith and Beger.
54.    October 30, 1998 Metro Squad Investigation Report completed by
       Detectives Casson and Rollwagen.
55.    October 30, 1998 (1020 hours) Metro #268 Interrogation Advice of Rights
       signed by Tammie Sanders.
56.    October 30, 1998 Metro Squad Investigation Report completed by
       Detectives Howard and Tennis.
57.    October 30, 1998 (1:03 pm) Affidavit for Search Warrant signed by
       Christopher I. Schneider, Assistant District Attorney.
58.    October 30, 1998 (1:04 pm) District Court of Wyandotte County, Kansas
       Search Warrant.
59.    October 30, 1998 State of Kansas, County of Wyandotte, Affidavit for
       Application for Warrant signed by Lt. John Cosgrove KCK PD.
60.    October 30, 1998 District court of Wyandotte County, Kansas Warrant
       (The State of Kansas to Any Sheriff of the State of Kansas).
61.    October 30, 1998 KCK PD  Arrest Reports for Wesley I. Purkey, Tammie
       Sanders, and Jeanette Purkey.
62.    October 30, 1998 (0944 hours) Lenexa, Kansas PD Consent to Search (773
       Miami, Leavenworth, Kansas).
63.    October 30, 1998 Metro Squad Investigation Report completed by
       Detectives Berger and Smith.
64.    October 30, 1998 Metro Squad Investigation Report completed by
       Detectives Howard and Eskina.
65.    October 30, 1998 Metro Squad Investigation Report completed by
       Detectives Casson and Rollwagen.
66.    October 31, 1998 (1102 hours) Suspect Statement of Wesley I. Purkey
       signed by Mr. Purkey.
67.    October 31, 1998 (re-initiated 1045 hours) Interrogation:  Advice of
       Rights signed by Wes Turkey.
68.    November 3, 1998 Synopsis of Crime.
69.    November 4, 1998 Field Investigation Report Identification Unit
       (Alandon Tow Lot) completed by Officer Stubler and Property Report
       (Dodge KS.LV.MCP297 (recovered cigarettes and baseball bat).
70.    November 10, 1998 Additional Information Prosecution Report (Request
       for Laboratory Analysis #1, #2, and Faxed Reports from Platte County
       Sheriff's Department #3).
71.    November 10, 1998 Regional Criminalistics Laboratory Report of Findings
       reported by Stephen C. Warlen Forensic Science Specialist.
C.     Kansas Department of Corrections –
1.     May 15, 1981 Kansas State Reception and Diagnostic Center Report of
       Clinical Evaluation completed by Karl K. Targownik, MD, FAPA, Clinical
       Director, KRDC.
2.     May 19, 1981 Kansas State Reception and Diagnostic Center Psychological
       Report completed by John Thomas, Psychologist.
3.     June 17, 1981 Kansas State Reception and Diagnostic Center Evaluation
       Summary completed by Charles R. Huddleston, MD.
4.     July 25, 1982 through October 20, 1993 Administrative Segregation
       Reports.

000431

Ex_13-000540

Diagnostic Interview Report
Wesley Purkey
Page 5

5.    August 11, 1982, November 16, 1982, July 13, 1984, November 1984
      Disciplinary Reports.
6.    January 8, 1985 and January 24, 1985 Disposition of Disciplinary Case
      reports.
7.    March 15, 1985 and April 4, 1985 Disposition of disciplinary Case
      reports.
8.    April 12, 1985, March 5, 1986, May 15, 1985, May 28, 1985, March 5,
      1986, April 15, 1986 Disciplinary Reports.
9.    1990 through 1997 DOC emergency health services reports, progress
      notes, patient notes/physician orders.
10.   March 6, 1991, July 7, 1991 July 23, 1991, Disposition of Disciplinary
      Case reports.
11.   July 7, 1992 Summary Judgment Citation.
12.   December 17, 1994 Disciplinary Report.
13.   April 8, 1996 through November 21, 1996 DOC Mental Health Services
      Progress Notes.
D.    **Providence Medical Center –**
1.    September 16, 1998 Emergency room record completed by Glen D. Georger,
      MD, and Emergency room nursing assessment.
E.    **Heartspring (formerly Institute of Logopedics) –**
1.    August 13, 1982 Handwritten letter by Mr. Purkey to Institute of
      Logopedics (requesting speech evaluation).
2.    September 28, 1982 Cathy Schlaiker letter to Mr. Purkey (evaluation).
3.    October 10, 1982 Handwritten letter by Mr. Purkey to Cathy Schlaiker.
4.    August 31, 1982 Case History:  Adult Form completed by Mr. Purkey.
F.    **Wesley Medical Center received 12/14/99 –**
1.    August 29, 1969 Outpatient record (sutures removed).
2.    February 15, 1976 (1250) Outpatient record (overdose).
3.    February 15, 1976 Admit note (handwritten by Dr. Murray).
4.    February 15-17, 1976 Physical Exam-Progress Notes.
5.    February 15-25, 1976 laboratory reports, EKG.
6.    February 16-17, 1976 Nurses progress notes.
7.    February 16, 1976 Report of Consultation (handwritten).
8.    February 17-25, 1976 Discharge Summary completed by R.D. Murray, MD.
G.    **University of Kansas Medical Center –**
1.    September 13, 1998 Record of Admission (Face Sheet).
2.    September 13, 1998 Emergency Treatment Record.
3.    September 13, 1998 Handwritten evaluation note completed by Michael
      Leeson, MD.
4.    September 13, 1998 Case Summary completed by David Meyers, MD
5.    September 13, 1998 ECG.
6.    September 13-14, 1998 History, Physical Examination and Progress Notes.
7.    September 14, 1998 EKG.
8.    September 14, 1998 Cardiovascular Stress Test Report completed by David
      B. Wilson, MD.
9.    September 14, 1998 Exercise Treadmill Informed Consent signed by Mr.
      Purkey.
10.   October 30, 1998 Emergency Treatment Record and flow sheet.
H.    **Correspondence from Mr. Purkey (received 12/9/99) –**
1.    Undated District Court of Wyandotte County Motion of In-Limine
      submitted by Aline Pryor.
2.    Undated District Court of Wyandotte County Motion to Dismiss Amended
      Complaint (S) submitted by Aline Pryor.
3.    Undated District Court of Wyandotte County Defendant's Motion for
      Relief of Court Appointed Counsel submitted by Aline Pryor.
4.    October 28, 1998 Handwritten letter from Mr. Purkey to "Darling."

000432

Diagnostic Interview Report
Wesley Purkey
Page 6

5.      October 28, 1998 Handwritten letter from Mr. Purkey to "Sweetheart."
6.      Undated Handwritten letter (marked received 12/5/99) from Mr. Purkey to Albert Grauberger.
7.      December 26, 1998 Handwritten letter from Mr. Purkey to Albert Grauberger.
8.      April 12, 1999 Mr. Purkey letter to Albert Grauberger.
9.      April 29, 1999 Mr. Purkey letter to Albert Grauberger.
10.     June 2, 1999 Handwritten letter from Mr. Purkey to Albert Grauberger.
11.     June 26, 1999 Handwritten letter from Mr. Purkey to Albert Grauberger.
12.     July 15, 1999 Mr. Purkey letter to Albert Grauberger.
13.     July 30, 1999 Mr. Purkey letter to Albert Grauberger.
14.     August 27, 1999 Mr. Purkey letter to Aline Pryor.
15.     September 14, 1999 Mr. Purkey letter to Aline Pryor.
16.     December 27, 1999 Mr. Purkey letter to Aline Pryor.


**SELECTED REVIEW OF MATERIAL:**
October 28, 1998 (1115 hours) KCPD report by Officer S.W. Isaacson responded to a call of a possible burglary that had just occurred.  A white male suspect wearing a plaid shirt and blue jeans was seen leaving the scene on foot.  Suspect was carrying two white bags. The suspect had left by the rear door of the house.  The rear porch exterior poor was open (rear porch was enclosed).  The rear door was unlocked and closed and the rear kitchen inside door was ajar about six inches.  Upon entering the house, the victim was found lying on the floor in a fetal position on her side facing east, covered by two blankets except for her sandled feet sticking out of the blanket.  Blood had pooled by her feet.  There were no signs of breaking in the rear door and the front door was locked.  Time of death was not clear.

October 28, 1998 (1115 hours) KCPD report by Officer Keith recorded that a neighbor (Betty Colston) stated the victim was seen in the front yard around 0900 hours on October 27, 1998, Reddi-Root'r was at the residence at approximate hours of 1300 through 1600 hours, a taxi cab was in front of the victim's residence at 2100 hours, that the lights were on all night, and she observed a white male exit the back porch carrying two white bags.  Suspect was last seen northbound on 10th.  This was when she phoned police. Suspect was wearing a long plaid shirt, blue jeans, approximately 30-40 years of age, tall and thin in build.  Phyllis Mallard advised she observed a male walking northbound on 10th, and had long blonde hair.  Another neighbor had also observed the lights on all night, which was unusual.

October 28, 1998 (1140 hours) KDPD Narrative was completed by Lt. John Cosgrove. The victim's head had been covered prior to being discovered. A pipewrench was located at the rear of the residence under a water spicket outside.  Relatives said the victim was having trouble with her kitchen faucets.  The victim had given the individual $70.00 to purchase a faucet.  The kitchen sink was still dripping and it did not appear any repairs had been made to the faucet.  Water traps for the sinks were checked for possible blood and the area did appear to have been cleaned up.  There were several smoked cigarettes (Maverick brand).  The victim did not smoke.  There were signs of drug activity.  A pen appeared to have been used to fashion a crackpipe known as a straight shooter.  K.B.I. agents surmised there were two areas of the beating, one appeared next to the doorway and the other in the area of where the victim's head rested.

Ex_13-000542

Diagnostic Interview Report
Wesley Purkey
Page 7

The lieutenant proceeded to 965 S. 75th and talked to Ms. Purkey.  She stated
her husband had been missing since 7:00 am the previous day, 10/27/98.  He
had gone to his job at Reddi-Root'r and she had not heard from him since.
she had reported him as a missing person.  While there, a phone call came
from the Super 8 Motel in Leavenworth.  Suspicion arose that Ms. Purkey might
know more than she was saying and upon further questioning stated she had
actually seen her husband since the previous morning.  She had taken a taxi
to "look on Central Avenue," then stated, "Okay, I went to 2211 South 10th to
meet my husband." She volunteered she had been lying and in fact had gone
there and seen her husband who was dressed only in his socks and underwear
when she arrived.  He had called and asked her to bring him pants, a shirt,
cigarettes and a lighter.  He smoked Maverick cigarettes.  The phone rang
again, now from a tavern in Leavenworth, and again it was a female.  Ms.
Purkey stated the female was the suspect's ex-wife who was in Leavenworth for
a court date for driving while intoxicated.  Ms. Purkey emphatically denied
that her husband was with his ex-wife.  Later in the interview, Ms. Purkey
received a call from a female known as "Mandy" who said she was in jail.

Lt. Cosgrove then contacted the Platte County PD, then talked with "Mandy" on
the phone.  She stated that she knew about the homicide and that her ex-
husband had admitted to her that he killed an old woman.  She further stated
that Ms. Purkey knew about this.  Additionally she stated the three of them,
Mr. and Ms. Purkey and Mandy had driven past the victim's home while the
police were there.  Mandy would be willing to give a statement.  At this
point, Ms. Purkey stated she wanted to be "completely truth and helpful,"
said she knew where the Reddi-Root'r van had been ditched, could show police
where the bloody clothes were, and would give a full account of everything
she knew.

Det. Howard, Lt. Cosgrove and Ms. Purkey proceeded to a dumpster behind a
small gas station on K-32 where they retrieved a black trash bag.  Inside the
bag were a pair of tennis shoes, a bloody uniform shirt, and uniform pants
with the name Reddi-Root'r on the shirt, a hammer which appeared to have some
blood and possibly hair on it, a piece of mail from the victim's address.
Some syringes were also located in the bag. The items were photographed and
recovered.  Further down the road, two white grocery-style trash bags were
found.  Prior to finding the white bags in the trash can behind Bill's West
Bar, Ms. Purkey informed officers that inside the bags should be several
empty Coke cans and a purse.  One bag contained several empty Coke cans and
the other bag held a woman's purse.

Ms. Purkey stated she would show officers how she drove her husband on
Wednesday, the day after the homicide, to the victim's residence so he could
"clean up some of the evidence."  They had purchased gasoline as her husband
had wanted to burn down the residence to destroy evidence.  They had tried to
find the Reddi-Root'r van her husband had let a prostitute drive away from
the crime scene.  She took them by the prostitute's residence in the 900
block of Tenny.  Her husband told her what had occurred in the house and he
had indicated to her he had gone to do a repair but that he had been smoking
crack cocaine and told the older woman he needed money to buy a faucet.  The
older woman gave him $70.00 cash.  Ms. Purkey further stated her husband had
bought crack, picked up a prostitute off Central Avenue and gone to a motel.
After the money ran out, her husband returned to the residence with the
prostitute and went inside to get more money.  Her husband said he did not
want to kill the lady but that she was screaming.  He only intended to rob

000454

Diagnostic Interview Report
Wesley Purkey
Page 8

her and was going to tie her up.  Duct tape was located on the bed next to the victim, but she had not been bound.

Mr. Purkey was taken into custody in Leavenworth County at approximately 0900 hours on 10/30/98.  He was taken into custody without incident. He understood his Miranda rights and was willing to talk to detectives, though not in great detail as he wanted to talk to his lawyer before going into any detail.  They took that to be an invocation of his rights and attempted to clarify that. Mr. Purkey did not wish to give a formal statement.  A search warrant had been obtained and he was transported to KU Medical Center for body fluids and hair samples.

October 28, 1998 (1145 hours) KCPD Investigative Addendum Clearance was completed by Det. Howard.  An 80-year-old white female was found inside the bedroom beaten to death.  Neighbors called police at 1100 hours to report a burglary in progress. It the appeared victim had been dead 10 to 24 hours. On a table next to a recliner chair was the shell to an ink pen, a wire push rod, and several tiny plastic baggies in an ashtray all suggesting the possibility of narcotics.  Eleven cigarette butts (unknown brand) were found A mashed Maverick cigarette package was also found.  An empty Marlboro Light cigarette package was found in the bathroom.  A cigarette butt was in the stool.  All items were collected.

The victim had an obvious head wound to the top of her skull. Her skull appeared to have been crushed or caved in.  A puddle of blood surrounded the victim's head. The victim wore a red flannel shirt, black slacks, socks and sandals.  A large puddle of blood was near her feet.  No injuries could be found to her lower torso.  Blood spatter was evident near the pool of blood by the feet.  Blood had spattered on the bed and under the bed next to the victim.  Above her head an aluminum cane was found which appeared to have blood near the handle and base.  Next to the cane was a pair of eyeglasses. A roll of duct tape with blood smears was found on the bed.  On the door jam a blood smear was found that appeared to be a palm print.  Bloodstains on the floor had dried and hardened.  Closer examination revealed a deep wound to her right cheek.  Wounds on her hands appeared to be defensive and from a blunt object.  Her right wrist appeared bruised and possibly broken.

The mail carrier was interviewed and noted the prior day on her regular delivery at approximately 1:25 pm she did not see the victim seated in her usual location.  She did, however, observe an unknown white male crouching or bending next to the victim's chair by a table where the ashtray was found. Blood spatter experts were called to analyze the evidence and a canine handler was requested to search the surrounding wooded area. Due to the rain, the officer indicated he would return at a later date.  A vehicle had driven past the crime scene several times while police were there.  The vehicle appeared to be a 1970 model Oldsmobile, two-door painted pink with the Kansas tag NEG-223 or 233.

October 28, 1998 (1157 hours) Investigative Addendum/Clearance was completed by Det. R. Eskina.  Det. Eskina did a neighborhood canvas. A white male with blonde stringy hair had been seen leaving the residence carrying two white plastic bags.  Betty Colston, a neighbor, had observed an unknown white male wearing a tan or brownish plaid long sleeve shirt and blue jeans exit the victim's back door that morning at approximately 10:45.  She saw that same individual go in the same door at approximately 10:30.  She indicated this might be the same individual she saw the day before in a Reddi-Root'r truck

000435

Diagnostic Interview Report
Wesley Purkey
Page 9

at the victim's house.  Ms. Colston stated the truck was observed on 10/27/98 for several hours.  The individual on 10/28/98 observed going into the residence came out approximately 15 minutes later and was wearing a ballcap, and carrying two sacks white in color.  That individual walked away from the residence.  Phyllis Mallard noted a cab at approximately 9:00 p.m. in front of the victim's house on 10/27/98.  She did not see anyone leave the cab or enter the residence, but did hear the cab door shut and saw the cab pull away.

Det. Eskina then spoke to personnel at Strasser's Hardware.  He was provided invoices of receipts from 10/27/98 charged to Reddi-Root'r.  None were for Mr. Purkey.

Det. Eskina returned 2211 S 10th and spoke with James W. Bales, Jr. grandson of the victim.  She kept very little person property in the home, suffered from polio and other health problems, and lived a very frugal lifestyle.  Mr. Bales stated the victim had a watch that belonged to his grandfather, wore a wedding ring, and kept bank account books and other items on the TV tray next to her chair in the front room of the residence.  She usually could be found resting in bed or in the chair in the front room.  She was known to keep money hidden in different locations of the residence.

October 28, 1998 (1245 hours) KCPD Investigative Addendum/Clearance was completed by Det. M. Shomin.  Det. Shomin talked with Orlin Kueck and Jessie Kueck.  Jessie Kueck is the niece of the victim.  The Kueck's were caretakers for the victim, doing yard work, transportation errands, etc.  They did not talk every day, but Ms. Kueck talked with the victim on October 26 and was advised by her aunt that she was having problems with a kitchen sink faucet in that it ran continually.  Ms. Kueck further stated she advised her aunt to call Strasser Hardware for referral to a reputable plumber.  The victim did call Strasser Hardware and they gave the name of a person by the name of Mr. Clay.  The victim contacted Mr. Clay who stated he would respond to the residence the afternoon of 10/26/98.  Ms. Kueck received a phone call from the victim at approximately 2100 hours in the evening stating that the party, Mr. Clay, had just arrived.  Ms. Kueck was somewhat concerned that he had arrived so late in the evening.  The individual told her aunt she needed new faucets and he did not have the cash to buy them.  At this time he requested money from the victim for the faucets.  Ms. Kueck believed the suspect returned the following morning, 10/27/98.  Ms. Kueck stated the victim told her she gave the suspect $69.00 cash to buy new faucets.  Ms. Kueck advised her aunt this was not the right thing to do, but the aunt replied the same individual had done work for her in the past and she trusted him.  Ms. Kueck stated this conversation took place at about 10:00 to 11:00 am on 10/27/98.  The last conversation she had with the victim was that the victim was waiting for the individual to return to repair the faucets.  Ms. Kueck attempted to contact her aunt on the evening of 10/27/98 between 1800 and 1830 hours.  The victim did not answer the phone but this was not totally out of the ordinary as the victim sometimes retired early and would not answer her phone after that.  Ms. Kueck also attempted to contact the victim today at approximately 10:00 or 11:00 am(10/28/98) but was unable to do so.  Ms. Kueck later received a phone call advising her of the situation at the victim's residence.  She stated that the victim did not smoke or drink.

October 28, 1998 Witness Statement of Phyllis Mallard was taken by Det. R. Eskina.  She described a 5'7" white male, who wore jeans, shirt, had shoulder-length blonde hair, and long-sleeved shirt leaving the neighborhood

000436

Ex_13-000545

Diagnostic Interview Report
Wesley Purkey
Page 10

carrying two white plastic bags.  The individual was walking north.  She thought she could identify the individual.  She had observed a Reddi-Root'r truck at about 11:00 or 11:30 on the previous day parked at 2211 S. 10th.  The last time she recalled seeing the truck was about 3:00 p.m.  It was right around 11:00 am when she was the individual walking north on 10th Street today (10/28/98).

October 28, 1998 Witness Statement of Betty Colston was taken by Det. R. Eskina.  Ms. Bolston lived at 2215 S 10th Street. She saw a man get out of the van, she wasn't sure if he wore a uniform, but thought so.  He was a white male and was taking plumbing equipment into the residence.  Ms. Colston had also seen a taxi in front of 2211 the previous night.  She had last seen Ms. Bales the previous morning around 8:00 or 8:30.

October 28, 1998 Witness Statement of Jessie Kueck was taken by Det. M. Shomin.  Ms. Kueck and her husband were retired and lived in Independence. Mary Ruth Bales was her aunt. The Kuecks looked after Ms. Bales, did yard work, ran errands, etc.  Ms. Bales "couldn't get around well," as she had polio.  Ms. Kueck called Ms. Bales on a daily basis at around the same time each day.  Ms. Kueck called Ms. Bales the previous day to inquire about her plumbing problems, it was between 10:00 and 10:00 am.  The kitchen sink faucets would not turn off.  Ms. Bales reported a man with the last name of "Clay" was going to do her plumbing.  Ms. Bales said it was the same guy who had done work for her before.  Ms. Kueck said this work by Mr. Clay would have been done "years before."  Ms. Kueck attempted to call Ms. Bales back in the evening but was unsuccessful.  Neighbors reported that unusually the lights had been on all night at Ms. Bales residence.  Ms. Bales did not smoke, she did not have many visitors.

Ms. Kueck had discussed the leaking faucets with Ms. Bales on Friday and Mr. Kueck mentioned the water would have to be shut off downstairs in the basement.  The plumber was supposed to come on Monday.  He did not arrive until after 9:00 that evening (Monday) and wanted to see what kind of a job he had to do.  She was referring to the man named Mr. Clay.  Ms. Kueck stated that Ms. Bales told her the plumber said she needed a whole new faucet, that he didn't have money for the faucet, and needed $69.00 to buy one.  Ms. Bales gave the plumber cash. When Ms. Kueck talked to Ms. Bales the next morning (Tuesday) between 10:00 and 11:00 am the plumber had not yet returned, but she was expecting him.

October 28, 1998 (1900 hours) KCPD autopsy Narrative was completed by Det. M. Shomin.  There was a large amount of blood on the bottom of the sole of the left sandal and a slight amount of blood on the sole of the right sandal. Around the victim's neck was a blue, white and green plaid western-style shirt, which was not tied.  The two ends actually lapped together as if to form a type of ligature.

Cause of death was homicide.  Findings showed multiple skin laceration, contusions and abrasions.  There were cerebral contusions and lacerations, calvarial fracture, laryngeal fracture, and contusions of the neck.  These were from a blunt instrument and a possible asphyxial component.  There were defensive wounds.  Bruises and lacerations were listed as A-PP, totaling 42.

October 28, 1998 (2300 hours) KCPD Narrative was completed by Det. W.L. Howard. At first, Ms. Purkey was very evasive but upon learning her husband's ex-wife talked to police, decided to cooperate with the investigation.  She

000437

Ex_13-000546

Diagnostic Interview Report
Wesley Purkey
Page 11

took them to 6700 Kaw Drive where a dumpster was found to contain a bag the suspect had dumped in the trash container. The bag contained the suspect's clothing which appeared to be covered in blood, a hammer which apparently had blood and grey hairs on it, mail belonging to the victim, needles and syringes, white low-cut tennis shoes with blood on them and, a sliver crack pipe. Ms. Purkey explained that her husband had attempted to stage a crime scene, making himself the victim. She had reported him missing and the plan was to make it appear as though he had been a victim of a kidnapping and robbery. She advised Mr. Purkey had poured bleach over the dash and steering column of the Reddi-Root'r van and parked it between two trees off an alley, ransacked the vehicle, and thrown his pager inside the vehicle to make it appear as though he were missing.

They next went to the scene and located the vehicle which appeared as though it had been ransacked, the suspect's pager was on the passenger seat. Her husband had given the van to a prostitute at the scene of the crime. When he "sobered up" the next morning he asked his wife to help him find the van. The vehicle was located in the 900 block of Tenny. Ms. Purkey helped him attempt to cover up the crime scene. She took Mr. Purkey to the victim's house after 10:00 am, dropped him off and parked around the corner. He returned a short time later carrying two plastic trash bags. She was aware Mr. Purkey had told his ex-wife, Claire Gaida, "Mandy" about what he had done and was enlisting her help in cleaning up the crime scene. He planned to burn down the house.

Later in the afternoon, all three went to a gas station at 67th and Kaw Drive and obtained gasoline, which they put in the trunk of Mr. Purkey's vehicle, a Dodge Aries. At that time, the suspect allegedly retrieved the black plastic bag out of the trunk containing his clothing from the crime scene and murder weapon and put it in the back dumpster at 67th and Kaw.

Ms. Purkey had arrived home at around 4:45 pm on 10/27/98. At that time she received a phone call from Mr. Purkey and he appeared to be saying goodbye to her and sounded suicidal. She discerned the suspect had, "Messed up and done something really bad." She spoke with him several times on the phone and he had been calling her since 1:45 pm. He wanted her to bring him clothes, cigarettes and a lighter to 2211 S 10th. He needed her assistance in leaving the crime scene and a change of clothes. She attempted to locate the address, could not, and returned home where she phoned for a cab. Upon arrived at 2210 S 10th, she followed his instructions, went into the home, noted he was wearing a pair of blue sweat pants and no shirt. He went into the front bedroom and changed clothing. Ms. Purkey returned to the cab and waited for her husband. He came out of the residence carrying a white tool bucket that contained tools, and his clothing. Mr. Purkey then went back to the front door where he retrieved some mail from the victim's mailbox. When they arrived home, Mr. Purkey confessed about the murder and they set off to cover up the crime scene.

October 29, 1998 Det. Luther Solomon of the Platte County Sheriff's Department noted he had talked with Claire Gaida and realized she had information about Wesley Purkey and a murder in Kansas City. She was interviewed by Lt. Cosgrove from Kansas City, Kansas. While watching television, she and Mr. Purkey saw stories on the news related to the crime. Mr. Purkey stated, "They know. They know it was me." He wanted to know if Ms. Gaida had a gun to which she replied, "I have one, but it is not with me. I am not going to tell you where it is at either." She stated the gun was at

Diagnostic Interview Report
Wesley Purkey
Page 12

her home in Wichita.  Mr. Purkey then insisted on leaving the area and they drove into Missouri.  While driving, Ms. Gaida was stopped, arrested for DUI, and Mr. Purkey was allowed to drive the vehicle from the scene.

October 29, 1998 Leavenworth County Sheriff's Department Investigative Report recorded they had been advised Mr. Purkey had spent 18 years in the Federal prison system for kidnapping, aggravated assault and armed robbery. Mr. Purkey told Ms. Purkey he killed the woman in the house, gave the woman with him $200.00 and told her to leave in the van.  Ms. Purkey said Mr. Purkey's hair and mustache were now gray and "his hair is shot."  She last saw him at their home in Kansas City on 10/28/98 at about 1900 hours.  He said he was thinking of going to Wichita or Tulsa, Oklahoma.

October 29, 1998 KCPD Investigation Report was completed by Det. R. Eskina and Det. W. Howard.  321-TAXI had made a round trip fare call to the victim's address on 10/27/98 in the evening hours.  A 321-TAXI driver picked up a white female at 965 S 75th St. on 10/27/98 and driven her to 2211 S 10th in the evening hours.  He related she had taken some clothing with her, took the clothing into 2210 S 10th and came out a short time later.  After that a white male joined her in the cab and they were transported back to 965 S 75th.  The officers then questioned Jeanette Purkey at 965 S 75th.  She began to cry, breath heavily, was noticeably shaken and nervous, and made statements that implicated Wesley Purkey in the crime at 2211 S 10th.  A Consent to Search form for her residence was given her which she willing signed, and stated authorities would have her full cooperation.

While at 965 75th, officers received information that a Claire Gaida had been detained for DWI.  She informed officers Mr. Purkey had been with her when she was stopped, had not been detained, and drove away in her vehicle.  Mr. Gaida is Mr. Purkey's ex-wife.  Ms. Gaida and Ms. Purkey were both implicating Mr. Purkey as the person who killed Mary Ruth Bales at 2211 S 10th.  A search warrant was obtained to search 965 75th St. and items relevant to the investigation were recovered.  Ms. Purkey was taken to headquarters where an interview was conducted.

October 29, 1998 KCPD Investigation Report was completed by Det. Wall and Det. Eskina.  Officers interviewed Claire Gaida at the Platte County Jail. She provided a complete tape-recorded statement.

October 29, 1998 KCPD Investigation Report was completed by Det. Casson and Det. J. Rollwagen.  They contacted Danny Gravatt of Reddi-Root'r and were informed that Wesley Purkey had been working there since September 21, 1998. He had passed a drug screen.  The call to Mary Bales' residence at 2211 S 10th was received by telephone and was for kitchen faucet repair.  The call was on Monday, 10/26/98 at 1:45 p.m. and dispatched at 8:54 pm on 10/26/98.  It was called in as completed at 9:30 pm. on 10/26/98.  They reviewed Mr. Purkey's personnel file and informed that on 10/27/98, Mr. Purkey came to Reddi-Root'r to get his work radio re-programmed.  This was in the morning and Mr. Purkey had not been seen since by Reddi-Root'r employees.

October 29, 1998 KCPD Investigation Report was completed by Det. B. Howard and Det. D. Tennis.  They received a lead to locate an unknown female prostitute at 656 Tenny.  This person was alleged with the suspect at the victim's home.  The female, Tammie Sanders, agreed to accompany officers to the KCPD for an interview.  She was a prostitute and picked up by the suspect in the earning morning hours of 10/27/98.  They spent the day smoking crack

000439

Ex_13-000548

Diagnostic Interview Report
Wesley Purkey
Page 13

and engaging in acts of prostitution.  She identified the suspect as Wesley
Purkey, driver of the Reddi-Root'r truck.  They went to the victim's house on
south 10th as he needed to get money from a friend.  While she waited in the
van, he obtained $70.00 from a person unknown to her.  They went back a
second time at about 1:30 pm to get more money.  They parked in front of the
house and she waited about 15 minutes in the van.  Finally, she went inside
the house and discovered the suspect was stripped down to his underwear.
While in the house, they smoked Maverick cigarettes and crack cocaine.  She
was in the house three hours and never saw the victim, but did find the
suspect's bloody clothes in the bathroom.  She panicked and attempted to
leave but was restrained and had bruises on her arms.  The suspect had acted
jumpy earlier when a postal carrier dropped off mail.  The suspect called his
wife several times.  Eventually, she was given the keys to the Reddi-Root'r
van and told she could leave.  She remembered biting his fingers when he
covered her mouth to keep her from screaming.  The suspect told her he had
fought with the guy who lived there and the guy bloodied his nose.  She took
the van home and saw the suspect the next morning when he came by for it.
The suspect said everything turned out okay and not to worry.  Officers
recovered a dark blue/gray man's coat "Red Kap" brand with a tag sewn inside
that said "Property of Walker Uniforms 14H-05-07 W. Purkey 0998 Reddi-Root'r.

October 29, 1998 KCPD Investigation Report completed by Det. Thompson and
Det. Boyer recorded they contacted the Super 8 Motel in Leavenworth, Kansas.
The front desk attendant had not seen Mr. Purkey, but did have an invoice for
Claire Gaida.  William Judd, a custodian at the motel, knew Mr. Purkey but
had not seen him for two weeks.  Jennifer Broyles, head housekeeper was
familiar with Mr. Purkey and his wife, Jeanette, but had not seen Wesley
Purkey for approximately two weeks. Officers searched Room 203 registered to
Ms. Gaida.  The front desk attendant verified phone calls from Room 302 to
Wesley's Purkey's residence.

October 29, 1998 KCPD Investigation Report completed by was an interview of
Rock Pennington the 321-TAXI driver.  He picked up a white female at 965 S 7th
at 8;14 pm on 10/27/98 for a round trip fare to 2211 S. 10th.  The female
stated she had to pick up her husband and bring him some clothes. She
couldn't find the address so her husband said to call a cab as they would
know address.  She repeated the conversation several times and he thought it
strange. Upon arrival, the white female went into the house carrying pants
(unknown color) and plaid shirt possibly blue or tan.  After about 5 to 7
minutes, the white female and a white male came out of the house.  The male
was carrying a gym bag.  They returned to 965 S 75th.  While driving back the
female was not talking as she did before, and the  male whispered, so the
driver couldn't hear what he was saying.

October 29, 1998 KCPD Investigation Report noted Det. Rollwagen and Det.
Casson went to 2211 S. 10th .  A two liter 7-up bottle was found behind the
front, blue pants found on the couch, no sweatpants.  No kitchen knife was
found.

October 29, 1998 KCPD Investigation Report by Det. Smith and Det. Berger
reported they interviewed persons at Strasser's Hardware.  Receptionist Paula
Shaeffler remembered an elderly lady calling on 10/27/98 at 1000-1100 hours
for a faucet repair.  She transferred the lady to the plumbing department.
The clerk in the plumbing department did not remember any calls from an
elderly lady and would not have referred anyone to Reddi-Root'r´for service
work.  Strassers would recommend contracts John Monteil or Gene Underwood.

000440

Ex_13-000549

Diagnostic Interview Report
Wesley Purkey
Page 14


No one at Strassers knew anyone named Clay who worked for them or bought supplies from the store. Reddi-Root'r had an account at Strassers.  Two purchases were made by Reddi-Root'r personnel on 10/27/98.  One was made at 1000 hours by Don Smith and the other at 1237 hours by Nelson Sanguinett. Invoices of the transactions were received.

October 29, 1998 KCPD Investigation Report by Det. Smith and Det. Berger reported an interview with Claire Gaida.  She was asked if the suspect (W.P.) had any friends or relatives in the KC or Leavenworth area. Mr. Purkey said he'd drive to a friend's house in Enid, Oklahoma to "hide out" as he had already talked to his friend staying there.  Ms. Gaida did not know the address.  She advised Mr. Purkey also had a brother, Gary Purkey, living in Nebraska.

October 29, 1998 KCPD Investigation Report by Det. Casson and Det. Rollwagen reported interview with Patti Patel at the Relax In Motel.  She had a registration card for Tammy Sanders at 737 Tenny in Kansas City, Kansas. Tammy Sanders checked in at 9:00 am and left about 11:30 am accompanied by a white male in a white Reddi-Root'r truck.  The male was described as 6' tall, 180 pounds and about 45 years old.

October 29, 1998 KCPD Investigation Report completed by Det. Holbert noted he contacted Maurice Holman, Mr. Purkey's parole officer.  Mr. Purkey transferred to this area from Wichita and gave his home address and phone number.  Mr. Holman reported Mr. Purkey had a brother, Gary, whom he did not talk to much.  Gary Purkey believed Wesley Purkey raped their mother.

October 29, 1998 Witness Statement of Laura Holly was taken by Det. Landon and Holbert.  Ms. Holly was a letter carrier.  She delivered mail to 2211 S. 10th and waved to Ms. Bales every day to make sure she was okay.  That was usually between 1:00 and 1:30 pm.  On October 27, 1998 there was a Reddi-Root'r truck parked outside the residence.  When Ms. Holly looked in the door she did not see Ms. Bales but did see a man kneeling behind her chair and assumed he was working for Ms. Bales.  Ms. Holly did not see anyone else in the house.  She thought the man seemed to have brown hair, short, maybe to his shoulders, a thin man, she didn't see his face.  She stated the man was wearing pants and a shirt, dark color, maybe dark blue.  It could have been a uniform.  Ms. Holly described the Reddi-Root'r van was white with red writing and maybe blue writing.

October 29, 1998 Suspect Statement of Claire Gaida was taken in the Detective Bureau of the Kansas City Police Department. Ms. Gaida was from Wichita, Kansas, and lived with her husband, Steve.  She had been employed as a LPN for two years.  She was acquainted with Wesley Purkey, they had had a common law marriage.  There was one child from that marriage, they were now divorced.  Ms. Gaida was also acquainted with Jeanette Purkey, wife of Wesley Purkey.  Ms. Gaida arrived at the Purkey home in the Kansas City area on Wednesday at about 1:30 p.m.  She was going to stay at their home before going to a court appearance the next morning.  When she got to the home "things were just real weird and Jeanette was smoking one cigarette after another, she don't even smoke usually and they was just acting strange, the kids was acting strange and she was in a hurry to get the kids out of the house."  Ms. Gaida did not realize Mr. Purkey was home because the Reddi-Root'r van was not parked at the residence.  Ms. Gaida asked why Mr. Purkey was there and Jeanette indicated he was not feeling well.  When Mr. Purkey came out of the bedroom he looked "real hard…like he had been out partying

Diagnostic Interview Report
Wesley Purkey
Page 15

all night or something…that kind of look."  Mr. Purkey had "got into some of
that stupid shit last night."  He did not want to tell Ms. Gaida what had
happened but eventually did, stating he hurt someone pretty bad last night.
He then explained he had "It was over drugs…I hit her in the mouth and I beat
her with a hammer…pretty bad…there's no way I can even get rid of it."  He
was talking about "blowing up and burning up" the house, but said the bones
would have been crushed so bad they still would be found.  Ms. Gaida asked,
"She is that bad?" and Mr. Purkey stated, "That bedroom is a mess."

Ms. Gaida stated Mr. Purkey said there was blood all over the bedroom.  He
had a job there two days ago, which would explain his fingerprints being
there, but would not explain why his fingerprints were in the bedroom.  He
was worried about evidence still at the house and he had gone back to the
house to get cigarette butts, pop cans and the hammer and stuff.  He and
Jeanette returned to the house and entered the back door.  He wanted Jeanette
to go to the house and clean it up and wondered if she could handle being
there with the body.  She indicated she could, "I don't have a choice."  They
discussed the missing person report as the only way Ms. Purkey could not get
him in trouble.  Mr. Purkey discussed setting the house on fire but that it
was raining and would put the fire out.  He did not ask Ms. Gaida to help
clean up the crime scene, and she indicated she would have refused had he
asked.  Mr. Purkey, Ms. Purkey and Ms. Gaida drove to the crime scene but
drove on by as they saw the yellow ribbon around the house.  They eventually
found the van and Mr. Purkey was "real scared," went to the van, and wiped
all prints off the inside with bleach.  He reported some of his tire tools
were missing and hoped someone would come back and make it look like he was
missing.  He stated, "Oh no, I forgot the blinker and the steering wheel
column."  Ms. Gaida said, "So what, its your truck, it's automatically gonna
have your prints on it."  Mr. Purkey then stated, "No, they're hers."  Ms.
Gaida thought he was referring to the lady he killed.

Mr. Purkey said he struck the woman in the face or teeth with his fist and
beat her to death with a hammer.  Discussion followed among the three of them
about where to go.  They eventually went to a tavern to drink beer.  Ms.
Gaida went into the tavern to use the restroom and when she came outside the
Purkeys were coming from a field where a dumpster was parked.  They stated,
"We had to get rid of the purse and the stuff that we had in the trunk of
that girls."  Once again, Ms. Gaida thought they were referring to the dead
woman.

They returned to the Purkey residence and decided that Ms. Gadia and Mr.
Purkey would leave the residence.  Ms. Gaida and Mr. Purkey went to a
friend's house around 8:00 pm, and eventually decided to go to Leavenworth.
Ms. Gaida did not have much money, but Mr. Purkey said for her to use what
she had and he would get more money for her the next day for her return to
Wichita.  They rented a room at the Super 8 Motel in Leavenworth.  Once in
the room, Ms. Gaida wanted to rest, but Mr. Purkey said they should go to a
bar across the parking lot where he could watch for the police.  They phoned
Ms. Purkey from the motel and from the bar, discovering the police were at
Ms. Purkey's home.  Mr. Purkey at some point decided to leave Leavenworth and
they drove into Missouri.  Ms. Gaida was frightened of Mr. Purkey and decided
to try to get stopped by the police, which she did by speeding.  The officer
arrested Ms. Gaida and indicated to Mr. Purkey he could leave in the vehicle,
which he did.

000442

Ex_13-000551

Diagnostic Interview Report
Wesley Purkey
Page 16

Ms. Gaida felt Mr. Purkey was "incarcerated, institutionalized…he's done 17 years…plus he's been in four or five times before that since he's been a teenager." In Wichita she reported that Mr. Purkey "got hold of Jeanett's kid's Ritalin and was shooting it up…" Ms. Purkey had told her Mr. Purkey took her to the garage and almost killed her. Ms. Purkey had never indicated to Ms. Gaida that she had been bound in any way, but a girlfriend came to the Purkey house who was shooting drugs with Mr. Purkey. He duct-taped her in a Jacuzzi and had a syringe he was going to shoot in her juggler vein with. The girlfriend got scared and left.

Ms. Gaida knew of no other taping incidents. Ms. Gaida stated that Mr. Purkey beat his children and wife. He had been hospitalized one night in Wichita for shooting drugs and he thought chemicals were spraying out of his ceiling. Ms. Gaida stated Mr. Purkey called the KBI on himself saying drug dealers were trying to kill him and chemicals were coming through the vents and ceiling and had planted something in his chest and were using remote things to increase it. He was "way flipped out and that's how he gets when he gets on them drugs…he stays the same when he doesn't have nothing in his system." Mr. Purkey believed, "Jeanette and them tried to kill him."

Mr. Purkey did not want to return to prison, "Because they will have to kill me first." After Ms. Gaida talked to Ms. Purkey from the motel, Mr. Purkey realized the police were "on to me." Ms. Gaida did not know what type of drugs Mr. Purkey was on but he usually did Ritalin. He had taken three bottles of nitroglycerin after the murder to kill himself. Ms. Gadia guessed it came from the lady's house, but Mr. Purkey would not admit that.

Mr. Purkey had expressed remorse for what he had done. Ms. Gaida noted he said, "I'm not worth nothing…I can't believe I did this…etc." "I've already tried to take three bottles of nitroglycerine but they didn't work. I woke back up." Mr. Purkey indicated to Ms. Gadia the reason for the murder was drugs. Ms. Gaida feared for her life and, "You don't snitch on him…he will kill you…I know he is very capable of that and I know too much on him and he knows that."

October 29, 1998 (0647) statement by Jeanette Purkey recorded that Wes "hallucinates when he shoots Ritalin."

October 29, 1998 (1029 hours) Suspect Statement of Jeannette Purkey was taken in the Detective Bureau of the Kansas City Police Department. She and Wesley had been married for nine years. She became aware he was involved in a criminal incident on 10/27/98 in the evening hours. She had not been completely honest and forthright in her initial contact with police, "Cause I was scared, cause Wes threatened me." He had hurt her before. Wes asked her to pick him up on Tuesday evening the 27th and she went by cab and took clothing. She eventually found out he had killed someone after he had not gone to work, had picked up another girl, and bought drugs. He also asked her to assist him in covering up that murder. She was supposed to wipe everything down with bleach and get rid of everything, cigarette butts, etc. There was also talk of doing something else to the house, "he was gonna burn the house down first." Jeannette bought the gas and they went back by the house. Wesley went by the house and got a purse and some cans out of the house. He wanted to get rid of those items from the house to cover that he had broken in the entrance of the lady's house. Jeanette helped Wes dispose of clothes he had on, and the purse in cans on K-32 behind Woody's grocery. Items were disposed of at more than one location. Claire Gata also had

000443

Ex_13-000552

Diagnostic Interview Report
Wesley Purkey
Page 17

knowledge of the killing.  She was Wes's ex-wife and was also known as Mandy. She was present in attempts to cover the crime.  While Wes wiped the van down, Mandy and Jeannette stayed in the car.  The van was on 9th street in an alley.  Wes moved the van from another location and Jeannette was aware this van was connected to a criminal investigation.  She made a false missing person report on her husband because he told her to do it. Wes told her to delete the ID calls on her phone.  She did it because she was afraid of Wes. They went to the crime scene at 8:30 Tuesday evening (27th).  She did not see the victim in the house.  While in the house, she gave Wes the clothes, etc. He lit a cigarette.  The bathroom light was on. He sat on the bed and took the sweats off and got dressed.  She did not know where the sweats he wore were but thought they were still in the house at 2211 S 10th.  Next, she got in the cab, Wes brought out his bucket, went back and took mail out of the mailbox. Wes only told Jeannette that he had hurt someone real bad, he finally said he hit somebody and he killed someone.  Later, Wes told Mandy he yelled and killed someone.  He said this in Jeannette's presence.  After this, Wes, Mandy and Jeannette entered a conspiracy to try to cover the crime.  The bleach came from their trailer house.  Jeannette thought Mandy was a willing participant. Mandy said they just might as well burn the house, it would be easier.  The suggestion did not come from Mandy originally, but from Wes; Mandy agreed to it.

Regarding the van, Wes "went in and clean it out and wiped it down with bleach." Wes drove the van from its original location on Wednesday morning. He indicated a girl had been with him, Jeanette did not know the girl, but provided officers with information about where she might be located.  Wes wanted to sabotage the van to make it look like he was robbed, and that someone took him.  Jeannette stated this was a part of the actions she took in concert with Wes.  She told his employers she had not heard from him. Jeanette asked Wes what he was doing at the house and he said he was supposed to put in a kitchen sink.  He got $70.00 from her to buy the sink, but bought drugs instead. With the initial amount of money he got from the lady he purchased illicit drugs.  Wes told her he later went back to the house, they were going to rob her and take some more money, about $200.00, he told the girl he was going to take the van and "get the hell out of there."  Jeanette was not sure if he completed this robbery.  Wes later told Jeannette he took $200.00 and gave it to the girl he was with.  He told the girl to take the van.  He told Jeanette the van was stolen at 2211 S 10th St.  Wes told Jeanette he gave the keys for the van to the girl.  Jeanette was able to later help Wes locate the van in the downtown area.

October 29, 1998 (1055 hours) Witness Statement of Tammy Sue Sanders was made to Det. Howard of the KCPD.  Ms. Sanders lived at 646 Tenny with Heather and Rick Cook.  She was self-employed as a prostitute.  She came to Kansas City three months ago with her finance who was a truck driver.  After a disagreement, he left her at a truck stop, she had been here since that time. She met a driver of a Reddi-Root'r truck at 7th and Center on October 27, 1998 at approximately 10:30 or 11:00 am.  He was tall, skinny, had grayish hair, tattoos, a scar on the left side of his face by his chin, a mustache and a beard.  She called him "hun" and thought his name was Steve.  She would recognize him again.  He was wearing a pair or blue jeans and a white t-shirt.

Ms. Sanders stated he was waiting for his company to page him.  There were several pages which he did not answer, she told him to "Call dispatch," but

000444

Diagnostic Interview Report
Wesley Purkey
Page 18

he never did.  He finally shut the pager off, as "all he did was try to get a
hold of his wife."

They went to the Relax Inn Motel on State.  He paid $26.00 for the room.
Before going to the motel they "picked up some dope."  They got crack cocaine
and paid $30.00.  "Steve" paid for the crack cocaine.  She went to get sodas
and when she returned he had the dope out, they took a couple hits, she went
down on him on oral sex but he couldn't get an erection.  They tried having
sex with a condom but were unsuccessful.

Ms. Sanders thought they checked in around 10:00 am and checked out around
12:30.  They checked in under Ms. Sanders' name.  After leaving the motel
they went to South 10th, she was not sure of the address.  They had trouble
finding the house.  He actually had trouble finding the house both times they
went to it.  When they arrived at the residence, "Steve" went in the house
and picked up some money, he was in the residence approximately five minutes.
They were parked out front in the van.  She heard a lady's voice say they
were "at the wrong house."  He told her to move the van up and she parked in
front of another person's house.  Ms. Sanders described the house as white
with a screened in porch.  She said he got, "$50.00 but later I learned he
had more," about $20.00 more.  The suspect told Ms. Sanders he was going to
the house to borrow some money until he got his paycheck that afternoon. He
bought crack cocaine with that money.  Next, they went back to South 10th "to
them people house" where he borrowed money.  Ms. Sanders thought it was
approximately 1:30 when they arrived.  The suspect went inside and Ms.
Sanders stayed in the van for about 15 or 20 minutes.  He then called for her
to come to the door.  When Ms. Sanders went into the house, the suspect had
no clothes on except his underwear and he was "sweating in a down pour of
sweat."  "He started smoking crack and some lady stepped on the porch."  "I
was sitting on the floor and as soon as he seen the lady step on the porch he
ran into the bedroom."  Ms. Sanders thought the lady on the porch was a post
lady.  Ms. Sanders asked why he was in his underwear and he said he was going
to take a shower.  He never did take a shower.  Next, he asked Ms. Sanders to
find him a shirt.  He put on some blue sweat pants.  Ms. Sanders did not
locate a shirt.  While in the bathroom looking for a shirt, she found a pair
of jeans on the floor and "they were all bloody."  She asked, "What's all
this blood doing on your pants?"  He said, "That's from me and him
scuffling." Ms. Sanders knew "all the blood didn't come from a nose.  The
pants were like almost soaked."

At this point, Ms. Sanders stated she got scared and wanted to leave but he
would not let her.  When she would try to leave, he would slam the door and
grab her arm.  She started screaming there was a whole bunch of money.  She
didn't know where he got it, but kept trying to "stuff it in my mouth."  When
she pulled away he kept "doing this with his hands over my face and mouth and
his fingers were going in my mouth…I would bite him but it didn't do any
good."  She finally got away and he told her to keep quiet or the police were
going to come.  Ms. Sanders stated she wished the police would come.  "I kept
telling him I wanted to go because I was screaming.  He didn't start acting
like this until he started smoking that crack.  Every time he would take a
hit it would get worse.  When he wouldn't mess with it he would be normal but
he would take a hit and go violent."

Ms. Sanders did finally leave the house.  The suspect had been walking around
the house with a meat cleaver.  She did not see him injure himself with the

Diagnostic Interview Report
Wesley Purkey
Page 19

knife, he told her it was not for her. He stated "If it's for anybody, it's for me."

Ms. Sanders did not go into any of the bedrooms.  When she tried to go into a bedroom where the door was shut to see if she could find a shirt he said, "Don't go in there, somebody is asleep."  Shortly after that was when Ms. Sanders started screaming and when nobody came out she said, "There ain't nobody up in this house otherwise they would have already been out here." The suspect shook his head but she never got the door open enough to see anything.

The room she was referring to was almost to the back of the house close to the kitchen.  Ms. Sanders thought she was probably in the residence about three hours.  They did drugs the entire time she was there, and smoked cigarettes (Maverick).  She carried GPC cigarettes.  She thought they smoked a pack and extinguished the cigarettes in an ashtray.  They were smoking the Reddi-Root'r man's cigarettes.  She did see some plastic lids that looked like Pringle lids next to the ashtray.

The suspect tried to reach his wife by phone but was unsuccessful.  He wanted to tell his wife goodbye.  Ms. Sanders finally left after the suspect told her she could take the van.  She next saw the suspect when he came to pick up the van the next morning.  He was sorry about what happened and everything was okay, yet  "He grabbed the keys and ran."  Ms. Sanders was able to identify the suspect from a six-man photo lineup.

October 30, 1998 KCPD Investigation Report was by Det. Bill Wall and Det. Randy Eskina.  At approximately 0900 hours on 9/30/98 they telephoned Ms. Gadia in Wichita.  Wesley Purkey had called her residence. She further stated that on 10/29/98 at 0920 hours her caller ID indicated Irvin Linck called. Ms. Gadia's daughter, Angie Purkey, age 19, called the number back and spoke with Linck.  He stated Mr. Purkey was no longer at that residence.  Ms. Gaida she received another call, put the officer on hold, and came back saying the other call was from Wesley Purkey who was going to turn himself in, but wanted to speak with Jeanette Purkey first.

October 30, 1998 KCPD Investigation Report by Det. Smith and Det. Berger indicated an interview with Irvin L. Linck in Atchison, Kansas.  Mr. Purkey had come to his residence on 10/29/98 at about 0900-0930 hours.  They generally visited, no mention was made of a homicide or anything serious. Mr. Purkey said he "got into a jam" in Kansas City and wanted to get his wife out of there.  He asked for Mr. Linck's son's addressed in Nevada.  Mr. Linck reported Mr. Purkey did not seem nervous, and that Mr. Purkey said he was going to Troy, Kansas to pick up some money from an individual.

October 30,1998 KCPD Investigation Report by Det. Casson and Det. Rollwagen reported contact Danny Gravatt of Reddi-Root'r.  He said he would hold Mr. Purkey's paycheck and inform them if he came to pick it up.  Mr. Gravatt had met with all his employees and asked them to inform him if they were contacted by or saw Mr. Purkey.  Mr. Gravatt denied having any employees named Clay.

October 30, 1998 KCPD Investigation Report was by Det. Howard and Det. Tennis.  They re-contacted Tammy Sanders and it was decided she would be arrested for aiding a felon.  She voluntarily agreed to accompany them to the KCPD for an interview where she was told she was under arrest.  She was

Ex_13-000555

Diagnostic Interview Report
Wesley Purkey
Page 20

advised of her rights and interviewed. While pacing inside the house, the suspect said things like, "my life is destroyed," "I made my family ashamed," "I have nothing to live for," "I did a bad thing," "I've done too many bad things." She said he also removed something from the back of the van prior to going inside.

Tammy stated she knew the suspect had been in prison as he told her that was where he got his tattoos. He said he was in prison 16 years. Photographs were taken of her arms of her injuries she said she received from Mr. Purkey. She was also fingerprinted and stated she had been released from jail in New York three months ago.

October 30, 1998 KCPD Investigation Report stated the suspect was apprehended and transported to the Investigative Division for possible interview/statement. The suspect was interviewed. He made some remarks after being advised of his rights and signing the rights form indicating a knowledgeable waiver. He remarked, "If I'm found guilty of this crime, I want the death penalty imposed." The suspect made other remarks indicating he wanted to confer with legal counsel before proceeding further. No further questioning occurred.

October 31, 1998 KCPD Narrative was completed by Det. R. Eskina. On 10/28/98 a Witness Statement was obtained from Betty Colston and Phyllis Mallard who lived on S. 10th Street. On 10/29/98 a Witness Statement was also obtained from Jeanette L. Purkey in which she stated among other things that she had initiated a Missing Persons Report for Wesley Purkey to cover the crime. She stated she had assisted him and had knowledge of a continuing plan to help Mr. Purkey not only coverup, but potentially destroy evidence of the crime.

October 30, 1998 (0745 hours) Sgt. Schermbeck of the Leavenworth County Sheriff's Department returned a call to Edward Wiley, Sr. Mr. Purkey had called him asking where Ms. Purkey was. Mr. Wiley would not say, and advised Mr. Purkey to turn himself in. Mr. Purkey stated he was thinking about doing this. At approximately 0900 hours on 10/30/98 officers responded to 773 Miami, Leavenworth, Kansas and located a car Mr. Purkey was believed to be driving in the alley behind the address. At approximately 0930 hours Mr. Purkey was observed moving the car, was stopped, ordered out of his vehicle, and transported to the Leavenworth County Jail. Mr. Purkey was driving a 1983 Oldsmobile Cutlass Supreme.

On October 31, 1998 (1045 hours) Wesley Purkey was re-advised of his rights via an Interrogation Advice of Rights Form in the Wayndotte County District Attorney's office. He signed the form and gave knowledge waiver of his rights. He stated he had written a letter to his wife and wanted the district attorney as well as the press to be afforded a copy of the letter. He stated the letter in his words "significantly characterizes the occurrence of the crime." He stated he did not want to talk about certain aspects of the murder except to say there were absolutely no sexual overtones with the victim. He stated he would discuss other aspects of the crime before and after the murder occurred. He then gave a detailed account of how he came to the victim's residence subsequent to a plumbing work order. He further stated that at one point he took a prostitute, Tammie Sue Sanders, to the victim's residence and that both he and Sanders "came in contact with each other," and were crack cocaine. He said he had used money he obtained from the victim to purchase some of this crack cocaine he and Tammie Sanders shared. He stated he had been at the victim's residence on more than one

000447

Ex_13-000556

Diagnostic Interview Report
Wesley Purkey
Page 21

occasion during the last few days.  He stated the actual murder took place on 10/27/98 while the prostitute was in his work van outside the residence. Just prior to the murder he went into the victim's residence and smoked a "big hunk of rock right there in the bathroom."  When he came out of the bathroom, the attack on the victim took place.  Sometime after this, Tammie Sanders entered the residence and took custody of some currency that belonged to the victim prior to leaving the scene in Wesley Purkey's van.  Mr. Purkey then remained inside the residence until later in the eyeing when hs wife, Jeanette Purkey, came to the residence in a taxicab and brought him a change of clothes.  He and Ms. Purkey then returned to 956 S 76th.

October 31, 1988 (1102 hours) Suspect Statement of Wesley Purkey was taken at the Wyandotte District Attorney's office.  He had been employed at Reddi-Root'r approximately 10 weeks.  He understood his rights and could stop talking at any time he wished and could have a lawyer.  He signed the waiver form.  He had made a brief statement the day before invoking his rights and today had indicated he wished to re-initiate contact and requested an interview.  He had no alcohol or drugs in the past 24 hours and desired to talk without counsel at this time.

He discussed Tuesday October 27, stating he got up at around 6:00, and had gotten to bed the night before around 1:00.  He had worked a 14-hour day and had to be at work by 7:00 am to have the radio in his van changed out.  He dressed in his regular clothes, not his uniform.  He went to work around 7:00, had not used drugs or alcohol to that point, nor the prior night.  He had communicated with his supervisor by pager throughout the day.  He was going to see about (no time stated) getting an extension on a ticket he had received, for $141.00.  He was on his way to city hall in the Reddi-Root'r van, and had around $120.00.  On his way, he met the prostitute, stopped and picked her up, and asked her if she could find some "smoke."  They did get drugs at 600 Tenny, he did not go in the house.  He and the prostitute shared the crack and smoked it with a pipe she had.  Mr. Purkey usually shot drugs. His main drug choice was meth or Ritalin.  He described the sensations as euphoric, came on fast, and built up in a few minutes.  He and the prostitute had smoked three rocks of crack and it was still morning.

He had received a call the prior day from 2211 South 10th, and visited. It was probably one of the last calls of that day.  He talked to a lady there, went to the basement to find a shut-off valve in the basement.  He worked on commission at Reddi-Root'r and intended to "cut a deal with the lady" for the work.  They decided he would return at approximately 11:00 the next day.  Mr. Purkey said she had not paid him any money to this point.  They did not discuss that she lived alone.

He was asked to discuss the time frame of having smoked 3 rocks with Tammie till the time he returned to 2211 S 10th.  Mr. Purkey wanted to make it clear he had not eaten since the night before at around 12:00.  This was unusual as he always ate breakfast.  He felt that could have been a contributing factor in how the drug effected him.  They got another rock and went to the Relax Inn, smoked two more rocks and then left.  He did not remember the room, but paid $26.00 for the room.  They left the motel and went to the victim's house on 10th.  He thought he went to the victim's house the first time at about 11:00 in the morning.  He parked out front, walked in and said he needed money for the faucet.  He thought he had about $20.00 at the time but "things weren't real accurate then."  The victim gave him $50.00.  He was there about 10 or 15 minutes and Tammie was with him in the van.  The victim gave him

000448

Diagnostic Interview Report
Wesley Purkey
Page 22

tens and twenties and he did not know where she retrieved the money.  He stated, "I guess I was just trying to be a plumber and I was too damn high, I was still going through the motions of being a plumber."

At this point he intended to replace the faucet and was going to purchase them at Stan's near K-32.  He had told Tammie what he was doing and that he had to change a faucet at 2211 10th.  He thought he told Tammie some guy lived there who owed him money, he told her "all kinds of shit."  Mr. Purkey did not go to Stan's for the faucet.  Mr. Purkey continued discussing what was going through his mind, "crazy things going through your head."  "We went back, she went back to pick up some more rock, I think we got 5."

After a break, Mr. Purkey continued discussing from the time he left the residence at S 10th to what happened, stating,  "No, I never made it to Stan's, went back to the crackhouse, picked up 5 more rocks, left there, smoked one of them on the way back to 2211 S 10th."  He thought probably an hour had passed before he returned to the residence at 2211 S 10th.  On the way back to the residence they smoked a rock.  He decided to go back to let the lady know he was doing some work, not just "trying to fuck her off."  When they arrived he parked one house down he thought.  He went inside and took his tools, which were in his tool bucket.  He walked to the front door, the victim answered the door.  He asked to use the bathroom.  He went to the bathroom and "smoked a big time rock right there…I was so damn high going in there I came back out, picked up my tools, we was talking about price and stuff…I think at this point here I just prefer to wait.

Mr. Purkey was asked if at sometime in this time frame the victim was killed and he said yes.  He said he was responsible for the killing.  The prostitute was not in the home at that time.  He thought approximately 15 minutes had passed.  He was asked about what happened then and said, "Yeah, un I was probably getting my clothes stained."  He stated he was wearing his Reddi-Root'r shirt, Levi blue jeans, and white low-cut tennis shoes when questioned about it.  He stated he was in his underwear, was totally spaced out, and described his jeans were saturated with blood.  He disrobed in the bathroom and washed in the sink.  He then got Tammie's attention and she came into the house.  He said he had gotten in a fight and been hit in the nose.  She seemed to have no reaction to that and they did not discuss the homeowner or anything up to that point.  They "got to smoking more of that rock, hit after hit, hit after hit, until that was gone."  They did smoke cigarettes, Marverick brand.  They were extinguished in an ashtray and on the floor, he did not remember any plastic lids.  He stated the mail lady did come by, he didn't know if she saw him or not, but thought she saw Tammi.  She came by probably an hour or hour and a half after the killing.  When asked what he was thinking at this point, Mr. Purkey said he was, "I wanted to die."  He couldn't grasp why this happened, "that's why I took that rock out and just started smoking, smoking, smoking, I was hoping for a god damn heart attack."  He stated he had probably four or five bottles of nitroglycerin, which he emptied and took.  There were knife pokes in his belly where he held a knife to his gut.  Tammie had not seen the knife that he knew of.  He had attempted to harm himself with a knife, but did not wish to discuss that now.  When asked if Tammie was aware something unusual had happened in the house, he thought she was.  She did not try to go into the locked bedroom as far as he knew.  He could not remember stopping her from going in the bedroom.  He was not sure if Tammie saw anything that would cause her to believe or disbelieve his story about a fight with a guy.  She did see his clothes and he told her he had a fight and said he needed to put his clothes back on and they could

000449

Ex_13-000558

Diagnostic Interview Report
Wesley Purkey
Page 23

leave.  At this point they had been in the house a couple of hours.  Later, Mr. Purkey tried to reach his wife by phone to tell her he loved her and Tammie asked if he was seeing about getting more rock.  At this time no money had been taken from the victim.  However, there was a purse in the chair, which Mr. Purkey was not aware of as it had a blanket over it.  He sat in the chair, guessed Tammie sat in the same chair, the blanket came down, he didn't know how, and "by some process I opened the purse and there was probably three 20s and another envelope with another six or eight 20s someplace like that, total was about $200.00.  I laid the money on top of a little newspaper stand…."

Mr. Purkey's main concern at that point was, "the fact I had done this shit."  Mr. Purkey was questioned about what Tammie may have known and he wasn't sure.  She did take the money.  At this point Mr. Purkey explained he was "wigging out", thought the cops were there, etc.  Tammie wanted to leave and get more rock.  Mr. Purkey said he was hallucinating and was very paranoid.

Mr. Purkey stated he struggled some with Tammie, didn't use force on her, might have grabbed her wrists, etc.  He told her he just wanted to talk to his wife and told her some things she could tell his wife.  Tammie never screamed but she yelled at him.  He told her to be quiet, and put his hand over her mouth, he did not recall if she bit his middle finger.  He did not explain the bite on his finger.  Tammie did eventually leave, they walked to the back door and he indicated he was staying at the residence.  He gave her the keys to the vehicle.  She took the money on the newspaper stand.  When asked if he was ever angry with Tammie, Mr. Purkey stated he probably just wanted her to stay and talk.  He denied stuffing $20.00 in her mouth or dress.

Mr. Purkey stated there was no sexual activity with the victim and it was not his original intention to rape the woman, or to rob her.  Tammie went out the back door, he gave her the keys to the van, had no idea where the van was going to be and didn't really care.  Mr. Purkey did not want to discuss contacting his wife.  He stated he took responsibility for the lady being dead by the results of his hands.  No one else was in the house at the time of the homicide.  He did not want to talk about other parts right now.

Mr. Purkey learned plumbing in prison.  At some point he disposed of the murder weapon and the clothes.  He put them in a dumpster at the Total Station near his home.  He disposed of a pair of jeans, a shirt, a pair of shoes, a crackpipe, and some syringes, which were from days gone by.  He also disposed of a hammer and mail from the victim's house.  He disposed of some items across the bridge on Kansas Avenue…"those days are pretty hazy."  When asked if those items were the two plastic bags he was seen carrying from the house he said yes.  He admitted he was the one who covered up the body, because he didn't want to see what he had done.

Mr. Purkey admitted he did not want to go back to jail.  His wife and ex-wife advised him to turn himself in, he knew he had hurt a lot of people.  When asked what should happen to him as a result of this case, he stated, "I think the death penalty should be implemented.  I didn't even realize what was going on, but I still know what the results were."  He would like to tell the victim's family he was deeply sorry, deeply sorry.  He had written to his wife and asked her to turn the letters over to the police.  These were forms of admission.  "I just trying to rectify them in some way, shape or form,

Ex_13-000559

Diagnostic Interview Report
Wesley Purkey
Page 24

that it was not intentional, because it's a night, I mean it…"  He had been having nightmares about this and was having trouble dealing with it.

November 10, 1998 Regional Criminalistics Laboratory report was completed by Stephen C. Warlen, Forensic Science Specialist.  There was no evidence of sexual assault.  The pubic hair was from Ms. Bales.

November 14, 1998 KCPD Field Investigation Report noted a 1983 Oldsmobile Cutlass Supreme Blue over Silver and a 1986 Dodge Aries Gray 2-door were involved in a homicide.  The vehicles were dusted for fingerprints; prints were recovered but did not have enough points of value for a comparison. A package of Maverick cigarettes and a wood baseball bat were recovered from the Dodge Aries.  A key on yellow key ring, empty package of Maverick cigarettes and a multi-color bath towel with possible bloodstains were recovered from the Cutlass.

**MEDICAL RECORDS**
December 29, 1972 LSH Summary of Hospitalization recorded that 20-year-old Mr. Purkey was admitted because of problems refraining from illegal activity. LSH was the alternative to vocational training or incarceration.  He had been arrested for burglary and attempted rape in August 1969; for burglary and larceny in March 1970; for burglary and attempted rape in April 1970, and for kidnap and attempted rape in July 1970.  He was admitted to the KSRDC April 1, 1971 where the diagnosis was Schizophrenic Reaction, Schizoaffective Type, Depressed, Superimposed upon a pre-existing antisocial personality characterized by selfishness, callousness, irresponsibility, impulsiveness, and inability to feel guilt or learn from experience and punishment.

Mr. Purkey's parole officer hoped he would receive vocational training.  The family background was extremely chaotic.  Both parents were alcoholics.  His mother was openly promiscuous.  His employment history was not stable.  Mr. Purkey had never been married and would like to join the military.  He denied excessive use of alcohol, but alcohol could become a problem.  He admitted to drug use.  In eighth grade he was admitted to Wichita Psychiatric Center due to truancy and antisocial behavior.  He was subsequently admitted to St. Francis for psychosexual problems and a serious personality disorder.  He had a head injury in 1968.  When he drinks it can be a problem. His parole officer hoped Mr. Purkey would not be returned to Wichita. On Christmas Eve 1972, Mr. Purkey's mother brought a bottle of whiskey to his residence.  She talked him into drinking with her until he passed out.  She then went to the hospital and accused Mr. Purkey of raping her.  The police talked with Mr. Purkey but did not pursue the matter as the mother denied it when sober.

Mr. Purkey had the usual childhood diseases.  He reported having meningitis when he was 4 years old, a history of being unconscious two times for short periods of time, and had a high fever when he was a child.

Psychiatric examination revealed a 20-year-old with a ninth grade education who was admitted on a voluntary basis because of drinking and acting in a bizarre way.  He was cooperative on admission.  He was oriented to time, place and person.  He was of average IQ but had poor reading skills. His thought content centered on his problems with the law.  He was somewhat depressed.  He was a very dependent individual who evidenced poor judgment, had difficulty accepting responsibility, and was very immature.

000451

Diagnostic Interview Report
Wesley Purkey
Page 25

He was placed on Sinequan 25 mg tid, Thorazine 100 mg q6h prn for agitation, Thorazine IM prn once a day AM or PM if patient refused his regular medication.  Diagnosis was Passive Aggressive Personality with Depressive Features.

January 12, 1973 LSH Summary of Hospitalization noted that Mr. Purkey attended his assignments regularly.  He was quiet and cooperative but did not socialize with other patients and could be considered a loner.  Staff opined he seemed to be an immature dependent individual who had difficulty accepting responsibility.  He had a long record of inappropriate and illegal behavior. He would be referred for vocational rehabilitation.  Diagnosis was Passive Aggressive Personality with Depressive Features.

February 15, 1976 through February 17, 1976 Wesley Medical Center hospitalization was for an overdose.  Mr. Purkey had taken an overdose of Tranxene and Tylenol #3.  Laboratory data showed his drug screen was positive for 96 mg percent blood alcohol, Meprobamate and salicylate.  It was believed he had taken Tranxene.  With supportive treatments he came to full alertness in approximately 18 hours.  Mr. Purkey believed he had been exposed to hepatitis approximately four to five weeks earlier, but his hepatitis screen was negative.  During the waking up process he was confused at times and hallucinated (2/17 at 12:00 pm).

May 15, 1981 KSRDC Report of Clinical Evaluation was completed by Karl Targownik, MD.  Mr. Purkey's parents first marriage lasted one month.  His mother remarried a second time, was divorced, and remarried Mr. Purkey's father in 1951.  They divorced a second time in 1962.  Mr. Purkey has a half-brother, Gary.  Ms. and Ms. Purkey were described as having problems with alcohol.  Mr. Purkey and his half-brother were taken care of a lot of the time by an aunt, Ms. Burk.  Ms. Purkey did not always assume responsibility for the children and was often promiscuous, bringing male friends to the home.  Due to the mother's inappropriate behavior in Ms. Burke's home, she was asked to leave.  Ms. Purkey took Wesley with her, but left Gary in the care of Ms. Burk.   In eighth grade, Mr. Purkey was evaluated at Wichita Psychiatric Center because of truancy and antisocial behavior.  On December 19, 1966 he was admitted to St. Francis Hospital in Wichita where psychological evaluation revealed he was experiencing a serious personality disorder centered on psychosexual problems of identification.  He was viewed as needing institution care and treatment, but this was never carried out. He was in outpatient psychotherapy from for an undefined period of time until his arrest in 1970.  Mr. Purkey used drugs and alcohol heavily when not incarcerated.

Mr. Purkey conveyed a general impression of friendliness and apprehension. He was alert and oriented in all spheres.  Attention, concentration and memory were unimpaired. At times in his inability to speak out his mind he "whispers at the same time he makes efforts to let himself be heard."  He whispered in an entirely different conversation from what he was talking aloud.  His judgment was characterized by wanting immediate satisfaction, inability to learn from past experiences and no common sense.  He could come across as quite blasé and without feelings of guilt.  He tended to blame others for his problems.  He tried hard to hide his emotions. His memories of childhood were generally quite painful.  His mother was quite critical and often shut him up in front of others and he grew up without forming lasting relationships.  Mr. Purkey could be seen as quite manipulative, to have a

000452

Ex_13-000561

Diagnostic Interview Report
Wesley Purkey
Page 26

need to appease for secondary gain, and was somewhat incorrigible.  No diagnosis was rendered.

May 19, 1982 Kansas State Reception and Diagnostic Center Psychological Report was completed by John Thomas, psychologist.  Mr. Purkey experienced occasional stammering.  He volunteered information about his drug use and the events which precipitated this incarceration.  Testing estimated Mr. Purkey to function with the average range of intelligence.  An MMPI suggested he might be highly rebellious and non-conforming, as well as unreliable.  He might be moody and resentful, liable to make a good impression at first, and yet sometimes give evidence of great insight.  A non-internalization of recognized social conventions may be a dynamic of such an individual. Excessive use of alcohol and drugs may be associated with Mr. Purkey as well as defects in judgment.  No diagnosis was rendered.

August 31, 1982 Institute of Logopedics speech-language services were requested by Mr. Purkey.  Mr. Purkey had received treatment at that facility about 20 years earlier. Mr. Purkey could not make and October 8 appointment as he was incarcerated.

September 13, 1998 University of Kansas Hospital Discharge Summary completed by David Myers, MD was for atypical chest pain, drug-induced anxiety, polysubstance drug abuse, rule out myocardial infarction.  Mr. Purkey had a history of IV drug abuse, polysubtance abuse and multiple tattoos.  He had been shooting 100-140 mg crushed Ritalin per day, and an unknown amphetamine intravenously one hour earlier. Mr. Purkey was an IV drug user and requested help with "addiction issues."  He had been off drugs for 10 years but started using in last six months.  Recent use had interfered with his work.  He denied depression and paranoia.  Contact with social services was recommended to arrange for rehab program.

September 14, 1998 psychiatric consult was signed by Michael Leeson, MD.  Mr. Purkey was identified as having had a serious intravenous drug habit. In the previous months, after 10 years of sobriety, probably because he was in prison, he had restarted using Ritalin at up to 140 mg per day.  He usually binged about one day.  He had difficulty stopping drug use once he started. Symptoms included use all day, tolerance, significant losses, long desire to quit, drug cravings, and drug dreams.  He denied depression but appeared anhedonic.  He was not paranoid but when using he had notable distortions in his thinking.

September 16, 1998 Providence Medical Center Emergency Department record noted Mr. Purkey presented with a complaint of drug abuse.  He had been seen at KU Medical Center four days earlier for chest pain.  While the patient assessment advocate was working on placing Mr. Purkey, he left AMA and did not sign out or receive discharge instructions.

October 10, 1998 University of Kansas Hospital Emergency Treatment Record was for evidence collection.

February 4, 1999 Larned State Hospital Release Summary diagnosed Mr. Purkey with Cocaine Dependence in a Controlled Environment, Depressive Disorder NOS, and Antisocial Personality Disorder (Principal Diagnosis).  Psychological screening for neuropsychological impairment revealed no indication of gross dysfunction.  Staff concluded there was no functioning which would indicate

000453

Ex_13-000562

Diagnostic Interview Report
Wesley Purkey
Page 27

that during the time period in discussion on 10/27/98 he acted in a demented manner or had experienced symptoms of a psychotic process (delusions or hallucinations) which impaired his ability to know the nature and quality of his acts or distinguish right and wrong.  He was judged not to lack the required mental state.  Effects of cocaine were not mentioned.  Prognosis was poor due to previous criminal history, antisocial activities, and drug dependence.

March 5, 1999 Psychological information report was completed by Mr. Robert Heuter.  His screening report had a recounting of the crime, nearly copied verbatim into Dr. Fernando's report.  Full scale IQ was in the average range without screening evidence of neuropsychologic dysfunction.  Mr. Purkey feigned severe psychiatric illness in contradiction to his ward behavior.

March 16, 1999 LSH Forensic Evaluation Report completed by J.L. Fernando, MD noted Mr. Purkey reported "his parents were drunk most of the time,"  his parents were divorced and remarried, and mother became sexually promiscuous. When Mr. Purkey was 14 yeas of age, his aunt was appointed as his legal guardian, whereabouts of his father were unknown.  He attended school making average or below average grades.  He was evaluated at Wichita Psychiatric Center because of truancy,  antisocial behavior, and physical complaints of dizziness with headaches for which no organic basis could be found.  His work experience consisted of short-term and odd jobs which he mostly terminated by simply not reporting for work.  An evaluation at St. Francis Hospital in Wichita revealed a serious personality disorder centering on a psychosexual problem of identification.  Mr. Purkey was admitted for the first time at LSH on a voluntary basis while on parole.  He was placed on temporary visit status from LSH on March 17, 1973 to begin work as a welder in Kansas City. He was discharged from temporary visit status on April 13, 1973.  Diagnosis at that time was Passive Aggressive Personality with Depressive Features.

Mr. Purkey gave a history of extensive substance abuse with Ritalin, methamphetamine crack, and cocaine.  He began using substances at age 15.  He was admitted to KU Medical Center for drug overdose of Ritalin and cocaine.

Mental Status showed no evidence of a thought disorder or delusions.  His mood was considered labile and his affect considered appropriate.  Mr. Purkey admitted to poor impulse control.  He denied suicidal or homicidal ideation. His memory was within the normal range.  Staff noted Mr. Purkey got angry easily, but in general presented no management problems.  The Wechsler Adult Intelligence Scale-Revised revealed a Verbal IQ of 95, Performance IQ of 85, and Full Scale IQ of 89.  Mr. Purkey's speech was goal directed and he gave no indication of defensiveness toward the examiner.  He denied hallucinations or delusions.  "Without seemingly making an attempt to rationalize his behavior or to manipulate this examiner, Mr. Purkey cried while talking about the victim of his crime."

However, in contrast to the attitude displayed during interviews, he did make an attempt to feign rather severe psychiatric symptoms on personality testing.
Thus, "For an individual of average intelligence, it would seem he could have made a more sophisticated attempt to manipulate the test data.  However, he exaggerated a degree of psychopathology to such a degree as to render both personality tests invalid."

000454

Ex_13-000563

Diagnostic Interview Report
Wesley Purkey
Page 28

LSSH diagnoses included Antisocial Personality Disorder; Cocaine Dependence; Nicotine Dependence and Depressive Disorder NOS. He complained of a dysthymic mood. Mr. Purkey discussed the events of the crime scene in a very organized and narrative manner on several occasions. Staff concluded Mr. Purkey's functioning didn't indicate he acted in a demented manner or experienced symptoms of a psychotic process which impaired his ability to know right from wrong. He was suffering cocaine-induced agitation and a fear of being caught.

## BACKGROUND INFORMATION FROM INTERVIEW OF THE PATIENT:

### Introductory information –

Mr. Wesley Purkey had been residing at Riveroaks Apartment, 965 75th Street in Kansas City, Kansas, 66101. He had been living there for three months after moving from Wichita with his wife, Jeanette, and three stepsons.

He wanted Jeanette contacted in an emergency at 700 Spruce in Leavenworth, Kansas. She was working at Taco Bell and raising her three sons, 14-year-old John, 12-year-old Terry, and 11-year-old Israel. She miscarried one biologic child while he was locked up in Lansing during 1996.

Mr. Purkey had another child, 21-year-old Angie, by Claire Gaida. Both Jeanette Purkey and Claire Gaida are co-defendants.

At the time of the charged offense, Mr. Purkey was working as a Reddi-Root'r plumber. He had learned these skills at Lansing State Prison in Hutchinson Correctional Facility. He had not yet passed the Master Plumber exam, failing it the first time by one point.

Prior to the interview, Mr. Purkey was quite certain he had killed Mary Ruth Bales and felt quite guilty about it. He had spoken with Jeanette about a possible life sentence. He also spontaneously offered that between October 28 and October 30, 1998, he had written two suicide notes. One was written at the rest area near St. Joseph, Missouri when he was "directionless" and the second when he was near the Kansas City International Airport and was feeling suicidal. He is not certain why he did not kill himself at that time. These notes were reviewed and showed despair but no clear suicidal intent.

Prior to John Duma, Mr. Purkey had two previous attorneys. The first was Al Grauberger whom he did not develop a trusting relationship with. The second was Aline Pryor, with whom he developed disagreements over the progression of his defense. At that the time of this writing, Mr. Purkey's relationship with Attorney Duma was intact.

### Past medical history –

Mr. Purkey had no known drug, mold, or food allergies. He was not being treated with any medications. In approximately 1978 while at Lansing Prison, he was treated with Valium and Tegretol. Valium decreased his anxiety level "when he didn't abuse it," and Tegretol "lengthened his anger fuse" so he was not as volatile.

Mr. Purkey had fractured the fourth finger of his left hand, and left ribs 9, 10, and 11 playing football in high school. He had been knocked out when his 1957 Chevy was hit by an 18-wheeler and wrapped around the front of the truck. He was hospitalized at St. Joseph Hospital in Wichita, Kansas,

Ex_13-000564

Diagnostic Interview Report
Wesley Purkey
Page 29

required intensive care monitoring, and suffered a "U-shaped" laceration on his left forehead.  He suffered headaches and blurred vision.

He had been in other motor vehicle accidents but was never severely injured. In four or five he "totaled the car," with one of them during a robbery in 1980.  He had been injured on a motorcycle, also in Wichita, Kansas during which his ex-wife bruised her leg but he was "high on ludes…number 714…or perhaps it was Desoxin."

In addition, he had been knocked out during a fight at Kansas Reception and Diagnostic Center in 1971.  He thinks he was out cold for 5 to 10 minutes but there were no consequences.  Interestingly, he recalled having been interviewed by Dr. Karl Menninger at that time.

Mr. Purkey denied having a seizure disorder.  However, he had "over amped" on methamphetamine in 1988 and suffered a drug-induced seizure.

Mr. Purkey had never had any major surgeries.  He suffered gonorrhea in 1968. He never had a positive HIV test.  He suffered Hepatitis B one time with the chief symptom being abdominal pain.  He learned of it when he and his wife gave blood during August 1998 "when the money was tight."  In retrospect, Mr. Purkey had been using intravenous drugs since 1968, when he was age 16.

Mr. Purkey had about 40 tattoos.  The first was a flower design on his left hand that he received in 1977 while in Lansing Prison.  The last was a 1986 "touch up" on his back of the "Aryan Brotherhood" tattoo.  The Aryan Brotherhood tattoo was only for self-protection at Lansing Prison.  He denied ever having been an active member there.

He had six ear piercings. The first two were before March 1987 and the latter four after then when he was at Osawatomie State Hospital.  He had no other piercings.  He had never been made ill from tattoos or piercings.

Mr. Purkey had participated in high-risk sexual activities.  These included sex with four or five different prostitutes whom he never lived with or married.  He had never served as a prostitute himself.  He denied bisexual sex.  He had no current homosexual contact, though while in the penitentiary "even though he regrets it now" he had participated in some due to loneliness.  He described himself as fully heterosexual and noted that five or six years earlier he would have denied the activity in the penitentiary. He revealed the penitentiary sexual activity because, "He did not want to be a game player now, and he was going to be more honest than before."

Mr. Purkey rated his health as good.  He was seeking inner peace and to understand why he had killed Mary Ruth.  Mr. Purkey believed that on September 27, 1998, he was treated at Kansas University Medical center for a mild heart attack.  This was actually September 13, 1998. He was certain that heart attack had been induced by "using Ritalin and methamphetamine on the same day, plus that his wife laced his drugs with pesticide."  Mr. Purkey maintained that his wife had been using pesticide for a while before then. In particular at KU, the hospital indicated he was going into shock.  A toxicologic drug screen showed only that Mr. Purkey was dehydrated.  He went into shock because his "top heart was beating twice as fast as the bottom." Mr. Purkey maintained that the "bizarre part" of the case had to do with the poisoning which caused "stinking-thinking" when he went to Ms. Bales' house. He really wanted the Kansas University records looked over closely.

000456

Diagnostic Interview Report
Wesley Purkey
Page 30

Mr. Purkey did not feel he had any other medical problems.  He had recovered from childhood asthma.

Mr. Purkey was first treated at age 14 in Wichita, Kansas for psychiatric difficulties.  He does not remember what his diagnosis was but his aunt admitted him for being a "wild kid."  There may have been a few other admissions at that hospital.

In 1982, at age 30, he was admitted to the Institute of Logopedics for speech therapy.  Twenty years earlier, he had found this very helpful because of his stuttering.  Stuttering was increased when he was anxious or scared.

**Social history –**
By the second appointment, Mr. Purkey was now in shackles and handcuffs.  He had been placed in solitary for a month after apparently refusing to transfer from one pod to the other.  He believed there was truly no reason for the shackles and handcuffs.  He had filed three lawsuits against Wyandotte County Department of Corrections.  These were for forcing him to shower in handcuffs, for not properly supervising other inmates given that five black inmates jumped him, and for denial of appropriate medical care.  In particular, medicines had been discontinued and he had not received a biopsy of left shoulder tumor.

**Family history -**
Mr. Purkey is the youngest of four children born to Velma Louise Purkey.  Mr. Purkey's oldest brother was 51-year-old Gary.  He had two older brothers, Laren and Garen, who died respectively one and two days after birth.  Mr. Purkey had not known about these brothers until he was an adult.

Velma Louise Purkey died in 1980 at age 49 of pancreatic cancer.  Before the cancer was discovered it had "spread like wildfire" throughout her body.  Mr. Purkey had always known his mother as being an alcoholic with drinking binges, passing out, and abusing medicines.  He learned from a KRDC report that his mother had two newborn deaths. After learning about his own daughter's miscarriage, he began to understand the agony his mother must have gone through.  He attributed her alcoholism to those causes.

When his mother was sober, she was a good person.  However, when intoxicated she was unpredictable.  Her moods could range from tearfulness to "being as mad as hell."  There were many times when he did not understand his mother's mood shifts.

She was also treated by a doctor with Valium and with pain pills.  When he was a pre-teenager, he borrowed a couple of her Valiums and a couple "Fiorinal."  Together they gave him a warm feeling, relieving his sense of dread.  Velma never used street drugs.

Velma always worked when he was young.  Before he started school, she worked at Boeing.  After his parents' divorce, Velma worked as a cocktail waitress. During those times there was no one to watch him so he lived with his maternal great-aunt.

When his mother was angry she would "go ballistic," meaning she lost control of her anger.  However, she never became suicidal or attempted to kill herself.

000457

Ex_13-000566

Diagnostic Interview Report
Wesley Purkey
Page 31

Three days before her death, Mr. Purkey and his mother reconciled.  He was 28 years old.  She was able to say to him that she was at peace with her life and that he "had the hard part."  He believed he mourned his mother's death but still cursed her at times for dying too early.

Mr. Purkey could not identify any very positive strengths about his mother.  Tearfully he stated that his mother's weaknesses included that she was "a woman who wasn't sure who she was and didn't have time to find out."  He never believed she provided any role guidance to him.  Some of the negative things she foisted upon him included her drunken behavior.  For example, when he was 7 or 8 years old she threw a glass of Gin in his face because he stuttered.  It humiliated him that this happened in front of 15 or 20 people who were attending a party.  He is not sure if the family ever went on vacation after the divorce, however remembered his father took them to the Grand Canyon.

Mr. Purkey was not sure if his mother praised him regularly.  When sober, she assured him that she loved him.  She praised him by going to some of his baseball games.

Mr. Purkey's mother slapped or yelled or belittled him for discipline.  He was not sure what would make her do this except "wrong behavior" especially if she was drunk.  She harshly slammed him with a belt on the legs or the stomach.  He is not certain the number of time but she left welts without bruises.  His father did this also and belittled him during that saying, "Stop doing that shit."

His mother never received mental health care.  She never went through substance abuse treatment.  She never received pastoral care or family counseling.

Mr. Purkey's father left when Wesley was 8 or 9 years old.  He remembered little about his father, except that he "beat the shit out of mother."  In one particular incident he remembered his father beating his mother in the hallway of their home.  Mr. Purkey tried to get between them and was shoved aside.  This made him feel ashamed, that he wanted to change his parents' relationship, and yet he felt powerless to stop the beating.  After being totally out of their life for two years, Mr. Purkey's father came back to the family for a short time.  During an alcohol-induced fight between his father and mother, Mr. Purkey finally had enough.  When his father was hitting his mother, Mr. Purkey swung a fifth of whiskey at his dad.  It hit and hurt his father who then "threw me across the room."  At that point, Mr. Purkey's father withdrew and never apologized.

Mr. Purkey's father had been in numerous fights with his mother.  There were probably "dozens."  His mother fought back with slaps and hits.

Mr. Purkey's father worked at Boeing Corporation until he "drank too much and was fired."  At that point, Mr. Purkey's father moved to the West Coast and worked in Seattle at the Boeing plant there.  He thought his father was a strange man, especially since he knew very little about him.  Occasionally, Mr. Purkey's father came back with a woman to Mr. Purkey's mother's house.  There were drinking parties that included Mr. Purkey's mother and her second spouse.  At these parties there was usually drinking, then fighting, and then passing out.  At one point, his father gave him money to go have a "good time," meaning paid sex with a woman.

000458

Diagnostic Interview Report
Wesley Purkey
Page 32

After Mr. Purkey's father left the family, no one stepped in for his dad. The major positive parental model was Mr. Purkey's maternal great-aunt who had raised his mother. Mr. Purkey knew little about his grandparents and little about his family history. The only thing he knew was that Sue and Bill Darling, his maternal grandparents, did not drink. Sue was a particularly critical person who had only two ways of doing things, "her way and the wrong way." Again, he had little knowledge of them until he was locked up at Lansing Prison. His maternal grandfather, Bill, died in 1989 from complications of diabetes. Velma was their only child. Mr. Purkey did not believe his mother experienced sexual, physical, or emotional abuse during childhood. He believed his mother was lonely, was hurting, needed love, and needed support.

Velma married Chuck when Mr. Purkey was approximately 16 or 17 years old. Velma was widowed two years later after Chuck was killed by a truck spring that hit him in the chest. Chuck was also an alcoholic. Velma mourned Chuck's death. Mr. Purkey was not close enough to mourn Chuck, but felt sorry for his mother. Chuck had never threatened or injured Mr. Purkey or his mother.
After that, Mr. Purkey's mother had several other live-in relationships with men.

Prior to and after Chuck, Mr. Purkey had been introduced to alcohol at age 13 by "an Oklahoma cowboy" who dated his mother. Some of these men gave his mother "black eyes." Because of her lifestyle, Mr. Purkey learned not to ask what had happened. He tried to stay out of his mother's life, especially when she had "different men in her bedroom." He hid his concerns from her and lied to his friend's parents when they asked whom she was dating. He never recalled a comfortable time with his mother or father. He believed his life had been truly disrupted since age 8 or 9 years old.

Mr. Purkey never slept with his mother. Initially, he denied ever having sex with her, his older brother, or any of his mother's significant others.

Mr. Purkey is not certain why his parents broke up but thinks they were never happy. He knows there were some separations when he was 7 or 8 years old. Those separtions may have contributed to her having thrown a glass of Gin at him during a Thanksgiving dinner. Mom suspected affairs but none of them were confirmed.

During some of the parties with his mother, her partner, his father, and his partner, Mr. Purkey recalled being fondled but there was no oral sex or intercourse. His parents never spoke about this. Initially he did not believe it "played a role in who he is today." He believed there were no consequences. He thought he didn't need to talk about those things because he actively suppressed them. Prior to this evaluation, he had only spoken to his wife about it because "he felt like it mattered to her." Also, she had experienced sexual abuse herself and he felt she was a sympathetic listener.

Then, Mr. Purkey revealed that his mother's girlfriend took him to the bathroom and washed or fondled him when he was 8 to 11 years old. She also took a shower with him. Mr. Purkey then tearfully revealed that this was actually his mother who had done these things with him when she was intoxicated. This lasted about two years, after which he developed fantasies of having sex with women. Eventually, he began to read True Detective magazines that had showed pictures of women being attacked. Though he

000459

Ex_13-000568

Diagnostic Interview Report
Wesley Purkey
Page 33

minimized this, he found those stories sexually exciting and when old enough began to masturbate to the thoughts. He thinks there were other women also that he was sexually involved with at that age. However, he specifically remembered that his mother anally stimulated him and taught him to anally stimulate or vaginally stimulate her. For many years, he thought this was his fault but learned later during therapy in prison that he had been victimized also. Mr. Purkey also replayed some of these experiences with his wife, Jeanette. In retrospect, he believed these were horrible experiences, however, often minimized them. He minimized them because in group therapy while incarcerated, he heard of much more trauma to other men. Thus, he did not feel his experiences counted.

Mr. Purkey then re-clarified that his having showered with his mother was not all that happened. He felt shame and guilt for what happened, reasserting this was with his mother and not his mother's girlfriend. It began during his youth when she bathed him and ended when he was about 22 years old. The sexual contact started when he was 9 or 10 years old, starting with her teaching him how to perform oral sex on her. There was no oral sex of him. He thinks his mother was lonely and felt unloved, especially when he was a teenager. He felt responsible for her teaching him about the sex. The sexual relationship continued off and on until he was age 22 and attempted to kill himself by cutting his wrist with a straight razor. This was after their very last sexual interlude when both were drunk and he was angry.

Mr. Purkey's father was a Boeing salesman. When drinking, he was "violent on whoever was there." He was unpredictable, prone to corporal punishment with a belt, and very loud. His father never apologized for whipping or beating him. His father's best strengths were that he paid the bills, took them on their only vacation, and left them better off when he went to California.

Mr. Purkey had not spoken with anyone at LSSH about these experiences because "no one asked." He offered that Dr. Fernando, the evaluating psychiatrist at LSSH, saw him for two interview periods of approximately 20 minutes each. Dr. Fernando clearly stated that he would "do the best report he could in the time he had."

When Mr. Purkey was beaten by his father, he just endured it. He tearfully recalled that "there was no one there to help you," especially when his mother just stood by and watched. This was even when Mr. Purkey screamed for his father to "leave me alone." The beatings stopped after Mr. Purkey hit his father in the head with a whiskey bottle. This was about the same time Mr. Purkey thought about killing his dad for "what he did to me and my mom."

At about age 14, Mr. Purkey was taken into custody by the juvenile court and sent to live with his maternal great-aunt until he reached age 18. His maternal great-aunt's house was peaceful and safe. Unfortunately, Mr. Purkey believed that he was "there too late." This was despite his aunt never criticizing him, always supportively listening to him, and giving him good advice. He also thinks it was too late because his older brother was already into drugs at that point and the aunt could not stop him. His brother taught him how to do burglaries and gave him his first intravenous injection of Preludes, then taught him how to use heroin.

Mr. Purkey's maternal great-aunt died one day after he was paroled from Lansing Prison in 1980. He still mourns her death and often talks with her

000460

Ex_13-000569

Diagnostic Interview Report
Wesley Purkey
Page 34

at times.  It is very hard for him to believe that his entire family has died.

After his maternal great-aunt's death, he "did several robberies."  In retrospect, he is not sure why he did this because he always had great jobs and yet did burglaries and robberies for extra money.  The very first robbery after his maternal grandmother's death was when he "acted as a gas man." When he started the robbery, he intended to tie up the female victim, steal from her, and leave.  However, two girls came home with their kids and Mr. Purkey's plan was thwarted.  He managed to steal guns and money.  While leaving the premises he told the three women, "Tell them there will be many more of these…"  Two days later, he got back with his ex-wife.

Mr. Purkey never told his wife but his maternal great-aunt knew.  Mr. Purkey forgave his mother and believed she would have never acted sexually toward him unless "really pickled."

**Alcohol and drug use –**
Mr. Purkey was given alcohol by his mother at age 9 or 10.  Usually she gave him a little bit of beer in a jigger.  His first drunk was at age 13 with his brother.  He drank the better part of a pint of Cherry Vodka but it made him "sick as a dog."  He became a regular drinker by age 15.  He experienced his first alcohol-induced blackout at age 15 when he woke up in the alley behind a bar just a block from his house.  He apparently awoke after sleeping in the alley all night.  He had been at the back of the bar to drink and sell stolen cigarettes.

Before age 18 he drank with his parents "whenever they drank."  After he reached age 14, they really didn't care how much he drank, even buying beer for him when he was age 15.  Someone would announce, "I have Coors for the house."  Mr. Purkey really didn't think much of this drinking pattern until he "awoke in prison at age 14 after joy riding."  He went through the juvenile court process and was placed in the care of his maternal aunt.

Despite all the drinking and some court contact, Mr. Purkey never went through substance abuse treatment.  He thinks he woke up at age 16 or 15 "in detox at a Wichita hospital."  He was not in restraints but had somehow been admitted to a group treatment room.  Before that, drinking always got him in trouble.  He felt he never was in trouble when sober.  Other than the hospitalization, no one tried to help him with his drinking.  For example, even though he went to Catholic Church with his maternal great-aunt and was an altar boy, he drank communion wine, "everyone drank," and "even the priest got drunk at his house."

As an adult, Mr. Purkey had no outpatient substance abuse treatment except when incarcerated at Lansing State penitentiary in Kansas.  That ADAPT program was in 1991 or 1990.  In that program, he learned to control his attitude, found it hard to accept that he was an alcoholic, and learned that for a long time he did not know how to function unless he was high or drunk.

Mr. Purkey believed he was still addicted to alcohol and other drugs.  He cannot even look at an injection needle without desiring to use drugs.

At age 13, Mr. Purkey's brother taught him to intravenously inject crushed up Preludin.  This was "the greatest day of his life" because the euphoria felt really good.  In fact, that was the first time he had felt happy since age 7

**000461**

Ex_13-000570

Diagnostic Interview Report
Wesley Purkey
Page 35

or 8.  There had never been a high that good although some were nearly as
good.  Even so, the intravenous drugs use were a trap and he tried to drown
himself at age 15 because he didn't know who he was, didn't have any goals,
and didn't know how to achieve them.

Mr. Purkey used heroin for the first time at age 15.  He never contracted
Hepatitis.  At age 19 he was just a few days out of Hutchinson Correctional
Facility and he overdosed on heroin when "attempting to get high and kill
himself."  To that point he had been "steeped in the dope culture," using
"script" doctors to obtain pharmaceutical drugs.  He would then sell them for
illicit drugs.  By 1986 he knew his habit was "too bad" as he was using up to
a quarter gram of heroin a day.

Mr. Purkey used intravenous crystal methamphetamine for the first time in
1973.  This caused a warm euphoria but became "bad real quick," and he was
intensely paranoid.  He kept thinking others were talking about him,
especially during the second day of being high.  At that first high on
crystal methamphetamine, he found his shotgun and pistol and went to the
attic.  He was looking for the police.  He accused his wife of locking him in
the attic, even though he just had forgotten how to open the ceiling trap
door.  Eventually he became dehydrated because of the heat, shot through the
ceiling a few times, and came down.  His wife gave him Quaalude's to calm him
down.

Mr. Purkey last used methamphetamine mixed with Ritalin on "September 26,
1998."  He knows he overdosed and was treated at Kansas University Medical
Center.  The meth was illegal and the Ritalin was from his son's ADHD supply.
He was absolutely certain that despite a negative toxicological report, he
was being poisoned by his wife and malicious others.  He was certain the
poisoning was not a side effect of his chronic methamphetamine use.

For example, before the KU overdose he was using one-half to three-quarters
gram methamphetamine every few days to every few weeks.  The week before
going to KU he had used drugs heavily on two occasions.  This included that
he had smoked three rocks of crack cocaine, which was a lot for him.  He also
used one-half to three-quarters gram of methamphetamine and 30 to 40 pills of
Ritalin taken from his son's supply.  He thinks they were 10 mg Ritalin.  He
used a little alcohol and no downers.  Mr. Purkey was taken to KU by his wife
after he felt as though he was dying.  He also thought she was doing some of
the poisoning.

Back then, he concluded that he was being poisoned.  He believed it began
when his wife's girlfriend and ex-wife and wife gave him drugs "while he
slept."  This was shortly after he had been discharged from the DOC.  He also
was using Tequila, marijuana, beer, and whiskey during that period.  There
was one party in which his wife went to bed and he began to mess with Beth,
having sex on the couch when "both were high."

Soon after, Mr. Purkey began to use Ritalin from his son's supply.  These
were Ritalin pills from both Terry and Izzie's prescriptions.  Mr. Purkey
needed 4 or 5 of these to get going in the morning.  He knows the poisoning
started because he felt as though he was under the influence of a pesticide
and "they were exchanging pills for pesticide."  In particular, one girl who
was helping his ex-wife and he even tied up his ex-wife to get her to tell
the truth about the poisoning.  Eventually she confessed while tied up with
rope and an extension cord.  She did not confess until he had her tied up for

000462

Diagnostic Interview Report
Wesley Purkey
Page 36

one-half to three-quarters of an hour and threatened to shoot her in the jugular vein with Ritalin. During that time he was high on Ritalin and methamphetamine. After he let his ex-wife go, he feels she almost killed him and was "involved in this poisoning shit."

Mr. Purkey never had any hard information that his drugs were poisoned. He believed that once he mixed up batch of Ritalin his ex-wife and others switched them. He also found bent needles and that meant someone was trying to keep him from using drugs. He also felt punished by his ex-wife who often appeared angry.

Eighteen months before going to KU, he called the KBI and told them of the potential poisoning. He went to Wesley Hospital in Wichita, Kansas for symptoms he thought were poisoning. He first went to St. Francis Hospital but left because he thought they were too slow to provide his care and feared his heart would explode before they got to him. While at the Wesley emergency room, he went to the stall of another patient. This patient had some kind of device in her purse that he thought would "explode his heart." Wesley staff admitted him for an overnight stay and gave him a shot to put him to sleep. He saw the doctor the next day that he did not tell about the poisoning. The doctor threatened to send him to Larned. Mr. Purkey admitted to the doctor he had been using methamphetamine, stated he'd gotten "bad stuff," and wanted to go home so he could keep his job. The doctor let him go.

Also during this time, Mr. Purkey used methamphetamine and Ritalin every two days to every two weeks, coming down with Jack Daniels. He never reported the poisoning to any doctors. He resented being poisoned. He couldn't control his anger at his wife for participating in the poisoning.

In June or July 1998, Claire Gaida, his ex-wife, threatened to call SRS because Mr. Purkey was using his son's Ritalin. Mr. Purkey told Claire to leave their property. It was around that time Mr. Purkey decided to move to Topeka from Wichita. He told his parole officer that he needed to move and he was using drugs. He could not recall the name of that parole officer but certain there would be a record somewhere. His wife was there and they all agreed he should transfer to Leavenworth as soon as the school year was over. Mr. Purkey also told his parole office, Mike Gibbons, who had heard from the KBI that Mr. Purkey was still using. Mike Gibbons wanted Wesley to go the Kansas City office for drug rehabilitation treatment in Kansas City, Missouri. Mr. Purkey did that and spoke with a Chris Langston. On September 28, 1998, Mr. Purkey could not be admitted to Mirror as he needed a direct referral from the Kansas City parole office. Referral from the Wichita office apparently was insufficient. After that, Mr. Purkey went to St. Johns, then St. Lukes, and then Providence for emergency help. He was repeatedly told that if he had been high they could help him. Apparently his wife admitted to poisoning him with pesticides but that didn't get him into the hospital either because they could offer no services as he was on parole. He also was attending an EAP program, Employee Assistance Program, supported by Reddi-Root'r located at Penn Towers in Kansas City, Missouri. This was entitled Alternatives and has since closed its doors.

Once in Kansas City, he went every two weeks to Alternatives and they helped him develop a relapse prevention chart. He only used once between the KU hospitalization and Mary Ruth Bales' killing. This one episode was of smoking three rocks of cocaine with one of the "Central street girls," prostitutes who would use drugs with him when his wife would not. After that cocaine

Ex_13-000572

Diagnostic Interview Report
Wesley Purkey
Page 37

use, Mr. Purkey had satisfactory sex with his wife that night.  He was also
using alcohol and hiding it from his wife by keeping it in the back of his
Reddi-Root'r truck.

Jeanette could tell that he was high because after the first one-half or
three-quarters hour of ecstasy he "turns bad."  That is he "gets down on
himself" or had been feeling ashamed of his weaknesses and used drugs.  The
drugs helped him feel better.  On that particular instance Jeanette said,
"We're not going through that shit again…paranoia and alcohol."  By this she
meant she wasn't going to go through his marked increase in sex drive because
he was high.  When not high, his sex drive is not dependent on pornographic
movies, handcuffs, or sex toys.  Jeanette apparently voluntarily went along
with "is interest in handcuffs" because of the "joint fantasies" he had after
having been incarcerated.

**Marital history -**
Mr. Purkey was first married to Claire Gaida in a common-law marriage during
1974.  She was "quite a manipulator" but at that time they enjoyed the same
madnesses.  They broke up when he was sentenced to prison.  Also, she was his
fall partner for a gun dealership robbery and drug deal.  They stayed linked
together because of their now 21-year-old daughter, Angie.  They enjoyed
cocaine.  Claire was on bond and they had had no contact except when he was
at Larned State Security Hospital.  He feels she manipulated him.

Mr. Purkey's second marriage was to Jeanette Purkey whom he met in 1989 while
on a state maintenance Work Release program at the Lansing, Kansas
courthouse.  Back then, he was in "decent physical shape" and she liked his
appearance.  Eventually, she asked someone about him and then started to
visit him in the Leavenworth County Jail. While he was still a trustee and
still in Work Release at the Lansing Court house, they had sex for the first
time under the dense branches of a pine tree next to the court house.
Jeanette was now 37 years old and they had been together for about 12 years.
She had prior drug and alcohol abuse problems.  They had no contact since he
was at LSSH.  While he was there, they exchanged 10 or 12 calls per week and
three visits.

Jeanette told "Donnie" about the pesticides that Claire and Steve had put in
Wesley's drugs.  Even so, Jeanette insisted "pesticides didn't make you kill
Mary."  Mr. Purkey remained quite skeptical because two of his dogs were
poisoned and he was told that poison had been put in their food.  Even though
one of Mr. Purkey's prior attorneys learned that Jeanette denied the
poisoning, he was certain it had happened.  He believed that many details had
been left out of the murder because he was "blacked out."  As he read more of
the police reports, much more came into focus.

**Legal history -**
Mr. Purkey was certain that much was wrong in his legal record as printed in
his papers.

**Miscellaneous -**
During the assessment, Mr. Purkey believed he experienced a great deal of
self-learning.  He learned he had gone through life often "ending badly after
good starts" on various activities.  He had always felt misunderstood and
this contributed to his anger when his attempts to get help were thwarted.
He often said he didn't care about things when in actuality he really did.
He felt he had come to terms about not knowing exactly how he killed Mary

000464

Ex_13-000573

Diagnostic Interview Report
Wesley Purkey
Page 38

Ruth Bales.  There had been another matter the year before which he wanted to discuss.  Since the interview was not psychotherapy and his attorney had advised he not discuss those events, he declined.  Mr. Purkey was particularly angry with deaths of his friends in the DOC due to poor medical care or abuses they received at Lansing Prison.  He thought those were separate from his childhood experiences.  In part, he engaged in litigation to find purpose for his life.

**DISCUSSION OF EVENTS RELATED TO THE CURRENT LEGAL SITUATION:**
Mr. Purkey believed his wife was coerced into lying.  He believed the police coerced her to say that he intended to rob Mary Ruth Bales.  While Mr. Purkey did not specifically remember what he told his wife that night, he knows the job at Mary Ruth Bales' was a side job and he was only there to work for the money.  He "totally did not believe" his wife said he had done it with premeditated intent.  He was absolutely certain this was not a killing for $200.00.  He believed his wife had been coerced because her confession had been taped by the law enforcement officers.  He wanted those tapes reviewed, because he was certain the confession would not reflect her own phraseology, thus indicating influence by the police.  His wife was not a good storyteller and could tell the same story five different ways, believing each version to be true.  He thinks his wife lied because the cops threatened her with a First-Degree Murder charge unless she agreed with what they said.  He did not begrudge her and just felt sad for the injustice done to her and him.

Mr. Purkey did not believe his wife's statements that she was frightened of him were accurate.  For example, the day after he killed Mary Ruth Bales, Jeanette and Wesley had good sex.  Even so, there were some problems such as one time he awoke from sleep while choking Jeanette, surprising himself that he would ever do that to her because he loved her.

Twenty days before October 28, 1998, Mr. Purkey was heavily into methamphetamine and Ritalin use.  He was suffering marital distress because he believed his wife was participating in poisoning him.  He was feeling terrible anger, but there were no physical fights.  Usually they argued about whether he was being poisoned.  This was when he was off drugs.  He also wasn't eating because he thought they were poisoning his food.  He even thought they were poisoning his spaghetti and would not eat it.  He was going to leave Jeanette because she was poisoning him and "he was not paranoid." He even made Jeanette have sex with him at the American Inn located at I-70 and 78th Street, just so he could be away from the home where the poisoning was taking place.

Between the times he used methamphetamine, cocaine, and Ritalin he felt better.  He was getting good plumbing side jobs and had lots of energy.

The day before going to Mary Ruth Bales, he landed a $400.00 Reddi-Root'r job.  He was working twelve to fourteen hours per day for Reddi-Root'r, five to six days per week.  He tended to side jobs on his days off or over his lunch period.

Prior to moving to Kansas City, there had been physical fights with Jeanette. One was in a garage of a Wichita bar.  She was trying to get him to go home and he threw her down.  There was another fight after he was discharged from KU.  He grabbed her, accused her of poisoning him, and accused her of poisoning his St. Bernard.

000465

Ex_13-000574

Diagnostic Interview Report
Wesley Purkey
Page 39

Ten days to two weeks before October 28, 1998, Mr. Purkey went to K-Mart to pick up toiletries, which he used between plumbing jobs. While there he picked up two or three bags of insulin syringes from the pharmacy. In retrospect he knows he was setting himself up to use. He was also "getting ready for" his son's Ritalin prescriptions which were due to be refilled and because he was "tired of smoking crack." Mr. Purkey did not make crack or methamphetamine at his home. To keep the syringes secret, he kept them in his extra work boots, so Jeanette would not see them. She would have challenged him if she found them. In those ten days to two weeks before October 28, 1998, Mr. Purkey made up batches of "Ritalin and crack." Usually he dissolved ten to fifteen Ritalin pills with some crack cocaine and make up small bottles to use later. He had some small pill bottles, or merely left it in tablespoons. He was certain that batches were being poisoned because the formerly clear liquid would turn iodine colored. Also during this time, he came home one day and the entertainment center was pulled eight inches out from the wall. This convinced him that someone was messing with his home. Even so, he tried Ritalin contaminated iodine anyway to see if it effected him differently. In all honesty, his judgement was impaired because "he was messed up anyway on Ritalin and crack."

Some time after discharge from KU Med Center his wife and her "ex old man" sprayed something on him, which was poison. He knows "they gave him drugs to kill him when he was unconscious." He knows they gave him shock treatment to stimulate him to stop using drugs. He knows they lied about what they were doing. He knows they poisoned his two Labrador Retrievers, because they were dead on September 29, 1998, after he was discharged from KU.

October 25, 1998 was the day Mr. Purkey rediscovered the syringes in his boot. He made a big show to Tammy of throwing them out, but as soon as she left he rescued them from the trash, as he "planned to use them."

On October 26, 1998 Mr. Purkey tried to get counseling for him through his parole officer. He wanted one-to-one counseling and this was scheduled for alternatives at Penn Towers on September 28, 1998. Mr. Purkey had not met with Claire or Tammy that day.

On October 26, 1998 Mr. Purkey worked a ten to twelve hour shift. He was not using drugs or alcohol and actually had been at Mary Ruth Bales home that day. He had a second job across Kansas City assigned to him late in the day. He knows his logbooks would reflect both the first visit to Mary Bales and the other visit across town. At that cross-town visit he had to "pull a stool, run the main line, and it was messy." The homeowner was very pleased. That night he did not eat, but grabbed a beer, smoked some cigarettes, and went to bed.

On October 27, 1998, Jeanette and Mr. Purkey were together. He believed she was poisoning his cigarettes. He knew she poisoned him because she bought them out of his sight.

On October 27, 1998 Mr. Purkey planned to go into the shop early because his radio needed work. Even though he had gone to bed around 1:00 a.m., he awoke early enough to get to the shop by 6:15. While his truck was being worked on, he attempted to catch up on his invoices, especially the $400.00 job. After taking his truck in he had breakfast with Jeanette, borrowed $40.00 from her, and planned to combine it with $30.00 of his to buy a faucet for the Bales' home. Jeanette told him this was the only money he had until

000466

Ex_13-000575

Diagnostic Interview Report
Wesley Purkey
Page 40

payday.  When Mr. Purkey went back to Mary Bales' home on a Reddi-Root'r call, he had trouble finding it because of the rain and the darkness.  Upon entering her home, he smelled gas right away, found a leak in the basement gas line union, hustled her out of the house and told her, "She was lucky she wasn't dead."  After that was secure, Mr. Purkey examined the 25 to 28-year-old kitchen faucet.  Because she was older and likely on a fixed income, he thought about what to do. He knew because there was no shut-off value at the faucet it would be an expensive job.  He advised her the faucet would cost between $140.00 and $150.00.  If Reddi-Root'r supplied it and labor would bring the total to about $300.00.  However, he offered to purchase a $50.00 or $60.00 faucet and install it for $50.00 or $60.00 "labor on the side."  He told her this would be a non-charge call.  Non-charge calls were common.  Mary Bales agreed.

He left about 10:45 am.  He was angry and tired because of the rain, but not high.  He wanted to go home rather do the cross-town Reddi-Root'r job but he eventually did.  This was when he ran the main line after pulling the stool in the bathroom.  No cause for the plug could be found and so Mr. Purkey "warned the guy on the line" that it was not just roots.  He was certain his invoice would show this and the times.  He finished that cross-town job at about 12:30 am on October 28, 1998.  He then went home and did not have any money from Mary Bales to purchase a faucet for her.

When he got home he may have had a beer but did not use any drugs.  He went to bed immediately and woke up about 6:15 am.  He really did not want to be up but hugged his kids, told them he would see them after work that night, and left without breakfast.  He had the $70.00.  He really wanted drug counseling that day, Wednesday.  The $70.00 made him consider whether to use drugs the night before.  That morning he drove around, went to work by 6:15, had his radio changed, and went to Circle K for coffee.  He really wanted to go home because of his early hours, and told Danny he was tired.  He was crowded out of line at Reddi-Root'r so took time to get parts for the $400.00 Reddi-Root'r job.

Mr. Purkey left the Reddi-Root'r shop about 8:45 of 9:00 am.  He took Cleveland to the light.  This was a T-intersection and he could go "left toward the job" or "right toward the dope house."  At the last second he turned right.  Instead of taking some of the $70.00 and paying on a $120.00 ticket, he bought a few rocks of cocaine.  He chose to buy the drugs because he "didn't feel right, didn't have any Ritalin, and his syringes were at home."  He also had reached a point with Jeanette he knew he needed counseling and knew they were in trouble.  Somehow, he made it to eighth and Central where he saw a prostitute named Tammy at the Gazebo.  When he pulled up to her, he really wanted to smoke cocaine.  She asked if he was a cop.  He offered to give her half a rock of cocaine if he could purchase three $20.00 rocks for $50.00, "a volume discount."  She did, and they smoked in the van near 18th Street.  A customer saw them in the Reddi-Root'r van but did not see Tammy.  Mr. Purkey then drove Tammy to the Relax Inn Motel and smoked another rock.  She attempted sex on him but it didn't work so they smoked more crack.  After an hour and a half to two hours at the Relax Inn costing $23.00 an hour, Mr. Purkey and Tammy went back to Mary Bales' home.  On the way, he felt disoriented, got lost, and made Tammy stay in the van.  He needed money for the faucet so asked Mary Bales for $70.00.  He promised he would be right back.  She asked him if she needed to clean up under the sink to help him.  Instead of buying a faucet, he bought five more rocks for $70.00, picked up Tammy's girlfriend in exchange for a quarter rock, and they smoked more crack

000467

Diagnostic Interview Report
Wesley Purkey
Page 41

together.  He liked to smoke crack with the prostitutes because his wife wouldn't smoke crack with him.

With the five rocks in hand, Mr. Purkey and two women smoked cocaine at the 18th Street location.  At about 11:30 am "without a faucet," and no money, he considered calling his wife to "borrow some more money."  Even so, he parked at Mary's house and went inside with his tools neatly arranged in a tool bucket.  He took in a chisel and other tools to prepare the copper mounts.  He went into the bathroom and then asked if he could go to the basement to turn off the gate valve and make sure the water was off.  When the shutoff didn't work, he told Mary he had to shut off the water main.  He went back to the bathroom and smoked "a big rock" then set another one to smoke later.  However, after that big rock "he couldn't breathe, decided to try and leave, grabbed his tools, and slipped or blacked out with the crack pipe in his hand."  He thinks this happened in the living room.  He next felt Mary Bales leaning over him, felt attacked, and still felt desperate to breathe.  He fought with her, pushed her into the bedroom, and saw himself standing over her with a claw hammer in his right hand.  She was face down. He walked out of the bedroom saying to himself, "Now what?"  He took the hammer to the kitchen sink and washed it.  He returned to the bedroom to check Mary's pulse but saw her head was crushed with hair embedded in her skull.  He panicked, saying to himself, "What the fuck happened…" and put a blanket over her head.  He did it so she could have some dignity.  He was still very high and his heart was racing "15,000 miles an hour."  He couldn't stop the rising panic and called his wife from the kitchen phone.  She was not home and he immediately felt "he was soaked," meaning he would be incarcerated again.  He picked up his tools but the bucket was now in disarray, smoked another rock of cocaine, and took off all his bloody clothes.  He yelled for Tammy who had been sitting in the truck for about one-half hour.  Tammy came in, saw him in his shorts, and heard him say he was going to take a shower.  Mr. Purkey then heard someone on the porch and "darted out of the front room chair."  Tammy was smoking crack and kneeling by the chair.  They did not have sex.  Whoever was on the porch left.  Tammy asked for Mary's purse and found an envelope that had $10.00 and $20.00 bills in it.  Mr. Purkey did not want it because he "hadn't earned it" by doing a plumbing job.  He put the purse on a coffee table in the kitchen and they smoked more crack cocaine.  He told Tammy to leave because he wanted to be alone.  He knows Tammy kept Mary Bales' money because he flung it at her, grabbed some and then "stuck it in her mouth to shut her up."  Mr. Purkey was in a "time warp."  He felt he would not go back to the penitentiary and wanted to tell Jeanette that he loved her.  He smoked "back to back crack" and hoped for death.  He also told Tammy again to call Jeanette.  He thinks Tammy never saw Mary Bales' body because he had closed the bedroom door.

Mr. Purkey then told Tammy to leave and he'd stay behind.  He gave her the keys to his van and she drove away.  He gave Tammy a note to give to Jeanette that effectively said, "I love you, I'm sorry, forgive me…"

Mr. Purkey the rummaged through the medicine cabinet and found three bottles of Nitroglycerin.  He took all three of the bottles and felt his head would burst.  He didn't die but kept trying to call his wife and tell her "something bad happened."  When talking to her, he admitted to smoking crack.  He gave her directions but she couldn't find the place, eventually needing a cab.  Jeanette brought him clothes and he dressed in the bathroom. While waiting for Jeanette, he cleaned up some of the blood in the front room, grabbed Mary Bales' mail and put it in his toolbox.   The next day he

000468

Diagnostic Interview Report
Wesley Purkey
Page 42

rediscovered this mail and put it in the dumpster.  Once Wesley and Jeanette left the Bales' home, he told her the next day what had happened.  He told her everything about the prostitutes and what happened with Mary Bales.  He was absolutely certain this had not been a robbery.  Jeanette reacted very angrily because she now understood why he had not wanted to look for a house as he really just wanted to use crack cocaine the day before.  That next morning they made a plan together to clean up the Bales' home, to make it look like a house burglary, and to burn the house.  On the way there, they took two white trash bags from their home.  They placed Mary Bales' purse and watches as well as a few pop cans in the bags.  They cleaned up a few cigarette butts from the house and wiped off some things such as the phone or whatever he thought he had touched.  They tried to find Tammy to get the Reddi-Root'r van back and found her but all his tools were missing.  The only thing left was his large auger.  He didn't tell his boss, Danny what had happened.

That morning he gave his kids a hug, felt very guilty about what he had done, and said to himself that they deserved better.  Jeanette had called in a Missing Persons report the night before.  He felt as though he had given himself a death sentence because he felt so bad about taking Mary Bales' life.

Claire Gaida came over on October 29 and he told her what he did.  She offered to burn Mary Bales' home.  She even helped cover up what happened because they drove by the residence and the police were there.  They bought gasoline to burn the house but didn't.

Mr. Purkey knows he didn't wake up that day intending to kill anyone.  He had every intention of buying a new house, continuing side jobs, and getting back into drug treatment.  He feels a kinship with Mary Bales, hopes for her inner peace, and asks her for guidance.  He believes she is at peace.

When not high, he has a very powerful anger response.  He can "lose it" and snap.  For example, the last time he fought was when he was at "the Walls." He quickly accelerated from a mere fight to wanting to kill the other inmate. He advised that at the Walls, Lansing State Penitentiary, to hurt someone only insured that they would come back at you, so "to fight was to kill."  He had been beaten and stabbed several times, so knew this to be true.

Mr. Purkey's anger cycle began when he felt his heart start to speed up. Soon after that, he was "on fire" and it was "fight or flight."  He could become very easily angered if he was stressed or pressured.  During that time "small shit" could cause him to flash and to anger.

Prior to October 28, 1998, Mr. Purkey feared he was not meeting the goals set by Reddi-Root'r.  However, his job assessments were good and he really was in no danger of being fired.

Mr. Purkey has several lawsuits against the State of Kansas, believing "all lawsuits arise from his anger."  The night before the last day of assessment, he laid there repeatedly asking himself why he had been put in the hole. He fantasized that the officers were wrong.  He also felt a measure of relief to redress the abuses against himself and other inmates by filing lawsuits.  He continues to have a high level of anger "all the time."  He feels guilty because of all the bills Jeanette has to pay off on her own.

000469

Diagnostic Interview Report
Wesley Purkey
Page 43

SUMMARY OF PSYCHOLOGIC TESTING:

Mr. Purkey completed the PAI-2 (Personality Assessment Inventory-2; a general personality assessment with proposed diagnoses and validity scales, as well as structure different than the MMPI-2) and the Shipley Institute of Living (SILS; a rapid IQ test correlated to the WAIS-R) on December 7, 1999.  Mr. Purkey completed the MMPI-2 on March 15, 2000.  The MMPI-2 (Minnesota Multiphasic Personality Inventory-2; a general personality assessment with validity scales and well established normative populations) was somewhat separated in time, but Mr. Purkey's psychiatric state had not appreciably changed between December and March.  He easily understood directions for both tests and maintained a positive mood. Thus, the PAI-2 and MMPI-2 were considered similarly accurate representations of Mr. Purkey's functioning. The testing was used as a complimentary perspective on his face-to-face interview.  Both were used within the bounds of clinical psychiatry.  That is, both tests were correlated with face-to-face interview and not used in isolation.

The Shipley Institute of Living Scale, judged that Mr. Purkey's IQ was in the average range.  This meant his IQ measured at 99.  One hundred full scale IQ points plus or minus 10 is the normal range.  There was no evidence of cognitive impairment.  This IQ correlated well with his diction, grammar, education, and demeanor during the assessment.

The MMPI-2 was valid, indicating Mr. Purkey probably felt the need to discuss his problems even though he was somewhat self-depreciating.  The latter portions of the MMPI-2 were answered in an exaggerated manner, so had less clinical utility.  Overall diagnostic considerations generated by the MMPI-2 were that Mr. Purkey suffered from a paranoid or passive-aggressive personality disorder.  Symptoms of a paranoid disorder were prominent, as were extremely high scores for addiction proneness.

The MMPI-2 computer-generated symptomatic patterns indicated Mr. Purkey was chronically maladjusted with immature, self-indulgent, and manipulative acts toward others.  He could be obnoxious, hostile, and aggressive.  He may have had an exaggerated or grandiose idea of his own capacity or self-worth, with a tendency to hedonism and overuse of alcohol or drugs.  He appeared "quite impulsive," and he may act out against others without considering the consequences."  Suspiciousness, aloofness, and unapproachability were quite likely for him.  Paranoid features and blame externalization were likely present.

The profile frequency for the MMPI-2 was normed on a very rare 46/64 configuration, occurring in less than 1% of a normative sample of men.  Specific scales for substance abuse indicated a strong propensity for it.  The profile was of high definition and likely would retain its structure at a later date.

Interpersonally, Mr. Purkey was likely to have difficulty in interpersonal relationships.  He was likely to have an uncompromising interpersonal style with manipulative and self-serving behavior, causing great difficulty for those close to him.  He may "go into a rage because of his poor impulse control and low frustration tolerance."  He could potentially threaten or physically abuse his wife when frustrated.  His marital situation was likely problematic.

Ex_13-000579

Diagnostic Interview Report
Wesley Purkey
Page 44

Visual inspection of the computer-generated MMPI-2 report was facilitated by referring to *MMPI-2: Assessment Personality and Psychopathology, Second Edition* by John R. Graham added a number of features.  Validity scales L, F, and K suggested a number of elements.  First, Mr. Purkey answered frankly and self-confidently.  Second, he manifested an answer style consistent for socially deviant convictions and severe neurotic or psychotic disorder. Third, he was socially skilled but could be characterized as cynical, caustic, disbelieving, and quite suspicious of others.  Highest elevations of the basic scales are for Scale 4 and Scale 6, suggesting Mr. Purkey is an immature, narcissistic and self-indulgent person who will make excessive demands on others for attention and sympathy but resent even mild demands. Socially, such persons do not get along well with others, are suspicious of others' motivations, and avoid deep emotional involvement.  Repressed hostility and anger are characteristic, as is resentment of authority and a derogatory attitude toward authority figures.  Unrealistic and grandiose self-appraisal was common. Diagnoses for such persons are equally divided between passive-aggressive personality and Paranoid Schizophrenia.  As Scale 6 becomes higher than Scale 4 (which is the case in this profile), a pre-psychotic disorder becomes more likely.

Elevation of MAC-R, ATS, AAS, and PK scales are strongly consistent with substance abuse difficulties.  Given that the F(B) is markedly elevated, the content scales and supplementary scores are not considered.

The PAI-2 was valid with no clinical evidence of either malingering or defensiveness.  Highest correlations were for self-mutilation, borderline personality, suicide history, current suicide, schizoaffective, cluster 4, assault history, major depression, Dysthymia, and rapists.  Further valid validity scales showed some idiosyncratic responses, which suggested the interpretation be viewed cautiously.  However, Mr. Purkey did not attempt to present an unrealistic impression that was either more negative or more positive than the clinical picture warranted.  Overall, the PAI-2 suggested psychoactive substance dependence, major depressive episode, Post-traumatic Stress Disorder, and Paranoid Personality Disorder.  Rule out diagnoses, that is potential diagnoses to be considered, were Intermittent Explosive Disorder, Borderline Personality Disorder, an Antisocial Personality Disorder.

The PAI-2 clinical feature section showed a broad range of answers consistent with multiple diagnoses and association with marked stress and severe impairment in functioning.  Substance abuse, stress, and anxiety were prominent.  He had likely experienced a disturbing traumatic event during his past.  There was significant depressive experience, discomforting anxiety or tension, uncertainty about major life issues, potential for very unstable sense of what he desires, intense short-lived relationships, suspiciousness to the point that he was likely to harbor feelings of resentment as a result of perceived slights and insults.  Mr. Purkey was quicker than most to feel he was being treated inequitably and could often hold grudges against others even if the perceived affront was unintentional.  There was no self-report of alcohol abuse or dependence, antisocial behavior, empathy problems, mood changes, or problems with health of physical functioning.

The PAI-2 self-concept section indicated Mr. Purkey's mood fluctuations were not extreme and comparable to those experienced by most adults.

000471

Ex_13-000580

Diagnostic Interview Report
Wesley Purkey
Page 45

PAI-2 treatment considerations indicated Mr. Purkey had experience recurrent suicidal thoughts.  His anger management was such that he was potentially prone to "more extreme displays of anger, including damage to property and threats to assault others."  These outbursts could be unexpected and take others by surprise.  It was also likely that others might be intimidated by his temper and potential for violence.  Even so, his motivation for treatment was typical of those being seen in a treatment setting.  His responses suggested an acknowledgement of important problems with the perception of a need for help.  He reported a positive attitude toward personal change, the value of therapy, and the importance of personal responsibility.  Even so, treatment would be fairly challenging.

PAI-2 Cluster 4 was characterized by extreme elevations in drug dependence and personality disorder scales.  The pattern suggested a history of acting out both in substance abuse and behaviors.  Substance abuse likely led to severe impairment and inability to maintain social role expectations, and recklessness and probably alienated most of those who were once close to him.  Anger, even though constantly present, would not be expressed unless disinhibited by alcohol or drugs.  Physical violence could be expected under such circumstances.  Impulsivity and thrill seeking, as well as attention and concentration problems, further impair already suspect judgment.  The vast majority had prior treatment, had a history of assaultive behavior, had an arrest for assault, or had other criminal behaviors.  These persons tended to be viewed as manipulative.  Fifty-six percent of such persons were diagnosed with alcohol dependence, twenty-five percent with drug dependence, and thirteen percent with antisocial personality.

Taken together, the psychologic testing strongly indicated that Mr. Purkey has an average IQ, has intact written language skills, has very severe substance abuse difficulties, and has a high degree of serious psychopathology.  The psychopathology takes the form of severely disordered interpersonal functioning with potential for discreet episodes of impulsive severe violent physical acting out, especially if intoxicated by drugs or alcohol.  When in distress, marked paranoia not unlike a pre-psychotic state is possible.

There was some disparity in the testing.  For example, the PAI-2 does not indicate any antisocial or substance abuse difficulties.  This may be because the PAI-2 questions are more obvious than the empirically derived MMPI-2 questions regarding substance abuse.  In addition, the MMPI-2 does not mention Intermittent Explosive Disorder as a possible diagnoses, however, the clinical description is not inconsistent with that mental health difficulty, especially with intoxication.

## MENTAL STATUS EXAMINATION:
The primary Mental Status Examination was completed on December 7, 1999.  His functioning did not change significantly over the period, and so the mental status was considered representative of Mr. Purkey's functioning throughout the three-month period of evaluation.  Mr. Purkey was neatly dressed, cleanly coifed, and had good eye contact.  He spoke with a confident tone of voice.  He described a deeply morbid and reflective mood since he had killed Mary Ruth Bales.  At times he felt depressed because of what he had done to Mary Ruth Bales and felt supported only by his relationship with his family and his Christian faith.

000472

Ex_13-000581

Diagnostic Interview Report
Wesley Purkey
Page 46

He had adequate appetite and used commissary.  His wife sent him money for commissary.  His weight was stable and he did not restrict his intake.

Mr. Purkey felt fatigued most of the time, felt it was difficult to get going during the day, often battled hopelessness, and often felt helpless.  He had turbulent sleep, finding himself tearful when alone, and regretted what he had done to Ms. Bales.  He also felt regretful for his own family.  At times he had bad dreams and nightmares about the killing which had increased over time.  These events were getting clearer.  He had not written any of these dreams down, however reading the law enforcement document's helped reinforce his recall of the events.  Reading the reports made the remembrances about the killing more vivid, as did the autopsy report.  He felt quite disturbed by these and tried to counteract his recall with prayer and diverting his attention.

Mr. Purkey did not feel certain about his future.  He attempted to avoid thinking about the reality of his future, and "buried himself in his work." His sex drive was not very good, even though normally it would have been quite strong.

Mr. Purkey had no plans to kill himself and no ultimate-out plans.  Even so, he had been suicidal for the first time at age 14 when he "was not able to find happiness and felt empty."  Some of that was counteracted by a good relationship with his maternal great-aunt.  Because of his Catholic-Christian beliefs, he would not kill himself, however he prayed to have "another heart attack."

Mr. Purkey denied homicidal ideas at the present time.  When he had been incarcerated in Oregon and then at Lansing, he often felt threatened so had homicidal plans then.  They were primarily defensive to counter disagreements. and that he had been stabbed in the stomach while at Lansing. He was stabbed by another inmate that he was collecting a drug debt from.  In Oregon he was stabbed "by a crazy guy."

At times, Mr. Purkey felt homicidal ideas to various "people on the street," and to other detainees.  It helped him to pray, to stay to himself, to avoid trouble, and to think about his boys' welfare.  He also hoped to cope well because he did not want to hurt anyone anymore.  At times, his homicidal ideas had been worsened due to intoxication.  For example in June 1997, he became intoxicated after his release from prison.  After drinking five or six beers, he "got angry" and couldn't stop himself.

Mr. Purkey functioned in the average range of intelligence based on his grammar, diction, and his writings.  His fund of knowledge was in the average range.

Mr. Purkey denied experiencing auditory hallucinations.  At Larned State Security Hospital he answered that he experienced auditory hallucinations as a way to express that he was experiencing a self-narrative that seemed like three or four different personalities.  His disagreed that he was attempting to manipulate their testing.  He experienced visual hallucinations such as images that he saw in prayer or felt comforted by.  These were usually images of his maternal great-aunt and of Mary Bales.  Thinking about those two people made him very tearful.  He wanted them to forgive him.  Some of these images felt very real to him.  They ranged from peacefulness to replaying the killing and to replaying other violent events in his life.  The switch from

Ex_13-000582

Diagnostic Interview Report
Wesley Purkey
Page 47

peaceful to violent acts often came when he remembered seeing his father beat his mother.  This was when he was age 5 or 6 and it still infuriated him. His mother was beaten beginning when Mr. Purkey was age 6 and it did not stop until he was 12 or 13.  That stopped at age 13 when Mr. Purkey's drunken father started to beat him, and Mr. Purkey "beat the shit out of his dad." Thereafter, there were no additional beating episodes.

Mr. Purkey denied experiencing tactile or gustatory hallucinations.  He denied any alcohol-induced tactile hallucinations.  However, he reported olfactory hallucinations such as smelling the blood of a woman who had died at the Wichita Woolworth store.  He can still smell the death experience. While there were no particular triggers, he experienced this only three to five weeks prior to the first day of evaluation.  There were no ideas of reference, no thought insertion or withdrawal, no dissociative episodes, no alternative identity, no manic episodes, no unbridled elation, and no extrasensory perceptive abilities.

Mr. Purkey completed his GED when age 19 or 20 at Kansas State Industrial Reformatory.  Prior to that he had dropped out of school in ninth grade.  In 1989 he earned his Associates Arts Degree in Literature when he was incarcerated in Salem, Oregon.  He was not more comfortable in jail but believed he knew how to live through such an experience.  He had already completed 26 or 30 bachelor hours from a junior college.  He intended to continue that education.

Mr. Purkey's attention and concentration as assessed by having him serially subtract 7 from 100 and serially subtract 3 from 20 and spell two words in reverse order were normal.  His memory, as assessed by having him recall three objects immediately, at one minute, and at five minutes was somewhat faulty.  That is, he could immediately repeat three or three words, however, by one minute he lost track of one of the words and perseverated.  By five minutes he could recall only one of the three words.

His categorical reasoning (similarities) was rapid and cogent.  His social judgment in hypothetical situations was normal.  His abstract reasoning (proverb interpretation) was slightly over personalized and suggested that he was quite needful.  For example, to the proverb, "Squeaky wheel gets the grease…" he answered, "A closed mouth doesn't get fed."  To the proverb, "Don't cry over spilled milk…" he answered, "You have to deal with the consequences of your actions."  To the  proverb, "A rolling stone gathers no moss…" he answered, "Keep moving and your troubles won't catch up with you."

His digit span, a clinical test for organic brain damage or cognitive impairment, was slightly abnormal.  That is, he could repeat 6 of 6 digits forward but only 4 digits reversed.  His spontaneous sentence was, "What are we going to have for supper?"  He correctly drew a clock face and set it to 4:30 pm but omitted the numbers, suggesting impulsive actions are possible. He correctly drew intersecting pentagons.

Mr. Purkey endorsed some repeating thoughts.  These were phrases or single words.  These few words were like "rambunctious" but there were no rituals.

At the end of the Mental Status Examination on the first day of interviewing, Mr. Purkey was smiling and happy. He thanked this writer for treating him with respect.

000474

Ex_13-000583

Diagnostic Interview Report
Wesley Purkey
Page 48


**DIAGNOSTIC FORMULATION:**

The following Diagnostic Formulation is offered on the basis of review of extensive records, detailed background interview, psychologic testing, discussion of the events of the current legal situation, and Mental Status Examination.  The current diagnostic convention is the DSM-IV.

Axis I:    292.11 Cocaine Induced Psychotic Disorder with Delusions.
           300.4  Dysthymic Disorder, Early Onset.
           304.80 Polysubstance Dependence (stimulants, alcohol, and
           hallucinogens).

Axis II:   301.9 Personality Disorder Not Otherwise Specified (with
           antisocial, obsessive-compulsive, and paranoid features).

Axis III:  Reported history of closed-head injury during high school with
           subsequent headache and blurred vision; amphetamine induced
           seizure in 1988, history of intravenous drug use since age 16 (32
           years); history of drug-induced anxiety attacks.

Cocaine Induced Psychotic Disorder with Delusions is diagnosed when a cocaine or other stimulant (Ritalin) user demonstrates prominent delusions, historical evidence of substance intoxication, and these experiences are not better accounted for by a different psychotic disorder or delirium.

Mr. Purkey demonstrated no less than a one-month history of delusional ideas directly due to abuse of his son's Ritalin, use of rock cocaine, and methamphetamine.  On October 28, 1998, Mr. Purkey had been out of the Kansas Penitentiary system for three to four months.  In the weeks before Mary Bales' death, his Ritalin and cocaine use had accelerated to the point he had lost control of his drug use.  In addition to the high induced by the stimulants, he developed delusions that his wife and ex-wife and others were poisoning him with the drugs he was using.  The intensity of these beliefs grew to the point that he called the Kansas Bureau of Investigation to report that not only he was using, but that he was being poisoned.  He also was admitted to Kansas University Medical Center on September 13, 1998 with a stimulant-induced anxiety disorder, which he thought was a heart attack.  Even though he continued to believe he was being poisoned, he still used Ritalin and crack cocaine.  His insight during this period was so poor that he did no realize the depth of his dependency even though others readily observed this.

Claire Gaida reported Wesley developed drug-induced delusions in Wichita. Wesley thought drugs were being sprayed from the ceiling and someone planted something in his chest.  Jeanette stated Ritalin made Wesley hallucinate.

On the day of the offense, Tammy reported Wesley became violent after he smoked crack.  Wesley stated he was "too dam high to be a plumber," felt totally spaced out, and wanted to die.

Now that Mr. Purkey has been drug free, there is no evidence of drug-induced persisting delusions.  His unconfirmed certainty that he was poisoned, the MMPI-2 showing risk for pre-psychotic decompensation especially when in distress, and the PAI-2 for intense suspiciousness as well as risk for surprise violence strongly indicated that under the influence of cocaine or

000475

Diagnostic Interview Report
Wesley Purkey
Page 49

other drugs, he was at high risk for unintended violent act or violent loss of control.

Dysthymia, Early Onset, is diagnosed when a person shows depressed mood, or if they are an adolescent, irritability, with some symptoms of depression but no evidence of Major Depressive Disorder.  Now that Mr. Purkey is drug free, he demonstrated considerable evidence for early onset, meaning before age 21, Dysthymia.  That is, he frequently feels dysphoric, is easily irritable, tends to snatch defeat from the jaws of victory, shows some MMPI-2 and PAI-2 evidence of Dysthymia, and expresses an ongoing high level of anger.  He has had some symptoms of Major Depression but eschewed antidepressant medication in favor of attempting self-control.

Polysubstance Dependence is diagnosed when a person demonstrates at least a 12-month period of repeated use of substances from at least three different drug groups.  While Mr. Purkey's primary drug of choice has been psychostimulants such as cocaine or Ritalin (methylphenidate), he has also had a well-documented and severe intravenous drug habit and a very serious alcohol dependency.  His intravenous drug use has included hallucinogens, stimulants, and sedative-hypnotics.  Currently his drug-free state is maintained likely only because he is in a controlled environment.

Both Mr. Purkey's parents were severe alcohol users.  Thus, he inherited genetic predisposition to serious alcohol dependency and risk for illicit drug dependencies.  His family environment fostered drug dependency.  His mother gave him sips of beer and other alcohols by age 9 or 10, he consumed alcohol for the first time at age 13, and after age 14, and his parents included him in adult drinking parties to the point they supplied him with beer.  During some of these alcohol parties, his intoxicated father offered him money for prostitutes even though Mr. Purkey was only 14 or 15 years old, suggesting an extremely permissive and chaotic homelife.  In addition, his intoxicated mother engaged him in sexual activity when he was age 8 through age 11.  In 1986 he was judged at St. Francis Hospital to have severe psychosexual problems.  There was some continued sexual activity even up through age 22 with his mother.

Mr. Purkey knew that by age 14 drinking would get him in trouble.  He went through detoxification for the first time when in juvenile custody at age 14.  He also passed out from alcohol intoxication at age 15.  There was no record available indicating any substance abuse treatment during adolescence, though Mr. Purkey reported adult substance abuse treatment when he was incarcerated in the Kansas DOC.

In 1972, SRDC said alcohol could cause him problems.  In February 1976 e overdosed on Tranxene, a sedative.  In 1982, SDRC recorded that he had severe drug problems.  The MMPI back then showed very similar defects in judgment to the recent MMPI-2.

Mr. Purkey was introduced to intravenous drugs at a very early age by his older brother who gave him his first injection of Preludin.  Given Mr. Purkey's Dysthymia, this was the first time he felt happy in his childhood.  Later, he used intravenous amphetamines as a teenager even though they induced paranoia and a psychotic state.  Similarly, he diverted Ritalin intended for his two sons for his own use so much so that by September 1998, he thought he was being poisoned by family members and went to the hospital with a drug-induced anxiety state.  He also thought his food was poisoned,

000476

Diagnostic Interview Report
Wesley Purkey
Page 50

family was putting iodine into his Ritalin/methamphetamine concoctions, that family was giving him shock treatments when he slept, and his wife was poisoning his cigarettes.

His own recollection of his drug use, and the MMPI-2 strongly indicate evidence for severe risk for substance abuse even now.  The PAI-2 did not indicate any risk for substance abuse.  The PAI-2 has very obvious questions addressing substance abuse, so it can under-report substance abuse in someone who is sophisticated enough to recognize the question.  In contrast, the MMPI-2 is empirically derived so risk for substance abuse questions are not easily discerned.

The Personality Disorder NOS with obsessive-compulsive, antisocial, and dependent features describes Mr. Purkey's severe personality fragmentation. Personality Disorder NOS is used to described someone whose personality characteristics overlap several areas so that no one personality disorder fully describes their difficulties.

Mr. Purkey presented a constellation of life experiences, maladaptive responses, and personality organization that overlapped at least three areas of personality disorder.  For example, he clearly described himself as having been the victim of physical abuse by both parents, emotional neglect by both parents, sexual abuse by his mother, witness to promiscuous sexual activity his mother had with numerous lovers, early introduction to alcohol by some of his mother's lovers, very intense anger response sometimes even with the slightest provocation, preoccupation with compliance with rules, inflexibility regarding his ethics, inability to refrain from illegal activity, participating in illegal acts out of shame or desire for vengeance, considerable victim empathy, alternating between identification with authority and rebelling against it, and short-lived mood swings.

Together, these constitute obsessive-compulsive, antisocial, and dependent personality features.  The obsessive-compulsive features include that Mr. Purkey rigidly adheres to a course of action he believes to be true.  For example, he has produced more than 100 pages of neatly written obsessively reasoned treatises on many aspects of his case.  At times he has believed that despite his not being trained in law, his knowledge regarding legal matters superceded those of his attorney, especially his second one.  When that attorney did not comply with his wishes regarding a deposition, Mr. Purkey was reported to have flown into an intense short-lived rage totally consistent with an Intermittent Explosive Disorder.  However, Intermittent Explosive Disorder is not diagnosed for Mr. Purkey because his over-riding symptoms are more consistent with personality disorder of longstanding nature.  Second, Mr. Purkey has demonstrated antisocial personality features with some key exceptions.  First, he has considerable problems confirming to social norms since age 15.  It should be noted, however, that he came from an abusive awash in alcohol and porous for adult-child boundaries.  Those conditions were a set up for his adopting abnormal behavior patterns. Second, he participated in stealing and drug use early on in childhood, in part due to the influence of his older brother who was heavily addicted to intravenous drugs.  He has also demonstrated consistent adult behavior of being unable to refrain from illegal acts and spent considerable time incarcerated.  However, in contrast to all this he has demonstrated considerable victim empathy and openness to interpersonal change, rather inconsistent with a pure antisocial position. He wants to somehow right the wrongs of his life through betterment while incarcerated.

000477

Ex_13-000586

Diagnostic Interview Report
Wesley Purkey
Page 51

In particular, his own words speak of the internal contradiction that he has felt. That is, when he was taken from his parents' custody and sent to live with his maternal aunt, he felt her support, love, and non-punitive interventions were wonderful but probably were "too late for him." He certainly believed they were too late for his older brother. Mr. Purkey has also shown some characteristics inconsistent with pure antisocial personality. These have included his concern for his wife's welfare, for his boys' welfare, and remorse for having killed Ms. Bales.

Third, Mr. Purkey demonstrates ongoing developmental evidence of dependent personality features. The primary aspect of those features has included his belief that his parents never provided adequate nurturance that they were emotionally and physically unavailable to him, and this has left him with deep-seated anger. This is separate from the sexual contact with his mother. Both may account for the reference to PTSD, Post-traumatic Stress Disorder, by the PAI-2. It has also left him to a certain extent unable to fully commit to a particular person such as his wife. This may also account for his intense physical anger toward his wife.

Mr. Purkey is also at extremely high risk for substance-induced medical difficulty. For example, he has used intravenous drugs very heavily since age 16, with his only hiatus during a 10-year incarceration. Mr. Purkey responded very positive to the group psychotherapy available to him in the Lansing correctional facility.

DISCUSSION:
The original consultation questions addressed presence of mental disease at the time of the charged offense, that is lack of the required mental state, diagnostic understanding, and discussion of mitigation elements for sentencing. More than sufficient information was developed to answer these questions.

1.    Presence of mental disease-lack of required mental state –
At the time of the charged offense, October 28, 1998, Mr. Purkey was a severe cocaine, Ritalin, alcohol, and other drug abuser. His drug dependence had reached the point that despite good intentions, he borrowed money from his wife for plumbing repair supplies but used it on crack cocaine, money for a ticket was used for crack cocaine, and he was diverting Ritalin intended for his sons' attention deficit disorders to a stock of intravenous Ritalin mixed with cocaine. In addition, he was feeling heavy temptation to use cocaine rather than go to work, even though he was doing well at work. He was working, at least sometimes, under the influence of psychostimulants. He was working 12 to 14 hours per day and not perceiving the calamity of his plight in a way that he could find alternatives. He also delusionally believed that his wife and ex-wife and others were poisoning him. Punctuating these drug difficulties were that he was trying to make the adjustment from incarceration to a life of freedom, was having marital/sex difficulty because of his drug use, was engaging prostitutes for the purpose of oral sex and sharing drugs, was having tremendous difficulty in normal commitment to his wife, and felt the tension within him.

In addition to the acute drug dependent and drug intoxicated state, Mr. Purkey had never been treated for his childhood experiences of physical abuse, emotional neglect, and sexual abuse. Such experiences can saddle young children with anger control problems, no understanding of the

000478

Ex_13-000587

Diagnostic Interview Report
Wesley Purkey
Page 52

boundaries between children and adults, and severe problems with anger control especially as adults.  These were all superimposed on his dysthymic view of life.  He reported attempts to obtain drug counseling prior to the charged offense.

Thus, at the time of the charged offense, Mr. Purkey was laboring under the effects of severe personality fragmentation, was heavily intoxicated from the use of crack cocaine/Ritalin, was feeling tremendous distress in trying to adjust to life outside the Kansas DOC, then savagely beat Ms. Bales totally out of context for the level of threat she posed to him.  That brutal overreaction had its roots in his untreated severe psychiatric difficulties.

There were some contradictions in statements regarding his intent for going to the Bales' home.  Tammy, Claire, and Jeanette all offered he was going there to rob Ms. Bales so he could obtain more cocaine.  None of them indicate that his intent was to kill her and he adamantly denied any intent to kill her when he went to the Bales' home.

Long before he killed Ms. Bales, Mr. Purkey had experienced drug-induced delusional ideas and extreme anxiety state.  This behavior and thinking was consistent with a diminished mental capacity due to the heavy intoxication, and adjustment difficulties he was having. Mr. Purkey recovered quickly enough to attempt a coverup strongly indicating his functioning was intermediate between full responsibility and lack of required mental state. That is, he was laboring under such a weight of serious personality disorder, untreated substance intoxication, and untreated traumatic experience as a child, that he was deprived of a normal ability to refrain, and acted violently.  He quickly grasped what he had done once he cooled down.

2.     Psychiatric diagnosis –
At the time of the charged offense, Mr. Purkey was suffering mental disease. This took the form of severe cocaine dependence with delusions, untreated childhood physical/sexual/emotional abuse difficulties, extremely disordered anger response, untreated severe polysubstance dependence, and personality disorder not otherwise specified.

3.     Elements relevant to mitigation of sentence -
A number of elements relevant to mitigation are as follows.  They are listed in no order of priority.

a.     At the time of the charged offense, Mr. Purkey was acutely intoxicated on crack cocaine.  In the weeks prior to the charged offense, Mr. Purkey suffered Ritalin-induced delusions that he was being poisoned, plotted against, and maligned.  These rose to the point that he called the K.B.I. to report himself and the poisoning, as well as went to Kansas University Medical Center for a Ritalin-induced panic attack that he thought was a heart attack, etc.  When no cardiac symptoms were discovered, Mr. Purkey fessed up to the intense drug dependency.  Mr. Purkey also offered anecdotal evidence that he was seeking drug treatment because he knew he couldn't control his drug use on his own.

b.     The brutality and viciousness of the attack on Mary Ruth Bales strongly indicated disinhibition induced by drug use.  In particular, psychologic testing, face-to-face interview, and

000479

Diagnostic Interview Report
Wesley Purkey
Page 53

chronologic history very clearly indicated Mr. Purkey was vulnerable to pre-psychotic and psychotic decompensation with intense outbursts of anger. These outbursts of anger would be short lived, unpredictable, and much more likely if he was intoxicated on alcohol or other drugs. Recall that those behaviors were modeled by both of his parents for his entire upbringing. Notably, during the psychologic testing section, Mr. Purkey did not present malingered symptoms or underreported symptoms. This was in contrast to the Larned State Hospital evaluation during which he was somewhat defensive, felt not enough time was available for him to be heard, and the evaluating psychiatrist actually spent less than an hour with him. Mr. Purkey remains intensely angry but is channeling it to grievances now that he is drug free and in better control of himself.

c.    Mr. Purkey demonstrated significant victim empathy, sadness for his own family, and assumption of responsibility for his actions.

d.    When previously incarcerated, Mr. Purkey demonstrated significant improvement in his anger control with Tegretol and Valium. This suggested some biologic basis for his loss of anger control over and above the cocaine-induced intoxication. He has some significant history showing closed-head injury and potential brain damage. These include the headache and dizziness after the car accident in high school and drug-induced seizures. Neither is well documented but could have left him with irreversible personality changes.

Stephen E. Peterson, MD
Diplomate, American Board of Psychiatry and Neurology 1992
ABPN Subspecialty in Forensic Psychiatry 1994

Date Signed:    4/19/00
SEP/ns

000480

Ex_13-000589

FEDERAL MEDICAL CENTER
ROCHESTER, MINNESOTA

FORENSIC EVALUATION

NAME: PURKEY, WESLEY                                     REG. NO.: 14679-045

DOB: ███████                                      DATE OF REPORT: 08-13-2002

**IDENTIFICATION AND REASON FOR REFERRAL:** Wesley Purkey is a 50-year-old, ███████ male. He was referred for evaluation by the United States District Court for the Western District of Missouri, Western Division, under the provisions of Title 18, U.S. Code, Section 4241(b). He is currently charged in that jurisdiction with Kidnaping, Rape, and Murder. The referring Court is interested in receiving an opinion regarding Mr. Purkey's present competency to stand trial for these charges.

**EVALUATION PROCEDURES:** The purpose of the evaluation was explained to Mr. Purkey. He was informed that the usual doctor/patient relationship would not exist. He was told the information obtained from the evaluation was not confidential and would be summarized in a written report to the Court. He was further informed that the staff from the Federal Medical Center (FMC), Rochester, Minnesota, could be subpoenaed at a later date to testify regarding his mental status. Mr. Purkey acknowledged and appeared to understand these conditions.

As part of the evaluation process, the following documents were reviewed:

1. The Court Order requesting this evaluation;
2. The Indictment charging Mr. Purkey with the instant offenses;
3. Investigative reports and materials pertaining to the instant offenses;
4. Forensic report by Christina A. Pietz, Ph.D., ABPP, U.S. Medical Center for Federal Prisoners (USMCFP), Springfield, Missouri, dated March 21, 2002;
5. Records from Prison Health Services, Incorporated, dated 2000-2001;
6. Kansas Department of Corrections Evaluation and Classification Report, dated May 18, 2000;
7. Presentence Investigation Report from State of Kansas, dated April 19, 2000;
8. Psychiatric report by Stephen E. Peterson, M.D., dated April 19, 2000 (provided to this evaluator by Mr. Purkey);
9. Records from Providence Medical Center, Kansas City, Kansas, dated September 16, 1998;
10. Records from the University of Kansas Hospital, Kansas City, Kansas, dated September 13 to 14, 1998;
11. Records from Via Christi Regional Medical Center, Wichita, Kansas, dated May 2 to 3, 1998;
12. Records from Institute of Logopedics, Wichita, Kansas, dated August 18 to October 13, 1982;
13. Kansas State Reception and Diagnostic Center reports, dated April 26, May 5, and May 11, 1971; September 24 and 26, 1974; November 9 and 16, 1976; and May 15, 18 and 19, 1981;

Ex_13-000590

14.    Medical records from Wesley Medical Center, Wichita, Kansas, dated August 29, 1969, and February 15 to 17, 1976;

15.    Records from Heartsprings, Wichita, Kansas, dated August 4, 1960;

16.    Court documents pertaining to the defendant's criminal history; and

17.    NCIC criminal history record of Mr. Purkey.

Additional information was obtained in telephone contacts with Laura O'Sullivan, Mr. Purkey's defense attorney. Several messages were left for Mr. Purkey's lead counsel, Fred Duchardt, but he was unavailable for interview.

Mr. Purkey arrived at FMC Rochester on May 16, 2002. During his time at this facility, the defendant was routinely observed on his ward of residence by both clinical and correctional staff. He received a physical examination and laboratory studies on admission. He participated in forensic interviews with the undersigned evaluator, and he was administered psychological testing. Specifically, he was given the Minnesota Multiphasic Personality Inventory-Second Edition (MMPI-2).

**BACKGROUND INFORMATION:** The following information concerning Mr. Purkey's history is based on his accounts and the above-referenced sources. The defendant's cooperation with this examiner was variable across interviews.

Mr. Purkey said he was born and raised in Wichita, Kansas. He has one brother, with whom he said he has not had contact for many years. He described a chaotic family history. His parents both reportedly abused alcohol. His father reportedly beat him and his mother. Mr. Purkey reported a history of sexual abuse in childhood. He detailed to a prior evaluator that his mother sexually abused him from the age of eight until early adulthood. Records indicated Mr. Purkey's mother accused him of raping her when he was 20; she reportedly later recanted. Mr. Purkey said both of his parents are deceased. His father reportedly committed suicide.

The defendant said he dropped out of school in the ninth grade. He said when he did attend school, he earned average grades and received no special education assistance. He said he did receive speech therapy for a stuttering problem. Mr. Purkey has a lengthy criminal history that dates back to age 13. He said he began using drugs intravenously with his older brother around age 14. Mr. Purkey reportedly lived with his maternal great aunt for a time during his adolescence due to his parents' instability and his own behavioral problems. He had placements in various juvenile facilities and was also psychiatrically hospitalized because of his antisocial behavior.

Mr. Purkey has spent most of his adult life incarcerated. He has prior convictions for Theft, Robbery, Aggravated Escape, Unlawful Possession of a Firearm, Aggravated Robbery, Aggravated

PURKEY, WESLEY
REG. NO.: 14679-045
DOB: ███████
FMC ROCHESTER
PAGE 2

WP928029

Ex_13-000591

Battery, and Kidnaping. The defendant said he earned a GED and an associate's degree while in prison. When not incarcerated, he said he worked as a plumber and a welder. Mr. Purkey said he had great difficulty relating to others socially in the "free world." He said he had a common-law marriage from 1973 to 1980, although he spent most of those years incarcerated. In the relationship, he fathered his only biological child, a daughter who is now age 23. He reported he has been married twice to his current wife, who divorced him after his most recent incarceration but later remarried him.

In 2000, Mr. Purkey was convicted of First Degree Murder and Aggravated Robbery in connection with the October 27, 1998, killing of an elderly woman, and he received a life sentence in the Kansas Department of Corrections. While in custody for those charges, Mr. Purkey reportedly contacted authorities and stated he would confess to the kidnap, rape, and murder of a woman that he said occurred in early 1998. In exchange, he reportedly asked for federal prosecution that would enable him to serve his sentence in a federal penitentiary rather than the Kansas Department of Corrections. The information he provided formed the basis for the current federal charges against him.

**MEDICAL/SUBSTANCE USE/PSYCHIATRIC HISTORY:** Mr. Purkey reported he has no significant medical problems. He said he experiences pain in the neck and back from injuries he sustained in a fall at the holding facility in Leavenworth, Kansas. He described three prior head injuries that resulted in loss of consciousness; he said he sustained these injuries in a 1968 car accident, a 1976 car accident, and a 1976 assault. He described experiencing memory and concentration problems following the injuries.

Mr. Purkey has a long history of severe substance dependence, which he said began at an early age when his older brother encouraged his drug use. During his teenage years, he used alcohol, marijuana, and inhalants on a regular basis, and was an IV drug user by the age of 14 or 15. He admitted having work, family, and legal problems in connection with his substance use. He said he participated in a drug program on one occasion during incarceration. He said during his most recent period in the community, he abstained from drugs for three to four months before relapsing. By the time of his arrest in October 1998, Mr. Purkey said he was using methamphetamine and Ritalin (obtained from his stepsons' prescriptions) intravenously on a daily basis, in addition to smoking crack cocaine.

There are a number of previous mental health evaluations of the defendant, but most of his prior contacts with mental health professionals appear related to his antisocial behavior and drug use. Records from the Kansas State Reception and Diagnostic Center (KRDC) indicated Mr. Purkey was referred to the Wichita Psychiatric Center for evaluation in the eighth grade because of his truancy and antisocial behavior. The records indicated he was referred by the Center to St. Francis Hospital for a complete diagnostic work-up. The records stated that the 1966 evaluation revealed Mr. Purkey

PURKEY, WESLEY
REG. NO.: 14679-045
DOB: ▇▇▇▇▇▇
FMC ROCHESTER
PAGE 3

WP928030

Ex_13-000592

had "a serious personality disorder," and institutional care was recommended. Instead, the defendant reportedly received outpatient psychotherapy. KRDC evaluations from 1971, 1974, and 1976 noted Mr. Purkey's antisocial personality pattern and substance abuse problems. He was assessed as functioning in the average range of intelligence and was not assessed as having significant medical problems. For the most part, the classification reports indicated Mr. Purkey displayed no psychological problems during his lengthy incarceration periods. However, a 1981 KRDC report indicated that in February 1979, Mr. Purkey reported feeling anxious, depressed, and unable to sleep. He reportedly cut himself twice because he "wanted to be heard," according to the report. He was reportedly prescribed the anti-anxiety and antidepressant medications Valium and Sinequan and was referred for therapy. The most recent evaluation, in May 2000, by the Kansas Department of Corrections yielded diagnoses of Polysubstance Dependence and Antisocial Personality Disorder. The assessment, which included psychological testing, revealed no evidence of major mental illness. Testing revealed Mr. Purkey functioned in the average range of intellectual ability.

It appears that the only significant mental health symptoms experienced by the defendant have been related to his extensive drug use. Investigative reports indicated Mr. Purkey experienced psychotic symptoms as a result of his heavy use of drugs in the months prior to his arrest in 1998. For instance, his wife told the FBI that after the defendant began using crushed Ritalin intravenously, he voiced beliefs that she and her sons were trying to kill him by spraying him with some sort of insecticide. His former landlord told the FBI Mr. Purkey tore out the insulation underneath his trailer because the defendant believed cameras had been installed and people were spying on him. Records indicated Mr. Purkey was admitted overnight to Via Christi Medical Center in May 1998 because of his paranoid beliefs. He claimed on admission that a drug dealer has been spraying him with a mist of poison while he slept and that his house was "wired" for the surveillance of him and his family. His recent use of methamphetamine was noted. He described feeling the "mist" of poison being sprayed on him during the intake interview, leaving the room and rubbing his skin vigorously. He was diagnosed with Psychotic Disorder Not Otherwise Specified, and Rule Out Psychosis Due to Substance Abuse. He was treated with the antipsychotic medication Haldol and discharged the following day when his symptoms resolved. Records indicated in September 1998, Mr. Purkey was admitted to the University of Kansas Hospital overnight due to chest pains that were thought to be related to drug-induced anxiety.

The drug-induced mental health symptoms were noted in a subsequent evaluation, which Mr. Purkey provided to me. The report by Stephen E. Peterson, M.D., dated April 2000, assessed Mr. Purkey's mental state at the time of the October 1998 offense that eventually led to the defendant's state conviction for Murder. The evaluator noted the defendant's heavy use of stimulants, particularly his intravenous use of Ritalin and his smoking of crack cocaine. He noted Mr. Purkey had been convinced that his wife and others had poisoned his drug supply with pesticides. He diagnosed the defendant with Cocaine-Induced Psychotic Disorder With Delusions; Dysthymic Disorder, Early

PURKEY, WESLEY
REG. NO.: 14679-045
DOB: 01-06-1952
FMC ROCHESTER
PAGE 4

WP928031

Ex_13-000593

Onset; Polysubstance Dependence; and Personality Disorder Not Otherwise Specified, With Antisocial, Obsessive-Compulsive, and Paranoid Features.

Dr. Peterson noted the defendant's psychotic symptoms had resolved after he was deprived of drugs during incarceration. However, other records indicated Mr. Purkey continued to report paranoid beliefs during his incarceration. Prison Health Services records indicated in August 2000, Mr. Purkey complained that people had been spraying chemicals in his cell that made him ill. In December 2000, he complained inmates had been poisoning him. A January 2001 note indicated Mr. Purkey complained that another inmate was spraying chemicals in his cell that caused him to feel weak. In January 2001, the defendant was prescribed Haldol and the antidepressant medication imipramine, although the Haldol prescription was discontinued after only a week. It was noted that his paranoia dissipated once he was placed in segregation.

There was no suggestion of persisting psychotic symptoms in a subsequent evaluation. After being charged in the current federal case, Mr. Purkey was referred for an evaluation of his competency to stand trial. The evaluation was conducted at USMCFP Springfield in February and March 2002. The report by Dr. Christina A. Pietz indicated Mr. Purkey was housed in the facility's locked unit due to security concerns. Aside from the defendant's frequently expressed anger about his housing and other conditions of confinement, his behavior was relatively unremarkable. The report noted he was prescribed the anti-anxiety medication Buspar and the mood-stabilizing medication Tegretol, although the indications for this treatment were not described in the report. He refused to participate in psychological testing but did participate in evaluation interviews. Dr. Pietz concluded there was no available information, either from historical records or from observation and interviews, to indicate Mr. Purkey suffered from a major mental illness. She diagnosed the defendant with Polysubstance Dependence and Antisocial Personality Disorder. She noted that, on the advice of counsel, Mr. Purkey refused to discuss his version of the alleged offense with her. However, she felt there was sufficient basis to conclude he was competent to proceed to trial.

The Court Order for the current evaluation indicated that following his departure from USMCFP Springfield, Mr. Purkey was apparently not provided with and/or refused the previously prescribed psychiatric medications (presumably the Buspar and Tegretol). Defense counsel asserted in a motion to the Court that "Mr. Purkey's condition has deteriorated to such a significant degree that he now cannot assist counsel. Mr. Purkey simply cannot focus on the case, and discuss case-related matters, because of the psychic difficulties which he is experiencing." The Court also noted neither defense counsel nor the Court had been advised of Mr. Purkey's refusal to participate in psychological testing at USMCFP Springfield, and thus counsel did not have an opportunity to resolve the issue with the defendant. The Court therefore ordered another evaluation of Mr. Purkey's competency to stand trial.

PURKEY, WESLEY
REG. NO.: 14679-045
DOB: ████████
FMC ROCHESTER
PAGE 5

WP928032

Ex_13-000594

Mr. Purkey's defense attorneys were contacted by the undersigned. Ms. Laura O'Sullivan stated after Mr. Purkey returned to the holding facility, he seemed "unable to concentrate" and "agitated" after he stopped receiving the medications that had been prescribed at USMCFP Springfield. She said it was difficult to carry on a meaningful conversation with the defendant about his case, as he was focused on his anger over the conditions of his confinement. She alluded to the defendant making bizarre statements, but she was reluctant to elaborate on this point, referring me to Mr. Duchardt. Unfortunately, Mr. Duchardt was unavailable by telephone during the evaluation period.

**MENTAL STATUS ON ADMISSION:** Mr. Purkey arrived at FMC Rochester on May 16, 2002. During initial interviews with staff, the defendant presented as alert and oriented. He denied depressed mood, psychotic symptoms, and suicidal and homicidal ideation. He seemed angry during a nursing intake, but he later apologized to the staff member, noting his tendency to "blow up" when he gets angry. His thought processes were described as clear. He expressed no delusional ideation. He related a history of mental health treatment as a juvenile, noting he was "a bad teenager" and used substances. No gross cognitive or memory deficits were noted.

**COURSE OF EVALUATION:** Due to security concerns, Mr. Purkey was housed in the locked Special Housing Unit (SHU) for his entire evaluation period. Mr. Purkey was angry about his placement in the locked unit, and he voiced complaints about this throughout his stay. Staff also noted Mr. Purkey was often quick-tempered and demanding, yelling at staff over minor issues when his desires were not immediately met.

The defendant stated he started taking psychiatric medications at USMCFP Springfield to "stabilize my mood." He said he perceived some benefit from the medications and denied any adverse side effects. At his request, he was continued on the anti-anxiety medication Buspar, 15 mg three times per day, and the mood-stabilizing medication Tegretol, 200 mg three times per day. He was compliant with the scheduled medication, but the treatment did not seem to improve his angry outbursts.

Mr. Purkey's behavior was otherwise unremarkable. He was independent in all activities of daily living. His hygiene and room sanitation were adequate. No overtly bizarre or unusual behavior was ever noted. His sleep and appetite were good. He participated in recreation when offered.

When first interviewed by this evaluator in SHU, Mr. Purkey presented as angry and entitled. He complained bitterly about the conditions of his confinement and was very upset that there had been some problems in his wife being granted authorization for a visit. He blamed his attorneys for not assisting more in the latter endeavor. He said if the visit was not granted, "We're done," indicating he would not cooperate with the evaluation. He said that the evaluation would in any case produce

PURKEY, WESLEY
REG. NO.: 14679-045
DOB: ▮▮▮▮▮▮
FMC ROCHESTER
PAGE 6

WP928033

Ex_13-000595

an "adverse report" because the conditions of his confinement were provoking him to present as angry and hostile. He was highly critical of the USMCFP Springfield evaluation, asserting there was a lack of support for the report's conclusions and noting there was a lack of emphasis on his history of mental health evaluations.

After the problems with his wife's visit had been resolved, Mr. Purkey did participate in interviews with this examiner and interacted cooperatively. His mood was neither significantly elevated nor depressed, and his affect was appropriate. He denied auditory and visual hallucinations. His thoughts were organized and coherent. He exhibited no signs of cognitive problems or memory deficits. He admitted what he described as "serious anger problems" dating back to his childhood, and he had difficulty controlling his angry outbursts when things upset him. He perceived the medications prescribed as beneficial in helping him control his anger. He admitted that when he used drugs heavily, he experienced psychotic symptoms. However, he seemed reluctant to elaborate about the previously described substance-induced delusions. He said he still believed he had been poisoned. He asserted his wife and his ex-wife had contaminated his drugs with pesticides in an effort to get him to stop taking substances. When asked about his current relationship with his wife, he said he did not want to discuss the details of their reconciliation. When asked about his assertions that chemicals had been sprayed on him during his incarceration, he maintained that this had occurred. He denied having had such experiences during his time at FMC Rochester.

**PSYCHOLOGICAL TESTING:** Mr. Purkey was administered the MMPI-2, a self-report measure of psychopathology, personality characteristics, and response bias. The pattern of MMPI-2 results indicated Mr. Purkey acknowledged some current distress. The resulting profile was valid for interpretation. Inspection of the clinical scales revealed a pattern consistent with severe, chronic maladjustment. Persons who obtain similar scores are usually described as angry and may report feeling depressed and anxious. Hostility, resentment, and suspiciousness characterize their interactions with others, resulting in poor interpersonal relationships. They are usually able to control the acting out of their hostility but do exhibit violent outbursts on occasion. They tend to externalize blame for their anger and are poor candidates for psychotherapy. While suspiciousness and distrust are common in such individuals, the profile did not suggest the presence of bizarre ideation or unusual perceptual experiences associated with psychotic disorders such as Schizophrenia.

**CASE FORMULATION:** Mr. Purkey's history and presentation clearly indicated he has a severe personality disorder. A personality disorder is defined as a chronic, pervasive, and inflexible pattern of cognition, behavior, emotional expression, and/or interpersonal relating that leads to significant distress or problems in important areas of life functioning. As previous evaluators have noted, Mr. Purkey meets the diagnostic criteria for Antisocial Personality Disorder, as evidenced by an

PURKEY, WESLEY
REG. NO.: 14679-045
DOB: ████████
FMC ROCHESTER
PAGE 7

WP928034

Ex_13-000596

early history of conduct disorder, his extensive criminal history, irritability and aggressiveness, consistent irresponsibility, and a lack of remorse.

Prominent irritability and mood lability can be symptoms of a mood disorder such as Bipolar Disorder. In the defendant's case, however, it seems clear that his hostility and angry outbursts are associated with a maladaptive personality style. He admitted his anger problems date back to childhood, and he asserted his quick temper was worsened by his years of incarceration. During the current evaluation, his mood and affect were normal when circumstances were favorable (e.g., when he was permitted a visit with his wife), but he was verbally hostile when he was denied things to which he felt entitled. These factors strongly suggest his anger and irritability were associated with his personality style rather than a primary mood disorder. Additionally, dysphoria or mildly depressed mood is commonly associated with Antisocial Personality Disorder, particularly when individuals are confronted by the consequences of their antisocial behavior (e.g., incarceration). It appears that at various times during the defendant's legal difficulties, he has suffered from minor depressive symptoms, although this was not a prominent feature during the current evaluation. It does not appear that Mr. Purkey's symptoms were ever of sufficient severity to warrant a diagnosis of a mood disorder. Mr. Purkey's mood symptoms were more likely attributable to situational factors combined with the irritability and dysphoria commonly associated with Antisocial Personality Disorder.

Mr. Purkey has chronic and severe substance dependence problems. His heavy use of stimulants, particularly his IV use of Ritalin and methamphetamine, caused him to experience psychotic symptoms such as paranoid delusions (e.g., beliefs that he was being monitored and poisoned) and probable somatic hallucinations (e.g., feeling the "mist" of poison on his skin). While such symptoms also occur in mental illnesses such as Schizophrenia, the onset of Mr. Purkey's symptoms during periods of sustained and heavy drug use strongly suggested his symptoms were substance-induced. However, it seems there was a recurrence of his psychotic symptoms many months after his incarceration; in December 2000 and January 2001, Mr. Purkey reported beliefs about being poisoned by chemicals, and these ideas were very similar to those he described when he was using stimulants heavily. There are several different explanations that could account for this symptom course. Psychotic symptoms associated with methamphetamine use can persist for many months following cessation of drug use, although there is debate about whether this phenomenon represents the surfacing of an underlying psychotic disorder that was already present. This does not seem to fit the defendant's symptom course and presentation, however; it seems the psychotic symptoms remitted, recurred during the time period in late 2000 and early 2001, then remitted again. Specifically, during the evaluation by Dr. Peterson in March and April 2000, the evaluator opined the defendant's psychotic symptoms had remitted. During Dr. Pietz's evaluation in March 2002, Mr. Purkey described no psychotic symptoms. During the present evaluation, he denied current beliefs about being poisoned, nor did psychological testing suggest the presence of active psychotic

PURKEY, WESLEY
REG. NO.: 14679-045
DOB: ▮▮▮▮▮▮
FMC ROCHESTER
PAGE 8

WP928035

Ex_13-000597

symptoms. Further, although Mr. Purkey maintained during the current evaluation that his wife and ex-wife had tried to poison him in the past, his reconciliation with his wife did not seem consistent with ongoing delusional thinking.

One possible explanation for this unusual symptom course is that the defendant could have used illicit stimulants during his incarceration; individuals who have experienced psychotic reactions to methamphetamine tend to develop a heightened sensitivity to the drug, such that even a small amount ingested can bring about symptoms of psychosis. It does not appear that a drug screening was conducted when the defendant began reporting such symptoms during incarceration, however, so this hypothesis is speculative. Another possibility is that the defendant experienced transient, stress-related psychotic symptoms, which have also been noted to occur with greater frequency in individuals with a history of methamphetamine dependence. Given that the defendant had many complaints about the conditions of his confinement at the previous facility and that his symptoms seemed to remit quickly, this interpretation is certainly possible. It should again be noted, however, that Mr. Purkey did not demonstrate active symptoms of psychosis during the present evaluation.

**DIAGNOSTIC IMPRESSION:** The following diagnoses are offered in accordance with criteria set forth in the Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition-Text Revision (DSM-IV-TR). Diagnoses of Axis III conditions are based on the impressions of FMC Rochester medical staff.

| | |
|---|---|
| Axis I: | Polysubstance Dependence, In Remission in a Controlled Environment |
| Axis II: | Antisocial Personality Disorder |
| Axis III: | None noted |

**PROGNOSIS:** By definition, personality disorders are longstanding patterns of behavior that are difficult to change. It is expected that the prominent features of Mr. Purkey's Antisocial Personality Disorder, particularly his irritability, will continue to characterize his functioning in the future. Psychiatric medications usually are not prescribed to treat Antisocial Personality Disorder, although medications such as those prescribed to the defendant can reduce impulsivity and aggression. While the defendant reported subjective improvement in his moodiness and anger control with the currently prescribed medications, staff observed no objective improvement in his behavior.

With regard to his substance use, the defendant's prognosis is poor. His substance dependence is chronic and severe, and Mr. Purkey has had few periods of sobriety outside of a controlled setting. At present, his substance-induced psychotic symptoms appear to be in remission.

**OPINION ON COMPETENCE TO STAND TRIAL:** Although he said he did not want to discuss details of his case, Mr. Purkey's understanding of his current legal situation was well

PURKEY, WESLEY
REG. NO.: 14679-045
DOB: ███████
FMC ROCHESTER
PAGE 9

WP928036

Ex_13-000598

communicated during interviews with the undersigned. He was aware that he was charged with Rape, Murder, and Kidnaping. He understood the death penalty could be sought in his case. Given Mr. Purkey's lengthy criminal history, it was not surprising that he displayed a rather sophisticated factual understanding of the legal process. In fact, he said he has functioned over the years as a "jailhouse lawyer," helping other inmates with their legal cases. He was quite conversant with the roles of courtroom personnel, the plea options available to him, and legal issues specific to his case, such as the procedures the government must follow in seeking the death penalty. He was aware of the potential consequences of various plea options available to him. He described the strengths and weaknesses of the prosecution's case against him, and he seemed to have fairly realistic appraisals of his chances for success in court. While he expressed anger about his assertion that the FBI reneged on promises made to him about his prosecution, he nevertheless said he expected he would be treated fairly in federal court.

Mr. Purkey acknowledged he tends to get upset over minor matters during his discussions with defense counsel. He admitted he tends to lose focus when he becomes angry. However, he expressed confidence in his defense team, specifically citing that Mr. Duchardt "has done more for me than any other attorney." He said he thought Mr. Duchardt's legal briefs were "excellent" and said he considered Mr. Duchardt to be "trustworthy." He said he was willing to work collaboratively with his defense team, and he seemed highly motivated to assist in his defense.

During the current evaluation, Mr. Purkey displayed some of the angry outbursts cited by defense counsel as impairing his ability to participate in his defense. I too had difficulty engaging the defendant in interviews when he was angry about other issues, such as whether his wife's visit would be approved. However, it is important to recognize that the defendant's anger and irritability are part of a longstanding and maladaptive personality style, rather than a mental illness. To be sure, he may be a difficult client at times during interactions with counsel, but there was no evidence to indicate Mr. Purkey's ability to understand the proceedings or participate in his defense was hampered by any current symptoms of a major mental disorder. Further, he demonstrated an excellent grasp of the case against him, cited realistic strategies for defense, and communicated clearly and coherently.

Based on the above, it is my professional opinion that Wesley Purkey does not presently suffer from a mental disease or defect rendering him unable to understand the nature and consequences of the proceedings against him, or to assist properly in his defense.

Christine Scronce, Ph.D.
Director of Forensics

8-15-02
Date

PURKEY, WESLEY
REG. NO.: 14679-045
DOB: ▮▮▮▮▮▮
FMC ROCHESTER
PAGE 10

WP928037

### PURKEY RECORDS

```
KU Medical Center                                          1
    9/13/98 admission                                      4
        summary                                            7-8
        meds                                               12-15
        progress notes                                     16-19
        ER intake summary                                  26-27
        psych summary                                      29
        blood work                                         43-47
    10/30/98 admission                                     54-55
        (describes collection of blood and hair)           56
    9/14/98 stress test                                    57-94

Providence Hospital                                        95
    9/16/98 ER admission                                   98
        summary, (was checking in for rehab then
            Left against medical advice)                   100

Heartspring Center                                         104
    1982 request for services while incarcerated           106-119
    1958-59 (copies of index cards w/basic info)           120-121

Wesley Medical Center                                      122
    2/15/76 OD admission                                   122
        history (suicide attempt)                          129-130
        Hallucinating, seeing mice/bugs                    154
    8/29/69 removal of stitches                            157

Via Christi Medical Center (St. Joseph Hospital)          160
    5/2/98 admission history (out of control, thinks
            being poisoned, sprayed w/chemicals, deemed
            to be hallucinations)                          161
        physician progress notes                           168-171
        Haldol prescribed                                  177, 182-3
        blood lab                                          179-181
            Positive for meth                              180
    8/31/72 concussion, car accident                       211
        history (car working on struck from behind)        212
        progress notes                                     213-215
            O'Donnell notes that Wes has "severe
                emotional unstable background
                both genetic and environmental"            214
            Wes takes "French leave" (leaves w/o
                being discharged, notes again
                need for psychiatric treatment)            215
        blood test                                         220
        radiology reports                                  222-223
    3/8/68 concussion, car wreck                           236
        O'Donnell history                                  237
```

Ex_13-000600

|            | Vin Zant history on consult | 238 |
|            | radiology report | 254 |
|            | nursing notes | 265-268 |
|            | notes was unconscious prior to a admission to hospital | 265 |
| 5/30/76    | in fight, pain left side of face | 269 |
| 6/4/70     | jammed hand in fall | 273 |
| 5/13/70    | fall at home, hit hand | 275 |
| 10/1/68    | stomach pain | 276 |
| 9/14/68    | elbow injury | 277 |
| 8/1/68     | urine analysis | 279 |
| 5/19/68    | suture cut on finger | 281 |
| 4/29/68    | car accident, multiple cuts | 282 |
|            | Radiology report | 283 |

Via Christi Medical Center (St. Francis Hospital)        286
    11/5/69 history when in for burglary and
        Attempted Rape, talks re psych history        287
        final summary, 1/10/70                        304
        physical exam                                 308
        eeg results                                   309
        progress notes                                311-314
        physician orders                              315-324
        nurse's notes                                 332-361
        meds                                          362-371
    5/26-30   hit in face                             288-296
    3/10/76   burn on hand                            297
    2/14/74   blood in urine                          299-300
    11/21/68  discharge summary-aggressive behavior   372
              Mention previous contacts w/Wes,
              Describe as passive/aggressive          373
              Nursing notes                           378-384
              (Mother's interference is noted)
    2/18/67   discharge summary, passive aggressive
              Diagnosis, says court order why there   385
              In boy's industrial school, to go to
              Larned                                  386
              Larned suggested because no room at
              Boys industrial school, suggest going
              Home on parole                          390
              Doctor progress reports                 392-393
              Nursing notes                           394-399
                  Mention of giving librium           397
                  Mention of giving placidyl          395-398
                  (Mother's interference noted)
    1/11/67   discharge summary, passive-aggressive
              Severe, do not note prior admissions
              Admission starts 12/29/66               400
              History re mother's promiscuity,
              openly bringing men into home, then

WP_PC000072497

Ex_13-000601

```
                abandoning her sons, headaches,
                dizziness, blackouts described         402
                Cranial X-ray                          404
                Brain Scan                             405
                12/30/66 EEG reading-mild depression of
                    cortical activity in left
                    frontal and temporal regions       409
                1/9/67 EEG reading-depression of
                    activity not seen this time        410
                Progress notes, passive aggressive
                    Severe                             411
                Physician Orders                       413-414
                    Note giving Librium
                Nursing Notes                          415-425
                    Mother's call                      423

    Via Christi Medical Center                         426-478
        St. Joseph Hospital (same admission as at p. 161
            above, some repeats and additional records)
            5/2/98 admission, description of spraying
                Chemicals, sleeping w/drug dealer's
                Wife, thinking being surveiled, etc)   428
                ER report                              434
                Physician Progress Notes               436-440
                Blood analysis                         447-449
                    Positive for meth                  447
                Meds                                   450-451

    Iowa Department of Corrections                     479
        letters re inquiry concerning escape charge    479-483
        10/31/83 report re consuming alcohol, also
            refers to escape attempt incident          496
        1/6/83 summary (good summary)                  498-504
            detailed account of chaotic upbringing     498
            headaches mentioned
            Wes' account of shooting drug dealer       501
        3/84 TV antenna incident                       513-515
        2/29/84 failure to use sign-out sheet          516-518
        2/24/84 getting mad over not getting silverware 521-524
        6/30/83 consumption of alcohol                 526-528
        Reports on Sylvester Jackson incident in KS    533-535
        Ad Seg review 5/17/83 re escape charge         536
        Appeal materials on escape attempt charges     537-561
            appeal result, reduction due to "procedural
                time error                             546
            report about factfinding, indication that
                there is "confidential information"
                which was "found to be reliable"
                (that was Purkey's info)               552
            original disciplinary notice, mentions
```

Ex_13-000602

```
        Confidential info                        553
    letter that Purkey was source of info        558
back injury 12/83                                568-570
8/10/83 classification for transfer to Anamosa
    recommended due to giving providing info
    makes clear he was the informant            583
psych reports from KDOC
    7/10/81 Wes trying to get across his remorse 591
    8/4/79 discussion re Wes' suicide attempts   592
copies of convictions                            596-619
    dispositions w/in KDOC                       618
inventory slip for "map" re escape attempt       641
Med information                                  652-
    KDOC record acknowledging need for treatment
        of stuttering, but no resources
        available                                670
    dental record                                720
    KDOC psych reports after suicide attempts
        5/19/79                                  733
        6/10/79                                  734
        6/22/79                                  735
        7/14/79                                  736
        8/4/79                                   737
        5/3/79 report re suicide attempt         738-743
        5/16/79                                  744
    11/25/75 psych eval                          745-50
        Self portrait and other drawings         746-749
    Jesness profile test sheet                   755-757
    Shipley                                      758-760
    MMPI 11/4/75                                 762
    1/22/79 self-inflicted wounds                763-774
    2/4/79 self-inflicted wounds                 775
    5/3/79 self inflicted wounds                 776
    3/28/79 self-inflicted wound                 778
    12/3/78 stab wounds to left arm              788-796
        cause "unknown"                          793
    1974 records re fears of release             807-808,
                                                 815

    1/24/72 letter from Paul Murphy re his
        Contacts w/Wes, calls him sociopath      823
    1972 institutional psych reports             824-825
    1971-1972 psych counseling progress notes    826-829
    1970-1971 testing scores                     844-845
9/30/83 dental clinic memo,                      868

Oregon Department of Corrections Records         895
    Questionnaires for psych treatment           896-899
                                                 907-916

    Assessment                                   918-921
    Purkey eval of counseling program            926-927
```

No.0293   P. 1        FRED DUCHARDT        WP_PC000072499    Nov. 14. 2008  3:40PM

Ex_13-000603