States District Court for the Western District of Missouri, Western Division. The referring Court requested an opinion regarding Mr. Purkey's competency to proceed from the United States Medical Center for Federal Prisoners located in Springfield, Missouri. The evaluation was conducted in the Mental Health Evaluation Unit from February 25, 2002, to March 21, 2002. Mr. Purkey was regularly observed by both clinical and correctional staff during this period. Purkey's evaluation included clinical interviews, review of his medical history, a physical examination, and reports of interviews and other records from the Assistant United States Attorney. Mr. Purkey refused to participate in any psychological testing [37, pp. 1 and 2].

During his mental health evaluation, Mr. Purkey advised that he was never referred to substance abuse treatment, but did complete a 12-week drug program while incarcerated in Lansing, Kansas. The defendant claimed to have attended Alcoholics Anonymous after his release in 1997. When describing his varied drug usage, he claimed he "sniffed glue on a regular basis." Mr. Purkey stated that throughout his incarceration in the Kansas Department of Corrections, he was never placed in a mental health facility. Christina A. Pietz, Ph.D., A.B.P.P., wrote in her March 21, 2002, evaluation report, "My review of the available records from the Kansas Department of Corrections confirmed this" [37, p. 5].

According to Dr. Pietz, Mr. Purkey followed the rules and regulations of the institution during the evaluation period. Throughout his hospitalization, his behavior was "consistently organized and appropriately goal-oriented. No bizarre, threatening, or assaultive behaviors were observed" [37, p. 6].

Mr. Purkey's physical examination was unremarkable. He complained of dry skin and an enlarged toe nail (left great toe). The dental staff did an examination and noted he needed a cleaning of his teeth and some dental work. According to Dr. Pietz, Mr. Purkey complained of lower back pain at the end of the evaluation but did not mention any pain during his physical. He was prescribed 550 mg of Naprosin to be taken twice a day, 15 mg of BuSpar to be taken three times a day, and 200 mg of Tegretol to be taken twice a day [37, pp. 6 and 7].

Dr. Pietz noted that Mr. Purkey's thoughts on mental status examination contained no delusional, suicidal or homicidal ideation or intent. She stated his affect, "was generally bland, it varied appropriately with his mood" [37, p. 7]. Dr. Pietz reported that Mr. Purkey "did not appear to meet criteria for a major mental illness."

35

WP_PC000090960

Ex_13-000744

She said he appeared to exhibit antisocial personality traits and "probably would have met a diagnosis of childhood conduct disorder because of his irresponsible behavior and participation in juvenile delinquent activities during adolescence." She opined Mr. Purkey met the criteria for antisocial personality disorder.

Dr. Pietz reported her diagnosis of Mr. Purkey as:

| | |
|---|---|
| Axis I: | Polysubstance Dependence |
| Axis II: | Antisocial personality disorder |
| Axis III: | Noncontributory [37, p. 8.] |

Christine Scronce, Ph.D., Director of Forensics, evaluated Mr. Purkey at the Federal Medical Center, Rochester, Minnesota, and issued a report on August 13, 2002. The Western District of Missouri had requested an opinion regarding Mr. Purkey's competency to stand trial. During his stay at the facility, Mr. Purkey was routinely observed on his ward of residence by both clinical and correctional staff. He received a physical examination and laboratory studies on admission. He was interviewed by Dr. Sconce and was administered the MMPI-2 [38, pp. 1 and 2].

When Dr. Scronce reviewed prior Kansas Reception Diagnostic Center evaluations of Mr. Purkey in 1971, 1974, and 1976, she noted each referenced his antisocial personality pattern and substance abuse problems. Dr. Scronce reported that for the most part, "the classification reports indicated Mr. Purkey displayed no psychological problems during his lengthy incarceration periods." After reportedly cutting himself twice in 1979, Dr. Scronce stated he was prescribed antianxiety and antidepressant medications (Valium and Sinequan). Dr. Scronce stated the only significant mental health symptoms experienced by the defendant have been related to his extensive drug use. As an example, Dr. Scronce noted an incident after the defendant crushed Ritalin to use intravenously; he voiced beliefs that his wife and her sons were trying to kill him by spraying him with some sort of insecticide [38, p. 4].

Dr. Scronce referenced an April 2000 evaluation conducted by Dr. Stephen E. Peterson and noted Dr. Peterson stated that the defendant's psychotic symptoms had resolved after he was deprived of drugs during incarceration. In December of 2000, Mr. Purkey complained of another inmate "spraying chemicals in his cell," and in January 2001 he was prescribed Haldol for one week and the

36

WP_PC000090961

Ex_13-000745

antidepressant medication imipramine.  Dr. Scronce reported his paranoia dissipated once he was placed in segregation [38, p. 5].

Upon Mr. Purkey's arrival on May 16, 2002, he denied any depressed mood, psychotic symptoms, suicidal ideation, or homicidal ideation. He did not express any delusional ideation nor gross cognitive or memory deficits.  At Mr. Purkey's request, he was continued on the anti-anxiety medication BuSpar, 15 mg three times per day, and the mood-stabilizing medication Tegretol, 200 mg three times per day. Dr. Scronce stated Mr. Purkey's "behavior was otherwise unremarkable" [38, p. 6].

During his first interview with Dr. Scronce, he reportedly was angry and complained bitterly about the conditions of his confinement.  He told Dr. Scronce that if his wife's visit were not granted, "We're done." Once this problem was resolved, the defendant continued the interview.  Mr. Purkey denied auditory or visual hallucinations.  He admitted to "serious anger problems" as far back as his childhood years.  He also admitted to Dr. Scronce experiencing psychotic symptoms during heavy drug usage [38, p. 7].

Mr. Purkey was administered the MMPI-2 and the resulting profile was reported as valid.  Dr. Scronce said the clinical scales revealed "a pattern consistent with severe, chronic maladjustment."  She noted that the profile did not suggest the presence of bizarre ideation or unusual perceptual experiences associated with psychotic disorders such as Schizophrenia [38, p. 7].

Dr. Scronce reported that Mr. Purkey's history and presentation "clearly indicated he has a severe personality disorder."  She agreed with previous evaluators in saying he "meets the diagnostic criteria for Antisocial Personality Disorder."  The diagnosis was supported by Mr. Purkey's early history of conduct disorder, extensive criminal history, irritability and aggressiveness, consistent irresponsibility, and a lack of remorse.  Dr. Scronce opined that Mr. Purkey's hostility and angry outbursts are associated with a maladaptive personality style rather than a mood disorder.  She said his mood symptoms were more attributable to "situational factors combined with the irritability and dysphoria commonly associated with Antisocial Personality Disorder" [38, p. 8].

Dr. Scronce reported Mr. Purkey's chronic and severe substance dependence problems.  She referenced Mr. Purkey's psychotic symptoms many months after his incarceration, in December 2000

WP_PC000090962

Ex_13-000746

and January 2001, reporting beliefs about being poisoned by chemicals. Dr. Scronce noted the similarity with ideas described when he was using stimulants heavily. Dr. Scronce stated many possibilities could explain Mr. Purkey's reports of poisoning, including the use of illicit stimulants during his incarceration. She noted that it "does not appear that a drug screening was conducted when he began reporting such symptoms during his incarceration. Dr. Scronce reported that Mr. Purkey did not demonstrate active symptoms of psychosis during her evaluation [38, p. 9].

Dr. Scronce's diagnostic impression was:

| | |
|---|---|
| Axis I: | Polysubstance Dependence, In Remission in a Controlled Environment |
| Axis II: | Antisocial Personality Disorder |
| Axis III: | None noted  [38, p. 9.] |

Dr. Scronce reiterated that Mr. Purkey's anger and irritability are part of a longstanding and maladaptive personality style rather than a mental illness. She reported finding no evidence to indicate Mr. Purkey's ability to understand the proceedings or participate in his defense was "hampered by any current symptoms of a major mental disorder" [38, p. 10].

Bruce A. Leeson, Ph.D., prepared an evaluation of Mr. Purkey's neuropsychological functioning at the request of his attorney, Fred Duchardt, Jr. The psychological assessment was dated January 5, 2003. Dr. Leeson reviewed selective medical records, defendant evaluations, and criminal records. He met with Mr. Purkey at Leavenworth Detention Facility, Leavenworth, Kansas on April 22, 2002, and administered the Wechsler Adult Intelligence Scale, Wechsler Memory Scale, Test of Variables of Attention, Delis-Kaplan Executive Function System and the Personality Assessment Inventory. Dr. Leeson interviewed Mr. Purkey and administered the Test of Memory Malingering on April 23, 2002. On December 9, 2002, he interviewed and administered the Smell Identification Test to Mr. Purkey [39, pp. 1 and 2].

Dr. Leeson highlighted in his report four incidents between 1968 and 1976 involving Mr. Purkey that resulted in head injuries. He reported Mr. Purkey's admission to St. Joseph's Hospital and Rehabilitation Center in Wichita, Kansas, on March 8, 1968. Following a vehicle accident, Mr. Purkey received multiple lacerations of the left face, anterior neck, and shoulder. Physicians diagnosed Mr. Purkey with a

38

WP_PC000090963

Ex_13-000747

cerebral concussion resulting in a week-long stay in intensive care. Dr. Leeson reported Mr. Purkey advised he suffered from headaches, dizziness, and blurred vision for months afterwards [39, p. 2].

Dr. Leeson noted the defendant's treatment at the emergency room of St. Joseph's Hospital on April 29, 1968, for multiple facial abrasions and contusions following another vehicular accident.  X-rays were negative for spinal or skull fractures with no indication of any neurological work-up [39, p. 2].

Dr. Leeson listed Mr. Purkey's admission to St. Joseph's Hospital on August 31, 1972, after a car was rear-ended while he was working on the engine.  According to Dr. Leeson, the investigating officer reported that Mr. Purkey lost consciousness for several minutes.  Dr. Leeson reported the defendant's medical diagnosis included multiple lacerations, face and forehead, and an acute cerebral concussion [39, p. 2].

The last incident reported by Dr. Leeson occurred on May 28, 1976, when Mr. Purkey was treated at St. Joseph's Hospital.  Mr. Purkey's injuries included a facial contusion and a "green stick" fracture of the left cheekbone.  Dr. Leeson states in the history section of the admitting documents he noted "following a car accident a few years previous, Mr. Purkey's behavior changed . . . doing things very carelessly as if he wants to be apprehended."  Dr. Leeson also reported from his conversations with Mr. Purkey that he had been "knocked unconscious in a fight on a basketball court in the Oregon Department of Corrections" [39, pp. 2 and 3].

Dr. Leeson reported the following results of psychological tests he administered to Mr. Purkey [39, pp. 3-6]:

> Personality Assessment Inventory:  There was some inconsistency in responses to similar items.  The score scales fall in the normal range.  The PAI profile is marked by significant elevations and the configuration of the clinical scales suggest a person with a history of severe substance abuse problems.  He is experiencing prominent stress, anxiety, and mild to moderate depressive symptoms.  He appears to be pessimistic and dwells on thoughts of worthlessness, hopelessness, and personal failure.  Indicators of a significantly higher than average risk for suicide.

39

WP_PC000090964

Ex_13-000748

Test of Memory Malingering:  Mr. Purkey achieved scores well within normal limits.  This suggests he made a reasonable effort to do well on this task.  Further evidence of validity was indicated when he performed within expected limits on most clinical measures of brain function, the exceptions being planning and sequencing, response inhibition, olfactory acuity, and sustained focused attention.

Wechsler Adult Intelligence Scale-III & Wechsler Memory Scale-III:  Mr. Purkey achieved Average or Low Average scores on the IQ Scales of the WAIS-III.  Scores achieved were VIQ 94 (conf. int. 89-99, PIQ 85 (conf. int. 79-93), FSIQ 90 (conf. int. 86-94). Mr. Purkey evidenced a significant weakness on Block Design, generally identified as a measure of spatial reasoning.  The significant difference between verbal and performance subtests is suggestive of brain based cognitive dysfunction.  WMS-III scores are essentially commensurate with what would be predicted by those achieved on the WAIS-III.

Delis-Kaplan Executive Function System:  is a battery of tests to assess the frontal system, of the brain and executive functions including flexibility thinking, problem solving, planning, impulse control, concept formation, abstract thinking, and creativity in both verbal and visual-spatial modalities.  The following tests were used:

Trail Making:  Timed scores were within normal limits, however Mr. Purkey made a "set-loss' error in Condition 4. While not definitively indicative of impairment, even one set loss error is quite unusual in subjects of his age.  This is consistent with difficulty maintaining cognitive set which may be frontal in origin.

Verbal Fluency:  When greater difficulty is exhibited on Category Fluency than on Letter Fluency, such as is the case with Mr. Purkey, relative dysfunction involving the left temporal regions of the brain is indicated.

Design Fluency:  Performance was fair and only slightly inconsistent across conditions.  Note should be taken of set-loss designs, however, which reflect impairment relative to both Mr. Purkey's own production rate and to

40

WP_PC000090965

Ex_13-000749

the performance of subjects in the standardization group. The significantly higher than average number of set-loss errors reflects significant frontal impairment.

Color-Word Interference:  Performance on the primary measures of completion time is good across all conditions of this test.  However, he evidenced multiple errors on both Inhibition and Inhibition/Switching conditions yielding scaled scores evidencing marked and borderline deficiencies respectively.  This is consistent with dysfunction that is frontal in origin.

Sorting:  Performance was good.  He made two unconfirmed target sorts providing inaccurate descriptions of the algorithms reflected in two recognition items.  These findings are highly unusual and reflect significant impairment, likely involving the frontal and left temporal regions.

Twenty Questions:  Average or slightly better, reflecting abstract reasoning commensurate with Mr. Purkey's FSIQ.

Word Context:  Average score reflecting abstract reasoning abilities commensurate with Mr. Purkey's FSIQ.

Tower Test:  Average score.  His rapid but haphazard approach to this test is underscored by the significantly deficient move accuracy ratio.  This reflects both a lack of planning and lack of response inhibition that are likely frontal in origin.

Proverb Test:  Achievement is in the lower Average range and essentially commensurate with his FSIQ.  Significant differences between scores achieved on common versus uncommon is suggestive of relative deficiencies with higher levels of abstraction.  While not indicative of severe impairment, these relative deficiencies are suggestive of frontal dysfunction.

Test of Variables of Attention:  Mr. Purkey's error rates for both errors of omission, false negative errors reflecting inattention, and errors of commission, false positive errors reflecting impulsive responding, were very significantly elevated.  This is consistent with frontal impairment.

41

WP_PC000090966

Ex_13-000750

Smell Identification Test: Mr. Purkey correctly identified 29 of the 40 stimuli, a score consistent with moderate microsmia or olfactory impairment. While these scores are not definitely indicative of trauma related damage, they are not inconsistent with the same.

Dr. Leeson concluded from test results and interview:

It is clear, however, that any conceptualization of Mr. Purkey's behavior must include frontal lobe dysfunction as a significant element. Under stress, Mr. Purkey is likely to react quite impulsively and without the ability to modify his actions. Because of brain based disorder, in situations that may be unclear and include emotional arousal his actions are not considered, tempered, or moderated. Intoxication would certainly exacerbate this problem. [39, p. 8.]

Stephen E. Peterson, M.D., completed a report regarding the defendant at the request of Mr. Purkey's attorney, Fred Duchardt, Jr., on August 13, 2003. His evaluation of Mr. Purkey focused on diagnostic assessment, Mr. Purkey's mental state at the time of the charged offense, and mitigation of penalty [40, p. 1].

Dr. Peterson reported interviewing Mr. Purkey 8.83 hours, divided into 1.6 hours on September 19, 2002, 2.16 hours on October 10, 2002, 4.0 hours on November 6, 2002, and 1.5 hours on December 30, 2002. No additional psychological testing was administered by Dr. Peterson. His evaluation chronicled his review of Mr. Purkey's medical, psychological, incarceration, and investigative records [40, p. 1].

Dr. Peterson reported that when he saw Mr. Purkey, the defendant was being treated with BuSpar and Tegretol. This combination apparently did not control anxiety as Klonopin had and resulted in Mr. Purkey trading BuSpar for Klonopin. According to Dr. Peterson, Mr. Purkey attended a court hearing without the benefit of Klonopin and "was about to blow a fuse." Dr. Peterson's December 30, 2002, interview of Mr. Purkey took place after he was placed on .5 mg of Klonopin twice per day and 50 mg of Zoloft. According to Dr. Peterson, the dosage of Klonopin was not high enough for Mr. Purkey, resulting in his saving three days of Klonopin and taking 3 mg at a time. Dr. Peterson said this helped the defendant focus and sleep. Mr. Purkey also told Dr. Peterson with the 3 mg of Klonopin he found

42

WP_PC000090967

Ex_13-000751

relief from anxiety, from noise, and from his racing thoughts [40, pp. 34 and 35].

Dr. Peterson noted that Mr. Purkey was having no side effects from the Tegretol. However, when he missed 3 or 4 doses of Tegretol he "experienced headaches, confusion, perception of color changes, and vivid racing bizarre pictures in his mind." Without Klonopin, Dr. Peterson reported Mr. Purkey finds himself quite internally aggressive. Dr. Peterson noted that Mr. Purkey had experienced no seizures but indicated the presence of pulsating frontal headaches brought on by stress when he "can't calm down." Mr. Purkey told Dr. Peterson of his long-term memory problems due to "his past and allows him to try and put it in a better perspective." According to Dr. Peterson, "he has accepted responsibility for his actions and was aware of behaviors that led to creating his personality style" [40, p. 36].

During Dr. Peterson's October 10, 2002, interview, Mr. Purkey told him of a situation in 1982 at the Arizona Ft. Grant County Jail when he suffered a "blackout while in the chow line." Mr. Purkey was not sure what happened and no further details were provided [40, p. 38].

Mr. Purkey told Dr. Peterson that he witnessed 10 to 15 murders when he was incarcerated at Lansing Correctional Facility stating, "I can't just let go of them." On the advice of Dr. Peterson, Mr. Purkey has used "the pen and paper to handle problems." Purkey told Dr. Peterson that he feels he "would not go back to violence as a problem-solving technique because that part of my life is over" [40, p. 40].

After discussing the dismemberment (Jennifer Long), Dr. Peterson reported, Mr. Purkey began to experience nightmares specifically about the dismemberment process [40, p. 40].

Mr. Purkey told Dr. Peterson that he used cocaine for the first time in October of 1997. He described the high as different then what he experienced with methamphetamines. The crack cocaine just "whacked him out" while methamphetamine would allow him to work while high. Mr. Purkey said cocaine increased his sexual desire but deprived him of an erection [40, p. 43].

Mr. Purkey described the incident involving the murder of Jennifer Long on January 22, 1998, to Dr. Peterson. He admitted smoking a "small joint before completing his application with Roto Rooter" on January 22, 1998. Prior to picking up Jennifer Long, the defendant told Dr. Peterson, he had already smoked one rock of crack cocaine.

43

WP_PC000090968

Ex_13-000752

After picking up Jennifer Long, he purchased Gin for her and "he drank Jack Daniels." According to Mr. Purkey, they drove to a gas station where he paid "$50 for three rocks." Mr. Purkey said he told the FBI that he used a knife against Jennifer Long to insure the "federal crime of kidnapping" but professed to Dr. Peterson that she wanted to go to Kansas City, Kansas, with him [40, pp. 45-46].

Mr. Purkey told Dr. Peterson he took Jennifer Long to his home where the two engaged in sexual intercourse "only once." At times Mr. Purkey advised Jennifer Long was willing, saying "Jennifer was willing and got some lotion for lubrication because she was a virgin." Later in his discussion, he said, he lifted her legs and was "too aroused to stop and had vaginal sex while she was not willing" [40, p. 46].

Dr. Peterson reported that Mr. Purkey admitted killing Jennifer Long but "believed she came to his house willingly so it wasn't kidnapping." Dr. Peterson noted "this was another situation in which not no is yes." Mr. Purkey said Jennifer Long wanted to leave and told him she would not tell anyone, but he remembered she knew where he lived. According to Mr. Purkey, he "reminded her that he could not go back to prison." Mr. Purkey described a struggle and "at one point he saw a knife in her hand." He told Dr. Peterson that he took the knife from Jennifer Long, cutting his hand in the process, and admitted stabbing her "15 times because there was blood everywhere and holes all through her" [40, p. 47].

After the homicide, Mr. Purkey told Dr. Peterson "there was blood on the walls, floor, the couch, and cabinets." He "got rid of all of it" and stated that he took care to hide any of the trace evidence. He admitted to Dr. Peterson dismembering her body the next day with his electric chain saw from his garage. Her body parts were placed in bags and placed in a toolbox. He told Dr. Peterson that he washed the walls 10 to 12 times and made sure the drain was well rinsed. After purchasing several cords of wood, he further dismembered Jennifer Long so "they could be burned." After burning some of her body he stated he would sweep out the fireplace, wet-vac the fireplace, Clorox the fireplace, and dump the ashes. He deposited the bags of ashes from the wood and Jennifer's body in the farm pond [40, pp. 47-48].

Mr. Purkey related to Dr. Peterson "how bad he felt about what he did to Jennifer." After describing what he had done, he told Dr. Peterson that he began to experience nightmares. He told Dr. Peterson that he "actually saved the heart at least for a time, and there were things he wouldn't tell this writer because of his death warrant" [40, p. 49].

44

WP_PC000090969

Ex_13-000753

Dr. Peterson formulated his diagnostic opinion utilizing a biopsychosocial model and discussed Mr. Purkey's "functioning under the areas of biological, psychological, and socialization influences on his capacity, thinking, and behavior" [40, pp. 53 and 54].

Biologically, he reported Mr. Purkey was born with a strong predisposition to substance abuse and dependence. He cited the defendant's parent's addiction to alcohol, the fallout of maladaptive alcohol-related behavior, and Mr. Purkey's half-brother Gary's alcohol and drug abuse [40, p. 54].

Dr. Peterson included as his second biological element, Mr. Purkey's head injuries, at least two of which were said to have resulted in periods of unconsciousness. He noted "while there are no evident obvious seizures, Mr. Purkey demonstrated paradoxical [sic] rage attacks, not inconsistent with a history of temporal lobe and frontal lobe dysfunction" [40, p. 54].

A third element noted by Dr. Peterson related to Mr. Purkey's "30-or-more-year history of intravenous drug abuse, using all manner of injectable drugs, and use of all manner of ingestible drugs." He noted Mr. Purkey's bilateral forearm cellulitis from injecting crushed Ritalin. He also reported Mr. Purkey's exposure to sexually transmitted diseases as a result of his sexual contacts with prostitutes and sexual encounters in prison [40, pp. 54-55].

The final biological element was a number of fights that could have caused concussions including a June 2003 incident during transport where officers "slammed his face against something so hard that he suffered facial lacerations, requiring up to 20 stitches."

One psychological contribution to his current behavior is that "he perceived his family as sexually, physically, and emotionally abusive." Dr. Peterson reported that Mr. Purkey harbors deep bitterness toward his parents and believes "a substantial portion of his behavior dyscontrol arises from the intense abuse experience he received at their hands" [40, p. 55].

A second psychological contribution, according to Dr. Peterson, relates to Mr. Purkey having a "deep sense of needing to be wanted, desired, and taken care of." According to Dr. Peterson, when his needs for affection and nurturance are not met, "he can fly into a rage, not unlike an infantile rage, then have extreme difficulty calming himself."

45

WP_PC000090970

Ex_13-000754

Dr. Peterson indicated that Mr. Purkey's ability to have better control over his rage attacks is seemingly accomplished when he is "on a therapeutic dose of Tegretol and an adequate dose of anti-anxiety such as Valium or Klonopin" [40, p. 55].

The third psychological contribution identified by Dr. Peterson encompassed Mr. Purkey's reported early experience of sexual victimization by his mother and abnormal exposure to prostitutes at the encouragement of his father. Dr. Peterson said this "predisposed him to develop an abnormal attitude toward his own sexuality." According to Dr. Peterson, Mr. Purkey "has come to value frequent sexual release as the only reliable soothing experience in his life."

The final psychological contribution to his current behavior reported by Dr. Peterson is the emotional distress associated with the death of Jennifer Long. Dr. Peterson reported this included

> marital distress due to sexual dissatisfaction, intense guilt about not making enough money, intense guilt about making money but not being good enough as a plumber, intense guilt about needing anonymous sex which he kept from his wife, excessive alcohol intake, and intense crack cocaine use. [40, p. 56]

Dr. Peterson concluded in the death of Jennifer Long:

> It may have been that Jennifer Long personified the fantasy of the skilled prostitute because he had such intense distress over his difficulties adjusting to life on parole. When it became increasingly clear that she could not comply with his sexual ritual, his fantasy for at least temporary relief from his intense distress was destroyed. [40, p. 56.]

Dr. Peterson reported that Mr. Purkey perceived himself as a "good person who has done bad things, but still deserves forgiveness." In his family environment, he never felt valued or experienced parental nurturing. Dr. Peterson reported Mr. Purkey "found himself caught up in self-defeating behaviors." Dr. Peterson opined that [40, pp. 56 and 57].

> Mr. Purkey really never had any reasonable unfettered access to just feeling good about himself. He had to somehow sexually relate to women, be high, drunk, be

46

WP_PC000090971

Ex_13-000755

successful, be nurtured or he would be stuck having to
face what he thought was his own tragic life.

Dr. Peterson reported that these biological, psychological, and social
impacts "on Mr. Purkey's behavior are presently active, were active at
the time of the Mary Bales homicide in October 1998, and were active
in January 1998 during the Jennifer Long homicide." Additionally, Dr.
Peterson opined that Mr. Purkey "expressed real remorse for his killing
of Jennifer Long and . . . great empathy for those he also hurt such as
his wife and the Long family" [40, p. 57].

Dr. Peterson reported that his diagnosis of Mr. Purkey describes his
current functioning as well as at the time of the Jennifer Long
homicide. His diagnoses were [40, p. 57]:

| | |
|---|---|
| Axis I: | Cocaine Abuse with Hypersexuality |
| | Alcohol Abuse |
| | Dysthymia –Early Onset |
| | Polysubstance Dependence, Severe |
| | Partner Relational Problem |
| Axis II: | Personality Disorder Not Otherwise Specified |
| Axis III: | Documented history of closed-head injuries; mild frontal and temporal neuropsychological brain dysfunction as assessed by Dr. Leeson; amphetamine-induced seizure in 1988; 32-year history of intravenous drug use; drug induced psychosis in May 1998; history of drug-induced anxiety attacks; and unconfirmed reports of poisoning by his ex-wife. |

Dr. Peterson reported that at the time of the Jennifer Long homicide
Mr. Purkey was

suffering mental disease from untreated severe psychiatric
difficulties and intense emotional distress, which
significantly reduced his mental capacity . . . by depriving
him of normal impulse control. [40, p. 61.]

Dr. Peterson reported a number of mitigating factors for consideration
of Mr. Purkey's actions on January 22, 1998. Some of these factors
included his intoxication while on crack cocaine and distilled liquor; 32-
year severe polysubstance dependence, severe psychosexual

47

WP_PC000090972

Ex_13-000756

maldevelopment; mild frontal lobe and temporal lobe brain damage as reported by Dr. Leeson; and despite considerable antisocial behavior at times, Mr. Purkey "labors under the severe impairment of chronic mental disease" [40, pp. 62-65].

## MEDICAL HISTORY

Mr. Purkey was admitted to the St. Joseph Hospital and Rehabilitation Center on March 8, 1968, with a provisional diagnosis of multiple lacerations, superficial and deep; acute cerebral concussion; and acute toxic state, etiology unknown. His final diagnosis remained the same. Dr. L.A. O'Donnell, Sr., recorded that the defendant was taken to St. Francis emergency room after sustaining multiple superficial lacerations from apparent glass to the left face, left anterior neck, left shoulder, and arm area. His wounds required 51 sutures. X-rays taken of Mr. Purkey's skull and cervical spine were negative. The neurologic examination was reported as negative. Dr. O'Donnell reported that in 1964, Mr. Purkey sustained a traumatic chondritis to the lower left anterior rib cage area while playing football [3, pp. 236 and 237].

L.E. VinZant, M.D., examined Mr. Purkey and reported on March 9, 1968, that "he does not remember the accident nor soon after the accident." He noted the defendant's pupils were equal and reactive to light, an absence of nystagmus, and the visual fields normal to confrontation. The neurological examination was negative. Dr. VinZant stated, "I would expect a complete recovery of this individual" [3, p. 238].

Admission records indicated Mr. Purkey received Empirin #3 for headache upon arrival. Progress notes of March 8, 1968, indicate "Pts aunt here a few minutes – says he vomited lg. amt of blood and was unconscious before admission to this hospital. Mr. Purkey was discharged from St. Joseph Hospital on March 15, 1968 [3, pp. 241, 243, 265].

Mr. Purkey was admitted to St. Joseph Hospital on April 29, 1968, after his involvement in a two car accident. He suffered multiple abrasions and contusions of his face and a large abrasion to his right elbow. Records indicate examination found his chest clear, abdomen soft, deep tendon reflexes and neurological examination within normal limits. X-rays of the lumbosacral spine determined no evidence of fracture, dislocation, or other bony abnormality. The skull x-ray failed to reveal evidence of fracture or other abnormality of the cranial wall

WP_PC000090973

Ex_13-000757

or intracranial structures.  X-rays of Mr. Purkey's right elbow, left knee, and dorsal spine evidenced no fractures and were otherwise unremarkable [3, pp. 282 and 283].

On November 17, 1968, Mr. Purkey was admitted to St. Joseph Hospital at the request of his aunt because of a disturbance described as "drinking and fighting."  Dr. Newsome noted in his records "patient is known to me and other evaluative agencies because of past behavior involving conflict with authorities."  Dr. Newsome noted his diagnosis of Mr. Purkey as "Passive Aggressive Personality."  On November 19, 1968, Dr. Newsome recorded "Behavior well controlled without medication."  The defendant was dismissed to the custody of his aunt on November 21, 1968 [3, p. 370].

On October 27, 1970, Mr. Purkey received a physical examination from Jorge Tomas, M.D., who reported he was "essentially healthy male." In his report, Dr. Tomas noted a March 1968 car accident; the source of this information was not identified but may have been record review or an interview with Mr. Purkey.  Dr. Tomas's notes indicate that Mr. Purkey sustained lacerations and a head concussion resulting in his being "unconscious for more than 4 or 5 hours" [41, p. 847] but the source of this information is not identified.  On a questionnaire, Mr. Purkey reported a history of migraine headaches, asthma, German measles, chicken pox, Whooping cough, and bone or joint disease. The form noted paralysis of the right leg when he was 4 or 5 years old [41, pp. 847-849].

The Kansas State Reception and Diagnostic Center completed a physical examination of Mr. Purkey on October 28, 1970 that was unremarkable [41, pp. 835-837].

The Kansas State Reception and Diagnostic Center completed a physical examination of Mr. Purkey on April, 14, 1971, that was unremarkable.  Dr. Tomas noted that Mr. Purkey was "essentially a healthy male" [41, pp. 835-837].

On August 31, 1972, Mr. Purkey was admitted to St. Joseph Hospital after sustaining a long laceration, curved, of the left forehead, several smaller lacerations of the right mandible area, and a small transverse laceration of the right elbow.  Mr. Purkey reported he had been working on a car with the hood up around midnight when his vehicle was hit in the rear by another vehicle.  According to Dr. O'Donnell's report, the investigating officer advised that Mr. Purkey was unconscious for several minutes following the injury.  This was noted

WP_PC000090974

Ex_13-000758

as the primary reason for his admission. At the time of admission his physical examination was recorded as unremarkable with the exception of the above-noted injuries [3, pp. 211-212].

On September 1, 1972, Dr. O'Donnell indicated "no report on skull X-rays—will review." He also noted that "this patient has had a severe emotional unstable background, both genetic and environmental and I think he is heading for trouble." Dr. O'Donnell reported a conversation with the defendant's mother who indicated behavioral problems with him at home. Dr. O'Donnell requested a "psychogenic consult" regarding Mr. Purkey. On September 3, 1972, Dr. O'Donnell reported that "this patient took French leave of the hospital yesterday afternoon and has not been seen since." According to Dr. O'Donnell's report, Mr. Purkey left partially completed psychological evaluation sheets. Dr. O'Donnell wrote, "I think he needs psychiatric treatment much and has needed it for some time" [3, pp. 214-215].

Mr. Purkey received a general physical at the Kansas State Industrial Reformatory on October 16, 1973, and it was noted "patient is apparently healthy physically with no new complaints whatsoever" [42 pp. 834-837].

Kulwant Singh, M.D., noted on the defendant's September 2, 1974, physical examination at the Kansas State Reception and Diagnostic Center, "essentially healthy male. He gives a history of asthma but there are no clinical evidence at the present time" [41, pp. 812-814].

On September 26, 1974, Dr. Singh wrote that the "subject denies severe head injuries or loss of consciousness." No abnormalities were reported on physical or neurological examinations. Routine laboratory findings were reported, including a negative Tine test [41, p. 1024].

As noted above, Mr. Purkey was admitted to the Wesley Medical Center on February 25, 1976, with a tentative diagnosis of "overdose." He was unable to give any history prior to admission. His wife thought her husband had overdosed. R.D. Murray, M.D., reported that Mr. Purkey was known to have taken some unknown amount of alcohol, 5 tablets of Tranzene, and an unknown amount of Tylenol #3. Mr. Purkey was given an IV D-5W .45 normal saline running at 200 cc per hour. His stomach was "lavaged," and he was kept on oxygen for the first 12 hours. According to Dr. Murray's report, "it took approximately 18 hours for the patient to wake up" [45, pp. 129-130].

WP_PC000090975

Ex_13-000759

On May 30, 1976, Mr. Purkey received medical attention at St. Joseph Hospital after stating the left side of his face was in pain.  Mr. Purkey reported he was involved in a fight and was struck in the face on May 26, 1976.  Mr. Purkey complained the left side of his face was numb and that he was having problems opening his mouth.  Records indicate Mr. Purkey received Penicillin and x-rays, but the results of the x-rays were not indicated [3, p. 269].

After a physical on October 21, 1976, Robert W. Hwang, M.D., concluded that Mr. Purkey was an essentially healthy male.  On Dr. Hwang's report of examination he noted Mr. Purkey is "suffering chronic headaches and running nose" [41, pp. 803-806].

Dr. Singh authored a medical summary of his examination of the defendant dated November 9, 1976.  Mr. Purkey told Dr. Singh that he was hospitalized for about three days with a concussion in January of 1976.  No additional details of this hospitalization were disclosed.  Dr. Singh considered Mr. Purkey an essentially healthy male.  While at KRDC, Dr. Singh stated, Mr. Purkey was seen on sick call with minor complaints [41, p. 519].

Romeo Villar, M.D., placed Mr. Purkey on "medical convalescence for one week" to address a chronic sore throat beginning January 24, 1978 [43, p. 784].

On June 15, 1978, Brian W. Joseph, M.D., authored a letter to the defendant verifying his prescription of Cylert 18.75 mgm, (1) daily and seemed to be responding to Mr. Purkey's complaint of no noticeable effects.  Dr. Joseph wrote, "I prefer to start on a small dose and build gradually" [46, p. 779].

Kansas State Penitentiary sick call treatment records on July 6, 1978, indicate that Mr. Purkey was taking Cylert for speech impairment [43, p. 780].

Mr. Purkey reported to Kansas State Penitentiary Hospital on December 3, 1978, after being stabbed in his left arm and abdomen.  According to R. Buford, Sr., P.M.A., the defendant had pressure bandages applied to his wounds, oxygen was provided, and he was transported to St. Johns emergency room.  No further details about the injuries were found in the medical records, and Mr. Purkey was discharged on December 8, 1978 [44, pp. 788-798].

WP_PC000090976

Ex_13-000760

R. Buford Sr., P.M.A., summarized self-inflicted multiple lacerations to Mr. Purkey's back on the right side, left arm, and to his right arm, and abdomen on January 13, 1979. Buford reported a 4" laceration on the defendant's left forearm that was approximately ½ to ¼ inches deep. In all, 13 sutures were used to close his wounds. Mr. Purkey told Buford the wounds were self-inflicted "because I got another year on my board and other things" [43, pp. 769 and 799].

Mr. Buford summarized multiple lacerations self-inflicted on January 22, 1979. Mr. Purkey sustained a 5" laceration to the right side of his back approximately 1/8" deep. Buford reported 5 lacerations to the defendant's abdomen, 4 superficial approximately 2" to 5" in length. One laceration to his abdomen 1½ to 2 inches long was approximately ¼" deep. Mr. Purkey inflicted 2 lacerations to his right arm and elbow approximately ½ to ¾" deep. He had one laceration to his left arm and elbow approximately ½ to ¾" deep. Mr. Purkey told Mr. Buford he inflicted these wounds "because I wanted to do myself in. I wish I hadn't come around then maybe it would have happened" [43, p. 768].

On March 29, 1979, Mr. Purkey received medical attention for self-inflicted laceration to his right wrist approximately 3 inches long and ¼ inches deep. He gave no comment to Mr. Buford as to why he inflicted this wound [43, p. 778].

Mr. Buford reported medical attention was given to the defendant on May 3, 1979, for self-inflicted lacerations to his left forearm and wrist. He received no explanation why Mr. Purkey inflicted these lacerations. Approximately 8 sutures were necessary to close his wounds [43, pp. 740 and 742].

Charles R. Huddleston, M.D., authored a March 23, 1981, medical summary report regarding his examination of Mr. Purkey. Mr. Purkey advised Dr. Huddleston that he was stabbed in the back on July 4, 1980, causing a puncture wound to his lung. He said he was hospitalized and "received an exploratory thoracotomy on the left." Mr. Purkey received his physical examination at KSP in February of 1981, and it was unremarkable. Dr. Huddleston reported Mr. Purkey's contacts with sick call complaining of back pain. X-rays showed first degree spondylolisthesis at the L5-S1 level and a bilateral pars defect at L5. An appointment with an orthopedic surgeon was scheduled. Dr. Huddleston considered Mr. Purkey to be an essentially healthy male who "has a history of alcohol and drug abuse" [41, 3928].

52

WP_PC000090977

Ex_13-000761

Dr. Huddleston reported the results of an unremarkable physical examination of Mr. Purkey on May 5, 1981. Dr. Huddleston reported the medical history of Mr. Purkey which included an admission to Allen County Hospital at an undisclosed date for an overdose of heroin. On a May 18, 1981, medical summary report, Dr. Huddleston stated the heroin overdose was treated at the Wesley Medical Center. Mr. Purkey was reported to be essentially healthy [41, pp. 716-720, 3996].

Kansas State Reception and Diagnostic Center progress notes indicate on September 3, 1981, Dr. Targownik prescribed Sinequan 25 mg BID & 50 mg HS for Mr. Purkey. On September 4, 1981, it was noted "says he didn't want meds changed. Sinequan 'doesn't agree' with inmate asked me to call Dr. T. to resume previous Chloral hydrate order." On September 4, 1981, Mr. Purkey was continued on chloral hydrate [41, p. 657].

On July 28, 1982, Mr. Purkey received a physical examination that was unremarkable [41, pp. 652, 653, 666]. Attached to his examination documents was an undated Department of Corrections, Reception and Treatment Center, Phoenix, Arizona document. The form was entitled Continuity of Nursing Care. Medication taken by Mr. Purkey was noted as "Zomax 100 mg every 4 hours for H.A. & low back pain." The nursing care summary stated [41, pp. 654-655]

> This patient has past history of numerous somatic complaints. Will invariably approach medical staff about headache relief only codeine; valium; etc.. Numerous tests ran in past month (since 1981 – x-rays, blood work – etc.) with no specific findings.

Kansas State Industrial Reformatory progress notes dated August 12, 1982, indicate Mr. Purkey had a normal skull X-ray on August 10, 1982. The X-ray report noted no definitive abnormalities, however, "slightly prominent occipital protuberance is noted posteriorly. This finding is of questionable (if any) clinical significance" [42, pp. 665 and 668].

Bernard Fallon, M.D., authored a letter, May 12, 1983, to Mr. Crispus Nix, Warden, State Penitentiary, Fort Madison, Iowa, regarding Mr. Purkey. Dr. Fallon reported his evaluation of Mr. Purkey for left flank discomfort. Mr. Purkey believed he had kidney stones, but urinalysis was normal, and a KUB demonstrated no evidence of any stones. Dr. Fallon noted "it was felt it might be related to his weight lifting." Mr. Purkey was prescribed Naprosyn 250 mg b.i.d. [47, p. 672].

53

WP_PC000090978

Ex_13-000762

Iowa State Penitentiary progress notes indicate Mr. Purkey complained on June 9, 1983, of headaches that "continue to recur. They start in the neck and migrate up my neck ultimately they feel like a constant band around head" [47, p. 680].

Iowa State Penitentiary progress notes Mr. Purkey spent periods of time between February 2 and February 24, 1984, seeking relief for back problem. It was noted that he complains of cold sores, headaches, and sinusitis [47, p. 698].

Throughout Mr. Purkey's stay at the Oregon State Penitentiary, he routinely sought medical attention for sprained ankles, lower back pain, headaches, colds, and attention to chronic problems with his left great toe. On May 7, 1988, Mr. Purkey complained of breathing difficulties, saying, "they sprayed my cell with bug repellant." Apparently, cells were being sprayed because of "crabs." According to progress notes, no respiratory distress was observed and no treatment was necessary [48, pp. 1059-1067].

As reported above, sometime after May 7, 1988, but before July 15, 1988 (incident date is not discernable), Mr. Purkey reported to the medical staff for a "possible overdose." He was received in an agitated state and told the staff he "injected something 3 days ago and is getting a rush." His blood pressure was recorded as 132/70 and his pulse 130-134. Dr. Shelton was notified [48, p. 1068].

A log entry in the progress notes for July 15, 1988, indicates Captain Barth, Watch Commander, requested the assistance of medical personnel to evaluate inmate Purkey who was "acting strange." His blood pressure was recorded as 120/80, and his pulse 74. Purkey advised the medical staff that he injected "crank" three days ago. He said other inmates at SI were spraying him with poison spray. Officers reported Mr. Purkey engaged in bizarre behavior, "throwing water into the shower on tier in front of cell; reportedly to keep poison out so I can breathe." Mr. Purkey was admitted for observation and given Haldol [48, p. 1069].

On December 12, 1988, Watch Commander requested assistance regarding Mr. Purkey. Reports indicate he stated "someone gave me bad shit . . . they going to die." His pupils were reported equal and not dilated, and some sweating was noted on his forehead. His blood pressure was recorded at 160/100 and his pulse 100. The log

54

WP_PC000090979

Ex_13-000763

indicates Dr. Shelton was called but no new orders were given [48, p. 1070].

On or about August 21, 1989, progress notes indicate Mr. Purkey was stabbed by an inmate on the yard.  He stated he was stabbed in the neck and a wound to the left lateral neck was observed.  Another stab wound to the right interior aspect of his right elbow was noted.  Also an incised laceration (superficial) was observed by medical staff across his chest to the base of his sternum. Approximately 5 sutures were used to close the neck wound and 3 sutures to close the elbow wound. Dr. Shelton authorized Motrin 800 mg and Vistaril 50 mg be provided to the defendant [48, p. 1079].

On August 24, 1989, Purkey reported for follow-up and said the left neck felt much better.  It was noted that he had been prescribed Keflex.  No evidence of infection was noted [48, p. 1073].

Mr. Purkey reported to the medical staff on October 22, 1990 complaining of bleach being thrown on his chest and up into his eyes. Redness was reported on his chest and both eyes remained red and irritated [43, p. 2149].

From October of 1990 to December of 1997, Mr. Purkey had numerous contacts with the medical staff for a variety of complaints, such as colds, back pain, chronic sinus problems, bronchitis, diarrhea, ankle and knee sprains, constipation, and chest pains. All of his complaints were addressed without any remarkable observations reported by the medical staff [43, pp. 1030-1048 and 2103-2150].

As reported above, David Meyers, M.D., attended to Mr. Purkey on September 13, 1998, after his admission to the University of Kansas Hospital for complaints of upper chest pressure with tingling in the left arm accompanied by anxiety and dyspnea.  It was noted that Mr. Purkey's complaint resulted from "shooting intravenously crushed Ritalin and an unknown amphetamine" [49, p. 7].  Dr. Meyers noted that Mr. Purkey's vital signs were within normal limits.  Chest X-ray was reported to be unremarkable.  Mr. Purkey was evaluated to rule out myocardial infarction and was placed on heparin, nitroglycerin patch, and 12.5 mg of metoprolol.  After blood cultures were drawn, he was also started on Ancef 1 gm IV q. 8 h.  The morning after, Mr. Purkey completed an exercise stress treadmill test that was within normal limits [49, p. 7].

WP_PC000090980

Ex_13-000764

During his interview with Dr. Meyers, Mr. Purkey claimed he'd been off drugs for 10 years but used drugs three times in the past 6 months. He told Dr. Meyers he used Ritalin, which he called "speed." Dr. Meyers noted that "he states he uses 120-130 mg/20 hours . . . the binges usually last n/day [night and day] . . . his use is all IV shared needles" [49, p. 29].

Dr. Meyers final diagnosis was rule out myocardial infarction; atypical chest pain, likely secondary to drug-induced anxiety; and cellulites of bilateral forearm. On discharge, Mr. Purkey was prescribed Keflex 500 mg one p.o. q.i.d for 10 days for his skin irritation secondary to IV drug abuse [49, p. 7].

On September 16, 1998, Glen D. Georger, M.D., met with Mr. Purkey who presented himself for drug rehabilitation. The defendant advised Dr. Georger of his admission to the University of Kansas Hospital for chest pain after "something of an overdose." Dr. Georger noted that Mr. Purkey was seen by the Menninger patient assessment team; however, "while the patient assessment advocate was working out placement issues, the patient left against medical advice without signing out or receiving discharge instructions" [50, pp. 100 and 101].

On May 12, 2000, Mr. Purkey reported to the emergency health services after fighting with another inmate. Records indicate he refused to have his vitals taken. On observation, the medical staff reported no injuries and noted that Mr. Purkey said "I'm fine" [43, pp. 992-993].

As noted previously, the medical staff was called to Segregation on August 1, 2000, to address Mr. Purkey's chest pain. He reportedly told medical personnel he was not suffering from chest pain rather "they have been spraying chemicals in his cell." He said his "heart is going to pound out of his chest." Mr. Purkey reported headache, stomach cramps, and "every time I close my eyes I feel like I'm trippin." According to medical records, Mr. Purkey was given 50 mg Vistiral and a urine sample was received for drug screen analysis. Results of the drug screen were not provided [43, pp. 977-978].

Since reporting to Segregation on August 1, 2000, and throughout the month of August, Mr. Purkey complained of stomach cramping and constipation. He was prescribed Colace 100 mg [43, pp. 971-976].

Medical records indicate that on December 23, 2000, Mr. Purkey was seen in clinic. He stated to medical staff, "they're poisoning me (gang

56

WP_PC000090981

Ex_13-000765

members @LCF) . . . I'm getting sicker each day." He denied hearing voices, being suicidal, but voiced thoughts to harm others. It was noted that "he displays a paranoid delusional process today – no history to know if any of this is true." Mr. Purkey received Haldrol 5 mg [43, p. 965].

Physician's records indicate Dr. Bowlin authorized Mr. Purkey to receive BuSpar 15 mg and Tegretol 200 mg on March 27, 2002 [43, p. 3477].

Dr. McCandless authorized on April 4, 2002, a "clarification order: Tegretol/200mg PO BID and @ HS; BuSpar 15 mg PO ITD; and Naproxen 550 mg PO BID" [43, p. 3476].

The medication regimen as clarified by Dr. McCandless was continued on June 20, 2002, and July 10, 2002, by Dr. Scott E. Bowlin [43, pp. 3472-3473].

Health clinic notes regarding a June 29, 2002, contact with Mr. Purkey indicate he said he was in segregation for "filing lawsuits and grievances." He reported his recent return from Rochester where he saw a psychologist. He also advised of his taking Tegretol and BuSpar, which has decreased his anger and mood swings. However, he stated he believed an increase in the medication would be helpful. He advised the medical staff that he wanted to see Dr. McCandless in May, but when he got there he remained in handcuffs and was being taped. He believed that was "discriminatory." Mr. Purkey requested to see Dr. McCandless again to get his Tegretol and BuSpar increased [43, p. 3483].

On September 15, 2003, Mr. Purkey stated that his medication regimen included "1.5 points of Klonopin and 100 milligrams of Tegretol" during the day. At night he is prescribed, "1.5 of Klonopin, 50 or more milligrams of Tegretol, and I take 100 milligrams of Zoloft" [Dietz exam, pp. 20-21].

## CRIMINAL HISTORY

Mr. Purkey's first recorded arrest occurred on August 12, 1969. He was charged with Burglary and Attempted Rape. His FBI fingerprint records did not list a disposition for this arrest [63, p. 562].

During 1970, Mr. Purkey was charged with Burglary and Larceny on March 2 – case dismissed; Burglary and Attempted Rape –

57

WP_PC000090982

Ex_13-000766

commitment issued on April 9; Kidnapping and Attempted Rape on June 29 – no disposition listed; and First Degree Burglary – conviction on October 12 [63, p. 562].

On December 15, 1972 Mr. Purkey pled guilty to Joyriding and was sentenced to 30 days and fined $50 [33, p. 1199].

Mr. Purkey's parole was revoked in March of 1973, and he was returned to institution and paroled in January of 1974. On July 2, 1974, the defendant was sentenced following conviction of one count of Burglary and one count of Theft. He received a controlling term of 1 to 10 years, however, his total controlling sentence was 10 to 21 years as his parole was revoked on a prior offense of Burglary [64, p. 975].

Mr. Purkey was paroled in December of 1975. On September 27, 1976, the defendant was sentenced with a controlling term of 1 to 20 years. He had pled guilty to charges of Robbery and Theft and parole violations. He received a parole release from the Kansas State Penitentiary on July 15, 1980 [64, 975].

On August 3, 1980, Mr. Purkey was arrested in Wichita, Kansas and charged with Aggravated Robbery; Unlawful Possession of a Firearm; Kidnapping; Aggravated Robbery; Aggravated Battery; Robbery; and Unlawful Possession of a Firearm. These charges resulted from three separate incidents. On July 21, 1980, Mr. Purkey entered the home of Valarie Scroggins, robbed her, and stole a shotgun, handgun, and other possessions. He also admitted to threatening Scroggins with bodily harm and pled guilty to this crime [65, pp. 3915-3916]. Mr. Purkey pled guilty to entering the home of Dennis Whiterock on August 3, 1980, taking his stereo, microwave, and monies, while using a handgun [65, pp. 3919 and 3920]. On August 3, 1980, Mr. Purkey while armed assisted his partner in the kidnapping and robbery of Gregg Carlberg. Mr. Carlberg was taken to a wooded area and shot at least two times but survived [65, pp. 3923-3924]. Mr. Purkey told the court that most of the week of August 3, 1980, he had been shooting drugs [65, p. 3922]. Mr. Purkey was sentenced in the spring of 1981 to a total controlling term of 15 years to Life [64, p. 975].

Mr. Purkey was paroled from prison in March of 1997 [66, p.1].

Kansas City Kansas Police Department records indicate Mr. Purkey was arrested on October 30, 1998, in Leavenworth, Kansas. On October 31, 1998, Mr. Purkey admitted to police interviewers killing Mary Bales

58

WP_PC000090983

Ex_13-000767

[53, p. 15].  Purkey pled guilty and was sentenced to a life prison term for the first-degree murder of Mary Bales [54, pp. 1-2].

On October 10, 2001, Mr. Purkey was indicted for the kidnapping and murder of Jennifer Long.  A grand jury indicted him with a single count of interstate kidnapping resulting in death [62, p. 1] .

## Murder of Mary Ruth Bales

Affiant Lieutenant John Cosgrove, Kansas City Kansas Police Department, completed a warrant application, October 29, 1998, alleging Mr. Purkey committed First Degree Murder in the death of Mary Ruth Bales.  On October 28, 1998, police found 80-year-old Mary Ruth Bales laying on the floor of her bedroom, bludgeoned to death. The affidavit stated that her head had been repeatedly struck with a blunt object and her skull was broken in several places with profuse bleeding from her head.  Neighbors and a mail carrier reported seeing a "Reddi Rooter" van at the victim's home on October 28, 1998.  Mary Bales' niece reported a discussion with her aunt about repairs needed to fix her kitchen sink [51, p. 1].

Police investigation determined a cab was dispatched to Bales' residence on the evening of October 28, 1998, and a women carrying men's clothing was observed entering the residence.  The defendant's wife later admitted entering Mary Bales residence at the request of her husband, Wesley Purkey.  Mr. Purkey admitted murdering Mary Bales to his wife.  On the day of the homicide, Mr. Purkey told his wife, he was with a prostitute, had sex with her, and had smoked crack with the prostitute.  The prostitute was at Mary Bales residence and starting "freaking out" because she saw blood and Wesley with a weapon.  Investigation located the prostitute, and she confirmed Mrs. Purkey's information.  With the cooperation of Mrs. Purkey, police were able to locate a dumpster containing the defendant's bloody cloths, shoes, Mrs. Bales' mail, and the hammer used to bludgeon Mary Bales. Police also located the "Reddi Rooter" van abandoned by Mr. Purkey, who had "ransacked it to make it look stolen."  Inside the van was a work order for Mary Bales initial plumbing work order [51, p. 2].

Kansas City Kansas Police Department records indicate Mr. Purkey was arrested on October 30, 1998, in Leavenworth, Kansas.  On October 31, 1998, Mr. Purkey admitted to police interviewers killing Mary Bales.  Prior to arriving at the home of Mary Bales, Mr. Purkey stated he picked up a prostitute, purchased 3 "rocks" of crack, and went to the Relax Inn with the prostitute.  According to Mr. Purkey, upon

WP_PC000090984

Ex_13-000768

leaving the motel, they had smoked all the crack cocaine. The defendant told interviewers after leaving the Relax Inn, he went to the residence of Mary Bales. He had arranged from the previous day to repair her kitchen faucet on October 28, 1998. With the prostitute still in the "Reddi Root'r" van, Mr. Purkey met briefly with Mary Bales inside her residence to obtain $50 to purchase a new kitchen faucet. The defendant left with Bales' money and purchased 5 more "rocks" [53, pp. 5-13].

Mr. Purkey claimed to investigators that an hour passed between his first and second contacts with Mary Bales on October 28, 1998. He stated that on his second contact, he asked to use the bathroom, and "I broke out a big time rock, smoked a big time rock right there, I was so damn high." Within a short period after being in the bathroom, Mr. Purkey admitted murdering Mary Bales. He did not give specific details about the murder during his October 31, 1998, interview [53, pp. 14-15].

Mr. Purkey admitted soliciting the assistance of his wife as indicated previously. He also admitted disposing of his bloody clothing and the murder weapon (hammer). He stated his wife and ex-wife both advised him to turn himself in, but this was not done [53, pp. 24-26].

Purkey was sentenced to a life prison term for the first-degree murder of Mary Bales. At the sentencing hearing, Mr. Purkey was reported to have said that "he was high on crack cocaine when he killed her and had been trying unsuccessfully for months to get into a treatment program" [54, pp. 1-2].

**Murder of Jennifer Long**

On December 16, 1998, Detective William Howard, Jr., Kansas City Kansas Police Department received a note from Mr. Purkey saying [55, pp. 1258-1259].

F.B.I

In Re: Kidnapping & Homicide
Date: Around January –Feb
   - Date can be verified when needed
Victim – Female – 17-19 she said –
     Name Provided later
Kidnapped in Mo. East of the Pasco
     Off on Truman Ave –

WP_PC000090985

Ex_13-000769

Brought back to Kansas – Murder
Body Never Found –
Probably listed as Missing –

At the time this note was sent to Detective Howard, Mr. Purkey was in Wyandotte County Jail on charges resulting from the October 28, 1998, murder of Mary Bales. Detective Howard and Dirk D. Tarpley, Special Agent, Federal Bureau of Investigation, met with Mr. Purkey on December 16, 1998, to discuss his note. Mr. Purkey told the investigators that he was going to plead guilty to the murder of Mary Bales and "feared spending the rest of his life in the Kansas Department of Corrections." It was reported that "he was willing to confess to the kidnapping, rape, and murder of a Missouri woman, if the state would allow him to spend his jail sentence in the Federal Penitentiary" [56, p. 1156].

Mr. Purkey stated that in January or February he filled out an employment application at the Roto Rooter located on West 18th Street, Kansas City, Missouri. He left Roto Rooter at approximately 8:45 a.m., in a Ford Ranger pick-up truck, and was heading east on Turman. He stopped at a grocery store to pick up some orange juice and gin to drink before heading home to Lansing, Kansas. He made contact with a 17 to 19-year-old female named Jennifer whom Mr. Purkey contended was a prostitute. He said she got into his truck without any threats, and after purchasing some gin, they drove around Kansas City, Missouri. Jennifer told Mr. Purkey that she had been in school that morning and had an argument with some black females at school [56, pp. 1157-1158].

Mr. Purkey told investigators he indicated to Jennifer that he needed to "run home for a few minutes to get something." According to Purkey, she did not want to go to Kansas, at which time Mr. Purkey pulled a "boning knife" from his truck's glove compartment and placed it under his right thigh. The defendant stated he pulled off one of the side roads along K-9 north and raped Jennifer in the front seat of his truck. After the rape, Mr. Purkey told investigators, he stabbed and killed her. After driving along back roads he saw a large wooden box situated just off the road. He cut the front seat cover and wrapped the victim's body up in the cover. He placed her inside the box and placed debris on top of her body for concealment [56, p. 1158].

Leaving the body behind, Mr. Purkey drove to Leavenworth, Kansas, and went to Snoopy's Bar, where he stayed from approximately 11:00 a.m. to 1:00 p.m., before driving to his residence. His wife arrived

61

WP_PC000090986

Ex_13-000770

home from work at 5:00 p.m. He told investigators after waiting a couple of days, he returned to the body disposal area. He then "proceeded to an unknown location to dispose of her body. At this point, Mr. Purkey refused to continue until he received assurances that the case would be prosecuted in Federal Court [56, p. 1159].

Assistant United States Attorney Kurt J. Shernuk told investigators his office would be willing to prosecute the case. Mr. Shernuk was interested in Mr. Purkey's cooperation in locating the victim's remains and the murder weapon. Mr. Purkey was placed in a transportation vehicle to be driven to the disposal location when he stated "no physical remains would be found." He indicated he took extraordinary care to dispose of Jennifer's remains. He told investigators, "what I'm about to tell you is probably the most hideous thing that you guys have ever heard" [56, pp. 1159-1160].

Two or three days after the murder, Mr. Purkey said, he purchased a Sears chain saw. He dismembered Jennifer with the saw and placed her body parts in large black trash bags. He told investigators he washed down his basement and the chain saw with bleach and water. Over the course of two or three weeks, he purchased cords of wood and burned the victim's remains, bag by bag, at his residence [56, p. 1160].

After burning the victim, he swept the fireplace, placing the ashes and bones in plastic bags. According to Mr. Purkey, these bags were then dumped in a pond located on leased property near Clearwater, Kansas [56, p. 1160].

Mr. Purkey was again interviewed by FBI Agent Tarpley and Detective Howard on December 17, 1998. At this time he provided a signed sworn statement to the investigators recounting the information provided the day before with certain exceptions. In the second interview he did not mention raping, killing, and disposing of Jennifer on a side road off K-9. According to Mr. Purkey, they came straight to his residence, where he raped and killed the victim in a back room in his basement. He said he wrapped her body in a seat cover and placed her in a plastic tool box. Two or three days later he picked up a large plywood box, which he placed along the north-front side of his back yard. After dismembering the body, he placed the bags in this box. He reiterated burning the body parts but said he threw away a plastic bag containing a bra, panties, and socks at the curb on Michaels Road [57, pp. 1162-1164].

WP_PC000090987

Ex_13-000771

Purkey told investigators that he "realized he needed to get rid of the victim." It is reported that he did not want to return to prison and knew that if he let the victim go free, he would be arrested. He said that while the victim was in the cab of his truck, he stabbed her in the chest, just below the breast bone, and "held it there for several minutes" [56, p. 1166].

Mr. Purkey said he used diesel fuel to start the fire in his fireplace and to keep it hot enough to burn the bags. According to the report of interview, the bones did not completely burn, and Mr. Purkey said they became brittle and were crushed. In addition to the victim's clothing, Mr. Purkey also disposed of the victim's jawbone and several teeth on Michaels Road in Leavenworth, Kansas [56, pp. 1167-1168].

Mr. Purkey agreed to be interviewed by FBI Agent Tarpley and Detective Howard on December 21, 1998. He discussed the details of the kidnapping, rape, and murder of Jennifer. Mr. Purkey said that prior to completing an application with Roto Rooter on January 22, 1998, he smoked a joint in the parking lot. Upon exiting Roto Rooter at approximately 8:45 a.m., he stopped in the parking lot near their offices and smoked a one half rock of crack cocaine. Once Jennifer was in his truck and they were driving around, Mr. Purkey told investigators, he smoked more crack cocaine. He said Jennifer would have nothing to do with it. After showing the knife, Mr. Purkey said, Jennifer wanted to know what the knife was for. Later, she reportedly said, "So you're going to make me go down there" [57, pp. 1169-1172].

During this interview, Mr. Purkey told investigators he took the floor mats out of his truck and washed them with bleach and water. He also washed the entire inside of his truck with bleach and water. After backing the truck out of his garage, he washed the floor of the garage with bleach [57, p. 1172].

On January 5, 1999, FBI Agent Tarpley and Detective Howard presented a photo lineup consisting of 6 females to Mr. Purkey. According to investigators, Mr. Purkey identified Jennifer Long from the photo line-up as the female he kidnapped, raped, and murdered on or about January 22, 1998.

Investigation confirmed that Mr. Purkey purchased a Sears chainsaw on January 22, 1998, at 14:46 hours [59, 1187].

WP_PC000090988

Ex_13-000772

Investigation confirmed that Mr. Purkey completed an application for employment at Roto Rooter on January 22, 1998 [60, p. 1252]. Roto Rooter hired Mr. Purkey on February 11, 1998, as a plumber. He was fired on March 22, 1998, after they found his Roto Rooter service truck abandoned near a building, with Mr. Purkey's uniforms, pager, and keys found inside [60, p. 1252].

Jeanette Purkey, wife of the defendant, disclosed to investigators that late in January or early February of 1998, her husband was acting extremely nervous and out of character. She described one incident when she attempted to place a telephone call from her home and the phone went dead. She went to the basement and found Mr. Purkey washing down the walls of the basement. According to Mrs. Purkey her husband "even washed down the rafters and that had caused the telephone and lights to short out" [61, p. 1155].

On October 10, 2001, Mr. Purkey was indicted for the kidnapping and murder of Jennifer Long. A grand jury indicted him with a single count of interstate kidnapping resulting in death [62, p. 1].

Dr. Stephen E. Peterson interviewed Mr. Purkey, who disclosed details of the murder of Jennifer Long. Some of his disclosures were different from those presented to investigators. Dr. Peterson reported that Mr. Purkey admitted killing Jennifer Long but "believed she came to his house willingly so it wasn't kidnapping." Mr. Purkey said Jennifer Long wanted to leave and told him she would not tell anyone, but he remembered she knew where he lived. According to Mr. Purkey, he "reminded her that he could not go back to prison." Mr. Purkey described a struggle and "at one point he saw a knife in her hand." He told Dr. Peterson that he took the knife from Jennifer Long, cutting his hand in the process, and admitted stabbing her "15 times because there was blood everywhere and holes all through her" [40, p. 47].

I examined Mr. Purkey on September 15 and 16, 2003. As with Dr. Peterson, Mr. Purkey gave me a different accounting of the murder of Jennifer Long than he had given to investigators. Mr. Purkey said Ms. Long willingly accepted his invitation when he asked, "Would you like to go out and party?" According to Mr. Purkey, Ms. Long requested gin, "so we went to the liquor store and I got a half pint of gin" [Dietz exam, pp. 195-196]. Asked if Jennifer Long was happy to go to from Missouri to Kansas with him, Mr. Purkey said:

> She was happy? Did she protest? No, she didn't protest.
> No it's a . . . I asked her when I first picked her up if she

64

WP_PC000090989

Ex_13-000773

wanted to go out and party, and she said yeah, and uh,
after we got to talking and drinking I didn't know anyplace
down there in Missouri to pick up any drugs and uh . . .
Kansas to Missouri is like a hop and a skip. Uh . . . during
our conversation she said she didn't have anything else to
do that day. [Dietz exam, pp. 210-211.]

Contrary to what he told the FBI, Mr. Purkey told me he did not have a
knife in his truck [Dietz exam, p. 197]. Because of a witness
statement indicating that Mr. Purkey always kept a knife in his truck, I
followed up on this question later in the interview with the following
exchange:

PD:   Did you usually keep a knife in the truck?
WP:   No, never.
PD:   You never kept a knife in the truck?
WP:   Never kept a knife in the truck.
PD:   Are there any exceptions, any times you might've
      had a knife in the truck?
WP:   Is there any exceptions I may have? Yeah. When I
      picked up a hitchhiker one time and I uh...gave him a
      ride, he asked me if I would give him ten dollars for
      a good sized buck knife he had. Uh, I was working
      at CNJ then. I gave him a ride I don't know where,
      some cut off. I felt sorry for the dude. I gave him
      ten bucks for the buck knife. I didn't keep that buck
      knife there in my glove box.
PD:   What'd you do with it?
      WP: I don't know exactly. Uh, I don't know exactly.
      I don't even know what ended up happening to the
      buck knife. [Dietz exam, pp. 207-208.]

Mr. Purkey claimed that he gave a kidnapping story to the FBI because
Mr. Tarpley advised him that "there's certain things that would make
this a federal crime and wouldn't, and they indicated well did you
kidnap her, force her across the state line" [Dietz exam, p. 197].

After riding around and talking, Mr. Purkey informed Ms. Long, "Do
you care if I go down to KCK real quick . . . I'm gonna go down there
and pick up some smoke." He said he located a prostitute who rode
with him and Jennifer Long to purchase "three rocks." After
purchasing the crack cocaine and dropping off the prostitute, Mr.
Purkey said he took a "hit off the pipe and asked her if she'd like to

65

WP_PC000090990

Ex_13-000774

have one." According to the defendant, Ms. Long "ended up taking a hit" of the crack cocaine [Dietz, exam, pp. 196-197].

Prior to driving to his home, Mr. Purkey recounted stopping at a gas station, possibly a Phillips 66, to purchase more orange juice. He said Ms. Long "come in there with me and she used the bathroom there and uh . . . I told her we didn't have very far to go to the house [Dietz exam, p. 213].

Upon arrival at his home, Mr. Purkey said they went upstairs to the living room area, where he turned on a radio to a rock station and his television to a prepaid Playboy channel. Mr. Purkey said, "We were drinking and sitting on the floor, finished smoking that rock, I got to rubbing on her and we made out some." He acknowledged that Ms. Long had one "toke" in the truck and one at his house. According to Mr. Purkey, the crack cocaine "seemed to stimulate her" [Dietz exam, p. 214]. Mr. Purkey said that Ms. Long told him she was a virgin and asked him to stop as he was pulling off her panties. He also said, "I was putting my fingers in her." Over her objections, Mr. Purkey stated, "I spread her legs apart and we had sex. She starts crying" [Dietz exam, pp. 197, 215]. Mr. Purkey stated that he did not use a condom and ejaculated while having sex with Jennifer Long [Dietz exam, p. 217].

After having had sex with Ms. Long, Mr. Purkey stated, "we're sitting there still naked, drunk or half way drunk. And uh, she asked me, "How was I?" He said they got dressed and went downstairs to a basement room off of his two-car garage. He described the room as an area for storage and where he maintained his weights for working out [Dietz exam, pp. 197-198].

Mr. Purkey recounted his conversation with Ms. Long in the basement room:

> And I said, "I'm sorry Jennifer for what I did." You know?
> She said, "I just want to go home. Just let me go home. I
> need to go home." I said, "Are you going home to tell
> your mom what happened . . . I hope you don't do that."
> [Dietz exam, pp. 198-199.]

Mr. Purkey said he was holding onto Jennifer Long's arm when she broke his grip, and as he reached for the back of her leg, she fell over his weight bench. As she turned around, Mr. Purkey said, "she's holding a knife." According to the defendant, he used this knife (a 6-

66

WP_PC000090991

Ex_13-000775

inch blade, straight-edged boning knife with a wood handle) the night before to cut electrical tape to wrap around his weight-lifting bar [Dietz exam, pp. 199-200, 208]. Mr. Purkey described the interaction with Jennifer Long that resulted in her death:

> I grab the knife with this hand. She pulls back with it and cut my hand. And she's screaming. I yanked the knife out of her hand and she's pushing me over, and the same time she's pushing me over to get me off of her, I'm stabbing her. She pushed me down and gets back up, I'm pulling on her leg or an arm or grabbing her skirt or something, and I'm still stabbing her. I don't know how many times I stabbed her. A whole bunch. . . . I sat there holding the knife, broke. [Dietz exam, pp. 199-200.]

After stabbing Jennifer Long to death, Mr. Purkey said:

> I'm sitting on the floor, blood's everywhere, blood's in her hair, blood's just covering. She's laying across my legs. I'm not touching her as far as a sexual manner. Caressing her hair. Wishing I could undo what had been done. [Dietz exam, p. 224.]

Mr. Purkey admitted to using underhand thrusts to kill Ms. Long (known as the knife fighter's grip), but denied having received prison instruction on that use of edged weapons [Dietz exam, pp. 221-222].

Mr. Purkey said he placed the body of Jennifer Long in a black tool box located in the basement room. He turned his attention to cleaning the room. He said,

> I got to—got the hose out, and I started washing the place down. Most of it. There was blood under the wood, under the wooden shelves. We had plastic bags, we had stuff in the plastic bags . . . wiped them down the best I could. The walls, the floor. Only had one drain, and it's out there in the garage. So I had to wash it all out there in that drain. Used bleach on walls, thought I took I don't know how long, couple hours minimum. [Dietz exam, pp. 200-201.]

After cleaning the room, Mr. Purkey said he "went down to Snoopy's and got drunk." After leaving Snoopy's bar, Mr. Purkey stated, he returned home. Upon his return, his wife and boys were at the

67

WP_PC000090992

Ex_13-000776

residence. According to the defendant, "nothing happened that night" [Dietz exam, p. 201].

Within a day of two of killing Jennifer Long, Mr. Purkey purchased a chainsaw from Sears. He said he could not recall exactly when

> I started to dismember the body because it was days afterwards, probably three or four days that I didn't know what to do with it. First time I ever killed someone so—so I wasn't real proficient in what to do. So I eventually got the chainsaw and dismembered the body and finally, uh, ultimately burned it in the fireplace. [Dietz exam, p. 202.]

Mr. Purkey recounted discarding Jennifer Long's socks, panties, bra, and shirt in a clear plastic bag. He said he threw the bag out of his truck window behind a building located somewhere off Michaels Road. He described the area as having high grass and trees. A few days later, he said "I took the seat cover off [the truck] because of the hair samples and all that" [Dietz exam, pp. 203, 220].

When describing his initial approach of Jennifer Long, he said he thought she was a prostitute. He concluded this by observing her "walking down the street that time of day. She kept turning her head toward the street as most prostitutes do to check traffic." He said she was wearing jeans, flannel shirt, little jacket and a pair of tennis shoes. Mr. Purkey stated he was wearing blue jeans, long sleeve shirt, and a jean jacket [Dietz exam, pp. 205-206]. Although he had never mentioned it in his prior statements, he acknowledged that she was carrying a book bag when he saw her and picked her up. He denied recollection of what he had done with the bag [Dietz exam, pp. 202-203].

According to Mr. Purkey, "I thought we were going to have sex when I first picked her up." He told the FBI that he knew when she got into the truck, she wasn't going to be getting out. However, he said this wasn't true. When asked when he first realized he was going to kill her, he responded, "I didn't." He stated ". . . what I told the FBI was, uh, what they needed to hear is what I told them." He admitted not being truthful when telling the FBI that he stabbed Jennifer Long in his truck [Dietz exam, pp. 219-220].

Mr. Purkey stated that he removed the heart of Jennifer Long but denied holding on to it for any period of time (in contrast to Dr.

WP_PC000090993

Ex_13-000777

Peterson's report).  He said "I burned it."  He also denied maintaining any of her body parts [Dietz exam, pp. 229-230].

Mr. Purkey discussed burning the body of Jennifer Long over a three or four day period.  He said

> . . . burning the body didn't all take place at the same time.  But within a totality of the cremation it took a good three or four day period.  If they were consecutively or not, it still took a three or four day period.  [Dietz exam, p. 233]

After burning Jennifer's remains, Mr. Purkey said, he used a wet-dry vac and a fireplace shovel to fill "three good-sized bags with ash."  Mr. Purkey stated he disposed of the bags of ash in Clearwater, Kansas, at a "lagoon" "where the trailer we were buying from my friend" is located [Dietz exam, p. 234].

Mr. Purkey said he confessed to the Jennifer Long murder

> . . . for two reasons.  I told you the first yesterday which was for a selfish reason [to serve a life sentence in a Federal prison].  And the second was to let the parents know that their little girl is never coming home.  [Dietz exam, p. 235]

The defendant also said he confessed "to be done with it.  It needs to be dealt with" [Dietz exam, p. 235].

## INCARCERATIONS

Mr. Purkey has spent most of his adult life in prison.  He has been incarcerated at the Kansas State Industrial Reformatory, Hutchinson; Kansas State Reception and Diagnostic Center, Topeka; Arizona Department of Corrections; Iowa Department of Corrections; Oregon State Penitentiary; and the Kansas State Penitentiary, Leavenworth, Kansas [64, pp. 975-976, 1021].

During his incarcerations, Mr. Purkey's behavior has resulted in numerous disciplinary infractions with reported multiple violations of rules prohibiting [64, p. 976]

WP_PC000090994

Ex_13-000778

> Possession or use of intoxicants, assault of another inmate, disrespect, blackmail, assault and battery, and disruptive behavior.

Other prison records indicate Mr. Purkey was disciplined for possession of illegal drugs, attempted murder 2nd, and numerous other displays of a lack of respect for authority [64, pp. 1021-1022].

On June 8, 1982, an incident report stated Mr. Purkey assaulted another inmate by hitting him with a clinched fist to the right side of his mouth, right bridge of his nose and to the back of the inmate's head. The inmate requested that no formal charge or prosecution of the defendant be pursued [73, pp. 1584-1587].

Mr. Purkey was the subject of a Kansas State Industrial Reformatory report of November 11, 1982. It was reported that he struck another inmate with a piece of iron pipe hitting inmate Sylvester Jackson on the left side of his head. He also struck out against Officer Avery with the pipe. According to the report, Mr. Purkey stated, "I'm gonna kill that black son-of-a-bitch." Records indicate Mr. Purkey was found guilty of Aggravated Battery and and Attempted 2nd Degree Murder [64, pp. 534-535].

On March 30, 1983, inmate Purkey's cell was searched and a hand-drawn map of part of the kitchen areas was recovered. He received disciplinary detention, loss of good time, and Administrative Segregation [64, p. 1458, 1967].

Mr. Purkey tested positive for the presence of alcohol on June 28, 1983. Purkey admitted to correctional officers having a glass of beer. He received disciplinary detention and loss of good time [64, pp. 528-530].

At a hearing on June 25, 1985, Mr. Purkey and two other inmates were found guilty of assault, battery, and blackmail against inmate Szcygiel. On July 12, 1985, Director Herb Maschner, Kansas Department of Corrections upheld the conviction of assault and battery against Mr. Purkey and the other two inmates. However, he revoked Mr. Purkey's conviction of blackmail [64, pp. 1921-1924, 1898].

An Administrative Segregation report filed April 16, 1986, noted that Mr. Purkey "assaulted and committed battery on Inmate Pennell." Statements were taken from Inmate Pennell and witness Inmate Archer. The report stated that other reports of assaults by Mr. Purkey

WP_PC000090995

Ex_13-000779

had been received but "none of the other inmates will make statements" [64, p. 1765].

A disciplinary hearing regarding Mr. Purkey was held November 6, 1987, reconvened, and concluded on November 30, 1987. At the hearing, Mr. Purkey admitted in his statement to [71, p. 978]

> Violations of Rule 4(i) – Assault (inmate), Rule 8 – Sexual Activity, and 7(G) – Possession, Manufacture or Use of Dangerous Contraband (intoxicants).

At these hearings, Mr. Purkey admitted hitting Inmate Hatfield "two or three times in the face" with his fist. His said he struck Inmate Hatfield to stop him from telling "the officers that he (Inmate Purkey) had raped him." Mr. Purkey stated he engaged in anal intercourse with Inmate Hatfield but said "it was a mutual thing." He denied using a knife against Inmate Hatfield, but admitted to drinking "three quarts of pruno" during the evening of the incident, October 31, 1987. The disciplinary committee recommended dismissal of Rule 8, and 7(G) but upheld Mr. Purkey's violation of Rule 4(i). It was further recommended that in addition to having Mr. Purkey serve 9 months in segregation, Mr. Purkey "be permanently restricted from occupying a double cell assignment for the remainder of his prison term" [71, pp. 978-930].

Sometime after November 1, 1987, Mr. Purkey was arraigned in Tillamook County on a charge of Sodomy in the First Degree under case #88-1084. The Tillamook County District Attorney's Office placed a detainer on Mr. Purkey. Records indicate that as of February 2, 1990, the detainer was still in place. Mr. Purkey had previously indicated to Superintendent Manfred Maass, Oregon State Penitentiary, that the Tillamook County District Attorney "will dismiss all charges regarding the incident at the Forest Camp" [71, pp. 1426 and 1424].

Mr. Purkey received a disciplinary hearing December 16, 1988, regarding his fighting with another inmate. During the hearing, Mr. Purkey admitted hitting Inmate Ross "in the face, three to five times with his fist." According to Mr. Purkey, his actions were in response to having been sprayed with a substance from a small bottle that made it difficult for him to breathe. Mr. Purkey confessed at the hearing to using crank the day before "by snorting." However, he stated "he was not hallucinating in the cell block." Mr. Purkey was found guilty of violating Rule 14 – Attempt (to violate Rule 4i – assault – inmate) and

71

WP_PC000090996

Ex_13-000780

received a recommendation of one month in segregation [71, pp. 987-988].

On December 24, 1988, Mr. Purkey received results from a drug urinalysis examination. He tested positive for the presence of amphetamines [71, p. 998].

A disciplinary hearing was held on June 27, 1990, during which Mr. Purkey admitted to violating Rule 7(c) – Possession, Manufacture or Use of Dangerous Contraband (narcotics/narcotics paraphernalia), and Rule 14 – Attempt to violate Rule 7(c). He denied violation of Rule 10 – Disobedience of an Order. Mr. Purkey admitted using amphetamines on or about June 23, 1990, by "injecting it into both of his arms, while inside E block." Further, he admitted "injecting himself three times during a 15 hour period." He said he received a "hot shot" consisting of four injections of amphetamines. Mr. Purkey admitted to Officer Kent "shooting crank" and "seeing colors." Mr. Purkey failed to comply with an order to submit a urine specimen for analysis. The defendant was found guilty of violating Rule 7(c) and Rule 10. He received 3 months segregation, loss of exercise privileges, and was fined $200 [71, pp. 1007-1008].

Lansing Correctional Facility records indicate that Mr. Purkey tested positive for the use of stimulants on October 16, 1995. The drug screen revealed a positive test for "THC and Cocaine." A confirmation test also revealed the same results [64, p. 1655].

An incident report dated May 12, 2000, noted that "Inmate Purkey assaulted Inmate Coleman by hitting him in the mouth hard enough to knock him to the floor." The incident was witnessed by supervisor Burdick and occurred while both were in line to receive medication. Mr. Purkey was sent to Administrative Segregation [64, pp. A1-7].

## DIAGNOSIS

Mental Disease or Defect

Although Mr. Purkey has received a variety of diagnoses over the years, the only diagnosis suggestive of a true mental disease or defect was the purported May 1971 diagnosis of schizoaffective psychosis. Notes subsequent to that diagnosis [6, p. 824; 7, p. 825] state that Mr. Purkey was evaluated at "KRDC in May/71" and was diagnosed as a "Schizo-affective psychosis superimposed on an anti-social personality," but the document originally offering this diagnosis has

72

WP_PC000090997

Ex_13-000781

not been provided and no data supporting this diagnosis appear anywhere in the record.

In a 1976 evaluation interview, Mr. Purkey admitted having auditory and visual hallucinations in the past related to his use of amphetamines, but he denied their presence at other times [11, p. 521]. On a number of occasions he complained of being sprayed with poison in association with self-injection of stimulants (July 1988, May 1998, December 1998) or anxiety attacks (August 2000), and his wife confirmed that when he was regularly abusing drugs he accused her and her sons of poisoning him with insecticides. On a few occasions when he made similar complaints, it was unclear whether he had recently injected stimulants [29, pp. 2442-2443; 43, p. 965], but he made it abundantly clear that he had ready access to drugs of abuse during incarceration in a variety of facilities.

Mr. Purkey's claims of being poisoned are further complicated by the contradictory statements of his wife, Jeanette Purkey, who testified that she knew nothing of her husband being poisoned [77] but gave a statement and affidavit to a defense investigator in which she confessed to repeatedly putting mouse poison in the water he used to dissolve Ritalin for injections [78, 79]. The possibility that he was actually administered poison (supposedly to convince him to stop injecting drugs) renders his claim during my examination [Dietz exam, pp. 146-165, 168-174; 249] that he was poisoned less unreasonable.

Based on the absence of any documentation of delusions, hallucinations, or formal thought disorder other than in association with his voluntary intoxication, I conclude that Mr. Purkey suffers from no mental disease or defect. His ready access to drugs in penal settings precludes any effort to determine that he has ever had psychotic symptoms after prolonged abstinence from drugs.

Polysubstance Abuse

Mr. Purkey has consistently described himself as a long-time abuser of a variety of illegal drugs, accompanied by other drug-seeking behaviors. Precise delineation of his level of dependence is difficult because of his imprecision about timing and access. He has abused alcohol, narcotics, and stimulants to a degree and with effects that justify dependency diagnoses for these three classes of substances, but it is unclear whether he had the overlapping periods of dependency necessary for a diagnosis of polysubstance dependency.

73

WP_PC000090998

Ex_13-000782

His accounts of drug use have not been entirely consistent, but include statements that he began to use alcohol at age 8 and was drinking daily by age 14; that he began sniffing glue, taking Quaaludes, and smoking marijuana at age 14; that at age 14 he began using "crystal, Desoxin, preludes [?], Quaaludes, Nembutals, congratols [?], Seconals, heroin, and opium" [Dietz exam, p. 32]; that he began IV drug usage at age 14 or 15; that he was a heroin addict by age 19; that he was addicted to methadone while incarcerated in Arizona; that he regularly used methampetamines while incarcerated in Oregon; that while out of prison and prior to his arrest in October 1998 he was injecting methamphetamine and Ritalin intravenously every day and smoking crack cocaine [38, p. 3]. He was treated for side effects of massive doses of IV Ritalin on 9/13/98. In March 1999, he gave a history of extensive abuse of Ritalin, methamphetamine, crack, and cocaine, though he later told Dr. Peterson that he used cocaine for the first time in October of 1997 [40, p. 43].

The defendant's extensive, continued use of alcohol and drugs makes it impossible to determine whether he may also suffer from a dysthymic disorder (chronic depression). An interval of verified abstinence would be necessary to adequately evaluate the presence of any mood disorder, and even then the effects of chronic drug use and incarceration would confound diagnostic efforts.

Antisocial Personality Disorder

Mr. Purdey had the onset of a conduct disorder before age 14 as evidenced by his stealing cars [Dietz exam, p. 34] and starting fights [Dietz exam, p. 35], truancy from school [Dietz exam, p. 37], and group sex with intoxicated girls [Dietz exam, p. 54].

With respect to the adult criteria for antisocial personality disorder, the defendant's history is replete with evidence of at least seven of the features:

(1)  Criterion A1:  Failure to conform to social norms with respect to lawful behavior:

- Mr. Purkey reported to Dr. Christina Pietz his initial consumption of alcohol began at age 8. By age 14, he said, he consumed alcohol daily. At the age of 17, Mr. Purkey considered himself an alcoholic. He admitted illicit drug usage to Dr. Pietz beginning at age 14. He said he sniffed glue on a regular basis and also used Quaaludes and marijuana [37, p. 5].

74

WP_PC000090999

Ex_13-000783

- Mr. Purkey said his initiation into the drug world came through his brother, Gary at age 14.  He claimed the introduction included "crystal, Desoxin, preludes [?], Quaaludes, Nembutals, congratols [?], Seconals, heroin, and opium" [Dietz exam, p. 32].

- Mr. Purkey discussed his criminal activity at age fourteen or fifteen stating [Dietz exam, p. 56]

  > Uh, broke into a canteen lodge and stole cases of cigarettes, cases of candy bars and sold them to bars.  Broke into the back of restaurants and stole steaks and sold most of them to bars too, the T-bones, the ribeyes.  It was fairly easy, no alarms.  Sometimes doing some drug store burglaries also with some friends of his, I was mainly just a look out guy.  But they were getting class As and of course back then they kept a lot of class As within shelves of drug stores in comparison to today.

- In 1970, Mr. Purkey was charged with Burglary and Larceny on March 2 – case dismissed; Burglary and Attempted Rape – commitment issued on April 9; Kidnapping and Attempted Rape on June 29 – no disposition listed; and First Degree Burglary – conviction on October 12 [63, p. 562].

- On December 15, 1972, Mr. Purkey pled guilty to Joyriding and was sentenced to 30 days and fined $50 [33, p. 1199].

- Mr. Purkey's parole was revoked in March of 1973, and he was returned to institution and paroled in January of 1974.  On July 2, 1974, he was sentenced following conviction of one count of Burglary and one count of Theft.  He received a controlling term of 1 to 10 years, however, his total controlling sentence was 10 to 21 years as his parole was revoked on a prior offense of Burglary [64, p. 975].

- On September 27, 1976, the defendant was sentenced with a controlling term of 1 to 20 years.  He had pled guilty to charges of Robbery and Theft and parole violations.  He received a parole release from the Kansas State Penitentiary on July 15, 1980 [64, 975].

75

WP_PC000091000

Ex_13-000784

- On August 3, 1980, Mr. Purkey was arrested in Wichita, Kansas and charged with Aggravated Robbery; Unlawful Possession of a Firearm; Kidnapping; Aggravated Robbery; Aggravated Battery; Robbery; and Unlawful Possession of a Firearm. These charges resulted from three separate incidents. On July 21, 1980, Mr. Purkey entered the home of Valarie Scroggins, robbed her, and stole a shotgun, a handgun, and other possessions. He also admitted to threatening Scroggins with bodily harm and pled guilty to this crime [65, pp. 3915-3916]. Mr. Purkey pled guilty to entering the home of Dennis Whiterock on August 3, 1980, taking his stereo, microwave, and monies, while using a handgun [65, pp. 3919 and 3920]. On August 3, 1980, Mr. Purkey while armed assisted his partner in the kidnapping and robbery of Gregg Carlberg. Mr. Carlberg was taken to a wooded area and shot at least two times but survived [65, pp. 3923-3924]. Mr. Purkey told the court that most of the week of August 3, 1980, he had been shooting drugs [65, p. 3922]. Mr. Purkey was sentenced in the spring of 1981 to a total controlling term of 15 years to Life [64, p. 975].

- Kansas City Kansas Police Department records indicate Mr. Purkey was arrested on October 30, 1998, in Leavenworth, Kansas. On October 31, 1998, Mr. Purkey admitted to police interviewers killing Mary Bales [53, p. 15]. Purkey pled guilty and was sentenced to a life prison term for the first-degree murder of Mary Bales [54, pp. 1-2].

- On October 10, 2001, Mr. Purkey was indicted for the kidnapping and murder of Jennifer Long. A grand jury indicted him with a single count of interstate kidnapping resulting in death [62, p. 1].

(2) Criterion A2: Frequently deceitful and manipulative in order to gain personal profit or pleasure (e.g. to obtain money, sex, or power):

- On November 16, 1976, the evaluation team at the Kansas State Reception and Diagnostic Center (KRDC) noted that "although Mr. Purkey claims that he has earned some academic credits through the Hutchinson Junior College; the record shows that he withdrew from all the courses" [11, p. 521].

- Sayed S. Jehan, M.D., on September 24, 1980, wrote a report to the Sedgwick County District Court in which he noted that Mr.

76

WP_PC000091001

Ex_13-000785

Purkey claimed he was severely handicapped by his emotional problems but "tries to use this as a defense for his antisocial behavior." According to Dr. Jehan's report, there was no indication of any hallucination, but "Mr. Purkey claims to be seeing people that are not there" [21, pp. 4118, 4119].

- Mr. Purkey described having dentists extract his teeth at Arizona Correctional Facility at Florence to obtain narcotics:

    I stole a lot of weed to supplement my income. Had a bunch of teeth pulled to supplement my drugs. Because for every tooth you had pulled you got sixteen Tylenol 4's and I was strung right out on that methadone and the guy I was getting methadone from died and left me hanging. So I ended up getting like eight teeth pulled. [Dietz exam, p. 127.]

- Robert Huerter's March 16, 1999, report concluded that Mr. Purkey "made an attempt to feign rather severe psychiatric symptoms on personality testing." Mr. Huerter noted that Mr. Purkey

    . . . exaggerated a degree of psychopathology to such a degree so as to render both personality tests as invalid. Ironically as much as the patient made efforts to make himself appear high emotionally distressed on testing, he does not present as an individual who, in the opinion of his examiner, does present as being emotionally distraught. [33, pp. 1200-1201.]

- A May 18, 2000, Evaluation and Classification Report noted that Purkey "tends to downplay his actions and displace the blame to his substance abuse." It was noted that he will likely try to manipulate the system to get what he wants and be manipulative of others [34, pp. 503-506].

(3) Criterion A3: Pattern of impulsivity may be manifested by a failure to plan ahead:

- A record from St. Francis Hospital dated 11/5/69 noted:

    Pt and friend entered a house trying to rape a girl. Police miscond of joyriding. Stole a chicken from a

77

WP_PC000091002

Ex_13-000786

counter having money in his pocket.  Behavior changed after car accident.  Periods of amnesia, impulsive, immature.  Does things very careless as if want to be apprehended.  [3, p. 287.]

November 1969 progress notes include references to impulsivity [3, pp. 311-314]:

| 12-5-69 | knowing about coming hearing that he might be sent to penitentiary.  Still gets anxious.  Afraid to leave hosp. doesn't feel too confident in handling his impulses.  He wants to try this weekend to test his controls.  Handling structure fairly well.  Will try him on home visit again. |

| 1-10-70 | Patient adjusted fairly well to hosp, several acting out episodes where he got drunk while on trial visit but handled restrictions well.  Showed good motivation but poor impulse control, easily suggested by others.  Diagnosis noted adolescent personality disorder antisocial. |

- On 5/15/81, Dr. Karl K. Targownik reported Mr. Purkey's recounting of his then-recent offense:

  I think that it was just something that came up.  It wasn't planned.  Of the kidnapping, I didn't know that it had happened.  I didn't have any illustration of doing any harm to the man.  But when we were in the woods I did shoot him; didn't kill him though; that's how loaded I was.  But as to what led to it I don't know.  Never seen the man before.  It was a senseless stupid crime; there wasn't hardly any gain to it; I think I was shooting myself at the same time that I was shooting the man.  I had been out of Lansing for a couple of weeks; I was broke; I jumped my parole; so my parole officer wouldn't help me; I didn't want to go back to Lansing . . . [22, p. 4002.]

78

WP_PC000091003

Ex_13-000787

Dr. Targownik characterized the defendant's judgment as aimed at immediate satisfaction of his needs with an inability to learn from past experiences and the handling of his everyday affairs without common sense [22, p. 4002].

- On 9/16/98, Glen D. Georger, M.D., met with Mr. Purkey who presented himself for drug rehabilitation. The defendant advised Dr. Georger of his admission to the University of Kansas Hospital for chest pain after "something of an overdose." Dr. Georger noted that Mr. Purkey was seen by the Menninger patient assessment team; however, "while the patient assessment advocate was working out placement issues, the patient left against medical advice without signing out or receiving discharge instructions" [50, pp. 100 and 101].

- During interview, Mr. Purkey was asked what his main reasons were for raping and killing Jennifer Long. He answered "impulsiveness. Uncontrollable impulsiveness. The murder was a . . . when it started it couldn't quit" [Dietz exam, p. 270].

(4)  Criterion A4:  Tend to be irritable and aggressive and may repeatedly get into physical fights or commit acts of physical assault (including spouse beating or child beating):

- Mr. Purkey described a fighting incident that occurred while he was in the eighth grade. He said:

  > I got into a fight with a Cuban there on the school yard and I can't even remember if I started it. I think it was over a girl and I ended up getting my ass kicked, nose broke, but I wasn't even drinking then. [Dietz exam, p. 35.]

- On 11/17/68, Mr. Purkey was admitted to St. Joseph Hospital at the request of his aunt because of a disturbance described as "drinking and fighting" [3, p. 370].

- On 5/30/76, Mr. Purkey received medical attention at St. Joseph Hospital after stating the left side of his face was in pain. Mr. Purkey reported he was involved in a fight and was struck in the face on May 26, 1976 [3, p. 269].

- Mr. Purkey reported to Kansas State Penitentiary Hospital on

79

WP_PC000091004

Ex_13-000788

12/3/78, after being stabbed in his left arm and abdomen [44, pp. 788-798].

- On 3/23/81, Mr. Purkey advised Charles R. Huddleston, M.D., that he was stabbed in the back on July 4, 1980 [41, 3928].

- A Kansas State Industrial Reformatory report of 11/11/82 reported that Mr. Purkey struck hitting inmate Sylvester Jackson on the left side of his head with an iron pipe. Mr. Purkey also struck out against a Correctional Officer with the pipe. According to the report, Mr. Purkey stated "I'm gonna kill that black son-of-a-bitch." Records indicate Mr. Purkey was found guilty of Aggravated Battery; and Attempted 2nd Degree Murder [64, pp. 534-535].

- On or about 8/21/89, medical progress notes indicate Mr. Purkey was stabbed by an inmate on the yard. He stated he was stabbed in the neck, and another stab wound to the right interior aspect of his right elbow was noted. An incised wound was observed by medical staff across his chest to the base of his sternum [48, p. 1079].

- John Dunn, M.A., on 3/18/92 noted that Mr. Purkey had "recently accrued two disciplinary reports for aggressive and rebellious conduct" [28, p. 2376].

- An incident report dated 5/12/00 noted that "Inmate Purkey assaulted Inmate Coleman by hitting him in the mouth hard enough to knock him to the floor" [64, pp. A1-7].

(5) Criterion A5:  Display a reckless disregard for the safety of themselves or others:

- During my interview, Mr. Purkey described participating in "gang bangs" involving "one or two girls and six, seven, eight guys and we're all sitting around having sex." When asked if the girls were drunk, he replied, "sometimes they were, and sometimes they weren't. Sometimes we were just skipping school." Mr. Purkey said he was 12 or 13 when he participated in this sexual activity [Dietz exam, p. 54].

- Mr. Purkey was admitted to the Wesley Medical Center on February 25, 1976, with a tentative diagnosis of "overdose." He

80

WP_PC000091005

Ex_13-000789

was unable to give any history prior to admission.  His wife thought her husband had overdosed.  R.D. Murray, M.D., reported that Mr. Purkey was known to have taken some unknown amount of alcohol, 5 tablets of Tranzene, and an unknown amount of Tylenol #3.  According to Dr. Murray's report, "it took approximately 18 hours for the patient to wake up" [45, pp. 129-130].

- An 11/16/76 assessment by the evaluation team at the Kansas State Reception and Diagnostic Center (KRDC) indicated Mr. Purkey said he had "overdosed about five or six times but with no conscious thought of committing suicide" [11, p. 523].

- Mr. Purkey required medical attention on four separate occasions for treatment of what was described as self-inflicted injuries during the first six months of 1979.  The dates of these injuries were 1/13/79, 1/22/79, 3/29/79, and 5/3/79.  During his medical intake 1/13/79, Mr. Purkey said he injured himself "because I got another year on my board and other things" [12, p. 769].  On 1/22/97 he said he injured himself "because I wanted to do myself in.  I wish I hadn't come around then maybe it would have happened" [13, p. 768].  He gave no motive for the other two incidents [12, 13, 14, and 15].

- On 5/19/79, Mr. Purkey gave R. Hemaya, M.D., three reasons for cutting himself:  "getting attention, experiencing bitterness and harming or killing self" [16, p. 733].

- In November 1987, Mr. Purkey admitted hitting Inmate Hatfield "two or three times in the face" with his fist.  His said he struck Inmate Hatfield to stop him from telling "the officers that he (Inmate Purkey) had raped him."  Mr. Purkey stated he engaged in anal intercourse with Inmate Hatfield but said "it was a mutual thing."  He denied using a knife against Inmate Hatfield but admitted to drinking "three quarts of pruno" during the evening of the incident [71, pp. 978-930].

- With respect to the murder of Mary Ruth Bales, Mr. Purkey explained in several interviews with Dr. Fernando's staff at Larned State Security Hospital in a "that he purchased and smoked crack cocaine in the hours just prior to going to the home of the victim."  After arriving at Bales' home, he admitted to smoking crack cocaine in her bathroom.  Mr. Purkey later admitted to and pled guilty to killing Mary Bales with a hammer

81

WP_PC000091006

Ex_13-000790

[33, p. 1203].

- Mr. Purkey claimed on 5/5/00 that he had attempted suicide by ingesting three bottle of nitroglycerin after murdering Mrs. Bales [29, 2475].

- Mr. Purkey has admitted prior consuming crack cocaine and alcohol prior to raping and murdering Jennifer Long [57, pp. 1169-1172; Dietz exam, pp. 196-198].

(6)  Criterion A6:  Tend to be consistently and extremely irresponsible:

- He was employed at Wesley Hospital, Wichita, Kansas, as a housekeeping technician from 1/6/70 to 1/20/70.  It was reported that "he terminated his job as he did most jobs by simply not reporting for work" [33, p. 1197].

- After his parole in December of 1975, Mr. Purkey worked as a cook for three days in February of 1976.  During this period he also worked at a car wash and other short-term labor jobs.  He commented to evaluators about his brief employments that "outside jobs require entirely different work habits, and I didn't know what they were" [22, p. 4000].

- Roto Rooter hired Mr. Purkey as a plumber on 2/11/98, but he was fired on 3/22/98 after they found his Roto Rooter service truck parked near a building unlocked with the keys inside [60, p. 1252].

- Mr. Purkey advised me that there were points in his life when was not financially responsible.  I asked if he ever got behind on his rent or got evicted.  Mr. Purkey responded, "I've never been evicted.  I've moved."  He indicated he had moved while owing rent and had borrowed money and not paid it back [Dietz exam, p. 263].

(7)  Criterion A7:  Show little remorse for the consequences of their acts:

- On 11/16/76, the evaluation team at the Kansas State Reception and Diagnostic Center (KRDC) reported that an interview with Mr. Purkey revealed "not the least hint of remorse about his offense as he insists he was simply going to help a girlfriend collect a debt and they simply took a car because they needed

82

WP_PC000091007

Ex_13-000791

transportation" [11, p. 521].

- Sayed S. Jehan, M.D., on 9/24/80 noted that Mr. Purkey "does not accept any responsibility for his legal problems and blames law enforcement authorities for his legal problems" [21, p. 4118].

- Mr. Purkey told investigators that he "realized he needed to get rid of the victim." He has acknowledged the motive that he did not want to return to prison and knew that if he let the victim go free, he would be arrested. His post-offense behavior did not express remorse for the murder of Jennifer Long; rather his actions of dismembering and burning the body and attempting to destroy and remove all physical evidence were directed at concealing what he had done [56, p. 1166-1168]. Only in later mental health interviews did Mr. Purkey claim remorse.

No significant brain injury

In 1969, an unidentified staff member at St. Francis hospital took a history from an unidentified informant who stated that after losing consciousness for two days in a car crash in 1967, the defendant's behavior had changed and he was impulsive, immature, and had periods of amnesia. The only examples cited were having broken into a house with a friend in an attempt to rape a girl, joyriding, and stealing a chicken despite having money. Since then, various examiners have wondered whether the defendant's multiple head injuries have had an effect on his behavior or temper.

Only Dr. Leeson (and, relying on him, Dr. Peterson) have concluded that brain dysfunction played any significant part in the defendant's behavior. Dr. Leeson summarized his findings rather specifically when he wrote:

> It is clear, however, that any conceptualization of Mr. Purkey's behavior must include frontal lobe dysfunction as a significant element. Under stress, Mr. Purkey is likely to react quite impulsively and without the ability to modify his actions. Because of brain based disorder, in situations that may be unclear and include emotional arousal his actions are not considered, tempered, or moderated. Intoxication would certainly exacerbate this problem. [39, p. 8.]

WP_PC000091008

Ex_13-000792

The objective effects mentioned in this passage would also be true in the absence of any frontal lobe dysfunction for an individual with antisocial personality disorder: Under stress, Mr. Purkey is likely to react quite impulsively. Because of antisocial personality disorder, in situations that may be unclear and include emotional arousal, his actions are not considered, tempered, or moderated. Intoxication would certainly exacerbate this problem.

Nothing in the defendant's history or in my examination of him leads me to believe that he has any clinically significant brain dysfunction. Most importantly, there is no indication that his brain function interferes with his capacity to appreciate the wrongfulness or his actions, conform his conduct to the requirements of the law, form the intent to commit specific intent crimes, premeditate, or deliberate.

Sexual Deviation

I make no diagnosis of sexual deviation because of the paucity of available evidence. The description of his alleged rape of Gary Lee Hatfield at forest camp, Tillamook, Oregon, on 10/31/87 [76] is consistent with the behavior of a man with sexual sadism, but Mr. Purkey refused to discuss this incident. Further evidence regarding this issue could be obtained through interviews of Mr. Purkey's sexual partners. This issue is important in connection with the rape and murder of Ms. Long, as it could provide additional evidence of Mr. Purkey's motives for the murder. His dismemberment of the body, his inconsistent stories about the murder, and his lack of credibility make it impossible to determine whether Ms. Long was tortured prior to death.

Mental Capacity

It is my opinion with reasonable medical certainty that Mr. Purkey suffers from no serious mental disease, no mental disease or defect, and no significant brain dysfunction that compromises his capacity to appreciate the wrongfulness or his conduct, conform his conduct to the requirements of the law, form the intent to commit specific intent crimes, premeditate, or deliberate.

Mitigation

The defendant's childhood was marked by parental fighting and separation, neglect by his alcoholic and promiscuous mother, humiliation for his stuttering, corporal punishment by both parents,

84

WP_PC000091009

Ex_13-000793

and inappropriate sexual behavior on the part of his mother. At a minimum, the defendant's mother made her promiscuity with other men apparent to her son; this is corroborated by Mrs. Burke. At a maximum the defendant's mother sexually abused her son, dressing seductively, teaching him to rub her and perform cunnilingus on her, fellating him, and eventually have intercourse with him on many occasions spanning years. Mr. Purkey also claimed that his father bought him oral sex with prostitutes when he was aged 10 or 11, and that he and his father would share prostitutes. No witnesses corroborate the defendant's accounts of maternal or paternal sexual abuse. The only document I found mentioning any sexual issue in childhood was Dr. Targownik's reference [22, p. 3999] to a December 29, 1966, diagnostic work-up of Mr. Purkey at the St. Francis Hospital in which psychological evaluation was said to state that "Mr. Purkey was experiencing a serious personality disorder centered on psychosexual problems of identification." Neither the underlying data that led to this assessment nor the evaluation itself was received. According to the defendant, he was physically abused by both parents and witnessed his father beat his mother. His parents died while he was in his early 20s, his mother from pancreatic cancer and his father by suicide.

Based on the foregoing, I conclude that Mr. Purkey was the victim of some level of neglect, psychological abuse, and physical abuse during childhood, and may also have been a victim of sexual abuse (though to date I must rely on his word for the latter).

As noted above, I do not find any mental disease or defect that could provide mitigation of sentence, but he has consistently maintained that he smoked crack cocaine and drank alcohol prior to his rape and murder of Ms. Long. If this is true, then voluntary intoxication may have played a part in his crimes. By his account, such voluntary intoxication did not prevent him from appreciating the wrongfulness of his actions, and his behavior in rapidly attempting to conceal the crime also indicates that he knew what he had done was wrong.

As to whether a combination of voluntary intoxication and frontal lobe impairment caused him to lack substantial capacity to conform his conduct to the requirements of the law, there are two times requiring analysis. The first is when he raped Ms. Long, and his account is merely that his arousal was at that time so intense that he ignored her refusal to have sex. The poor judgment he exercised at that moment is consistent with his lifelong pattern of poor judgment and self-indulgence at the expense of others. The second is when he began

WP_PC000091010

Ex_13-000794

stabbing Ms. Long (and apparently continued to so longer than necessary to insure her death).  If one credits his claim that she was the first to pull a knife on him, this moment needs to be understood as his reaction to the self-defense efforts of a frightened, young, rape victim whom he was falsely imprisoning.  Already motivated to silence her from sending him back to prison, he was no doubt enraged by any defiance she may have shown him.  This rage seems to me the most plausible explanation for his overkill.

I reserve the right to modify these opinions in light of additional information that may be forthcoming and to amend this report in light of such new information.  In the event I am called to testify at trial, I may prepare a PowerPoint exhibit of points made in this report for use as demonstrative evidence.

_____

Park Dietz, M.D., M.P.H., Ph.D.
Clinical Professor of Psychiatry and Biobehavioral Sciences
UCLA School of Medicine

WP_PC000091011

Ex_13-000795

### Declaration of Gary Hamilton

I am four years older than my brother, Wes. When we were kids, we stuck together. We were always together. My grandma used to say, if she took Wes shopping he always had to get something for Gary. She said I never got anything for him. I was the big brother, he looked up to me. He wanted to be just like me. When I started drinking, he started drinking. I remember the first time I took him out partying. I was about fifteen or sixteen. He had been begging me and my friends forever. We took him out he got really drunk. He got really sick, and we thought it would end there. But it didn't. It escalated. He never stopped. Soon, I started doing drugs, he started doing drugs. Heroin, acid. Wes would shoot acid. Nobody else was even doing that. Wes looked up to me, he looked up to things that I had done. I was an athlete he wanted to be an athlete. He imitated me, first drugs, then jail, then prison.

We fought together, too. That's how it was, if you got one of us -- you got both. That's how it was where we grew up. We grew up in a violent home, in a violent town, and then went to violent prisons. Wichita was tough in those days. We used to party a lot. I remember coming home one time when Wes was probably about 14, and finding him with his head and hair all bloody. He had gotten into a fight at a party. Some guy had hit him in his head with a shotgun. We had to take him to the hospital that time. He has a scar on his forehead from that.

He has a jagged scar down his neck from when he got hit by a semi truck. He was about 17, he got into a really bad car accident. A semi truck hit him. He was at Vine and Highway 54, and the light turned green, so he went. The semi came down over the hill and hit him, ripped his car apart. He was driving a little car. After that accident he would just flip out and was impulsive. It was like he was a totally different person.

Our house was always violent. Jack, Wes' father, my step-father, was brutal to our mother. I remember one time he punched her so hard and when she ducked, he punched a hole through the wall with his fist. Wes and I were both just standing there watching. Another time, he slammed her arm in a door, and kept slamming it until it broke. He had a chair right in front of the t.v. that was just for him. I can still remember if he caught my mother sitting in that chair, he would sit on her, and move around, so that it crushed her. Wes and I would just stand there watching. He was so big. He was always drunk, he was a mean drunk. Jack was an ex-marine, and a huge man. He was at least 6'4", and weighed about 260-280 pounds. He stood up straight, never slouched, and he stuttered. Wes is like him there, he always stands up rigid, and he has always stuttered. He put up with a lot of making fun for that. Our parents ridiculed him for that. Jack hated Wes. When we were kids, he called me son, but he called Wes, Wes. He told me that I was his only son, he told me this later, when I was grown.

Jack and my mom got divorced when I was about 13. Later, I confronted him, when I was 18, went to kill him. He was such a pathetic old drunk, I just walked away. It wasn't the first time I tried to kill him. My mom's stepfather gave me a .22 rifle when I was in fifth or sixth grade. My mom hid the clips, but she didn't hide them good enough. It's a good thing for Jack that I didn't know how to shoot that gun, or he'd be dead. Wes and I both went from being kids to being men

1

Ex_13-000796

when we were young. When mom divorced Jack, she couldn't control us. She worked nights at Boeing, plus she was a party-goer herself.

I was about 14 when mom started taking me to after-hours clubs with her. I was bigger, so I looked older. I was just getting into drinking, and wasn't into drugs yet. I can still see it like it was right in front of my eyes -- mom and me in the bathroom stalls of the bars. I can still close my eyes and see it right in front of me -- mom forcing me to watch her shower.

Grandma did some of the same things to me that mom did. Wes and I rotated spending the weekends with her. She and her husband slept in different rooms. He slept in what he called "the gun room." And I slept with Grandma. She walked around the house naked, made me stand in the bathroom with her while she showered. She would say, "Grandpa's out tonight, we can cuddle on the couch." She had this big mirror in the bed room, she used to stand in front of it naked, staring at me in her bed. I would lay in her bed pretending to be asleep. Grandma would buy anything for me, when she was alive, I never had to work. When she died she left me about $3600. I blew through it pretty fast though, spent it on drugs mostly.

Our grandmother's husband, Oliver Darling, was raping our mother. He was possessive of mom and did not want her to be with anyone else. When mom was young, Grandma sent her away to boarding school, because her husband could not keep his hands off mom. When mom got older, her stepfather would beat any man that she tried to date. He would beat her and any man around her. I remember one time at my Aunt Carrie's funeral, we all gathered at my mom's house. At the time she was living with her boyfriend Dick. Grandpa came over and he was furious, he tried to grab mom, because he was jealous that she was with Dick. I shoved him in a corner. Grandpa tried to control her, to dictate everything to her. After the divorce, mom lived with her stepfather off and on, and it was clear to the family that they were having sex. Our grandparents lived in a house with a back apartment. Mom would stay in the back apartment. While Grandma was alive, this apartment was not accessible through the house. When mom stayed there, I can remember my step-grandfather paying her nighttime visits in the back apartment. After Grandma died, though, my Grandpa re-did it so that the back apartment was easily accessible through the front of the house. After Grandma died, mom would stay with him often, because she had no where else to live. After Grandma died, he didn't have to be as sneaky, so he made it more easily accessible. This is something that I always knew, even as a child, because Grandpa was so possessive of mom. Before Grandma died, she told me that she knew as well. One time I actually took my mother down to the police station to press charges against her step-father. The police would do nothing. Darling was well respected in the community, and they even would not file charges.

On December 10, 1969, I went into Lansing. I was in from the time I was twenty, until I was twenty three. Even doing three years, it changes the way you think. I saw a lot of people die. Lansing was rough. Guys dropped all the time. Prison is not a place for nice guys, you can't be polite. When I first got there, I was so scared I couldn't even eat. You have to be in a gang. The black gangs rape white boys. A young white boy comes in and you see him just get surrounded by black guys. I tried to talk to the guards, and they told me, "this is a man's place, be a man." You have to join a gang for safety and protection. If you're white you join the AB. Back then, Blacks

2

000285

Ex_13-000797

join the Muslims, or the Panther If you're not in a gang, you're fresh meat.

I think that Wes really did 't know how to live when he got out of prison. He basically spent 30 years in prison. People out he are different. They walk different, use a different language. On the inside, street is walk; and pol ce are bulls. You think different in prison, constantly paranoid. If someone is looking at you, or s iling at you, or offering you a hand, you wonder why. You don't trust anyone; you wonder what th r motives are. When you get out, people look at you and you feel like they know you were in. Wes got out and had nothing, didn't know how to pay bills, deal with stress. He had been controlled all ose years. He had no rehabilitation. There is no drug or alcohol rehabilitation in prison. Drugs are easy to get, and you make your own alcohol. Or the guards bring it in. Wes needed supervision. e Kansas prison system made him who he is. How did he feel when he got out after all those yea s? Lost, like he didn't know what was going on. Wes really had to rear himself. He went into pri n young. He worked hard at educating himself on the inside -- business math, algebra, law. He v rked hard at studying. Wes went to tough prisons when he was really young, like Lansing and Fl rence. That was where and how he grew up.

Fred came out to my hous and talked to me for a while once. He brought his teenage son, who was in high school at the ti c. I don't know why he brought him along. I thought it was strange. Fred's son came in and o of the room several times, and waited in the car for some of the time.

During his visit, Fred neve talked to me about testifying. He called me right before and told me to come down. I didn't know w at I was supposed to be testifying about. Fred came to my hotel briefly on the night before I testif d and told me where I needed to go, and how to get there. He never talked to me about what the rosecution would ask me. Everything I said got twisted. It was a joke. I did not get to say what I vanted to say.

I declare, under penalty of erjury, that the foregoing declaration is true and correct to the best of my knowledge.

Signed this _5_ day of Oi ober, 2007.

_Gary Hamilton_
Gary Hamilton

3

000286

Ex_13-000798

### Declaration of Dion Leiker

I have known Wes Purkey for 25 years. Wes was possibly the only true friend that Duane, (my brother) had at the time of his death. When Duane was murdered, Wes called my father, Floyd Bose, and told him that he had heard another inmate bragging about the murder. At that time my father was Sheriff of Smith Center, KS. He held that position for many years. And I was a Deputy Sheriff. My dad went down to Hutchinson, where Wes was incarcerated, and talked with him about what Wes had heard. Wes explained that Duane had gotten involved with drug traffickers. They killed his wife, who was six months pregnant at the time, and were planning on taking the insurance money. Duane wanted out of the drug trade, but they would not allow it, he was in too deep. Duane went to California, and these men told him that they would kill his family in the same way they had killed his wife. They killed him and left his body in a swamp in Florida. Were it not for Wes coming forward with what he had heard, my family would have no closure. We would never have known what happened to my brother. Wes was punished mightily in prison for coming forward with the truth. My father helped him get transferred to Lansing, thinking that it would be safer than Hutchinson. But in Lansing he was later stabbed seven times. I believe that he was stabbed because he helped my family.

Wes and I have written one another on and off ever since then. He is a very compassionate person, who cares a great deal for others. He cares more than anything for his daughter. He put me in contact with her because he felt that she really needed more people like me in her life. Her mother is a very negative force in her life. She resurfaces in Angie's life and tortures her emotionally.

I have never known Wes on the streets, and I have never known him on drugs. I believe that he is a very different person when he is on drugs. I do not agree with the crime that he committed, but I also believe that drugs played a major part in it. I know that he was desperately seeking help from his parole officer to clean up and quit using drugs. Wes knew that he was losing control, and his parole officer ignored his pleas for help. As a long time member of law enforcement, that really upsets me. I worked in law enforcement for most of my life. My father was the sheriff while I was growing up. I started riding with him in his patrol car when I was 18. About that time, I started as a dispatcher. I was also a matron, and a deputy. I worked in law enforcement for 12 years.

I think Wes' mental problems, as well as his drug problems, are related to his childhood. Wes is very emotional and unstable. He reminds me of an aunt who would become very manic at the drop of a hat, anything could set her off. We found out that my aunt had a brain aneurysm. I always wondered if Wes had some sort of brain injury like that. He gets so worked up sometimes, and I know that it is frustrating for him, because he doesn't know why. When I found out that he was in a terrible car accident in 1968, it made sense to me. I could always tell that something was wrong, his thinking patterns seemed disjointed, and his mannerisms were off sometimes. Sometimes it was as if he was unable to reason. He also has constant severe headaches, like my aunt used to have. They're not like migraines, they're always present.

His parents were really awful to him and I think that has a lot to do with his psychological problems as well. His father beat the daylights out of both Wes and his brother, and their mom. Wes' brother, Gary, got the tar beat out of him as well, until he was old enough to get out of that house, and away from their parents. One of the worst stories that Wes ever told me about his father, was that when he was very young he saw his father dragging his mother by her hair down the hallway completely naked. When Wes tried to stop his father, his father turned his rage on him.

Wes' mother molested him for years. She would force him to have sex with her. She forced him to touch her and do things to make her feel good. Wes was less than ten years old at the time. He avoids talking

1

000354

Ex_13-000799

about the intimate details, because it's really hard for him. When he tries to talk about it, he becomes very emotional and starts stuttering really badly. He opened up to me about this to help me understand what my grandson was going through, after he was molested by his father. My grandson now lives with me and I have had difficulty addressing and understanding some of his behavioral problems. For example, my grandson was having trouble with hygiene. Wes told me that this was directly related to the sexual molestation, and encouraged me to do some research on the subject. I went to the mental health center, and learned that many of the behaviors my grandson was displaying were a direct consequence of the sexual exploitation he had endured. Wes has helped me to understand what was going on, and now I can better help my grandson.

This is not the only time that Wes has helped me through a difficult time. Last year my daughter took her own life. Wes was my only source of emotional support. I have always been the strong one for my family, and when my daughter died, I had no one to lean on. Through his letters, Wes offered me comfort, support, reassurance, and understanding. I felt horribly guilty, and deeply sad. He was a good listener, and he never shied away from talking to me about her death. He is a very compassionate person, and he really helped me get through that time in my life. Wes is very strong in his faith, he believes that God saved his life. We write to one another about our faith, about our grandkids, and about what is going on in our lives.

Wes probably saved my life in 1983. I was in an extremely violent marriage and was being abused on a weekly basis. I was far too ashamed to tell my family or anyone else, except Wes, in my letters. He was my only outlet. Then I got the letter from Wes that changed everything. I remember it like it was yesterday. He said that if I didn't tell my dad what was happening to me and get out of there, he was going to and he had the letter to my dad already written to mail the day after he mailed the one I was reading. He forced my hand and I called my dad that day. Within a few days of that letter, my kids and I were safely in a house 300 miles from my husband and I was granted an emergency divorce within 30 days. I honestly believe that my husband wasn't far from coming home drunk and killing me by the time I got out of there. If not for Wes, I probably wouldn't be here today raising my grandson.

I would have testified on Wes' behalf, but his attorney never called me. Wes and I were not in touch at that time, but I would have been easy to find. Wes told me that he asked Fred Duchardt, his attorney, multiple times to contact me or my father. My father, who was still sheriff at the time, had lived in the same home since I was eleven years old. He's had the same address and phone number for 40 years. We both would have been easy to find, and willing to testify. I even called Fred multiple times after the trial, because I was very concerned about Wes, who was not receiving medication at Terre Haute. Fred never asked me if I would have been willing to testify. I am very grateful for what Wes did for my family and I appreciate how he has been there for me. I believe that Wes is a good person, who is compassionate, loyal and caring. I would have happily come to court and told that to the jury.

I declare, under penalty of perjury, that the foregoing declaration is true and correct to the best of my knowledge

Signed this _15_ day of October, 2007.

_Dion Leiker_
Dion Leiker

Ex_13-000800

**Declaration of Dr. Rex Newton**

I received my Ph.D. in Counseling Psychology from the University of Oregon in 1971. I was hired as a Prison Psychologist by the Oregon Department of Corrections in January of 1973. I helped create and became the director of the Cornerstone Alcohol and Drug Residential Treatment Program in 1976. Cornerstone was a residential treatment program where both male and female inmates with histories of addictions came to spend the last year of their incarceration preparing to re-enter free society. I remained as the director of Cornerstone for five years, during which time the program was designated a "National Model Program" by the National Institute of Drug Abuse (NIDA). In 1983 I became a Mental Health Consultant to the Oregon Department of Corrections, a position I held until my retirement in June of 2007, after more than thirty-three years in the Oregon Prison System.

I recall meeting Wesley Purkey in my capacity of Mental Health Consultant at the Oregon State Penitentiary in 1987. Mr. Purkey was remarkable to me because he had embraced a racist organization in prison, complete with tattoos indicating his allegiance to the group, and then found himself at odds with their purpose and philosophy. He had a belief that the direction in which his life was going was not a direction he truly believed in or wanted to continue. He knew he wanted a different life, but did not know how to make a life-change to something better. He was adamant about getting into therapy, continuing to make requests to the Counseling Unit until he could not be ignored.

Mr. Purkey presented as a young man in his early thirties who had been sexually abused for years as a child, then incarcerated for the first time as an adolescent, followed by many years of adult prison time. He had spent more time locked up than in free society, and he stated he felt "institutionalized" and "fearful" of returning to the community because he "didn't know how to act". His demeanor was a combination of free-floating anger occasionally turning into rage and, at times, was pleasant, thoughtful and sensitive. His stated goal for being in therapy was to "get his head on right and get rid of the prison mentality".

Mr. Purkey displayed behaviors and characteristics common among many men in prison who started life being sexually abused by family members during many years of their childhood. The sexual abuse made Mr. Purkey feel dirty and unworthy inside, feelings that were validated for him in the form of rejection from his own parents (the abusers) and main stream society. Those feelings turned to anger and rage in his adolescence when he became intellectually mature enough to understand how he was victimized. He soon discovered he could numb the rageful turmoil he was feeling with alcohol and drugs, which would eventually lead him into the criminal justice system. Some social scientists call this the "throw away kid" syndrome where children are born to parents who do not want them, who use them for their own pleasures and then discard them into the nation's system of social services.

Clearly, Mr. Purkey wanted something different for his life when I met him in 1987. However, without the benefit of any mentor or family role model, he had no idea how to

Ex_13-000801

make the life-changes he wanted to make. He seemed deeply ashamed of his tattoos, always wearing long sleeved shirts to keep them covered. He did, on one occasion, reluctantly remove his shirt for me to see the basis of his dilemma. The ink on his body signaled a lifestyle that was the exact opposite of the core values I believe Mr. Purkey held most dear, a life style in which he and people around him were happy, where he could trust others and live a productive life. He had transferred from the Kansas Prison System to Oregon in hopes of getting a fresh start where people did not know him or have pre-conceived, negative judgments about him. However, those around him quickly made their opinions based primarily on the message written on his skin, a message he did not believe and was trying desperately to distance himself from. As I came to know Mr. Purkey through the therapy sessions we had, I began to see a frightened little boy underneath the anger and bravado he used to keep people away from him, complete with a serious speech impediment (stuttering) created during the times of peak stress and anxiety of living in a family of predators.

Wesley Purkey has done horrific things. One could argue that horrific things were done to Wesley Purkey throughout his childhood that sent him on a life-path so filled with rage that it practically guaranteed his ending up in prison. There are no justifications for what he has done, and he must be held accountable for his actions to the fullest extent of the law. However, it seems prudent that the law should consider the dire circumstances from which the defendant came that shaped his ability to function in free society. Mr. Purkey wanted help to deal with the demons inside him. He actively sought help from this writer and others during his life to find a better way to live. However, in the final analysis, he received very little assistance to overcome the huge emotional barriers that were created for him in early childhood by his own family, and he fell through the proverbial cracks of all our social services.

Mr. Purkey's trial attorney never contacted me. If he had, I would have told him everything that I said here. I would have come to court and testified on behalf of Wesley Purkey, had he asked me to. I am currently available to testify to the court under oath if that would be productive in the court's considerations of this case.

I declare, under penalty of perjury, that the foregoing declaration is true and correct to the best of my knowledge.

Signed this __15th__ day of October, 2007.

Rex M Newton Ph.D.

000495

Ex_13-000802

Declaration


My name is Margaret Ann Noe. My maiden name was Martenay. My friends and family call me Peggy. I am an adult resident of Davidson County, Tennessee.

I have known Wes Purkey since I was in the second grade. We attended St. Joseph Catholic School in Wichita, Kansas. I became close friends with Wes when I was 20 or 21 years old. Wes is approximately two years older then I am. I remember that Wes attended special classes after school for his stuttering.

Soon after we became close friends, Wes confided in me that he had been sexually abused by his mother for a long time. He told me that she had done things to him and had made him to do things to her. He couldn't go into a lot of details or he would start stuttering really bad, to the point that he couldn't even talk. Wes was ashamed of the abuse and hated that his home life was so horrible.

Wes reluctantly took me to meet his mom at an apartment where she lived. He told me that his mother was an alcoholic. He only wanted to stay for a minute because he didn't know what to expect. When we went in, his mother was in the bed in her nightgown, either drunk or hungover, although it was early afternoon. We left quickly, because Wes was ashamed of her condition.

For awhile Wes lived with his Aunt Carrie, who everyone called GaGa. GaGa was very protective of Wes and didn't want her Wes' mom around Wes.

When Wes' mother's mother died, Wes' mom went to live with her mother's husband. It was obvious that Wes' mom was living with her step-father as man and wife. Wes took me to their house one time and it was obvious to me. Wes was very ashamed about the situation. He knew it was wrong and felt horrible about it. His step-grandfather seemed to rub it in his face. Wes was very embarrassed.

Wes saved my life one time. I took drugs for a short time in my 20's. I had a bad reaction to some drugs that I took while in a house with several people. I passed out and was sick. Wes came to the house and tried to wake me up, but couldn't. No one in the house would help me, but Wes took me to my brother's house. My brother took care of me until I was better. I did not find out that Wes had helped me until much later.

Once when Wes was in his mid-twenties, we went with a group of friends to visit the grave of another friend. We stayed in a motel overnight. When Wes woke up in the morning he realized he had wet the bed. He was embarrassed and ashamed and quietly told me about what happened. I went out to the vehicle and got him a change of clothes and we turned the mattress over and no one else knew. Wes told me he had a problem with bed wetting ever since he could remember.

000492

Ex_13-000803

Although Wes and I were never romantically involved and he treated me almost like the younger sister he never had, he took a special interest in my daughter, Evette, who was born in 1973, and always encouraged her to do her best.

I would have been more then willing to have told anyone from Wes' trial defense team all of what I have said here. I could have been easily located because my daughter and I have stayed in contact with Wes off and on through the years.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Margaret A. Noe

November 6, 2007.

000493

Ex_13-000804

Declaration of Marguerite Hotchkiss

I am Wesley Ira Purkey's aunt. His father, Jack Purkey, was my brother.

Wes' attorney, Fred Duchardt, called me several times and asked me the same questions over and over, but he didn't tell me what I'd be asked when I went to testify. He didn't tell me anything about it except the address of the place in Springfield. Nobody ever prepared me for what would take place there.

My daughter, Debbie Prothero, and her husband, Russ Prothero, took me up to Springfield to testify on Wes' behalf. We waited a long time. No one was there. They led me to a room all by myself. Mr. Duchardt didn't tell me I'd be testifying by video. It really surprised me to be led into a room all by myself and sit down in a chair without anybody telling me what to do. I thought my daughter and son-in-law could be with me, just like in a courtroom. When things started, I was looking at a screen, but couldn't see anybody. I could only see Fred from the neck down. I was appalled. I thought I'd be talking to a person, not a television. I don't think that it could have helped Wes any. It was very uncomfortable and frustrating. The only thing they asked was, "How do you feel about your nephew? Do you love him?"

We all really love Wes. We felt sorry for him when he was a boy. His parents were drinkers and smokers, and there's just no way to describe how it was when he was little. All he could do was point and grunt. He couldn't speak at all; he didn't speak until he was six years old. There was something very wrong. He acted like a little animal, just pointing and going, "uh, uh, uh." If you came in and tried to hug him, he'd scream and run away. His parents didn't seem to even notice that it wasn't right behavior. He seemed to be the black sheep of his family. We always felt sorry for him. That is an indelible memory upon my mind and heart.

My mother, his grandmother, was a dedicated Christian. She loved everyone. Velma would drop the boys off at my parent's home many, many times, but she usually wouldn't stay because she didn't like being there. Velma was known as a "party girl". Our family didn't drink or smoke. My mom wouldn't let her smoke or drink in the house. Mother would often watch Wes and Gary, hoping her influence would help them. She wanted to help Wes. She and I would cry together when we thought about and talked about him. It was just so sad.

I remember we all wondered what kind of man he would be when he grew up because he couldn't even talk; once he did begin to speak, he stuttered very badly. I think from the very beginning everyone knew he would need to be in a hospital or somewhere that would help him. There was just no way he would be able to take care of himself or know how to function, especially because of the horrible life his parents lived.

Once my husband and I went over to Velma and Jack's house. It smelled awful, like liquor and cigarettes. All you could hear was they yelling at the kids. There didn't seem to be any love for them. I remember thinking, "He'll end up in a hospital

000248

Ex_13-000805

somewhere." We never thought it'd be prison. But he never got the help he needed when he was young. My husband used to say he needed help when he was younger, people shouldn't wait until it's too late. When I heard what his mother and brother had been doing to him, I was horrified, but I can believe it, looking back now. It's really sad to see a young man end up behind bars because of something he couldn't control. My husband and our family moved to Hawaii when he was only 12. And my mother and father died when he was only 16. There was no one around to help him learn how to be a good, normal, hard-working man. If we'd been close, we could have been there to help. I think my mother's home was the only safe haven he had. My mother grieved herself to death over it.

Stuttering ran in our family. In fact, I'm the only one of the siblings who didn't stutter to some extent. Some weren't so bad, but Jack also stuttered. He was a good, kind man, but he had a terrible accident when he hit his head on the windshield. After surgery, he had a metal plate in his head that caused him to be in constant pain. We think it was Velma who gave him the idea to start drinking to help with the pain. The alcohol totally ruined his life. Velma divorced Jack and married another man. That's when she had Gary. Then, she divorced that husband and married Jack again, and they had Wesley. As an alcoholic, Jack just couldn't provide for his family, and every time he and Velma had a fight, he'd end up running back to our mother and father's house. They let him stay up in his old room instead of counseling him to get help and work out their problems. He just couldn't cope and he was no help to the boys.

When I flew back to Wichita from Hawaii for my father's funeral, I heard Wes had been in an accident and had a horrible head injury, like his father. But we didn't hear any more or have any contact for years. When Jack shot himself, it nearly broke my heart with grief. My sisters and I met in Wichita to make his arrangements. That is when we got Wes' address in prison. We were so sad that it had come to this. It grieves me how his life has turned out, but I don't know how it could have gone in any other direction considering the awful living conditions he had as a child. Wes and I used to write one another. (Now it's too difficult for me, but I still love and pray for him. My daughter keeps me up to date about him.) When he was in Oregon in prison, I was able to visit him with my sister, Irene. He stuttered so badly, I could hardly understand one word he said. The whole way there and back, we cried. It wasn't his fault.

Wes writes very well. In fact, I put a couple of his poems in a family scrapbook that I put together for my family. They are very touching. I know he could do a lot of good for people with the rest of his life.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

This, the 25th day of January, 2008

Marguerite Hotchkiss

000249

Ex_13-000806

## DECLARATION OF TERESA L. NORRIS

I, Teresa L. Norris, declare and state the following:

1. I am an attorney licensed to practice law in the State of South Carolina since November 1990. I am a member of the bars of the State of South Carolina, the United States Army Court of Criminal Appeals, the United States Court of Appeals for the Armed Forces, the United States District Court for the District of South Carolina, the United States District Court for the Eastern District of Texas, the United States Court of Appeals for the Fourth Circuit, and the United States Supreme Court. I have been admitted pro hac vice in a number of other courts, including the United States District Court for the Western District of Missouri and the United States Court of Appeals for the Eighth Circuit. From April 1996 to April of 2006, I served as the acting director and then Director of the Center for Capital Litigation, a private, not-for-profit corporation located in Columbia, South Carolina, that provided legal services to indigent death-sentenced individuals. From April 2006 to November 2016, I was in private practice, which was composed almost exclusively of court-appointed representation of indigent death-sentenced inmates or trial defendants in which the prosecution was seeking imposition of the death penalty. Since November 1, 2016, I have been a Special Assistant Public Defender in Charleston County, South Carolina. Over the course of my legal career, I have represented approximately 40 persons charged or convicted of capital offenses during the trial, appellate, and post-conviction phases.

2. On December 18, 2006, Western District of Missouri District Court Judge Fernando J. Gaitan, Jr., appointed me and Gary E. Brotherton, an attorney licensed to practice law in the State of Missouri, to represent Wesley I. Purkey, an inmate under a sentence of death, in post-conviction proceedings pursuant to 28 U.S.C. § 2255. On October 16, 2007, we filed on Mr. Purkey's behalf a Motion to Vacate, Set Aside or Correct Sentence pursuant to § 2255, a motion

1

**001774**

Ex_13-000807

which the district court denied without evidentiary hearing on September 29, 2009. On November 16, 2011, we filed an appeal of the district court's order denying Mr. Purkey's § 2255 petition and on September 20, 2012, argued the appeal before a three-judge panel of the Eighth Circuit Court of Appeals. On September 6, 2013, the Eighth Circuit affirmed the district court's denial of Mr. Purkey's § 2255 petition. On December 6, 2013, the Eighth Circuit granted my motion to withdraw from representing Mr. Purkey and allowed substitute counsel to enter their appearances.

3. In general, when representing a death-sentenced individual in post-conviction proceedings, I review what transpired in the trial and appeal courts in order to determine whether there are viable claims that fundamental defects in the underlying proceedings render the individual's death sentence unconstitutional. To comply with this duty, I am required to review what transpired at each phase of the trial case by reading the transcripts of all court hearings, reading pretrial motions and corresponding rulings, and by examining all evidence. I am required to review all information related to jury selection, including juror questionnaires, the transcripts of jury selection, and all records concerning the use of strikes for cause and peremptory challenges. I also conduct an independent fact and mitigation investigation to discover any inadequacies in trial counsel's investigation and to explore claims of actual innocence. Once my review of the record and my investigation are complete, I write a motion to vacate, set aside or correct the death sentence pursuant to § 2255, in which I raise all viable claims usually in the context of the ineffectiveness of trial counsel or prosecutorial misconduct.

4. In Mr. Purkey's case, I examined the trial transcripts, the files from the clerk of court's office, and the files from both of Mr. Purkey's trial counsel. I do not recall whether, as part of this review, I reviewed the juror questionnaires. It has recently been brought to my

2

**001775**

Ex_13-000808

attention that Juror # 13, a juror named Jennifer, disclosed on her questionnaire that she had been the victim of an attempted rape at age 16, a disclosure highly relevant to the issue of juror bias given that Mr. Purkey was accused of kidnapping a teenager named Jennifer, and then raping and killing her. Apparently Juror # 13 actually served on the jury after Mr. Purkey's trial counsel asked Juror # 13 no questions concerning this disclosure during *voir dire*, and made no effort to exclude Juror # 13 from serving on the jury by either moving to exclude Juror # 13 for cause or exercising a peremptory challenge.  If I had discovered this during my review of the record or this had been brought to my attention during my representation of Mr. Purkey, I likely would have raised a claim in the § 2255 motion that Mr. Purkey's trial counsel was constitutionally ineffective for failing to exclude from the jury Juror # 13, a juror with an inherent bias given the facts of Mr. Purkey's case, and that Mr. Purkey was prejudiced by trial counsel's ineffectiveness.

5.  In August 2007, I hired a mitigation investigator, Jennifer Merrigan, to conduct a thorough investigation of Mr. Purkey's life history.  Ms. Merrigan was exceptionally qualified to act as a mitigation investigator because she had extensive mitigation investigation experience and training.  Early in her investigation, it became apparent that there were problems with the trial team's mitigation investigation.

6.  One significant problem was the trial team's failure to offer evidence to rebut the Government's penalty-phase argument that Mr. Purkey, in an effort to gain sympathy with the jury and avoid the death penalty, recently fabricated a claim that as a child, he had been sexually abused by his own mother.  The trial team's failure was egregious, in my opinion, because there was evidence readily available to the trial team proving that long before Mr. Purkey was facing the death penalty, he disclosed to close friends and mental health professionals that he had been sexually abused by his mother.  Much of Ms. Merrigan's mitigation investigation focused on

**001776**

interviewing witnesses who all said that Mr. Purkey made such disclosures to them, including his brother, Gary Purkey, Mr. Purkey's childhood friend, Margaret ("Peggy") Noe, and his psychologist while incarcerated in Oregon, Dr. Newton.

7. Because our mitigation budget was limited by the district court, the mitigation investigation focused on these witnesses and the most obvious issue. In my opinion, the testimonies of these witnesses established that the Government's theory of recent fabrication was not true because Mr. Purkey made disclosures of sexual abuse long before he faced the death penalty. We allocated our limited resources in this way because this evidence supported a strong claim that trial counsel was constitutionally ineffective for failing to rebut the Government's erroneous recent fabrication argument with evidence readily available to them.

8. Another significant problem was that during the penalty phase, the trial team failed to present to the jury a comprehensive life history for Mr. Purkey by calling as witnesses those people who knew Mr. Purkey as a child, an adolescent, and as an adult. I wanted to locate and interview such witnesses in order to show that trial counsel was ineffective for failing to present a complete mitigation case, but I could not obtain funding from the district court to pay Ms. Merrigan to complete such an investigation. The district court restricted our mitigation investigation budget to $7,500 plus a little over $1,000 in travel expenses, and would not approve additional funding despite my request for additional funding. In fact, Ms. Merrigan's expenses for conducting even a limited mitigation investigation far exceeded the $7,500 allotted by the district court, and in order to pay for at least a portion of the work that had been done, I used $3,500 of my own money to pay Ms. Merrigan's remaining voucher. We were so short on both time and money that Ms. Merrigan had law students and her office staff assist with reviewing records in the case at no cost to the court. An investigator from the Federal Public Defender in

**001777**

Ex_13-000810

Nashville was enlisted to obtain signed declarations from Peggy and Evette Noe, who both lived in Nashville at the time, because Ms. Merrigan had neither the time nor the money to do so.

9. After being contacted by Mr. Purkey's current counsel, I reviewed the investigation plan memo I prepared in 2007 after reviewing the files and records in Mr. Purkey's case. One of the witnesses I identified as an important witness to be interviewed as part of the comprehensive life history investigation was Lee Hatfield, a name that kept turning up in Mr. Purkey's old criminal records as being either involved or a witness. Hatfield was obviously someone who had known Mr. Purkey over a long period of time and could potentially offer important information about Mr. Purkey's background, but trial counsel never interviewed him. We should have interviewed Hatfield, especially since I had identified him as an important witness in my investigation plan, but, to my knowledge, we never did. I do not recall why we failed in this endeavor. Similarly, I identified at least one of Gary Hamilton's ex-girlfriend's from the 1970's as someone we needed to interview, but we never interviewed her, or his ex-wife from that time period either, to my knowledge. These were also witnesses who definitely should have been interviewed, but I do not recall why we did not interview them.

10. As part of my investigation, I interviewed lead trial counsel, Fred Duchardt, as well as his co-counsel, Laura O'Sullivan, and his investigator, Mic Armstrong. These were separate interviews. I interviewed Mr. Duchardt at his home located in rural Missouri, north of Kansas City. It was my impression from Mr. Duchardt that my interview of him on that day was my "one shot" to ask him questions. In other words, he made it clear that he would not consent to another interview prior to our filing of the 2255 motion, even if additional matters arose subsequent to the "one shot" interview that needed explanation.

**001778**

Ex_13-000811

11. Mr. Duchardt was clearly distracted during my interview due to his contemporaneous involvement in preparing for trial in the Lisa Montgomery case, a federal death penalty case then-pending in the Western District of Missouri. During my interview of Mr. Duchardt, he repeatedly digressed from discussing Mr. Purkey's case by talking about his work preparing for the upcoming Montgomery trial, particularly his disdain for mitigation specialists. The thing that I recall most about Mr. Duchardt's discussion of the Montgomery case and what happened in this case is that he clearly thought mitigation specialists were worthless. In what Mr. Duchardt did say to me concerning Mr. Purkey's case, he was extremely arrogant and gave the definite impression that there could not possibly have been any failures on his part or in his team and if there were any failures it could only be due to failures or shortcomings of other members of his team rather than due to any decision or action he took.

12. My unfavorable impression of Mr. Duchardt after our meeting became even worse when he filed his affidavit in response to the § 2255 motion. The affidavit demonstrated that Mr. Duchardt was most interested in protecting himself rather than his client, which to me is evident in his unnecessary disclosures of client confidences and other factors. In my opinion, his behavior and statements were completely contrary to the ethical duties owed to Mr. Purkey as a former client. The affidavit went beyond the pale, worse than any I have ever seen from a trial lawyer, because not only did Mr. Duchardt unnecessarily disclose client confidences, he argued the Government's case by citing various cases purporting to defeat Mr. Purkey's claims. When Mr. Duchardt filed the affidavit, I was dumbfounded because in over 18 years of practicing law and specializing in capital post-conviction, I had never seen a lawyer file a document so adverse to a former client's interest. And to this day after more than 26 years practicing law, I haven't seen another example even close in comparison and hope I never do

**001779**

Ex_13-000812

again. I know I am not alone in thinking this. I remember there was even a law review article later written about the affidavit and how ethically abhorrent it was.

13. Further, Mr. Duchardt gave me no true opportunity to voice an objection to his affidavit before it was provided to the Government. I don't recall specific times but the times were documented in our objections. In essence, though Mr. Duchardt claims to have given me notice prior to providing the affidavit to the Government, his notice to me consisted of forwarding the 117-page affidavit to me by email only about one hour before the affidavit was forwarded to the Government. It is fortuitous that I even saw it then because at that time I did not have a Blackberry or iPhone. I just happened to be sitting in front of my desk and email that afternoon. Shortly after I first saw the affidavit—I mean within brief minutes of just a first skim -- I conveyed to Mr. Duchardt that I vehemently objected to him providing the affidavit to the Government, only to then learn that my objection was too late because Mr. Duchardt had already sent the affidavit to the Government. Mr. Duchardt's form of "notice" could not be construed as meaningful even if it was actual notice of any kind. I interpreted his action as a way for him to be able to say that notice was given, without giving me any actual opportunity to lodge the objections he surely should have expected to come. After the affidavit was forwarded to the Government, I voiced strong objections to the affidavit to all parties based on ethical considerations. But of course, by that time the damage was done because the Government had the affidavit in its possession. Based on my objections, the Government agreed with me that the affidavit should be filed in the district court under seal, as it was.

14. I interviewed Michael Armstrong, the trial team fact and alleged mitigation investigator. At Mr. Armstrong's request, we met in the lobby of a hotel in the suburbs of Kansas City where neither of us was staying, which I thought was unusual. During our visit of

001780

one hour or so, Mr. Armstrong provided no helpful substantive information related to his investigation of Mr. Purkey's case. He mostly wanted to talk about the search for arsenic poisoning, and I vaguely remember him saying something about digging up a dead dog to try to prove that Mr. Purkey's ex-wife was poisoning him. However, the discussion did leave me with the impression that Mr. Armstrong and Mr. Duchardt had a long-term business relationship and that Mr. Duchardt was a steady stream of good revenue for Mr. Armstrong and that Mr. Armstrong would say nothing contrary to or negative about Mr. Duchardt.

15.   I interviewed Laura O'Sullivan at her office in St. Louis and had a number of follow-up phone calls with her. She had returned to working for the state public defender office then. Ms. O'Sullivan was friendly and open in providing her files and the information she could. She provided a declaration to us for the § 2255 motion that I drafted and she revised as necessary after talking with us.

16.   Gary Brotherton was my co-counsel on the § 2255 case. Mr. Brotherton was initially very attentive to Mr. Purkey and his case but as the case progressed, Mr. Brotherton became less involved with the case. Although Mr. Brotherton did not discuss details of his personal issues with me, I know that he was in the midst of a difficult divorce and professional breakup as well because his wife was also his business partner. He was having a difficult time personally and professionally as the case progressed. Mr. Brotherton also became less involved in the case because of Mr. Purkey's demands. While I don't recall all the details, the essence was that for a good while Mr. Purkey agreed to continue talking and working with me but refused to even talk to Mr. Brotherton. In short, toward the end of the case, I was essentially the only attorney working on the case because Mr. Brotherton and Mr. Purkey were no longer working together.

**001781**

Ex_13-000814

17. I found it difficult to work with Mr. Purkey. Mr. Purkey had entrenched opinions about what needed to be done on his case, and he was not willing to entertain my opinions if they were contrary to his rigid way of thinking. Mr. Purkey would become disproportionately angry over the most insignificant things and demand that I give my attention to that issue. For example, he mailed me a bag of stale potato chips he had been served with his prison meal and insisted that I fight that grievance battle for him. When I declined it became a huge issue for him as most things did. He was prone to outbursts of rage directed at me, but he would sometimes be very apologetic afterwards.

18. In preparing an investigation plan for the § 2255 case, I identified the need to obtain mental health experts, specifically a neurologist and an expert in fetal alcohol syndrome, but we never hired them due to lack of funding. We were able to get a little bit of money from the court for Dr. Peterson, the defense expert psychiatrist at trial, who was already familiar with Mr. Purkey's case. I also recall working with Dr. Cunningham, the defense psychologist from trial, in the 2255. However, our mitigation investigation got cut off at the pass by the court's limited budget, and I knew we would not be able to get more money for additional experts. Our decisions about Mr. Purkey's mental health were driven primarily by funding from the start. It was and is my opinion that Mr. Purkey has significant mental health issues. His complex mental health problems made it difficult for him to meaningfully participate in his defense. Mr. Purkey's competence became our main mental health concern, and Dr. Peterson evaluated Mr. Purkey and assisted us in trying to obtain appropriate psychiatric medication treatment for our client. Every day was an effort to keep Mr. Purkey from flying off in a completely different direction so that he could work with us productively enough to get the § 2255 petition filed and litigated without

**001782**

Ex_13-000815

him constantly threatening to file motions to proceed pro se or to waive his litigation because he was upset about other things.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed this 2nd day of August, 2017.

_____

Teresa L. Norris

Ex_13-000816