# Exhibit 27

### Declaration of Stephen E. Peterson, M.D.

I am a Board Certified Forensic and General psychiatrist, licensed in Kansas and Missouri. I was first retained to evaluate Wesley Purkey by Aline Pryor in late 1999. Ms. Pryor had been appointed to represent him on the Mary R. Bales case then pending in Wyandotte County, Kansas. I knew at that time that Mr. Purkey had also confessed to the rape and murder of Jennifer Long and would likely face a capital charge in the federal court system.

I evaluated Mr. Purkey for the Bales case in December 1999 and March 2000. I issued a report on April 19, 2000. In that report I discussed extensive loss of interpersonal boundaries, physical abuse within the family, tremendous family disruption, his extensive sexual abuse, and extreme abnormal sexual training of Wes Purkey. Some of the topics included that Mr. Purkey learned not to ask why men punched his mother in the face, why she had different men in her bedroom, learned to lie about whom his mother dated, never felt comfortable with his mother or his father, and felt his life had been truly disrupted since age 8 or 9 years old. Initially, he denied any sexual involvement with his mother, preferring to state it was his mother's girlfriend, then tearfully clarified that his mother began sexual contact with him when he was 9 or 10 years old and it did not end until he was 22 years old. He felt great shame and guilt for what happened. She bathed him, taught him how to perform oral sex on her, and seemed to feel lonely and unloved. He took on the belief that he was responsible for her sexual activity with him and eventually angrily tried to kill himself by cutting his wrist with a straight razor after a drunken sexual encounter with his mom. He endured beatings by his father and eventually hit his own father over the head with a whiskey bottle for abusing him and his mother. In addition, others within the family circle fondled Mr. Purkey when he was a preteen. These were other women. His mother taught him to anally stimulate himself and her as well as vaginally stimulate her. For a time, these became abnormal obsessive self-stimulation behaviors for him. He often tried to minimize his own horrible experiences, especially in group therapy while incarcerated, because other men reported much more severe traumas. In this way, he errantly discounted his own experiences, a common consequence of severe sexual abuse.

In late 2001, after Mr. Purkey was indicted in federal court and it was clear that the government would seek the death penalty, I was contacted in late December 2001 by Fred Duchardt, who had been appointed to represent him. The focus of the assessment for the new legal mater was to be structured around the previous assessment of Mary Bales. Of note, reports of his having been poisoned, prior head trauma, and "severe upbringing" were to be eventually revisited. Duplication of prior assessments was to be avoided. While I consulted with Mr. Duchardt and reviewed some information, I did not actually examine Mr. Purkey again until late 2002. During most of the defense team effort to represent Mr. Purkey, Mr. Duchardt and co-counsel, Laura O'Sullivan, had great difficulty effectively consistently communicating with Mr. Purkey. During large portions of pre-trial evaluation and preparation, Mr. Purkey was not effectively treated with proper psychiatric medications and needed to be. Substantial efforts were put forth by Mr. Duchardt and this writer to obtain effective psychiatric medication treatment for Mr. Purkey.

My last examination of Mr. Purkey prior to his capital trial was in December 2002, even

1

000496

Ex_27-001512

though the trial did not occur until approximately a year later. My final report was submitted on August 13, 2003. In that report, I clearly referenced prior records that I had reviewed, including specific records from the Oregon Department of Corrections that referenced Mr. Purkey's report of being sexually abused between the ages of 6 and 10. I also included a finding of longstanding sexual abuse by his mother.

With respect to the sexual abuse, most of the information Mr. Purkey provided to me on this topic was done in connection with the Bales case. I was surprised when I looked back at my report in this case that I did not include more graphic narrative history regarding the sexual abuse. I certainly thought at the time and included in my discussion that the physical and sexual abuse of Mr. Purkey shaped his behavior very dramatically and contributed to the events of both offenses. In retrospect, I did not emphasize the pivotal role of sexual abuse enough with Mr. Purkey in this case where it was pertinent mitigation evidence. Even so, I believed I had made a strong case for emotional, sexual, and physical abuse as causative in shaping his extremely damaged psychological development.

I do not recall now why I did not specifically explain individual topics of emotional, physical, and sexual abuse more graphically in my report or testimony, except that Mr. Duchardt had asked me to not reduplicate information available from the Bales report. Normally, a comprehensive summary of social history and background interviews, along with all the prior records would have been be done by a mitigation specialist and provided to me and the other mental health experts to assist us in digesting such an enormous amount of information. That was not done in this case. Instead, I was provided with approximately 3,500 pages of records and only a brief index of those records.

I was not aware, that prior to trial, Mr. Duchardt informed the court he had been able to dispense with the hiring of a mitigation specialist, in part due to my work. I have worked with mitigation specialists previously in capital cases.

Mitigation specialists are typically social workers that are trained in interviewing people to obtain sensitive information and gather records and other information concerning a defendant's entire life history and background. Mitigation specialists conduct necessary interviews, review all of the records obtained, and then prepare a comprehensive well-documented psychosocial history that is then provided to other mental health experts, such as me, to assist us in conducting competent and reliable evaluations. In essence, all of this information can be mitigating in its own right, but it is also necessary for mental health experts to have full and complete information in order to ensure reliable diagnoses and information.

I did not perform the work of a mitigation specialist in Mr. Purkey's case and am not trained in the area of social work or this specialized field. I did not gather any records on my own. All of the records that I reviewed were provided to me by Ms. Pryor, Mr. Duma (who had replaced Ms. Pryor as court-appointed counsel in the Bales case), and Mr. Duchardt. All of the information concerning background interviews was also provided to me by Mr. Duchardt. I did not personally interview anyone other than Mr. Purkey.

2

000497

Ex_27-001513

I was aware prior to trial that Mr. Duchardt had retained other experts. I had been provided with reports from Dr. Leeson and Dr. Preston, but I did not talk with or consult with them. I did not consult with Dr. Cunningham or see his report, if one was written. This was unusual in my experience because normally when multiple mental health experts are retained, defense counsel will generally have them exchange reports and consult together at some point.

I believe it would have been very helpful to consult with the other experts in this case. For example, I am now aware that Mr. Purkey discussed with Dr. Cunningham the details of his sexual abuse and other traumatic exposures to sexual events during his childhood. As I did, Dr. Cunningham also clearly found that these events were significant in shaping Mr. Purkey's development and mental state. If we had discussed these matters beforehand, I likely would have highlighted this more in my report and preparation for my testimony.

Instead, when I testified during sentencing, I provided only general testimony about the extensive sexual abuse in the context that Mr. Purkey was severely sexually, physically, and emotionally abused in childhood so developed extremely abnormal psychosexual ideas. The only detail I included in my testimony was that Mr. Purkey had reported pervasive sexual abuse by his mother from age six to 14 and witnessed her sexual involvement with her boyfriends after his father left. I also mentioned his father's paying for prostitutes for him at a young age and how each of these things resulted in Mr. Purkey having substantial difficulties with emotional attachment to women. I also mentioned his prior diagnosis of psychosexual problems of identification. I did not include any of the raw details of what had happened to Mr. Purkey, such that the jury could really envision what had happened to Mr. Purkey as a child. During my testimony, I felt that I had made it clear that he had experienced a number of very severe childhood traumas that had a pervasive negative impact on his psychological development that was relevant to his degree of criminal responsibility.

Despite the reference in my own report to the Oregon Department of Corrections records in the Index and Review of Material sections, when I testified on cross-examination, I had forgotten about that report. Thus, I testified that the only prior report of sexual contact with his mother was her 1972 report that he raped her. I also testified that I was the only one Mr. Purkey told about sexual abuse in detail because I was the only one to ask. At that point, I was unaware of the details of Dr. Cunningham's assessment of Mr. Purkey. I was not aware then that Dr. Cunningham could also testify that Mr. Purkey had been exposed so such things as observing his mother having sexual intercourse with a man. In addition, as early as age eight, his mother began inappropriately touching his genitalia. After she separated from her husband, she would have him sleep with her and manually stimulate her sexually or penetrate her with the handle of a hairbrush. She would also have him to rub lotion on her breasts and genitalia. As he grew older, she had him to perform cunnilingus on her and she would manually stimulate him to orgasm. Ultimately, she sporadically engaged him in sexual intercourse.

I do not know why this lapse of memory occurred on my part at the time during cross-examination. Clearly, Mr. Purkey had previously reported sexual abuse to the psychologist he saw in

3

000498

Ex_27-001514

the Oregon Department of Corrections and I had reviewed those documents as background for my own assessment of Mr. Purkey. I do not know why Mr. Duchardt did not object to the government's questions on this point or direct me to the records or my own report in redirect to clarify this point.

This is one specific example where I believe that the presence of a mitigation specialist in the defense team would have made a significant difference. In every other capital case for which I have been the defense expert, except for one, the defense retained a mitigation specialist. Had there been a mitigation specialist, the defense team would not have failed to bring the Oregon records in front of the jury. Nor would they have failed to contact Dr. Rex Newton. Because of the absence of a mitigation specialist, however, the government was able to impeach the reports of sexual abuse to me by implying that Mr. Purkey fabricated them to me in order to avoid the death penalty. This was clearly incorrect since he had reported it to Dr. Newton at the Oregon State Penitentiary in 1987. Nonetheless, the jury did not hear the truth on this point and I believe this was very damaging to Mr. Purkey's case.

The extensive sexual abuse that Wes Purkey suffered, with the subsequent prolonged intense loss of personal security and safety, helps clarify one of the very important life traumas that caused his psychological development to become extremely fragmented and intermixed with mood swings, extreme anxiety, severe substance abuse, and rage attacks. As a pre-adolescent, he would have been much more vulnerable to and shaped by his family environment due to his tender years. These extreme losses of interpersonal boundaries within his family lasted until he was 22 years old, thus encompassing nearly all of his tender developmental years and then were never effectively treated by any mental health practitioner. Very often as a consequence of such prolonged psychological traumas, there is a higher incidence of disordered behavior, acting-out behavior and criminal activity in persons, especially men, who have suffered extensive emotional, sexual, and physical abuse. Mr. Purkey's abuse experience started at such a young age by the hands of those he needed to protect him. He was powerless to protect himself and unable to prevent the tragic impact on his psyche as well as how he views the world. As recently as this month, October 2007, he still is virtually unable to discuss the details of the abuse. Such reluctance is extremely common for abused boys who grow into manhood. He feels as though, when he does talk about it, that he is betraying his mother. He feels that it does not alleviate his responsibility and he does not want to use the abuse as a crutch. He errantly feels he must protect his mother, and defend her from what she did. These feelings are indicative of a person who was sexually abused as a child. He seems to defend his mother, to protect the few good memories he actually has from his childhood. He expresses that telling people about his abuse is not very masculine. He has a hyper-masculine mindset, such that men are expected to be strong protectors of their families and themselves. Thus, to focus on being a sexual abuse victim is counterintuitive for his personality style and against his psychological defense mechanisms, which protect his view of himself and his mother. Despite this front of emotional competence, he still experiences nightmares of the abuse. Mostly what he can remember is the anger that he felt. As a child, he withdrew from normal personal contacts, as it was emotionally less frightening. The anger is most likely a combination of reaction to childhood powerlessness, loss of personal physical safety, and amorphous rage, as he incorrectly believes he should have been able to protect himself from his chaotic parental environment. Mr. Purkey's abuses and mental health problems are not resolved but

4

000499

Ex_27-001515

he ineffectively acts the role of a fully capable adult. These are roles that he thinks important for a man to act, such as strong, tough, without need to share his feelings, and loyal even to his abusive mother. In therapy groups, he could not talk about his sexual abuse in front of other men. He was protecting himself, and he was playing a role. In therapy, he was trying to find out something about himself.

As a child, he could not confide in anyone about the abuse. But there were people who knew. His Aunt Carrie Burke was aware that something sexual was going on with him and his mother. His history reflects that others knew of the abuse or believed his maternal relationship was toxic. For example, in 1967 he was admitted to St. Francis. Hospital notes show that the hospital would not permit his mother to visit him. He reported that this was because his Aunt Carrie Burke, GaGa, told the hospital that his mother was sexually abusing him, that she had seen her molesting him, and had actually kicked her out of the house. His aunt had also seen Mr. Purkey's mother and father naked, physically fighting one another, and witnessed his mother with other men in front of him, naked and very sexual. Mr. Purkey reported that when he was young, the nuns at school frequently asked him what was wrong and what was going on at home. However, he never felt that he could open up to them.

Mr. Purkey was comfortable in opening up to Dr. Newton in the Oregon Department of Corrections. He was trying to improve himself then, and was involved in group therapy called the "State Raised" group. To become a member, a prisoner had to be incarcerated for at least 12 years. There were between 10 and 15 inmates involved in each therapy session. It was called State Raised because the group members were literally raised by the state in confinement. The focus was about prisoners trying to identify what they had felt throughout their lives and create ways to change their life direction. Dr. Newton also had individual therapy sessions with him and he was able to share with him some of the history of abuse.

Finally, I had consulted with Mr. Duchardt prior to trial concerning the possibility of my testifying in the guilt-or-innocence phase of the trial. I do not know why he chose not to call me during the trial. My opinion did not really support a defense to the charges. Even so, Mr. Purkey had told me on numerous occasions that he did not kidnap Ms. Long, which I believe was the focus of the defense during the trial. After Mr. Purkey testified during the trial, I do not recall Mr. Duchardt calling me again about the possibility of calling me to testify during the trial itself. Our discussions after that time were all related to sentencing issues.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

This the 15TH day of October 2007.

_____
Stephen E. Peterson, M.D

5

000500

Ex_27-001516