IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WESLEY IRA PURKEY<br>Register Number 14679-045<br>U.S. Penitentiary Terre Haute<br>Terre Haute, IN  47802,<br><br>        Plaintiff,<br><br>    v.<br><br>WILLIAM P. BARR<br>Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC  20530<br><br>KATHLEEN HAWK SAWYER<br>Acting Director<br>Federal Bureau of Prisons<br>U.S. Department of Justice<br>320 First St., NW<br>Washington, DC  20534<br><br>       and<br><br>John Does 1-X<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 1:19-cv-03570-TSC<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY
INJUNCTION BARRING EXECUTION OF WESLEY PURKEY PENDING FINAL
DISPOSITION ON THE MERITS**

## **TABLE OF CONTENTS**

PAGE

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 4

    A.   Procedural Posture ........................................................................................................ 4

    B.   Mental Competency ...................................................................................................... 5

    C.   Efforts to Obtain Information from the Government .................................................... 8

ARGUMENT ............................................................................................................................ 11

    I.   This Court Should Issue a Preliminary Injunction To Stay the Proceedings.............................. 12

    A.   Mr. Purkey Demonstrates A High Likelihood of Success on His Eighth Amendment and Due Process Claims........................................................................................................ 12

        1.   Mr. Purkey Is Likely To Prevail On His Eighth Amendment Claims .................................... 14

        2.   Mr. Purkey Is Likely To Prevail On His Due Process Claim. ................................................ 16

    B.   Mr. Purkey Will Suffer Irreparable Harm Without an Injunction.............................................. 17

    C.   The Balance of The Equities and Public Interest Weigh In Favor Of A Preliminary Injunction 19

    D.   The Court Should Grant Mr. Purkey Expedited Discovery ...................................................... 22

CONCLUSION .......................................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amaya-Ruiz v. Stewart,*
   136 F. Supp. 2d 1014 (D. Ariz. 2001) ................................................................................. 22

*Barefoot v. Estelle,*
   463 U.S. 880 (1983) ............................................................................................................ 16

*Battaglia v. Stephens,*
   824 F.3d 470 (5th Cir. 2016) .............................................................................................. 20

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ....................................................................................... 21, 24

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.,*
   317 F. Supp. 3d 555 (D.D.C. 2018) ................................................................................. 14, 15

*Commonwealth v. Banks,*
   29 A.3d 1129 (Pa. 2011) ..................................................................................................... 23

*Eldridge v. Thaler,*
   Civil Action No. H-05-1847, 2009 WL 3856672 (S.D. Tex. Nov. 17, 2009) .................................. 18

*Ferguson v. Sec'y for Dept. of Corr.,*
   716 F.3d 1315 (11th Cir. 2013) .......................................................................................... 22

*Ford v. Wainwright,*
   477 U.S. 399 (1986) .................................................................................................... *passim*

*Green v. State,*
   374 S.W.3d 434 (Tex. Crim. App. 2012) ............................................................................. 24

*Harris v. Johnson,*
   323 F. Supp. 2d 797 (S.D. Tex. 2004) ................................................................................. 22

*In re Hearn,*
   376 F.3d 447 (5th Cir. 2004) .............................................................................................. 16

*Ingraham v. Wright,*
   430 U.S. 651 (1977) ............................................................................................................ 20

*John Doe Co. v. Consumer Fin. Prot. Bureau,*
   849 F.3d 1129 (D.C. Cir. 2017) ....................................................................................... 13, 14

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton,*
   752 F.3d 755 (9th Cir. 2014) .............................................................................................. 15

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) .................................................................................. 20, 21

*Madison v. Alabama,*
  139 S. Ct. 718 (2019) ............................................................................... 5, 16, 17, 18

*Miller v. Stewart,*
  231 F.3d 1248 (9th Cir. 2000) ............................................................................ 14, 16

*In re Moser,*
  69 F.3d 690 (3d Cir. 1995) ................................................................................. 14, 16

*Nat'l Parks Conservation Ass'n v. Semonite,*
  No. 17-CV-01361-RCL, 2018 WL 3838809 (D.D.C. July 3, 2018) ............................ 14, 15

*Nat'l Wildlife Fed'n v. Burford,*
  835 F.2d 305 (D.C. Cir. 1987) .................................................................................. 15

*Nken v. Holder,*
  556 U.S. 418 (2009) ........................................................................................... 14, 21

*Nooner v. Norris,*
  No. 5:06CV00110 SWW, 2006 WL 8445125, at *4 (E.D. Ark. June 26, 2006) ................ 24

*Osorio-Martinez v. Attorney Gen. of the U.S.,*
  893 F.3d 153 (3d Cir. 2018) ...................................................................................... 24

*Panetti v. Quarterman,*
  551 U.S. 930 (2007) ......................................................................................... *passim*

*Population Inst. v. McPherson,*
  797 F.2d 1062 (D.C. Cir. 1986) ................................................................................. 15

*Santosky v. Kramer,*
  455 U.S. 745 (1982) .................................................................................................. 21

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) ................................................................................... 14

*Smith ex rel. Smith v. Armontrout,*
  626 F. Supp. 936 (W.D. Mo. 1986) ............................................................................ 21

*Steele v. United States,*
  287 F. Supp. 3d 1 (D.D.C. 2017) ......................................................................... 14, 15

*Wainwright v. Booker,*
  473 U.S. 935 (1985) (Powell, J., concurring) ...................................................... 7, 20, 21

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
  559 F.2d 841 (D.C. Cir. 1977) ................................................................................... 15

*Wilson v. Grp. Hospitalization & Med. Servs., Inc.*,
  791 F. Supp. 309 (D.D.C. 1992)................................................................................... 6, 20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................................................... 13, 14

*Wood v. Quarterman*,
  572 F. Supp. 2d 814 (W.D. Tex. 2008) ............................................................................ 24

**Other Authorities**

Irving B. Weiner & W. Edward Craighead, eds., *The Cornsini Encyclopedia of
  Psychology* (4th ed., vol. 1 2010)................................................................................... 10

U.S. Const. amend. V......................................................................................................... 6, 20

## INTRODUCTION

Attorney General Barr has scheduled the execution of Mr. Wesley Purkey for December 13, 2019 in the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute"). Wesley Purkey is a 67-year-old man with Alzheimer's disease, a progressive form of dementia, and schizophrenia, who has suffered multiple, extensive traumatic brain injuries over several decades. These assaults on his brain are layered on top of his life history of atrocious trauma, including the repeated sexual abuse and molestation by those charged with caring for him as a child. As a result of his brain injuries, severe mental illness, and advancing disease, Mr. Purkey has significant memory impairments, grossly deteriorated cognitive function, paranoia, and delusions, all of which contribute to his present inability to rationally understand the reason the United States seeks to execute him. As such, his execution would violate the Eighth Amendment prohibition against cruel and unusual punishment. *Madison v. Alabama*, 139 S. Ct. 718 (2019); *Panetti v. Quarterman*, 551 U.S. 930 (2007); *Ford v. Wainwright*, 477 U.S. 399 (1986). Furthermore, upon a substantial showing of incompetence to be executed, Mr. Purkey is entitled to a hearing under the Fifth and Eighth Amendments. *See Panetti*, 551 U.S. at 949.

Mr. Purkey's execution date is currently stayed pursuant to an order in a related but separate case. *See* Order, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, Case No. 19-mc-145 (TSC) (D.D.C. Nov. 20, 2019). Therefore, Mr. Purkey files this protective motion in order to present an independent argument to enjoin his execution. Filing the motion at this time provides the Court with the time to fully consider the issues presented in the event the stay in the related matter is lifted.

The Court should enjoin the execution because Mr. Purkey satisfies the relevant criteria for a preliminary injunction. *First*, even on the basis of the evidence currently available to Mr.

Purkey and without the additional information he has been denied by the Government to date, Mr. Purkey is likely to succeed on his substantive claim that his current incompetency renders his execution unconstitutional and his procedural claim that he is entitled to a hearing about whether his execution would violate his rights under the U.S. Constitution. The Eighth Amendment's prohibition on cruel and unusual punishment bars the government from executing someone who is incompetent. *Panetti*, 551 U.S. at 934; s*ee also Ford v. Wainwright,* 477 U.S. 399 (1985). A condemned prisoner is deemed incompetent when he cannot rationally understand his punishment, or the reason for it. *Panetti*, 551 U.S. at 958–60. Mr. Purkey is currently incompetent to be executed. By virtue of his Alzheimer's disease, cognitive impairments, and severe mental illness he "lack[s] a rational understanding of the basis for his execution." Compl. Ex. 1 at 11–12. He presents this Court with substantial evidence of his incompetence through an expert evaluation finding him presently incompetent, as well as contemporaneous institutional records and psychiatric evaluations documenting decades of delusional behavior and rapidly progressing dementia. Having made a "substantial threshold showing of insanity," the Eighth Amendment entitles him to a hearing on his claim. *Panetti*, 551 U.S. at 948–50. Carrying out Mr. Purkey's execution without affording him an opportunity to prove his incompetency would violate the Due Process Clause of the Fifth Amendment. U.S. Const. amend. V.

*Second*, Mr. Purkey will suffer irreparable harm in the absence of preliminary relief. Without the Court's intervention, Mr. Purkey will be executed well before he can fully litigate his claims. As this Court has previously held, "nearly certain death" is "the ultimate irreparable injury." *Wilson v. Grp. Hospitalization & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992); *see also Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Mem.) (Powell, J.,

concurring) (irreparable harm that will result if stay is not granted "is necessarily present in capital cases").

*Finally*, the equities and the public interest favor a preliminary injunction. The Government's interests will not suffer from a preliminary injunction of Mr. Purkey's execution. Any exigency or need for expediency claimed by the Government simply does not exist, as evidenced by the Government's lengthy and self-imposed nearly two-decade moratorium on executions and the Government's failure to disclose information necessary for Mr. Purkey to press the claims asserted in this motion. In any event, any such concerns are minimal compared to the harm Mr. Purkey will suffer should his execution move forward as scheduled on December 13, 2019. The public interest is not served by executing an individual presenting a *prima facie* case of incompetence, such as Mr. Purkey, before he has had the opportunity to avail himself of the legitimate procedures to challenge his competence, as required by clearly existing United States Supreme Court authority. Accordingly, the public interest is only served by preliminarily enjoining Mr. Purkey's execution because it will allow this Court to follow the directives announced by the Supreme Court in *Panetti*.

In light of these factors, the Court should enjoin execution while Mr. Purkey's claims are being adjudicated. At the very least, the Court should prohibit the Defendants from seeking to carry out the execution until Mr. Purkey has had an opportunity to conduct expedited discovery that would allow him to identify and obtain information integral to his claims and present a renewed motion for preliminary relief supported by additional, relevant evidence.

## BACKGROUND

### A.    Procedural Posture

On July 25, 2019, Attorney General Barr scheduled Mr. Purkey's execution for

December 13, 2019. As a result of his brain injuries, severe mental illness, and advancing

Alzheimer's disease, Mr. Purkey has significant memory impairments, grossly deteriorated

cognitive function, paranoia, and delusions, all of which contribute to his present inability to

rationally understand the reason the United States seeks to execute him.

Mr. Purkey filed a complaint in this case on November 26, 2019 raising serious

constitutional concerns with his execution. *First*, Mr. Purkey alleges that his execution would

violate the Eighth Amendment prohibition against cruel and unusual punishment. *See* Compl. at

51–55 (Count I). *Second,* Mr. Purkey alleges that his execution would violate due process under

the Fifth and Eighth Amendments. *See* Compl. at 55–56 (Count II). If Mr. Purkey's execution

proceeds, he will suffer the gravest harm imaginable; one that can never be remedied.

In this suit, Mr. Purkey does not seek relief from his sentence. Instead, he seeks to enjoin

Defendants from carrying out his execution in a manner and under circumstances that violate his

Fifth and Eighth Amendment rights. A competency to be executed claim is not ripe until it is

time to execute the sentence. *Panetti*, 551 U.S. at 947 (citing *Stewart v. Martinez-Villareal,* 523

U.S. 637, 643–45 (1998))*.* Thus, rather than bringing a claim prematurely before it had ripened,

Mr. Purkey presents his claim to this Court now, close in time to his scheduled execution date.

On October 25, 2019, other counsel on behalf of Mr. Purkey filed a separate action in

this Court challenging violations of the APA and constitutional law with respect to the

Government's July 25, 2019 adoption of a new lethal injection protocol and seeking injunctive

and declaratory relief. That suit was consolidated with similar challenges, and on November 20,

2019, the Court issued an order granting injunctive relief to stay Plaintiffs' executions. *See* Order, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, Case No. 19-mc-145 (TSC), (D.D.C. Nov. 20, 2019). On December 2, 2019, the D.C. Circuit denied the Government's motion to vacate the stay of execution in place in Mr. Purkey's case. Order, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, Case No. 19-5322 (D.C. Cir. Dec. 2, 2019). Following that ruling, the Government applied to the Supreme Court of the United States for a stay or vacatur of the injunction. *In re Federal Bureau of Prisons' Execution Protocol Causes*, No. 19A615 (filed Dec. 2, 2019).

### B.    Mental Competency

Mr. Purkey's mental condition, described by the lawyers and investigators on his defense team, as well as by experts who have evaluated him over decades, reveals deterioration, paranoia, and delusion. *See, e.g.*, Compl., Ex. 1 at 9 ("In addition to Mr. Purkey's longstanding poisoning delusions, he has for many years adhered to a delusional belief system that the guards and prison are engaged in systemic retaliation against him for his legal work"); Compl., Ex. 13 at 561 (May 15, 1981, psychiatric evaluation reporting auditory hallucinations as Mr. Purkey held two conversations at the same time, "whisper[ing] in an entirely different conversation from what he [was] talking aloud."); Compl., Ex. 13 at 345 (May 1998 emergency room record noting Mr. Purkey was admitted because he "started to act paranoid," stating that "they" were watching him at all times and sprayed him with "poisonous mist several times" while he was sleeping"); Compl., Ex. 5 at 42 ("Early in my involvement [as Wes's mitigation specialist], Wes began exhibiting delusional thinking"); Compl., Ex. 7 at 74 ("Wes was constantly paranoid that various prison officials were trying to harm him in retaliation for his jailhouse lawyering," and his "paranoia also increased over time."); *see generally* R. Woodman Decl.

Mr. Purkey's cognitive decline, including memory loss, is evident from neuropsychological testing administered in 2003 and 2016, and from expert evaluations in 2016 and 2019. While the 2003 testing did not reveal memory deficits, testing did reveal moderate microsmia on the Smell Identification Test (SIT)—an early marker of dementias, including Alzheimer's Disease. Additionally, a brain scan from 2003 "indicated abnormalities in the area of the brain involved in memory and typically implicated in Alzheimer's disease." Compl., Ex. 3 at 20.

Thirteen years later, in 2016, neuropsychological testing revealed that Mr. Purkey was suffering from frontal lobe deficits and progressive dementia consistent with Alzheimer's disease. The testing revealed that Mr. Purkey had experienced significant declines in both memory and executive functioning since previous testing in 2003. Compl., Ex. 9 at 88. A follow-up report in 2018 revealed that Mr. Purkey's condition had continued to deteriorate since 2016, and recommended further neurology work-up, including brain imaging, and a reassessment of his neurological status. Compl., Ex. 12 at 120.

In 2019, Mr. Purkey was diagnosed with Alzheimer's disease, a progressive neurodegenerative disease that impacts memory, intellectual function and behavior. Compl., Ex. 3 at 28. *See also* Compl., Ex. 9 at 89 (Testing, medical and family history "strongly suggest" in 2016 that "Mr. Purkey is currently suffering from the beginning stages of a cortical neurodegenerative disease, such as dementia"); Compl., Ex. 12 at 120 (describing the reports of cognitive, physical and psychiatric decline and finding that this "reported change is very much consistent with progression of a cortical dementia"); Irving B. Weiner & W. Edward Craighead, eds., The Cornsini Encyclopedia of Psychology, p. 71 (4th ed., vol. 1 2010) (describing Alzheimer's Disease).

Dr. Bhushan Agharkar concluded to a reasonable degree of medical certainty that Mr.

Purkey "lacked a rational understanding of the basis for his execution." Compl., Ex. 1 at 11–12.

While Mr. Purkey could recite the Government's position that his execution is for the murder of

Jennifer Long, this recitation was merely "parroting," as he can repeat what others say but he

cannot rationally understand what it means. Mr. Purkey holds a "a fixed belief that he is going to

be executed in retaliation for his legal work, to prevent him from being a hassle for the

government." *Id*. This belief does not stand on its own but rather serves as a foundation for an

entire delusional system involving conspiracies of retaliation. This entire delusional system

makes it impossible for him to have "a rational understanding of the purpose of his execution."

*Id*. at 12.

Dr. Jonathan DeRight administered additional neuropsychological testing in August of

2019. Based on this evaluation, Dr. DeRight diagnosed Mr. Purkey with Alzheimer's disease.

Compl., Ex. 3 at 27–28. Dr. DeRight opined that the collateral information about Mr. Purkey's

decline was also highly consistent with Alzheimer's disease. Mr. Purkey's worsening cognitive

symptoms, including paraphasic word efforts, word loss, impaired recall of information he knew

before, and incontinence, are indicative of the progression of Alzheimer's disease. *See id.* at 27.

These conditions have rendered Mr. Purkey unable to understand the rationale for his

pending execution. *See, e.g*., Compl., Ex. 1 at 12 ("The lack of rationality from Mr. Purkey's

delusional thoughts and paranoia are compounded by the deterioration of his brain from his

dementia."); Compl., Ex. 3 at 20 (noting that Alzheimer's disease "can lead to more marked

problems with confusion, delusions, paranoia, problems with communication, and recall for

personal details."). Mr. Purkey holds an honest and deeply entrenched belief that the federal

Government plans to execute him not as punishment for the murder of Jennifer Long, but because

of his "protracted jailhouse lawyering." Compl., Ex. 15 at 994. In Mr. Purkey's mind, the

voluminous grievances and lawsuits he has filed throughout his incarceration "have had a

monumental impact in preventing correctional officers from depriving prisoners of their

constitutional rights." Compl., Ex. 5 at 41. Mr. Purkey believes that Attorney General Barr and

the Bureau of Prisons ("BOP"), therefore, developed a plot to kill him both as retaliation against

him for his previous litigation and to prevent him from future filings. *See, e.g*., Compl., Ex. 1 at

11 (finding that Mr. Purkey insists the Government is "eager[] to be rid of him and his successful

litigation"). Moreover, Mr. Purkey perceives his own counsel "as part of the conspiracy against

him and his efforts to litigate against the prison"—a belief that prevents him from cooperating

with them on matters related to his execution. Compl., Ex. 5 at 54.

### C.   Efforts to Obtain Information from the Government

Counsel for Mr. Purkey has made repeated efforts to get information from the BOP to

further evaluate his competency. The Government has failed provide the requested information

and denied his defense access to expert testing and highly probative information about their

client.

On October 9, 2019, Mr. Purkey's counsel submitted a request under the Freedom of

Information Act (FOIA) to the BOP for Mr. Purkey's updated BOP medical and mental health

records. R. Woodman Decl. ¶ 6, Ex. 8. Counsel also requested the surveillance video from Mr.

Purkey's cell, evidence of Mr. Purkey's current mental state and functioning. R. Woodman

Decl. ¶ 6; Ex.6. Counsel sought expedited processing in light of Mr. Purkey's December 13,

2019 scheduled execution date. Compl., Ex. 17 at 1456; R. Woodman Decl. ¶ 6. Counsel also

sent a copy of this request to USP Terre Haute Attorney-Advisory Katherine Siereveld. R.

Woodman Decl. ¶ 6, Ex. 9. Counsel had previously requested the video footage from Ms.

Siereveld on September 17, 2019.  R. Woodman Decl. ¶ 5, Ex. 4.

In a letter from the BOP dated October 10, 2019, Mr. Purkey's counsel was notified that

their request for expedited processing was granted and would be processed as soon as

practicable, but that processing the request may nonetheless take up to six months. Compl., Ex.

16 at 1454–55; R. Woodman Decl. ¶ 7. On October 11, 2019, counsel for Mr. Purkey wrote

again to Ms. Siereveld, noting that the response time was "untenable" in light of Mr. Purkey's

pending execution date and requesting the records as soon as possible. R. Woodman Decl. ¶ 7;

Ex. 11. Ms. Siereveld responded on October 16, 2019 that she would follow up to see about a

more expedited time frame.

On November 11, 2019, counsel for Mr. Purkey again asked for Mr. Purkey's medical

records and video records. This time, counsel asked that Defendant BOP provide the records

within ten days in light of Mr. Purkey's pending execution date set for December 13, 2019. R.

Woodman Decl. ¶ 7, Ex. 13. Ms. Siereveld acknowledged that "everyone involved is cognizant

that time is of the essence," and agreed to forward the request to the FOIA personnel handling

the request. To date, now less than 10 days before Mr. Purkey's execution, none of the requested

materials have been received.

The reports from Dr. DeRight and Dr. Agharkar both illustrate important questions of

fact that cannot be fully answered without the withheld medical records. For example, Mr.

Purkey's legal team reports that Mr. Purkey appears to be incontinent. Compl., Ex. 3 at 25. This

is an important marker of Alzheimer's Disease. Compl., Ex. 3 at 28. The medical records could

shed light on when Mr. Purkey's incontinence began, and the extent of his loss of this

biological function. Dr. Agharkar noted that Mr. Purkey has less movement on the right side of

his face, as if he had suffered a stroke. Compl., Ex. 1 at 10. Without the medical records,

counsel lacks information about whether Mr. Purkey has had a stroke.  These questions are

merely illustrative, not exhaustive, of the information withheld.

Defendants have also prevented Mr. Purkey from access to highly probative testing

ordered by his experts.  On September 26, 2019, Dr. Agharkar ordered brain image testing,

based on Mr. Purkey's history of cognitive deficits and the need to rule out an intracranial

process. *See* Case No. 2:19-cv-414, Dkt. 56-1 (*Ex Parte*); R. Woodman Decl. ¶ 9. Counsel

contacted appropriate authorities at USP Terre Haute to address institutional issues associated

with carrying out such testing and were advised that such testing would require a court order,

had to be done on-site by Defendant vendors, and had to be paid for by defense counsel. R.

Woodman Decl. ¶ 10. Mr. Purkey's counsel filed an *ex parte* motion for brain imaging in

October 2019, requesting a Court order directing that such testing occur at no cost to the Court.

Case No. 2:19-cv-414, Dkt. 56 (*Ex Parte*). This motion was denied on November 20, 2019.

Case No. 2:19-cv-414 (S.D. Ind.), Dkt. 75 (*Ex Parte*).

Defendants have additionally interfered with counsel's access to Mr. Purkey during this

critical period. Mr. Purkey filed various pro se documents, including a request to withdraw

pending litigation in October 2019. R. Woodman Decl. ¶ 11. The Southern District of Indiana

ordered a telephonic hearing regarding those filings with Mr. Purkey and his counsel. R.

Woodman Decl. ¶ 12. In anticipation of that hearing, Michelle Law, counsel for Mr. Purkey

traveled to USP Terra Haute from her office in Kansas City. R. Woodman Decl. ¶ 13. By car,

this trip is over six hours. The prison refused to allow counsel to meet with Mr. Purkey in

preparation for the imminent telephone conference. *Id*. Scheduling of legal calls and visits has

been more difficult, not easier, since the Government announced its intention to execute Mr.

Purkey on December 13, 2019. R. Woodman Decl. ¶ 14.

All of the efforts by Mr. Purkey's counsel to obtain critical medical records, protocol

documents, and video footage expeditiously have been unsuccessful, despite the fact that Mr.

Purkey's execution date is less than two weeks away.

## ARGUMENT

Courts consider four factors on a motion for a preliminary injunction: 1) the threat of

irreparable harm to the plaintiff if an injunction is not granted, 2) the likelihood of the plaintiff's

success on the merits, 3) the balance of the equities, and 4) the interests of the public. *Winter v.*

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also John Doe Co. v. Consumer Fin.*

*Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017). Irreparable harm and likelihood of success

are "the most critical" factors in whether a preliminary injunction is warranted. *Nken v. Holder*,

556 U.S. 418, 434 (2009).

Courts in this Circuit traditionally analyze the four factors using a "sliding-scale"

approach, whereby "a strong showing on one factor could make up for a weaker showing on

another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). That framework "allows a

movant to remedy a lesser showing of likelihood of success on the merits with a strong showing

as to the other three factors, provided that [there is] a 'serious legal question' on the merits."

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018)

(quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844

(D.C. Cir. 1977)). Absent a contrary holding from the D.C. Circuit, courts in this District

continue to apply the sliding-scale standard following the Supreme Court's decision in *Winter*.

*See, e.g.*, *id.* at 560–61; *Nat'l Parks Conservation Ass'n v. Semonite*, No. 17-CV-01361-RCL,

2018 WL 3838809, at *1 (D.D.C. July 3, 2018); *Steele v. United States*, 287 F. Supp. 3d 1, 3

(D.D.C. 2017); *see also John Doe Co.*, 849 F.3d at 1131 (citing *Holiday Tours* when describing

the requirements of a preliminary injunction). Courts repeatedly have held that where a petitioner

provides current evidence suggesting that he is not competent and "no court has ever made the

appropriate inquiry," the balance of these factors warrant a stay of execution for a competency

determination. *See, e.g., Miller v. Stewart*, 231 F.3d 1248, 1250, 1252 (9th Cir. 2000) (granting

stay of execution to determine competency because petitioner presented current evidence of

incompetence as well as evidence that his housing conditions are such that they "can cause

psychological decompensation to the point that individuals may become incompetent."); *In re

Moser*, 69 F.3d 690, 691 (3d Cir. 1995) (granting a stay of execution in order to determine

competency where competency had been an issue earlier in the proceedings and where petitioner

had previously been placed in psychiatric facilities).

Each of the preliminary injunction factors independently weighs in favor of an

injunction in this matter.

# I.    THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION TO STAY THE PROCEEDINGS.

### A.  Mr. Purkey Demonstrates A High Likelihood of Success on His Eighth Amendment and Due Process Claims.

Mr. Purkey is likely to succeed on his claims. To demonstrate that success on the merits

is sufficiently likely, a plaintiff "need not establish an absolute certainty of success."

*Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986); *see also Holiday Tours*,

559 F.2d at 843. Instead, it is ordinarily sufficient that "the plaintiff has raised questions going

to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for

litigation and thus for more deliberative investigation." *Holiday Tours*, 559 F.2d at 844; *see also Cigar Ass'n*, 317 F. Supp. 3d at 560–61; *Nat'l Parks Conservation Ass'n*, 2018 WL 3838809, at *1; *Steele*, 287 F. Supp. 3d at 3. But even under a more exacting standard, Mr. Purkey has a strong likelihood of success on the merits of each of his claims. Furthermore, a preliminary injunction is appropriate if the Court finds that any *one* of Mr. Purkey's claims is sufficiently likely to succeed. *See, e.g.*, *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 319 (D.C. Cir. 1987) (affirming that, "in light of the district court's conclusion that the [plaintiff] will likely succeed on . . . two counts, it correctly declined to reach the merits of the [plaintiff's] other claims"); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 n.1 (9th Cir. 2014) (reversing denial of preliminary injunction where "there is a likelihood of success on the merits on one claim").

   As set out in his Complaint and this Memorandum, Mr. Purkey presents lay and expert observations of his obvious mental and cognitive decline and current state of mental incompetence. He demonstrates a high likelihood of success and "[a] death sentence cannot begin to be carried out by the State while substantial legal issues remain outstanding." *Barefoot v. Estelle*, 463 U.S. 880, 888 (1983). It is only by enjoining Mr. Purkey's execution pending the hearing and determination of this motion that the Court can ensure the effective presentation and resolution of Mr. Purkey's *prima facie* competency claim. *Miller*, 231 F.3d at 1250; *In re Moser*, 69 F.3d at 692; *see also In re Hearn*, 376 F.3d 447 (5th Cir. 2004) (staying execution to allow investigation of mental retardation claim). Any other form of relief could result in the untenable situation where this Court finds a colorable competency issue to exist but cannot consider those arguments because the Government executed Mr. Purkey. Thus, this Court should enjoin and bar

Mr. Purkey's execution until this Court can resolve the merits of this *prima facie* competency claim.

### 1.  Mr. Purkey Is Likely To Prevail On His Eighth Amendment Claims

The Eighth Amendment's prohibition on cruel and unusual punishment bars the government from executing someone who is incompetent. *Panetti,* 551 U.S. at 934; *Ford v. Wainwright,* 477 U.S. 399 (1985); *see also Madison,* 139 S. Ct. at 722. A condemned prisoner is incompetent when he cannot rationally understand his punishment or the reason for it. *Panetti,* 551 U.S. at 958–60.

When a petitioner has made a substantial threshold showing of incompetency, he is entitled to a stay of execution for a judicial hearing regarding his competency:

> Once a prisoner seeking a stay of execution has made "a substantial threshold showing of insanity," the protection afforded by procedural due process includes a "fair hearing" in accord with fundamental fairness. *Ford*, 477 U.S., at 426, 424, 106 S. Ct. 2595 (opinion concurring in part and concurring in judgment) (internal quotation marks omitted). This protection means a prisoner must be accorded an "opportunity to be heard," *id.*, at 424, 106 S. Ct. 2595 (internal quotation marks omitted), though "a constitutionally acceptable procedure may be far less formal than a trial," *id.*, at 427, 106 S. Ct. 2595.

*Panetti*, 551 U.S. at 949.

The Supreme Court has recognized that evidence of either delusional disorders or dementia can establish a threshold showing of incompetency. As the Supreme Court recently explained in *Madison*, "a delusional disorder can be of such severity—can 'so impair the prisoner's concept of reality'—that someone in its thrall will be unable 'to come to grips with' the punishment's meaning." *Madison*, 139 S. Ct. at 729 (citing *Panetti*, 551 U.S. at 958; *Ford*, 477 U.S. at 409). Similarly, the Court recognized that dementia "can cause such disorientation and cognitive decline as to prevent a person from sustaining a rational understanding of why the State wants to execute him." *Id.*

In *Panetti*, the facts establishing the "substantial threshold showing" for and necessitating a competency hearing included merely "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row on February 3, 2004. The new evidence, according to counsel, demonstrated that petitioner did not understand the reasons he was about to be executed." *Panetti*, 551 U.S. at 938.

Here, Mr. Purkey presents a stronger factual basis regarding his current mental incompetence from more sources, including: a report of a neuropsychologist concluding that Mr. Purkey has dementia, a report of a neuropsychiatrist concluding that Mr. Purkey—due to his irrational delusions and dementia—does not have a rational understanding of the basis for his execution, and reports of the investigators on his case who have witnessed his decline and deterioration. Mr. Purkey presents a neuropsychiatric report from Dr. Agarkhar, finding that, by virtue of his Alzheimer's Disease, cognitive impairments, and severe mental illness, Mr. Purkey "lack[s] a rational understanding of the basis for his execution." Compl., Ex. 1 p. 11–12.

As in *Panetti*, Mr. Purkey "can recite the fact that his execution is for the murder of Jennifer Long, [but] he lacks rational understanding of that fact." *Id*. at 12. "This," Dr. Agarkhar explains, "is an example of parroting, rather than having a rational understanding." *Id.* Much like Scott Panetti, Mr. Purkey misunderstands the real reason for his execution, instead believing it is a "conspiracy of retaliation . . . for his legal work." *Id*. This "fixed belief" is "part of his long-standing delusions" (*id.*), which have persisted over decades, and are evidenced by numerous prior evaluations and institutional records as well as contemporaneous observations and opinions rendered by experts and defense team members. *See* Compl., Exs. 5, 7, 9–12.

Contemporaneous institutional records and psychiatric evaluations documenting decades of delusional behavior by Mr. Purkey and the progression of his dementia support this conclusion. *See* Compl., *Exs.* 1, 3, 9, 12–15. Further, affidavits and declarations of those interacting with him on a regular basis demonstrate his decline. *See* Compl., *Exs.* 5, 7. Thus, like the petitioners in *Panetti* and *Madison*, Mr. Purkey has made the substantial threshold showing of his incompetence for execution. *Eldridge v. Thaler*, Civil Action No. H-05-1847, 2009 WL 3856672 (S.D. Tex. Nov. 17, 2009) (finding a substantial threshold showing of *Ford* insanity where the petitioner "submitted evidence from lay observers about his bizarre behavior and his delusional statements," including a belief his food is poisoned, evidence that his mental health has deteriorated in the last few years, and expert evidence corroborating those observations and opining on incompetence).

2. *Mr. Purkey Is Likely To Prevail On His Due Process Claim.*

Under the Due Process Clause of the Fifth Amendment, Mr. Purkey is entitled to notice and an opportunity to be heard on the manner in which the Government will deprive him of his life and liberty. In a *Ford* inquiry, due process requires that once a prisoner has made the "substantial showing of insanity" he is entitled to "the protection afforded by procedural due process," including a hearing at which to present evidence on the ultimate issue of competency. *See Panetti*, 551 U.S. at 948–49 ("Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being." (quoting *Ford*, 477 U.S. at 411–12)).

A "fair hearing" is necessary under *Panetti* and *Ford* because there are facts that must be established at the time of, or shortly before, an execution date to determine if sanity is an issue. *Id.* at 948–49 (quoting *Ford*, 477 U.S. at 411–12, 426) ("fair hearing" necessary for fundamental fairness because "the fact or timing of [a prisoner's] execution [is] contingent upon establishment of a further fact"). Scott Panetti met the "threshold showing" when he filed a Renewed Motion To Determine Competency, supported by "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row." *Id.* at 938, 950. Here, Mr. Purkey, who has not previously received an execution-related competency hearing, has submitted hundreds of pages of evidentiary support demonstrating his current incompetence, as well as its historical progression and underpinnings. In the present case, Mr. Purkey has made a "substantial threshold showing" and, accordingly, is entitled to "'fair hearing' in accord with fundamental fairness." *Id.* at 949 (quoting *Ford*, 477 U.S. at 426).

Being "deprived of life" unequivocally implicates a constitutionally protected interest, U.S. Const. amend. V, and the Supreme Court has held that constitutionally protected "liberty interests are implicated" when the government plans to "inflict[] appreciable physical pain," *Ingraham v. Wright*, 430 U.S. 651, 674 (1977). Thus, carrying out Mr. Purkey's execution without affording him an opportunity to prove his incompetency would violate the Due Process Clause of the Fifth Amendment. This Court must accord Mr. Purkey an opportunity to be heard, which can only occur by the Court enjoining his execution pending a hearing and determination of this motion.

### B.   Mr. Purkey Will Suffer Irreparable Harm Without an Injunction.

Unquestionably, Mr. Purkey will suffer irreparable harm if the Court denies the motion for a preliminary injunction. To constitute irreparable harm, "the harm must be certain and great,

actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and it "must be beyond remediation." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)) (internal quotation marks and brackets omitted). Here, absent a preliminary injunction, Mr. Purkey will die at 8 a.m. on December 13, 2019. As this Court has previously held, "nearly certain death" is "the ultimate irreparable injury." *Wilson*, 791 F. Supp. at 314; *see also Wainwright*, 473 U.S. at 935 n.1 (Powell, J., concurring) (noting that the "irreparable harm [that] will result if stay is not granted . . . is necessarily present in capital cases"). In *Battaglia v. Stephens*, in determining whether a *Ford* stay was warranted, the Fifth Circuit granted a stay of execution because the petitioner had "presented some evidence of mental illness and delusions." 824 F.3d 470, 475 (5th Cir. 2016). Because the irreparable injury factor weighed so heavily in the petitioner's favor, it was enough that there was a possibility that his claim had some merit. *Id*. at 475–76.

Like others facing imminent execution, Mr. Purkey has alleged a harm that, if realized, cannot be corrected. Without the Court's intervention, Mr. Purkey will be executed well before he can fully litigate his claims. The threatened harm is "beyond remediation," *Newby*, 838 F.3d at 7–8, because no "adequate compensatory or other corrective relief will be available at a later date," *Chaplaincy*, 454 F.3d at 297. For Mr. Purkey, there is no later date. His claims are therefore "categorically irreparable." *Nken*, 556 U.S. at 435. Recognizing this basic reality, courts have found that the "requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases." *Wainwright*, 473 U.S. at 935 n.1 (Powell, J., concurring).

A preliminary injunction maintains the status quo, and is subject to future correction or even reversal, while the denial of a preliminary injunction is not susceptible to correction. The proper course is to maintain the status quo, so that life is sustained, because the decision to choose death is irreversible. When life is at stake, and Mr. Purkey's surely is, due process places a heightened burden of proof on the Government where the "individual interests at stake . . . are both 'particularly important' and 'more substantial than mere loss of money.'" *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (termination of parental rights). As the Government intends to extinguish Mr. Purkey's life, irreparable harm will result absent a preliminary injunction.

### C.    The Balance of The Equities and Public Interest Weigh In Favor Of A Preliminary Injunction

The balance of the equities and public interest also favor a preliminary injunction. Where the government opposes a preliminary injunction, these two factors merge. *See Nken*, 556 U.S. at 434–35. This Court has an interest in granting a preliminary injunction in order "to protect the Court's jurisdiction over the case, for if the inmate was executed while the competency question was pending, the case would become moot even if it later appeared that the inmate clearly was incompetent." *Smith ex rel. Smith v. Armontrout*, 626 F. Supp. 936, 939 n.1 (W.D. Mo. 1986). A cognizable *Ford* claim presents important constitutional questions courts must approach with "deliberate and thoughtful" consideration, for "a ripe *Ford* claim is due the same consideration as other issues raised in a first habeas petition." *See Amaya-Ruiz v. Stewart*, 136 F. Supp. 2d 1014, 1030–31 (D. Ariz. 2001) (granting stay of execution pending resolution of the *Ford* claim). Consequently, the question becomes what equitable interest does the Government possess in executing someone who is presumptively incompetent?

Although the Government might claim it will be harmed if there is delay in its scheduled execution of Mr. Purkey, such a claim must necessarily be rejected, as the Government itself

elected to delay Mr. Purkey's execution, as well as the execution of any other federal prisoner, for nearly two decades. Arbitrarily setting an execution date of December 13, 2019, after years of delay by the Government itself and at its sole discretion, does not create a true exigency here. This critical fact undermines any claims the Government may have on the grounds of prejudicial delay. Moreover, other courts have found "little potential for injury" as a result of a delayed execution date. *See*, *e.g.*, *Harris v. Johnson*, 323 F. Supp. 2d 797, 809 (S.D. Tex. 2004). Any potential harm to the Government caused by a delayed execution is outweighed by the clear and obvious harm to Mr. Purkey and by the public's interest in a constitutional application of the execution protocol. And not delaying the execution undermines the rule of law as pronounced by *Ford* and *Panetti*—that we as a society do not execute the incompetent. Moreover, the complexity of the issue before the Court, as well as the unsettled nature of this area of the law, also countenance in favor of granting a stay. *See Ferguson v. Sec'y for Dept. of Corr.*, 716 F.3d 1315, 1318 (11th Cir. 2013) (noting that after *Panetti*, "there is not yet a well-defined bottom line in this area of the law.").

Further, as noted above, the Government has failed to collect and provide counsel with medical records and expert testimony integral to Mr. Purkey's claim despite repeated requests and efforts by counsel for Mr. Purkey. The BOP imposed conditions on medically ordered brain image testing, including that it occur on-site with BOP contractors and that it be paid for by Mr. Purkey's defense counsel. R. Woodman Decl. ¶ 10. The BOP further refused to allow for the testing without a court order, leading to delay. *Id.*; *see* Case No. 2:19-cv-414, Dkt. 56-1 (*Ex Parte*). Additionally, despite multiple requests, the BOP has failed to provide Mr. Purkey with key information requested pursuant to FOIA requests. Specifically, counsel for Mr. Purkey delivered FOIA requests to the BOP for surveillance video, all BOP policies and procedures

relevant to the execution watch protocol implemented after July 25, 2019 and surveillance video following that time period, and updated medical and mental health records for Mr. Purkey. R. Woodman Decl. ¶ 6. Evaluation of Mr. Purkey's competence necessitates this information. While these expedited FOIA requests were ultimately granted, the BOP unilaterally imposed a six-month timeline for processing the requests, an untenable period of time given the pending execution date. *Id.* at ¶ 7. To date, none of these requested documents or videos have been provided to counsel. *Id.* Accordingly, the Government's failure to provide such information has led to delay.

Additionally, this case falls into a category of cases where filing is not proper until just prior to the imposition of the sentence. A competency to be executed claim is not ripe until it is time to execute the sentence. *Panetti*, 551 U.S. at 947 (citing *Stewart v. Martinez-Villareal,* 523 U.S. 637, 644–45 (1998). Thus, it is standard for courts to evaluate these cases in the weeks leading up to the scheduled execution. *See Commonwealth v. Banks*, 29 A.3d 1129 (Pa. 2011) (state court granting a stay the day before the prisoner's execution to allow for a hearing where the *Ford* claim was filed two weeks before the execution date); *Wood v. Quarterman*, 572 F. Supp. 2d 814 (W.D. Tex. 2008)) (federal district court granting a stay of execution, appointing counsel and ordering evaluation where prisoner raised the *Ford* claim six days before the execution date); *Green v. State*, 374 S.W.3d 434 (Tex. Crim. App. 2012) (appellate court grating a stay to review competency determination where prisoner raised his *Ford* claim seven days before the execution date).

Lastly, as the foregoing makes clear, Mr. Purkey's status has declined significantly in recent months and weeks. Mr. Purkey's legal team and experts have noted his decline over time.

R. Woodman Decl. ¶¶ 3–15. It is due to this decline, and Mr. Purkey's current mental incompetence, that the case is now before this Court and finally ripe for judicial consideration.

The Government may have a "strong interest in enforcing its criminal judgments," but that interest is not outweighed by the public's interest in a "humane and constitutional" application of the federal execution protocol. *Nooner v. Norris*, No. 5:06CV00110 SWW, 2006 WL 8445125, at *4 (E.D. Ark. June 26, 2006). Indeed, that interest will be served even if Mr. Purkey ultimately succeeds on the merits of his claims. He does not contest his conviction or the sentence of death. He contests only the unconstitutional way in which the Government proposes to execute him. In any event, "the fact that the government has not—until now— sought to" schedule Mr. Purkey's execution "undermines any urgency surrounding" its need to carry out Mr. Purkey's sentence. *Osorio-Martinez v. Attorney Gen. of the U.S.*, 893 F.3d 153, 179 (3d Cir. 2018). A preliminary injunction will therefore "not substantially injure other interested parties," the public, or the Government. *Chaplaincy*, 454 F.3d at 297.

There is no public interest in executing an incompetent person. The public interest is not served by executing an individual presenting a *prima facie* case of incompetence before he has the opportunity to avail himself of the legitimate procedures to challenge his competence, as required by clearly existing United States Supreme Court authority. Accordingly, the public interest is only served by preliminarily enjoining Mr. Purkey's execution because it will allow this Court to follow the directives announced by the Supreme Court in *Panetti*. The public has an interest in the equal application of the law in its judicial processes.

### D.   The Court Should Grant Mr. Purkey Expedited Discovery

As set forth above, the Government has imposed conditions on Mr. Purkey's pursuit of additional medical testing and has delayed in providing information requested pursuant to FOIA

requests, all of which are relevant to the claim Mr. Purkey currently brings before this Court. R. Woodman Decl. ¶ 6. Specifically, Mr. Purkey seeks: (1) the BOP medical and mental health records for Mr. Purkey from January 1, 2017 through present; (2) video surveillance of Mr. Purkey's cell from July 25, 2019 through present; (3) BOP polices and procedures regarding the day and night watch protocols for death row in effect from July 25, 2019 to present; and (4) access to Mr. Purkey for independent brain imaging as ordered by Dr. Bhushan Agharkar, Compl. Ex. 1 at 9.

Before a preliminary injunction hearing, Mr. Purkey requests that this Court order expedited discovery on these issues. Mr. Purkey's current competency is squarely at issue in the instant matter, and his ability to present a full picture of his current mental state is undermined by the lack of access to his most up to date medical records and doctor-ordered brain imaging, both of which are exclusively in the Government's possession and control. Likewise, the Government's failure to provide counsel with the requested policies and procedures and limited surveillance footage impedes Mr. Purkey's defense team from evaluating his current mental state in light of the execution watch protocol. See R. Woodman Decl. ¶¶ 6-7.

Following an accelerated discovery timeline to obtain the requested testing and documents and review these key materials, counsel may file a renewed motion for preliminary relief that takes into account this additional evidence.

## CONCLUSION

The Court should preliminarily enjoin the Government from proceeding to execute Mr. Purkey pending (a) the completion of expedited discovery, (b) the filing of a renewed motion for preliminary relief presenting additional evidence resulting from such expedited discovery and (c) the final determination of Mr. Purkey's claims.

DATED: December 4, 2019                Respectfully Submitted,

*/s/Charles F.B. McAleer, Jr.*
Charles F.B. McAleer, Jr. (DC Bar
#388681)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5963
Email: CMcAleer@milchev.com

*/s/Brian Fleming*
Brian Fleming (DC Bar #974889)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5871
Email: bfleming@milchev.com

*/s/Rebecca E. Woodman*
Rebecca E. Woodman (*pro hac vice*)
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

*/s/Michelle M. Law*
Michelle M. Law, MO Bar No. 45487
(appointment motion to be filed)
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile:  (417) 873-9038
Email: michelle_law@fd.org

***Counsel for Plaintiff***