**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WESLEY IRA PURKEY<br>Register Number 14679-045<br>U.S. Penitentiary Terre Haute<br>Terre Haute, IN  47802,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM P. BARR<br>Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC  20530<br><br>KATHLEEN HAWK SAWYER<br>Acting Director<br>Federal Bureau of Prisons<br>U.S. Department of Justice<br>320 First St., NW<br>Washington, DC  20534<br><br>and<br><br>John Does 1-X<br><br>Defendants. | No. 1:19-cv-03570-TSC |

**DECLARATION OF REBECCA E. WOODMAN, ATTORNEY AT LAW**

I, Rebecca E. Woodman, pursuant to 28 U.S.C. § 1746, declare and state the following:

1.    I am an attorney representing plaintiff Wesley I. Purkey ("Mr. Purkey" or "Plaintiff") in the above-captioned action ("Civil Action"). The Complaint in the Civil Action presents the claim that Mr. Purkey is presently incompetent to be executed, and therefore carrying out his execution while he is incompetent would be unconstitutional

under the Eighth Amendment and the Fifth Amendment's Due Process Clause.  *See Ford v. Wainwright*, 477 U.S. 399 (1985); *Panetti v. Quarterman*, 551 U.S. 930 (2007); *Madison v. Alabama*, 139 S.Ct. 718 (2019).  I am admitted to the Court *pro hac vice*.

2.      I am over eighteen (18) years old and competent to attest and declare to the matters set forth herein.  Unless otherwise stated, I have personal knowledge regarding the facts set forth herein.

3.      I have represented Mr. Purkey since 2013, when I was originally appointed under the Criminal Justice Act and 18 U.S.C. § 3599 by the U. S. Court of Appeals for the Eighth Circuit at the *certiorari* stage of Mr. Purkey's 28 U.S.C. § 2255 proceedings.  I have been involved in all subsequent aspects of investigation and litigation in Mr. Purkey's case.  This subsequent litigation includes the investigation and preparation of a petition pursuant to 28 U.S.C. § 2241, *Purkey v. Warden et al*., No. 2:19-cv-00414 (S.D. Ind.), *appeal pending* No. 19-3318 (7th Cir.), as well as the complaint filed in *Purkey v. Barr et al*, No. 1:19-cv-03570.  I, along with my co-counsel Michelle M. Law, were counsel of record for Mr. Purkey when a notice was issued on July 25, 2019 by Attorney General William Barr, scheduling an execution date for Mr. Purkey on December 13, 2019.

4.      Throughout the course of my representation of Mr. Purkey, my defense team and I have observed the effects of his longstanding mental health problems, which include past diagnoses of severe mental illness, including schizophrenia and complex Post-Traumatic Stress Disorder; multiple traumatic brain injuries; and progressive Alzheimer's Disease.  We observed that Mr. Purkey's mental health symptoms began to worsen after a "death watch protocol" was implemented at USP Terre Haute for prisoners

under execution warrant, who were moved to A Range, an isolated unit of cells within the

Secure Confinement Unit (SCU), following the execution notices issued on July 25,

2019. Concerned about Mr. Purkey's competency to be executed and his ability to work

with counsel, and given his scheduled execution date, the defense team and I began

taking steps immediately to obtain additional information relating to Mr. Purkey's current

mental health functioning.

     5.     We understood from Mr. Purkey that, as part of the newly implemented

death watch protocol, a bright flashlight was being shone in his eyes by Bureau of Prisons

(BOP) guards every 10 to 15 minutes, 24 hours per day, resulting in extreme sleep

deprivation.  Given the DOJ's and BOP's failure to provide us with a protocol detailing

the execution watch procedures, we were unable to verify whether this was an execution

watch policy.  Thus, my co-counsel, Michelle Law, sent an email to USP Terre Haute

Attorney-Advisor Katherine Siereveld on August 21, 2019, informing her that the

flashlight checks were interfering with Mr. Purkey's sleep and affecting counsel's ability

to communicate with him, and that a solution needed to be found.  In the alternative, Ms.

Law requested that she be allowed to provide Mr. Purkey a sleep mask to shield his eyes

from the bright flashlight.  Ex. 1.[1]  On August 28, 2019, Ms. Law sent Ms. Siereveld

another email requesting an answer about the sleep mask, since she would be visiting Mr.

Purkey the following morning and had a sleep mask to give to Mr. Purkey in the event

BOP approved the request.  In an email on August 29, 2019, Ms. Siereveld informed Ms.

Law that Mr. Purkey would not be allowed a sleep mask and that "[h]e can cover his eyes

with a blanket if that helps."  Ex. 2.  That same day, Ms. Law emailed Ms. Siereveld

requesting a copy of the written BOP policy concerning the night watch checks, to which

---

[1]  Unless otherwise stated herein, the exhibits attached hereto are true and genuine copies thereof.

Ms. Siereveld replied that she would have to do further research, but that "specific directives such as that are usually found in Post Orders which are Law Enforcement Sensitive and cannot be released." Ex. 3.

6.      On September 17, 2019, Ms. Law sent an email to Ms. Siereveld requesting preservation of range surveillance video in the SCU range where Mr. Purkey was currently housed. Ms. Law also requested that copies of the surveillance video be provided on a weekly basis, and offered to provide blank storage media for that purpose. Ms. Siereveld replied on September 19, 2019 that there was no mechanism to provide ongoing footage. Ms. Siereveld stated further that the preservation alone was "quite voluminous, but can be accomplished if necessary." Ex. 4. Ms. Law followed up on September 24, 2019 with a request to preserve all night watch range surveillance video since Mr. Purkey was moved to the new range or, in the alternative, the earliest video available for night watch hours and every night since and to come, and that a FOIA request was forthcoming. That same date, Ms. Siereveld responded that she had forwarded the request to the appropriate office to determine the time period for which the videos could be preserved. Ex. 5.

7.      Ms. Law and I waited two weeks for the BOP to communicate the dates they would preserve. When further communication was not forthcoming, on October 9, 2019, I prepared three separate expedited FOIA requests for the following: (1) a request for night watch and day watch surveillance video for limited date ranges in an effort to accommodate Ms. Siereveld's ability to facilitate preservation of the video in accordance with her previous email correspondence with counsel; (2) a comprehensive request for all records of BOP policies and procedures pertaining to the day and night watch protocol

implemented following issuance of the execution notices on July 25, 2019 and all video surveillance on the watch range dating from July 25, 2019 to the present; and (3) a request for Mr. Purkey's BOP medical and mental health records dating from January 1, 2017 to the present.  Ex. 6; Ex. 7; Ex. 8.  I delivered these FOIA requests to the relevant department of the BOP via email and U.S. Mail on October 9, 2019.  The same day I sent an email to Ms. Siereveld, notifying her in particular of the FOIA requests for the watch protocol surveillance videos, and stressing that it was imperative we obtain at least the surveillance videos pursuant to our limited request, given Mr. Purkey's impending execution date.  Ex. 9.

8.      On October 10, 2019, I received an emailed response to the FOIA request and attached letter from the North Central Regional Office of the Federal BOP, acknowledging receipt of the request and granting expedited processing, but stating that processing the request may take up to six months.  Ex. 10.  The following day, October 11, I informed Ms. Siereveld via email that our expedited request for the limited surveillance video had been granted, but that a potential six-month time frame for processing the request was untenable in light of Mr. Purkey's execution date. I asked Ms. Siereveld to provide a time frame within the next few weeks in which the videos could be made available, given the importance of the surveillance video to our representation of Mr. Purkey and the fact that she had indicated she could facilitate preservation of the video.  Ex. 11.  Ms. Siereveld responded to me on October 16 that she had no authority to circumvent the FOIA process, but that she would follow up "with our FOIA folks" and see if there was a more expedited time frame.  Ex. 12.  I heard nothing further from the Federal BOP about the matter.  I followed up with Ms. Siereveld again on November 11,

2019 about our FOIA requests, and Ms. Siereveld responded with a similar answer on

November 13, 2019, stating that "everyone involved is cognizant that time is of the

essence[,]" and that she would "forward your concerns along to the folks directly

involved in the FOIA process."  Ex. 13.  To date, despite Ms. Siereveld's

acknowledgement that "time is of the essence," none of the requested documents or

videos have been received.

9.       On September 6, 2019, Mr. Purkey filed a motion to withdraw his § 2241

petition and proceed without counsel in Case No. 2:19-cv-00414 (S.D. Ind.)  In an Order

dated September 11, 2019, the court rejected the document for filing because Mr. Purkey

was represented by counsel and directed that the motion be forwarded to counsel for Mr.

Purkey "who, consistent with counsel's professional obligations, shall review the

document and decide what action, if any, should be taken regarding the issues raised

therein."  Ex. 14.  Subsequently, on September 13, 2019, Mr. Purkey filed a letter

rescinding his waiver.  On September 16, 2019, the court issued an Order reiterating the

language of the court's previous Order, that the document was not accepted for filing and

ordering counsel to review the document and decide what action, if any, to take regarding

the issues raised therein.  Ex. 15.

10.      On September 26, 2019, I obtained a medical order for brain image testing

to be conducted on Mr. Purkey from one of our medical experts, Dr. Bhushan Agharkar,

who had previously evaluated Mr. Purkey in 2016.  Dr. Agharkar recommended testing

based upon Mr. Purkey's history of cognitive deficits and need to rule out an intracranial

process.  Ex. 16; Ex. 17.  Dr. Agharkar was also aware of Mr. Purkey's diagnosis of

progressive dementia such as Alzheimer's by Dr. Robert Oauou in 2016, as well as Dr.

Oauou's 2018 updated report of further progression of the disease following Mr. Purkey's

defense team's reports of Mr. Purkey's deteriorating mental health symptoms.

11.     In our efforts to accomplish the brain image testing as soon as possible,

my co-counsel Michelle Law corresponded with Ms. Siereveld by email and telephone

beginning September 26, 2019 to discuss the need for this testing.  Ex. 18.  Ms. Siereveld,

without citing any policy or other authority, imposed three conditions for the testing: (1)

it had to be done on-site with BOP contractors; (2) a court had to enter an order for the

testing; and (3) Mr. Purkey's defense counsel had to pay for the testing.  On October 4,

2019, Ms. Law sent an email to Ms. Siereveld confirming their telephone conversations

regarding the testing, and requesting information concerning the costs and procedures

associated with the testing.  In addition, Ms. Law informed Ms. Siereveld that counsel

needed this information first, and then would move for a court order authorizing the

testing. Ex. 19.  Ms. Law subsequently forwarded Dr. Agharkar's order to Ms. Siereveld,

along with his prescribed testing parameters, on October 9, 2019.  On October 16, 2019,

Ms. Siereveld sent an email outlining some of the estimated costs of the testing, and Ms.

Law responded on October 21, 2019 that she would begin the process of procuring

funding for the tests through her office.  Ex. 19.  On October 25, 2019, Ms. Law and I

filed an *ex parte* motion for brain imaging in Case No. 2:19-cv-00414 (S.D. Ind.).  The

motion explained that the testing was an "integral part" of the evidence we wanted to

gather in anticipation of filing a motion challenging Mr. Purkey's competency to be

executed.  Ex. 20.

12.     Approximately one week earlier, on October 17, 2019, I had been notified

by the Clerk of the District Court for the Southern District of Indiana that Mr. Purkey had

filed a mandamus petition in the Court of Appeals for the Seventh Circuit. Ex. 21.  On

October 21, 2019, Judge Hanlon issued an order directing counsel to respond to the

allegations in Mr. Purkey's Mandamus and file a status report by October 25, 2019, which

could be filed *ex parte*.  Ex. 22.  We subsequently filed an *ex parte* status report, in which

we set forth our concerns about Mr. Purkey's incompetency and inability to engage in

rational decision making, particularly since the implementation of the death watch

protocol since July 25, 2019 that was exacerbating Mr. Purkey's longstanding mental

health symptoms.  We detailed our diligent attempts to obtain information regarding the

execution watch protocol and the stresses on Mr. Purkey, records of his worsening his

mental impairments and consequent behavior, as well as our communications with BOP

about the logistics of conducting the brain image testing as recommended by Dr.

Agharkar.  Ex. 23.  We attached to our response a declaration of Dr. Craig Haney, a

psychologist and recognized expert on the psychological effects of solitary or isolated

confinement on mental health, who met with Mr. Purkey and opined that Mr. Purkey's

attempt to withdraw his appeals should be viewed with judicial caution and concern,

because his decision making was likely affected by the increased severity of his isolated

conditions of confinement in combination with his organic mental health condition from

which he suffers, that results in deteriorating cognition and dementia.  Ex. 24; Ex. 25.

Concurrently with that response, we also filed the *ex parte* motion for brain imaging

described above.  Ex. 20; Ex. 23.  That motion was later denied by the district court on

November 20, 2019, the same day the court denied Mr. Purkey's § 2241 petition.

13.     On October 28, 2017, the Court ordered counsel for Mr. Purkey to file a

supplemental response to Mr. Purkey's *pro se* filing and petition for mandamus no later

than October 30, 2019, specifically requesting that we address Mr. Purkey's allegations that he did not give counsel permission to file his § 2241 petition; that counsel deceived him by rewriting the petition to include issues that he was adamant should not be raised; and that he prohibited his capital habeas attorneys from filing the petition after he repeatedly and adamantly told them not to file it.  Ex. 26.  The court also issued a separate *ex parte* order for a telephonic status conference with Mr. Purkey to take place on October 31, 2019.  Ex. 27.  In response to these orders, Ms. Law and I filed an *ex parte* request for additional time to respond to the court's October 28 order, and for a continuation of the telephonic status conference, reiterating our ongoing concerns about Mr. Purkey's competency to be executed and his ability to engage in rational decision making and to communicate with counsel, and raising ethical concerns about attorney-client privilege, the potential of the court's orders to create a conflict of interest between counsel for Mr. Purkey and their client, and the standard of care owed to Mr. Purkey in light of his severe cognitive impairments.  We also informed the court that our mental health expert was scheduled to evaluate Mr. Purkey on November 7 and 8, 2019, and requested that our response await that evaluation.  Ex. 28.  The court subsequently issued an *ex parte* order on October 30, 2019, granting our motion for additional time, but denying our request to continue the telephonic status conference.  Ex. 29.  We then filed an *ex parte* motion to reconsider, arguing that we should have an opportunity to consult with Mr. Purkey and be present with him during the telephonic status conference, and that the court had not yet addressed our concerns about Mr. Purkey's competency and their ethical duties to their client in light of Mr. Purkey's mental impairments and need to

confer with their mental health expert following the scheduled evaluation in November. Ex. 30.

14.     With the court's telephonic conference scheduled for October 31, 2019, and not having heard anything from the court before the close of business on October 30, my team and I decided that Ms. Law should make an emergency trip to USP Terre Haute so that one of Mr. Purkey's lawyers could be present with him at the scheduled telephonic conference and consult with him beforehand.  When Ms. Law arrived at USP Terre Haute, she was informed by prison officials that she would not be allowed to visit Mr. Purkey or be present with him during the telephonic conference.  Ms. Law met in person with Katherine Siereveld in an effort to resolve the situation, but was unsuccessful. Shortly thereafter, we received an order from the court granting our motion to reconsider. Ex. 31.  The court subsequently rescheduled the telephonic conference for November 6, 2019.  Ex. 32.  Ms. Law, who had travelled to Terre Haute from Kansas City, Missouri late the previous night to be with Mr. Purkey, was forced to leave the prison and return to Kansas City without ever being given any opportunity to meet with Mr. Purkey.

15.     From the time that the execution notice was issued and Mr. Purkey was moved to A Range, my defense team and I sought to increase our communication with Mr. Purkey in order to address his needs and to monitor his mental health status, which has sometimes warranted emergency communication with Mr. Purkey.  Even though Mr. Purkey is under an execution warrant and communication with his counsel is vitally important, it has been extremely difficult at times to arrange for legal calls or visits with Mr. Purkey with officials at USP Terre Haute.  More than once our team has been told by SCU case managers that a visit or phone call could not be scheduled because the

visitation rooms were full or the telephone time slots taken on the requested dates.  It

appeared to us that the unavailability was due, in part, to the fact that five individuals,

including Mr. Purkey, were scheduled for execution in December 2019 and January

2020, and that the SCU was unprepared to handle the increased traffic.

16.     On October 30, 2019, I received an email from a court official for the

Southern District of Indiana that Mr. Purkey had filed a *pro se* civil action with the

district court on October 28, 2019.  Ex. 33.  Mr. Purkey alleges in that *pro se* filing that

he was selected for execution in retaliation for his grievances about BOP conditions of

confinement and his successful legal work on behalf of himself and other prisoners, and

that the BOP guards have confirmed this to him personally.

17.     On November 8, 2019, Dr. Bhushan Agharkar conducted an evaluation of

Mr. Purkey for his competency to be executed and competency to work with counsel.

For his review, Mr. Purkey's defense team provided Dr. Agharkar with updated medical

records obtained since his previous evaluation of Mr. Purkey in 2016, while noting that

we had been unable to obtain his updated records from his BOP medical and mental

health files, which remained pending pursuant to our FOIA request.  The team also

provided Dr. Agharkar with expert reports of neuropsychological testing by a previous

defense expert in 2003, Dr. Oauou's 2016 report diagnosing Mr. Purkey with progressive

dementia, as well as Dr. Oauou's 2018 update, an expert report from 2018 diagnosing Mr.

Purkey with complex PTSD, compendiums of grievances and *pro se* lawsuits Mr. Purkey

had filed over the years, including *pro se* motions to fire his attorneys and to withdraw

litigation filed by attorneys on his behalf, and declarations of our mitigation specialist Dr.

Elizabeth Vartkessian and former mitigation specialist John Fox, who detailed their

observations Mr. Purkey's delusional and paranoid behavior, and increasing memory loss

over the last 5 years.  Based upon his contemporaneous evaluation, his observations of

Mr. Purkey's behavior and mental status, and his review of the records, Dr. Agharkar

concluded in a written report dated November 19, 2019, that Mr. Purkey lacked a rational

understanding of the basis for his execution; instead,  Mr. Purkey has a fixed belief that

he is going to be executed in retaliation for his legal work. Dr. Agharkar found that Mr.

Purkey's lack of rationality is a result of his delusional thoughts and paranoia,

compounded with the deterioration of his brain due to Alzheimer's disease and his long

time complex PTSD. Dr. Agharkar also concluded that Mr. Purkey's brain damage,

dementia and delusions prevent him from effectively communicating or working with

counsel or working for his own interests.

18.     In August 2019, after the defense team began to observe Mr. Purkey's

rapid mental deterioration, counsel requested that Dr. Jonathan DeRight conduct an

updated neuropsychological examination of Mr. Purkey to assess whether Mr. Purkey's

dementia was related to Alzheimer's disease and whether it had progressed since his

previous evaluation in 2016.  Dr. DeRight submitted his written report on November 21,

2019, concluding that Mr. Purkey is appropriately diagnosed with Alzheimer's disease,

and documenting a marked deterioration.

19.     The evidence that would be presented at a hearing in support of our

petition is as follows:

- Report of Dr. Bhushan S. Agharkar dated 11-19-2019

- Report of Dr. Jonathan DeRight dated 11-21- 2019

- Declaration of Elizabeth Vartkessian, Ph.D. dated 11-15-2019

- Declaration of John D. Fox dated 11-6-2019

- Court orders and responses (*ex parte*) in Case No. 2:19-cv-00414, Dkt. 54, 55, 55-1, 55-2, 57, 59, 61, 62, 63, 64, 65

- *Ex Parte* Motion for Brain Imaging filed October 25, 2019 in Case No. 2:19-cv-00414, Dkt. 56

- FOIA requests for written BOP execution watch protocol and surveillance videos dated 10-9-2019

- FOIA request for Mr. Purkey's BOP medical and mental health records dated 10-9-2019

- Email correspondence with USP Terre Haute Attorney Advisor Katherine Siereveld dated 8-21-2019, 8-29-2019, 9-17-2019, 9-19-2019, 9-24-2019, 10-9-2019, 10-11-2019, 10-16-2019, 10-21-2019, 11-11-2019, 11-13-2019

    20.    The evidence that counsel for Mr. Purkey have diligently attempted to but

thus far have been unable to obtain and would require expedited discovery to present at a

hearing in support of our petition is as follows:

- Brain image testing per medical order of Dr. Agharkar dated 9-26-2019

- BOP medical and mental health records per FOIA request dated 10-9-2019 and response dated 10-10-2019

- BOP execution watch protocol and surveillance video per FOIA requests dated 10-9-2019 and response dated 10-10-2019

    I hereby declare, pursuant to 28 U.S.C. §1746, Fed. R. Civ.65 and Local Civil

Rule 65.1, and under penalty of perjury that the foregoing is true and correct to based on

my knowledge, information and belief.

Signed on this 4th day of December 2019.

Rebecca E. Woodman, Attorney at Law
Counsel for Petitioner Wesley I. Purkey