# Exhibit 24

## Opinion of Dr. Craig Haney as to the Filing from Wesley Purkey

## Introduction

1.      I was contacted by counsel for Wesley Purkey, who is incarcerated at U.S.P. Terre Haute under warrant of execution. Mr. Purkey, who suffers from pre-existing complex post-traumatic stress disorder, major depression and progressive dementia, has been on "execution watch" at Terre Haute since July 25, 2019. This means that he is in a special isolation cell, apart from other prisoners. Upon implementation of the execution watch, Mr. Purkey was moved to a so-called "shotgun cell" that is a cell much smaller than the cell he occupied prior to the execution watch, and which has two doors that separate him from the range hallway.  It is my understanding that as a part of the execution watch, prisoners are monitored through "cell checks" that occur around-the-clock, every 15 minutes. They are conducted even at night, when correctional officers use flashlights that they shine into prisoners' cells every 15 minutes.  Mr. Purkey has reported to his attorneys that these cell checks awaken him, or keep him awake throughout the night. It is also my understanding that Mr. Purkey's attorneys requested permission to provide Mr. Purkey a sleep mask to shield his eyes from the bright flashlights that awaken him every 15 minutes during the night but that prison authorities have denied the request.  Mr. Purkey has recently reported to his attorneys that during one cell check, a particular guard shone a flashlight on Mr. Purkey for an extended period of time while he was at the toilet urinating. I understand from counsel that they have requested video surveillance of these checks from the prison, but have not yet received the videos.

2.      In addition, Mr. Purkey has limited access to family and loved ones.  I understand that his daughter and only child, Angie Genail, must travel from Leavenworth, Kansas, to Terre Haute, Indiana, a round-trip distance of 442 miles,

in order to visit her father. She does not have the financial means to make frequent trips. However, during her last visit on October 20, 2019, she was arbitrarily denied permission to visit her father based on the pair of jeans she was wearing, even though she had been allowed to visit her father wearing the same jeans the previous two days. Her two minor children were sent up alone to visit their grandfather, and Ms. Genail, Mr. Purkey's daughter, was forced to leave the premises instead of being allowed to wait for them in the reception area near the front desk.

3.       Recently, in a filing docketed on October 17, 2019, Mr. Purkey has asked the Seventh Circuit Court of Appeals to waive an appeal that his attorneys filed on his behalf. I have also been made aware that Mr. Purkey attempted to file, and then withdrew, a motion to waive his appeal in the district court prior to filing his motion in the Seventh Circuit.  I was asked by his counsel to offer an opinion on whether his current conditions of confinement could have an impact on his mental health and whether they could be a factor in the October 17 filing. As discussed further below, the increased severity of Mr. Purkey's changed conditions of confinement, especially the increased level of isolation to which he now exposed and the sleep deprivation that he is now experiencing, are likely to have significantly impacted his mental health and affected state of mind and decision-making. They likely were a significant factor that contributes to and accounts for the letter he wrote effectively asking to be allowed to commit suicide.

**Expert Qualifications**

4.       I am Distinguished Professor of Psychology, and UC Presidential Chair, 2015-2018, at the University of California at Santa Cruz. I have been teaching graduate and undergraduate courses in social psychology, research methodology, psychology and law, forensic psychology, and institutional analysis

at the University of California for nearly 40 years. I previously served as the Chair of the Department of Psychology, Chair of the Department of Sociology, Director of the Program in Legal Studies, and Head of the Graduate Program in Social Psychology. I received a Ph.D. in psychology from Stanford University and a J.D. degree from the Stanford Law School. I have been the recipient of a number of scholarship, fellowship, and other academic awards and have published approximately one hundred scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on conditions of confinement and the psychological effects of incarceration. My book on the psychological consequences of imprisonment, Reforming Punishment: Psychological Limits to the Pains of Imprisonment,[1] was published by the American Psychological Association in 2006. (My curriculum vitae is attached to this Report as "Appendix A.")

5. For more than 40 years, I have been studying the psychological effects of living and working in institutional environments. In the course of that work, I have conducted what is perhaps the only laboratory experiment ever done on the acute psychological effects of prison-like environments.[2] This research, which has come to be known as the "Stanford Prison Experiment," is regarded as a classic

---

[1] Craig Haney, Reforming Punishment: Psychological Limits to the Pains of Imprisonment. Washington, DC: APA Books (2006).

[2] This study was originally published as Haney, C., Banks, C., and Zimbardo, P., Interpersonal Dynamics in a Simulated Prison, 1 *International Journal of Criminology and Penology* 69 (1973), and has been reprinted in numerous books in psychology and law and translated into several languages. For example: Steffensmeier, D., and Terry R. (Eds.) *Examining Deviance Experimentally*. New York: Alfred Publishing, 1975; Golden, P. (Ed.) *The Research Experience*. Itasca, Ill.: Peacock, 1976; Leger, R. (Ed.) *The Sociology of Corrections*. New York: John Wiley, 1977; *A kiserleti tarsadalom-lelektan foarma*. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, N., and Savitz, L. *Justice and Corrections*. New York: John Wiley, 1978; *Research Methods in Education and Social Sciences*. The Open University, 1979; Goldstein, J. (Ed.), *Modern Sociology*. British Columbia: Open Learning Institute, 1980; Ross, R. (Ed.) *Prison Guard/Correctional Officer: The Use and Abuse of Human Resources of Prison*. Toronto: Butterworth's 1981; Monahan, J., and Walker, L. (Eds.), *Social Science in Law: Cases, Materials, and Problems*. Foundation Press, 1985; Siuta, Jerzy (Ed.), *The Context of Human Behavior*. Jagiellonian University Press, 2001; and Ferguson, Susan (Ed.), *Mapping the Social Landscape: Readings in Sociology*. St. Enumclaw, WA: Mayfield Publishing, 2001; Pethes, Nicolas (Ed.), *Menschenversuche (Experiments with Humans)*. Frankfurt, Germany: Suhrkamp Verlag, 2006.

social psychological study of the effects of institutional environments.[3] In the nearly 50 years since that study was completed, I have continued to study and publish scholarly articles on the psychology of imprisonment. My research on this topic has included conducting numerous interviews with correctional officials, officers, and prisoners to assess the nature and consequences of living and working in correctional settings. In addition, I have statistically analyzed aggregate correctional data to examine the effects of overcrowding, punitive segregation, and other conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.

6.     In addition, I have toured and inspected and analyzed conditions of confinement at numerous state prisons (including in Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Idaho, Louisiana, Massachusetts, Montana, New Jersey, New Mexico, New York, Nebraska, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Washington, and Wyoming), maximum security federal prisons (at McNeil Island, Washington; Marion, Illinois; Lewisburg, Pennsylvania; and the United States Penitentiary and Administrative Maximum or "ADX" facility in Florence, Colorado), as well as prisons in Canada, Cuba, England, Hungary, Ireland, Norway, the Netherlands, and Russia. In 1989, I received a UC-Mexus grant to conduct a comparative study of prisons and prison policy in the United States and Mexico. As a result of that research grant, I toured a number of Mexican prisons, interviewed correctional officials and, in conjunction with United States Department of State officials, interviewed many United States citizens who were incarcerated in Mexico.

---

[3] The American Psychological Association sponsored a "retrospective" commemorating the 25th anniversary of this study at its Annual Convention a decade ago, and a 40th anniversary commemorative event two years ago at the Annual Convention in Washington, DC. *See also* Haney, C., and Zimbardo, P., The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment, 53 *American Psychologist* 709- 727 (1998); and Haney, C., and Zimbardo, P., The Stanford Prison Experiment, in Brian Cutler (Ed.), *The Encyclopedia of Psychology and the Law* (pp. 756-757). Volume II. Thousand Oaks, CA: Sage Publications (2008).

Case 2:19-cv-00414-JPH-DLP Document 55-1 (Ex Parte) Filed 10/25/19 Page 5 of 18
Case 1:10-cv-03570-TSC Document 7-26 Filed 12/04/19 Page 6 of 19
PageID #: 9392

7.      I have lectured and given invited addresses throughout the country on the psychological effects of living and working in institutional settings (especially maximum security prisons) at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association. I have also served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, the California Judicial Council, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the NAACP Legal Defense Fund, and the United States Department of Justice.

8.      In addition to the research I have conducted into the psychological effects of confinement and patterns of adjustment in institutional settings, I also have extensive experience evaluating the life histories and psychological reactions of individual clients in the criminal justice system. Beginning as a Law and Psychology Fellow at the Stanford Law School in the mid-1970s, I participated for several years in an intensive clinically-oriented course co-taught by law professor Anthony Amsterdam and psychiatrist Donald Lunde that sensitized me to the special problems and vulnerabilities of psychiatrically impaired criminal defendants and prisoners with special needs. Since that time, I have been extensively involved in teaching and conducting research on a variety of forensic issues that have placed me in continuing contact with diverse prisoner populations, many of whose members suffer from adverse effects of institutionalization, as well as preexisting psychiatric disorders and developmental disabilities.[4]

9.      I have often focused in this work on the effects of conditions of confinement on so-called "special needs" prisoners (primarily the mentally ill and

_____

[4] For example, *see* Haney, C., and Specter, D., Legal Considerations in the Treatment of "Special Needs" Offenders, in Ashford, J., Sales, B., and Reid, W., (Eds.), *Treating Adult and Juvenile Offenders with Special Needs* (pp. 51-79). Washington, D.C.: American Psychological Association (2000).

developmentally disabled). For example, under the auspices of the United States Department of Justice, I evaluated conditions of confinement and the quality of care provided at Atascadero State Hospital, a forensic facility designed to house mentally-ill and developmentally-disabled offenders for the State of California. As noted above, I testified as an expert witness concerning conditions of confinement and their effects on prisoners at the California Men's Colony, which was a treatment-oriented facility in which many mentally-ill prisoners were housed at the time I evaluated it. In addition, I evaluated the effects of conditions of confinement on prisoners at the California Medical Facility at Vacaville (including prisoners housed in the Department of Mental Health units),[5] and also testified about the prevalence of seriously mentally-ill prisoners in the California Department of Corrections, as well as the special psychological problems that living in isolated housing units created for them.[6]

10. I have also evaluated the psychological effects of conditions of confinement at juvenile justice facilities, on the condemned or "death row" units in several states (including Arkansas, California, New Mexico, and Texas), and in various special treatment facilities for sex offenders (in Florida and Washington).

**Extreme Penal Isolation and Its Effects on Mental Health**

11. It is my expert opinion that being housed in solitary or isolated confinement—especially over a long period of time—can and often does produce a number of negative psychological effects. It places prisoners at grave risk of psychological harm. I believe that these effects are now well understood and described in the scientific literature. There are numerous empirical studies that report "robust" findings—that is, the findings have been obtained in studies that were conducted by researchers and clinicians from diverse backgrounds and

---

[5] *Gates v. Deukmejian*, Civ-S-87-1636 LKK-JFM (E.D. Cal. 1990).
[6] *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995).

perspectives, were completed and published over a period of many decades, and are empirically very consistent. With remarkably few exceptions, virtually every one of these studies has documented the pain and suffering that isolated prisoners endure and the risk of psychological harm to which they are exposed.

12. In addition, the empirical conclusions are theoretically sound. That is, there are straightforward scientific explanations for the fact that long-term isolation—the absence of meaningful social contact and interaction with others— and the other severe deprivations that typically occur under conditions of isolated or solitary confinement have harmful psychological consequences. Social exclusion and isolation from others is known to produce adverse psychological effects in contexts other than prison; it makes perfect theoretical sense that this experience produces similar negative outcomes in correctional settings, where the isolation is so rigidly enforced, the social opprobrium that attaches to isolated prisoners can be extreme, and the other associated deprivations are so severe.

13. It should be noted that "long-term" or "prolonged" exposure to prison isolation is generally used in the literature to refer to durations of solitary confinement that are much briefer than the amounts of time that Mr. Purkey has been subjected to it. For example, the American Psychiatric Association (APA) defined "prolonged segregation" as segregation lasting for *four weeks* or longer (which the APA also said "should be avoided" for the seriously mentally ill).[7] Thus, Mr. Purkey has been subjected to durations of isolated confinement that far exceed—by substantial orders of magnitude—the amounts typically reported in the literature, studied by researchers, and considered psychiatrically problematic.

---

[7] American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), *available at* http://www.psych.org/File%20Library/Learn/Archives/ps2012 PrisonerSegregation.pdf

14. "Solitary confinement' and isolated confinement" are terms of art in correctional practice and scholarship. For perhaps obvious reasons, total and absolute solitary confinement—literally *complete* isolation from any form of human contact—does not exist in prison and never has. Instead, the term is generally used to refer to conditions of extreme (but not total) isolation from others. I have defined it elsewhere, in a way that is entirely consistent with its use in the broader correctional literature, as:

15. [S]egregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.[8]

16. Mental health and correctional staff who have worked in disciplinary segregation and isolation units have reported observing a range of problematic symptoms manifested by the prisoners confined in these places.[9] The authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."[10]

---

[8] Haney, *The Social Psychology of Isolation, supra* note 8, at footnote 1.

[9] For detailed reviews of all of these psychological issues, and references to the many empirical studies that support these statements, see, for example: Haney, *Mental Health Issues in Long- Term Solitary and "Supermax" Confinement*, and Haney & Lynch, *Regulating Prisons of the Future, supra* note 8; and Smith, *The Effects of Solitary Confinement on Prison Inmates, supra* note 18.

[10] Bruno M. Cormier & Paul J. Williams, *Excessive Deprivation of Liberty*, Canadian Psychiatric Association Journal, 11, 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Paul Gendreau, N. Freedman, G. Wilde, & George Scott, *Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement*, Journal of Abnormal Psychology, 79, 54-59 (1972); George Scott & Paul Gendreau, *Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison*, Canadian Psychiatric Association Journal, 12, 337- 341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, *Effect of Solitary Confinement on Prisoners*, American Journal of Psychiatry, 119, 771-773 (1963).

17.  A decade later, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important observations about the effects of isolation.[11] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, a build-up of physiological and psychic tension that led to incidents of self-mutilation.[12] 24 Professor Toch noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[13]

18.  More recent studies have identified other symptoms that appear to be produced by these conditions. Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, rage, paranoia, hopelessness, a sense of impending emotional breakdown, self- mutilation, and suicidal ideation and behavior.[14]

---

[11] Hans Toch, *Men in Crisis: Human Breakdowns in Prisons*. Aldine Publishing Co.: Chicago (1975).

[12] *Id.* at 54.

[13] *Ibid.*

[14] In addition to the numerous studies cited in the articles referenced *supra* at notes 11 and 15, there is a significant international literature on the adverse effects of solitary confinement. For example, see: Henri N. Barte, *L'Isolement Carceral*, Perspectives Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social

19. In addition, a number of correlational studies have been done examining the relationship between housing type and various kinds of incident reports in prison. They show that self-mutilation and suicide are more prevalent in isolated, punitive housing units such as administrative segregation and security housing or SHU, where prisoners are subjected to solitary-like conditions of confinement. For example, clinical researchers Ray Patterson and Kerry Hughes attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" that are generated by the "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there.[15] These

---

rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, *Einzelhaft: Eine Literaturubersicht* (Solitary confinement: A literature survey), Psychologie -Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, *Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft* (A controlled investigation on psychopathological effects of solitary confinement), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., *Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung* (Solitary confinement as a risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that prisoners who were hospitalized in a psychiatric clinic included a disproportionate number who had been kept in solitary confinement); Boguslaw Waligora, *Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej* (How men function in conditions of penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization"). See, also, Ida Koch, *Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems*, Working Papers in European Criminology, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125). See, also: Michael Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, *Long-Term Mental Sequelae of Political Imprisonment in East Germany*, Journal of Nervous & Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.

[15] Raymond Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004*, Psychiatric Services, 59, 676-682 (2008), at p. 678.

authors reported that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[16] Similarly, a team of researchers in New York recently reported that "[i]nmates punished by solitary confinement were approximately 6.9 times as likely to commit acts of self-harm after we controlled for the length of jail stay, SMI [whether the inmate was seriously mentally ill], age, and race/ethnicity."[17] In addition, signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence are also more prevalent in these units.[18]

20.    Not every isolated prisoner will suffer all of the previously described adverse psychological reactions to their severe conditions of confinement. But the overall nature and magnitude of the negative psychological reactions that I have documented in my own research and that have been reported by others in the literature underscore the stressfulness and painfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the risk of harm that it creates. The potentially devastating effects of these conditions are

---

[16] Ibid. See also: Lindsay M. Hayes, *National Study of Jail Suicides: Seven Years Later*. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, *Vulnerability and Prison Suicide*, British Journal of Criminology, 36, 173-187 (1995); and Alison Liebling, *Prison Suicide and Prisoner Coping*, Crime and Justice, 26, 283-359 (1999).

[17] Fatos Kaba, et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, American Journal of Public Health, *104*, 442-447 (2014), at p. 445.

[18] For example, see: Howard Bidna, *Effects of Increased Security on Prison Violence*, Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, *Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital*, Behavioral Sciences and the Law, 6, 131-137 (1988); Elmer H. Johnson, *Felon Self-Mutilation: Correlate of Stress in Prison*, in Bruce L. Danto (Ed.) Jail House Blues. Michigan: Epic Publications (1973); Anne Jones, *Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators*, Criminal Justice and Behavior, 13, 286- 296 (1986); Peter Kratcoski, *The Implications of Research Explaining Prison Violence and Disruption*, Federal Probation, 52, 27-32 (1988); Ernest Otto Moore, *A Prison Environment: Its Effect on Health Care Utilization*, Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, *Managing Violent Individuals in Correctional Settings*, Journal of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, *Using Situational Factors to Predict Types of Prison Violence*, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991).

Case 2:19-cv-00414-JPH-DLP    Document 55-1 (Ex Parte)    Filed 10/25/19    Page 12 of 18
Case 1:10-cv-03570-TSC    Document 7-26    Filed 12/04/19    Page 13 of 19
PageID #: 9399

reflected in the characteristically high numbers of suicide deaths, incidents of self-harm and self-mutilation that occur in many of these units.

21.    In recognition of the adverse mental health effects of segregated, solitary, or isolated confinement, the American Bar Association's *Standards for Criminal Justice on the Treatment of Prisoners* mandate that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable."[19] Moreover, the ABA requires that the mental health of *all* prisoners in segregated housing "should be monitored" through a process that should include daily correctional staff logs "documenting prisoners' behavior," the presence of a "qualified mental health professional" inside each segregated housing unit "[s]everal times a week," weekly observations and conversations between isolated prisoners and qualified mental health professionals, and "[a]t least every [90 days], a qualified mental health professional should perform a comprehensive mental health assessment of each prisoner in segregated housing" (unless such assessment is specifically deemed unnecessary in light of prior individualized observations).[20] In addition, at intervals "not to exceed [30 days], correctional authorities should meet and document an evaluation of each prisoner's progress" in an evaluation that explicitly "should also consider the nature of the prisoner's mental health," and at intervals "not to exceed [90 days], a full classification review" should be conducted that addresses the prisoner's "individualized plan" in segregation with "a presumption in favor of removing the prisoner from segregated housing."[21]

**Exacerbating Effects of Isolation on Mental Illness**

---

[19] American Bar Association, *ABA Criminal Justice Standards on the Treatment of Prisoners, Standard 23-2.6(a)*                    (2010),                    *available*                    *at* http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html [hereinafter "*ABA Standards*"].
[20] *ABA Standards*, 23-2.8(b).
[21] *ABA Standards*, 23-2.9.

22. Although prison isolation places all prisoners at significant risk of serious harm, its adverse psychological effects vary as a function not only of the specific nature and duration of the isolation (such that more deprived conditions experienced for longer amounts of time are likely to have more detrimental consequences) but also a function of the characteristics of the prisoners subjected to it. A rare and unusually resilient prisoner might be able to withstand even harsh forms of solitary confinement with few or minor adverse effects, especially if the experience does not last for an extended period of time. Conversely, some prisoners are especially vulnerable to the psychological pain and pressure of solitary confinement, and deteriorate even after brief exposure. Mentally ill prisoners are particularly at risk in these isolated environments and have been precluded from such environments by legal and human rights mandates precisely because of this. There are several reasons why this is so.

23. For one, as I have noted, solitary confinement or isolated confinement subjects prisoners to significantly more stress and psychological pain than other forms of imprisonment. Mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the kind of benign and socially supportive atmosphere that mental health clinicians seek to create within genuinely therapeutic environments. Not surprisingly, mentally ill prisoners are more likely to deteriorate and decompensate when they are subjected to the harshness and stress of prison isolation.

24. Some of the deterioration and decompensation that mentally ill prisoners suffer in isolated confinement results from the critically important role that social contact and social interaction play in maintaining psychological equilibrium. The esteemed psychiatrist Harry Stack Sullivan once summarized the clinical significance of meaningful social contact by observing that "[w]e can't be

Case 1:18-cv-03570-TSC Document 7-26 Filed 12/04/19 Page 15 of 19
PageID #: 9401

alone in things and be very clear on what happened <u>to</u> us, and we…can't be alone and be very clear even on what is happening <u>in</u> us very long - excepting that it gets simpler and simpler, and more primitive and more primitive, and less socially acceptable."[22] Social contact and social interaction are essential components in the creation and maintenance of normal social identity and social reality.

25.     Thus, the experience of isolation is inherently psychologically destabilizing. It undermines a person's sense of self or social identity and erodes his connection to a shared social reality. Isolated prisoners have few if any opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. As Cooke and Goldstein put it:

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.[23]

In extreme cases, a related pattern emerges: isolated confinement becomes so painful, seemingly so bizarre and impossible for them to make sense of that some prisoners create their own reality - they live in a world of fantasy, instead of the intolerable one that surrounds them.

26.     Finally, many of the direct negative psychological effects of isolation mimic or parallel specific symptoms of mental illness. Even though the direct effects of isolation, experienced in reaction to adverse conditions of confinement, are generally less chronic that those that are produced by a diagnosable mental

---

[22] Harry Stack Sullivan, The Illusion of Personal Individuality, *Psychiatry*, 12 317 - 332 (1971), at p. 326.
[23] Compare also, Margaret K. Cooke and Jeffrey H. Goldstein, Social Isolation and Violent Behavior, *Forensic Reports*, 2, 287 - 296 (1989), at p. 288.

illness, they can add to and compound a mentally ill prisoner's outward manifestation of symptoms as well as the internal experience of their disorder.

27. For example, many studies have documented the degree to which isolated confinement contributes to feelings of lethargy, hopelessness, and depression. Thus, for already clinically depressed prisoners, these acute situational effects are likely to exacerbate their pre-existing chronic condition and lead to a worsening of their depressed state. Similarly, the mood swings that some prisoners report experiencing in isolation would be expected to amplify the pre-existing emotional instability that prisoners diagnosed with conditions such as bi-polar disorder suffer. Prisoners who suffer from disorders of impulse control would likely find their pre-existing condition made worse by the high levels of frustration, irritability, and anger that many isolated prisoners report experiencing. And prisoners prone to psychotic breaks may suffer more in isolated confinement due to conditions that deny them the potentially stabilizing influence of social feedback that might ground their sense of reality in a stable and meaningful social world.

28. As I noted in passing above, widespread recognition of the heightened vulnerability to mentally ill prisoners to the adverse psychological effects of isolated confinement has let numerous corrections officials, professional mental health groups, and human rights organizations to prohibit their placement in such units or, if it is absolutely necessary (and only as a last resort) to confine them there, to very strictly limit the duration of such confinement and to provide prisoners with significant amounts of out-of-cell time and augmented access to care. For example, the American Psychiatric Association ("APA") has issued a Position Statement on Segregation of Prisoners with Mental Illness stating:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in

segregation, out-of-cell structured therapeutic activities (i.e. mental health/psychiatric treatment) in appropriate programming space for an adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for the individuals.[24]

The APA's position on this issue reflects the accepted fact that mentally ill prisoners are especially vulnerable to isolation- and stress-related regression, and decompensation that worsen their psychiatric conditions and intensify their mental health related symptoms and maladies (including depression, psychosis, self-harm).

29. This widely accepted fact about mentally ill prisoners' heightened vulnerability to isolated confinement is acknowledged in the standard operating procedures that typically govern their admission and retention in such units. Specifically, mental health staff in most prison systems with which I am familiar are charged with the responsibility of screening prisoners in advance of their possible placement in isolation, identifying those who are mentally ill and, typically, taking steps to exclude them from such confinement. Moreover, mental health staff are required to regularly and meaningfully monitor isolated prisoners with the same intended purpose - to identify any prisoners who may be manifesting the signs and symptoms of emerging mental illness and to remove them from these harmful environments.

30. Courts that have been presented with evidence on this issue have reached the same conclusions about the vulnerability of the mentally ill to several forms of prison isolation. One such court, in an opinion issued in a case in which I

---

[24] AM. PSYCH. ASSOC., POSITION STATEMENTS: SEGREGATION OF PRISONERS WITH MENTAL ILLNESS (2012), *available at* http://www.psychiatry.org/advocacy--newsroom/position statements.

testified as an expert witness, noted that the psychological risks of isolated confinement were "particularly" and unacceptably high for any prisoner suffering from "overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions in [solitary confinement]."[25] The judge elaborated, noting that the group of prisoners to be excluded from isolation should include:

> [T]he already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates, placing them in [isolated confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable."[26]

31. In summary, the accumulated weight of the scientific evidence that I have cited and summarized above demonstrates the painful nature of isolated confinement and the serious risk of significant psychological harm at which it places prisoners. When persons are deprived of normal social contact for extended periods of time they experience mental pain and suffering, are more susceptible to severe stress-related maladies and disorders, and are subject to deterioration and dysfunction along a number of mental, emotional, and physical dimensions. These people are thus placed at risk of even more serious harm, including the loss of their sanity and even their lives. The broad range of adverse effects that derive from social deprivation underscores the fundamental importance of meaningful social contact and interaction and, in essence, establishes

---

[25] *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995)
[26] *Id.*

Case 2:19-cv-00414-JFH-DLB Document 55-1 (Ex Parte) Filed 10/25/19 Page 18 of 18
Case 1:19-cv-03570-TSC Document 7-26 Filed 12/04/19 Page 19 of 19
PageID #: 9405

these things as identifiable human needs. Over the long-term, meaningful social contact and interaction may be as essential to a person's psychological well-being. This appears to be true for prisoners in general, but especially true for mentally ill prisoners who are particularly vulnerable to the pains of isolated confinement and susceptible to its harmful effects.

### Opinion regarding the October 17 pro se filing

32. In my professional opinion, Mr. Purkey's pro se attempt to withdraw his appeals should be viewed with judicial caution and concern. His decision-making was undoubtedly affected by the increased severity in his isolated conditions of confinement in combination with the organic mental health condition from which he suffers, one that results in deteriorating cognition and dementia. A competent psychological evaluation is clearly necessary in order to determine the exact cause of Mr. Purkey's request and to evaluate his competence to make it. The very likely possibility that his pro se filing was the result of a chronic mental condition, the psychological trauma of extreme isolation, and the exacerbating effect of sleep deprivation raises grave concerns about the voluntariness of the filing and serious doubts about Mr. Purkey's capacity and competence to make such a request.

33. It is my understanding that Mr. Purkey's attorneys are seeking the orders necessary to collect medical information in order to make informed decisions regarding his competency issues. Given the information we have about the conditions of confinement in combination with counsel's observations about their client's deteriorating mental health, in my expert opinion, counsel should be given the opportunity to evaluate this information before any court were to acquiesce to Mr. Purkey's wishes and allow him to withdraw his appeals. This evaluation should also include an evaluation of the prison conditions, including an in person tour of the execution watch cell and access to video footage of sleep monitoring.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: October 25, 2019

_Dr. Craig Haney_

Dr. Craig Haney