IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WESLEY IRA PURKEY,

        Plaintiff,

    v.

WILLIAM P. BARR, *et al.*,
        Defendants.

No. 1:19-cv-03570-TSC

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR A
PRELIMINARY INJUNCTION BARRING EXECUTION OF WESLEY PURKEY
PENDING FINAL DISPOSITION ON THE MERITS**

## **TABLE OF CONTENTS**

PAGE

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 5

I.    Procedural Posture of This Case ................................................................................. 5

II.    Mr. Purkey's Incompetency ........................................................................................ 9

III.   The Government's Continued Refusal to Provide Mr. Purkey Information Relevant to His Competency ....................................................................................... 14

ARGUMENT ....................................................................................................................... 22

I.    This Court Should Issue a Preliminary Injunction to Stay the Proceedings. ............ 22

A.   Mr. Purkey Demonstrates A High Likelihood of Success on His Eighth Amendment and Due Process Claims ........................................................... 23

1.   Mr. Purkey Is Likely to Prevail On His Due Process Claim. .................... 24

2.   Mr. Purkey Is Likely to Prevail On His Eighth Amendment Claim ......... 29

B.   Mr. Purkey Will Suffer Irreparable Harm Without an Injunction ................. 31

C.   The Balance of The Equities and Public Interest Weigh in Favor of A Preliminary Injunction. 32

II.   Expedited Discovery Is Required To Support an Evidentiary Hearing .................... 36

CONCLUSION .................................................................................................................... 38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amaya-Ruiz v. Stewart*,
 136 F. Supp. 2d 1014 (D. Ariz. 2001) ............................................................. 33

*Barefoot v. Estelle*,
 463 U.S. 880 (1983) ....................................................................................... 24

*Battaglia v. Stephens*,
 824 F.3d 470 (5th Cir. 2016) ..................................................................... 31, 38

*In re Beatty*,
 No. WR-59,939-04, 2020 WL 1329145 (Tex. Crim. App. March 19, 2020)...................................... 36

*In re Busby*,
 No. WR-70,747-03, 2020 WL 2029306 (Tex. Crim. App. April 27, 2020)......................................... 36

*Chaplaincy of Full Gospel Churches v. England*,
 454 F.3d 290 (D.C. Cir. 2006)..................................................................... 32, 35

*Charles v. Stephens*,
 612 Fed. App'x 214 (5th Cir. 2015) ................................................................. 26

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*,
 317 F. Supp. 3d 555 (D.D.C. 2018)............................................................. 22, 23

*Commonwealth v. Banks*,
 943 A.2d 230 (Pa. 2007)................................................................................. 25

*Eldridge v. Thaler*,
 Civil Action No. H-05-1847, 2009 WL 3856672 (S.D. Tex. Nov. 17, 2009) .................................... 27

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
 Case No. 19-mc-145 (TSC) (D.D.C. Nov. 20, 2019) ......................................... 5

*Ferguson v. Sec'y for Dept. of Corr.*,
 716 F.3d 1315 (11th Cir. 2013) ...................................................................... 33

*Ford v. Wainwright*,
 477 U.S. 399 (1986) ...............................................................................*passim*

*Harris v. Johnson*,
 323 F. Supp. 2d 797 (S.D. Tex. 2004)............................................................. 33

*In re Hearn*,
 376 F.3d 447 (5th Cir. 2004).......................................................................... 24

*In re Hernandez*,
    No. WR-81,577-02, 2020 WL 1645052 (Tex. Crim. App. April 1, 2020).........................36

*In re Hummel*,
    No. WR-81,578-02, 2020 WL 1268970 (Tex. Crim. App. March 16, 2020).......................36

*Ingraham v. Wright*,
    430 U.S. 651 (1977)..........................................................................................28

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
    849 F.3d 1129 (D.C. Cir. 2017)...........................................................................22

*Ex parte Jordan*,
    758 S.W.2d 250 (Tex. Crim. App. 1988) (en banc) .................................................25

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014)..............................................................................24

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)...........................................................................31, 32

*Madison v. Alabama*,
    139 S. Ct. 718 (2019) ...........................................................................2, 29, 30

*Miller v. Stewart*,
    231 F.3d 1248 (9th Cir. 2000)........................................................................23, 24

*In re Moser*,
    69 F.3d 690 (3d Cir. 1995) ...........................................................................23, 24

*Nat'l Parks Conservation Ass'n v. Semonite*,
    No. 17-CV-01361-RCL, 2018 WL 3838809 (D.D.C. July 3, 2018) ...........................22, 23

*Nat'l Wildlife Fed'n v. Burford*,
    835 F.2d 305 (D.C. Cir. 1987).......................................................................24, 31

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................22, 32

*Nooner v. Norris*,
    No. 5:06CV00110 SWW, 2006 WL 8445125 (E.D. Ark. June 26, 2006) ...........................35

*Osorio-Martinez v. Attorney Gen. of the U.S.*,
    893 F.3d 153 (3d Cir. 2018) ............................................................................35

*Panetti v. Quarterman*,
    551 U.S. 930 (2007) .............................................................................*passim*

*Population Inst. v. McPherson*,
    797 F.2d 1062 (D.C. Cir. 1986).........................................................................23

*Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*,
  No. 19-1348 (U.S. June 5, 2020) ..................................................................................... 8

*Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*,
  No. 19A1050 (U.S. June 10, 2020) ................................................................................. 8

*Santosky v. Kramer*,
  455 U.S. 745 (1982) ....................................................................................................... 32

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ....................................................................................... 22

*Smith ex rel. Smith v. Armontrout*,
  626 F. Supp. 936 (W.D. Mo. 1986) ............................................................................... 33

*Steele v. United States*,
  287 F. Supp. 3d 1 (D.D.C. 2017) ............................................................................. 22, 23

*Wainwright v. Booker*,
  473 U.S. 935 (1985) (Powell, J., concurring) ..................................................... 4, 31, 32

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841 (D.C. Cir. 1977) ....................................................................................... 23

*Wilson v. Grp. Hospitalization & Med. Servs., Inc.*,
  791 F. Supp. 309 (D.D.C. 1992) ............................................................................... 4, 31

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................................... 22

*Wood v. Quarterman*,
  572 F. Supp. 2d 814 (W.D. Tex. 2008), *aff'd sub nom. Wood v. Stephens*, 619 F.
  App'x 304 (5th Cir. 2015) .............................................................................................. 27

**Other Authorities**

*BOP Implementing Modified Operations*, Fed. Bureau of Prisons,
  https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 21, 2020) .............. 20

Fed. R. Civ. P. 12(b)(6) ........................................................................................................ 6

Irving B. Weiner & W. Edward Craighead, eds., The Cornsini Encyclopedia of
  Psychology (4th ed., vol. 1 2010) ................................................................................. 11

U.S. Const. amend. V ..................................................................................................... 4, 28

## INTRODUCTION

Mr. Wesley Purkey is a 68-year-old man suffering from progressive dementia, schizophrenia, complex-Post Traumatic Stress Disorder (PTSD), and severe mental illness. He has experienced multiple, extensive traumatic brain injuries throughout the course of his life. These assaults on his brain are layered on top of a life history of atrocious trauma, including repeated sexual abuse and molestation by those charged with caring for him as a child. Yet despite the extensive evidence of Mr. Purkey's mental illness and current incompetency, at the personal instruction of United States Attorney General William Barr in Washington D.C., a death warrant has been issued to execute Mr. Purkey on July 15, 2020 at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute") in violation of Mr. Purkey's Fifth and Eighth Amendment rights.

This is the second execution warrant Attorney General Barr has personally directed at Mr. Purkey in the past year. The first was prior to the current COVID-19 pandemic, but it was enjoined by this Court on other grounds and that warrant has since expired. Now, Attorney General Barr has issued the second warrant immediately upon the lifting of this Court's order, even though the United States remains in the throes of a global pandemic in which prisons are bearing a disproportionate share of the potentially deadly infections. The new warrant, issued in the midst of the outbreak, comes despite the fact that USP Terre Haute has not allowed any in-person visitation—legal or otherwise—in the months leading up to its issuance because of active infections in the prison and surrounding community. Indeed, Defendants scheduled Mr. Purkey's execution without adopting or implementing any written protections or policies to ensure the safety of visitors, staff, prisoners, or the community from the danger posed by purporting to re-institute visitation for just those with execution warrants during the COVID-19 outbreak.

This civil rights lawsuit, filed by Mr. Purkey while the first warrant was pending, does not seek to invalidate his death sentence or alter his judgment of conviction. Instead, Mr. Purkey's suit seeks to have this Court enjoin Attorney General Barr's action on two grounds: (1) that Mr. Purkey is not currently competent to be executed under Eighth Amendment constitutional standards articulated by the Supreme Court in a host of cases dating as far back to *Ford v. Wainwright*, 477 U.S. 399 (1986), and as recently as *Madison v. Alabama*, 139 S. Ct. 718 (2019); and (2) that Attorney General Barr and the Bureau of Prison Director Michael Carvajal have not afforded Mr. Purkey due process in connection with this Eighth Amendment claim. Despite being in sole possession of evidence critical to that claim, Defendants have repeatedly stonewalled Mr. Purkey's efforts to acquire that evidence both previously and now, during the pandemic. They have done so despite explicit and repeated warnings from Mr. Purkey's counsel that there would not be sufficient time to obtain and review the necessary information and testing if the Defendants waited to grant access to the evidence until Mr. Purkey was under a time-compressed warrant.

Even at this stage, in the absence of any hearing on the claim and despite the Defendants' efforts (assisted by the pandemic) to stonewall the claim, the evidence of Mr. Purkey's incompetency to be executed is compelling. The record already before the Court contains evidence that Mr. Purkey suffers from brain injuries, severe mental illness, complex-PTSD, and advancing disease of dementia, all of which have caused significant memory impairments, grossly deteriorated cognitive function, paranoia, and delusions. As a result, there is significant evidence before the Court to suggest that Mr. Purkey does not currently have the ability to rationally understand the reason the United States seeks to execute him. As such, his execution would violate the Eighth Amendment prohibition against cruel and unusual punishment. *Panetti*

*v. Quarterman*, 551 U.S. 930 (2007). Furthermore, under the Fifth and Eighth Amendments and upon a substantial threshold showing of incompetency—a threshold that has already been met here—Mr. Purkey is entitled to due process on the issue of his competence to be executed. *See Panetti*, 551 U.S. at 949. Mr. Purkey is further entitled to pre-hearing discovery, irrespective of this threshold showing, including his relevant Bureau of Prisons ("BOP") records (records entirely within the custody and control of the BOP), certain neurological testing that has already been ordered, and medical assessments by Mr. Purkey's expert witnesses. *See id.* at 952 (distinguishing between procedures required under *Ford* (namely, an impartial decision maker and an opportunity to offer evidence to counter government evidence of competency) and others that may be required under the Due Process Clause, such as "the opportunity for discovery or for the cross-examination of witnesses").

Because Mr. Purkey has a strong likelihood of success in this civil rights lawsuit and easily satisfies the other applicable preliminary injunction criteria, it is incumbent upon the Court to enter a preliminary injunction preventing his execution during the pendency of his lawsuit.

*First,* Mr. Purkey's likelihood of success on the merits is substantial, even on the basis of the evidence currently available to Mr. Purkey and without the additional information he has been denied by the Government to date. Under the Eighth Amendment, a condemned prisoner is deemed incompetent when he cannot rationally understand his punishment, or the reason for it. *Id.* at 958–60. A prisoner who makes a "substantial threshold showing of insanity," as Mr. Purkey has here, is entitled to a hearing on his claim of incompetency to be executed. *Id.* at 948–50. Mr. Purkey presents this Court with substantial evidence of his incompetency through an expert evaluation finding him incompetent as of the time of the evaluation as well as contemporaneous institutional records and psychiatric evaluations documenting decades of

delusional behavior and rapidly progressing dementia.[1] In the face of such evidence, carrying out Mr. Purkey's execution without affording him an opportunity to prove his incompetency would violate the Due Process Clause of the Fifth Amendment. U.S. Const. amend. V. Moreover, Mr. Purkey is, in fact, currently incompetent to be executed. By virtue of his dementia, cognitive impairments, and severe mental illness, he "lack[s] a rational understanding of the basis for his execution." Compl. Ex. 1 at 2, ECF No. 1-1.

*Second*, Mr. Purkey will undeniably suffer irreparable harm in the absence of preliminary relief. Without the Court's intervention, Mr. Purkey will be executed well before he can fully litigate his claims. As this Court has previously held, "nearly certain death" is "the ultimate irreparable injury." *Wilson v. Grp. Hospitalization & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992); *see also Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (Mem.) (Powell, J., concurring) (irreparable harm that will result if stay is not granted "is necessarily present in capital cases").

*Finally*, the equities and the public interest favor a preliminary injunction. The Government's interests will not suffer if Mr. Purkey's execution is enjoined until his competency claim can be fairly litigated in an orderly fashion. Any exigency or need for expediency claimed by the Government simply does not exist, as evidenced by the Government's lengthy and self-imposed nearly two-decade moratorium on executions and the Government's failure to disclose highly-probative information necessary to resolve Mr. Purkey's claims, including failing to comply with document requests for the past ten months. In any event, such concerns are minimal compared to the harm Mr. Purkey will suffer should his execution move forward as scheduled on

---

[1] In contrast to the materials proffered by Mr. Purkey, Mr. Panetti, who was presumed without question to have met the substantial threshold showing, only provided the Court "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row." *Panetti*, 551 U.S. at 938, 950.

July 15, 2020. No public interest is served by executing an individual presenting a *prima facie* case of incompetency before he has had the opportunity to avail himself of fair procedures to challenge his competence as required by United States Supreme Court authority—let alone doing so during a global pandemic that has prevented him from seeing counsel and medical experts. Accordingly, the public interest is only served by preliminarily enjoining Mr. Purkey's execution.

The Court should enjoin Mr. Purkey's execution until Mr. Purkey receives a fair hearing to determine his competency to be executed and his competency to be executed is in fact determined. The Court should further grant expedited discovery so that Mr. Purkey may provide the Court relevant evidence of his incompetency, evidence that is solely within the Government's possession and control.

## BACKGROUND

### I.      PROCEDURAL POSTURE OF THIS CASE

This is the second time that Attorney General Barr has issued a warrant for Mr. Purkey's execution. Mr. Purkey's first execution warrant issued on July 25, 2019 and his execution was scheduled for December 13, 2019. This Court entered a preliminary injunction in a related matter preventing this execution date. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, Case No. 19-mc-145 (TSC) (D.D.C. Nov. 20, 2019) (Protocol Case). On November 26, 2019, Mr. Purkey filed the complaint in this case (ECF No. 1), raising an Eighth Amendment claim challenging his competency to be executed. The lawsuit raises issues solely related to Mr. Purkey's competency to be executed in light of his current mental state; Mr. Purkey does not challenge his conviction or sentence, and he does not permanently seek to enjoin his execution. Instead, he seeks to enjoin Defendants from carrying out his execution for as long as doing so

would violate his Fifth and Eighth Amendment rights. This suit was brought after Mr. Purkey's first execution warrant issued because a competency to be executed claim is not ripe until a time is set to execute the sentence. *Panetti*, 551 U.S. at 947 (citing *Stewart v. Martinez-Villareal,* 523 U.S. 637, 644–45 (1998))*.*

Even though this Court had already enjoined Mr. Purkey's execution in the related Protocol cases, on December 4, 2019, Mr. Purkey filed a parallel protective Motion for a Preliminary Injunction (ECF No. 7) out of an abundance of caution to ensure he would not be executed while incompetent if the Protocol Case injunction was lifted.

On December 17, 2020, after the initial execution warrant had expired, and after the Government had filed an opposition to Mr. Purkey's Preliminary Injunction Motion (ECF No.10), Mr. Purkey filed a Motion to Withdraw the protective Motion for Preliminary Injunction, since his execution was no longer imminent. *See* Mot. to Withdraw, ECF No. 11. Soon afterwards, on December 31, 2019, this Court granted the motion to withdraw and *sua sponte* ordered Mr. Purkey to respond to the Government's jurisdictional arguments raised in its Opposition to Mr. Purkey's motion—namely that this case could only be brought as a habeas corpus action because Mr. Purkey was in fact challenging his death sentence, despite his repeated statements in his Complaint that he sought an injunction only unless and until he was restored to competency. After this issue was fully briefed (ECF Nos. 14–17), the Government filed a Motion to Dismiss or, in the alternative, to Transfer (ECF No. 18), reiterating its position that this case could only be brought in habeas, but also arguing that Mr. Purkey's claims fail under Federal Rule of Civil Procedure 12(b)(6) and that venue in the District of Columbia is either improper or inconvenient (despite the extensive and admitted personal role that Washington D.C. participants played in issuing Mr. Purkey's execution warrant and despite their responsibility for formulating

procedures to pursue competency-to-be-executed claims in the federal system). The Government's motion was fully briefed and remains pending.[2]

In the nearly seven months since he filed this case, Mr. Purkey's competency has continued to decline. Mr. Purkey's counsel has also used this time to attempt to secure the information that was sought in connection with the first filing, requesting (numerous times) Mr. Purkey's updated BOP administrative and health records, access to Mr. Purkey himself for medical experts to conduct in-person assessments of his declining mental competency, as well as the ability to conduct neurological testing. This information is all critical to enable this Court to make an informed decision about Mr. Purkey's current competency and, thus, the constitutionality of executing his sentence on July 15, 2020. The Government has refused to provide any of this information despite repeated requests beginning in August of 2019. R. Woodman Decl. ¶¶ 10–13. Meanwhile, due to the current COVID-19 global pandemic, the USP Terre Haute prison where Mr. Purkey is being held has been locked down with *no* visitors

---

[2] The Government's position that Mr. Purkey's *Ford* claim must be brought in habeas remains unsupported. The Government has never addressed the fact that Mr. Purkey's *Ford* claim is definitively *not* a challenge to his sentence or conviction and, thus, not core habeas. As the briefing in response to the Court's *sua sponte* order and on the Motion to Dismiss demonstrates, *Ford* claims *may* be brought independent of habeas where they do not challenge the sentence or conviction. *See generally* Pl.'s Br. Pursuant to This Court's Order of Dec. 31, 2019, ECF No. 14; Pl.'s Reply to Def.'s Resp. to this Court's Order of Dec. 31, 2019 at 4–5, ECF No. 17. The lack of prior examples of independent federal *Ford* claims merely reflects that the federal government has only implemented three death sentences since *Ford* was decided, none of which involved *Ford* claims. Pl.'s Reply to Def.'s Resp. to This Court's Order of Dec. 31, 2019 at 4–5, ECF No. 17. The lack of federal *Ford* claim examples is in no way reflective of anything else, especially where or how they may be raised. Moreover, since the parties' briefing on jurisdiction and venue, the Government has since reiterated numerous times that Attorney General Barr is the singular authority responsible for executing Mr. Purkey. *See* R. Woodman Decl. ¶¶ 29 (referencing Government correspondence that made clear that Mr. Purkey's new execution date will be determined "when the Attorney General makes a decision"), 31 (referencing Government correspondence that Mr. Purkey's execution was scheduled at the "Attorney General's direction"). The Government's own continued emphasis that Attorney General Barr, located in the District of Columbia, is the only person responsible for deciding when and how to execute Mr. Purkey's sentence reinforces the propriety of Mr. Purkey's choice of venue in the District of Columbia where both Defendants reside.

admitted into the prison, the BOP has acknowledged a potential virus outbreak in the prison, and Mr. Purkey's counsel and mental health experts have been denied access to Mr. Purkey for the last three months as a result.

On April 7, 2020, the preliminary injunction issued in the Protocol Case was vacated by the D.C. Circuit. *See* Judgment, *FBOP Execution Protocol Cases*, No. 19-5322 (D.C. Cir. Apr. 7, 2020).[3] On June 15, 2020, the next business day after the mandate issued in connection with the D.C. Circuit litigation, Attorney General Barr issued another warrant for Mr. Purkey's execution with only *30 days'* notice, setting his execution date for July 15, 2020—despite the current COVID-19 pandemic, the USP Terre Haute lockdown and COVID-19 outbreak, and the fact that Mr. Purkey's counsel, mitigation specialists, and mental health experts, necessary to ensure Mr. Purkey's constitutional rights are protected, have had *no* in-person and only telephonic access to Mr. Purkey since March 13, 2020. R. Woodman Decl. ¶¶ 7, 13, 33–35; E. Vartkessian Supp. Decl. ¶¶ 3, 12. All visits, which are critical to assess Mr. Purkey's rapidly deteriorating mental state, have been cancelled. R. Woodman Decl. ¶¶ 7, 33–35; E. Vartkessian Supp. Decl. ¶¶ 3, 12, 22–25. Moreover, the prison itself remains on lockdown and there are currently *no* procedures in

---

[3] Mr. Purkey sought rehearing *en banc*, which was denied by the D.C. Circuit on May 15, 2020. *See* Order, *FBOP Execution Protocol Cases*, No. 19-5322 (D.C. Cir. May 15, 2020). Mr. Purkey filed a petition for certiorari, which is currently pending at the Supreme Court. *See* Pet. for a Writ of Cert., *Bourgeois v. Barr*, No. 19-1348 (U.S. June 5, 2020). The D.C. Circuit issued the mandate on June 8, 2020. *See* Am. Order, *FBOP Execution Protocol Cases*, No. 19-5322 (D.C. Cir. June 8, 2020). On June 10, 2020, Mr. Purkey also filed an emergency application, seeking a stay of the D.C. Circuit's mandate pending disposition of the petition for certiorari. *See*, Emergency Appl. for a Stay of Mandate Pending Disposition of Pet. for a Writ of Cert., *Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*, No. 19A1050 (U.S. June 10, 2020). The Government filed its response to the emergency stay application on June 15, 2020. *See* Resp. in Opp. to Appl. For a Stay of the Mandate Pending Disposition of the Pet. for a Writ of Cert. & for an Administrative Stay, *Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*, No. 19A1050 (U.S. June 15, 2020). Mr. Purkey's emergency application and petition for certiorari remain pending. On an expedited briefing schedule, the Government filed its response to Mr. Purkey's petition for certiorari on June 19, 2020. *See* Br. for the Resp'ts in Opp., *Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*, No. 19-1348 (U.S. June 19, 2020). Petitioners have until June 22, 2020 to file a reply. *See Roane v. Barr (In re Fed. Bureau of Prisons' Execution Protocol Cases)*, No. 19-1348 (U.S. June 18, 2020).

place to ensure critical visitors can consult with Mr. Purkey safely without unnecessary risk of exposure to a deadly virus that is known to be present inside the prison. While a BOP Legal Counsel has indicated that the prison will allow such visits and some *ad hoc* minimal safety measures are purportedly (and hurriedly) being planned (less than three weeks before Mr. Purkey's scheduled execution date), *see* R. Woodman Decl. ¶¶ 33–38, the prison has provided *no* formal, written or even credible or tangible means of ensuring such visits will be managed in a way that would meaningfully protect Mr. Purkey or his legal and medical expert visitors (many of whom are particularly vulnerable to the virus due to their age and current medical conditions) from the serious health and safety concerns posed by travel and in-person contact during the pandemic, at a location with reported COVID-19 cases.

## II.   MR. PURKEY'S INCOMPETENCY

Mr. Purkey's mental condition, described by the lawyers and investigators on his defense team, as well as by experts who have evaluated him over decades, reveals deterioration, paranoia, and delusion. *See, e.g.*, Compl. Ex. 1 at 9, ECF No. 1-1 ("In addition to Mr. Purkey's longstanding poisoning delusions, he has for many years adhered to a delusional belief system that the guards and prison are engaged in systemic retaliation against him for his legal work"); Compl. Ex. 13 at 561, ECF No. 1-8 (May 15, 1981, psychiatric evaluation reporting auditory hallucinations as Mr. Purkey held two conversations at the same time, "whisper[ing] in an entirely different conversation from what he [was] talking aloud."); *id.* at 345 (May 1998 emergency room record noting Mr. Purkey was admitted because he "started to act paranoid," stating that "they" were watching him at all times and sprayed him with "poisonous mist several times" while he was sleeping"); Compl. Ex. 5 at 40, ECF No. 1-1 ("Early in my involvement [as Wes's mitigation specialist], Wes began exhibiting delusional thinking"); Compl. Ex. 7 at 74, ECF No. 1-1 ("Wes was constantly paranoid that various prison officials were trying to harm him in retaliation for his

'jailhouse lawyering,'" and his "paranoia also increased over time."); R. Woodman Decl. ¶ 7; *see generally* E. Vartkessian Supp. Decl.

Mr. Purkey's cognitive decline, including memory loss, is evident from neuropsychological testing administered in 2003 and 2016, from expert evaluations in 2016 and 2019, and continues to be observed up to his most recent visitations. While the 2003 testing did not reveal memory deficits, testing did reveal moderate microsomia on the Smell Identification Test (SIT)—an early marker of dementia, including Alzheimer's Disease. Additionally, a brain scan from 2003 "indicated abnormalities in the area of the brain involved in memory and typically implicated in Alzheimer's disease." Compl. Ex. 3 at 20, ECF No. 1-1.

Thirteen years later, in 2016, neuropsychological testing revealed that Mr. Purkey was suffering from frontal lobe deficits and progressive dementia consistent with Alzheimer's disease. The testing revealed that Mr. Purkey had experienced significant declines in both memory and executive functioning since previous testing in 2003. Compl. Ex. 9 at 88, ECF No. 1-1. A follow-up report in 2018 revealed that Mr. Purkey's condition had continued to deteriorate since 2016, and recommended a further neurology work-up, including brain imaging, and a reassessment of his neurological status. Compl Ex. 15 at 120, ECF No. 1-18.

In 2019, Mr. Purkey was diagnosed with Alzheimer's disease, a progressive neurodegenerative disease that impacts memory, intellectual function and behavior. Compl Ex. 3 at 28, ECF No. 1-1; *see also* Compl. Ex. 6 at 89, ECF No. 1-1 (testing, medical and family history "strongly suggest" in 2016 that "Mr. Purkey is currently suffering from the beginning stages of a cortical neurodegenerative disease, such as dementia"); Compl. Ex. 12 at 120, ECF No. 1-2 (describing the reports of cognitive, physical and psychiatric decline and finding that this "reported pattern of change is very much consistent with progression of a cortical dementia");

Irving B. Weiner & W. Edward Craighead, eds., The Cornsini Encyclopedia of Psychology, p. 71 (4th ed., vol. 1 2010) (describing Alzheimer's Disease).

Dr. Bhushan Agharkar, a neuropsychiatrist, concluded to a reasonable degree of medical certainty that Mr. Purkey "lacked a rational understanding of the basis for his execution." Compl. Ex. 1 at 11–12, ECF No. 1-1. While Mr. Purkey could recite the Government's position that his execution is for the murder of Jennifer Long, this recitation was merely "parroting," as he can repeat what others say but cannot rationally understand what it means. Mr. Purkey holds "a fixed belief that he is going to be executed in retaliation for his legal work, to prevent him from being a hassle for the government." *Id*. This belief does not stand on its own but rather serves as a foundation for an entire delusional system involving conspiracies of retaliation. This entire delusional system makes it impossible for him to have "a rational understanding of the purpose of his execution." *Id*. at 12.

Dr. Jonathan DeRight, a neuropsychologist, administered additional testing in August of 2019. Based on this evaluation, Dr. DeRight diagnosed Mr. Purkey with Alzheimer's disease. Compl. Ex. 3 at 27–28, ECF No. 1-1. Dr. DeRight opined that the collateral information about Mr. Purkey's decline was also highly consistent with Alzheimer's disease. Mr. Purkey's worsening cognitive symptoms, including paraphasic word efforts, word loss, impaired recall of information he knew before, and incontinence, are indicative of the progression of Alzheimer's disease. *See id.* at 27.

Dr. Thomas Hyde, a neurologist, similarly concluded that there is "substantive evidence of Mr. Purkey's neurological deterioration over time affecting memory and cognitive function that is compatible with the diagnosis of a dementing disorder," based on a close review of Mr. Purkey's extensive records, including medical records, family birth and death records, and expert

reports. T. Hyde Decl. ¶ 13. While unable to make a definitive diagnosis without the benefit of an in-person visit (which has been impossible due to the COVID-19 pandemic) or a review of recent medical records or current diagnostic testing (which have been blocked by the Government), Dr. Hyde nevertheless concludes that Mr. Purkey's "intellectual deficits, paranoia, and delusional beliefs, and the course of his progressive deterioration are consistent with the diagnosis of dementia." *Id.* ¶ 14.

Dr. Bhushan Agharkar, a neuropsychiatrist, concluded to a reasonable degree of medical certainty that Mr. Purkey "lacked a rational understanding of the basis for his execution." Compl. Ex. 1 at 11–12, ECF No. 1-1. While Mr. Purkey could recite the Government's position that his execution is for the murder of Jennifer Long, this recitation was merely "parroting," as he can repeat what others say but cannot rationally understand what it means. Mr. Purkey holds "a fixed belief that he is going to be executed in retaliation for his legal work, to prevent him from being a hassle for the government." *Id*. This belief does not stand on its own but rather serves as a foundation for an entire delusional system involving conspiracies of retaliation. This entire delusional system makes it impossible for him to have "a rational understanding of the purpose of his execution." *Id*. at 12.

Further, Mr. Purkey's mitigation specialist, Dr. Elizabeth Vartkessian, PhD, who has had constant contact with Mr. Purkey for the last five years, has witnessed Mr. Purkey's recent continual and rapidly declining cognitive abilities both in-person before the USP Terre Haute lockdown and even by telephone since the lockdown despite the severe limitations of telephonic consultations. *See generally* E. Vartkessian Supp. Decl. In Dr. Vartkessian's most recent visits with Mr. Purkey—the last one being in early March 2020—he struggled to remember words for simple items such as a long-sleeve t-shirt (instead calling it a tank top) and could not recall

names that he knew well (including fellow inmates, his own grandson, and his long-time defense attorneys). *Id.* ¶¶ 7, 11–21.

These conditions have rendered Mr. Purkey unable to understand the rationale for his pending execution. *See, e.g.*, Compl. Ex. 1 at 12, ECF No. 1-1 ("The lack of rationality from Mr. Purkey's delusional thoughts and paranoia are compounded by the deterioration of his brain from his dementia."); Compl. Ex. 3 at 20, ECF No. 1-1 (noting that Alzheimer's disease "can lead to more marked problems with confusion, delusions, paranoia, problems with communication, and recall for personal details."); T. Hyde Decl. ¶ 14 ("Mr. Purkey has demonstrated a progressive decline in his cognitive abilities over the past 4–5 years, characterized by memory deficits, problems with speech and language, impairments in reasoning and judgment, paranoia, and delusional beliefs . . . consistent with the diagnosis of dementia."). Mr. Purkey holds an honest and deeply entrenched belief that the federal Government plans to execute him not as punishment for the murder of Jennifer Long, but because of his "protracted jailhouse lawyering." Compl. Ex. 15 at 994, ECF No. 1-18. In Mr. Purkey's mind, the voluminous grievances and lawsuits he has filed throughout his incarceration "have had a monumental impact in preventing correctional officers from depriving prisoners of their constitutional rights." Compl. Ex. 5 at 41, ECF No. 1-1. Mr. Purkey believes that Attorney General Barr and the BOP, therefore, developed a plot to kill him both as retaliation against him for his previous litigation and to prevent him from future filings. *See, e.g.*, Compl. Ex. 1 at 11, ECF No. 1-1 (finding that Mr. Purkey insists the Government is "eager[] to be rid of him and his successful litigation"). Moreover, Mr. Purkey perceives his own counsel "as part of the conspiracy against him and his efforts to litigate against the prison"—a belief that prevents him from cooperating with them on matters related to his execution. Compl. Ex. 5 at 54, ECF No. 1-1.

13

### III.     THE GOVERNMENT'S CONTINUED REFUSAL TO PROVIDE MR. PURKEY INFORMATION RELEVANT TO HIS COMPETENCY

The evidence recited above has been collected and presented despite numerous impediments imposed by the United States to the full and fair litigation of this claim. Since August 2019, counsel for Mr. Purkey has made repeated efforts to obtain information from the BOP to further evaluate Mr. Purkey's competency. *See generally* R. Woodman Decl. . The Government has repeatedly stonewalled these efforts, refusing to provide the requested information and denying access to expert testing and highly probative contemporaneous information about Mr. Purkey's mental and physical health. Mr. Purkey's counsel still has not received any of this requested information with only 21 days remaining before the Government plans to carry out his execution. The Government's months-long failure to provide this relevant information has now been exacerbated by the COVID-19 pandemic. Mr. Purkey's counsel and medical experts have been unable to visit Mr. Purkey for months. As Drs. DeRight and Hyde stated, these in-person visits from individuals who have known Mr. Purkey for some time and have witnessed his mental decline over the years are critical to understanding the trajectory of his progressive dementia and his present mental state. *See* Letter from Jonathan DeRight, PhD, ABPP-CN, Woodbridge Psychological Associate, PC, to Rebecca E. Woodman, Esq., Attorney at Law, L.C. (June 14, 2020), attached hereto as Ex. 1; T. Hyde Decl. ¶ 14 (noting observations over time by mitigation specialists Fox and Vartkessian); *see also* E. Vartkessian Supp. Decl. ¶¶ 4, 11, 22–25 (describing the kind of information only available through in person, face-to-face visits).

For almost ten months, Mr. Purkey's counsel has continually requested Mr. Purkey's updated BOP medical and mental health records, the surveillance video from Mr. Purkey's cell, and the BOP death watch protocol—all of which are relevant to Mr. Purkey's current mental

state and functioning. Mr. Purkey's counsel first requested this information directly from the BOP and was told the information could only be obtained through the Freedom of Information Act (FOIA) process (even though the request was for Mr. Purkey's own records and made by Mr. Purkey's attorney of record). R. Woodman Decl. ¶¶ 9–12. On October 9, 2019, Mr. Purkey's counsel did submit FOIA requests for the information to the BOP. R. Woodman Decl. ¶ 12, Exs. 6–9. Counsel sought expedited FOIA processing in light of Mr. Purkey's then-scheduled execution date of December 13, 2019. Compl. Ex. 17 at 1456, ECF No 1-20; R. Woodman Decl. ¶ 12, Exs. 6–9. Counsel also sent a copy of this request to BOP Legal Counsel (from whom Mr. Purkey's counsel had also unsuccessfully requested the cell video footage on September 17, 2019). R. Woodman Decl. ¶ 12, Ex. 9.

In a letter from the BOP dated October 10, 2019, Mr. Purkey's counsel was notified that the request for expedited processing was granted and would be processed as soon as practicable, but that processing the request may nonetheless take up to six months. Compl. Ex. 16 at 1454–55, ECF No. 1-19; R. Woodman Decl. ¶ 13, Ex. 10. On October 11, 2019, counsel for Mr. Purkey wrote again to BOP Legal Counsel, noting that the response time was "untenable" given Mr. Purkey's pending execution date was two months away and requesting the records as soon as possible. R. Woodman Decl. ¶ 13, Ex. 11. BOP Legal Counsel responded on October 16, 2019 that she would follow up to see about a more expedited time frame. R. Woodman Decl. ¶ 13, Ex. 12.

On November 11, 2019, counsel for Mr. Purkey again asked for Mr. Purkey's medical records and video records. *Id.* ¶ 13, Ex. 13. This time, counsel asked that Defendant BOP provide the records within ten days in light of Mr. Purkey's pending execution date. *Id.* BOP Legal Counsel acknowledged that "everyone involved is cognizant that time is of the essence,"

and agreed to forward the communication to the FOIA personnel handling the request. *Id.* Despite this, no production of relevant records was made.

Even after Mr. Purkey's initial execution warrant expired, Mr. Purkey's counsel continued to pursue these critical records and the BOP continued to refuse to provide them. On February 3, 2020, Mr. Purkey's counsel submitted updated and renewed FOIA requests seeking: (1) BOP policies and procedures pertaining to BOP surveillance of Mr. Purkey as well as copies of video surveillance tapes of his cell, and (2) Mr. Purkey's medical, mental health, and administrative BOP file (including disciplinary records). *See* R. Woodman Decl. ¶¶ 25–26, Exs. 28–30. A supervisory attorney at the BOP acknowledged receipt of the requests and stated that the information would be forwarded to the FOIA processor who would reach out if more information was necessary to fulfill them. *See id.* ¶ 26, Ex. 35. Neither the FOIA processor nor any other person at the BOP has requested further information to facilitate the FOIA request and the requested information has still not been produced. Defendants, however, first disputed that Mr. Purkey had renewed his FOIA requests, and then remarkably represented that the BOP did not have any record of the updated or renewed FOIA request. *See* R. Woodman Decl. ¶¶ 27–29, Ex. 37.

Mr. Purkey's counsel pressed the issue of Defendants' failure to provide Mr. Purkey's records or grant access for testing in Mr. Purkey's March 16, 2020 Opposition to Defendant's Motion to Dismiss. Mem. in Supp. of Pl. Opp. to Defs.' Mot. to Dismiss 7–10, ECF 20.[4] As recently as June 15, 2020, shortly before receiving notice of the new warrant, Mr. Purkey's

---

[4] Counsel specifically argued that Defendants should grant access to the necessary materials because waiting for a short warrant period would impose "'unrealistic time-frame' to allow counsel to obtain the information it needs to prepare for a competency hearing, this court to conduct it, and an appellate court to review it." Mem. in Supp. of Pl. Wesley Purkey's Opp. to Defs.' Mot. to Dismiss 10, ECF No. 20.

counsel again wrote to BOP Legal Counsel to follow-up on the 2020 FOIA requests. *See* R. Woodman Decl. ¶ 32, Ex. 39. No response was received and, to date, *none* of the requested materials from either of the FOIA requests have been produced.

The reports from Dr. DeRight and Dr. Agharkar and declaration from Dr. Hyde illustrate that important questions of fact regarding Mr. Purkey's competency cannot be fully answered without the withheld medical and BOP records. For example, Mr. Purkey's legal team reports that Mr. Purkey appears to be incontinent. Compl. Ex. 3 at 25, ECF No. 1-1. This is an important marker of Alzheimer's Disease. *Id.* at 28. The medical records may shed light on when Mr. Purkey's incontinence began, and the extent of his loss of this biological function. Dr. Agharkar noted that Mr. Purkey has less movement on the right side of his face, as if he had suffered a stroke. Compl. Ex. 1 at 10, ECF No. 1-1. Without the medical records, counsel lacks information about whether Mr. Purkey has had a stroke. These questions are merely illustrative, not exhaustive, of the information withheld. The need for the withheld medical records is especially pressing because neither Mr. Purkey's counsel nor counsel's expert witnesses have been able to visit Mr. Purkey since March 2020 to evaluate whether Mr. Purkey's cognitive and physical impairments have worsened. Further, continuous observation is imperative to identify the declining functions and cognitive awareness that are hallmarks of persons with dementia. This is one reason the surveillance footage from Mr. Purkey's cell is so critical in addition to his medical and administrative records. Range video surveillance, which shows Mr. Purkey in his typical prison setting, will provide for observation of Mr. Purkey's condition in a way that the somewhat artificial setting of a visitation cannot.

Defendants have also prevented Mr. Purkey's access to highly probative testing ordered by his experts. On September 26, 2019, Dr. Agharkar ordered brain image testing based on Mr.

Purkey's history of cognitive deficits and the need to rule out an intracranial process. *See* R. Woodman Decl. ¶ 14, Exs. 14, 15. Counsel contacted appropriate authorities at USP Terre Haute to address institutional issues associated with carrying out such testing and were advised that such testing would require a court order, had to be conducted on-site by Defendant vendors, and that Mr. Purkey's defense counsel had to pay for the testing. R. Woodman Decl. ¶ 15, Exs. 16–17. Mr. Purkey's counsel filed an *ex parte* motion for brain imaging in October 2019 in Mr. Purkey's habeas case, requesting a Court order directing that such testing occur at no cost to the Court. *See* R. Woodman Decl. ¶ 15, Ex. 18. The motion was denied on November 20, 2019 because it was not related to a *Ford* claim. Order Denying Pet. for a Writ of Habeas Corpus, *Purkey v. United States*, Case No. 2:19-cv-00414-JPH-DLP (S.D. Ind. Nov. 20, 2019), ECF No. 76 (*Ex Parte*); *see* R Woodman Decl. ¶ 18.

On June 15, 2020, Mr. Purkey's counsel requested that Dr. DeRight be allowed to visit and evaluate Mr. Purkey in person. *See* R. Woodman Decl. ¶ 32, Ex. 39. Dr. DeRight last conducted an in-person examination of Mr. Purkey in August of 2019. *Id. See* Ex. 1. Standard best medical practices require repeated neuropsychological examinations, including up-to-date neuroimaging and blood laboratory tests, to assess Mr. Purkey's current abilities and the progression of his dementia. *Id.* Dr. Hyde also made clear that additional examination and testing is necessary. *See* T. Hyde Decl. ¶ 8 (stating that "a complete neurological assessment includes a face-to-face interview and physical neurological examination of Mr. Purkey, and follow-up with relevant diagnostic testing," to include an MRI, EEG, a variety of blood tests, spinal tap, and PET scans).

Defendants have also interfered with counsel's access to Mr. Purkey during this critical period before and during the current pandemic and USP Terre Haute's lockdown. In October

2019 Mr. Purkey filed, among other filings, a *pro se* request to withdraw pending litigation. R. Woodman Decl. ¶ 16, Exs. 19–21. The Southern District of Indiana ordered an October 31, 2019 telephonic hearing regarding those filings with Mr. Purkey and his counsel. *Id.* ¶ 20. In anticipation of that hearing, Michelle Law, counsel for Mr. Purkey, traveled to USP Terre Haute from her office in Springfield, Missouri. *Id.* By car, this trip is over six hours one way. The prison refused to allow counsel to meet with Mr. Purkey in preparation for the telephone conference. *Id.*

Now, with just over three weeks until Mr. Purkey's execution, Mr. Purkey has been prohibited from meeting in-person with legal counsel since March 13, 2020. *Id.* ¶ 33; E. Vartkessian Supp. Decl. ¶ 3 This access to Mr. Purkey by both his legal counsel and medical experts continues to be impeded by the COVID-19 pandemic, the USP Terre Haute COVID-19 outbreak, and the BOP's complete lack of preparation to deal with visitations, let alone executions during this extreme medical emergency. BOP has yet to officially release *any* written safety protocols or procedures regarding visitations to USP Terre Haute during the pandemic. R. Woodman Decl. ¶¶ 13–38. In fact, communications with BOP Legal Counsel indicate that such protocols and procedures do not yet exist. This is troubling and, ultimately, unacceptable, particularly given there has been a confirmed death and ongoing infections from COVID-19 at USP Terre Haute. *Id.* ¶ 36.

COVID-19 is a global pandemic, that has sickened over two million people and resulted in over 119,000 deaths in the United States alone. J. Goldenson Decl. ¶ 8. Cases continue to rise in states across the country, including in the Midwest. *Id.* Prisons and other detention facilities pose heightened risks for exposure and transmission of the COVID-19. *Id.* ¶ 17. The lack of adequate ventilation, inability of all prisoners and staff to practice social distancing, inadequate

hand washing, and insufficient cleaning practices all contribute to the increased risk for the rapid spread of COVD-19 in prisons. *Id.* ¶¶ 18–31.

In recognition of the threat of COVID-19, the BOP has suspended all social and legal visits across the country.[5] All visitation at USP Terre Haute has been suspended since March 13, 2020. At the time of this filing, the BOP website still states that no visitors are allowed at USP Terre Haute and that all social and legal visits for all BOP facilities remain suspended. J. Goldenson Decl. ¶ 39. With scant testing, and no published data about the number of tests administered at USP Terre Haute, it is impossible to know the full scale of the infection. *Id.* ¶ 37.

Mr. Purkey's counsel immediately contacted BOP Legal Counsel to discuss USP Terre Haute's visitation policy after receiving notice of Mr. Purkey's new execution warrant. R. Woodman Decl. ¶ 37, Ex. 50. BOP Legal Counsel expressed willingness for legal visits to resume but could not provide any official protocols regarding visitation or safety precautions, despite the COVID-19 pandemic and outbreak at USP Terre Haute. *See id.* Ex. 51. Although BOP Legal Counsel stated that she would provide Mr. Purkey's counsel with a written policy the next day, June 17, 2020, Mr. Purkey's counsel has yet to receive any official documentation regarding legal or expert visits despite following up multiple times with BOP Legal Counsel. *Id.* ¶ 38, Ex. 52. This makes it impossible to plan for any type of visit, particularly since getting to the prison would require virtually every member of Mr. Purkey's defense team to travel hundreds of miles, some necessarily by plane, during a pandemic. *See id.* BOP Legal Counsel indicated only that the prison anticipated installing Plexiglass on Thursday, June 25, 2020 for possible use during visits. *Id.* ¶ 38. A single email referencing the possible installation of a

---

[5] *BOP Implementing Modified Operations*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 21, 2020).

piece of Plexiglass (with no supporting details) falls far short of the coordinated formalized

plan necessary to protect Mr. Purkey, his medical experts, and counsel, as well as prison staff,

prisoners, and members of the community. BOP has not explained how visitation is suddenly

safe for the four inmates who have execution warrants and their visitors, but still too dangerous

for the over 1200 other prisoners at USP Terre Haute and their visitors. In any case, the cursory

and unplanned approach is entirely insufficient to protect Mr. Purkey, his medical experts, and

counsel from exposure to COVID-19, particularly in the close quarters with limited ventilation

and air flow within death row visitation rooms, while also providing adequate access to Mr.

Purkey to make meaningful assessments. J. Goldenson Decl. ¶ 40.

All three of Mr. Purkey's expert witnesses have made clear how vital it is for Mr.

Purkey's legal team to have in-person visits, testing, imaging, and examinations to obtain an

accurate assessment of the progression of his dementia. *See* Ex. 1; Compl. Ex. 1, ECF No. 1-1;

T. Hyde Decl. ¶¶ 8, 9, 11, 12, 15, 16, 17. By fast-tracking Mr. Purkey's execution, the

Government ignores the unfortunate realities of the COVID-19 pandemic, creating an

impossible choice for Mr. Purkey's experts and counsel: in order to help save Mr. Purkey's life,

they must risk their own life and the lives of their family members or medically vulnerable

persons to whom they provide care. Mr. Purkey must face the prospect of dying without his

legal and spiritual advisors, and without familial support by his side—either because they will

not be permitted to visit him, or because they must risk their lives to do so. J. Goldenson Decl.

¶¶ 40–49. Even the family members of the *victim* of Mr. Purkey's crime must make this difficult

decision, as it is their right to attend the execution. *Id.* ¶¶ 44–49.

The Government's decision to schedule Mr. Purkey's execution with only one month's

notice, after its months-long refusal to provide relevant materials and access to Mr. Purkey, and

in the midst of a global pandemic that creates new difficulties and dangers associated with in-person visits, further illustrates the necessity and appropriateness of injunctive relief.

## ARGUMENT

## I.   THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION TO STAY THE PROCEEDINGS

Courts consider four factors on a motion for a preliminary injunction: 1) the likelihood of the plaintiff's success on the merits, 2) the threat of irreparable harm to the plaintiff if an injunction is not granted, 3) the balance of the equities, and 4) the interests of the public. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017). Likelihood of success and irreparable harm are "the most critical" factors in whether a preliminary injunction is warranted. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

Courts in this Circuit traditionally analyze the four factors using a "sliding-scale" approach, whereby "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). That framework "allows a movant to remedy a lesser showing of likelihood of success on the merits with a strong showing as to the other three factors, provided that [there is] a 'serious legal question' on the merits." *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018) (quoting *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)). Absent a contrary holding from the D.C. Circuit, courts in this District continue to apply the sliding-scale standard following the Supreme Court's decision in *Winter*. *See, e.g.*, *id.* at 560–61; *Nat'l Parks Conservation Ass'n v. Semonite*, No. 17-CV-01361-RCL, 2018 WL 3838809, at *1 (D.D.C. July 3, 2018); *Steele v. United States*, 287 F. Supp. 3d 1, 3 (D.D.C. 2017); *see also John Doe Co.*, 849 F.3d at 1131 (citing *Holiday Tours* when describing

the requirements of a preliminary injunction). Courts repeatedly have held that where a petitioner provides current evidence suggesting that he is not competent and "no court has ever made the appropriate inquiry," the balance of these factors warrant a stay of execution for a competency determination. *See, e.g., Miller v. Stewart*, 231 F.3d 1248, 1250, 1252 (9th Cir. 2000) (granting stay of execution to determine competency because petitioner presented current evidence of incompetency as well as evidence that his housing conditions are such that they "can cause psychological decompensation to the point that individuals may become incompetent."); *In re Moser*, 69 F.3d 690, 691 (3d Cir. 1995) (granting a stay of execution in order to determine competency where competency had been an issue earlier in the proceedings and where petitioner had previously been placed in psychiatric facilities).

Each of the preliminary injunction factors independently weighs in favor of an injunction in this matter.

### A.  Mr. Purkey Demonstrates A High Likelihood of Success on His Eighth Amendment and Due Process Claims

Mr. Purkey is likely to succeed on his claims. To demonstrate that success on the merits is sufficiently likely, a plaintiff "need not establish an absolute certainty of success." *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986); *see also Holiday Tours*, 559 F.2d at 843. Instead, it is ordinarily sufficient that "the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Holiday Tours*, 559 F.2d at 844; *see also Cigar Ass'n*, 317 F. Supp. 3d at 560–61; *Nat'l Parks Conservation Ass'n*, 2018 WL 3838809, at *1; *Steele*, 287 F. Supp. 3d at 3. But even under a more exacting standard, there is a strong likelihood that Mr. Purkey will succeed on the merits of each of his claims. Furthermore, a preliminary injunction is appropriate if the Court finds that any *one* of Mr.

Purkey's claims is sufficiently likely to succeed. *See, e.g.*, *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 319 (D.C. Cir. 1987) (affirming that, "in light of the district court's conclusion that the [plaintiff] will likely succeed on . . . two counts, it correctly declined to reach the merits of the [plaintiff's] other claims"); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 n.1 (9th Cir. 2014) (reversing denial of preliminary injunction where "there is a likelihood of success on the merits on one claim").

Mr. Purkey presents lay and expert observations of his obvious mental and cognitive decline and current state of mental incompetency, as well as a wealth of corroboration of his deteriorating mental health and cognitive impairments. *See generally* Compl., ECF No. 1. He demonstrates a high likelihood of success, and "[a] death sentence cannot begin to be carried out by the State while substantial legal issues remain outstanding." *Barefoot v. Estelle*, 463 U.S. 880, 888 (1983)*.* It is only by enjoining Mr. Purkey's execution pending the hearing and determination of this motion that the Court can ensure the effective presentation and resolution of Mr. Purkey's *prima facie* competency claim. *Miller*, 231 F.3d at 1250; *In re Moser*, 69 F.3d at 692; *see also In re Hearn*, 376 F.3d 447 (5th Cir. 2004) (staying execution to allow investigation of mental retardation claim). Any other form of relief could result in the untenable situation where this Court finds a colorable competency issue to exist but cannot consider those arguments because the Government executed Mr. Purkey. Thus, this Court should enjoin and bar Mr. Purkey's execution pending a resolution on the merits of his *Ford* competency claim.

### 1.  *Mr. Purkey Is Likely to Prevail On His Due Process Claim*

Mr. Purkey is likely to prevail on his claim that he is entitled to a hearing on his competence to be executed pursuant to his right to due process. Under the Due Process Clause of the Fifth Amendment, Mr. Purkey is entitled to notice and an opportunity to be heard on the

manner in which the Government will deprive him of his life and liberty. In a *Ford* inquiry, a prisoner who makes a sufficient threshold showing of incompetency is entitled to "the protection afforded by procedural due process," including a hearing at which to present evidence on the ultimate issue of competency. *See Panetti*, 551 U.S. at 948–49 ("Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being.") (quoting *Ford*, 477 U.S. at 411–12). A "fair hearing" is necessary under *Panetti* and *Ford* because there are facts that must be established at the time of, or shortly before, an execution date to determine if sanity is an issue. *Id.* at 948–49 ("fair hearing" necessary for fundamental fairness because "the fact or timing of [a prisoner's] execution [is] contingent upon establishment of a further fact") (quoting *Ford*, 477 U.S. at 411–12, 426).

Defendants have failed to provide Mr. Purkey with any adequate mechanism to gather, assess, and present information relevant to his current competency in violation of his federal due process rights. Indeed, Defendants have failed to establish *any* federal process at all to allow for the adequate review of Mr. Purkey's *Ford* competency claim. There are no federal procedures or regulations to facilitate access to necessary information by federal prisoners for investigating and litigating *Ford* claims. *Cf. Ex parte Jordan*, 758 S.W.2d 250, 252–53 (Tex. Crim. App. 1988) (en banc) (highest Texas criminal court noting that Texas had an "alarming lack of any Texas statute specifying the procedures to be followed in raising and determining a defendant's execution competency," in contrast to the vast majority of states, and inviting the legislature to adopt standards); *Commonwealth v. Banks*, 943 A.2d 230, 234 n.7 (Pa. 2007) (there "is not currently in place a specific procedure for the timely handling of *Ford v. Wainwright* claims").

In the context of state-conducted executions, courts have described the threshold showing of incompetency that a prisoner must make under *Ford* in various ways. *Panetti*, 551 U.S. at 949 (prisoner who makes a "substantial threshold showing" of incompetency is entitled to hearing on competency issue) (quoting *Ford*, 477 U.S. at 426, 424); *Charles v. Stephens*, 612 Fed. App'x 214, 221–22 (5th Cir. 2015) (whether described as a "colorable" or "substantial" showing, the burden "may require little, [but] at least requires some competent evidence" of prisoner's incompetency); *see also Ford*, 477 U.S. at 417 (citing *Pate v. Robinson*, 383 U. S. 375, 383 U.S. 387 (1966) and comparing competency to be executed to competency to stand trial, wherein a hearing on competency is required if "sufficient doubt" of competency exists). Regardless of how this standard is characterized, Mr. Purkey's extensive evidence of incompetency more than satisfies the threshold showing.

Mr. Purkey, who has not previously received an execution-related competency hearing, has submitted hundreds of pages of evidentiary support demonstrating his current incompetency as well as its historical progression and underpinnings, including: a report of a neuropsychologist concluding that Mr. Purkey has Alzheimer's; a report of a neuropsychiatrist concluding that Mr. Purkey—due to his irrational delusions and dementia—does not have a rational understanding of the basis for his execution; a neurologist report concluding that Mr. Purkey likely has some type of dementia based on his review of Mr. Purkey's history and current conditions, and reports of the investigators on his case who have witnessed his decline and deterioration. As cases granting a *Ford* hearing demonstrate, this evidence is more than enough to entitle Mr. Purkey to a fair competency hearing. *See Panetti*, 551 U.S. at 938, 950 (Panetti met the "threshold showing" when he filed a Renewed Motion To Determine Competency, supported by "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed

petitioner while on death row"); *Eldridge v. Thaler*, Civil Action No. H-05-1847, 2009 WL 3856672 (S.D. Tex. Nov. 17, 2009) (finding a substantial threshold showing of *Ford* insanity where the petitioner "submitted evidence from lay observers about his bizarre behavior and his delusional statements," including a belief his food is poisoned, evidence that his mental health has deteriorated in the last few years, and expert evidence corroborating those observations and opining on incompetency); *Wood v. Quarterman*, 572 F. Supp. 2d 814, 819 (W.D. Tex. 2008), *aff'd sub nom. Wood v. Stephens*, 619 F. App'x 304 (5th Cir. 2015) (petitioner was entitled to a *Ford* hearing based on his record of suicides, prior mental health problems, paranoia, and delusional statements to counsel).

Further, Mr. Purkey's federal *Ford* claim is properly brought before this Court. *See generally* Pl.'s Br. Pursuant to This Court's Order of Dec. 31, 2019, ECF No. 14; Pl.'s Reply to Defs.' Resp. to This Court's Order of Dec. 31, 2019 at 4–5, ECF No. 17. Mr. Purkey's *Ford* claim does not challenge his underlying conviction or sentence and is therefore not "core" habeas and need not be brought exclusively through habeas. *See* Pl.'s Reply to Defs.' Resp. to This Court's Order of Dec. 31, 2019 at 4–5, ECF No. 17 (providing multiple examples of parties seeking equitable relief for constitutional violations outside of habeas). The Government's relevant briefings continue to provide no authority for a contrary holding and in fact continues to ignore the core habeas analysis. Defs.' Resp. to Purkey's Br. Filed Pursuant to this Court's Order of Dec. 31, 2019, ECF No. 16; Defs.' Mot. to Dismiss or, in the Alternative to Transfer, ECF No. 18. As the Government itself acknowledges (through its convenient silence), competency is transitory and may be restored. Pl.'s Reply to Defs.' Resp. to This Court's Order of Dec. 31, 2019 at 3, ECF No. 17. If Mr. Purkey's *Ford* claim is successful, neither his conviction nor his sentence would be altered and, were the Government able to restore Mr. Purkey to a competent

27

state, his sentence would be executable. Mr. Purkey's *Ford* claim is thus not core habeas and is properly brought before this Court, independent of habeas, particularly because the named Defendants are the individuals that are singularly responsible for issuing Mr. Purkey's execution warrant, facilitating his actual execution, and issuing procedures to implement the execution.

Mr. Purkey is therefore likely to succeed on his due process claim entitling him to notice and a hearing on the competency issue, as well as the discovery that he has long sought and thus far been denied, including access to his most recent medical records. *See Panetti*, 551 U.S. at 952 (distinguishing between procedures required under *Ford* (namely, an impartial decision maker and an opportunity to offer evidence to counter government evidence of competency) and other rights falling under the Due Process Clause in some cases such as "the opportunity for discovery or for the cross-examination of witnesses"); *Ford*, 447 U.S. at 399 (due process on issue of competency to be executed was not satisfied where there was no meaningful opportunity to substantiate the claim before it was rejected, there was no opportunity to confront state's evidence, and there was no judicial factual determination of competency or incompetency to be executed).

Being "deprived of life" unequivocally implicates a constitutionally protected interest, U.S. Constitution amendment V, and the Supreme Court has held that constitutionally protected "liberty interests are implicated" when the government plans to "inflict[] appreciable physical pain." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977). Thus, carrying out Mr. Purkey's execution without affording him an opportunity to prove his incompetency would violate due process under the Fifth and Eighth Amendments. Mr. Purkey's likelihood of prevailing on his due process claim merits the grant of a preliminary injunction in order to accord Mr. Purkey an opportunity to be heard.

### 2. Mr. Purkey Is Likely to Prevail On His Eighth Amendment Claim

Mr. Purkey is also likely to prevail on his Eighth Amendment claim that his execution would constitute cruel and unusual punishment. The Eighth Amendment's prohibition on cruel and unusual punishment bars the government from executing someone who is incompetent. *Panetti,* 551 U.S. at 934; *Ford v. Wainwright,* 477 U.S. 399 (1985); *see also Madison*, 139 S. Ct. at 722. A condemned prisoner is incompetent when he cannot rationally understand his punishment or the reason for it. *Panetti,* 551 U.S. at 958–60. "The critical question is whether a 'prisoner's mental state is so distorted by a mental illness' that he lacks a 'rational understanding' of 'the State's rationale for [his] execution.' . . . Or similarly put, the issue is whether a 'prisoner's concept of reality' is 'so impair[ed]' that he cannot grasp the execution's 'meaning and purpose' or the 'link between [his] crime and its punishment.'" *Madison*, 139 S. Ct. at 718 (quoting *Panetti*, 551 U.S. at 958–60).

The Supreme Court has recognized that evidence of either delusional disorders or dementia can be a basis to find incompetency to be executed. As the Supreme Court recently explained in *Madison*, "a delusional disorder can be of such severity—can 'so impair the prisoner's concept of reality'—that someone in its thrall will be unable 'to come to grips with' the punishment's meaning." *Madison*, 139 S. Ct. at 729 (citing *Panetti*, 551 U.S. at 958; *Ford*, 477 U.S. at 409). Similarly, the Court recognized that dementia "can cause such disorientation and cognitive decline as to prevent a person from sustaining a rational understanding of why the State wants to execute him." *Id.*

Here, Mr. Purkey presents a strong factual basis regarding his current mental incompetency from numerous sources, including: a report of a neuropsychiatrist concluding that Mr. Purkey—by virtue of his Alzheimer's Disease, cognitive impairments, and severe mental illness—"lack[s] a rational understanding of the basis for his execution"; a report of a

neuropsychologist diagnosing Mr. Purkey with Alzheimer's disease; a declaration by a neurologist concluding that there is "substantive evidence of Mr. Purkey's neurological deterioration over time affecting memory and cognitive function that is compatible with the diagnosis of a dementing disorder"; and reports of the investigators on his case who have witnessed his decline and deterioration.

As in *Panetti*, Mr. Purkey "can recite the fact that his execution is for the murder of Jennifer Long, [but] he lacks rational understanding of that fact." Complaint, Ex. 1 at 11–12, ECF No. 1-1; *Panetti*, 551 U.S. at 938. "This," Dr. Agarkhar explains, "is an example of parroting, rather than having a rational understanding." Compl. Ex. 1 at 11–12, ECF No. 1-1. Much like Scott Panetti, Mr. Purkey misunderstands the real reason for his execution, instead believing it is a "conspiracy of retaliation . . . for his legal work." *Id*. This "fixed belief" is "part of his long-standing delusions" (*id.*), which have persisted over decades, and are evidenced by numerous prior evaluations and institutional records as well as contemporaneous observations and opinions rendered by experts and defense team members. *See, e.g.*, Compl. Exs. 1, 3, 7; E. Vartkessian Supp. Decl. & Ex. 1 to Supp. Decl. R. Woodman Decl. Contemporaneous institutional records and psychiatric evaluations documenting decades of delusional behavior by Mr. Purkey and the progression of his dementia support this conclusion. *See id*.; *see also* Compl. Exs. 12–15, ECF Nos. 1-1 to 1-18. Further, affidavits and declarations of those interacting with him on a regular basis demonstrate his decline. *See generally* E. Vartkessian Supp. Decl.; R. Woodman Decl.; Compl. Ex. 7., ECF No. 1-1.

Like the petitioners in *Panetti* and *Madison*, Mr. Purkey has already made a substantial threshold showing of his incompetency, entitling him to a *Ford* hearing. Upon an opportunity to be heard, the extensive factual record compiled thus far, together with witness testimony and

the additional discovery to which Mr. Purkey is entitled, will demonstrate that Mr. Purkey is

not competent to be executed. Mr. Purkey is therefore highly likely to prevail on this ultimate

issue of whether his execution would constitute cruel and unusual punishment under the Eighth

Amendment. Thus, although Mr. Purkey need only demonstrate a likelihood of success on one

of his claims, *see, e.g., Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 319 (D.C. Cir. 1987),

both of Mr. Purkey's claims satisfy the likelihood of success prong of the preliminary

injunction analysis.

### B.   Mr. Purkey Will Suffer Irreparable Harm Without an Injunction

Unquestionably, Mr. Purkey will suffer irreparable harm if the Court denies the motion

for a preliminary injunction. To constitute irreparable harm, "the harm must be certain and great,

actual and not theoretical, and so imminent that there is a clear and present need for equitable

relief to prevent irreparable harm," and it "must be beyond remediation." *League of Women

Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citing *Chaplaincy of Full Gospel

Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)) (internal quotation marks and

brackets omitted). Here, absent a preliminary injunction, Mr. Purkey will die on July 15, 2020.

As this Court has previously held, "nearly certain death" is "the ultimate irreparable injury."

*Wilson*, 791 F. Supp. at 314; *see also Wainwright*, 473 U.S. at 935 n.1 (Powell, J., concurring)

(noting that the "irreparable harm [that] will result if stay is not granted . . . is *necessarily present*

in capital cases") (emphasis added). In *Battaglia v. Stephens*, where the petitioner presented

"some evidence of mental illness and delusions," the Fifth Circuit granted a stay of execution to

afford the petitioner the opportunity to develop his *Ford* claim with new counsel. 824 F.3d 470,

475 (5th Cir. 2016). Because the irreparable injury factor weighed so heavily in the petitioner's

favor, it was enough that there was a possibility that his claim had some merit. *Id*. at 475–76.

Like others facing imminent execution, Mr. Purkey has alleged a harm that, if realized, cannot be corrected. Without the Court's intervention, Mr. Purkey will be executed well before he can fully litigate his claims. The threatened harm is "beyond remediation," *Newby*, 838 F.3d at 7–8, because no "adequate compensatory or other corrective relief will be available at a later date," *Chaplaincy*, 454 F.3d at 297. For Mr. Purkey, there is no later date. His claims are therefore "categorically irreparable." *Nken*, 556 U.S. at 435. Recognizing this basic reality, courts have found that the "requirement—that irreparable harm will result if a stay is not granted—is necessarily present in capital cases." *Wainwright*, 473 U.S. at 935 n.1 (Powell, J., concurring).

A preliminary injunction maintains the status quo, and is subject to future correction or even reversal, while the denial of a preliminary injunction is not susceptible to correction. The proper course is to maintain the status quo, so that life is sustained, because the decision to allow Mr. Purkey to die is irreversible. When life is at stake, and Mr. Purkey's surely is, due process places a heightened burden of proof on the Government where the "individual interests at stake . . . are both 'particularly important' and 'more substantial than mere loss of money.'" *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (termination of parental rights). As the Government intends to extinguish Mr. Purkey's life, irreparable harm will result absent a preliminary injunction.

### C.  The Balance of The Equities and Public Interest Weigh in Favor of A Preliminary Injunction

The balance of the equities and public interest also favor a preliminary injunction. Where the government opposes a preliminary injunction, these two factors merge. *See Nken*, 556 U.S. at 434–35. This Court has an interest in granting a preliminary injunction in order "to protect the Court's jurisdiction over the case, for if the inmate was executed while the competency question

was pending, the case would become moot even if it later appeared that the inmate clearly was incompetent." *Smith ex rel. Smith v. Armontrout*, 626 F. Supp. 936, 939 n.1 (W.D. Mo. 1986). A cognizable *Ford* claim presents important constitutional questions courts must approach with "deliberate and thoughtful" consideration, for "a ripe *Ford* claim is due the same consideration as other issues raised in a first habeas petition." *See Amaya-Ruiz v. Stewart*, 136 F. Supp. 2d 1014, 1030–31 (D. Ariz. 2001) (granting stay of execution pending resolution of the *Ford* claim). Consequently, the question becomes, what equitable interest do Defendants possess in executing someone who is presumptively incompetent?

Although Defendants may claim the Government will be harmed if there is delay in its scheduled execution of Mr. Purkey, such a claim must necessarily be rejected, as the Government itself elected to delay Mr. Purkey's execution, as well as the execution of any other federal prisoner, for nearly two decades. Arbitrarily setting an execution date of July 15, 2020, after years of delay by the Government itself and at its sole discretion, does not create a true exigency here. This critical fact undermines any claims the Government may have on the grounds of prejudicial delay. Moreover, other courts have found "little potential for injury" as a result of a delayed execution date. *See*, *e.g.*, *Harris v. Johnson*, 323 F. Supp. 2d 797, 809 (S.D. Tex. 2004). Any potential harm to the Government caused by a delayed execution is outweighed by the clear and obvious harm to Mr. Purkey and by the public's interest in a constitutional application of the execution protocol. And not delaying the execution undermines the rule of law as pronounced by *Ford* and *Panetti*—that we as a society do not execute the incompetent. Moreover, the complexity of the issue before the Court, as well as the unsettled nature of this area of the law, also countenance in favor of granting a stay. *See Ferguson v. Sec'y for Dept. of*

*Corr.,* 716 F.3d 1315, 1318 (11th Cir. 2013) (noting that after *Panetti,* "there is not yet a well-defined bottom line in this area of the law.").

Further, as noted above, the only delays in this matter have been caused by the Government. Since August 2019, despite repeated requests and efforts by Mr. Purkey's counsel, the Government has continuously refused to provide his medical, mental health, and administrative records, to furnish (or possibly even preserve) video evidence depicting Mr. Purkey's dementia, or to grant access to Mr. Purkey for brain imaging, all of which is integral to Mr. Purkey's claim. *See generally* R. Woodman Decl. Additionally, due to COVID-19, the United States BOP has precluded all visitors into USP Terre Haute beginning March 13, 2020, and to this date, has not released specific policies or precautions so that visits can be safely planned and conducted with enough notice before Mr. Purkey's execution date. *Id.* ¶¶ 33–38. Mr. Purkey's defense team is still in a holding pattern, notwithstanding a Government-manufactured fire-drill. Although Mr. Purkey has presented sufficient evidence to overcome the threshold showing to be granted a *Ford* hearing, Mr. Purkey's defense team does not have the information it needs to fairly and accurately prosecute Mr. Purkey's constitutional claims in this suit, despite repeated efforts to obtain relevant information.

By contrast, Mr. Purkey has acted diligently and expediently to protect his constitutional rights. This case falls into a category of cases where filing is not ripe until execution is imminent. *Panetti*, 551 U.S. at 947 (citing *Stewart v. Martinez-Villareal,* 523 U.S. 637, 644–45 (1998) (a competency to be executed claim is not ripe until it is time to execute the sentence). Mr. Purkey's status has declined over the years, including in the months and weeks leading up to his initial execution date and has declined even more since. E. Vartkessian Supp. Decl. ¶¶ 5–21. Mr. Purkey's legal team and experts have noted his decline over time. *Id.*; R. Woodman Decl. ¶¶ 14–

23. It is due to this decline, and Mr. Purkey's current mental incompetency, and the imposition of the sentence, that the case is now properly before this Court.

The Government may have a "strong interest in enforcing its criminal judgments," but that interest is outweighed by the public's interest in a "humane and constitutional" application of the federal execution protocol. *Nooner v. Norris*, No. 5:06CV00110 SWW, 2006 WL 8445125, at *4 (E.D. Ark. June 26, 2006). Indeed, that interest will be served even if Mr. Purkey ultimately succeeds on the merits of his claims. He does not contest his conviction or the sentence of death. He contests only the unconstitutional way in which the Government proposes to execute him in his current condition of incompetency. In any event, "the fact that the government has not—until now—sought to" schedule Mr. Purkey's execution "undermines any urgency surrounding" its need to carry out Mr. Purkey's sentence. *Osorio-Martinez v. Attorney Gen. of the U.S.*, 893 F.3d 153, 179 (3d Cir. 2018). A preliminary injunction will therefore "not substantially injure other interested parties," the public, or the Government. *Chaplaincy*, 454 F.3d at 297.

And, the COVID-19 pandemic inescapably impacts what is a humane and constitutional execution. Based on Mr. Purkey's deteriorating condition, it is very likely that Mr. Purkey's competency has only continued to decline. But Mr. Purkey's counsel has been unable to assess this without access to in-person visits with her client. R. Woodman Decl. ¶¶ 33–38; E. Vartkessian Supp. Decl. ¶¶ 22–25. Further, the lack of access to one of the only forms of contact with the outside world has itself likely exacerbated his serious mental illness and deteriorating mental capacity. E. Vartkessian Supp. Decl. ¶ 25. Even if the BOP begins to permit visits, Mr. Purkey's legal counsel, expert witnesses, and others will need to risk their

lives to save Mr. Purkey's. It is not in the public interest to subject citizens to undue and unnecessary health hazards.[6]

Finally, it is clearly not in the public interest to execute an incompetent person. The public interest is not served by executing an individual presenting a *prima facie* case of incompetency before he has the opportunity to avail himself of the legitimate procedures to challenge his competence, as required by clearly existing United States Supreme Court authority. Accordingly, the public interest is only served by preliminarily enjoining Mr. Purkey's execution because it will allow for the equal application of the law in judicial processes.

## II.   EXPEDITED DISCOVERY IS REQUIRED TO SUPPORT AN EVIDENTIARY HEARING

As set forth above, the Government has imposed conditions on Mr. Purkey's pursuit of additional medical testing and has delayed in providing information requested pursuant to FOIA requests, all of which are relevant to the claim Mr. Purkey currently brings before this Court. *See generally* R. Woodman Decl. Specifically, Mr. Purkey seeks: (1) the BOP medical, mental health, and administrative (including disciplinary) records for Mr. Purkey from January 1, 2017 through the present; (2) video surveillance of Mr. Purkey's cell from July 25, 2019 through the

---

[6] Texas and Tennessee appellate state courts have stayed several executions in light of the COVID-19 Pandemic. *See* Order, *Tennessee v. Smith*, No 89-F-1773 (Tenn. Apr. 17, 2020) (resetting the June 4, 2020 execution for February 4, 2021 "due to the COVID-19 pandemic"); *In re Hummel*, No. WR-81,578-02, 2020 WL 1268970, at *1 (Tex. Crim. App. March 16, 2020) (sua sponte granting 60 stay of execution "in light of the current health crisis and the enormous resources needed to address that emergency"); *In re Beatty*, No. WR-59,939-04, 2020 WL 1329145, at *1 (Tex. Crim. App. March 19, 2020) (same); *In re Hernandez*, No. WR-81,577-02, 2020 WL 1645052, at *1 (Tex. Crim. App. April 1, 2020) (granting sixty day stay of execution in recognition that execution "should be stayed at the present time"); *In re Busby*, No. WR-70,747-03, 2020 WL 2029306, at *1, (Tex. Crim. App. April 27, 2020) (same). A Texas district court rescheduled Carlos Trevino's execution from June 3, 2020 until September 30, 2020. Order Withdrawing Execution Date, *Texas v. Carlos Trevino*, No. 1997-CR-1717D (Bexar Co. Dist. Ct. Apr. 15, 2020) (order granting unopposed motion to withdraw order setting execution date until September 30, 2020 "due to restrictions and concerns caused by the COVID-19/Coronavirus pandemic"), https://files.deathpenaltyinfo.org/documents/Trevino-Carlos-TX-Bexar-Cty-Order-Rescheduling-Execution-2020-04-15.pdf.

present; (3) BOP policies and procedures regarding the day and night watch protocols for death row in effect from July 25, 2019 to the present; and (4) access to Mr. Purkey for independent brain imaging as ordered by Dr. Bhushan Agharkar and Dr. Thomas Hyde, and requested by Dr. Jonathan DeRight in accordance with the standard of care. Ex. 1, Compl. Ex. 1 at 9, ECF No. 1-1; R. Woodman Decl. ¶ 12, Exs. 6–8.

Mr. Purkey is entitled to expedited discovery on these issues. Mr. Purkey's current competency is squarely at issue in the instant matter, and his ability to present a full picture of his current mental state is undermined by the lack of access to his most up to date medical records and doctor-ordered brain imaging, both of which are exclusively in the Government's possession and control, and which the Government continues to refuse to provide to Mr. Purkey. Likewise, the Government's failure to provide counsel with the requested policies and procedures and limited surveillance footage impedes Mr. Purkey's defense team from evaluating his current mental state in light of the execution watch protocol. *See* R. Woodman Decl. ¶¶ 6–7. This is further exacerbated by the COVID-19 pandemic and now encompasses the Government's utter lack of any safety procedures or protocol related to safe visitation of death row inmates during the pandemic.[7]

Mr. Purkey intends to file a separate motion before this Court seeking expedited discovery to ensure Mr. Purkey's access to a full and fair competency hearing and this Court's ability to make an informed decision on the merits. Following an accelerated discovery timeline

---

[7] Mr. Purkey previously filed a request for expedited discovery as part of his original motion for preliminary injunction, Pl.'s Mot. for a Prelim. Inj. Barring Execution of Wesley Purkey's Pending Final Disposition on the Merits, ECF No. 7.

to obtain the requested testing and documents and review these key materials, counsel may seek to supplement this motion with this additional evidence.[8]

## CONCLUSION

The Court should preliminarily enjoin the Government from proceeding to execute Mr. Purkey pending (a) a fair hearing on the issue of Mr. Purkey's competency to be executed; (b) a determination of Mr. Purkey's competency to be executed; and (c) the completion of expedited discovery in a *Ford* hearing to which Mr. Purkey is entitled based on his substantial showing of a threshold of incompetency.


DATED: June 22, 2020                    Respectfully Submitted,

                                        */s/Charles F.B. McAleer, Jr.*
                                        Charles F.B. McAleer, Jr. (DC Bar #388681)
                                        Miller & Chevalier Chartered
                                        900 16th Street NW
                                        Washington, D.C. 20006
                                        Telephone: (202) 626-5963
                                        Email: CMcAleer@milchev.com

                                        */s/Brian Fleming*
                                        Brian Fleming (DC Bar #974889)
                                        Miller & Chevalier Chartered
                                        900 16th Street NW
                                        Washington, D.C. 20006
                                        Telephone: (202) 626-5871
                                        Email: bfleming@milchev.com

---

[8] At a minimum, Mr. Purkey has demonstrated that he is entitled to expedited discovery in order to further develop his *Ford* claim and in support of this motion. Thus, to the extent the Court does not now enjoin Mr. Purkey's execution pending final resolution of his claims, the Court should enjoin the execution until the Court resolves this renewed motion for preliminary relief *after* Mr. Purkey has been given an opportunity to gather additional evidence through expedited discovery, including information Mr. Purkey previously sought from Defendants but as to which he has been denied access, and *after* Mr. Purkey has been given an opportunity to supplement this motion with such additional evidence. *See, e.g., Battaglia*, 824 F.3d at 475 (where the petitioner presented "some evidence of mental illness and delusions," stay of execution was granted to afford the petitioner the opportunity to develop his threshold claim of incompetency with new counsel, given that any delay was not due to any dilatory conduct on the prisoner's part, and "newly appointed counsel may locate and produce more" evidence of incompetency upon being given a meaningful opportunity to advance the merits of his *Ford* claim).

_/s/Rebecca E. Woodman_
Rebecca E. Woodman (*pro hac vice*)
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

_/s/Michelle M. Law_
Michelle M. Law, MO Bar No. 45487
(appointment motion to be filed)
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile:  (417) 873-9038
Email: michelle_law@fd.org

**Counsel for Plaintiff**