# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03570-TSC |
| | ) | |
| WILLIAM P. BARR, *et al.*, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### Declaration of Dr. Joe Goldenson

I, Dr. Joe Goldenson, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

**Background**

1.      I am a medical physician with 33 years of experience in correctional health care. For 28 years, I worked for Jail Health Services of the San Francisco Department of Public Health. For 22 of those years, I served as the Director and Medical Director.  In that role, I provided direct clinical services, managed public health activities in the San Francisco County jail, including the management of HIV, tuberculosis, Hepatitis C, and other infectious diseases in the facility, planned and coordinated the jail's response to H1N1, and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2.      I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and was past President of the California chapter of the American Correctional Health Services Association. In 2014, I received the Armond Start Award of Excellence from the Society of Correctional Physicians, which recognizes its recipient as a representative of the highest ideals in correctional medicine.

3.      For 35 years, I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco.

4.      I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate

1

patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert/monitor at Cook County Jail in Chicago and Los Angeles County Jail, at other jails in Washington, Texas, and Florida, and at prisons in Illinois, Ohio, and Wisconsin.

5.      My CV is attached as Exhibit A.

6.      I am not being compensated for my time reviewing materials and preparing this report.

7.      As a researcher of prisoner health care and infectious diseases, I have studied the scientific literature about COVID-19, including the literature regarding symptoms, testing, infection rates and transmission.  In addition, I have studied and am familiar with the public health guidance regarding prevention and containment of COVID-19, including U.S. Centers For Disease Control ("CDC")'s Guidance for Population in Jails and the CDC's Interim Infection Prevention and Control  Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings.

8.      I have been asked by counsel for Wes Purkey, a death row prisoner detained at the United State States Prison at Terre Haute in Terre Haute, Indiana to describe the risks to visitors, prisoners, staff and the community posed by legal, religious, social and/or expert visits at Terre Haute during the COVID-19 pandemic, and in particular, the risks to individuals with medical vulnerabilities.  I have also been asked to describe the risk to those attending and participating in Mr. Purkey's scheduled execution on July 15, 2020.

**COVID-19**

COVID-19 is a serious disease that has reached pandemic status.  As of June 19, 2020, there are at least 8,637,901 confirmed cases of COVID-19 worldwide, including 2,219,675 cases in the United States.[1] At least 459,399 people have died, including 119,097 in the United States.[2] As of June 19, 2020 there were 41,438 confirmed cases of COVID in Indiana and 2,491 reported deaths.[3] Vigo County, where Terre Haute is located, has had only 203 confirmed cases but 8 deaths. Because these numbers include only laboratory confirmed cases, they likely understate the actual number of cases and deaths.  Even as some jurisdictions relax social distancing restrictions, new hotspots of infection continue to emerge and cases continue to rise in states across the South, West and Midwest.[4]  Cases have

---

[1] Johns Hopkins University COVID-19 Data Center, https://coronavirus.jhu.edu/(last visited June 19, 2020).

[2] *Id.*

[3] *Id.*

[4] Julie Bosman, W.H.O. Warns of 'Dangerous Phase' of Pandemic as Outbreaks Widen, New York Times (June 19, 2020), https://www.nytimes.com/2020/06/19/us/coronavirus-new-dangerous-phase.html;  New York Times, *Coronavirus Live Updates: Cases Across U.S. Surge Toward May's High* (June 20, 2020).

increased 15% over the last two weeks and, as of June 20, are rising in 18 states across the South, West, and Midwest.  Twelve states hit single-day case records this week.[5]

9.      COVID-19 is a highly contagious respiratory illness. It is transmitted between persons in close proximity (within about six feet) by airborne droplets released by infected individuals when they cough or sneeze.[6] The droplets can survive in the air for up to three hours. It may also be possible for an individual to become infected by touching a surface or object that has the virus on it and then touching his or her own mouth, nose, or possibly eyes. Infected droplets can survive on surfaces for variable lengths of time, ranging from up to four hours on copper, to 24 hours on cardboard, to two to three days on plastic or stainless steel.

10.     Signs and symptoms of COVID-19 may appear two to 14 days after exposure and may include fever, cough, shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, or new loss of taste or smell.[7] In severe cases, COVID-19 can require hospitalization and lead to respiratory failure or death. While more than 80% of the cases are mild, overall some 20% of cases will have severe disease requiring medical intervention and support.

11.     Patients who suffer from serious disease may progress to Acute Respiratory Distress Syndrome (ARDS), which is a type of respiratory failure.  Many patients suffering from ARDS will require mechanical ventilation.  ARDS has a 30 percent mortality rate overall, and a higher mortality rate in people with other medical conditions.

12.     Certain populations are particularly vulnerable to severe cases of COVID-19.  The case fatality rate and need for advanced medical intervention and support increase significantly with advancing age in people aged over 50 and for people of any age with certain underlying medical conditions (the "medically vulnerable").  The CDC has identified people with the following medical conditions as being particularly vulnerable to severe illness from COVID-19:

- Diabetes mellitus
- Lung disease including asthma or chronic obstructive pulmonary disease (chronic bronchitis or emphysema) or other chronic conditions associated with impaired lung function or that require home oxygen

---

[5] New York Times, *Coronavirus Live Updates,* June 21, 2020, https://www.nytimes.com/2020/06/21/world/coronavirus-updates.html?action=click&module=Top%20Stories&pgtype=Homepage

[6] Centers for Disease Control and Prevention, Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings, https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Finfection-control%2Fcontrol-recommendations.html.

[7] Centers for Disease Control and Prevention, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

- Heart disease
- Blood disorders (e.g., sickle cell disease or on blood thinners)
- Chronic kidney disease
- Chronic liver disease
- Compromised immune system (immunosuppression) (including seeing a doctor for cancer and treatment such as chemotherapy or radiation, received an organ or bone marrow transplant, taking high doses of corticosteroids or other immunosuppressant medications, HIV or AIDS)
- Current or recent pregnancy in the last two weeks
- Endocrine disorders
- Metabolic disorders
- Neurological and neurologic and neurodevelopment conditions [including disorders of the brain, spinal cord, peripheral nerve, and muscle such as cerebral palsy, epilepsy (seizure disorders), stroke, intellectual disability, moderate to severe developmental delay, muscular dystrophy, or spinal cord injury ][8]
- Severe obesity[9]

13.    The CDC also deems people 65 or older to be particularly vulnerable to COVID.[10]

14.    A significant number of infected individuals do not exhibit symptoms, however, and asymptomatic individuals—either before the onset of symptoms or because no symptoms will ever manifest—can nevertheless transmit the disease to others. According to the CDC, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[11] Similarly, infected individuals may experience only mild symptoms. These asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. Because of the high risk of transmission by asymptomatic individuals, CDC recommends everyone wear a mask when they leave their homes.

---

[8] Centers for Disease Control and Prevention, *Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission* (Mar. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[9] Centers for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness* (Apr. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[10] Centers for Disease Control and Prevention, *What You Can Do if You are at Higher Risk of Severe Illness from COVID-19* (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/COVID19-What-You-Can-Do-High-Risk.pdf.

[11] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

15.    At this time there is no vaccine to prevent COVID-19 and there is no known cure or anti-viral treatment available.[12]

16.    Current preventive measures seek to slow the transmission of COVID-19 through social distancing (keeping persons separated by at least six feet), frequent handwashing, and respiratory hygiene (*e.g.*, covering mouth and nose when coughing or sneezing), and frequent cleansing of surfaces.[13] While these are important and necessary actions to reduce the risk of infection and the spread of the virus, they are not fully preventive.

**COVID-19 in Detention Facilities Generally**

17.    For multiple reasons, the risk of exposure to and transmission of infectious diseases, as well as the potential harm to those who become infected, is significantly higher in jails and prisons than in the community, putting inmates and correctional staff at high risk of becoming ill with COVID-19.

18.    Close living quarters and often overcrowded conditions in jails, prisons, and detention centers facilitate the rapid transmission of infectious diseases, particularly those transmitted by airborne droplets through sneezing or coughing. In these congregate settings, large numbers of people are closely confined and forced to share bunkrooms, bathrooms, cafeterias, and other enclosed spaces. They are physically unable to practice social distancing, which the CDC has identified as a "cornerstone of reducing transmission of respiratory diseases such as COVID-19."[14] Within these facilities, space and resource limitations—and the resulting inability of inmates and employees to practice social distancing[15]—make it extremely difficult to effectively quell the explosive growth of a highly contagious virus. The CDC has recognized that correctional and detention facilities "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."[16]

19.    Frequent and thorough hand washing is one of the key recommendations to reduce transmission but sufficient soap and/or hand sanitizer is often not available (for inmates and staff) to wash their hands frequently enough to prevent the risk of transmission in contravention of the CDC's *Interim Guidance*.[17]

---

[12] Centers for Disease Control and Prevention, *Prevent Getting Sick* (Apr. 8, 2020), cdc.gov/coronavirus/2019-ncov/prevent-getting-sick.

[13] Centers for Disease Control and Prevention, *How to Protect Yourself and Others* 1–2 (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention-H.pdf.

[14] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, at 4 (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf

[15] *See id.* at 2, 11.

[16] *Id.* at 2.

[17] *See id*.

20.     Housing units are commonly poorly ventilated, which facilitates the transmission of airborne illnesses, such as COVID-19. The CDC recommends generally after an infection in buildings that building operators open windows to allow fresh air to circulate.[18] This recommendation is not possible in prisons.

21.     Current CDC recommendations for reducing the transmission of COVID-19  in jails include screening of all newly arriving arrestees,  quarantining all newly arriving arrestees for 14 days and performing daily symptom screening and temperature checks while they are in quarantine,  isolating any detainee with any symptoms consistent with COVID-19 or with fever who is currently housed in the facility,  and providing masks to all inmates who are "confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19."[19]  In addition, the CDC generally recommends providing and wearing masks in congregate settings.   Individuals should not be added to an existing quarantine cohort after the 14-day quarantine clock has started.

22.     These are also difficult, if not impossible, to implement in prisons due to space constraints, lack of sufficient respiratory isolation rooms, and lack of necessary equipment and other resources.

23.      Testing has been limited in many jails and prisons.  Even when available, it can take days to obtain results. Moreover, someone who is tested shortly after being infected may test negative.  Non-test based verbal screens—i.e., asking a person for a subjective report of symptoms—cannot adequately screen for new, asymptomatic or pre-symptomatic infections. COVID-19 has a typical incubation period of 2 to 14 days, commonly five days, and transmission often occurs before presentation of symptoms. According to the Centers for Disease Control and Prevention, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[20] Similarly, infected individuals may experience only mild symptoms.  These newly infected, asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread.  As a result, such inadequate screening presents a critical problem.  The possibility of asymptomatic transmission means that monitoring staff and incarcerated people for symptoms and fever is inadequate to identify all who may be infected and to prevent transmission.  Because of the problems with screening procedures, the risk of false negative tests, the unavailability of test kits and the delays in obtaining test results, one necessary means to prevent the introduction of COVID into the jails by someone who is arrested is to quarantine all arrestees for 14 days and monitor them daily for symptoms and fever before they are deemed safe to introduce into the general population of the jail.

---

[18] Centers for Disease Control and Prevention, *Cleaning and Disinfecting Your Facility* 2 (Apr. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility-H.pdf.

[19] *See* Centers for Disease Control and Prevention, *Interim Guidance* at 10, 14, 15, 20.

[20] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html

24.     In detention facilities, groups of persons are often moved from space to space, for example, from a dormitory to a cafeteria or visiting room. Persons often from multiple different housing units, congregate and come in close contact while standing in lines for medication, commissary, fresh laundry, telephones, or court appearances. These group movements, which may cluster large numbers of people together in small spaces, increase the risk of transmission between incarcerated persons and throughout the facility. It is common for detainees in a given housing unit to routinely be subjected to such group movements multiple times each day. Additionally, detention facilities often rely on detainees to perform work that supports the operation of the facility, such as food service, laundry, and cleaning. To perform these work assignments, they typically travel from their housing units to other parts of the facility.

25.     Correction officers and other detention facility staff routinely have direct physical contact with detainees, especially when handcuffing or removing handcuffs from detainees who are entering or exiting the facility. Staff members also move around within the facility, which creates opportunities for transmission both among staff in different parts of the facility and transmission to and from detainees in different parts of the facility.

26.     Correctional facilities largely lack the robust medical care infrastructure that would be necessary to deal with a COVID-19 outbreak. If a significant number of people become sick with COVID-19 the institution's health care facilities will be unable to respond appropriately to those people and those who need medical care for other reasons.  And, when an incarcerated patient's needs are too acute for a correctional facility to provide adequate treatment, the patient must be transported to and treated at a community hospital.  Once COVID-19 spreads throughout the correctional facility, the burden of caring for many of these sick individuals will shift to local community medical facilities.

27.     When an outbreak strikes a correctional facility, correction and medical staff will become ill. They will not show up to work.  These vacancies can result in facilities becoming dangerously understaffed, which compromises medical care.  Healthcare staff who provide treatment are unavailable.  Correctional staff also play a vital role in delivering medical services, by escorting prisoners, responding to and alerting medical of medical emergencies, and providing security to health care staff while they provide services.  Their absence also compromises treatment.

28.     If infected, inmates are at greater risk for harm from COVID-19 than those in the general community.  This is due to a number of factors including the fact that people in prisons have high rates of chronic illnesses, such as diabetes, heart disease, chronic lung disease, and immunosuppressive illnesses such as HIV disease that increase the risk from COVID-19, often have had poor or absent prior health care, and often have made unhealthy life-style choices, including alcohol and drug use.  For these reasons, it is well accepted within the medical community that prison inmates are physiologically 10 years older than their chronological age.

29.    Because of the conditions typically found in jails and prisons, carceral settings often have particularly serious incidence of communicable disease.  For example, during the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[21] Until recently the Cook County Jail in Chicago was believed to be the largest-known source of U.S. COVID virus infections.[22]  As of April 13, more than 500 people had been infected at the facility, and the numbers continue to climb.[23]   In one prison in Ohio,  78% of the approximately 2,500 prisoners tested positive.[24]  The State of Ohio tested its prisoners en masse for COVID-19 so this number includes large numbers of inmates who were asymptomatic and would otherwise not have been tested.  This underscores the risk of the spread of COVID-19 by asymptomatic individuals.  In addition, 109 staff had tested positive for COVID-19.[25]

30.    During an infectious disease outbreak, a containment strategy requires people who have known or suspected illness be isolated and that caregivers have access to personal protective equipment to protect themselves and to prevent the further transmission of the disease. During an outbreak, jails and prisons are under-resourced in being able to provide medically appropriate housing for persons with known or suspected infectious illness, and are often underequipped to provide sufficient personal protective equipment, increasing the risk of a widespread outbreak.

31.    In sum, current CDC recommendations for social distancing, frequent hand washing, frequent cleansing of surfaces, symptom screening, temperature checks and isolation to prevent infection and the spread of the virus are extremely difficult, if not impossible, to implement in carceral settings.  As a result, the risk of COVID transmission is far greater than in non-custodial institutions.  Given the rapid spread of COVID-19, it is likely impossible to achieve and sustain these measures sufficiently to mitigate the risk of transmission for medically vulnerable individuals.

---

[21] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deathsare-few/.

[22] Timothy Williams and Danielle Ivory, *Chicago's Jail is Top U.S. Hot Spot as Cirus Spreads Behind Bars*, N.Y. Times (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

[23] Cheryl Corley, *The COVID-19 Struggle In Chicago's Cook County Jail*, NPR (Apr. 13, 2020) https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail.)

[24] Ohio Department of Rehabilitation & Correction, COVID-19 Inmate Testing (last updated Apr. 20, 2020), https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-20-2020%20%201304.pdf,

[25] Bill Chappell and Paige Pfleger, *73% Of Inmates At An Ohio Prison Test Positive For Coronavirus,* NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus

**CONDITIONS IN PRISONS POSE SIGNIFICANT RISK OF TRANSMISSION OF COVID-19 IN THE COMMUNITY OUTSIDE THE PRISONS**

32.     The conditions in prisons pose very significant risk of transmission of communicable diseases like COVID-19 not only to inmates, employees and volunteers in the prisons, but also to the community as a whole.  It has long been known that jails, prisons, and detention centers can be hotbeds of disease transmission, and that due to the frequent ingress and egress of employees at these facilities, an outbreak within a jail, prison, or detention center can quickly spread to surrounding communities. While prisons are often thought of as closed environments, this is not the case. A large number of custody, medical, and other support staff and contractors who have direct contact with detainees enter and leave the facility throughout the day.  Prisons admit and release prisoners on a regular basis.  Since there is no effective way to screen for newly infected or asymptomatic individuals, they can unknowingly transmit COVID-19 to the jail population.

33.      When there is an outbreak in a prison, staff can become infected and bring the virus home to their families and community.  For example, the tuberculosis epidemic that broke out in New York City in the early 1990s began in jails and was spread to the community by jail employees who became infected and then returned home.

34.     It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on the detention facilities and its surrounding communities. At Rikers Island in New York, between the mornings of Wednesday, April 1 and Thursday, April 2, the number of COVID-19 positive incarcerated individuals and staff members grew by 47 and 57 people, respectively, upping the jail's total numbers of confirmed cases to 231 among the incarcerated population and 223 among staff.[26] The first known case of COVID-19 at Rikers was confirmed on Wednesday, March 18,[27] illustrating just how quickly this disease can and will overwhelm detention facilities. A rising number of individuals in prisons continue to test positive for COVID-19.[28]

---

[26] Julia Craven, *Coronavirus Cases Are Spreading Rapidly on Rikers Island*, Slate (Apr. 2, 2020), https://slate.com/news-and-politics/2020/04/rikers-coronavirus-cases-increase.html.

[27] *As Testing Expands, Confirmed Cases of Coronavirus in N.Y.C. Near 2,000*, N.Y. Times (updated Mar. 19, 2020), https://www.nytimes.com/2020/03/18/nyregion/coronavirus-new-york-update.html.

[28] The Marshall Project*, A State-by-State Look at Coronavirus in Prisons* (June 18, 2020), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons?utm_medium=email&utm_campaign=newsletter&utm_source=opening-statement&utm_term=newsletter-20200612-2022&utm_source=The+Marshall+Project+Newsletter&utm_campaign=06b2d8b8bf-EMAIL_CAMPAIGN_2020_06_12_11_47&utm_medium=email&utm_term=0_5e02cdad9d-06b2d8b8bf-160852501 (describing recent "remarkable growth in coronavirus cases and noting that recent widespread testing results "suggest that coronavirus had been circulating in prisons in much greater numbers than know in the early weeks of the pandemic").

**CONDITIONS AT TERRE HAUTE USP AND RISKS FOR VISITATION**

35.    The Bureau of Prisons (BOP) describes the Terre Haute Federal Correctional Complex (FCC) as comprised of two facilities, USP Terre Haute, a High Security Detention Facility with 1,306 male prisoners and FCI Terre Haute, a Medium Security Federal Correctional Institution (978) with an adjacent Minimum Security Satellite Camp (256 prisoners).[29]  Death row prisoners are housed in USP Terre Haute, in the Maximum Security Facility.

36.    In April, Terre Haute FCC became the BOP's regional intake center, resulting in the transfer of inmates who were in the custody of the US Marshals from facilities around the region.[30]

37.    The first case of COVID-19 in Terre Haute was publicly reported on May 16, 2020.[31] Since then, at least one prisoner has died from the virus.[32] The BOP has not reported information about the number of tests it has conducted at the facility. News report describe that as of March, 2020 the facility had only 4 testing kits for the entire complex.[33]

38.    Counsel has provided a declaration of a mitigation specialist, Elizabeth Vartkessian, describing the process of admission and visitation for death row prisoners at Terre Haute. This process is similar to other prisons I have visited, and involves close and repeated contact between the visitor and custodial staff and the visitor and the death row prisoner.

39.    As of June 19, 2020, the BOP website announces that "all visiting at this facility has been suspended." According to the BOP website's modified operations, all in person social and legal visits are suspended across all BOP facilities "in order to mitigate the spread of COVID-19."

---

[29] https://www.bop.gov/locations/institutions/tha/.

[30] WHTI-TV 10, *Terre Haute's Federal Prison Set to Become Intake Center for the Region, Bringing in Over 100 Inmates*, (April 15, 2020), https://www.wthitv.com/content/news/Terre-Hautes-federal-prison-set-to-become-intake-center-for-the-region-bringing-in-over-100-inmates--569642741.html; WHTI-TV 10, *New Inmates Arrived at Terre Haute's Federal Penitentiary As Part of Plan to Make it Intake Center for the Region* (April 22, 2020), https://www.wthitv.com/content/news/New-inmates-arrived-at-Terre-Hautes-federal-penitentiary-as-part-of-plan-to-make-it-intake-center-for-the-region-569837071.html.

[31] Lisa Trigg, *Case of COVID-19 Infection Reported at Federal Prison in Terre Haute*, Tribute-Star (May 18, 2020), https://www.tribstar.com/news/case-of-covid-19-infection-reported-at-federal-prison-in-terre-haute/article_85a075ee-9940-11ea-87fe-fb3a2398734d.html

[32] *Terre Haute Prison Inmate With COVID-19 Dies; 3 More Have It*, U.S. News (May 26, 2020), https://www.usnews.com/news/best-states/indiana/articles/2020-05-26/3-terre-haute-federal-prison-inmates-positive-for-covid-19

[33] Heather Good, *Inmates Describe Life in Federal Prison in the Age of the Coronavirus* (June 11, 2020), https://www.wthitv.com/content/news/Inmates-describe-life-in-federal-prison-in-the-age-of-coronavirus-571194451.html.

40.    Counsel for Mr. Purkey, Rebecca Woodman, has provided me with information regarding possible visits by members of Mr. Purkey's defense team, expert witnesses, spiritual advisor visits, and family visits.  According to USP Terre Haute Counsel, the only precautions the prison can offer are to provide visitors a mask, type unknown, take the temperature of visitors, and to install Plexiglass in the visitation room.  These measures alone are not adequate.  As noted above, necessary precautions include ensuring the ability to social distance, frequent cleaning and disinfecting of objects and surfaces, requiring staff and inmates to wear masks if within six feet of others, and adequate ventilation.

41.    Counsel has further informed me that some of Mr. Purkey's team members and witnesses are Medically Vulnerable.

42.    Given the current health crisis related to the COVID-19 pandemic, and the fact that COVID-19 has already been identified in the prison, with at least one inmate death, it is my medical opinion that it is not safe for medically vulnerable individuals (as defined above) to visit a correctional facility.

43.    I have personally been requested to visit a number of correctional facilities to determine if appropriate safety precautions were being implemented and followed.  Given my age (70 years old) and the fact that I suffer from medical conditions that make me medically vulnerable, I have turned down these requests.

## SPECIAL RISKS POSED BY EXECUTION

44.    The BOP execution regulations specify the attendance of a large number of witnesses for executions.  They delineate 24 witnesses, exclusive of the custodial staff, Warden, Marshall, and Department of Justice Attorneys. The execution protocol provided by counsel, although redacted in many areas, clearly anticipates involvement of a large number of BOP and Marshall personnel.

45.    Public reports of the execution facility show it as a single low building.[34]   One reporter described the room where media witnesses were directed to witness the execution as a  "small, unadorned room." [35]  Images from news reports show a small execution chamber with windows into what appear to be small observation areas.[36]

---

[34] Andrew Cohen, *Same Planet, Different Wolds*, CBS News.Com (June 10, 2001), https://www.cbsnews.com/news/same-planet-different-worlds/.
[35] Peter Slevin, Witnessing A Federal Execution (Sept. 4, 2019), https://www.newyorker.com/news/news-desk/witnessing-a-federal-execution
[36] Annie Johnston, WHI-TV1-, *Judge Halts Federal Executions Scheduled to Take Place in Terre Haute* (Nov. 21, 2019); Julia Delcourt, Timothy McVeigh's Last Day, Tulsa World (June 10, 2001), https://www.tulsaworld.com/archive/timothy-mcveighs-last-day/article_3ee65baf-50b9-5253-9a98-140faf0cc125.html.

46.     During the 2001 Timothy McVeigh execution, a reporter described a "media area, on the prison grounds, but away from the actual buildings" that "looks and feels like a fairground or circus," with a temporary village of media tents and media staff moving around on golf carts and foot.[37]

47.     In Mr. Purkey's case, I am informed that all of the defense attorneys, defense investigators, and his family members live out of town and will need to travel by plane or long car rides to the prison to attend the execution.

48.     While airlines have implemented many safety measures aimed at reducing the risk of COVID-19 infection, air travel (including transportation to and from the airport, going through security check points, using public bathrooms, and boarding the airplane) still poses a significant risk of COVID-19 infection.  Dr. Bob Wachter, the chairman of the University of California, San Francisco's Department of Medicine stated, "Flying is an accumulation of a bunch of things that in general imply higher risk.  It is staying in fairly close contact with a whole lot of people you don't know, it is doing that indoors, it is doing that for long periods of time."[38]

49.     Events, such as the execution described above, pose added risk of COVID-19 infection and spread of the virus.  They are referred to as "super-spreader events" and involve indoor gatherings with many people, like a religious service or birthday party.  On April 8, 2020, CDC reported on a cluster of 16 confirmed or probable cases of COVID-19, including three deaths, likely resulting from one introduction. CDC noted that family gatherings including a funeral and a birthday party likely facilitated transmission of SARS-CoV-2 in this cluster.  CDC concluded, "Together with evidence emerging from around the world these data shed light on transmission beyond household contacts, including the potential for super-spreading events."[39]

**Conclusion**

50.     For the reasons above, it is my professional opinion that any individual entering the prison for legal or other types of visits or to witness an execution is at increased risk of COVID-19 infection and that those who are medically vulnerable are at even greater risk if they were to become infected.

---

[37] Andrew Cohen, *Same Planet, Different Worlds*, CBS News.Com (June 10, 2001), https://www.cbsnews.com/news/same-planet-different-worlds/.

[38] Sarah Feldberg, *Is it safe to fly? Far-flung Bay Area families weigh coronavirus risk,* San Francisco Chronicle, June 20, 2020, https://www.sfchronicle.com/travel/article/Is-it-safe-to-fly-Far-flung-Bay-Area-families-15351374.php

[39] *Community Transmission of SARS-CoV-2 at Two Family Gatherings — Chicago, Illinois, February–March 2020*, Morbidity and Mortality Weekly Report (MMWR), April 17, 2020, 69(15);446–450, https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e1.htm?s_cid=mm6915e1_w

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 21, 2020 in Alameda County, California.

Dr. Joe Goldenson

13

# Exhibit A

## CURRICULUM VITAE

**JOE GOLDENSON, MD**
**1406 CYPRESS STREET**
**BERKELEY, CA 94703**
**(510) 557-1086**
**jgoldenson@gmail.com**

## EDUCATION

### Post Graduate Training

| | |
|---|---|
| February 1992 | University of California, San Francisco, CPAT/APEX Mini-Residency in HIV Care |
| 1979-1980 | Robert Wood Johnson Fellowship in Family Practice |
| 1976-1979 | University of California, San Francisco Residency in Family Practice |

### Medical School

| | |
|---|---|
| 1973-1975 | Mt. Sinai School of Medicine, New York M.D. Degree |
| 1971-1973 | University of Michigan, Ann Arbor |

### Undergraduate Education

| | |
|---|---|
| 1967-1971 | University of Michigan, Ann Arbor B.A. in Psychology |

## PROFESSIONAL EXPERIENCE

### Practice Experience

| | |
|---|---|
| 1993-2015 | Director/Medical Director Jail Health Services San Francisco Department of Public Health |
| 1991-1993 | Medical Director Jail Health Services San Francisco Department of Public Health |
| 1990-1991 | Chief of Medical Services, Hall of Justice Jail Health Services San Francisco Department of Public Health |
| 1987-1990 | Staff Physician Jail Health Services San Francisco Department of Public Health |
| 1980-1987 | Sabbatical |
| 1975-1976 | Staff Physician United Farm Workers Health Center, Salinas, CA |

## Consulting

| | |
|---|---|
| 3/20-Preset | Federal Court appointed Medical Monitor, *Chavez, et al., v. County of Santa Clara,* Case No. 15-cv-05277-RMI, Consent Decree, United States District Court, Northern District of California, Eureka Division, re: Medical care in Santa Clara County Jail |
| 6/16-8/19 | Consultant to Los Angeles Department of Health Services re: provision of health care services in the LA County Jail |
| 4/02-Present | Federal Court Medical Expert, *Plata v. Newsome*, Class Action Lawsuit re: prisoner medical care in California State Prison System |
| 6/14-9/14 | Medical expert for the Illinois Department of Corrections and the ACLU of Illinois |
| 6/10-12/13 | Federal Court appointed Medical Monitor, U.S.A. v. Cook County, et al., United States District Court for the Northern District of Illinois, No. 10 C 2946, re: medical care in the Cook County Jail |
| 6/08-6/12 | Member, *Plata v. Schwarzenegger* Advisory Board to the Honorable Thelton E. Henderson, U.S. District Court Judge |
| 5/08-9/09 | Medical Expert for ACLU re Maricopa County Jail, Phoenix, AZ |
| 1/08 | Member of the National Commission on Correctional Health Care's Technical Assistance Review Team for the Miami Dade Department of Corrections |
| 9/07-1/10 | Federal Court appointed Medical Expert, *Herrera v. Pierce County, et al.,* re: medical care at the Pierce County Jail, Tacoma, WA |
| 8/06-8/12 | State Court Appointed Medical Expert, *Farrell v. Allen*, Superior Court of California Consent Decree re medical care in the California Department of Juvenile Justice |
| 6/05 | Member of Technical Assistance Review Team for the Dallas County Jail |
| 11/02-4/03 | Medical Expert for ACLU re Jefferson County Jail, Port Townsend, Washington |
| 4/02-8/06 | Federal Court Medical Expert, *Austin, et. al vs Wilkinson, et al*, Class Action Law Suit re: Prisoner medical care at the Ohio State Penitentiary Supermax Facility |
| 1/02-3/02 | Consultant to the Francis J. Curry, National Tuberculosis Center re: *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template),* |
| 8/01-4/02 | Medical Expert for ACLU re Wisconsin Supermax Correctional Facility, Boscobel, WI |
| 7/01-4/02 | Medical Expert for Ohio Attorney General's Office re Ohio State Prison, Youngstown, OH |
| 1/96-1/14 | Member and Surveyor, California Medical Association Corrections and Detentions Health Care Committee |
| 5/95-6/08 | Medical Expert for the Office of the Special Master, *Madrid vs* |

|  | *Alameida*, Federal Class Action Law Suit re: Prisoner medical care at the Pelican Bay State Prison Supermax Facility |
|---|---|
| 3/98-12/98 | Member, Los Angeles County Department of Public Health Jail Health Services Task Force |
| 2/98 | Medical Expert, Department of Justice Investigation of Clark County Detention Center, Las Vegas, Nevada |
| 6/94 | Surveyor, National Commission on Correctional Health Care, INS Detention Center, El Centro, CA |

## Work Related Committees

| 1/14 to present | Member, Editorial Advisory Board, *Correctional Health Care Report* |
|---|---|
| 10/11 to 5/19 | Member, Board of Directors of the National Commission on Correctional Health Care |
| 5/07-10/12 | Liaison to the CDC Advisory Council for the Elimination of Tuberculosis (ACET) from the National Commission on Correctional Health Care |
| 12/04-3/06 | Member of the CDC Advisory Council for the Elimination of Tuberculosis (ACET) Ad Hoc Working Group on the *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC* (MMWR 2006; 55(No. RR-9)) |
| 6/03-8/03 | Member of the Advisory Panel for the Francis J. Curry National Tuberculosis Center and National Commission on Correctional Health Care, 2003: *Corrections Tuberculosis Training and Education Resource Guide* |
| 3/02-1/03 | Member of the Advisory Committee to Develop the *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, Francis J. Curry, National Tuberculosis Center |
| 6/01-1/15 | Director's Cabinet <br> San Francisco Department of Public Health |
| 3/01 | Consultant to Centers for Disease Control on the Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings (MMWR 2003; 52(No. RR-1)) |
| 9/97-6/02 | Member, Executive Committee of Medical Practice Group, San Francisco Department of Public Health |
| 3/97-3/02 | American Correctional Health Services Association Liaison with American Public Health Association |
| 3/96-6/12 | Chairperson, Bay Area Corrections Committee (on tuberculosis) |
| 2/00-12/00 | Medical Providers' Subcommittee of the Office-based Opiate Treatment Program, San Francisco Department of public Health |
| 12/98-12/00 | Associate Chairperson, Corrections Sub-Committee, California Tuberculosis Elimination Advisory Committee |
| 7/94-7/96 | Advisory Committee for the Control And Elimination of Tuberculosis, San Francisco Department of Public Health |
| 6/93-6/95 | Managed Care Clinical Implementation Committee, San Francisco Department of Public Health |

| | |
|---|---|
| 2/92-2/96 | Tuberculosis Control Task Force, San Francisco Department of Public Health |
| 3/90-7/97 | San Francisco General Hospital Blood Borne Pathogen Committee |
| 1/93-7/93 | Medical Staff Bylaws Committee, San Francisco Department of Public Health |

## ACADEMIC APPOINTMENT

| | |
|---|---|
| 1980-2015 | Assistant Clinical Professor University of California, San Francisco |

## PROFESSIONAL AFFILIATIONS

Society of Correctional Physicians, Member of President's Council, Past-Treasurer and Secretary

American Correctional Health Services Association, Past-President of California Chapter

American Public Health Association, Jails and Prison's Subcommittee

Academy of Correctional Health Professionals

## PROFESSIONAL PRESENTATIONS

*Caring for the Inmate Health Population: A Public Health Imperative,* Correctional Health Care Leadership Institutes, July 2015

*Correctional Medicine and Community Health,* Society of Correctional Physicians Annual Meeting, October, 2014

*Identifying Pulmonary TB in Jails: A Roundtable Discussion*, National Commission on Correctional Health Care Annual Conference, October 31, 2006

*A Community Health Approach to Correctional Health Care,* Society of Correctional Physicians, October 29, 2006

*Prisoners the Unwanted and Underserved Population*, *Why Public Health Should Be in Jail*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 10/12/04

*TB in Jail: A Contact Investigation Course, Legal and Administrative Responsibilities,* Francis J. Curry National Tuberculosis Center, 10/7/04

*Public Health and Correctional Medicine,* American Public Health Association Annual Conference, 11/19/2003

*Hepatitis in Corrections,* CA/NV Chapter, American Correctional Health Services Association  Annual Meeting, 1/17/02

*Correctional Medicine*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 12/16/02

*SuperMax Prisons*, American Public Health Association Annual Conference, 11/8/01

*Chronic Care Programs in Corrections,* CA/NV Chapter, American Correctional Health Services Association  Annual Meeting, 9/19/02

*Tuberculosis in Corrections - Continuity of Care*, California Tuberculosis Controllers Association Spring Conference, 5/12/98

*HIV Care Incarcerated in Incarcerated Populations*, UCSF Clinical Care of the AIDS Patient Conference, 12/5/97

*Tuberculosis in Correctional Facilities*, Pennsylvania AIDS Education and Training Center, 3/25/93

*Tuberculosis Control in Jails*, AIDS and Prison Conference, 10/15/93

*The Interface of Public Health and Correctional Health Care*, American Public Health Association Annual Meeting, 10/26/93

*HIV Education for Correctional Health Care Workers*, American Public Health Association Annual Meeting, 10/26/93

## PUBLICATIONS

*Structure and Administration of a Jail Medical Program. Correctional Health Care: Practice, Administration, and Law*.  Kingston, NJ: Civic Research Institute. 2017.

*Structure and Administration of a Jail Medical Program – Part II.* Correctional Health Care Report. Volume 16, No. 2, January-February 2015.

*Structure and Administration of a Jail Medical Program – Part I.* Correctional Health Care Report. Volume 16, No. 1, November-December 2014.

*Pain Behind Bars: The Epidemiology of Pain in Older Jail Inmates in a County Jail.* Journal of Palliative Medicine. 09/2014; DOI: 10.1089/jpm.2014.0160

*Older jail inmates and community acute care use.* Am J Public Health. 2014 Sep; 104(9):1728-33.

*Correctional Health Care Must be Recognized as an Integral Part of the Public Health Sector*, Sexually Transmitted Diseases, February Supplement 2009, Vol. 36, No. 2, p.S3–S4

*Use of sentinel surveillance and geographic information systems to monitor trends in HIV prevalence, incidence, and related risk behavior among women undergoing syphilis screening in a jail setting.*  Journal of Urban Health 10/2008; 86(1):79-92.

*Discharge Planning and Continuity of Health Care: Findings From the San Francisco County Jail*, American Journal of Public Health, 98:2182–2184, 2008

*Public Health Behind Bars*, Deputy Editor, Springer, 2007

*Diabetes Care in the San Francisco County Jail*, American Journal of Public Health, 96:1571-73, 2006

*Clinical Practice in Correctional Medicine, 2nd Edition*, Associate Editor, Mosby, 2006.

*Tuberculosis in the Correctional Facility*, Mark Lobato, MD and Joe Goldenson, MD, *Clinical Practice in Correctional Medicine, 2nd Edition*, Mosby, 2006.

*Incidence of TB in inmates with latent TB infection: 5-year follow-up.* American Journal of Preventive Medicine. 11/2005; 29(4):295-301.

*Cancer Screening Among Jail Inmates: Frequency, Knowledge, and Willingness* Am J Public Health. 2005 October; 95(10): 1781–1787

*Improving tuberculosis therapy completion after jail: translation of research to practice.* Health Education Research. 05/2005; 20(2):163-74.

*Incidence of TB in Inmates with Latent TB Infection, 5-Year Follow-up*, American Journal of Preventive Medicine, 29(4), 2005

*Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings,* Morbidity and Mortality Reports, (External Consultant to Centers for Disease Control),Vol. 52/No. RR-1 January 24, 2003

*Randomized Controlled Trial of Interventions to Improve Follow-up for Latent Tuberculosis Infection After Release from Jail,* Archives of Internal Medicine, 162:1044-1050, 2002

*Jail Inmates and HIV care: provision of antiretroviral therapy and Pneumocystis carinii pneumonia prophylaxis*, International Journal of STD & AIDS; 12: 380-385, 2001

*Tuberculosis Prevalence in an urban jail: 1994 and 1998*, International Journal of Tuberculosis Lung Disease, 5(5):400-404, 2001

*Screening for Tuberculosis in Jail and Clinic Follow-up after Release*, American Journal of Public Health, 88(2):223-226, 1998

*A Clinical Trial of a Financial Incentive to Go to the Tuberculosis Clinic for Isoniazid after Release from Jail*, International Journal of Tuberculosis Lung Disease, 2(6):506-512,1998

**AWARDS**
Armond Start Award of Excellence, Society of Correctional Physicians, 2014
Award of Honor, San Francisco Board of Supervisors, 2014
Award of Honor, San Francisco Health Commission, 2014
Certificate of Appreciation, San Francisco Public Defender's Office, 2014
Certificate for Excellence in Teaching, California Department of Health Services, 2002
Employee Recognition Award, San Francisco Health Commission, July 2000
Public Managerial Excellence Award, Certificate of Merit, San Francisco, 1997

**LICENSURE AND CERTIFICATION**
Medical Board of California, Certificate #A32488
Fellow, Society of Correctional Physicians
Board Certified in Family Practice, 1979-1986 (Currently Board Eligible)