**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WESLEY IRA PURKEY,

Plaintiff,

v.

WILLIAM P. BARR, *et al.*,

Defendants.

No. 1:19-cv-03570-TSC

**SUPPLEMENTAL DECLARATION OF ELIZABETH VARTKESSIAN, PH.D.**

Elizabeth Vartkessian, Ph.D., pursuant to 28 U.S.C. §1746(2), declares as follows:

**Background and Qualifications**

1. On November 15, 2019, I submitted a declaration detailing my observations of Mr. Wesley Purkey ("Wes") as it related to his progressive cognitive decline, attached herewith as Exhibit 1. This supplemental declaration provides updated information regarding my observations of Wes since November 15, 2019. As set forth in my previous declaration, I possess the necessary qualifications to submit this declaration. A true and genuine copy of my current curriculum vitae is attached herewith as Exhibit 2.

2. Since I provided a declaration, the United States has experienced the impacts of the world-wide pandemic related to COVID-19, a highly contractible viral disease with a high rate of death especially for those with preexisting medical conditions, including diabetes, asthma, compromised immune systems, or other age-related vulnerabilities. Correctional institutions have been hit especially hard due to the inability for social distancing to take place as well as the limited amount of sufficient ventilation within most institutions.

3. Due to the risks associated with contracting COVID-19, all visitation to United States Penitentiary Terre Haute, including legal visits, was suspended on March 13, 2020. Between November 15, 2019 and March 13, 2020, I visited with Wes in-person eight times. I was scheduled to visit with Wes every two to three weeks thereafter. Had legal visits not been canceled, I would have had the opportunity to personally observe Wes approximately six to eight additional times since March 13, 2020.

4. I have participated in six legal calls with Wes since the pandemic forced the suspension of in-person legal visits. This has been particularly challenging for Wes and the team. Part of the reason we visit with Wes so frequently is that he is far less likely to irrationally end an in-person visit than he would a phone call. Wes gets very agitated over the phone when he cannot see other people. If Wes asks a question and an answer is not immediately provided, he tends to become irate. When we are in-person, Wes can see that the visitor is thinking and not concocting a lie or being evasive, which are two common beliefs Wes has about his attorneys.

**In-Person Observations of Decline**

5. During these in-person visits, I was able to observe Wes's continuing decline. For instance, during an in-person visit on December 13, 2019, Wes forgot some items that he intended to bring to the visit with him, including his eye glasses, which an officer had to go back to his cell to collect for him. Toward the end of the visit, Wes discovered the materials and noted that he did not recall putting them in his folder in the first place. This was not something Wes did when I first met him in 2015 and has increased in frequency since 2019. He also struggled to locate words; that visit he could not recall a word that meant "people understanding each other

without speaking." He was not able to recall the word during the visit and became visibly agitated by his inability to find the word he wanted.

6. When I met with Wes on January 17, 2020, I was able to observe his unsteady gait, the involuntary movement of his muscles, his gaunt and ashy skin, and his lack of physical stamina, which resulted in a shorter visit then we would have had in previous years. Wes tired quickly during the visit, which I was able to observe by his posture, his facial expression, and his continuous sighing as he struggled to recall words.

7. During these in-person visits, Wes was unable to describe things he once could. For instance, Wes appeared at the visit wearing a long-sleeve thermal shirt, which he referred to as a tank top. Had I not been with Wes, I could not have determined the inaccuracy of that description.

8. Likewise, during the same visit, I was able to observe that Wes could not recall dates independently without the assistance of a list that he could reference. Visits were scheduled for the same day of the week to maintain consistency for Wes. For example, in February and March of 2020, visits with Wes were scheduled on Fridays. At each visit with Wes, a member of his legal team would remind him that the following week he would have another legal visit and let him know who would be coming. Despite these reminders, during my visit, Wes took out a piece of paper on which one of the Special Confinement Unit staff had written out his visits for the next two weeks. Wes noted that he would not have been able to remember his visit schedule without the paper.

9. These in-person visits also permitted me to observe Wes's declining ability to recall names of people with whom he had regular contact. He struggled to recall the names of officers who walked past us, even though he had written their names in grievances and orally

complained about their treatment of him in the past. He could not recall the names of some of the inmates with whom he communicated with on a regular basis. As Wes shared legal materials with me, I could see, based on the writing, that he had forgotten the names of cases which had been easy for him to recall previously. The notes were repetitive and indicated that he had to re-read these cases again and again; his ability to independently retain the information was significantly diminished.

10. Wes also showed me a form he needed to fill out. It was a request for the withdrawal of an inmate's personal funds (BP-199.045). The document was a scantron form with lines of bubbles that needed to be filled out. Wes could not fill out the bubbles in a straight line without using another piece of paper to act as a ruler. He described how the bubbles jumped around the page making it very hard for him to complete the form without the use of another piece of paper.

11. When I saw Wes on February 21, 2020, I observed his physical struggles with taking materials in and out of the mesh bag he brought to legal visits. Though I had seen Wes a few weeks before, he struck me as looking older, very tired, and smaller as if he had lost weight. His skin looked loose and his eyes became increasingly bloodshot as our visit continued. He yawned periodically even though he had slept well the night before. Wes's word recall was extremely poor. He could not recall the name of his grandson or the judge handling his habeas case and struggled to recall other names of people on his legal team throughout the visit. He combined names of people, such as his two attorneys: Michelle and Rebecca became Revel. Finally, Wes noted that he had visited with someone the week before for about 90 minutes. While I was waiting to be escorted out, I noticed that the log book stated the person had only

been with Wes for 30 minutes. I could not have verified this if I had not been with Wes in-person.

**Continuing Decline in Speech and Memory**

12. No one from Wes's legal team has been able to see him in person since his last legal visit took place on March 12, 2020. Our contact with Wes has been via phone or the occasional letter.

13. Almost every call is conducted by at least two members of our team to make it more likely for us to understand what Wes is saying. His speech impediments, especially his stuttering and slurring of words, have been very pronounced in the last few months. Likewise, Wes's inability to locate words or use the correct word, his memory problems, and general incoherence makes it necessary for multiple people to participate in legal calls.

14. Wes's letters have changed significantly since 2015. He used to write longer letters by hand, but the letters I receive now are usually more like notes on larger post-its. His handwriting does not stay within the lines. He writes anywhere on the page, which has also increased over time.

15. In June, I received a two-page letter from Wes in which he wrote the letter "M" and then the letter "J," crossed them both out, and then wrote "Is it May still or June?" at the top of the second page, even though he had already written the correct date on the first page of the letter.

16. Wes has struggled with word recall, stuttering, and using the wrong words in sentences in each call I have had with him over the last three months. For instance, on our May 20, 2020 call, Wes attempted to describe an epiphany and instead called it an elliptical. He also called coronavirus, coronus.

17. During that same call, Wes discussed a letter he received as if he did not understand how the sender got his name and contact information. We had to remind Wes that he was the one who initiated the correspondence, which we knew because the letter stated so.

18. Wes's deteriorating memory and delusions are also evidenced by his inability to recall his own medical history. Wes cannot recall that he was diagnosed with Hepatitis C in the late 1980s. A recent medical exam showed that his Hepatitis C has returned. Wes was convinced that he was recently diagnosed with HIV instead of Hepatitis C. Wes does not believe that he was ever diagnosed with Hepatitis C, and he believes that if he is in fact positive for Hepatitis C, he contracted it through the food provided to him through the Bureau of Prisons.

19. Wes's frustration level has also increased as his inability to recall dates, events, and people worsens. During a legal call on June 3, 2020, Wes had questions about the timing of filings that had taken place in December 2019. When provided with the information, which differed from his memory, he would not accept that he was wrong. He yelled and screamed that the information was wrong, and he was right. This type of response has occurred with greater frequency over the last several months.

20. There have been many instances on the phone where Wes starts to ask a question only to forget what he wanted to say. He makes requests for materials that have already been sent to him, but which he has misplaced in his cell. During these calls, Wes has described standing in his cell and forgetting what he was about to do. He has also described feeling like he is on the verge of blacking out, which used to occur only on a monthly basis, but now is happening several times a week.

21. As Wes's memory continues to deteriorate, his frustration increases. Wes recently requested a legal call, which was arranged. He began the call angrily demanding to know why a

legal call had been scheduled. When I informed him that he had asked for the call, he was so irate that he left the call.

**Insufficiency of Telephonic Interactions**

22. Though it is possible to ascertain that Wes's memory and word finding capacity appears to be declining, a significant amount of additional, necessary information is missed when he cannot be visited in-person by members of his legal team. We cannot observe his physical appearance, gait, and functioning. More specifically, there have been occasions when we have observed one side of Wes's face drooping, Wes's need for an incontinence bag, and his increasing unsteadiness as he walks or stands. We miss critical information about the context of his comments, like the example described above where he mistakenly referred to a long sleeve thermal shirt as a tank top.

23. Critically, being in-person also allows the legal team to ensure that the conversation is taking place out of earshot of anyone else. "Mental health experts recognize that '[m]ost patients do not speak freely unless they have privacy and are sure that their conversations cannot be overheard.'"[1] There have been numerous incidents where defense team calls have been recorded and provided to prosecutors even though the communications were assured to be protected by legal privilege,[2] and prisoners understandably fear their communications are not private.

---

[1] Sean D. O'Brien, *When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases,* 36 HOFSTRA L. REV. 693, 746 (2008) (quoting BENJAMIN JAMES SADOCK & VIRGINIA ALCOTT SADOCK, KAPLAN & SADOCK'S SYNOPSIS OF PSYCHIATRY 136 n. 8 (9th ed. 2003)).

[2] Katie Bernard & Steve Vockrodt, *Federal Judge Holds Kansas City, Kansas, U.S. Attorney's Office in Contempt of Court*, THE KANSAS CITY STAR (Aug. 15, 2019, 11:56 AM), https://www.kansascity.com/news/state/kansas/article233985767.html.

24. Privacy and confidentiality are particularly critical for Wes given his longstanding and well-documented mental health history of paranoia and distrust.

25. Moreover, given that Wes has struggled to communicate with counsel as he continues to view them as working against him, the inability to meet face-to-face with members of his team exacerbates his mental condition.

I DECLARE PURSUANT TO 28 U.S.C. §1746(2) AND UNDER PENALTY OF PERJURY THAT THE FOREGOING FACTS ARE TRUE AND CORRECT.

DATED: _JUNE 22, 2020_

ELIZABETH VARTKESSIAN, PH.D.

# Exhibit 1

# DECLARATION OF ELIZABETH VARTKESSIAN, PH.D.

I, Elizabeth Vartkessian, declare and state the following:

## QUALIFICATIONS

1. I have worked as a mitigation specialist for capital defense teams since 2004 in both trial and post-conviction cases. In the last 15 years, I have conducted mitigation investigations in nearly 40 death penalty cases. I have worked on federal capital cases originating in the 2nd, 3rd, 4th, 5th, 6th, 8th, and 9th circuits and state capital cases originating in Alabama, Arkansas, Georgia, Florida, Texas, Louisiana, Oklahoma, Pennsylvania, and South Dakota. I have provided a copy of my *curriculum vitae*, which outlines the trainings I have attended or taught, publications authored, and other relevant work as it relates to conducting mitigation investigation in capital cases.

2. I am the founding Executive Director of Advancing Real Change, Inc. (hereinafter, ARC) a national not-for-profit organization conducting mitigation investigation in criminal cases across the country. In addition to direct casework, we provide training and consultation to defense teams regarding best practices in mitigation investigation, development and courtroom presentation and litigation.

3. Throughout my career, by virtue of my training and experience, I have developed a knowledge and understanding of mental illnesses and impairments, cognitive disorders, PTSD, and related symptomology. As detailed in my CV, since 2005 I have attended over 50 training seminars related to identifying signs and symptoms of mental illness and trauma, working with clients with mental illness specifically, understanding and working with clients with delusions, paranoia, intellectual disability, and other impairments.

## BACKGROUND OF INVOLVEMENT

4. My office was retained by the Federal Defender in the Western District of Missouri to conduct the mitigation investigation for Mr. Purkey's post-federal habeas proceedings in October 2014. I was the lead mitigation specialist from that time until December 2015, when I took a medical leave due to an automobile accident. In order to ensure that work on Wes's case



EV (Initial)

continued, John Fox, another ARC mitigation specialist, assumed the lead mitigation role. I returned to full-time employment, John remained in that position with me in a supporting role. I resumed the lead mitigation specialist role in May of 2018 after John left the firm.

5. I met Wes for the first time on February 3, 2015. Since then, I have visited in person with Wes 24 times, with my longest visit lasting up to six hours. Wes corresponded with me in writing during this time as well. I have been asked by Wes's current counsel Rebecca Woodman and Michelle Law to provide details of my observations of his mental and physical health from the start of my involvement in his case to the present day, a period of approximately five years.

6. Wes has resisted discussions about his mental health with his defense team. When talking about the need to provide the court with full information about his functioning, Wes responds that he takes responsibility for his actions – not recognizing that those two things are not mutually exclusive. This resistance towards even discussing his functioning has only increased in the last two years, since receiving a diagnosis of dementia. Wes has flatly stated that he does not want to be found incompetent, though my observations lead me to believe that he is.

## MENTAL HEALTH OBSERVATIONS

### Delusions and Paranoia

7. Early in my involvement, Wes began exhibiting delusional thinking. The first delusions he shared with me were about his belief that he was being poisoned. Wes believed that, between January and October 1998, drugs were being sprayed into his room from the ceiling and that someone was poisoning his food and cigarettes. Like many delusions, there was a kernel of truth. Wes's ex-wife Jeannette had in fact added rat poison to his intravenous drugs. However, Wes was certain that it was a broader conspiracy, and that his other ex-wife (Claire) and several friends were involved in poisoning him over a long period of time as well. For example, on March 9, 2015 he told me that the people who poisoned him were camouflaged and trying to hide, and that he was living out in the country so that there was no one to observe what was happening to him. He believed that the FBI, DEA, and Kansas Bureau of Investigation (KBI) were a part of the conspiracy to kill him. At various points he also mentioned that



 (Initial)

Jeannette's three sons, who were all children at the time, were also involved in poisoning him. Wes mentioned that he couldn't remember how or why he decided to call the KBI, but he called several times.

8. Likewise, Wes has expressed throughout the last five years a consistent belief that there exists a grand conspiracy against him. The main components of this conspiracy are that he is being singled out by the Bureau of Prisons (BOP) in retaliation for filing lawsuits and grievances on behalf of himself and other prisoners addressing the conditions of death row. Wes falsely believes that his filings have had a monumental impact in preventing correctional officers from depriving prisoners of their constitutional rights, and therefore the prison staff have developed a "retaliatory animus" against him. Some evidence of this retaliation, according to Wes, is that the prison has restricted his visitation, email, and his access to a microwave and has written him up for contraband. Wes perceives that this retaliation is something that he experiences because the BOP wants to keep him quiet and stop him from revealing numerous instances of BOP staff violating BOP policies.

9. One example can be seen in an affidavit Wes wrote in connection to a grievance on 11/07/2018: "SCU Unit Manager Thomas and Case Worker Sutton have reiterated and clarified that because of my *sedulous and assiduous filing of administrative remedies, and as well as for assisting other inmates in filing of such in turn and aiding other inmates in preparing and filing litigation naming* Thomas as a named defendant in such litigation that any and all visitors that I request visitation with will be denied, and they have maintained this tactic policy on different occasions denying requested visitors without reason given". In reality, Wes had a number of visitors during that period of time.

10. These 2018 views are consistent with his historical record. An August 10, 2000 declaration reflects the same delusional beliefs about prison officials conspiring against him. In a grievance filed against the Kansas Department of Corrections, Wes complained that officers had issued a disciplinary write up against him because they wanted to destroy grievances he had filed about the unsanitary conditions, denial of basic necessities, and extreme heat. Wes wrote that the unit team management was aware of "the continuing harassment and refuses to take any initiative to stop it" and that the unit team was clearly "doing everything they can to impede and thwart me from seeking redress of these issues through the grievance process." The unit



EV (Initial)

team's response pointed out that Wes did not offer any evidence to support his allegation that he was being targeted or singled out for harassment: "you have never mentioned the allegation that grievances were being destroyed to unit team staff, despite the fact that you have contact with them on a daily basis. You also offer absolutely no evidence supporting your allegation that UT staff are aware of AND covering up staff misconduct. Every allegation made regarding staff conduct is investigated and appropriate action taken. No further action deemed necessary for this complaint."

11. Wes often provides me with his grievances so I can make copies of the forms and send them out for him. Wes does this because he believes the BOP staff are destroying his grievances and that if he does not provide the materials to me the grievances will not get filed. I have noticed that the grievances are rigidly and narrowly focused on Wes's views that the prison is covering up its misdeeds, retaliating against Wes for his efforts to expose the truth, and engaging in a campaign of retaliation against Wes to stop him from assisting inmates with lawsuits.

12. Wes has repeatedly said that "picking up his Bic" is the only way for changes to happen within the prison. He views himself as the only one able to effect change for the other inmates. Likewise, he has stated that the other inmates are not strong enough to handle the retaliation he experiences in order to safeguard the protections inmates are supposed to be afforded.

13. Since Wes received an execution date I have seen him four times (July 31, August 16, September 10, and October 9). Each time he has noted that he is facing an execution date because of his use of the grievance process and because of his efforts to file lawsuits about the conditions of confinement. The first time Wes mentioned this, I was struck by the fact that just a few weeks before Wes had filed a petition requesting that he be executed. He did not attribute his petition as even remotely connected to him receiving a date. Nor did he express a desire to actually be executed. There is a clear disconnect between the reality of his execution and his own perceptions around it.

**Speech Deficits and Inability to Communicate Effectively**

14. From the first time I met with Wes in February 2015, I noticed that he often mispronounced words and that these mistakes were not consistent. For example, while Wes sometimes says or writes, "per batim" instead of



 (Initial)

"verbatim," "egrevious" instead of "egregious," and "toleracy" instead of "tolerance," he occasionally pronounces the words correctly. Sometimes when Wes uses a word that does not exist, such as "prociforus," it is impossible to determine even with context what word he meant to say instead. Wes makes these mistakes both orally and in writing, and they have become increasingly frequent with the passage of time. As recently as October 31, 2019 I received a letter from Wes in which he misspelled the name of George Kouros, an attorney with whom Wes is in frequent contact. He spelled George's last name as Kourose. In July of 2019, Wes sent me a letter in which he even spelled my last name incorrectly, spelling it "Vartessian" instead of "Vartkessian," which he has never done before.

15. Wes frequently uses words and phrases incorrectly. Sometimes he conflates two existing words that sound alike. For example, he has said "abolish" instead of "admonish," "refugee" instead of "refuge," "exist" instead of "existence," "affording" instead of "forwarding," and "under" instead of "unless." Other times he mixes up words that do not sound similar at all. For instance, described himself as "stamped Catholic" instead of "raised Catholic." Wes's difficulties finding the right words and putting them together in a coherent sentence often prevent him from having constructive communication with me and other members of his defense team.

16. Wes's speech is often tangential, jumping from topic to topic without any transition. It is common for him to begin an anecdote and divert to several other topics before reaching a conclusion to his original story. Sometimes Wes tells half a story and then moves on to a new topic without ever returning to the first, leaving the story unfinished. Wes is easily distractible and it does not seem possible for him to think and speak linearly. Beginning in 2017, I started to suspect that Wes's tangential manner of speaking was related to his poor memory. Sometimes it seemed like he would forget what we were talking about in mid-sentence, and then try to guess what the conversation was about at various points.

17. In having conversations with Wes, I often felt as if he had a repertoire of prepackaged phrases that he would use repetitively, like "lucrative endeavor," "a blind man in sunglasses could see that," and "crazy as a fox." Wes uses these phrases with such frequency that the context is often hard to place.

18. On May 13, 2015, Wes and I discussed his stuttering. He told me he used to



EV (Initial)

stutter so badly that it was hard for people to understand what he was trying to say. As child, whenever Wes stuttered, his father would throw him up against the wall and punch him. He said his mother did not have any patience for him either, and described a Thanksgiving dinner in which he struggled to say "pass the gravy." His mother reacted by throwing vodka in his face and screaming at him, "If you can't talk correctly then shut the fuck up." Since his childhood, Wes learned various speech therapy techniques from professionals at the Institute of Logopedics and within the Oregon State Prison system that greatly reduced his stuttering. Given that Wes has a long history of stuttering and has learned techniques to minimize this deficit, I have taken particular note of the times he is unable to control his stutter.

19. During my earliest meetings with Wes in 2015, he started to stutter only when fatigue set in around four or five hours into a visit. Since then, however, Wes's stuttering has started progressively sooner into each of our meetings. The same speech exercises that were previously effective no longer work. During several visits in 2017, Wes began to slur his words. This occurred within the first hour and a half of our conversation. Now, Wes begins stuttering and slurring his words within five minutes of our visits.

20. Wes no longer has the stamina to handle conversations lasting as long as when I first joined his case. In the early days, I would often visit Wes two days in a row, and speak with him for five to six hours straight each day. In 2017, Wes began to look especially tired when he arrived for my visit the second day. Now, I avoid scheduling visits back to back, and I have greatly shortened the length of my visits.

**Memory Problems**

21. Wes has struggled with both memory retention and recall, a problem that continues to progressively worsen with the passage of time. Wes acknowledges that he doesn't have a good memory. He has said that he "get[s] a glimpse of a memory, like looking through a little window or through little gaps in time, but [he] can't remember much about [his] life. [He couldn't] remember good times at all, just the bad."

22. During my first visit with Wes on February 3, 2015, he shared the story of when another prisoner stabbed him in the neck while he was serving time



EV (Initial)

in Oregon in 1988. Wes could not recall the name of the person who stabbed him, even though Wes was placed in segregation immediately after being treated at a hospital for refusing to disclose his attacker's name. During that same visit, Wes told me he knew he was divorced because he remembered being served with papers, but he couldn't recall when or how it happened. It is important to note that Wes has been married and divorced two times.

23. After just three visits with Wes, I noticed that he began recycling a number of stories that he forgot he had already shared. Each time he retold a story, he told it using the same exact words and phrases as his first recitation. Sometimes Wes would even retell the same stories within the span of one visit. For example, during a visit with Wes in May 2015, he described a phone call in which he told his daughter Angie that I was younger than her. During the visit, he relayed the story twice, each time acting as if it was the first time I was hearing this information.

24. The stock narratives that Wes tells include three to four stories about the lawsuits he had engaged in against the Kansas Department of Corrections for its use of box car cells. Wes tells the same story about how he was represented by Sly James, the former Mayor of Kansas City in one of the suits. Wes tells this story, completely unprompted, as if he is reading from a script. In actuality, Wes was not represented by Sly James, but another attorney for the same office.

25. The more I met with Wes, the more apparent his memory failures became. During several visits, Wes struggled to recall significant details about his relationships with friends and family. For example, Wes forgot how he met and developed a relationship with his ex-wife Claire Gaida. He also could not remember much about his relationship with Peggy Noe, a lifelong friend with whom he was especially close. First Wes described meeting Peggy in sixth grade. Later in the same conversation, Wes said he met her in second grade, as if he did not remember just telling me they met in middle school.

26. During my visit on March 12, 2019, Wes forgot the dates of his grandchildren's birthdays, which he had never done before. He also started the conversation by telling me about his grandson's new girlfriend from El Paso. A few minutes later, he told me she was from Tucson, forgetting he had just said it was El Paso.



EV (Initial)

27. In a letter on May 13, 2019, Wes asked me to send him information on his mother's "birthday and death, and where she was buried at, as well as birth's or the babies lost." Over the years Wes had spoken with me about her birthday and visiting his mother's grave. I know Wes was aware of when his mother died because he sought permission from the prison to visit her in the hospital just before her death. The fact that Wes asked me for these details was especially noteworthy because he used to know all of the information he was requesting.

28. During my visit on May 12, 2015, Wes could not recall several details about the car accident that left a permanent and noticeable bump on his head, including which hospital he received treatment from, how long he was in the hospital, or the fact that he lost consciousness.

29. During my visit the following day, Wes told me that his grandmother died when he was a teenager and left something for him in her will, but not for his brother Gary. He said this made sense since Wes was her grandson and Gary was not, which was not true. It took Wes several minutes to realize that his brother was also his grandmother's grandson. Even then, Wes did not remember why he was included in his grandmother's will when his brother was not.

30. In the time that I have known Wes, he has struggled to recall names. For example, he could not recall the names of Aline Pryor (his attorney for a previous criminal charge), Detective Howard (who investigated the crime for which he was convicted, and testified at Wes's trial), and Stormy (his mother's Siamese cat whom he frequently played with growing up). He also confused the title of "Hamilton" the musical by calling it "Jefferson". At one point, Wes repeatedly told me to watch the movie "Sully," which he later started referring to as "Scully." More recently, however, I have been increasingly surprised by the names Wes has had trouble remembering or could not recall at all. For example, he has both forgotten his aunt Marguerite's name and called her by his mother's name. He has repeatedly forgotten the name of his current counsel, Rebecca Woodman, and sometimes called her Teresa, the name of a previous attorney. He has also repeatedly forgotten the name of his current counsel Michelle Law. In fact, in a declaration Wes wrote in January of 2019 he referred to Michelle as Mr. Law. In January of this year, Wes told me that last time he talked to his niece, whom he adores, he had to say "*tell your daughter* I said



EV (Initial)

congratulations" instead of "tell Britney" because he could not remember Britney's name.

31. Based on my conversations with Wes, he does not have an accurate recollection of his 2003 capital trial. For example, Wes could not remember when his trial occurred or whether his trial attorney questioned jurors individually or as a group. He also struggled to remember who testified at his trial, and could not remember the name of Dominick Geniuk, the penalty phase witness who testified about Wes's work mentoring young prisoners. Additionally, on at least four separate occasions (March 9, 2015; February 17, 2017; May 17, 2017; January 17, 2019), Wes affirmatively stated that his jury spent 13-14 hours deliberating his guilt. In reality, his jury deliberated for just two and a half hours.

32. When Wes holds a wrong belief or memory, I am often unable to change that belief – even with evidence. Often, my efforts to correct Wes are met by him with anger and frustration. In the above example about the duration of deliberations, I provided Wes with the transcripts of the trial to show that his memory was incorrect. On that particular occasion, Wes retreated temporarily from his position. But the next time he discussed his jury, he again maintained that jury deliberations were 13-14 hours. This fixed false memory is directly connected to his inability to understand the facts from the crime and trial. For example, according to Wes, the "inordinate amount of time" the jury deliberated is evidence that the jurors were wrestling with finding him guilty because of the information Wes provided them in his testimony at trial.

33. Wes's inaccurate recollection of his trial has created problems for his current defense team. Wes continuously threatened to fire his attorneys, Rebecca and Michelle, if they did not litigate that his trial lawyer Fred Duchardt told him to lie on the stand when he testified at his trial. Accusing an officer of the court of suborning perjury is a serious allegation and Wes's attorneys did not have the evidence to lodge such a claim. Wes became fixated on how the visitation logs would prove that his trial attorneys did not prepare him to testify. After obtaining the logs we could see that counsel had actually visited with Wes the day before his testimony. Rather than accepting that evidence, Wes immediately determined that trial counsel had lied on the timesheet and that the logs were not true.

34. Wes has on a number of occasions said that he believes his current



_____ (Initial)

attorney, Rebecca Woodman, is secretly cooperating with his trial counsel. When Rebecca did not file the litigation described above, for example, Wes intimated that it was because Rebecca was friends with Ms. O'Sullivan and had no incentive to tell the truth. Wes continues to believe that Rebecca is collaborating against him on this point. Wes has also continuously conflated Laura O'Sullivan, trial counsel in his capital case, with Aline Pryor, counsel in the Mary Ruth Bales case, and at times uses their names interchangeably.

35. Wes's thinking becomes extremely fixed when he perceives that someone does not believe what he is saying. He is not able to understand that differences can be due to interpretation. There is no ability to agree to disagree with Wes. If one does not come around to his view Wes interprets it as that person acting against him.

36. Wes told me he struggles on a daily basis to remember whether or not he took his hypertension medication. He has noted that he cannot often remember what he was doing in his cell, meaning that he will find himself standing in his cell as if he was about to look for something and cannot recall what he had intended to do. This problem appears to have gotten worse in the last 12 to 18 months, and he has raised the issue with me much more frequently.

37. In speaking with Wes, it is often difficult to ascertain whether my difficulties in understanding him are due to his memory failures or his problems conveying information. For example, during a visit on February 4, 2015, Wes said that Terre Haute offered "a diabetic diet via facsimile only." During another visit on March 10, 2015, he told me his granddaughter Haley did not want to visit him because "she didn't want to do math."

38. During a visit in 2018, Wes could not recall the term PTSD, even though we had previously discussed PTSD in depth. Just a year before, Wes told me that he never believed PTSD was real. He then started talking about how he blew his head off while his bed wasn't made and there were bottles everywhere. He then repeated the question "Why couldn't he come up?" I could not make sense of what Wes was saying.

39. Recently, Wes forgot to prepare for and bring materials with him to our legal visit. As usual, I had sent Wes a letter letting him know what day I



EV (Initial)

would be visiting. When I showed up for the visit, Wes was surprised because, though he knew I planned to see him that day, he had forgotten what day of the week it was.

40. In Wes's correspondence he will often ask for copies of the same document multiple times. When I provide the documents he will forget having asked for the materials and/or sometime later say that I never provided the materials to him and become very upset. By May of 2016, I started sending letters back to Wes that detailed when he asked for the materials and what I was sending back so he would have a document verifying the completion of the task.

41. Wes regularly expresses the belief that Rebecca and Michelle have promised to perform a task, when, in actuality, they did not. For instance, recently, Wes was incensed that Michelle did not pay Wes back for copies he made of medical records. This came up in the last visit I had with Wes in October 2019. Wes repeatedly called Michelle a son-of-a-bitch and a liar. After I left the prison, I spoke with Michelle who confirmed that she had not told Wes that she would reimburse him for the cost of the copies.

42. The October 2019 visit with Wes lasted less than 20 minutes. When I arrived, Wes was told that I was getting him items from the vending machine. I could hear him say, "there is just one of them". When I walked in Wes said that Michelle and Rebecca were supposed to be there. I had told Wes that I was coming alone. I explained that they were working on a reply brief in his case. He was furious that they were not with me. I offered to write down all he wanted to go over and share it with them. Wes declined, noting that doing so would just give the appearance that they were working on his case, another paranoid and conspiratorial belief. I reminded him that they were coming to see him with a draft the next week and told him the date. Wes stated that the date they were coming was the day before the reply was due, which was incorrect. I corrected Wes and he became irate and terminated the visit.

43. Losing the ability to recall basic information such as the name of his aunt or his niece's daughter has been especially chilling for Wes. He watched several family members die of dementia and is aware of the painful end that comes with the disease. Wes has mentioned several times that he would prefer death to having to experience dementia to the end. Wes's ability to communicate and write has been a source of purpose for him. As



 (Initial)

such, he has tried very hard to minimize the lapses in his memory though at this stage he cannot mask the decline as effectively as he once could.

44. Wes's memories are often inaccurate reflections of exchanges that have taken place. As a recent example, Wes told me about a conversation he had with attorney George Kouros, who has previously assisted Wes in several civil lawsuits. Wes described George as "passionately [telling him] 'just fuck you Purkey.'" When relaying the conversation to me, Wes told me during the exchange he wanted to tell George "now you are starting to sound like Liz." I have never spoken to Wes that way and believe that George did not speak to Wes that way either. I had spoken with George about this exchange previously and he had described the exchange much differently.

**Additional Signs of Cognitive and Physical Impairment**

45. The first time I met Wes in February 2015, I was accompanied by Jeremy Isard, another mitigation specialist from my office. When Jeremy wrote his name on a piece of paper and handed it to Wes, Wes asked him to clarify the spelling because he mistook the "A" in "Isard" for an "L." Jeremy's handwriting was perfectly legible, and I did not see how Wes could confuse the two letters from what Jeremy had written. Afterwards, Wes rewrote Jeremy's name, spelling his first name "Jemery."

46. Ever since my first meeting with Wes in February 2015, he has been paranoid that prison officials were targeting him to prevent his work filing grievances and lawsuits on behalf of fellow prisoners. During our first meeting, Wes complained that the prison's visitation policy restricting visits to those who had a previous relationship with the prisoner was selectively applied to him. He was convinced the prison rejected his request for a visit from his Scottish pen pal because he was "being singled out since [he was] the least favorite camper of the administration." Wes's paranoia has only become more deeply engrained in his thinking since I first met him.

47. On December 7, 2017, Wes told me the prison staff fired him from his job at the law library because they knew about and did not approve of the lawsuits he brought against the Wyandotte County Jail over a decade ago. He was convinced the prison staff lied when they told him the reason for his termination from the law library was because of his typing errors.



EV (Initial)

According to Wes, this explanation was a cover up for the truth—they wanted him to stop "pushing his pen in the wrong direction" and filing lawsuits to improve prison conditions. Wes told me that despite the prison staff's intimidation, he was not going to stop because his lawsuits are helping inmates, and specifically referred me to *Purkey v. Green I* and *Purkey v. Green II*. In reality, Wes's claims in *Green I* were dismissed for failure to raise a claim and *Green II* was dismissed on summary judgment. One such claim included the allegation that jail employees put Wes in segregation and incited other inmates to harm him in retaliation for his attempts to file grievances and lawsuits against jail employees.

48. During my first visit with Wes he told me that ever since he was hit by an 18-wheeler on the highway in 1968 he suffers from frequent headaches in the form of sharp pains in the front of his head. He also gets dizzy whenever he rolls over or leans back. His dizziness is especially bad when he lays down on his back.

49. During the same visit, Wes described the lines as "jumping" when he reads. Since that time, Wes's ability to read in my presence has also declined. When I first started visiting with Wes he would read documents to me before handing the papers over for my review. Within the last two years Wes started handing documents to me without reading them aloud first. After he passes the materials he will often ask me to read it to him. His handwriting, which was once legible, is now almost impossible for me to read, I have to take time and decipher the words. Wes himself has trouble reading his own handwriting and it takes time in visits for him to try and figure out what he has written. Likewise, Wes often gives me handwritten documents to read during our visits and I have noticed that in his writings there are often pages of documents that simply list words. When asked about the words on the page Wes will shake his head as if to indicate he doesn't know why he wrote them.

50. Wes has told me that he talks to pictures in his cell. He has mentioned in passing that he catches himself speaking aloud in his cell to no one.

51. In May 2015, I noticed Wes starting to have trouble controlling his body. During some visits, the muscles in his chest seemed to be constantly and involuntarily flexing. Beginning in 2017, I started opening Wes's drinks and snack wrappers for him because his hands were shaking too much to do



EV (Initial)

it himself. Wes also seemed to be getting clumsier, as I noticed him periodically misjudge the location of the table and hit his leg against it—a problem he did not have before. Over the course of my last few visits, Wes has visibly aged. His chest, which had always been very muscular, looked saggy. He looked gaunt and appears to have lost a considerable amount of weight in a short period of time. This rapid decline in his physical appearance has been extremely pronounced since Wes was moved to the execution range. During my last three visits between August and October 2019 Wes has repeatedly stated that he is tired, which is unusual for him to say. During my last visit with Wes on October 9, 2019 he appeared unable to hold his composure and swayed as he stood. He banged the table between us accidently. I thought that at one point he might fall over because his balance appeared to be off.

52. During my visit with Wes on September 10, 2019 I became aware that he was urinating in a bag when he told me that he needed to empty his "pee bag." I had never known Wes to do this before. I learned that he had fashioned something he could use to relieve himself while we were in a legal visit. This struck me as especially troubling given the fact that there was a correctional officer outside our visiting room who could take him to the bathroom. Wes has never had to wait longer than five minutes to be escorted from the visiting room to the bathroom when he has asked in the past. It is my belief that Wes is experiencing incontinence and cannot wait to be taken to the bathroom.

53. On February 16, 2017, the emergency alarm went off within thirty minutes of the start of my visit with Wes. While the sirens stopped after about ten minutes, the flashing lights never ceased. Wes could not get past this. Though I tried to continue our conversation, the flashing lights were distracting Wes beyond his ability to control his frustration. He abruptly stopped talking to go ask the staff to cover the light and shout that he would file a grievance.

54. Less intense disruptions have also caused Wes to lose focus. In the last two years especially I have observed Wes become distracted to the point where he has stood up from our visits mid conversation to see what was happening outside of the room. The sounds were often those of doors opening and closing, officers walking past, or keys jingling – all common sounds for the inside of a prison.



EV (Initial)

55. Wes used to prolifically create artwork, especially yarn work. I have noticed that this has decreased remarkably over the last two years. Wes barely crafts any blankets, handbags, hats, or toys compared to how active he was in 2015-2017.

**Inability to Work with his Defense Team**

56. Wes frequently vacillates in his instructions to the legal team. At times when Wes has been clear about material he does not want the team to litigate, we could not have a rational discussion about it because his frustration and concreteness would get in the way. Other times, he would tell us that we were allowed to include certain information.

57. Wes's anger escalates often and quickly, sometimes in ways that I can anticipate and other times without any obvious trigger. On July 31, 2018, Wes explained that when he gets angry, he is not able to think. He described his episodes of anger as if he was having an out-of-body experience standing by, watching himself unravel and act in ways he did not understand.

58. Wes's memory failures have created tension between him and the defense team, particularly when he misremembers what we have communicated to him. Wes becomes very frustrated when events do not occur as he expected they would, so these constant misunderstandings create huge issues for Wes's ability to cooperate effectively with his team. Moreover, when Wes cannot convince members of his team of his point of view, he sees that as evidence that they are actively working against him. The instances in which he has attempted to fire Rebecca and Michelle are often connected to Wes's inability to convince them to see what he is saying as accurate, or to rationally understand their perspective.

59. Wes demonstrates extremely fixed thinking and this has been the cause of much of his frustration. For instance, Wes became especially agitated on May 16, 2017. I started the visit by sharing records we had collected as a part of the investigation into his case related to his aunt's husband, John, whom Wes had never met. Wes wanted to keep the documents related to John's personal history. I reminded Wes that we had reached an agreement about him getting such materials and that I wouldn't be leaving the papers with him that day. Wes's entire body language changed within seconds from being open to looking extremely tense. All his muscles seemed to be



EV (Initial)

flexed and his face looked both angry and confused. He became irrational stating that the records about John that he had just seen for the first time that day meant more to him than life itself. I asked if the records meant more to him than his own life and he said they did. I explained that I was not trying to keep the records from him, but that I could not leave the records that day. This frustrated him further. He stood up, his face turning red, and snapped that he didn't care if the prison found the records. After I tried further explaining my rationale, he cussed me out, threw his materials into a bag, told me he did not want to see me again, and called for the guard to escort him out of the visitation room. The visit was over within 30 minutes.

60. Wes repeatedly threatened to have his attorneys, Rebecca Woodman and Michelle Law removed from his case. Wes has maintained throughout the last four years that he never gave permission for Rebecca and Michelle to work on his case, which is not accurate. Wes repeatedly brings this up when he is frustrated. Likewise, Wes will say that he is more knowledgeable on death penalty litigation because this is Michelle and Rebecca's first death penalty case and although they are smart women, he has done extensive research on the topic. Wes's belief that his is the first capital case that Rebecca and Michelle have worked on is false. I have corrected Wes about this several times over the years and yet it continues to be something he states as a matter of fact at various points.

61. Wes is paranoid about attorneys. Though it would be rational for Wes to have a healthy skepticism of some lawyers given his experiences with his capital trial counsel, who filed a 117-page affidavit post-conviction essentially justifying every single potential issue that could have been brought up to allege ineffectiveness, Wes's views are not rational. For example, Wes continues to hold on to the false belief that Rebecca and Michelle do not want to file certain claims related to conditions of confinement because they actually want him to die. When they do not do as he says, Wes internalizes that decision as evidence of their desire to cause him harm and, more specifically, for him to be executed. In this way, he sees them as part of the conspiracy against him and his efforts to litigate against the prison.

62. Likewise, when Wes does not understand the law Rebecca and Michelle have tried to explain to him, he accuses them of lying to him. On May 12, 2015, for example, Wes accused Rebecca of lying and deceiving him about



EV (Initial)

the filing deadlines for his petition and blamed Michelle for being a passive accomplice. In reality, Wes just did not understand Rebecca's explanations of the statute regarding filing deadlines. As a result, Wes drafted a motion to fire both Rebecca and Michelle, though he did not file it. In September 2019, Wes told me that he removed both Rebecca and Michelle from his visit list because of their "repeated and protracted lies for a five year period." He accused them have having a hidden agenda. Wes more recently filed a motion requesting to go *pro se* again for similar reasons. Wes has a long history of filing and withdrawing pro se motions, so much so that the clerks of the courts Wes routinely files in have acknowledged this behavior as a sign of mental illness.

63. Wes believes that those on death row, as well as himself, are being represented by attorneys who do not have the interests of their clients in mind. He has made efforts to get other inmates to file grievances and suits. Attorneys for other inmates have contacted our team to ask us to try and persuade Wes to stop trying to litigate on behalf of their clients. Wes truly believes that he is capable of adequately representing himself and others in complex litigation even though he has failed to successfully litigate far less complicated cases.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Signed on this 15th day of November, 2019.

Elizabeth Vartkessian, Ph.D.



EV (Initial)

# Exhibit 2

# CURRICULUM VITAE

**Elizabeth S. Vartkessian, Ph.D.**
309 N. Charles St., 3rd floor
Baltimore, MD 21201
Phone: (281) 217-0946 esv@advancechange.org

## EDUCATION

2012 Ph.D. in Law (DPhil)
University of Oxford, St. Hilda's College—Oxford, England

2004 M.S. in Comparative Social Policy (M.Sc.)
University of Oxford, St. Antony's College—Oxford, England

2003 B.A., Political Science; B.A., Philosophy; Minor, Africana Studies, *Magna Cum Laude*
George Washington University, Washington D.C.

## PROFESSIONAL EXPERIENCE

2014-Present *Founding Executive Director*, Advancing Real Change, Inc. (ARC, Inc.), Baltimore, Maryland.
ARC, Inc. promotes justice by ensuring that the life histories of people charged with crimes are at the forefront of their cases. ARC, Inc. engages in casework, provides training and consulting services to legal teams regarding the best practices of life history investigations.

In addition to working as a mitigation specialist further tasks as the Executive Director include:

- Managing daily office operations of 11 full-time staff.
- Providing direct supervision to all mitigation and records collection specialists.
- Reporting to the Governing Board of Directors.
- Overseeing office finances.
- Leading fundraising efforts.
- Engaging in coalition building and community outreach.
- Providing training and consultation services to defender organizations and private bar attorneys.
- Maintaining a discrete caseload as a mitigation specialist in complex cases.
- Licensed as a Private Detective in Maryland, number 101-24647.

2010-2014 *Mitigation Specialist*, private consulting services for capital and cases involving juvenile life sentences.

- Built a successful private mitigation practice.
- Engaged in networking including identifying clients and marketing.

- Ran daily operations, including budgeting, invoicing, accounting, and collection of payments.
- Obtained a private investigator license in New York.
- Trained as a Defense Victim Outreach Liaison.

2004-2010 *Mitigation Specialist*, The Gulf Region Advocacy Center, Houston, Texas. Life history investigator for death penalty cases at trial and post-conviction stages. Regular tasks included:

- Providing expert testimony regarding the standard of care for the development and presentation of mitigating evidence in death penalty cases.
- Interviewing the client for the purpose of preparing a social history.
- Identifying, locating, and interviewing family, friends, and other witnesses for the purpose of preparing a social history.
- Collecting and evaluating birth, medical, education, social welfare, employment, incarceration, military, and other records of clients and family members for the construction of a social history.
- Investigating and researching issues related to medical history; prenatal, pediatric and adult health; exposure to harmful substances *in utero* and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religion, gender and sexual orientation; ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.
- Working with the client's family, community, and clergy in the development of other favorable evidence for the client.
- Analyzing information gathered in investigation to determine potential expert witness consultations.
- Writing memoranda analyzing the factual information obtained from witnesses and historical documents in light of the principles discerned from the professional literature.

## INVITED GUEST LECTURES, PRESENTATIONS, AND TRAINING SESSIONS

2020 Thurgood Marshall, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker by video. Houston, Texas. June 9.

2020 Advancing Real Change, Inc.: *Mitigation Webinar Series*. "Mitigation Investigation During COVID-19". Baltimore, Maryland. April 7.

2020 American Civil Liberties Union, Scharlette Holdman Mentorship Training. Plenary speaker session topic "ABA Guidelines" and "Advanced Interviewing Skills". New Orleans, Louisiana. March 12-13.

2020 Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. March 4.

2019 Advancing Real Change, Inc.: *Mitigation Training Series*. Curriculum coordinator and plenary session speaker topic "Mitigation's Power and Purpose". Houston, Texas. December 6-8.

2019 Federal Death Penalty Strategy Session, Closing Comments: Thoughts on Pleas and Deauthorization. San Diego, California. November 14-16.

2019 *Bring Your Own Case* training, Curriculum coordinator and faculty member. Supported by National Association of Criminal Defense Lawyers and a grant from the Bureau of Justice. Tallahassee, Florida. November 8-10.

2019 Arkansas Association of Criminal Defense Lawyers: *Death Penalty Conference*. Plenary session speaker, "Ethics of Mitigation Investigation". Rogers, Arkansas. October 25-26.

2019 Louisiana State Public Defender, Faculty member and plenary session speaker for capital and *Miller/Montgomery* tracks, topics "Mitigation's Power and Purpose", "Assets-Based Mitigation Evidence", "Identifying Trauma". Kenner, Louisiana. October 23-25.

2019 University of Texas, Capital Punishment Clinic: Tools for Organizing Casework. Austin, Texas. September 18.

2019 Authorized Case Consultation and Training. Federal Resource Counsel, "Capital Jury Selection". St. Louis University School of Law. June 6-8.

2019 Advancing Real Change, Inc.: *Baltimore Training Series*. Curriculum coordinator and plenary session speaker, "Mitigation 101" and "Mitigation's Power and Purpose". May 16-18.

2019 Bellarmine University, Topic: "Capital Mitigation" (by video). April 10.

2019 Amicus U.S. Death Penalty Training, "Mitigation 101", "Working with Clients", "Investigating and Litigating Mental Health and Trauma", and "Getting in the Door and Conducting Witness Interviews". London, England. March 23-24.

2018 The Virginia Bar Association, 26th Annual Capital Defense Workshop, plenary session speaker, "School to Prison Pipeline as Mitigation". Richmond, Virginia. November 16.

**CURRICULUM VITAE**

2018 — 26th Annual Federal Death Penalty Strategy Session, plenary speaker “Preparing for Authorization”. Tampa, Florida. November 7-9.

2018 — Amicus U.S. Death Penalty Training, “Mitigation 101”, “Common Claims and How to Prepare Evidence”, Unearthing Records that Will Change the Face of a Case”, “Working with Clients”, “Identifying Signs and Symptoms of Mental Health and Trauma”, and “Getting in the Door and Conducting Witness Interviews”. London, England. November 3-4.

2018 — Louisiana State Public Defender, Faculty member and plenary session speaker, “Working with Experts”, “Capital Jury Project: Findings and Application”, and “Developing Themes and Theories in Juvenile Cases”. Kenner, Louisiana. October 24-26.

2018 — University of Texas, Capital Punishment Clinic: Tools for Organizing Casework. Austin, Texas. September 19.

2018 — Office of the Public Defender in the Ninth Circuit, Sentencing Strategies Seminar, plenary session speaker, “Preparing for Your Penalty Phase and Sentencing”. Orlando, Florida. August 6-7.

2018 — Miami Public Defender, in-house training. Case management and document processing. Miami, Florida. May 7-9.

2018 — University of Texas, Capital Punishment Clinic: Mitigation Advocacy. Panelist discussing empirical assessments of successful mitigation in capital and non-capital cases. Austin, Texas. April 7-8.

2018 — Advancing Real Change, Inc.: *Baltimore Mitigation Training*. Curriculum coordinator and plenary session speaker, “Mitigation: The Heart of Criminal Defense,” and “Forward-looking Mitigation and Re-entry”. Baltimore, Maryland. March 16-18.

2018 — American Civil Liberties Union, *Bring Your Own Case Training*. Faculty member and plenary session speaker, “What Must Be Done in Every Case: Mitigation Investigation”. Perdido Beach, Alabama. February 28-March 2.

2018 — Alabama Criminal Defense Lawyers Association: *Capital Training*. Plenary Speaker, “Basics of Case Organization and Tools of the Mitigation Trade”, and “Compelling Narratives: Mitigation Themes and Theories” Birmingham, Alabama. January 18-20.

2017 — Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member and plenary session speaker, “Themes and Theories”. Lafayette Hill, Pennsylvania. November 29-December 2.

**CURRICULUM VITAE**

2017 Amicus U.S. Death Penalty Training, "Mitigation 101", "Common Claims and How to Prepare Evidence", Unearthing Records that Will Change the Face of a Case", and "Getting in the Door and Conducting Witness Interviews". London, England. November 4-5.

2017 Louisiana State Public Defender, Faculty member and plenary session speaker, "Ethical Obligations of the Mitigation Investigation", "Mitigation in *Miller* cases", and "Capital Juror Research". Kenner, Louisiana. October 18-20.

2017 Virginia Correctional Association: *Stop Blocking the Exit*. Panelist, "Struggles and Success of the Journey Home". Williamsburg, Virginia. October 12.

2017 Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. October 11.

2017 Federal Criminal Defense Seminar, Administrative Offices of the U.S. Courts. "Mitigation Investigation and Mental Health Evidence". Philadelphia, Pennsylvania. August 24.

2017 The Gulf Region Advocacy Center: *Mitigation Skills Training*. Faculty member and plenary session speaker, "Records Collection". Houston, Texas. August 7-9.

2017 Habeas Assistance and Training Counsel Project: *Fourteenth Annual National Seminar on the Development and Integration of Mitigation Evidence*. "Basics of Case Organization and Tools of the Mitigation Trade". Baltimore, Maryland. April 7.

2017 Florida Defender Organization: Topic: "Compelling Narratives: Mitigation Themes and Theories" (by videoconference). March 24.

2017 Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. March 23.

2017 Yale School of Management: *Yale Philanthropy Conference*. Invited panelist, "A Public Voice: Rethinking How Advocacy Supports Mission". New Haven, Connecticut. February 24.

2017 Advancing Real Change, Inc.: *Baltimore Mitigation Training*. Curriculum coordinator and plenary session speaker, "Best Practices of Mitigation Investigation," and "Forward-looking Mitigation". Baltimore, Maryland. February 10-11.

**CURRICULUM VITAE**

2017 Yale School of Law: *Educational Opportunity and Juvenile Justice Clinic*. Topic: records collection and interviewing basics for mitigation development. Guest speaker. New Haven, Connecticut (by videoconference). January 31.

2016 Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Themes and Theories". Lafayette Hill, Pennsylvania. December 15-17.

2016 Michigan State Appellate Defender: *Juvenile Life Mitigation Training*. Curriculum coordinator and plenary session speaker, "Best Practices of Mitigation Investigation". Detroit, Michigan. December 8-9.

2016 Louisiana State Public Defender: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Walk a Mile in My Shoes: A Day in the Life of Your Client". Baton Rouge, Louisiana. October 19-21.

2016 University of Baltimore, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Baltimore, Maryland. April 25.

2015 Maryland Office of the Public Defender, *Summer Law Clerk Training*. Plenary session speaker, "Mitigation: The Heart of Criminal Defense". Baltimore, Maryland. May 27.

2015 Habeas Assistance and Training Counsel Project: *Twelfth National Seminar on the Development and Integration of Mitigation Evidence*. "Basics of Case Organization and Tools of the Mitigation Trade". Baltimore, Maryland. April 12.

2015 Arizona Capital Representation Project: *Bring Your Own Case Training*. Faculty member Phoenix, Arizona. April 1-3.

2015 University of Maryland, School of Law: *Social Work and Law*. Topic: social work assessments and sentencing determinations. Guest speaker. Baltimore, Maryland. March 30.

2015 Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. March 19.

2015 Administrative Offices of the U.S. Courts: *Fourth Annual Capital Mitigation Skills Workshop*. Faculty member and plenary session speaker, "Basics of Case Organization and Tools of the Mitigation Trade", Kansas City, Missouri. January 15-18.

2014 Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member and plenary session speaker, "Themes and Theories". Lafayette Hill, Pennsylvania. November 20-22.

2014 Arkansas Association of Criminal Defense Lawyers: *Death Penalty Conference*. Plenary session speaker, "Records Collection" and "What Matters to Capital Jurors". Rogers, Arkansas. October 31-November 1.

2014 Oregon Capital Resource Center: Plenary session speaker, "Capital Jurors and Mitigation Evidence". Gleneden Beach, Oregon. October 10-11.

2014 Florida Death Penalty Training Program: *Life Over Death*. Plenary session speaker, "What Matters to Capital Jurors". Orlando, Florida. September 5.

2014 The Gulf Region Advocacy Center: *Bring Your Own Case Training*. Plenary session speaker, "Capital Jurors and Mitigation Evidence"; "Developing the Social History"; "Effective Team Work". Faculty member. St. Louis, Missouri. August 15-17.

2014 Atlantic Center for Capital Representation: *Mitigation Skills Training*. Planner and faculty member. Philadelphia, Pennsylvania. August 8-9.

2014 University of Baltimore, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Baltimore, Maryland. June 10.

2014 Maryland Office of the Public Defender, Summer Law Clerk Training. Plenary session speaker, "Mitigation: The Heart of Criminal Defense". Baltimore, Maryland. May 28.

2014 Georgetown University, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Washington D.C. February 27.

2013 The Gulf Region Advocacy Center: *Mitigation Skills Training*. Faculty member. Houston, Texas. November 20-22.

2013 Atlantic Center for Capital Representation: *Bring Your Own Case Training*. Faculty member. Lafayette Hill, Pennsylvania. September 25-28.

2013 University of Baltimore, School of Law: *Capital Punishment*. Topic: the development of mitigation evidence in capital cases. Guest speaker. Baltimore, Maryland. May 28.

2013 Oregon Capital Resource Center: Plenary session speaker, "Capital Jurors and Mental Health Mitigation Evidence". Portland, Oregon. April 19-21.

2013 University at Albany, School of Criminal Justice: *Qualitative Research Methods*: Topic: intensive interviewing techniques and conducting field research. Guest speaker. Albany, New York. January 22.

2012 University at Albany, School of Criminal Justice: *Law and Psychology*: Topic: the role of mitigation evidence in juror decision-making in capital cases. Guest speaker. Albany, New York. October 31.

2012 Idaho Federal Defenders Annual Training Seminar: Plenary session speaker, "Capital Jurors and Mitigation Evidence". Boise, Idaho. September 13.

2012 Habeas Assistance and Training Counsel Project: Ninth National Seminar on the Development and Integration of Mitigation Evidence. Plenary session speaker, "Capital Jurors and Mitigation Evidence". Atlanta, Georgia. April 28.

2008 Reprieve U.K. *Death Penalty Investigators Training*. Faculty member. London, England. March 29-30.

2007 Reprieve U.K. *Death Penalty Investigators Training*. Faculty member. London, England. April 21.

2007 National Consortium for Capital Defense Training funded by the Bureau of Justice Assistance: *Capital Defense Mitigation Issues*. Faculty member. Plano, Texas. March 23-24.

2007 The Gulf Region Advocacy Center: *Mitigation Skills Training*. Faculty member. Houston, Texas. January 19-21.

2006 Texas Criminal Defense Lawyers Association: *Mitigation Training*. Faculty member. Dallas, Texas. April 20-21.

2005 Capital Unit of the Oklahoma City Public Defenders Office: *Conducting Mitigation Investigation*. Faculty member. Oklahoma City, Oklahoma. September 20-23.

## PROFESSIONAL TRAININGS AND CONFERENCES ATTENDED

2019 NAACP Legal Defense Fund, Inc. 40th Annual Capital Punishment Training Conference. Tarrytown, New York. July 11-14.

2019 Authorized Case Consultation Training, Federal Resource Conference. Atlanta, Georgia, January 22-24.

2015 Post-2255 Litigation and Advocacy, Federal Capital Habeas Project Training Conference. Philadelphia, Pennsylvania, July 21-22.

2015 NAACP Legal Defense Fund, Inc. 36th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 9-12.

2014 Defense Initiated Victim Outreach Training, sponsored by the Administrative Offices of the U.S. Courts. Santa Clara, California. September 15-19. (by application).

2014 NAACP Legal Defense Fund, Inc. 35th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 17-20.

2014 Eleventh National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases sponsored by the Administrative Offices of the U.S. Courts. Philadelphia, Pennsylvania. March 27-30.

2013 Eighteenth Annual National Federal Habeas Corpus Seminar sponsored by the Administrative Offices of the U.S. Courts. Cleveland, Ohio. August 15-18.

2013 NAACP Legal Defense Fund, Inc. 34th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 11-14.

2013 Tenth National Seminar on the Development and Integration of Mitigation Evidence in Capital Cases sponsored by the Administrative Offices of the U.S. Courts. Baltimore, Maryland. April 4-7.

2011 Law and Society Annual Meeting, San Francisco, California. June 2-5.

2011 Vermont Law School Symposium, New Perspectives on Capital Punishment, South Royalton, Vermont. February 11.

2009 NAACP Legal Defense Fund, Inc. 30th Annual Capital Punishment Training Conference. Warrenton, Virginia. July 9-12.

2008 Law and Society Annual Meeting, Montreal, Quebec. May 29-June 1.

2006 Mitigation Seminar sponsored by the Habeas Assistance and Training Counsel: The Development and Integration of Mitigation Evidence in Capital Cases. Washington D.C. April 27-30.

2006 Third National Forensics Seminar sponsored by The Habeas Assistance and Training Counsel. San Antonio, Texas. January 26-29.

2006 National Consortium for Capital Defense Training funded by the Bureau of Justice Assistance. Plano, Texas. January 11-14.

2005 National Association of Criminal Defense Lawyers Death Penalty Seminar. Oklahoma City, Oklahoma. September 30-October 2.

2005 A Fighting Chance: Themes and Theories of Mitigation Investigation. New Orleans, Louisiana. June 1-3.

2005 Records collection, Juror and Witness Interviews and Legal Aspects of Investigative Work. Houston, Texas. April 12-14.

2005 National Legal Aid and Defender Association: Life in the Balance. New Orleans, Louisiana. March 18-22.

2005 Capital and Mental Health Seminar. Houston, Texas. February 23-25.

## ACADEMIC POSITIONS

2013-present *Research Fellow*, School of Criminal Justice, University at Albany

2012-2013 *Adjunct Professor*, School of Criminal Justice, University at Albany
Introduction to Criminal Justice Processes

2010-2011 *Discussion Leader*, School of Criminal Justice, University at Albany
Introduction to Criminal Justice Processes
Introduction to Criminology

## PUBLICATIONS

2019 Vartkessian, Elizabeth S., "Including Assets-Based Mitigation in Sentencing" ***Criminal Justice Policy Review***. Published on-line (August 9) ahead of print, https://journals.sagepub.com/doi/10.1177/0887403419866887.

2018 Sean O'Brien, Elizabeth S. Vartkessian, and Marla Sandys "Psychological Defenses and Mitigation" in ***Forensic Science Reform: The Psychology and Sociology of Wrongful Convictions***. Wendy J. Koen and Michael Bowers (Eds). Elesevier.

2018 Riner, Robin and Elizabeth S. Vartkessian. "Showing Humanity: How Defense Attorneys Use Mitigation Narratives to Advocate for Clients" in ***Language & Social Justice: Case Studies on Communication & the Creation of Just Societies***.

2018 Vartkessian, Elizabeth S. (July 12). "All Serious Crimes Deserve Podcast-Style Scrutiny" Published by ***The Baltimore Sun***, Retrieved from: http://www.baltimoresun.com/news/opinion/oped/bs-ed-op-0713-curtis-flowers-20180711-story.html.

2017 Vartkessian, Elizabeth S. (April 27). "The Tragic Life and Cruel Execution of Ledell Lee" Published on-line by ***The Marshall Project*** and ***Vice News***, Retrieved from: https://www.vice.com/en_us/article/the-tragic-life-and-cruel-execution-of-ledell-lee.

2017 Sandys, Marla, Elizabeth S. Vartkessian, Heather Pruss, and Sarah Walsh, "Setting the Stage and Listening to What Jurors Have to Tell Us About Mitigation" in Edward Monahan and Jim Clark (Eds.) *Mitigation in Capital Cases: Understanding and Communicating the Life Story*. ***American Bar Association***.

2017 Vartkessian, Elizabeth S., Jonathan Sorenson, and Christopher E. Kelly. "Tinkering with the Machinery of Death: Juror Decision-Making in Texas Death Penalty Trials During Two Statutory Eras" ***Justice Quarterly***. 34(1): 1-24.

2014 Bowers, William, Christopher E. Kelly, Ross Kleinstuber, Elizabeth S. Vartkessian, and Marla Sandys. "The Life or Death Sentencing Decision: It's at Odds with Constitutional Standards, Is it Beyond Human Ability?" in James R. Acker, Robert M. Bohm, and Charles S. Lanier (Eds.) ***America's Experiment with Capital Punishment***. Carolina Academic Press.

2012 Vartkessian, Elizabeth S. "What One Hand Giveth, the Other Taketh Away: How Future Dangerousness Corrupts Guilt Verdicts and Produces Premature Punishment Decisions in Capital Cases." ***Pace Law Review***. 32: 447-543.

2011 Vartkessian, Elizabeth S. and Jared P. Tyler. "Legal and Social Exoneration: The Consequences of Michael Toney's Wrongful Conviction." ***Albany Law Review***. 75: 1467-1498.

2011 Vartkessian, Elizabeth S. "Dangerously Biased: How the Texas Capital Sentencing Statute Encourages Jurors to be Unreceptive to Mitigation Evidence." ***Quinnipiac Law Review***. 29: 237-288.

## WORKS IN PROGRESS

Vartkessian, Elizabeth S., Christine Land, and Alice Gould, "How Evidence of Mental Illness Becomes Aggravating: An Analysis of Texas Capital Cases" (Manuscript)

## RESEARCH EXPERIENCE

2017-present *Co-investigator with Scott Sundby*
Capital Jury Project, Arizona data collection

2010-2013 *Visiting Researcher*, School of Criminal Justice, University at Albany, State University of New York
Capital Jury Project

2008-2010 *Primary Investigator*, Research Foundation of the State University of New York, Hindelang Criminal Justice Research Center
Capital Jury Project, Texas data collection

## SCHOLARSHIPS, GRANTS, AND AWARDS

2018 Resolution by the City Council of Baltimore recognizing ARC, Inc.'s work

2017 United States Human Rights Network, Human Rights Builders Award (for ARC, Inc.'s work to bring empathy to the criminal legal system)

2015 J.M. Kaplan Social Innovation Prize Awardee (private foundation grant to support the work of ARC, Inc.)

2014 Research Affinity Group (private foundation grant)

2010 Research Affinity Group (private foundation grant)

2009 Criminology Department, Oxford University (partial tuition)

2009-2008 St. Hilda's Graduate Student Scholarship (partial tuition)

2008 Alpha Delta Pi Foundation (academic, philanthropic, and social society grant)

2008 Law and Society Graduate Students Workshop Grant

1999-2003 George Washington University's Presidential Scholarship

## ACADEMIC PAPERS PRESENTED

2018 Vartkessian, Elizabeth S. and Kaylesh Ramu, Paper entitled "*Improving Outcomes in Juvenile Life Without Parole Resentencings: A Preliminary Analysis of National Transcripts*" Legal Services for the Indigent: The Impact of Policy Changes, The American Society of Criminology, Atlanta, Georgia.

2017 Vartkessian, Elizabeth S., Paper entitled "*Mitigation's Role in Criminal Defense*" Legal Services for the Indigent: Social Work, Mitigation, and Holistic Defense, The American Society of Criminology, Philadelphia, Pennsylvania.

2017 Vartkessian, Elizabeth S., Paper entitled "*Capital Juror's Response to Mental Health Evidence: Context Matters Most*" International Academy of Law and Mental Health, Prague, Czech Republic.

2013 Vartkessian, Elizabeth S. and Christopher E. Kelly, Paper entitled *"Capital Improvements? Juror Decision-Making in Texas Death Penalty Trials Before and After Penry v. Lynaugh"* Law and Society Association, Boston, Massachusetts.

2011 Acker, Jim, William J. Bowers, Andrew L.B. Davies, Elizabeth S. Vartkessian, and Kay Lang, Paper entitled *"Families and Friends of Homicide Victims: Violent Bereavement and Adaptation"* The American Society of Criminology, Washington D.C.

2011 Vartkessian, Elizabeth S., Paper entitled *"What One Hand Giveth, the Other Taketh Away: How Future Dangerousness Corrupts Guilt Verdicts and Produces Premature Punishment Decisions in Capital Cases"* School of Criminal Justice, University at Albany.

2011 Bowers, William J.,Wanda Foglia, Elizabeth S. Vartkessian, Marla Sandys, and Christopher E. Kelly, Paper entitled *"The Receptivity of Courts to Empirical Evidence of How Jurors Decide Death Penalty Cases: The Capital Jury Project (CJP) as a Case Study"* Michigan State Law School Symposium, East Lansing, Michigan.

2010 Vartkessian, Elizabeth S., Paper entitled *"Fatal distraction: Does the Texas capital sentencing statute discourage the consideration of mitigating evidence?"* Law and Society Annual Meeting, Chicago, Illinois.

2009 Vartkessian, Elizabeth S., Paper entitled *"Persuasive Mitigation Evidence in Texas Capital Cases"* Law and Society Annual Meeting, Denver, Colorado.

2008 Vartkessian, Elizabeth S., Paper entitled "*Making the Case for Life: Patterns of Successful Mitigation Evidence Presented to Capital Juries in Texas"* St. Hilda's College, Oxford University.

## BOARD MEMBERSHIPS

2008-Present Governing Board of the Gulf Region Advocacy Center
A non-profit law office committed to providing quality defense services to indigent defendants facing capital charges primarily in Texas and throughout the south.

## REVIEWER

Justice Quarterly
Punishment and Society