## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WESLEY IRA PURKEY, ) | |
| Plaintiff, ) | |
| v. ) | No. 1:19-cv-03570-TSC |
| WILLIAM P. BARR, *et al.*, ) | |
| Defendants. ) | |

## DECLARATION OF REBECCA E. WOODMAN, ATTORNEY AT LAW

Rebecca E. Woodman, pursuant to 28 U.S.C. §1746(2), declares as follows:

1.      I am an attorney representing plaintiff Wesley I. Purkey ("Mr. Purkey" or "Plaintiff") in the above-captioned action ("Civil Action"). The Complaint in the Civil Action ("Complaint" or "Compl.") presents the claim that Mr. Purkey is presently incompetent to be executed, and therefore carrying out his execution while he is incompetent would be unconstitutional under the Eighth Amendment and the Fifth Amendment's Due Process Clause. *See Ford v. Wainwright*, 477 U.S. 399 (1985); *Panetti v. Quarterman*, 551 U.S. 930 (2007); *Madison v. Alabama*, 139 S.Ct. 718 (2019). I am admitted to the Court *pro hac vice*.

2.      I am over eighteen (18) years old and competent to attest and declare to the matters set forth herein. Unless otherwise stated, I have personal knowledge regarding the facts set forth herein.

3.      I have represented Mr. Purkey since 2013, when I was originally appointed under the Criminal Justice Act and 18 U.S.C. § 3599 by the U. S. Court of Appeals for the Eighth Circuit at the *certiorari* stage of Mr. Purkey's 28 U.S.C. § 2255 proceedings. I have been involved in all

aspects of investigation and litigation in Mr. Purkey's case with respect to the investigation and preparation of a petition pursuant to 28 U.S.C. § 2241, *Purkey v. United States, et al.*, No. 2:19-cv-00414 (S.D. Ind.), *appeal pending* No. 19-3318 (7th Cir.), the *Ford* complaint filed in *Purkey v. Barr et al.*, No. 1:19-cv-03570, and clemency proceedings. I, along with my co-counsel Michelle M. Law, were counsel of record for Mr. Purkey when a notice was issued on July 25, 2019 by Attorney General William Barr, scheduling an execution date for Mr. Purkey on December 13, 2019.

4.    Mr. Purkey is also one of the consolidated Plaintiffs in the suit challenging the lethal injection execution protocol. On November 20, 2019, this Court preliminarily enjoined Mr. Purkey's execution (and the scheduled execution of three other federal prisoners) in the related case of *Roane v. Barr*, No. 19-mc-145, ECF No. 50 (D.D.C. Nov. 20, 2019). The Government sought to stay the November 20, 2019 preliminary injunction in both the D.C. Circuit and the United States Supreme Court.

5.    While the Government sought to stay the injunctive order, Mr. Purkey filed a Protective Motion for a Preliminary Injunction in the *Ford* suit on December 4, 2019. The Government's request to stay the preliminary injunction were denied, and after Mr. Purkey's scheduled execution date passed, Mr. Purkey moved to withdraw his Protective Motion in the *Ford* suit. This Court granted that motion but ordered briefing on jurisdictional questions. The parties completed that briefing in January 2020. On February 24, 2020, the Government filed a Motion to Dismiss Mr. Purkey's *Ford* complaint, and Mr. Purkey filed his opposition on March 16, 2020. The Government filed its reply on March 30, 2020.

6.    On June 15, 2020, Attorney General Barr sent a notice of new execution date for Mr. Purkey, set for July 15, 2020.

7. Throughout the course of my representation of Mr. Purkey, my defense team and I have observed the effects of his longstanding mental health problems, which include past diagnoses of severe mental illness, including schizophrenia and complex Post-Traumatic Stress Disorder; multiple traumatic brain injuries; and progressive dementia including Alzheimer's Disease and a likely diagnosis of vascular dementia. As described in detail below, the ability of our defense team to observe Mr. Purkey's current functioning has been curtailed since March 13, 2020, when all legal visits were canceled because of COVID-19.

**Record Requests From the 2019 Warrant Period**

8. Though Mr. Purkey's mental health has deteriorated over the course of my representation, in the immediate aftermath of the July 25, 2019 warrant notice, the defense team observed a rapid and substantial decline in Mr. Purkey's mental health. USP Terre Haute had implemented a "death watch protocol" for prisoners under execution warrant, who were moved to A Range, an isolated unit of cells within the Secure Confinement Unit (SCU), following the execution notices issued on July 25, 2019. Concerned about Mr. Purkey's competency to be executed and his ability to work with counsel, and given his scheduled execution date, we began taking steps immediately to obtain additional information relating to Mr. Purkey's then current mental health functioning.

9. We requested Mr. Purkey's medical, mental health, and disciplinary records, and surveillance videos as well as information about BOP policies through the FOIA process, directly through counsel for the Federal Bureau of Prisons ("BOP"), and through the litigation in this case, beginning on August 28, 2019. To date, Defendants have failed to produce a single record we have requested.

10.     We first submitted requests related to the BOP protocols on August 28, 2019.  We understood from Mr. Purkey that, as part of the newly implemented death watch protocol, a bright flashlight was being shone in his eyes by BOP guards every 10 to 15 minutes, 24 hours per day, resulting in extreme sleep deprivation.  Given the DOJ's and BOP's failure to provide us with a protocol detailing the execution watch procedures, we were unable to verify whether this was an execution watch policy. On August 21, 2019, my co-counsel, Michelle Law, sent an email to BOP Legal Counsel at USP Terre Haute Katherine Siereveld, informing her that the flashlight checks were interfering with Mr. Purkey's sleep and affecting counsel's ability to communicate with him. Ex. 1.[1] Having received no response, on August 28, 2019, Ms. Law again emailed BOP Counsel Siereveld requesting to bring a sleep mask with her on a visit the following day. Ex. 2. In an email on August 29, 2019, BOP Counsel Siereveld informed Ms. Law that Mr. Purkey would not be allowed a sleep mask and that "[h]e can cover his eyes with a blanket if that helps." *Id.* That same day, Ms. Law emailed BOP Counsel Siereveld again requesting a copy of the written BOP policy concerning the night watch checks to which BOP Counsel Siereveld replied that she would have to do further research, but that "specific directives such as that are usually found in Post Orders which are Law Enforcement Sensitive and cannot be released." Ex. 3.

11.     On September 17, 2019, Ms. Law sent an email to BOP Counsel Siereveld requesting disclosure and preservation of range surveillance video in the SCU range where Mr. Purkey was currently housed. Ex. 4. Ms. Law also requested that copies of the surveillance video be provided on a weekly basis and offered to provide blank storage media for that purpose. *Id.* BOP Counsel Siereveld replied on September 19, 2019 that there was no mechanism to provide

---

[1] Unless otherwise stated herein, the exhibits attached hereto are true and genuine copies thereof.

4

ongoing footage and suggested that it was best requested via another process such as a FOIA request. BOP Counsel Siereveld stated further that the preservation alone was "quite voluminous, but can be accomplished if necessary." *Id.* Ms. Law followed up on September 24, 2019 with a request to preserve all night watch range surveillance video since Mr. Purkey was moved to the new range or, in the alternative, the earliest video available for night watch hours and every night since and to come, and that a FOIA request was forthcoming. Ex. 5. That same date, BOP Counsel Siereveld responded that she had forwarded the request to the appropriate office to determine the time period for which the videos could be preserved. *Id.*

12.    Ms. Law and I waited two weeks for the BOP to communicate the dates they would preserve. When it became evident that further communication was not forthcoming, on October 9, 2019, I prepared three separate expedited FOIA requests for the following: (1) a request for night watch and day watch surveillance video for limited date ranges (in an effort to accommodate BOP Counsel Siereveld's ability to facilitate preservation of the video in accordance with her previous email correspondence with counsel); (2) a comprehensive request for all records of BOP policies and procedures pertaining to the day and night watch protocol implemented following issuance of the execution notices on July 25, 2019 and all video surveillance on the watch range dating from July 25, 2019 to the present; and (3) a request for Mr. Purkey's BOP medical and mental health records dating from January 1, 2017 to the present. Ex. 6; Ex. 7; Ex. 8. I delivered these FOIA requests to the relevant department of the BOP via email and U.S. Mail on October 9, 2019. The same day I sent an email to BOP Counsel Siereveld, notifying her in particular of the FOIA requests for the watch protocol surveillance videos, and stressing that it was imperative we obtain at least the surveillance videos pursuant to our limited request, given Mr. Purkey's impending execution date. Ex. 9.

13.     On October 10, 2019, I received an email and letter (attached to the email) from the North Central Regional Office of the Federal BOP, acknowledging receipt of the FOIA requests and granting expedited processing, but stating that processing the requests may take up to six months. Ex. 10. The following day, October 11, 2019, I informed BOP Counsel Siereveld via email that our expedited request for the limited surveillance video had been granted, but that a potential six-month time frame for processing the request was untenable in light of Mr. Purkey's execution date. Ex. 11. I asked BOP Counsel Siereveld to provide a time frame within the next few weeks in which the videos could be made available, given the importance of the surveillance video to our representation of Mr. Purkey and the fact that she had indicated she could facilitate preservation of the video. *Id.* BOP Counsel Siereveld responded to me on October 16 that she had no authority to circumvent the FOIA process, but that she would follow up "with our FOIA folks" and see if there was a more expedited time frame. Ex. 12. I heard nothing further from the BOP about the matter. I followed up with BOP Counsel Siereveld again on November 11, 2019 about our FOIA requests, requesting that the BOP provide the requested materials within ten days in light of Mr. Purkey's fast-approaching execution date, and BOP Counsel Siereveld responded with a similar answer on November 13, 2019, stating that "everyone involved is cognizant that time is of the essence[,]" and that she would "forward [our] concerns along to the folks directly involved in the FOIA process." Ex. 13. Despite BOP Counsel Siereveld's acknowledgement that "time is of the essence," to date none of the requested documents or videos have been produced.

**Attorney and Expert Access to Mr. Purkey During the 2019 Warrant Period**

14.     On September 26, 2019, Dr. Bhushan Agharkar, a psychiatrist who had previously evaluated Mr. Purkey in 2016, wrote a medical order for brain image testing to be

conducted on Mr. Purkey. Ex. 14; Ex. 15. Dr. Agharkar recommended testing based upon Mr. Purkey's history of cognitive deficits and need to rule out an intracranial process. Ex. 14; Ex. 15. Dr. Agharkar had reviewed Mr. Purkey's diagnosis of progressive dementia such as Alzheimer's by Dr. Robert Oauou in 2016, as well as Dr. Oauou's 2018 updated report of further progression of the disease following Mr. Purkey's defense team's reports of Mr. Purkey's deteriorating mental health symptoms. Ex. 14; Ex. 15.

15.    In our efforts to accomplish the brain image testing as soon as possible, my co-counsel Michelle Law corresponded with BOP Counsel Siereveld by email and telephone beginning September 26, 2019 to discuss the need for this testing. Ex. 16. BOP Counsel Siereveld, without citing any policy or other authority, imposed three conditions for the testing: (1) it had to be done on-site with BOP contractors; (2) a court had to enter an order for the testing; and (3) Mr. Purkey's defense counsel had to pay for the testing. On October 4, 2019, Ms. Law sent an email to BOP Counsel Siereveld confirming their telephone conversations regarding the testing, and requesting information concerning the costs and procedures associated with the testing. Ex. 17. In addition, Ms. Law informed BOP Counsel Siereveld that counsel needed the information regarding costs and procedures first, and then would move for a court order authorizing the testing. *Id.* On October 9, 2019, Ms. Law forwarded Dr. Agharkar's order to BOP Counsel Siereveld, along with his prescribed testing parameters. *Id.* On October 16, 2019, BOP Counsel Siereveld sent an email outlining some of the estimated costs of the testing, and Ms. Law responded on October 21, 2019 that she would begin the process of procuring funding for the tests through her office. *Id.* On October 25, 2019, Ms. Law and I filed an *ex parte* motion for brain imaging in Case No. 2:19-cv-00414 (S.D. Ind.). The motion explained that the testing

7

was an "integral part" of the evidence we wanted to gather in anticipation of filing a motion challenging Mr. Purkey's competency to be executed. Ex. 18.

16.    While we were seeking access for the imaging, Mr. Purkey continued to deteriorate. He filed various *pro se* motions that were against his own interest, one to withdraw a pending petition and another to proceed *pro se*, as well as another mandamus petition. *See generally* Ex. 19; Ex. 20. On October 17, 2019, I was notified by the Clerk of the District Court for the Southern District of Indiana that Mr. Purkey had filed a mandamus petition in the Court of Appeals for the Seventh Circuit. Ex. 21.

17.    On October 21, 2019, Judge Hanlon issued an order directing counsel to respond to the allegations in Mr. Purkey's Mandamus and file a status report by October 25, 2019, which could be filed *ex parte*. Ex. 22. In response, we profferred a declaration from Dr. Craig Haney, a psychologist and recognized expert on the psychological effects of solitary or isolated confinement on mental health, who met with Mr. Purkey and opined that Mr. Purkey's attempt to withdraw his appeals should be viewed with judicial caution and concern, because his decision making was likely affected by the increased severity of his isolated conditions of confinement in combination with his organic mental health condition from which he suffers that results in deteriorating cognition and dementia. Ex. 23; Ex. 24.

18.    Ultimately, the court rejected Mr. Purkey's attempts to fire us and proceed *pro se*. At the same time it denied Mr. Purkey's 2241 petition, the court also denied the motion for brain imaging. The court ruled that it was not appropriately granted before Mr. Purkey had filed a *Ford* claim. *Purkey v. United States, et al.*, No. 2:19-cv-00414, ECF No. 76 (S.D. Ind. Nov. 20, 2019).

19.    Throughout this process, and even under warrant when communication with counsel is vitally important, we have had difficulty obtaining access to Mr. Purkey. From the

time that the execution notice was issued and Mr. Purkey was moved to the A Range, my defense team and I sought to increase our communication with Mr. Purkey in order to address his needs and to monitor his mental health status, which has sometimes warranted emergency communication. It was been extremely difficult at times to arrange for legal calls or visits with Mr. Purkey with officials at USP Terre Haute during the fall of 2019. More than once our team was told by SCU case managers that a visit or phone call could not be scheduled because the visitation rooms were full or the telephone time slots taken on the requested dates. It appeared to us that the unavailability was due, in part, to the fact that five individuals, including Mr. Purkey, were scheduled for execution in December 2019 and January 2020, and that the SCU was unprepared to handle the increased need for access to and by counsel.

20.     The BOP attempted to deny Mr. Purkey's access to counsel during a teleconference with the court and prohibited counsel from meeting with Mr. Purkey to prepare beforehand. To prepare for a quickly scheduled October 31, 2019 hearing on Mr. Purkey's *pro se* motions to withdraw, Ms. Law made an emergency trip to USP Terre Haute to be present with Mr. Purkey at the scheduled telephonic conference and consult with him beforehand. When Ms. Law arrived at USP Terre Haute, she was informed by prison officials that she would not be allowed to visit Mr. Purkey or be present with him during the telephonic conference. Ms. Law met in person with BOP Counsel Siereveld in an effort to resolve the situation, but this conversation did not result in access to Mr. Purkey. Ms. Law, who had traveled to Terre Haute from Kansas City, Missouri late the previous night, was forced to leave the prison and return to Kansas City without ever being given any opportunity to meet with Mr. Purkey. Shortly thereafter, the hearing was rescheduled. *See* Ex. 25; Ex. 26.

9

21.    Around this time, I learned that Mr. Purkey had filed yet another *pro se* pleading against counsel's wishes and against his best interests. On October 30, 2019, I received an email from a court official for the Southern District of Indiana that Mr. Purkey had filed a *pro se* civil action with the district court on October 28, 2019. Ex. 27. The filing alleged that Mr. Purkey was selected for execution in retaliation for his grievances about BOP conditions of confinement and his successful legal work on behalf of himself and other prisoners. Though the filing alleged that BOP guards had personally confirmed this, it did not include affidavits or documentation in support. The filing was consistent with Mr. Purkey's long standing delusions about retaliation by guards because of his legal advocacy. We provided the filing to the forensic psychiatrist, Dr. Bhushan Agarkar, who had previously evaluated Mr. Purkey.

22.    On November 8, 2019, Dr. Agharkar conducted an evaluation of Mr. Purkey for his competency to be executed and competency to work with counsel. Counsel provided Dr. Agharkar with the scant updated medical records obtained since his previous 2016 evaluation of Mr. Purkey, but noted that the BOP had failed to disclose critical medical and mental health files, and that FOIA requests were still pending. The team also provided Dr. Agharkar with various expert reports, including neuropsychological testing conducted in 2003, a 2016 report (updated in 2018) from Dr. Oauou's diagnosing Mr. Purkey with progressive dementia, and a 2018 report from Dr. Sautter diagnosing Mr. Purkey with complex PTSD. The team also provided Dr. Agharkar with other relevant documents from Mr. Purkey himself, including a compendium of grievances and *pro se* lawsuits Mr. Purkey had filed over the years, and *pro se* motions to fire his attorneys and to withdraw litigation. Finally, the team provided Dr. Agharkar declarations from the team's current mitigation specialist, Dr. Elizabeth Vartkessian, and former mitigation specialist, John Fox, detailing their observations of Mr. Purkey's delusional and paranoid

10

behavior, as well as his increasing memory loss over the last five years. Dr. Agharkar concluded in a written report dated November 19, 2019, that Mr. Purkey lacked a rational understanding of the basis for his execution based upon Dr. Agharkar's contemporaneous evaluation, his observations of Mr. Purkey's behavior and mental status, and his review of the records. *See* Compl. Ex. 1 at 11–13. Dr. Aghargkar observed that Mr. Purkey has a fixed and false belief that the government wants to execute him in retaliation for his legal advocacy. *Id.* at 3, 10–13. Dr. Agharkar found that Mr. Purkey's lack of rationality is a result of his delusional thoughts and paranoia, compounded with the deterioration of his brain due to Alzheimer's disease and his long-time complex-PTSD. *Id.* at 12. Dr. Agharkar also concluded that Mr. Purkey's brain damage, dementia, and delusions prevent him from effectively communicating or working with counsel or working for his own interests. *Id.*

23.    Dr. Jonathan DeRight, a neuropsychologist, submitted a written report on November 21, 2019, concluding that Mr. Purkey's previously diagnosed dementia is consistent with Alzheimer's disease, and documenting a marked deterioration in his functioning. *See* Compl. Ex. 3. Dr. DeRight evaluated Mr. Purkey in August 2019 after the defense team began to observe Mr. Purkey's rapid mental deterioration. *See id.*

24.    In the instant litigation, we continued to seek access to the imaging, medical and custody records, and relevant BOP policies, raising these issues in both our complaint for relief and in the Protective Motion for Preliminary Injunction. Compl. ¶¶ 14, 17, 19, 25 n.1; Pl's Mem. in Supp. of Mot. for A Prelim Inj. 8-11, 22-23, ECF No. 7-1.

11

**Post-Warrant, Winter and Spring, 2020**

25.     Even after Mr. Purkey's original warrant expired, we continued to press our requests for information and expert access. We did not receive any of the information, videos or documents we requested, and indeed, our access to Mr. Purkey became even more limited.

26.     On February 3, 2020, I renewed the FOIA requests for the death watch protocols, A-Range surveillance video, and Mr. Purkey's medical and mental health records, having received no response to our previous requests. The renewed FOIA requests were updated to encompass records from July 25, 2019 to the present and were emailed to the relevant department of BOP on February 3, 2020. Ex. 28; Ex. 29; Ex. 30.  That same day, I received email responses from the relevant department of BOP acknowledging receipt of the requests. At first, the BOP/FOIA representative, S. Lilly on behalf of Eugene Blaine, Supervising Attorney, responded via email that I would need to submit a new Certificate of Identity in order to authorize the requests because the current authorization was more than three months old. Ex. 31. Then the BOP/FOIA representative, S. Lilly, responded in a separate email that my requests were duplicative of the requests I had sent previously on October 10, 2019. Ex. 32; Ex. 33. After that, I sent a response email clarifying that I was renewing my previous requests as well as updating the time period for the requests to extend to the present.  Ex. 34; Ex. 35. I was then informed in another email from the same representative that my information would be forwarded to the processor. *Id.* I heard nothing further regarding my requests, and to date, none of the requested records have been provided.

27.     We again raised the issue of the Defendants' failures to provide the video surveillance, protocols, and medical and mental health records (even pursuant to FOIA) as well as access to diagnostic again in Mr. Purkey's Opposition to the Defendant's Motion to Dismiss,

filed on March 16, 2020. ECF 20, at 1, 7–9. We specifically raised our concern that Defendants might attempt to issue another warrant with as little as twenty days' notice, which would provide insufficient timing for us to receive all of the necessary information to prepare for a *Ford* competency hearing. *Id.* at 10. Defendants filed their Reply on March 30, 2020 and erroneously asserted that Mr. Purkey had not renewed the FOIA request. ECF 21, at 4, n. 1.

28.    On April 14, 2020, my co-counsel in the *Ford* case, Brian Fleming, sent a letter via electronic mail to opposing counsel in response to several statements set forth in Defendants' Reply to Mr. Purkey's Opposition to Defendants' Motion to Dismiss that counsel believed did not fairly and accurately represent various aspects of this case. Ex. 36. A portion of that letter was in response to Defendants' assertion in their Reply that our requests for relevant information, documents, and testing regarding Mr. Purkey's condition and circumstances, including the requests for the A-range video surveillance footage, the BOP records, and brain imaging, were made only for "dilatory purposes," as well as Defendants' assertion that the BOP did not receive "any additional requests for information since Purkey's October 2019 FOIA request." ECF 21, at 4 n.1. Mr. Fleming pointed out my additional follow-up to the October 9, 2019 FOIA requests on October 11, 2019, and November 11, 2019, and my additional FOIA requests for Mr. Purkey's BOP records on February 3, 2020. *See* Ex. 36. Given that my requests had been refused or obstructed by the relevant officials to whom the requests were made, and the fact that my requests "remain unresolved to this day[,]" Mr. Fleming suggested in his letter that "the simple solution would be for Defendants to ensure that the relevant government officials immediately and fully provide the requested information and documentation, as well as access for testing." *See id.* Mr. Fleming also requested that "if the government is intending to seek a new execution warrant for Mr. Purkey on an expedited basis," that "the government disclose,

without delay, its intended course of action regarding the issuance of new execution warrants so we can make an informed decision about the need to seek immediate judicial intervention to ensure Mr. Purkey's competency claim is fully and fairly heard on the merits." *Id.*

29.    On April 22, 2020, my co-counsel Mr. Fleming received an email from Assistant United States Attorney Brian P. Casey, counsel of record for the Government in the instant case, acknowledging receipt of the April 14, 2020 letter (Exhibit 36) and stating that they had inquired with BOP regarding the renewed and updated FOIA requests submitted to and acknowledged by the BOP on February 3, 2020, but that "the BOP has been unable to find any record of it." Ex. 37. Mr. Casey also represented that they would "let us know as soon as we learn of a new execution date, which will be when the Attorney General makes a decision." *Id.*

30.    On May 20, 2020, Mr. Fleming responded to AUSA Casey's April 22, 2020 email, again reiterating the history of FOIA requests from October 9, 2019 and February 3, 2020, and reiterating that Mr. Purkey has yet to receive any of the requested information. Ex. 37. Still, to date, Mr. Purkey's counsel has not been provided any of the requested information or granted access to testing.

31.    On June 15, 2020, AUSA Casey emailed my co-counsel Mr. Fleming that Mr. Purkey's execution warrant would be issued shortly, only a few minutes before alerting the Court. Ex. 38. In this same email, AUSA Casey again reiterated that the execution warrant was scheduled at the "Attorney General's direction." *Id.*

32.    Most recently, on June 15, 2020, before receiving notice of Mr. Purkey's new warrant, I emailed BOP Counsel Siereveld regarding my outstanding request for Mr. Purkey's BOP records, attaching copies of all of my previous requests and emphasizing the importance of the records to the ability of our expert, Dr. Jonathan DeRight, to accurately assess and evaluate

14

Mr. Purkey's current mental state and the extent of his deterioration, especially given Dr. DeRight last saw Mr. Purkey in August 2019. Ex. 39. To date, I have received no response from BOP Counsel Siereveld or any other BOP personnel in response to my outstanding requests.

33.    In-person visits by Mr. Purkey's defense team as well our mental health experts are essential to the ability to conduct in-person evaluations of Mr. Purkey to monitor and assess Mr. Purkey's current level of incompetency and the extent of his cognitive deterioration. However, since March 13, 2020, neither members of our defense team nor any of our defense experts have been able to conduct in-person visits with Mr. Purkey at USP Terre Haute due to the ongoing effects of the COVID-19 pandemic.

34.    On March 13, 2020, Ms. Law received an email from SCU Unit Manager Royer at USP Terre Haute stating that all legal visits were immediately suspended for 30 days, after which the suspension would be reevaluated. Ex. 40. The same day, she received an email from her office, the Federal Public Defender for the Western District of Missouri, that the BOP was suspending visits bureau-wide. Ex. 41. On March 16, 2020, Ms. Law received an email from BOP Counsel Siereveld, who advised that no-contact visits would be allowed pursuant to screening procedures, including "self-reporting of symptoms and temperature checks based on current CDC guidance," but that any approved visit would be no-contact, and that "visit by phone conference" should be considered. Ex. 42. That same day, Ms. Law received an email from USP Terre Haute SCU Correctional Counselor Andrew Sutton that a previously-requested visit with Mr. Purkey by defense expert Dr. Bhushan Agharkar, M.D. "was not scheduled and is now not considered under the circumstances." Ex. 43.

35.    Contrary to Ms. Siereveld's March 16, 2020 email, no-contact attorney visits were also canceled. On March 30, 2020, Ms. Law received an email from Counselor Sutton informing

15

her that previously-scheduled visits with Mr. Purkey on April 13, April 22, and May 1 were cancelled, and that, due to the COVID-19 outbreak, all legal and social visits would be suspended through May 3, 2020, after which the suspension would be reevaluated. Ex. 44. On April 1, 2020, the BOP instituted a total lockdown of all BOP facilities. Ex. 45. On April 8, 2020, I received an email from Ms. Law informing me that our defense team member, mitigation specialist Kathleen Cleary, who was also employed by the Federal Public Defender for the Western District of Missouri, would be prohibited by the FDO from visiting Mr. Purkey at USP Terre Haute until it could be determined that a visit would be safe for everyone. Ex. 46. On April 15, 2020, Ms. Law received an email from Counselor Sutton that our previously scheduled visits with Mr. Purkey on May 8 and May 15 were cancelled, and that all visits were suspended through May 18, 2020, after which the suspension would be reevaluated. Ex. 47. Then, on May 14, 2020, Ms. Law received an email from Counselor Sutton advising that our previously-scheduled visits with Mr. Purkey on May 20, May 29, and June 17 were cancelled, that "there will not be a resumption of visitation on May 18, 2020[,]" that "all visits scheduled for the rest of May and continuing through June are hereby postponed until further notice[,]" and that "there is no date set that visiting will begin to resume." Ex. 48.

36.    To date, the BOP reports that one inmate has died and 5 inmates have tested positive for COVID-19 at USP Terre Haute. *See* https://www.bop.gov/coronavirus/#:~:text=COVID%2D19%20Cases,12%2C785%20in%20community%2Dbased%20facilities.&text=Currently%2C%203%2C868%20inmates%20and%20452.attributed%20to%20COVID%2D19%20disease (last visited June 19, 2020). The homepage of USP Terre Haute's website states prominently that, "All visiting at this facility has been suspended until further notice." Ex. 49 (last visited June 22, 2020).

37.     On June 16, 2020, the day after I learned that Mr. Purkey's execution was scheduled for July 15, 2020, I sent an email to BOP Counsel Siereveld requesting information on arrangements being made at USP Terre Haute to facilitate access to our client for legal, social, and spiritual visitation given the ongoing COVID-19 crisis and requesting copies of any written policies in this regard. Ex. 50. BOP Counsel Siereveld responded that "[w]e do not have anything written yet but I am working on it." Ex. 51. The public facing website for USP Terre Haute continued to announce on June 16, 2020 that all visitation was suspended at the institution. *See* Ex. 49. This makes it impossible to safely plan any type of visit, particularly since getting to the prison would require virtually every member of Mr. Purkey's defense team to travel hundreds of miles.

38.     Later in the day on June 16, 2020, I received an email from BOP Counsel Siereveld stating, "We are still working on a plan that will allow as much visitation as possible while still mitigating the risk of exposure to COVID-19" and that she would have something in writing for me by the next day. Ex. 52. The following day, I received nothing. On both June 19 and June 20, 2020, I again emailed BOP Counsel Siereveld requesting a copy of the written policy or plan. Ex. 53; Ex. 54. Despite BOP Counsel Siereveld's repeated promises to provide a written policy or plan that would set forth in detail the precise safety protocol to protect counsel, our experts, spiritual advisors, family members, and any other person for whom access to Mr. Purkey will be crucial in the next few weeks leading up to and including the execution, to date I have received no such writing.

39.     The evidence that would be presented at a hearing in support of our petition is as follows:

- Report of Dr. Bhushan S. Agharkar dated 11-19-2019

- Report of Dr. Jonathan DeRight dated 11-21- 2019

- Declaration of Elizabeth Vartkessian, Ph.D. dated 11-15-2019

- Declaration of John D. Fox dated 11-6-2019

- Court orders and responses (*ex parte*) in Case No. 2:19-cv-00414, Dkt. 54, 55, 55-1, 55-2, 57, 59, 61, 62, 63, 64, 65

- *Ex Parte* Motion for Brain Imaging filed October 25, 2019 in Case No. 2:19-cv-00414, Dkt. 56

- FOIA requests for written BOP execution watch protocol and surveillance videos dated 10-9-2019

- FOIA request for Mr. Purkey's BOP medical and mental health records dated 10-9-2019

- FOIA requests for written BOP execution watch protocol and surveillance videos dated 2-3-2020

- FOIA request for Mr. Purkey's BOP medical and mental health records dated 2-3-2020

- Email correspondence with BOP FOIA official S. Lilly for Eugene Baine, Supervising Attorney, dated 2-3-2020

- Email correspondence with BOP Counsel Siereveld dated 8-21-2019, 8-29-2019, 9-17-2019, 9-19-2019, 9-24-2019, 10-9-2019, 10-11-2019, 10-16-2019, 10-21-2019, 11-11-2019, 11-13-2019, 3-16-2020, 6-16-2020, 6-18-2020, 6-19-2020, 6-20-2020

- Email correspondence with USP Terre Haute staff dated March 13, 2020, March 16, 2020, March 30, 2020, April 15, 2020, May 14, 2020

- Email correspondence from Michelle Law to Rebecca Woodman dated April 8, 2020 (email from ML to REW re visit with Wes by Kathleen Cleary not permitted by WDMO FDO)

- BOP lockdown notice dated April 1, 2020

- BOP COVID-19 statistics for USP Terre Haute (showing 1 death and 5 positives)

- Federal Bureau of Prisons Website, USP Terre Haute homepage (showing visits suspended until further notice)

18

40.    The evidence that counsel for Mr. Purkey have diligently attempted to but thus far have been unable to obtain and would require expedited discovery to present at a hearing in support of our petition is as follows:

- Brain image testing per medical order of Dr. Agharkar dated 9-26-2019

- BOP medical and mental health records per FOIA request dated 10-9-2019 and response dated 10-10-2019

- BOP execution watch protocol and surveillance video per FOIA requests dated 10-9-2019 and response dated 10-10-2019

- BOP medical and mental health records per FOIA request and responses dated 2-3-2020

- BOP execution watch protocol and surveillance video per FOIA requests and responses dated 2-3-2020

I DECLARE PURSUANT TO 28 U.S.C. §1746(2) AND UNDER PENALTY OF PERJURY THAT THE FOREGOING FACTS ARE TRUE AND CORRECT.

DATED: 6-22-2020

REBECCA E. WOODMAN
ATTORNEY AT LAW
COUNSEL FOR MR. PURKEY

19

# Exhibit 1

**Subject:**  FW: Night Checks on Range -- Wesley Purkey
**Date:**  Monday, September 9, 2019 at 12:25:08 PM Central Daylight Time
**From:**  Michelle Law
**To:**  rewlaw_outlook.com
**Attachments:**  image001.png



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

**From:** Michelle Law
**Sent:** Wednesday, August 21, 2019 9:27 AM
**To:** 'Katherine Siereveld' <ksiereveld@bop.gov>
**Cc:** rewlaw_outlook.com <rewlaw@outlook.com>; 'Elizabeth Vartkessian' <esv@advancechange.org>
**Subject:** Night Checks on Range -- Wesley Purkey

Katherine:

I am writing about an ongoing issue on the range where the five with execution dates are being housed.  As you know, I represent Wesley Purkey, and he is complaining about the cell checks that occur about every 10 - 15 minutes during the night.  Apparently, a guard is using a large flashlight to illuminate Mr. Purkey's cell, and the super bright light is waking Mr. Purkey every time there is a cell check.  This has led to extreme sleep deprivation and the resulting agitation is affect our ability to communicate with Mr. Purkey.  I would prefer not to litigate this issue, but if we can't find a solution soon, we plan to file a lawsuit.  It seems to me that significantly curtailing the use of a bright flashlight at night is a reasonable request.  Or, if that is not an option, I could bring Mr. Purkey a sleep mask to shield his eyes from the bright light.

Any assistance that you can offer on this issue would be appreciated.  If you cannot resolve this issue, please let me know to who I should talk to about this situation.

Thank you

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

Exhibit 2

| | |
|---|---|
| **Subject:** | FW: Wesley Purkey - Sleep Mask Question Follow-up |
| **Date:** | Monday, September 9, 2019 at 12:24:12 PM Central Daylight Time |
| **From:** | Michelle Law |
| **To:** | rewlaw_outlook.com |
| **Attachments:** | ATT00001.png, image001.png |



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail. Thank you for your cooperation.

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Sent:** Thursday, August 29, 2019 5:41 AM
**To:** Michelle Law <Michelle_Law@fd.org>
**Subject:** Re: Wesley Purkey - Sleep Mask Question Follow-up

Hi,
I'm sorry. I did get an answer, but forgot to convey it to you. He cannot have a sleep mask and they are not sold on commissary. He can cover his eyes with his blanket if that helps. As long as the officers see living inmate it won't be a problem.
Thanks!

Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Michelle Law <Michelle_Law@fd.org> 8/28/2019 8:22 PM >>>

Hi Katherine    Did you get word back about the sleep mask for Wesley Purkey?  I am visiting him tomorrow (Thursday) and I have a mask with me to give to him.  The mask is in its original packaging if someone wants to look at it before deciding, I'll be in the reception area around 8:45 a.m.



## Michelle M. Law
Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

Exhibit 3

**Monday, September 9, 2019 at 12:12:34 PM Central Daylight Time**

| | |
|---|---|
| **Subject:** | Re: Policy Regarding Night Checks |
| **Date:** | Thursday, August 29, 2019 at 2:26:53 PM Central Daylight Time |
| **From:** | Katherine Siereveld |
| **To:** | Michelle Law |
| **CC:** | rewlaw_outlook.com |
| **Attachments:** | Portable Network Graphics image |

Hi Michelle,
I will have to do some further research to see if we have anything that is releasable, but specific directives such as that are usually found in Post Orders which are Law Enforcement Sensitive and cannot be released.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Michelle Law <Michelle_Law@fd.org> 8/29/2019 3:18 PM >>>

Katherine:

Would you mind forwarding a copy of the BOP written policy regarding the night checks?

Thanks-

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

Exhibit 4

| | |
|---|---|
| **From:** | Katherine Siereveld |
| **To:** | Michelle Law |
| **Cc:** | Elizabeth Vartkessian; rewlaw_outlook.com |
| **Subject:** | Re: Range Surveillance Video |
| **Date:** | Thursday, September 19, 2019 11:00:41 AM |

Hi Michelle,

I apologize for the delay in response, we have not had computers or electricity the last few days.

We do not have a mechanism with which to provide you ongoing footage. Additionally, the preservation alone is quite voluminous, but can be accomplished if necessary. Are there specific time frames or days even that you are looking for? At that point we could preserve what you need and then evaluate our ability to provide it through a properly filed FOIA request, discovery request, or subpoena.

I hope that helps. Please don't hesitate to call and discuss.

Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Michelle Law <Michelle_Law@fd.org> 9/17/2019 4:54 PM >>>
Katherine:

I am writing to request the preservation of the range surveillance video for the SCU range where Mr. Purkey is currently housed. I am also requesting that copies of the surveillance video be provided to me on a weekly basis. If you require blank storage media in order to provide weekly copies, please let me know, and my office will provide blank storage media.

Thanks -

Michelle

Get Outlook for iOS

# Exhibit 5

| | |
|---|---|
| **From:** | Katherine Siereveld |
| **To:** | Michelle Law |
| **Subject:** | RE: Range Surveillance Video |
| **Date:** | Tuesday, September 24, 2019 10:25:18 AM |
| **Attachments:** | ATT00001.png |

Hi Michelle:
I forwarded this on to the appropriate office to see how far back they can go preserving the evening watch.
Thanks,
Katherine

>>> Michelle Law <Michelle_Law@fd.org> 9/24/2019 9:19 AM >>>
Katherine:

We would like the range video for the night watch hours since Wes was moved to the new range. If the video has not been maintained that far back, we would like the earliest range surveillance video available for night watch hours, every night since and every night to come. We will be making a FOIA request in the very near future. As I wrote before, if you need storage media, please let me know and I'll have my CSA provide a storage device.

Thanks-

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail. Thank you for your cooperation.

**From:** Katherine Siereveld <ksiereveld@bop.gov>

**Sent:** Thursday, September 19, 2019 11:01 AM
**To:** Michelle Law <Michelle_Law@fd.org>
**Cc:** Elizabeth Vartkessian <esv@advancechange.org>; rewlaw_outlook.com <rewlaw@outlook.com>
**Subject:** Re: Range Surveillance Video

Hi Michelle,

I apologize for the delay in response, we have not had computers or electricity the last few days.

We do not have a mechanism with which to provide you ongoing footage.  Additionally, the preservation alone is quite voluminous, but can be accomplished if necessary.  Are there specific time frames or days even that you are looking for?  At that point we could preserve what you need and then evaluate our ability to provide it through a properly filed FOIA request, discovery request, or subpoena.

I hope that helps.  Please don't hesitate to call and discuss.

Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Michelle Law <Michelle_Law@fd.org> 9/17/2019 4:54 PM >>>
Katherine:

I am writing to request the preservation of the range surveillance video for the SCU range where Mr. Purkey is currently housed.  I am also requesting that copies of the surveillance video be provided to me on a weekly basis.  If you require blank storage media in order to provide weekly copies, please let me know, and my office will provide blank storage media.

Thanks -

Michelle

Get Outlook for iOS

Exhibit 6

## Rebecca E. Woodman, Attorney at Law, L.C.
### 1263 W. 72nd Ter.
### Kansas City, Missouri 64114
(785) 979-3672
*rewlaw@outlook.com*

October 9, 2019

*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**
    **Wesley Ira Purkey**
    **DOB: 01/06/1952**
    **SSN: 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**
    **FPN: 14679-045**
    **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana. Mr. Purkey is one of five prisoners at Terre Haute who were notified of scheduled execution dates in writing by the Department of Justice on July 25, 2019. These five inmates, including Mr. Purkey, were moved to a special range (hereinafter "death watch range") in the Secure Confinement Unit (SCU) at USP-Terre Haute on or about July 25, 2019, and remain in the death watch range to the present day.

On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey, specifically pertaining to the following:

1.  All night watch range surveillance videotape of the death watch range dating from the earliest two weeks available from July 25, 2019, and separately, dating from September 18-28, 2019.

2. All day watch range surveillance videotape of the death watch range on August 13, 2019 and September 18-19, 2019.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as Mr. Purkey has a pending execution date of December 13, 2019**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Rebecca E. Woodman, Esq.
> 1263 W. 72nd Terrace
> Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

Rebecca E. Woodman

*Enclosures: (2)*

Exhibit 7

# Rebecca E. Woodman, Attorney at Law, L.C.
## 1263 W. 72nd Ter.
## Kansas City, Missouri 64114
(785) 979-3672
*rewlaw@outlook.com*

October 9, 2019

*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**
       **Wesley Ira Purkey**
       **DOB: 01/06/1952**
       **SSN: 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**
       **FPN: 14679-045**
       **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana. Mr. Purkey is one of five prisoners at Terre Haute who were notified of scheduled execution dates in writing by the Department of Justice on July 25, 2019. These five inmates, including Mr. Purkey, were moved to a special range (hereinafter "death watch range") in the Secure Confinement Unit (SCU) at USP-Terre Haute on or about July 25, 2019, and remain in the death watch range to the present day.

On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with a copy of all records, document files, work papers, tape recordings, notes, memoranda, electronic information, or any and all other information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey, specifically pertaining to the following:

1. All records of BOP policies and procedures pertaining to the day and night watch protocol implemented on the range housing the five prisoners at USP-Terre Haute

including Wesley Ira Purkey who received execution notices issued by the Department of Justice on July 25, 2019.

2. All watch range surveillance videotape (both day and night) dating from July 25, 2019-Present (date upon receipt).

The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audiotapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies. When searching for materials responsive to this request, please search any and all databases, indexes, or other sources, maintained by the BOP, as well as any sub-office, subdivision, or component of the BOP. In short, this request is directed to this office and to any other office within the BOP.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as Mr. Purkey has a pending execution date of December 13, 2019**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Rebecca E. Woodman, Esq.
> 1263 W. 72nd Terrace
> Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

Rebecca E. Woodman

*Enclosures: (2)*

Exhibit 8

# Rebecca E. Woodman, Attorney at Law, L.C.
## 1263 W. 72nd Ter.
## Kansas City, Missouri 64114
(785) 979-3672
*rewlaw@outlook.com*

October 9, 2019

*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**
   **Wesley Ira Purkey**
   **DOB: 01/06/1952**
   **SSN: 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**
   **FPN: 14679-045**
   **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana and has been previously incarcerated at the U.S. Penitentiary in Leavenworth, Kansa. We are in need of all custodial records regarding Mr. Purkey dated **January 01, 2017-Present (date upon receipt).**

On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with a copy of all records, document files, work papers, tape recordings, notes, memoranda, electronic information, or any and all other information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey. This request includes specifically, but is not limited to, the following records:

1. All records contained in Mr. Purkey's "Medical File;"

2. All records contained in Mr. Purkey's "Mental Health File;"

3. All records contained in any file maintained by a BOP psychologist, social worker, counselor, or any other individual providing any type of services related to emotional and/or mental health care and/or treatment;

4. All records relating to Mr. Purkey's disciplinary history, any gang affiliations or activities, including without limitation all incident reports issued to Mr. Purkey, even such incident reports that may have been canceled or rescinded;

5. All records related to Mr. Purkey's grievances at the BOP;

6. All records relating to Mr. Purkey's inmate classification;

7. All medical records and notes relating to any health care requested by or provided to Mr. Purkey, and including but not limited to all medical care, dental care, mental health care, and substance abuse treatment;

8. All documentation of suicide attempts by Mr. Purkey, or injuries of Mr. Purkey, inflicted upon himself, intentionally or otherwise;

9. All records relating to any internal memoranda or correspondence within the BOP relating to Mr. Purkey;

10. All records relating to any reviews of Mr. Purkey's housing placements and transfers within institutions as well as between institutions within BOP; and

11. All records relating to any administrative remedies sought by Mr. Purkey.

The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audiotapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies. When searching for materials responsive to this request, please search any and all databases, indexes, or other sources, maintained by the BOP, as well as any sub-office, subdivision, or component of the BOP. In short, this request is directed to this office and to any other office within the BOP.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as Mr. Purkey has a pending execution date of December 13, 2019**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Rebecca E. Woodman, Esq.
> 1263 W. 72nd Terrace
> Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

Rebecca E. Woodman

*Enclosures: (2)*

Exhibit 9

| | |
|---|---|
| **From:** | Rebecca Woodman |
| **To:** | Katherine Siereveld |
| **Cc:** | Michelle Law |
| **Subject:** | Purkey FOIA requests |
| **Date:** | Wednesday, October 9, 2019 9:47:07 AM |
| **Attachments:** | Purkey FOIA request death watch protocols 10-9-2019.pdf |
| | Purkey limited FOIA request 10-9-2019.pdf |
| | Purkey updated certificate of identity 9-25-2019.pdf |
| | Purkey updated release 9-25-2019.pdf |

Dear Katherine: I am attaching two FOIA requests that I sent via email and USPS today to the Federal Bureau of Prisons. One is a limited request for the surveillance videos of the death watch range that my co-counsel, Michelle Law, specifically requested be preserved in previous email correspondence with you. That specific request is reiterated in the attached FOIA letter. It is imperative that we obtain at least these video surveillance tapes as soon as possible, given Mr. Purkey's impending execution date of December 13, 2019, so anything you can do to ensure that we obtain these videotapes as soon as possible would be appreciated. The other FOIA request is a more detailed request for all records pertaining to BOP protocols for the death watch range, as well as all video surveillance of the range. Anything you can do to expedite this request would be most appreciated as well. Please let me know if you have any questions, and Michelle and I are available to discuss these requests further with you should you wish.

Thank you.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 10



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

*Office of the Regional Counsel*

*400 State Avenue*
*Tower II, Suite 800*
*Kansas City, KS 66101*

October 10, 2019

Rebecca Woodman
1263 W. 72nd Terrace
Kansas City, MO  64114

Re:  Freedom of Information Act Request No. 2020-00234
     Wesley Purkey

Dear Sir/Madame:

This acknowledges our receipt of your Freedom of Information Act (FOIA) request. Regulations that may be pertinent to your request may be found at Title 28 C.F.R.   A copy of the first page of your request is attached to help you more easily keep track of your request.

We have examined your request and have determined that the documents responsive to your request must be searched for and collected from a field office.  As a result, the amount of time necessary to respond to your request will increase. Once responsive documents have been collected from the field, we will process your request in the order that it was received.

The Department of Justice requires all requests for records be processed on a first-in, first-out basis. The four exceptions to this requirement are: "(i) Circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; (ii) An urgency to inform the public about an actual or alleged Federal Government activity, if made by a person who is primarily engaged in disseminating information; (iii) The loss of substantial due process rights; or (iv) A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e).

Your request meets the requirement to be processed on an expedited basis and will be expedited to the best of our ability. This request will be placed on the processing track

ahead of other requests and processed as soon as practicable. Processing this request may take up to six months.

If you have questions regarding the status of your request or anything discussed in this letter, you may contact the North Central Regional Office or the BOP FOIA Public Liaison, Mr. C. Darnell Stroble at (202) 616-7750 or BOP FOIA Section, 320 First Street, NW, Room 936, Washington, D.C. 20534. You can also check the status of your request on line at http://www.bop.gov/PublicInfo/execute/foia.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information, Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

*E. Fenstermaker*
*for*

Richard M. Winter
Regional Counsel

# Exhibit 11

**Michelle Law**

| | |
|---|---|
| **From:** | Rebecca Woodman <rewlaw@outlook.com> |
| **Sent:** | Friday, October 11, 2019 7:45 AM |
| **To:** | Katherine Siereveld |
| **Cc:** | Michelle Law |
| **Subject:** | Re: Purkey FOIA requests |
| **Attachments:** | Ack and Expedite Grant Ltr.pdf |

Hi Katherine: Attached is a reply to our limited FOIA request for the A range death watch video surveillance, granting our request for expedited response. Nevertheless, the response indicates it may take as much as six months to process the request. As you know, this time frame is untenable in light of Mr. Purkey's execution date. You have already agreed to preserve the requested video, and it is vitally important that we obtain at least these limited video surveillance tapes now. Please advise on the time frame in which those videos can be made available to us in the next few weeks. We greatly appreciate your timely assistance in this matter.

Thank you.

Best,
Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com


**From:** Rebecca Woodman <rewlaw@outlook.com>
**Date:** Wednesday, October 9, 2019 at 9:46 AM
**To:** Katherine Siereveld <ksiereveld@bop.gov>
**Cc:** Michelle Law <Michelle_Law@fd.org>
**Subject:** Purkey FOIA requests

Dear Katherine: I am attaching two FOIA requests that I sent via email and USPS today to the Federal Bureau of Prisons. One is a limited request for the surveillance videos of the death watch range that my co-counsel, Michelle Law, specifically requested be preserved in previous email correspondence with you. That specific request is reiterated in the attached FOIA letter. It is imperative that we obtain at least these video surveillance tapes as soon as possible, given Mr. Purkey's impending execution date of December 13, 2019, so anything you can do to ensure that we obtain these videotapes as soon as possible would be appreciated. The other FOIA request is a more detailed request for all records pertaining to BOP protocols for the death watch range, as well as all video surveillance of the range. Anything you can do to expedite this request would be most appreciated as well. Please let me know if you have any questions, and Michelle and I are available to discuss these requests further with you should you wish.

Thank you.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 12

**Subject:** Re: Purkey FOIA requests

**Date:** Wednesday, October 16, 2019 at 9:54:20 AM Central Daylight Time

**From:** Katherine Siereveld

**To:** Rebecca Woodman

**CC:** Michelle Law

Hi Rebecca,
I understand your time constraints, but I do not have the authority to circumvent the FOIA process.  I will follow up with our FOIA folks and see if there is a more expedited time frame.
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 10/11/2019 8:45 AM >>>
>
Hi Katherine: Attached is a reply to our limited FOIA request for the A range death watch video surveillance, granting our request for expedited response. Nevertheless, the response indicates it may take as much as six months to process the request. As you know, this time frame is untenable in light of Mr. Purkey's execution date. You have already agreed to preserve the requested video, and it is vitally important that we obtain at least these limited video surveillance tapes now. Please advise on the time frame in which those videos can be made available to us in the next few weeks. We greatly appreciate your timely assistance in this matter.

Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Rebecca Woodman <rewlaw@outlook.com>
**Date:** Wednesday, October 9, 2019 at 9:46 AM
**To:** Katherine Siereveld <ksiereveld@bop.gov>
**Cc:** Michelle Law <Michelle_Law@fd.org>
**Subject:** Purkey FOIA requests

Dear Katherine: I am attaching two FOIA requests that I sent via email and USPS today to the Federal Bureau of Prisons. One is a limited request for the surveillance videos of the death watch range that my co-counsel, Michelle Law, specifically requested be preserved in previous email correspondence with you. That specific request is reiterated in the attached FOIA letter. It is imperative that we obtain at least these video surveillance tapes as soon as possible, given Mr. Purkey's impending execution date of December 13, 2019, so anything you can do to ensure that we obtain these videotapes as soon as possible would be appreciated. The other FOIA request is a more detailed request for all records pertaining to BOP protocols for the death watch range, as well as all video surveillance of the range. Anything you can do to expedite this request would be most appreciated as well. Please let me know if you have any questions, and Michelle and I are available to discuss these requests further with you should you wish.

Thank you.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**Page 2 of 2**

Exhibit 13

**Subject:** Re: Request for documents/video

**Date:**  Wednesday, November 13, 2019 at 12:28:43 PM Central Standard Time

**From:**  Katherine Siereveld

**To:**  Rebecca Woodman

**CC:**  Michelle Law

Hi Rebecca,
I do not have the authority to circumvent the FOIA process, but please be assured that everyone involved is cognizant that time is of the essence.  I will forward your concerns along to the folks directly involved in the FOIA process.
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 11/11/2019 12:28 PM >>>
>
Dear Katherine: We have previously submitted three FOIA requests for documents and video that contain information vital to our urgent warrant litigation for Mr. Purkey. The requests are for the video surveillance tapes of A range since the "death watch" protocol began on July 25, 2019, and written documents pertaining to the same, a more limited request for video surveillance tapes on specified dates (which you had previously indicated to us would be easier to assemble in a short amount of time), and a request for Mr. Purkey's current BOP records. I am also attaching the FOIA reply granting our request to expedite, but stating it may take six months for us to receive the documents. As you know, we do not have this kind of time, since Mr. Purkey's execution date is scheduled for December 13, 2019. It is imperative that we receive at least the limited video surveillance tapes we requested, as well as Mr. Purkey's BOP records in order to prepare impending warrant litigation for Mr. Purkey. I am respectfully requesting that you forward the requested documents to us in the next 10 days so that we have the necessary documentation for our litigation on behalf of Mr. Purkey. We greatly appreciate your timely assistance in this matter. Please let me know if you have any questions in the meantime. Thank you.

Best,
Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 14

Case 1:19-cv-03570-TSC    Document 23-6 (Ex Parte)    Filed 06/22/20    Page 60 of 230
Case 2:19-cv-00414-JPH-DLP    Document 56-1    Filed 10/28/19    Page 1 of 1
PageID #: 9450

ATTACHMENT 1



September 26, 2019

Re:  Wesley Purkey
DOB:  1/6/52
Dx:  R41.844 - Frontal lobe and executive
      function deficit

To Whom It May Concern:

I would like to order a head MRI w/ and w/o contrast, PET scan (brain), and a DTI scan (brain) for Mr. Purkey. The indication is that he has a history of cognitive deficits and need to rule out an intracranial process. For his head MRI, this study should be done with a field strength of at least 1.5 tesla. Scanning should include a T1−weighted 3−dimensional 1x1x1mm (no skips) acquisition sequence (such as MPRAGE or a 3D spoiled−gradient procedure) to allow segmentation of gray matter (GM) and white matter (WM) for volumetric analysis. If feasible, scanning should also include a dual−echo sequence (proton density and T2−weighted) with slice thickness of no more than 5mm and in−plane resolution of no worse than 1x1mm, no skip, and covering at least the entire supratentorial volume. This could be needed for robust segmentation of brain parenchyma from cerebrospinal fluid (CSF). If possible, the raw data needs to be saved in a standard (e.g., DICOM) format and downloadable for post-processing by specialized software. I would like to order a diffusion tensor imaging (DTI) study to evaluate for fiber tract abnormalities. It should be done with a minimum of 25 directions; 64 directions is preferred. Please see the attached scanning protocol for further details and information. Please send the images to Rebecca Woodman <rewlaw@outlook.com> when ready.

Sincerely,

Bhushan S. Agharkar, M.D., D.F.A.P.A.
Distinguished Fellow, American Psychiatric
Association
Diplomate, American Board of Psychiatry
and Neurology, with Added Qualifications in
Forensic Psychiatry
NPI:  1619180304

**4062 Peachtree Road NE, Suite A-203  |  Atlanta, GA 30319**
**Tel: 404.939.6636  |  Tel/Fax: 866.824.5215**

# Exhibit 15

Case 1:19-cv-03570-TSC   Document 23-6   Filed 06/23/20   Page 62 of 230
Case 2:19-cv-00414-JPH-DLP   Document 56-2 (Ex Parte)   ATTACHMENT 2   Page 1 of 1
PageID #: 9451



**Ruben C. Gur, PhD**
Professor, Departments of Psychiatry, Radiology & Neurology
Director, Brain Behavior Laboratory and the Center for Neuroimaging in Psychiatry

**MRI.**  A magnetic resonance imaging (MRI) study should be done with a field strength of at least 1.5 tesla. Scanning should include a T1-weighted 3-dimensional **1x1x1mm** (no skips) acquisition sequence (such as MPRAGE or a 3D spoiled-gradient procedure) to allow segmentation of gray matter (GM) and white matter (WM) for volumetric analysis. If feasible, scanning should also include a dual-echo sequence (proton density and T2-weighted) with slice thickness of no more than 5mm and in-plane resolution of no worse than 1x1mm, no skip, and covering at least the entire supratenorial volume. This could be needed for robust segmentation of brain parenchyma from cerebrospinal fluid (CSF). The raw data needs to be saved in a standard (e.g., DICOM) format and downloadable for postprocessing by specialized software. If a diffusion tensor imaging (DTI) study is performed, it should be done with a minimum of 25 directions; 64 directions is preferred. Of course, the scans can be supplemented by any other clinically indicated scans as deemed necessary by the referring neuropsychiatrist or neurologist or by the performing neuroradiologist. Furthermore, the scans should receive clinical readings, although these are not necessarily expected to detect diffuse volume reduction of the kind we can document with quantitative volumetric analysis.

**PET.**  A resting baseline positron emission tomography (PET) study using ligands such as 18F-fluoro-d-2-deoxyglucose (FDG) for measuring local cerebral metabolic rates for glucose (CMRgl). Ideally, the PET studies should be quantitative, with good estimation of the input function using arterial (or "arterialized") blood samples. This is necessary to have quantitative assessment of CMRgl in physiological units (milliliter per 100 grams of tissue per minute). Such quantitative data will allow for a better estimate of the nature of the pathology and possibly determine its origin. Perhaps more importantly from the clinical perspective, such data will allow for a better prognosis of whether an ongoing pathological process may be kindling. However, it is acknowledged that not all PET centers are capable of this procedure, and that non-quantitative measures (such as region-to-whole brain ratios of raw counts) are likely sufficient to document abnormalities. As with the structural studies, the scans should be supplemented by any other clinically indicated scans as deemed necessary by the referring neuropsychiatrist or neurologist or by the performing nuclear medicine physician. Furthermore, the scans should receive clinical readings, although again these are not necessarily expected to detect diffuse abnormalities of the kind we are proposing to document with quantitative analysis. Also, as with MRI, the raw data should be saved in a standard (e.g. DICOM) format and downloadable for post-processing.

*Updated 16-May-2012*

10th Floor Gates Pavilion  |3400 Spruce Street |  Philadelphia, PA 19104 |  215.615.3604| Fax: 215.662.7903  |  gur@upenn.edu

Exhibit 16

| | |
|---|---|
| **From:** | Michelle Law |
| **To:** | "Katherine Siereveld" |
| **Cc:** | rewlaw_outlook.com |
| **Subject:** | Medical Questions regarding Wesley Purkey |
| **Date:** | Thursday, September 26, 2019 10:02:00 AM |
| **Attachments:** | image001.png |

Katherine:

Mr. Purkey requires neurology imaging of his brain in order to determine his current neurological functioning in light of a progressive dementia diagnosis and recommendations therefrom. This testing must be performed in a hospital setting. Mr. Purkey must be transported to a hospital facility for testing, and we are looking at hospitals near Terre Haute as a testing location. Given the pending execution date, we hope to have arrangements made soon. Will a doctor's order for the procedure, along with an appointment date be sufficient for Mr. Purkey's transport? How much lead time will the prison need in order to make arrangements for Mr. Purkey's transport to a hospital facility?

Thanks-

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail. Thank you for your cooperation.

# Exhibit 17

**Michelle Law**

| | |
|---|---|
| **From:** | Michelle Law |
| **Sent:** | Monday, October 21, 2019 7:59 AM |
| **To:** | 'Katherine Siereveld' |
| **Cc:** | rewlaw_outlook.com |
| **Subject:** | RE: Medical Imaging Tests for Wesley Purkey |

Thanks, Katherine – I'll start the process of procuring funding.  I am certain that we will want a true DTI image so let me know what the outside vendors report about costs.



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Sent:** Wednesday, October 16, 2019 9:59 AM
**To:** Michelle Law <Michelle_Law@fd.org>
**Cc:** rewlaw_outlook.com <rewlaw@outlook.com>
**Subject:** RE: Medical Imaging Tests for Wesley Purkey

**Please see below for the estimates I have received so far for the outside testing.**

PET Scan of the brain – CPTs 78608 and 70450 is about $2500
MRI of the brain with and without contrast – CPT 70553 is about $800.

MRI DT can most likely be done with the regular MRI but it may have to go out of network depending on availability of the testing/reading. Two other hospitals both say they can do it. I am checking to see if the onsite vendor can do it as well.  I would add another $250 to the regular MRI to cover that cost just to be on the safe side.

1

**The response from the onsite vendor is in red below.  Please let me know how you want us to proceed...**

The answer is yes and no.
We can provide Diffusion-weighted Imaging which is a part of diffusion tensor imaging .

From what I was told is that DTI is used a lot in Brain accident injury application. DWI provides the raw data for the DTI.

Bottom line we can do DWI. Let me suggest this. Let's do a DWI and submit it to the Radiologist and see if he can interpret a DTI from the data.

>>> Michelle Law <Michelle_Law@fd.org> 10/9/2019 11:26 AM >>>
Katherine:
I've attached our doctor's order for the imaging – this is all the information I have regarding the details of the tests.  It is my understanding that all imaging is of the head and no other part of the body.
Once you learn more about who will be performing the tests, would you please forward that information to me along with more information regarding the machines that will be used to perform the tests (manufacturer, model number, etc.).  If you will not be able to obtain this information, would you forward the name of a contact person so we can obtain all relevant information regarding the performance of the tests and the qualifications of those administering the tests?  Also, we will need to know how to go about paying for the tests – like a vendor number, etc.
Thanks-
Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Sent:** Tuesday, October 8, 2019 1:28 PM

**To:** Michelle Law <Michelle_Law@fd.org>
**Subject:** RE: Medical Imaging Tests for Wesley Purkey

Hi Michelle,
They need a little more information...

The providers for the DT MRI need more specific orders to have a good understanding of what they are looking for. They gave the example of stroke vs. MS.

Also, do you want the MRI with or without contrast?

One more, is the PET scan of the whole body? What are the parameters for that?

Thanks!
Katherine


>>> Michelle Law <Michelle_Law@fd.org> 10/4/2019 2:26 PM >>>
It stands for diffusion tensor imaging and it is a study to evaluate brain fiber tract abnormalities.



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail. Thank you for your cooperation.

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Sent:** Friday, October 4, 2019 1:20 PM
**To:** Michelle Law <Michelle_Law@fd.org>
**Cc:** rewlaw_outlook.com <rewlaw@outlook.com>
**Subject:** Re: Medical Imaging Tests for Wesley Purkey

Really quick dumb question…what is DTI??  I have not been asked for that one before.

>>> Michelle Law <Michelle_Law@fd.org> 10/4/2019 2:18 PM >>>
Katherine:

We have a medical order for the following imaging tests for Mr. Purkey:  1)  An MRI of Mr. Purkey's head; 2) a PET scan of his brain; and 3) a DTI scan of his brain.  Pursuant to our earlier conversation, if you will let me know the medical costs associated with these examinations, and some detail regarding how they will be carried out, we will then move forward with plans to get a court order and to arrange for payment of medical expenses.  I am happy to assist in any way that I can – if you need more info from me, please let me know.

Thanks-

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

# Exhibit 18

Case 1:19-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 71 of 230
Case 2:19-cv-00414-JPH-DLP   Document 56 (Ex Parte)   Filed 10/25/19   Page 1 of 4
PageID #: 9446

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| **WESLEY IRA PURKEY**, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | |
| | ) | Case No.: 2:19-cv-414 |
| **WARDEN OF USP TERRE HAUTE**, | ) | |
| **UNITED STATES OF AMERICA** | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| | ) | FOR DECEMBER 13, 2019 |
| Respondents. | ) | |

---

## SEALED *EX PARTE* MOTION FOR BRAIN IMAGING

---

Petitioner Wesley Ira Purkey, through counsel undersigned, respectfully requests an Order from this Court for Mr. Purkey to undergo certain brain imaging tests, which have been determined by his defense experts to be medically necessary for a determination of Mr. Purkey's present brain functioning, specifically frontal lobe and executive functioning deficits. In support, counsel states as follows:

1. The results of the recommended brain image testing, which is an integral part of the evaluation of Mr. Purkey's mental state and deterioration observed by counsel, will also bear on the question of whether Mr. Purkey is competent to be executed, an issue that is ripe in his case for the reasons set forth in the *ex parte*

1

Case 2:19-cv-00414-JPH-DLP   Document 56 (Ex Parte)   Filed 10/25/19   Page 2 of 4
Case 1:19-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 72 of 230
PageID #: 9447

response to the Court's order. *See* Sealed *Ex Parte* Status Report filed October 25, 2019.

2. The medical order for brain imaging testing setting forth the need for such testing and the parameters of such testing by Mr. Purkey's medical expert are submitted herewith as Attachments 1 and 2.

3. Recognizing the various institutional issues associated with carrying out brain imaging testing, such as security and transportation issues, Counsel contacted Katherine Siereveld, Attorney Advisor, USP-Terre Haute regarding the logistics of carrying out the medical imaging. Ms. Siereveld advised counsel that the brain imaging testing can be carried out if: 1) the Court enters an order for the testing; 2) the testing is completed by a BOP medical vendor; and 3) Counsel assumes responsibility to pay the medical costs associated with each imaging test. Ms. Siereveld indicated that as long as these requirements are met, the BOP will provide transportation and security. Counsel provided Ms. Siereveld with a copy of Attachments 1 and 2, and she in turn indicated that she would collect more information in light of the Petitioner's expert's order for medical imaging testing. Ms. Siereveld has since informed Counsel that the MRI testing, and possibly the DTI testing, can be accomplished when a mobile MRI truck is scheduled to be at the prison. Ms. Siereveld also provided Counsel with the medical costs associated with the MRI and PET scan. Ms. Siereveld indicated off-site testing may be

2

Case 1:19-cv-03570-TSC Document 23-6 Filed 06/22/20 Page 73 of 230
Case 2:19-cv-00414-JPH-DLP Document 56 (Ex Parte) Filed 10/25/19 Page 3 of 4
PageID #: 9448

required for the DTI and PET scan, but that two local hospitals can do the testing.

Counsel would therefore request that the Court's order include appropriate

transportation orders and directives to BOP to ensure Mr. Purkey's transportation

to any off-site facility for any part of testing should it be necessary.

4. Counsel informs the Court that the cost of the testing will be borne by

counsel Michelle Law's office, the Federal Public Defender for the Western

District of Missouri.

WHEREFORE, for the foregoing reasons, Petitioner requests that the Court

enter an order directing that the testing occur and ensuring any necessary

transportation for Mr. Purkey to effectuate such testing.

Respectfully submitted,

/s/Rebecca E. Woodman
Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

/s/Michelle M. Law
Michelle M. Law
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile:  (417) 873-9038
Email: michelle_law@fd.org

Case 1:19-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 74 of 230
Case 2:19-cv-00414-JPH-DLP   Document 56 (Ex Parte)   Filed 10/25/19   Page 4 of 4
PageID #: 9449

*Counsel for Petitioner*

Dated: October 25, 2019

# Exhibit 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00414-JPH-DLP |
| | ) | |
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Respondents. | ) | |

## ORDER

On September 6, 2019, the Court received a two-page document prepared by Petitioner

Wesley Purkey styled, "Motion to Withdraw Petition for Habeas Corpus." The Court does not

accept this document for filing because Mr. Purkey is represented by counsel. *See United States*

*v. Patterson*, 576 F.3d 431, 436–37 (7th Cir. 2009) (stating in the criminal context that there is no

right to "hybrid" representation and that such arrangements are disfavored).

The document was inadvertently docketed at docket 21 and has since been restricted. The

parties should disregard the document. The document will be forwarded to Mr. Purkey's counsel

who, consistent with counsel's professional obligations, shall review the document and decide

what action, if any, should be taken regarding the issues raised therein.

The clerk is **directed** to send a copy of docket 21 by United States Mail to Mr. Purkey's

counsel.

**SO ORDERED.**

Date: 9/11/2019

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Brian Patrick Casey
U.S. ATTORNEY'S OFFICE
brian.casey@usdoj.gov

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Kathleen D. Mahoney
UNITED STATES ATTORNEY'S OFFICE
kate.mahoney@usdoj.gov

Brian L. Reitz
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brian.reitz@usdoj.gov

Jeffrey E. Valenti
UNITED STATES ATTORNEY'S OFFICE
jeff.valenti@usdoj.gov

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
901 Saint Louis Street, Suite 801
Springfield, MO 65806

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
1263 W. 72nd Ter.
Kansas City, MO 64114

# Exhibit 20

Case 1:19-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 79 of 230

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

WESLEY IRA PURKEY,                        )
                                          )
                Petitioner,               )
                                          )
        v.                                )       No. 2:19-cv-00414-JPH-DLP
                                          )
UNITED STATES OF AMERICA, et al.          )
                                          )
                Respondents.              )

### ORDER

On September 13, 2019, the Court received a one-page document prepared by Petitioner

Wesley Purkey styled, "Motion to Rescind Petitioner's Pro Se Motion to Withdraw Petition(s)."

The Court does not accept this document for filing because Mr. Purkey is represented by counsel.

*See United States v. Patterson*, 576 F.3d 431, 436–37 (7th Cir. 2009) (stating in the criminal

context that there is no right to "hybrid" representation and that such arrangements are disfavored).

The document will be forwarded to Mr. Purkey's counsel who, consistent with counsel's

professional obligations, shall review the document and decide what action, if any, should be taken

regarding the issues raised therein.  The clerk is **directed** to send a copy of the above referenced

document by United States Mail to Mr. Purkey's counsel.

**SO ORDERED.**

Date: 9/16/2019

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Brian Patrick Casey
U.S. ATTORNEY'S OFFICE
brian.casey@usdoj.gov

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Kathleen D. Mahoney
UNITED STATES ATTORNEY'S OFFICE
kate.mahoney@usdoj.gov

Brian L. Reitz
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brian.reitz@usdoj.gov

Jeffrey E. Valenti
UNITED STATES ATTORNEY'S OFFICE
jeff.valenti@usdoj.gov

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
1263 W. 72nd Ter.
Kansas City, MO 64114

# Exhibit 21

|              |                                                             |
|--------------|-------------------------------------------------------------|
| **Subject:** | Fwd: 2-19-cv-414 Purkey's mandadum short record             |
| **Date:**    | Thursday, October 17, 2019 at 5:06:11 PM Central Daylight Time |
| **From:**    | Laura Briggs                                                 |
| **To:**      | rewlaw_outlook.com                                           |
| **Attachments:** | purkey short record for mandamus action.pdf             |

The document itself is attached to this message, for reference.

(Or maybe you already have it).

I'll get to sorting this all out tonight, but likely won't have an update until tomorrow.

Laura A. Briggs, Clerk of Court
U.S. District Court, Southern District of Indiana
(317) 229-3705

---

**From:** Rebekah Farrington <Rebekah_Farrington@insd.uscourts.gov>
**Sent:** Thursday, October 17, 2019 5:22:32 PM
**To:** Laura Briggs <Laura_Briggs@insd.uscourts.gov>; Roger Sharpe <Roger_Sharpe@insd.uscourts.gov>
**Subject:** 2-19-cv-414 Purkey's mandadum short record


Rebekah Farrington
Divisional Operations Manager/
CRD to Magistrate Judge McKee
U.S. District Courthouse
921 Ohio Street
Terre Haute, Indiana 47807
(812) 231 1841

# Exhibit 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

WESLEY IRA PURKEY,                     )
                                       )
                 Petitioner,           )
                                       )
         v.                            )          No. 2:19-cv-00414-JPH-DLP
                                       )
UNITED STATES OF AMERICA, et al.       )
                                       )
                 Respondents.          )

**Order Directing Response to Petitioner's Pro Se Filing and Writ of Mandamus**

On September 6, 2019, the Court received a two-page document prepared by Petitioner Wesley Purkey styled, "Motion to Withdraw Petition for Habeas Corpus." Mr. Purkey indicated, among other things, that he did not consent to actions taken by his counsel. In response, the Court issued an Order stating that the document would not be accepted for filing because Mr. Purkey is represented by counsel. *See* Dkt. 22. The Court forwarded the document to Mr. Purkey's counsel and ordered counsel, "consistent with counsel's professional obligations, [to] review the document and decide what action, if any, should be taken regarding the issues raised therein." *Id.* Mr. Purkey's counsel did not file anything with the Court in response to Mr. Purkey's allegations or the Court's order.

On October 17, 2019, the Court received notification that Mr. Purkey filed a writ of mandamus with the United States Court of Appeals for the Seventh Circuit. *See* Dkt. 53. In this filing, Mr. Purkey reiterates the allegations previously made against his counsel and his desire to represent himself. *See Purkey v. Hanlon*, No. 19-3047 (7th Cir. Oct. 17, 2019), Dkt. 1.

Mr. Purkey's counsel shall file a status report by **October 25, 2019** responding to the allegations in Mr. Purkey's "Motion to Withdraw Petition for Habeas Corpus" and his writ of

mandamus filed with the Seventh Circuit. The status report may be filed ex parte if deemed

necessary by counsel to preserve client confidences and attorney-client privileged

communications.

**SO ORDERED.**

 Date: 10/21/2019

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Brian Patrick Casey
U.S. ATTORNEY'S OFFICE
brian.casey@usdoj.gov

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Kathleen D. Mahoney
UNITED STATES ATTORNEY'S OFFICE
kate.mahoney@usdoj.gov

Brian L. Reitz
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brian.reitz@usdoj.gov

Jeffrey E. Valenti
UNITED STATES ATTORNEY'S OFFICE
jeff.valenti@usdoj.gov

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

Exhibit 23

## Opinion of Dr. Craig Haney as to the Filing from Wesley Purkey

## Introduction

1.      I was contacted by counsel for Wesley Purkey, who is incarcerated at U.S.P. Terre Haute under warrant of execution. Mr. Purkey, who suffers from pre-existing complex post-traumatic stress disorder, major depression and progressive dementia, has been on "execution watch" at Terre Haute since July 25, 2019. This means that he is in a special isolation cell, apart from other prisoners. Upon implementation of the execution watch, Mr. Purkey was moved to a so-called "shotgun cell" that is a cell much smaller than the cell he occupied prior to the execution watch, and which has two doors that separate him from the range hallway.  It is my understanding that as a part of the execution watch, prisoners are monitored through "cell checks" that occur around-the-clock, every 15 minutes. They are conducted even at night, when correctional officers use flashlights that they shine into prisoners' cells every 15 minutes.  Mr. Purkey has reported to his attorneys that these cell checks awaken him, or keep him awake throughout the night. It is also my understanding that Mr. Purkey's attorneys requested permission to provide Mr. Purkey a sleep mask to shield his eyes from the bright flashlights that awaken him every 15 minutes during the night but that prison authorities have denied the request.  Mr. Purkey has recently reported to his attorneys that during one cell check, a particular guard shone a flashlight on Mr. Purkey for an extended period of time while he was at the toilet urinating. I understand from counsel that they have requested video surveillance of these checks from the prison, but have not yet received the videos.

2.      In addition, Mr. Purkey has limited access to family and loved ones. I understand that his daughter and only child, Angie Genail, must travel from Leavenworth, Kansas, to Terre Haute, Indiana, a round-trip distance of 442 miles,

in order to visit her father. She does not have the financial means to make frequent trips. However, during her last visit on October 20, 2019, she was arbitrarily denied permission to visit her father based on the pair of jeans she was wearing, even though she had been allowed to visit her father wearing the same jeans the previous two days. Her two minor children were sent up alone to visit their grandfather, and Ms. Genail, Mr. Purkey's daughter, was forced to leave the premises instead of being allowed to wait for them in the reception area near the front desk.

3.       Recently, in a filing docketed on October 17, 2019, Mr. Purkey has asked the Seventh Circuit Court of Appeals to waive an appeal that his attorneys filed on his behalf. I have also been made aware that Mr. Purkey attempted to file, and then withdrew, a motion to waive his appeal in the district court prior to filing his motion in the Seventh Circuit.  I was asked by his counsel to offer an opinion on whether his current conditions of confinement could have an impact on his mental health and whether they could be a factor in the October 17 filing. As discussed further below, the increased severity of Mr. Purkey's changed conditions of confinement, especially the increased level of isolation to which he now exposed and the sleep deprivation that he is now experiencing, are likely to have significantly impacted his mental health and affected state of mind and decision-making. They likely were a significant factor that contributes to and accounts for the letter he wrote effectively asking to be allowed to commit suicide.

**Expert Qualifications**

4.       I am Distinguished Professor of Psychology, and UC Presidential Chair, 2015-2018, at the University of California at Santa Cruz. I have been teaching graduate and undergraduate courses in social psychology, research methodology, psychology and law, forensic psychology, and institutional analysis

at the University of California for nearly 40 years. I previously served as the Chair of the Department of Psychology, Chair of the Department of Sociology, Director of the Program in Legal Studies, and  Head of the Graduate Program in Social Psychology. I received a Ph.D. in psychology from Stanford University and a J.D. degree from the Stanford Law School. I have been the recipient of a number of scholarship, fellowship, and other academic awards and have published approximately one hundred scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on conditions of confinement and the psychological effects of incarceration. My book on the psychological consequences of imprisonment, Reforming Punishment: Psychological Limits to the Pains of Imprisonment,[1] was published by the American Psychological Association in 2006. (My curriculum vitae is attached to this Report as "Appendix A.")

5.     For more than 40 years, I have been studying the psychological effects of living and working in institutional environments. In the course of that work, I have conducted what is perhaps the only laboratory experiment ever done on the acute psychological effects of prison-like environments.[2] This research, which has come to be known as the "Stanford Prison Experiment," is regarded as a classic

---

[1] Craig Haney, Reforming Punishment: Psychological Limits to the Pains of Imprisonment. Washington, DC: APA Books (2006).

[2] This study was originally published as Haney, C., Banks, C., and Zimbardo, P., Interpersonal Dynamics in a Simulated Prison, 1 *International Journal of Criminology and Penology* 69 (1973), and has been reprinted in numerous books in psychology and law and translated into several languages. For example: Steffensmeier, D., and Terry R. (Eds.) *Examining Deviance Experimentally*. New York: Alfred Publishing, 1975; Golden, P. (Ed.) *The Research Experience*. Itasca, Ill.: Peacock, 1976; Leger, R. (Ed.) *The Sociology of Corrections*. New York: John Wiley, 1977; *A kiserleti tarsadalom-lelektan foarma*. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, N., and Savitz, L. *Justice and Corrections*. New York: John Wiley, 1978; *Research Methods in Education and Social Sciences*. The Open University, 1979; Goldstein, J. (Ed.), *Modern Sociology*. British Columbia: Open Learning Institute, 1980; Ross, R. (Ed.) *Prison Guard/Correctional Officer: The Use and Abuse of Human Resources of Prison*. Toronto: Butterworth's 1981; Monahan, J., and Walker, L. (Eds.), *Social Science in Law: Cases, Materials, and Problems*. Foundation Press, 1985; Siuta, Jerzy (Ed.), *The Context of Human Behavior*. Jagiellonian University Press, 2001; and Ferguson, Susan (Ed.), *Mapping the Social Landscape: Readings in Sociology*. St. Enumclaw, WA: Mayfield Publishing, 2001; Pethes, Nicolas (Ed.), *Menschenversuche (Experiments with Humans)*. Frankfurt, Germany: Suhrkamp Verlag, 2006.

social psychological study of the effects of institutional environments.[3] In the nearly 50 years since that study was completed, I have continued to study and publish scholarly articles on the psychology of imprisonment. My research on this topic has included conducting numerous interviews with correctional officials, officers, and prisoners to assess the nature and consequences of living and working in correctional settings. In addition, I have statistically analyzed aggregate correctional data to examine the effects of overcrowding, punitive segregation, and other conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.

6. In addition, I have toured and inspected and analyzed conditions of confinement at numerous state prisons (including in Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Idaho, Louisiana, Massachusetts, Montana, New Jersey, New Mexico, New York, Nebraska, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah, Washington, and Wyoming), maximum security federal prisons (at McNeil Island, Washington; Marion, Illinois; Lewisburg, Pennsylvania; and the United States Penitentiary and Administrative Maximum or "ADX" facility in Florence, Colorado), as well as prisons in Canada, Cuba, England, Hungary, Ireland, Norway, the Netherlands, and Russia. In 1989, I received a UC-Mexus grant to conduct a comparative study of prisons and prison policy in the United States and Mexico. As a result of that research grant, I toured a number of Mexican prisons, interviewed correctional officials and, in conjunction with United States Department of State officials, interviewed many United States citizens who were incarcerated in Mexico.

---

[3] The American Psychological Association sponsored a "retrospective" commemorating the 25th anniversary of this study at its Annual Convention a decade ago, and a 40th anniversary commemorative event two years ago at the Annual Convention in Washington, DC. *See also* Haney, C., and Zimbardo, P., The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment, 53 *American Psychologist* 709- 727 (1998); and Haney, C., and Zimbardo, P., The Stanford Prison Experiment, in Brian Cutler (Ed.), *The Encyclopedia of Psychology and the Law* (pp. 756-757). Volume II. Thousand Oaks, CA: Sage Publications (2008).

Case 1:10-cv-03570-TSC   Document 23-6   Filed 06/23/20   Page 91 of 230
Case 2:19-cv-00414-JPH-DLP   Document 55-1 (Ex Parte)   Filed 10/29/19   Page 3 of 18
PageID #: 9392

7.      I have lectured and given invited addresses throughout the country on the psychological effects of living and working in institutional settings (especially maximum security prisons) at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association. I have also served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, the California Judicial Council, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the NAACP Legal Defense Fund, and the United States Department of Justice.

8.      In addition to the research I have conducted into the psychological effects of confinement and patterns of adjustment in institutional settings, I also have extensive experience evaluating the life histories and psychological reactions of individual clients in the criminal justice system. Beginning as a Law and Psychology Fellow at the Stanford Law School in the mid-1970s, I participated for several years in an intensive clinically-oriented course co-taught by law professor Anthony Amsterdam and psychiatrist Donald Lunde that sensitized me to the special problems and vulnerabilities of psychiatrically impaired criminal defendants and prisoners with special needs. Since that time, I have been extensively involved in teaching and conducting research on a variety of forensic issues that have placed me in continuing contact with diverse prisoner populations, many of whose members suffer from adverse effects of institutionalization, as well as preexisting psychiatric disorders and developmental disabilities.[4]

9.      I have often focused in this work on the effects of conditions of confinement on so-called "special needs" prisoners (primarily the mentally ill and

---

[4] For example, *see* Haney, C., and Specter, D., Legal Considerations in the Treatment of "Special Needs" Offenders, in Ashford, J., Sales, B., and Reid, W., (Eds.), *Treating Adult and Juvenile Offenders with Special Needs* (pp. 51-79). Washington, D.C.: American Psychological Association (2000).

developmentally disabled). For example, under the auspices of the United States Department of Justice, I evaluated conditions of confinement and the quality of care provided at Atascadero State Hospital, a forensic facility designed to house mentally-ill and developmentally-disabled offenders for the State of California. As noted above, I testified as an expert witness concerning conditions of confinement and their effects on prisoners at the California Men's Colony, which was a treatment-oriented facility in which many mentally-ill prisoners were housed at the time I evaluated it. In addition, I evaluated the effects of conditions of confinement on prisoners at the California Medical Facility at Vacaville (including prisoners housed in the Department of Mental Health units),[5] and also testified about the prevalence of seriously mentally-ill prisoners in the California Department of Corrections, as well as the special psychological problems that living in isolated housing units created for them.[6]

10.    I have also evaluated the psychological effects of conditions of confinement at juvenile justice facilities, on the condemned or "death row" units in several states (including Arkansas, California, New Mexico, and Texas), and in various special treatment facilities for sex offenders (in Florida and Washington).

**Extreme Penal Isolation and Its Effects on Mental Health**

11.    It is my expert opinion that being housed in solitary or isolated confinement—especially over a long period of time—can and often does produce a number of negative psychological effects. It places prisoners at grave risk of psychological harm. I believe that these effects are now well understood and described in the scientific literature. There are numerous empirical studies that report "robust" findings—that is, the findings have been obtained in studies that were conducted by researchers and clinicians from diverse backgrounds and

---

[5] *Gates v. Deukmejian*, Civ-S-87-1636 LKK-JFM (E.D. Cal. 1990).
[6] *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995).

perspectives, were completed and published over a period of many decades, and are empirically very consistent. With remarkably few exceptions, virtually every one of these studies has documented the pain and suffering that isolated prisoners endure and the risk of psychological harm to which they are exposed.

12. In addition, the empirical conclusions are theoretically sound. That is, there are straightforward scientific explanations for the fact that long-term isolation—the absence of meaningful social contact and interaction with others—and the other severe deprivations that typically occur under conditions of isolated or solitary confinement have harmful psychological consequences. Social exclusion and isolation from others is known to produce adverse psychological effects in contexts other than prison; it makes perfect theoretical sense that this experience produces similar negative outcomes in correctional settings, where the isolation is so rigidly enforced, the social opprobrium that attaches to isolated prisoners can be extreme, and the other associated deprivations are so severe.

13. It should be noted that "long-term" or "prolonged" exposure to prison isolation is generally used in the literature to refer to durations of solitary confinement that are much briefer than the amounts of time that Mr. Purkey has been subjected to it. For example, the American Psychiatric Association (APA) defined "prolonged segregation" as segregation lasting for *four weeks* or longer (which the APA also said "should be avoided" for the seriously mentally ill).[7] Thus, Mr. Purkey has been subjected to durations of isolated confinement that far exceed—by substantial orders of magnitude—the amounts typically reported in the literature, studied by researchers, and considered psychiatrically problematic.

---

[7] American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012), *available at* http://www.psych.org/File%20Library/Learn/Archives/ps2012 PrisonerSegregation.pdf

14.    "Solitary confinement' and isolated confinement" are terms of art in correctional practice and scholarship.  For perhaps obvious reasons, total and absolute solitary confinement—literally *complete* isolation from any form of human contact—does not exist in prison and never has. Instead, the term is generally used to refer to conditions of extreme (but not total) isolation from others. I have defined it elsewhere, in a way that is entirely consistent with its use in the broader correctional literature, as:

15.    [S]egregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.[8]

16.    Mental health and correctional staff who have worked in disciplinary segregation and isolation units have reported observing a range of problematic symptoms manifested by the prisoners confined in these places.[9] The authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."[10]

---

[8] Haney, *The Social Psycohology of Isolation, supra* note 8, at footnote 1.

[9] For detailed reviews of all of these psychological issues, and references to the many empirical  studies that support these statements, see, for example: Haney, *Mental Health Issues in Long- Term Solitary and "Supermax" Confinement,* and Haney & Lynch, *Regulating Prisons of the Future, supra* note 8; and Smith, *The Effects of Solitary Confinement on Prison Inmates, supra*  note 18.

[10] Bruno M. Cormier & Paul J. Williams, *Excessive Deprivation of Liberty,* Canadian Psychiatric Association Journal, 11, 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Paul Gendreau, N. Freedman, G. Wilde, & George Scott, *Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement,* Journal of Abnormal Psychology, 79, 54-59 (1972); George Scott & Paul Gendreau, *Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison,* Canadian Psychiatric Association Journal, 12, 337- 341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, *Effect of Solitary  Confinement on Prisoners,* American Journal of Psychiatry, 119, 771-773 (1963).

17. A decade later, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important observations about the effects of isolation.[11] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, a build-up of physiological and psychic tension that led to incidents of self-mutilation.[12] 24 Professor Toch noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[13]

18. More recent studies have identified other symptoms that appear to be produced by these conditions. Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, rage, paranoia, hopelessness, a sense of impending emotional breakdown, self- mutilation, and suicidal ideation and behavior.[14]

---

[11] Hans Toch, *Men in Crisis: Human Breakdowns in Prisons*. Aldine Publishing Co.: Chicago (1975).

[12] *Id*. at 54.

[13] *Ibid*.

[14] In addition to the numerous studies cited in the articles referenced *supra* at notes 11 and 15, there is a significant international literature on the adverse effects of solitary confinement. For example, see: Henri N. Barte, *L'Isolement Carceral*, Perspectives Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social

19. In addition, a number of correlational studies have been done examining the relationship between housing type and various kinds of incident reports in prison. They show that self-mutilation and suicide are more prevalent in isolated, punitive housing units such as administrative segregation and security housing or SHU, where prisoners are subjected to solitary-like conditions of confinement. For example, clinical researchers Ray Patterson and Kerry Hughes attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" that are generated by the "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there.[15] These

---

rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, *Einzelhaft: Eine Literaturubersicht* (Solitary confinement: A literature survey), Psychologie -Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, *Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft* (A controlled investigation on psychopathological effects of solitary confinement), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., *Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung* (Solitary confinement as a risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that prisoners who were hospitalized in a psychiatric clinic included a disproportionate number who had been kept in solitary confinement); Boguslaw Waligora, *Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej* (How men function in conditions of penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization"). See, also, Ida Koch, *Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems*, Working Papers in European Criminology, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125). See, also: Michael Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, *Long-Term Mental Sequelae of Political Imprisonment in East Germany*, Journal of Nervous & Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.

[15] Raymond Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004*, Psychiatric Services, 59, 676-682 (2008), at p. 678.

Case 1:19-cv-03570-TSC   Document 23-6 (Ex Parte)   Filed 06/22/20   Page 97 of 230
Case 2:19-cv-00414-JPH-DLP   Document 55-1   Filed 10/25/19   Page 11 of 18
PageID #: 9398

authors reported that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[16] Similarly, a team of researchers in New York recently reported that "[i]nmates punished by solitary confinement were approximately 6.9 times as likely to commit acts of self-harm after we controlled for the length of jail stay, SMI [whether the inmate was seriously mentally ill], age, and race/ethnicity."[17] In addition, signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence are also more prevalent in these units.[18]

20.   Not every isolated prisoner will suffer all of the previously described adverse psychological reactions to their severe conditions of confinement. But the overall nature and magnitude of the negative psychological reactions that I have documented in my own research and that have been reported by others in the literature underscore the stressfulness and painfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the risk of harm that it creates. The potentially devastating effects of these conditions are

---

[16] Ibid. See also: Lindsay M. Hayes, *National Study of Jail Suicides: Seven Years Later*. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, *Vulnerability and Prison Suicide*, British Journal of Criminology, 36, 173-187 (1995); and Alison Liebling, *Prison Suicide and Prisoner Coping*, Crime and Justice, 26, 283-359 (1999).

[17] Fatos Kaba, et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, American Journal of Public Health, *104*, 442-447 (2014), at p. 445.

[18] For example, see: Howard Bidna, *Effects of Increased Security on Prison Violence*, Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, *Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital*, Behavioral Sciences and the Law, 6, 131-137 (1988); Elmer H. Johnson, *Felon Self-Mutilation: Correlate of Stress in Prison*, in Bruce L. Danto (Ed.) Jail House Blues. Michigan: Epic Publications (1973); Anne Jones, *Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators*, Criminal Justice and Behavior, 13, 286-296 (1986); Peter Kratcoski, *The Implications of Research Explaining Prison Violence and Disruption*, Federal Probation, 52, 27-32 (1988); Ernest Otto Moore, *A Prison Environment: Its Effect on Health Care Utilization*, Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, *Managing Violent Individuals in Correctional Settings*, Journal of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, *Using Situational Factors to Predict Types of Prison Violence*, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991).

Case 2:19-cv-00414-JPH-DLP   Document 55-1 (Ex Parte)   Filed 10/25/19   Page 12 of 18
Case 1:19-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 98 of 230
PageID #: 9399

reflected in the characteristically high numbers of suicide deaths, incidents of self-harm and self-mutilation that occur in many of these units.

21.     In recognition of the adverse mental health effects of segregated, solitary, or isolated confinement, the American Bar Association's *Standards for Criminal Justice on the Treatment of Prisoners* mandate that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable."[19] Moreover, the ABA requires that the mental health of *all* prisoners in segregated housing "should be monitored" through a process that should include daily correctional staff logs "documenting prisoners' behavior," the presence of a "qualified mental health professional" inside each segregated housing unit "[s]everal times a week," weekly observations and conversations between isolated prisoners and qualified mental health professionals, and "[a]t least every [90 days], a qualified mental health professional should perform a comprehensive mental health assessment of each prisoner in segregated housing" (unless such assessment is specifically deemed unnecessary in light of prior individualized observations).[20] In addition, at intervals "not to exceed [30 days], correctional authorities should meet and document an evaluation of each prisoner's progress" in an evaluation that explicitly "should also consider the nature of the prisoner's mental health," and at intervals "not to exceed [90 days], a full classification review" should be conducted that addresses the prisoner's "individualized plan" in segregation with "a presumption in favor of removing the prisoner from segregated housing."[21]

**Exacerbating Effects of Isolation on Mental Illness**

---

[19] American Bar Association, *ABA Criminal Justice Standards on the Treatment of Prisoners, Standard 23-2.6(a)* (2010), *available at* http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html [hereinafter "*ABA Standards*"].

[20] *ABA Standards*, 23-2.8(b).

[21] *ABA Standards*, 23-2.9.

Case 1:19-cv-03570-TSC   Document 23-6 (Ex Parte)   Filed 06/22/20   Page 99 of 230
Case 2:19-cv-00414-JPH-DLP   Document 55-1   Filed 10/25/19   Page 19 of 18
PageID #: 9400

22.     Although prison isolation places all prisoners at significant risk of serious harm, its adverse psychological effects vary as a function not only of the specific nature and duration of the isolation (such that more deprived conditions experienced for longer amounts of time are likely to have more detrimental consequences) but also a function of the characteristics of the prisoners subjected to it. A rare and unusually resilient prisoner might be able to withstand even harsh forms of solitary confinement with few or minor adverse effects, especially if the experience does not last for an extended period of time. Conversely, some prisoners are especially vulnerable to the psychological pain and pressure of solitary confinement, and deteriorate even after brief exposure. Mentally ill prisoners are particularly at risk in these isolated environments and have been precluded from such environments by legal and human rights mandates precisely because of this. There are several reasons why this is so.

23.     For one, as I have noted, solitary confinement or isolated confinement subjects prisoners to significantly more stress and psychological pain than other forms of imprisonment. Mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the kind of benign and socially supportive atmosphere that mental health clinicians seek to create within genuinely therapeutic environments. Not surprisingly, mentally ill prisoners are more likely to deteriorate and decompensate when they are subjected to the harshness and stress of prison isolation.

24.     Some of the deterioration and decompensation that mentally ill prisoners suffer in isolated confinement results from the critically important role that social contact and social interaction play in maintaining psychological equilibrium. The esteemed psychiatrist Harry Stack Sullivan once summarized the clinical significance of meaningful social contact by observing that "[w]e can't be

alone in things and be very clear on what happened to us, and we…can't be alone and be very clear even on what is happening in us very long - excepting that it gets simpler and simpler, and more primitive and more primitive, and less socially acceptable."[22] Social contact and social interaction are essential components in the creation and maintenance of normal social identity and social reality.

25.     Thus, the experience of isolation is inherently psychologically destabilizing. It undermines a person's sense of self or social identity and erodes his connection to a shared social reality. Isolated prisoners have few if any opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. As Cooke and Goldstein put it:

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.[23]

In extreme cases, a related pattern emerges: isolated confinement becomes so painful, seemingly so bizarre and impossible for them to make sense of that some prisoners create their own reality - they live in a world of fantasy, instead of the intolerable one that surrounds them.

26.     Finally, many of the direct negative psychological effects of isolation mimic or parallel specific symptoms of mental illness. Even though the direct effects of isolation, experienced in reaction to adverse conditions of confinement, are generally less chronic that those that are produced by a diagnosable mental

---

[22] Harry Stack Sullivan, The Illusion of Personal Individuality, *Psychiatry*, 12 317 - 332 (1971), at p. 326.
[23] Compare also, Margaret K. Cooke and Jeffrey H. Goldstein, Social Isolation and Violent Behavior, *Forensic Reports*, 2, 287 - 296 (1989), at p. 288.

Case 1:10-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 101 of 230
Case 2:19-cv-00414-FH-DEP   Document 55-1 (Ex Parte)   Filed 10/25/19   Page 43 of 18
PageID #: 9402

illness, they can add to and compound a mentally ill prisoner's outward manifestation of symptoms as well as the internal experience of their disorder.

27. For example, many studies have documented the degree to which isolated confinement contributes to feelings of lethargy, hopelessness, and depression. Thus, for already clinically depressed prisoners, these acute situational effects are likely to exacerbate their pre-existing chronic condition and lead to a worsening of their depressed state. Similarly, the mood swings that some prisoners report experiencing in isolation would be expected to amplify the pre-existing emotional instability that prisoners diagnosed with conditions such as bi-polar disorder suffer. Prisoners who suffer from disorders of impulse control would likely find their pre-existing condition made worse by the high levels of frustration, irritability, and anger that many isolated prisoners report experiencing. And prisoners prone to psychotic breaks may suffer more in isolated confinement due to conditions that deny them the potentially stabilizing influence of social feedback that might ground their sense of reality in a stable and meaningful social world.

28. As I noted in passing above, widespread recognition of the heightened vulnerability to mentally ill prisoners to the adverse psychological effects of isolated confinement has let numerous corrections officials, professional mental health groups, and human rights organizations to prohibit their placement in such units or, if it is absolutely necessary (and only as a last resort) to confine them there, to very strictly limit the duration of such confinement and to provide prisoners with significant amounts of out-of-cell time and augmented access to care. For example, the American Psychiatric Association ("APA") has issued a Position Statement on Segregation of Prisoners with Mental Illness stating:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in

segregation, out-of-cell structured therapeutic activities (i.e. mental health/psychiatric treatment) in appropriate programming space for an adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for the individuals.[24]

The APA's position on this issue reflects the accepted fact that mentally ill prisoners are especially vulnerable to isolation- and stress-related regression, and decompensation that worsen their psychiatric conditions and intensify their mental health related symptoms and maladies (including depression, psychosis, self-harm).

29. This widely accepted fact about mentally ill prisoners' heightened vulnerability to isolated confinement is acknowledged in the standard operating procedures that typically govern their admission and retention in such units. Specifically, mental health staff in most prison systems with which I am familiar are charged with the responsibility of screening prisoners in advance of their possible placement in isolation, identifying those who are mentally ill and, typically, taking steps to exclude them from such confinement. Moreover, mental health staff are required to regularly and meaningfully monitor isolated prisoners with the same intended purpose - to identify any prisoners who may be manifesting the signs and symptoms of emerging mental illness and to remove them from these harmful environments.

30. Courts that have been presented with evidence on this issue have reached the same conclusions about the vulnerability of the mentally ill to several forms of prison isolation. One such court, in an opinion issued in a case in which I

---

[24] AM. PSYCH. ASSOC., POSITION STATEMENTS: SEGREGATION OF PRISONERS WITH MENTAL ILLNESS (2012), *available at* http://www.psychiatry.org/advocacy--newsroom/position statements.

Case 2:19-cv-00414-FH-DEP   Document 55-1 (Ex Parte)   Filed 10/25/19   Page 17 of 18

testified as an expert witness, noted that the psychological risks of isolated confinement were "particularly" and unacceptably high for any prisoner suffering from "overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions in [solitary confinement]."[25] The judge elaborated, noting that the group of prisoners to be excluded from isolation should include:

> [T]he already mentally ill, as well as persons with borderline personality disorders, brain   damage or mental retardation, impulse-ridden personalities, or a history of prior    psychiatric problems or chronic depression. For these inmates, placing them in [isolated confinement] is the mental equivalent of putting an asthmatic in a place with little air to   breathe. The risk is high enough, and the consequences serious enough, that we have  no hesitancy in finding that the risk is plainly "unreasonable."[26]

31.    In summary, the accumulated weight of the scientific evidence that I have cited and summarized above demonstrates the painful nature of isolated confinement and the serious risk of significant psychological harm at which it places prisoners. When persons are deprived of normal social contact for extended periods of time they experience mental pain and suffering, are more susceptible to severe stress-related maladies and disorders, and are subject to deterioration and dysfunction along a number of mental, emotional, and physical dimensions. These people are thus placed at risk of even more serious harm, including the loss of their sanity and even their lives. The broad range of adverse effects that derive from social deprivation underscores the fundamental importance of meaningful social contact and interaction and, in essence, establishes

---

[25] *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995)

[26] *Id.*

these things as identifiable human needs. Over the long-term, meaningful social contact and interaction may be as essential to a person's psychological well-being. This appears to be true for prisoners in general, but especially true for mentally ill prisoners who are particularly vulnerable to the pains of isolated confinement and susceptible to its harmful effects.

**Opinion regarding the October 17 pro se filing**

32.     In my professional opinion, Mr. Purkey's pro se attempt to withdraw his appeals should be viewed with judicial caution and concern. His decision-making was undoubtedly affected by the increased severity in his isolated conditions of confinement in combination with the organic mental health condition from which he suffers, one that results in deteriorating cognition and dementia. A competent psychological evaluation is clearly necessary in order to determine the exact cause of Mr. Purkey's request and to evaluate his competence to make it. The very likely possibility that his pro se filing was the result of a chronic mental condition, the psychological trauma of extreme isolation, and the exacerbating effect of sleep deprivation raises grave concerns about the voluntariness of the filing and serious doubts about Mr. Purkey's capacity and competence to make such a request.

33.     It is my understanding that Mr. Purkey's attorneys are seeking the orders necessary to collect medical information in order to make informed decisions regarding his competency issues. Given the information we have about the conditions of confinement in combination with counsel's observations about their client's deteriorating mental health, in my expert opinion, counsel should be given the opportunity to evaluate this information before any court were to acquiesce to Mr. Purkey's wishes and allow him to withdraw his appeals. This evaluation should also include an evaluation of the prison conditions, including an in person tour of the execution watch cell and access to video footage of sleep monitoring.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date:   October 25, 2019

_Dr. Craig Haney_
Dr. Craig Haney

Exhibit 24

Case 2:19-cv-00414-JPH-DLP   Document 55-2 (Ex Parte)   Filed 10/25/19   Page 1 of 40
Case 1:19-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 106 of 230
PageID #: 9406

APPENDIX A

## CURRICULUM VITAE

Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064

Co-Director,
UC Consortium on Criminal Justice Healthcare

Co-Director,
AMEND at UCSF: US-Norway Correctional Change/Exchange Program

| | |
|---|---|
| home address: | 317 Ocean View Ave. |
| | Santa Cruz, California 95062 |
| phone: | (831) 459-2153 |
| fax: | (831) 425-3664 |
| email: | psylaw@ucsc.edu |

## PREVIOUS EMPLOYMENT

| 2015-2018 | University of California Presidential Chair |
|---|---|
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |

1

Case 1:19-cv-03570-TSC   Document 23-6 (Ex Parte)   Filed 06/22/20   Page 107 of 230
Case 2:19-cv-00414-JPH-DLP   Document 55-2   Filed 10/29/19   Page 2 of 40
PageID #: 9407

EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

HONORS AWARDS GRANTS

2018     Emerald Literati Award for "Outstanding Paper" (for "Reducing the Use and Impact of Solitary Confinement in Corrections").

2016     Vera Institute of Justice "Reimagining Prisons" Initiative Advisory Council.

Psychology Department "Most Inspiring Lecturer"

2015     University of California Presidential Chair (2015-2018 Term)

Martin F. Chemers Award for Outstanding Research in Social Science

Excellence in Teaching Award (Academic Senate Committee on Teaching).

President's Research Catalyst Award for "UC Consortium on Criminal Justice Healthcare" (with Brie Williams and Scott Allen).

Vera Institute of Justice "Safe Alternatives to Segregation" (SAS) Initiative Advisory Council.

Who's Who in Psychology (Top 20 Psychology Professors in California) [http://careersinpsychology.org/psychology-degrees-schools-employment-ca/#ca-psych-prof]

2014     Distinguished Faculty Research Lecturer, University of California, Santa Cruz.

2013     Distinguished Plenary Speaker, American Psychological Association Annual Convention.

2

Case 1:19-cv-03570-TSC   Document 23-6 (Ex Parte)  Filed 06/22/20   Page 108 of 230
Case 2:19-cv-00414-JPH-DLP   Document 55-2 (Ex Parte)  Filed 10/25/19   Page 3 of 40
PageID #: 9408

| 2012 | Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States. |
|------|---|
| | Invited Expert Witness, United States Senate, Judiciary Committee. |
| 2011 | Edward G. Donnelly Memorial Speaker, University of West Virginia Law School. |
| 2009 | Nominated as American Psychological Foundation William Bevan Distinguished Lecturer. |
| | Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors). |
| 2006 | Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for <u>Death by Design</u>). |
| | Nominated for National Book Award (by American Psychological Association Books, for <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>). |
| | "Dream course" instructor in psychology and law, University of Oklahoma. |
| 2005 | Annual Distinguished Faculty Alumni Lecturer, University of California, Santa Cruz. |
| | Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient). |
| | Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley). |
| 2004 | "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz. |
| | National Science Foundation Grant to Study Capital Jury Decision-making |
| 2002 | Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz. |
| | United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project. |

Case 1:19-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 109 of 230
Case 2:19-cv-00414-JPH-DLP   Document 55-2 (Ex Parte)   Filed 10/25/19   Page 4 of 40
PageID #: 9409

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000     Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999     American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997     National Science Foundation Grant to Study Capital Jury Decision-making.

1996     Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995     Gordon Allport Intergroup Relations Prize (Honorable Mention)

Excellence in Teaching Convocation, Social Sciences Division

1994     Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice.

1992     Psychology Undergraduate Student Association Teaching Award

SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities

1991     Alumni Association Teaching Award ("Favorite Professor")

1990     Prison Law Office Award for Contributions to Prison Litigation

1989     UC Mexus Award for Comparative Research on Mexican Prisons

4

1976        Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School

1975-76     Law and Psychology Fellow, Stanford Law School

1974-76     Russell Sage Foundation Residency in Law and Social Science

1974        Gordon Allport Intergroup Relations Prize, Honorable Mention

1969-71     University Fellow, Stanford University

1969-74     Society of Sigma Xi

1969        B.A. Degree Magna cum laude with Honors in Psychology

            Phi Beta Kappa

1967-1969   University Scholar, University of Pennsylvania


UNIVERSITY SERVICE AND ADMINISTRATION

2010-2016     Director, Legal Studies Program

2010-2014     Director, Graduate Program in Social Psychology

2009          Chair, Legal Studies Review Committee

2004-2006     Chair, Committee on Academic Personnel

1998-2002     Chair, Department of Psychology

1994-1998     Chair, Department of Sociology

1992-1995     Chair, Legal Studies Program

1995 (Fall)   Committee on Academic Personnel

1995-1996     University Committee on Academic Personnel (UCAP)

1990-1992     Committee on Academic Personnel

1991-1992     Chair, Social Science Division Academic Personnel Committee

Case 1:19-cv-03570-TSC   Document 23-6 (Ex Parte)   Filed 06/22/20   Page 111 of 230
Case 2:19-cv-00414-JPH-DLP   Document 55-2   Filed 10/29/19   Page 6 of 40
PageID #: 9411

1984-1986          Chair, Committee on Privilege and Tenure


WRITINGS AND OTHER CREATIVE ACTIVITIES IN PROGRESS

Books:

Counting Casualties in the War on Prisoners: Toward a Just and Lasting Peace (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.


PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

2020          Criminality in Context: The Psychological Foundations of Criminal Justice Reform. APA Books, in press.

2014          The Growth of Incarceration in the United States: Exploring the Causes and Consequences (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press.

2006          Reforming Punishment: Psychological Limits to the Pains of Imprisonment, Washington, DC: American Psychological Association Books.

2005          Death by Design: Capital Punishment as a Social Psychological System. New York: Oxford University Press.


Monographs and Technical Reports

1989          Employment Testing and Employment Discrimination (with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation.

<u>Articles in Professional Journals and Book Chapters</u>

2019    "Afterword," in Robert Johnson, <u>Condemned to Die: Life Under Sentence of Death</u> (pp. 136-141). Second Edition. New York: Routledge.

"Changing correctional culture: Exploring the role of U.S.-Norway exchange in placing health and well-being at the center of U.S. prison reform" (with Cyrus Ahalt, Brie Williams, and Kim Ekhaugen), <u>American Journal of Public Health</u>, in press.

"Solitary Confinement, Loneliness, and Psychological Harm," in Jules Lobel and Peter Scharff Smith (Eds.), <u>Solitary Confinement: Effects, Practices, and Pathways to Reform</u>. New York: Oxford University Press, in press.

2018    "Restricting the Use of Solitary Confinement," <u>Annual Review of Criminology</u>, <u>1</u>, 285-310.

"Death Qualification in Black and White: Racialized Decision-Making and Death-Qualified Juries" (with Mona Lynch), <u>Law & Policy</u>, in press.

"Balancing the Rights to Protection and Participation: A Call for Expanded Access to Ethically Conducted Correctional Research. <u>Journal of General Internal Medicine</u>, 33(22). DOI: 10.1007/s11606-018-4318-9.

"The Plight of Long-Term Mentally-Ill Prisoners" (with Camille Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.), <u>The Criminalization of Mental Illness</u> (pp. 163-180). Durham, NC: Carolina Academic Press.

"The Psychological Effects of Solitary Confinement: A Systematic Critique," <u>Crime and Justice</u>, <u>47</u>, 365-416.

"The Media's Impact on the Right to a Fair Trial: A Content Analysis of Pretrial Publicity in Capital Cases (with Shirin Bakhshay), <u>Psychology, Public Policy, and Law</u>, <u>24</u>, 326-346.

2017    "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). <u>Analyses of Social Issues and Public Policy</u>, <u>17</u>, 286-318.

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," Punishment and Society, 19, 310-326.

"Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), Torture and Its Definition in International Law: An Interdisciplinary Approach (pp.139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, International Journal of Prisoner Health, 13, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), International Journal of Prisoner Health, 13, 41-48.

2016    "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), The Prison Journal, 96, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book Moral Disengagement: How People Do Harm and Live With Themselves, by A. Bandura], PsycCRITIQUES, 61(8).

2015    "When Did Prisons Become Acceptable Mental Healthcare Facilities?," Report of the Stanford Law School Three Strikes Project (with Michael Romano et al.) [available at: http://law.stanford.edu/wp-content/uploads/sites/default/files/child-page/632655/doc/slspublic/Report_v12.pdf ].

"Emotion, Authority, and Death: (Raced) Negotiations in Capital Jury Negotiations" (with Mona Lynch), Law & Social Inquiry, 40, 377-405.

"Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), APA Handbook of Forensic Psychology (pp. 415-436). Washington, DC: APA Books.

"The Death Penalty" (with Joanna Weill & Mona Lynch), in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 451-510). Washington, DC: APA Books.

"'Prisonization' and Latinas in Alternative High Schools" (with Aida Hurtado & Ruby Hernandez), in J. Hall (Ed.), <u>Routledge Studies in Education and Neoliberalism: Female Students and Cultures of Violence in the City</u> (pp. 113-134). Florence, KY: Routledge.

2014    "How Healthcare Reform Can Transform the Health of Criminal Justice-Involved Individuals" (with Josiah Rich, et al.), <u>Health Affairs</u>, <u>33:3</u> (March), 1-6.

2013    "Foreword," for H. Toch, Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing. Washington, DC: APA Books (in press).

"Foreword," for J. Ashford & M. Kupferberg, <u>Death Penalty Mitigation: A Handbook for Mitigation Specialists, Investigators, Social Scientists, and Lawyers</u>. New York: Oxford University Press.

2012    "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" <u>West Virginia Law Review</u>, <u>114</u>, 373-414.

"Prison Effects in the Age of Mass Incarceration," <u>Prison Journal</u>, <u>92</u>, 1-24.

"The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), <u>Oxford Handbook of Sentencing and Corrections</u> (pp. 584-605). New York: Oxford University Press.

2011    "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," <u>American Criminal Law Review</u>, <u>48</u>, 121-141. [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Gender, Sexuality, and Social Class</u>. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), <u>Law and Society Review</u>, <u>45</u>, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), <u>Law and Human Behavior</u>, <u>35</u>, 339-350.

Case 1:10-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 115 of 230
Case 2:19-cv-00414-JFH-DEP   Document 55-2 (Ex Parte)   Filed 10/25/19   Page 10 of 40
PageID #: 9415

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), Michigan State Law Review, 2011, 573-608.

2010    "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" Connecticut Public Interest Law Review, 9, 139-196.

"Hiding From the Death Penalty," Huffington Post, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in Sentencing and Justice Reform Advocate, 2, 3 (February, 2011).

2009    "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), Law and Human Behavior, 33, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," Prison Service Journal UK (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: California Prison Focus, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), Encyclopedia of Group Processes and Intergroup Relations. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," DePaul Law Review, 58, 689-740. (Reprinted: Capital Litigation Update, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," University of Missouri-Kansas City Law Review, 77, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), Personality and Social Psychology Bulletin, 35, 807-814.

10

2008    "Counting Casualties in the War on Prisoners," University of San Francisco Law Review, 43, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," Hofstra Law Review, 36, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," Criminal Justice and Behavior, 35, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), Dictionary of Prisons (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006    "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," Washington University Journal of Law & Policy, 22, 265-293. [Reprinted in: N. Berlatsky, Opposing Viewpoints: America's Prisons. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," Golden Gate Law Review, 37, 131-173.

Case 2:19-cv-00414-JFH-DEP   Document 55-2 (Ex Parte)   Filed 10/29/19   Page 12 of 40
Case 1:10-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 117 of 230
PageID #: 9417

"Preface," D. Jones (Ed.), <u>Humane Prisons</u>. San Francisco, CA: Radcliffe Medical Press.

2005    "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), <u>The Effects of Imprisonment </u>(pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), <u>Harvard Journal of Hispanic Policy</u>, <u>17</u>, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), <u>Report on Asylum Seekers in Expedited Removal</u>. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004    "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," <u>DePaul Law Review</u>, <u>53</u>, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), <u>Analyses of Social Issues and Public Policy (ASAP)</u>, <u>4</u>, 1-22.

"Abu Ghraib and the American Prison System," <u>The Commonwealth</u>, <u>98 (#16)</u>, 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003        "Mental Health Issues in Long-Term Solitary and 'Supermax'
            Confinement," <u>Crime & Delinquency</u> (special issue on mental health
            and the criminal justice system), <u>49</u>, 124-156. [Reprinted in:
            Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and
            Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

            "The Psychological Impact of Incarceration: Implications for Post-
            Prison Adjustment," in Travis, J., & Waul, M. (Eds.), <u>Prisoners
            Once Removed: The Impact of Incarceration and Reentry on
            Children, Families, and Communities</u> (pp. 33-66). Washington, DC:
            Urban Institute Press.

            "Comments on "Dying Twice": Death Row Confinement in the Age
            of the Supermax," <u>Capital University Law Review</u>.


2002        "Making Law Modern: Toward a Contextual Model of Justice,
            <u>Psychology, Public  Policy, and Law</u>, <u>7</u>, 3-63.

            "Psychological Jurisprudence: Taking Psychology and Law into the
            Twenty-First Century," (with John Darley, Sol Fulero, and Tom
            Tyler), in J. Ogloff (Ed.), <u>Taking Psychology and Law into the
            Twenty-First Century</u> (pp. 35-59). New York: Kluwer Academic/
            Plenum Publishing.

            "Science, Law, and Psychological Injury: The <u>Daubert</u> Standards
            and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and
            Carella, S., <u>The Handbook of Psychological Injury</u> (pp. 184-201).
            Chicago, IL: American Bar Association. [CD-ROM format]


2001         "Vulnerable Offenders and the Law: Treatment Rights in Uncertain
            Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid
            (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u>
            (pp. 51-79). Washington, D.C.: American Psychological Association.

             "Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256).
            Boston, MA: Northeastern University Press.


2000        "Discrimination and Instructional Comprehension: Guided
            Discretion, Racial Bias, and the Death Penalty" (with M. Lynch),
            <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999    "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998    "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," <u>Hastings Women's Law Journal</u>, <u>9</u>, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), <u>La Raza Law Journal</u>, <u>10</u>, 645-690.

1997    "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), <u>New York University Review of Law and Social Change</u>, <u>23</u>, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 303-337.

14

Case 2:19-cv-00414-JFH-DEP   Document 55-2 (Ex Parte)   Filed 10/25/19   Page 15 of 40
Case 1:10-cv-03570-TSC   Document 236   Filed 06/22/20   Page 120 of 230
PageID #: 9420

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," Stanford Law Review, 49, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, America's Experiment with Capital Punishment: Reflections on the Past, Present, and Future of the Ultimate Penal Sanction. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), Law and Human Behavior, 21, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" Studies in Law, Politics, and Society, 16, 3-69.

1995    "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," Santa Clara Law Review, 35, 547-609. [Reprinted in part in David Papke (Ed.), Law and Popular Culture, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," Indiana Law Journal, 70, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," California Criminal Defense Practice Reporter, 1995(1), 1-7.

1994    "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), Law and Human Behavior, 18, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), Law and Human Behavior, 18, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), Law and Human Behavior, 18, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), Journal of Social Issues (special issue on the death penalty in the United States), 50, 75-101.

15

Case 2:19-cv-00414-JPH-DEP   Document 55-2 (Ex Parte)   Filed 10/23/19   Page 16 of 40
Case 1:10-cv-03570-TSC   Document 236   Filed 06/22/20   Page 121 of 230
PageID #: 9421

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital Punishment</u>. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), <u>Law and Human Behavior</u>, <u>18</u>, 619-633.

"Processing the Mad, Badly," <u>Contemporary Psychology</u>, <u>39</u>, 898-899.

"Language is Power," <u>Contemporary Psychology</u>, <u>39</u>, 1039-1040.

1993    "Infamous Punishment: The Psychological Effects of Isolation," <u>National Prison Project Journal</u>, <u>8</u>, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u> (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), <u>Correctional Perspectives: Views from Academics, Practitioners, and Prisoners</u> (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," <u>Law and Human Behavior</u>, <u>17</u>, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

1992    "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). <u>Forum</u>, <u>19</u>, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. <u>Behavioral Science and Law</u>, <u>10</u>, 179-195.

1991    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," <u>Law and Human Behavior</u>, <u>15</u>, 183-204.

1988    "In Defense of the Jury," <u>Contemporary Psychology</u>, <u>33</u>, 653-655.

| | |
|---|---|
| 1986 | "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), <u>Journal of Community Psychology</u>, <u>14</u>, 267-277. |

1984    "Editor's Introduction.  Special Issue on Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 1-6.

"On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 121-132.

"Examining Death Qualification:  Further Analysis of the Process Effect," <u>Law and Human Behavior</u>, <u>8</u>, 133-151.

"Evolving Standards and the Capital Jury," <u>Law and Human Behavior</u>, <u>8</u>, 153-158.

"Postscript," <u>Law and Human Behavior</u>, <u>8</u>, 159.

"Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman, A. (Eds.), <u>Perspectives in Psychology and Law</u>.  New York:  John Wiley, pp. 43-54.

1983    "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>. Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>.  Lexington, Mass.: Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982    "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), <u>Law and American History: Cases and Materials</u>. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) <u>Introduction to Criminal Justice: A Sociological Perspective</u>. Palo Alto, CA: Stanford University Press (2012).]

Case 1:10-cv-03570-TSE    Document 23-6 (Ex Parte)    Filed 06/22/20    Page 123 of 230
Case 2:19-cv-00414-JPH-DEP    Document 55-2 (Ex Parte)    Filed 10/25/19    Page 18 of 40
PageID #: 9423

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), <u>The Analysis of Judicial Reform</u>. Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination: A Dissenting Psychological Opinion," <u>Industrial Relations Law Journal</u>, <u>5</u>, pp. 1-86.

"To Polygraph or Not: The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), <u>Polygraph</u>, <u>11</u>, 185-199.

1981        "Death Qualification as a Biasing Legal Process," <u>The Death Penalty Reporter</u>, <u>1</u> (<u>10</u>), pp. 1-5. [Reprinted in <u>Augustus: A Journal of Progressive Human Sciences</u>, <u>9(3)</u>, 9-13 (1986).]

1980        "Juries and the Death Penalty: Readdressing the <u>Witherspoon</u> Question," <u>Crime and Delinquency</u>, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Loh, Wallace (Ed.), <u>Social Research and the Judicial Process.</u> New York: Russell Sage, 1983.]

"The Creation of Legal Dependency: Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), <u>The People's Law Review</u>. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology: Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), <u>Readings on the Social Animal</u>. San Francisco, W.H. Freeman, pp. 125-136.

1979        "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), <u>Challenges and Alternatives to the Criminal Justice System.</u> Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), <u>Social Psychology and Modern Life</u>. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World: Good Deals in the Criminal Courts" (with M. Lowy), <u>Law and Society Review</u>, <u>13</u>, pp. 633-650.

[Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), <u>Criminal Law and Its Processes</u>. Boston: Little, Brown, 1983.]

1977 "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), <u>The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology</u>, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), <u>Law, Justice, and the Individual in Society: Psychological and Legal Issues</u> (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976 "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), <u>The Research Experience</u>, pp. 177-190. Itasca, IL: Peacock.

1975 "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  <u>Psychology</u> <u>Today</u>, 26ff.

"Implementing Research Results in Criminal Justice Settings," <u>Proceedings</u>, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), <u>Theory and Research in Abnormal Psychology</u>.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), <u>Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving</u>.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) <u>Contemporary Issues in Social Psychology</u>.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  <u>Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships</u>. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, <u>Revisita de Psicologia Social</u>, 1, 95-105 (1986).]

1973 "Social Roles, Role-Playing, and Education" (with P. Zimbardo), <u>The Behavioral and Social Science Teacher</u>, Fall, 1(1), pp. 24-45. [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) <u>Psychology For Our Times</u>. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E.

and Hunt, R. (Eds.) <u>Current Perspectives in Social Psychology</u>. Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), <u>The New York Times Magazine</u>, April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.), Psychology Is Social:  Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), <u>International Journal of Criminology and Penology</u>, 1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry, Robert (Eds.) <u>Examining Deviance Experimentally</u>. New York: Alfred Publishing, 1975; Golden, P. (Ed.) <u>The Research Experience</u>. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) <u>The Sociology of Corrections.</u> New York:  John Wiley, 1977; <u>A kiserleti tarsadalom-lelektan foarma</u>. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. <u>Justice and Corrections</u>. New York: John Wiley, 1978; <u>Research Methods in Education and Social Sciences.</u> The Open University, 1979; Goldstein, J. (Ed.), <u>Modern Sociology</u>. British Columbia:  Open Learning Institute, 1980; Ross, Robert R. (Ed.), <u>Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison.</u> Toronto:  Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), <u>Social Science in Law: Cases, Materials, and Problems</u>. Foundation Press, 1985: Siuta, Jerzy (Ed.), <u>The Context of Human Behavior</u>. Jagiellonian University Press, 2001; Ferguson, Susan (Ed.), <u>Mapping the Social Landscape: Readings in Sociology</u>. St. Enumclaw, WA: Mayfield Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), <u>Menschenversuche (Experiments with Humans)</u>. Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo).  <u>Naval Research Reviews</u>, <u>1</u>-<u>17</u>.  [Reprinted in Aronson, E. (Ed.) <u>Readings About the Social Animal</u>. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) <u>Key Studies in Psychology</u>. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), <u>Basic Themes in Law and Jurisprudence</u>. Anderson Publishing, 2000.]

MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Case 2:19-cv-00414-JPH-DEP   Document 55-2 (Ex Parte)   Filed 10/25/19   Page 21 of 40
Case 1:10-cv-03570-TSC   Document 236   Filed 06/22/20   Page 126 of 230
PageID #: 9426

Law and Society Association

National Council on Crime and Delinquency

INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC
MEETINGS AND RELATED SETTINGS (SELECTED)

2016    "The Culture of Punishment," American Justice Summit, New York,
        January.

        "Mental Illness and Prison Confinement," Conference on Race,
        Class, Gender and Ethnicity (CRCGE), University of North Carolina
        Law School, Chapel Hill, NC, February.

        "Reforming the Treatment of California's Mentally Ill Prisoners:
        Coleman and Beyond," Meeting of the UC Consortium on Criminal
        Justice & Health, San Francisco, April.

        "Bending Toward Justice? The Urgency (and Possibility) of
        Criminal Justice Reform," UC Santa Cruz Alumni Association
        "Original Thinkers" Series, San Jose, CA (March), and Museum of
        Tolerance, Los Angeles (April).

        "Isolation and Mental Health," International and Inter-Disciplinary
        Perspectives on Prolonged Solitary Confinement, University of
        Pittsburgh Law School, Pittsburgh, PA, April.

        "Mechanisms of Moral Disengagement in the Treatment of
        Prisoners" (with Joanna Weill), Conference of the Society for the
        Study of Social Issues, Minneapolis, June.

2015    "Reforming the Criminal Justice System," Bipartisan Summit on
        Criminal Justice Reform, American Civil Liberties Union/Koch
        Industries co-sponsored, Washington, DC, March.

        "PrisonWorld: How Mass Incarceration Transformed U.S. Prisons,
        Impacted Prisoners, and Changed American Society," Distinguished
        Faculty Research Lecture, UC Santa Cruz, March.

        "Think Different, About Crime and Punishment," Invited Lecture,
        UC Santa Cruz 50th Anniversary Alumni Reunion, April.

21

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera Institute of Justice, "Safe Alternatives to Solitary Confinement-A Human Dignity Approach" Conference, Washington, DC, September.

"Mental Health and Administrative Segregation," Topical Working Group on the Use of Administrative Segregation in the U.S., National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

2014    "Solitary Confinement: Legal, Clinical, and Neurobiological Perspectives," American Association for the Advancement of Science (AAAS), Chicago, IL February.

"Overcrowding, Isolation, and Mental Health Care, Prisoners' Access to Justice: Exploring Legal, Medical, and Educational Rights," University of California, School of Law, Irvine, CA, February.

"The Continuing Significance of Death Qualification" (with Joanna Weill), Annual Conference of the American Psychology-Law Society, New Orleans, March.

"Using Psychology at Multiple Levels to Transform Adverse Conditions of Confinement," Society for the Study of Social Issues Conference, Portland, OR, June.

"Humane and Effective Alternatives to Isolated Confinement," American Civil Liberties Union National Prison Project Convening on Solitary Confinement, Washington, DC, September.

22

Case 2:19-cv-00414-JFH-DEP   Document 55-2 (Ex Parte)   Filed 10/29/19   Page 28 of 40
Case 1:10-cv-03570-TSC   Document 236   Filed 06/22/20   Page 128 of 230
PageID #: 9428

"Community of Assessment of Public Safety," Community Assessment Project of Santa Cruz County, Year 20, Cabrillo College, November.

"Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," Chief Justice Earl Warren Institute on Law & Social Policy, Boalt Hall Law School, Berkeley, CA, November.

"Presidential Panel, Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," American Society for Criminology, San Francisco, November.

"Presidential Panel, National Academy of Sciences Report on Consequences of High Rates of Incarceration on Individuals," American Society for Criminology, San Francisco, November.

"Findings of National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration," Association of Public Policy Analysis and Management Convention (APPAM), Albuquerque, NM, November.

"Politics and the Penal State: Mass Incarceration and American Society," New York University Abu Dhabi International Scholars Program, Abu Dhabi, United Arab Emirates, December.

2013    "Isolation and Mental Health," Michigan Journal of Race and Law Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

23

Case 1:10-cv-03570-TSC   Document 23-6 (Ex Parte)   Filed 06/22/20   Page 129 of 230
Case 2:19-cv-00414-FH-DEP   Document 55-2 (Ex Parte)   Filed 10/25/19   Page 24 of 40
PageID #: 9429

| | |
|---|---|
| 2012 | "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April. |
| | "The Creation of the Penal State in America," Managing Social Vulnerability: The Welfare and Penal System in Comparative Perspective, Central European University, Budapest, Hungary, July. |
| 2011 | "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January. |
| | "The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January. |
| | "Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March. |
| | "Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August. |
| | "The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October. |
| | "Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November. |
| 2010 | "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March. |
| | "Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March. |

Case 2:19-cv-00414-JFH-DEP   Document 55-2 (Ex Parte)   Filed 10/25/19   Page 25 of 40
Case 1:10-cv-03570-TSC   Document 236   Filed 06/22/20   Page 130 of 230
PageID #: 9430

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008    "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address, Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007    "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006   "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005   "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

Case 1:10-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 132 of 230
Case 2:19-cv-00414-FPH-DEP   Document 55-2 (Ex Parte)   Filed 10/29/19   Page 27 of 40
PageID #: 9432

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004 "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

27

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003    "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002    "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001       "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000       "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

29

Case 1:10-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 135 of 230
Case 2:19-cv-00414-JPH-DEP   Document 55-2 (Ex Parte)   Filed 10/25/19   Page 30 of 40
PageID #: 9435

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999 "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

1998 "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997 "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996 "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995 "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994 "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

1992 "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August.

1991 "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August.

1990 "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA.

1989 "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August.

"Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June.

"The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June.

31

| 1987 | "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August. |
| | |
| | "The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July. |
| 1986 | Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August. |
| | |
| | "Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August. |
| 1985 | "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November. |
| | |
| | "The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August. |
| 1983 | "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September. |
| 1982 | "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July. |
| 1982 | "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March. |
| 1982 | "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April. |

Case 2:19-cv-00414-JPH-DEP   Document 55-2 (Ex Parte)   Filed 10/29/19   Page 33 of 40
Case 1:10-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 138 of 230
PageID #: 9438

1980     "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," <u>Proceedings</u> of the American Trial Lawyers Association, Mid-Winter Meeting, January.

1975     "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April.

## SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2016-present     Editorial Consultant, <u>Translational Issues in Psychological Science</u>.

2015-present     Editorial Consultant, <u>Criminal Justice Review</u>.

2014-present     Editorial Board Member, <u>Law and Social Inquiry</u>.

2013-present     Editorial Consultant, <u>Criminal Justice and Behavior</u>.

2012-present     Editorial Consultant, <u>Law and Society Review</u>.

2011-present     Editorial Consultant, <u>Social Psychological and Personality Science</u>.

2008-present     Editorial Consultant, <u>New England Journal of Medicine</u>.

2007-present     Editorial Board Member, <u>Correctional Mental Health Reporter</u>.

2007-present     Editorial Consultant, <u>Journal of Offender Rehabilitation</u>.

2004-present     Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press.

| | |
|---|---|
| 2000-2003 | Reviewer, Society for the Study of Social Issues Grants-in-Aid Program. |
| 2000-present | Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues) |
| 1997-present | Editorial Board Member (until 2004), Consultant, <u>Psychology, Public Policy, and Law</u> |
| 1991 | Editorial Consultant, Brooks/Cole Publishing |
| 1989 | Editorial Consultant, <u>Journal of Personality and Social Psychology</u> |
| 1988- | Editorial Consultant, <u>American Psychologist</u> |
| 1985 | Editorial Consultant, <u>American Bar Foundation Research Journal</u> |
| 1985-2006 | <u>Law and Human Behavior</u>, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985 | Editorial Consultant, <u>Law and Social Inquiry</u> |
| 1980-present | Reviewer, National Science Foundation |
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, <u>Law and Society Review</u> |
| 1979-1985 | Editorial Consultant, <u>Law and Human Behavior</u> |
| 1997-present | Editorial Consultant, <u>Legal and Criminological Psychology</u> |
| 1993-present | <u>Psychology, Public Policy, and Law</u>, Editorial Consultant |

<u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and guard training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982 (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the

Case 2:19-cv-00414-JFH-DEP   Document 55-2 (Ex Parte)   Filed 10/25/19   Page 36 of 40
Case 1:10-cv-03570-TSC   Document 236   Filed 06/23/20   Page 141 of 230
PageID #: 9441

Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCRIF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-present.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of undocumented persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy

Case 2:19-cv-00414-JPH-DLP   Document 55-2 (Ex Parte)   Filed 10/29/19   Page 37 of 40
Case 1:10-cv-03570-TSC   Document 236   Filed 06/22/20   Page 142 of 230
PageID #: 9442

Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety, August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and Consequences of the High Rate of Incarceration in the United States, 2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public officials at Pew Research Center, Congressional staff, and White House staff concerning policy implications of The Growth of Incarceration in the United States: Exploring the Causes and Consequences (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy Council on formulation of federal policy concerning use of segregation confinement, 2015.

PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION

Hoptowit v. Ray [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)].  Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown  (Marin Country Superior Court; September, 1982, Justice Burke).  Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy  [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest  (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle  [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital  (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock  (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey  (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson  (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy  [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

38

Case 2:19-cv-00414-JFH-DEP   Document 55-2 (Ex Parte)   Filed 10/25/19   Page 39 of 40
Case 1:10-cv-03570-TSC   Document 23-6   Filed 06/22/20   Page 144 of 230
PageID #: 9444

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya  (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989).  Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Case 1:10-cv-03570-TSC   Document 236   Filed 06/22/20   Page 145 of 230
Case 2:19-cv-00414-FTW-DEP   Document 55-2 (Ex Parte) Filed 10/25/19   Page 40 of 40
PageID #: 9445

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities.

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

# Exhibit 25

Case 1:19-cv-03570-TSC   Document 28-6   Filed 06/23/20   Page 147 of 230

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00414-JPH-DLP |
| | ) | |
| UNITED STATES OF AMERICA, et al. | ) | |
| | ) | |
| Respondents. | ) | |

**Ex Parte Order Granting Motion to Reconsider**

For the reasons stated in the motion, Petitioner Wesley Purkey's motion to reconsider the Court's denial of his motion to continue the telephonic conference, dkt. [63], is **granted**. The Court will reschedule the telephonic conference by separate order.

**SO ORDERED.**

Date: 10/31/2019

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

Exhibit 26

Case 1:19-cv-03570-TSC   Document 28-6   Filed 06/23/20   Page 149 of 230

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00414-JPH-DLP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| WARDEN USP Terre Haute, | ) | |
| | ) | |
| Respondents. | ) | |

**EX PARTE ORDER SCHEDULING TELEPHONIC STATUS CONFERENCE**

The above cause is set for a telephonic status conference on

**November 6, 2019 at 11:00 a.m.**  If counsel is present with Mr. Purkey,

counsel need not separately call into the conference.  Otherwise, counsel for

Mr. Purkey shall attend the conference by calling the designated telephone

number, to be provided by the Court via email.  Mr. Purkey shall attend the

conference by telephone.

**SO ORDERED.**

Date: 10/31/2019

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Michelle M. Law
FEDERAL DEFENDER -- WESTERN DISTRICT OF MISSOURI
michelle_law@fd.org

Rebecca Ellen Woodman
REBECCA E. WOODMAN, ATTORNEY AT LAW, L.C.
rewlaw@outlook.com

# Exhibit 27

**Monday, December 2, 2019 at 10:40:05 AM Central Standard Time**

| | |
|---|---|
| **Subject:** | new civil action filed by Mr. Purkey 2-19-cv-517 |
| **Date:** | Wednesday, October 30, 2019 at 9:55:45 AM Central Daylight Time |
| **From:** | Rebekah Farrington |
| **To:** | rewlaw_outlook.com, Michelle Law |
| **CC:** | Laura Briggs |
| **Attachments:** | 2-19-cv-517 purky new civil rights action.pdf |

Rebecca and Michelle:

Wanted to make you aware of a recent filing.

Rebekah Farrington
Divisional Operations Manager/
CRD to Magistrate Judge McKee
U.S. District Courthouse
921 Ohio Street
Terre Haute, Indiana 47807
(812) 231 1841

# Exhibit 28

## Rebecca E. Woodman, Attorney at Law, L.C.
### 1263 W. 72nd Ter.
### Kansas City, Missouri 64114
(785) 979-3672
*rewlaw@outlook.com*

February 3, 2020

*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**

> **Wesley Ira Purkey**
> **DOB: 01/06/1952**
> **SSN: 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**
> **FPN: 14679-045**
> **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana. Mr. Purkey is one of five prisoners at Terre Haute who were notified of scheduled execution dates in writing by the Department of Justice on July 25, 2019. These five inmates, including Mr. Purkey, were moved to A-Range, a special range (hereinafter "death watch range") in the Secure Confinement Unit (SCU) at USP-Terre Haute on or about July 25, 2019, and remained there until on or about December 10, 2019, after a stay of execution. On October 9, 2019, I submitted a FOIA request by letter requesting pertinent records and surveillance videotape (detailed below) from July 25 to the date of receipt of the request. Although this request was expedited, I have yet to receive the requested records. That previous request is included with this request. In addition to that previous request, I am updating the request for the records detailed below from **October 9, 2019 to the present (date upon receipt)**.

On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with a copy of all records, document files, work papers, tape recordings, notes, memoranda,

electronic information, or any and all other information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey, specifically pertaining to the following:

1. All records of BOP policies and procedures pertaining to the day and night watch protocol implemented on the A-Range housing the five prisoners at USP-Terre Haute including Wesley Ira Purkey who received execution notices issued by the Department of Justice on July 25, 2019.

2. All watch range surveillance videotape (both day and night) dating from October 9, 2019-Present (date upon receipt).

The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audiotapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies. When searching for materials responsive to this request, please search any and all databases, indexes, or other sources, maintained by the BOP, as well as any sub-office, subdivision, or component of the BOP. In short, this request is directed to this office and to any other office within the BOP.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as the Department of Justice has indicated that it will issue new warrants of execution as soon as the law allows**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Rebecca E. Woodman, Esq.
> 1263 W. 72nd Ter.
> Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

/s/Rebecca E. Woodman

*Enclosures: (3)*

# Exhibit 29

## Rebecca E. Woodman, Attorney at Law, L.C.
### 1263 W. 72nd Ter.
### Kansas City, Missouri 64114
(785) 979-3672
*rewlaw@outlook.com*


February 3, 2020


*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*


Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV


**RE: Expedited Records Request Pertaining to:**

> **Wesley Ira Purkey**
> **DOB: 01/06/1952**
> **SSN: 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**
> **FPN: 14679-045**
> **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

   I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana. Mr. Purkey is one of five prisoners at Terre Haute who were notified of scheduled execution dates in writing by the Department of Justice on July 25, 2019. These five inmates, including Mr. Purkey, were moved to A-Range, a special range (hereinafter "death watch range") in the Secure Confinement Unit (SCU) at USP-Terre Haute on or about July 25, 2019, and remained there until on or about December 10, 2019, after a stay of execution. On October 9, 2019, I submitted a FOIA request by letter requesting pertinent records and surveillance videotape (detailed below) from July 25 to the date of receipt of the request. Although this request was expedited, I have yet to receive the requested records. That previous request is included with this request. In addition to that previous request, I am updating the request for the records detailed below from **October 9, 2019 to the present (date upon receipt)**.

   On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with a copy of all records, document files, work papers, tape recordings, notes, memoranda,

electronic information, or any and all other information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey, specifically pertaining to the following:

1. All records of BOP policies and procedures pertaining to the day and night watch protocol implemented on the A-Range housing the five prisoners at USP-Terre Haute including Wesley Ira Purkey who received execution notices issued by the Department of Justice on July 25, 2019.

2. All watch range surveillance videotape (both day and night) dating from October 9, 2019-Present (date upon receipt).

The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audiotapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies. When searching for materials responsive to this request, please search any and all databases, indexes, or other sources, maintained by the BOP, as well as any sub-office, subdivision, or component of the BOP. In short, this request is directed to this office and to any other office within the BOP.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as the Department of Justice has indicated that it will issue new warrants of execution as soon as the law allows**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Rebecca E. Woodman, Esq.
> 1263 W. 72nd Ter.
> Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

/s/Rebecca E. Woodman

*Enclosures: (3)*

Exhibit 30

**Rebecca E. Woodman, Attorney at Law, L.C.**
**1263 W. 72nd Ter.**
**Kansas City, Missouri 64114**
(785) 979-3672
*rewlaw@outlook.com*


February 3, 2020


*Sent via: U.S.P.S & Email to OGC_EFOIA@BOP.GOV*

Freedom of Information Act/Privacy Action Section
Office of General Counsel, Room 924
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534
(E): OGC_EFOIA@BOP.GOV

**RE: Expedited Records Request Pertaining to:**

> **Wesley Ira Purkey**
> **DOB: 01/06/1952**
> **SSN: 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**
> **FPN: 14679-045**
> **Place of Birth: Wichita, Kansas**

Dear Sir or Madam:

   I am a CJA-Appointed Attorney representing Wesley Ira Purkey, a federal death row inmate who is currently incarcerated at the U.S. Penitentiary in Terre Haute, Indiana and has been previously incarcerated at the U.S. Penitentiary in Leavenworth, Kansas. We are in need of all custodial records regarding Mr. Purkey dated **October 9, 2019-Present (date upon receipt).** We are requesting expedited processing. Mr. Purkey is one of five prisoners at Terre Haute who were notified of scheduled execution dates in writing by the Department of Justice on July 25, 2019. On October 9, 2019, I submitted a FOIA request by letter requesting all custodial records regarding Mr. Purkey from January 01, 2017 to the date of receipt of the request. Although this request was expedited, I have yet to receive the requested records. That previous request is included with this request.

   On behalf of my client and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), and the Privacy Act, 5 U.S.C. § 552a, I request that I be furnished with a copy of all records, document files, work papers, tape recordings, notes, memoranda, electronic information, or any and all other information in the possession of the Federal Bureau of Prisons related to or concerning Wesley Ira Purkey. This request includes specifically, but is not limited to, the following records:

1.  All records contained in Mr. Purkey's "Medical File;"

2.  All records contained in Mr. Purkey's "Mental Health File;"

3.  All records contained in any file maintained by a BOP psychologist, social worker, counselor, or any other individual providing any type of services related to emotional and/or mental health care and/or treatment;

4.  All records relating to Mr. Purkey's disciplinary history, any gang affiliations or activities, including without limitation all incident reports issued to Mr. Purkey, even such incident reports that may have been canceled or rescinded;

5.  All records related to Mr. Purkey's grievances at the BOP;

6.  All records relating to Mr. Purkey's inmate classification;

7.  All medical records and notes relating to any health care requested by or provided to Mr. Purkey, and including but not limited to all medical care, dental care, mental health care, and substance abuse treatment;

8.  All documentation of suicide attempts by Mr. Purkey, or injuries of Mr. Purkey, inflicted upon himself, intentionally or otherwise;

9.  All records relating to any internal memoranda or correspondence within the BOP relating to Mr. Purkey;

10. All records relating to any reviews of Mr. Purkey's housing placements and transfers within institutions as well as between institutions within BOP; and

11. All records relating to any administrative remedies sought by Mr. Purkey.

The term "records" as used herein includes all records or communications preserved in electronic or written form, including but not limited to correspondence, documents, data, videotapes, audiotapes, faxes, files, guidance, guidelines, evaluations, instructions, analyses, memoranda, agreements, notes, orders, policies, procedures, protocols, reports, rules, technical manuals, technical specifications, training manuals, or studies. When searching for materials responsive to this request, please search any and all databases, indexes, or other sources, maintained by the BOP, as well as any sub-office, subdivision, or component of the BOP. In short, this request is directed to this office and to any other office within the BOP.

I certify as true and correct to the best of my knowledge and belief that my client Wesley I. Purkey is incarcerated under a sentence of death at USP-Terre Haute, that I

have been appointed to represent him in his capital appeals and it is critical that I obtain and review his BOP records as quickly as possible to preserve his due process rights.

I have attached a release and Certificate of Identity (DOJ-361 Form) signed by my client, Wesley Ira Purkey, authorizing the release of all such records to me, Rebecca E. Woodman.

Mr. Purkey seeks a waiver of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.") and 39 C.F.R. § 265.9(g)(3) (same). Disclosure of the requested documents is necessary in this case because Mr. Purkey is under sentence of death, and this information is fundamental to ensuring that the sentence against him is lawfully imposed. This type of government activity also sheds light on the degree to which the executive branch of the federal government may be violating existing law and regulations. Additionally, disclosure of the information is not primarily in Mr. Purkey's commercial interest. Therefore, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be "liberally construed in favor of waivers for noncommercial requesters.").

If this request is denied in whole or in part, Mr. Purkey asks that you justify all deletions or omissions by reference to specific exemptions to FOIA and the Privacy Act. Mr. Purkey expects the release of all separable portions of otherwise exempt material. Mr. Purkey reserves the right to appeal a decision to withhold any information or to deny a waiver of costs.

Additionally, **I am requesting expedited processing of this FOIA request pursuant to 28 CFR § 16.1(d)(iii) as the Department of Justice has indicated that it will issue new warrants of execution as soon as the law allows**. Thank you for your prompt attention to this matter. Please furnish all applicable records to:

> Rebecca E. Woodman, Esq.
> 1263 W. 72nd Ter.
> Kansas City, Missouri 64114

Should you have any questions related to this request, please do not hesitate to call me at (785) 979-3672 or by email at rewlaw@outlook.com.

Sincerely,

/s/ Rebecca E. Woodman

*Enclosures: (3)*

Exhibit 31

| **Subject:** | Re: Updated FOIA request 1 |
|---|---|
| **Date:** | Monday, February 3, 2020 at 12:56:49 PM Central Standard Time |
| **From:** | OGC Electronic Freedom of Information |
| **To:** | Rebecca Woodman |
| **Attachments:** | _DOJ-361.pdf |

Good afternoon,

We determined the information you request is maintained in a Privacy Act protected system of records and requires written authorization from the subject of the record before it can be released. The written authorization must meet the requirements of 28 C.F.R. §16.41(d).  Please resubmit your request, and provide the information identified below. Until such time as this information is received, your request is not considered perfected and has not been logged in or assigned a request number.

**Your authorization was incomplete because the date on the authorization was more than three months old.**

For your convenience, we attached a form DOJ-361, Certification of Identity. Completing this form should provide the information we need to proceed. A current or former inmate should include on the form his/her Federal Bureau of Prisons register number.

You must resubmit your request when returning the Certification of Identity or proper authorization as we do not keep copies. You can find additional information on the Federal Bureau of Prisons FOIA/PA process at www.bop.gov.

Sincerely,
S. Lilly, for
Eugene Baime
Supervisory Attorney

If you have quest ons about th s response p ease fee free to contact the unders gned, th s office, or the Federa Bureau of Pr sons (BOP) FOIA Pub c L a son, Mr. C. Darne Strob e at 202-616-7750, 320 F rst Street NW, Su te 936, Wash ngton DC 20534, or ogc efo a@bop.gov.

Add t ona y, you may contact the Office of Government Informat on Serv ces (OGIS) at the Nat ona Arch ves and Records Adm n strat on to nqu re about the FOIA med at on serv ces they offer. The contact nformat on for OGIS s as fo ows: Office of Government Informat on, Serv ces, Nat ona Arch ves and Records Adm n strat on, Room 2510, 8601 Ade ph Road, Co ege Park, Mary and 20740-6001; e-ma at og s@nara.gov; te ephone at 202-741-5770; to free at 1-877-684-6448; or facs m e at 202-741-5769.

If you are not sat sfied w th my response to th s request, you may adm n strat ve y appea by wr t ng to the D rector, Office of Informat on Po cy (OIP), Un ted States Department of Just ce, S xth F oor, 441 G Street, NW, Wash ngton, DC 20001, or you may subm t an appea through OIP s FOIAon ne porta by creat ng an account at: https://www.fo aon ne.gov/fo aon ne/act on/pub c/home. Your appea must be postmarked or e ectron ca y transm tted w th n 90 days of the date of my response to your request. If you subm t your appea by ma , both the etter and the enve ope shou d be c ear y marked "Freedom of Informat on Act Appea ."

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 12:47 PM >>>
>
Dear Sir or Madam: Please see the attached FOIA request for Federal Bureau of Prisons records pertaining to my client, Wesley I. Purkey, along with a signed release and certificate of identity. As detailed in the attached letter, I am requesting expedited processing, as Mr. Purkey is under imminent threat of execution warrant. Please let me know if you have any questions or require further information.

Sincerely,


Rebecca E. Woodman
Attorney at Law, L.C.

1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

Exhibit 32

| **Subject:** | Re: Updated FOIA request 1 |
| **Date:** | Monday, February 3, 2020 at 1:25:44 PM Central Standard Time |
| **From:** | OGC Electronic Freedom of Information |
| **To:** | Rebecca Woodman |
| **Attachments:** | 2020-00234 Ack and Expedite Grant Ltr2.pdf |

Good afternoon,

Please disregard my previous message about the outdated Certification of Identity.  Upon further review it looks like this is a duplicate request of 2020-00234.  As such, your request is not considered perfected and has not been logged in or assigned a request number.

Additionally, your request was previously granted expedited processing on October 10, 2019.  A copy of the letter is attached.

Sincerely,
S. Lilly, for
Eugene Baime
Supervisory Attorney

If you have quest ons about th s response p ease fee  free to contact the unders gned, th s office, or the Federa  Bureau of Pr sons  (BOP) FOIA Pub c L a son, Mr. C. Darne  Strob e at 202-616-7750, 320 F rst Street NW, Su te 936, Wash ngton DC 20534, or ogc efo a@bop.gov.

Add t ona y, you may contact the Office of Government Informat on Serv ces (OGIS) at the Nat ona  Arch ves and Records Adm n strat on to  nqu re about the FOIA med at on serv ces they offer. The contact  nformat on for OGIS  s as fo ows: Office of Government Informat on, Serv ces, Nat ona  Arch ves and Records Adm n strat on, Room 2510, 8601 Ade ph  Road, Co  ege Park, Mary and 20740-6001; e-ma  at og s@nara.gov; te ephone at 202-741-5770; to  free at 1-877-684-6448; or facs m e at 202-741-5769.

If you are not sat sfied w th my response to th s request, you may adm n strat ve y appea  by wr t ng to the D rector, Office of Informat on Po cy (OIP), Un ted States Department of Just ce, S xth F oor, 441 G Street, NW, Wash ngton, DC 20001, or you may subm t an appea  through OIP s FOIAon ne porta  by creat ng an account at: https://www.fo aon ne.gov/fo aon ne/act on/pub c/home. Your appea  must be postmarked or e ectron ca y transm tted w th n 90 days of the date of my response to your request. If you subm t your appea  by ma , both the  etter and the enve ope shou d be c ear y marked "Freedom of Informat on Act Appea ."


>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 12:47 PM >>>
>
Dear Sir or Madam: Please see the attached FOIA request for Federal Bureau of Prisons records pertaining to my client, Wesley I. Purkey, along with a signed release and certificate of identity. As detailed in the attached letter, I am requesting expedited processing, as Mr. Purkey is under imminent threat of execution warrant. Please let me know if you have any questions or require further information.

Sincerely,


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 33

**Subject:** Re: Updated FOIA request 2

**Date:** Monday, February 3, 2020 at 1:31:36 PM Central Standard Time

**From:** OGC Electronic Freedom of Information

**To:** Rebecca Woodman

Good afternoon,

Upon review it looks like this is a duplicate request of 2020-00234.  As such, your request is not considered perfected and has not been logged in or assigned a request number.

Additionally, your request was previously granted expedited processing on October 10, 2019.  A copy of the letter was attached in the previous email.

Sincerely,
S. Lilly, for
Eugene Baime
Supervisory Attorney

If you have quest ons about th s response p ease fee  free to contact the unders gned, th s office, or the Federa  Bureau of Pr sons  (BOP) FOIA Pub c L a son, Mr. C. Darne  Strob e at 202-616-7750, 320 F rst Street NW, Su te 936, Wash ngton DC 20534, or ogc efo a@bop.gov.

Add t ona y, you may contact the Office of Government Informat on Serv ces (OGIS) at the Nat ona  Arch ves and Records Adm n strat on to  nqu re about the FOIA med at on serv ces they offer. The contact  nformat on for OGIS s as fo ows: Office of Government Informat on, Serv ces, Nat ona  Arch ves and Records Adm n strat on, Room 2510, 8601 Ade ph  Road, Co ege Park, Mary and 20740-6001; e-ma  at og s@nara.gov; te ephone at 202-741-5770; to  free at 1-877-684-6448; or facs m e at 202-741-5769.

If you are not sat sfied w th my response to th s request, you may adm n strat ve y appea  by wr t ng to the D rector, Office of Informat on Po  cy (OIP), Un ted States Department of Just ce, S xth F oor, 441 G Street, NW, Wash ngton, DC 20001, or you may subm t an appea  through OIP s FOIAon ne porta  by creat ng an account at: https://www.fo aon ne.gov/fo aon ne/act on/pub c/home. Your appea  must be postmarked or e ectron ca y transm tted w th n 90 days of the date of my response to your request. If you subm t your appea  by ma , both the  etter and the enve ope shou d be c ear y marked "Freedom of Informat on Act Appea ."

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 12:47 PM >>>
>
Dear Sir or Madam: Please see the attached FOIA request for Federal Bureau of Prisons records pertaining to my client, Wesley I. Purkey, along with a signed release and certificate of identity. As detailed in the attached letter, I am requesting expedited processing, as Mr. Purkey is under imminent threat of execution warrant. Please let me know if you have any questions or require further information.

Sincerely,

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 34

**Subject:** Re: Updated FOIA request 1

**Date:** Monday, February 3, 2020 at 1:43:00 PM Central Standard Time

**From:** OGC Electronic Freedom of Information

**To:** Rebecca Woodman

I will forward this message to the processor.  If a new Certification of Identity is needed they will let you know.

Sincerely, S. Lilly
FOIA/PA Section

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 2:34 PM >>>
>
Good afternoon: These are updated requests for the time period from the previous grant of October 10, 2019 to the present. If you need a new Certification of Identity we can re-submit the requests once we have that document.

Thank you,

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** OGC Electronic Freedom of Information <ogc_efoia@bop.gov>
**Date:** Monday, February 3, 2020 at 1:25 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Updated FOIA request 1

Good afternoon,

Please disregard my previous message about the outdated Certification of Identity.  Upon further review it looks like this is a duplicate request of 2020-00234.  As such, your request is not considered perfected and has not been logged in or assigned a request number.

Additionally, your request was previously granted expedited processing on October 10, 2019.  A copy of the letter is attached.

Sincerely,
S. Lilly, for
Eugene Baime
Supervisory Attorney

If you have quest ons about th s response p ease fee  free to contact the unders gned, th s office, or the Federa  Bureau of Pr sons  (BOP) FOIA Pub  c L a son, Mr. C. Darne  Strob e at 202-616-7750, 320 F rst Street NW, Su te 936, Wash ngton DC 20534, or ogc_efo a@bop.gov.

Add t ona y, you may contact the Office of Government Informat on Serv ces (OGIS) at the Nat ona  Arch ves and Records Adm n strat on to  nqu re about the FOIA med at on serv ces they offer. The contact  nformat on for OGIS s as fo ows: Office of Government Informat on, Serv ces, Nat ona  Arch ves and Records Adm n strat on, Room 2510, 8601 Ade ph  Road, Co ege Park, Mary and 20740-6001; e-ma  at og s@nara.gov; te ephone at 202-741-5770; to  free at 1-877-684-6448; or facs m e at 202-741-5769.

If you are not sat sfied w th my response to th s request, you may adm n strat ve y appea  by wr t ng to the D rector, Office of Informat on Po  cy (OIP), Un ted States Department of Just ce, S xth F oor, 441 G Street, NW, Wash ngton, DC 20001, or you may subm t an appea  through OIP s FOIAon ne porta  by creat ng an account at: https://www.fo aon ne.gov/fo aon ne/act on/pub c/home. Your appea  must be postmarked or e ectron ca  y transm tted w th n 90 days of the date of my response to your request. If you subm t your appea  by ma , both the  etter and the enve ope shou d be c ear y marked "Freedom of Informat on Act Appea ."


>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 12:47 PM >>>
>
Dear Sir or Madam: Please see the attached FOIA request for Federal Bureau of Prisons records pertaining to my client, Wesley I. Purkey, along with a signed release and certificate of identity. As detailed in the attached letter, I am requesting expedited processing, as Mr. Purkey is under imminent threat of execution warrant. Please let me know if you have any questions or require further information.

Sincerely,


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**Page 2 of 2**

# Exhibit 35

**Subject:** Re: Updated FOIA request 2

**Date:** Monday, February 3, 2020 at 1:43:05 PM Central Standard Time

**From:** OGC Electronic Freedom of Information

**To:** Rebecca Woodman

I will forward this message to the processor.  If a new Certification of Identity is needed they will let you know.

Sincerely, S. Lilly
FOIA/PA Section

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 2:35 PM >>>
>
Good afternoon: These are updated requests for the time period from the previous grant of October 10, 2019 to the present. If you need a new Certification of Identity we can re-submit the requests once we have that document.

Thank you,

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** OGC Electronic Freedom of Information <ogc_efoia@bop.gov>
**Date:** Monday, February 3, 2020 at 1:31 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Updated FOIA request 2

Good afternoon,

Upon review it looks like this is a duplicate request of 2020-00234.  As such, your request is not considered perfected and has not been logged in or assigned a request number.

Additionally, your request was previously granted expedited processing on October 10, 2019.  A copy of the letter was attached in the previous email.

Sincerely,
S. Lilly, for
Eugene Baime
Supervisory Attorney

If you have quest ons about th s response p ease fee  free to contact the unders gned, th s office, or the Federa  Bureau of Pr sons  (BOP) FOIA Pub  c L a son, Mr. C. Darne  Strob e at 202-616-7750, 320 F rst Street NW, Su te 936, Wash ngton DC 20534, or ogc  efo a@bop.gov.

Add t ona  y, you may contact the Office of Government Informat on Serv ces (OGIS) at the Nat ona  Arch ves and Records Adm n strat on to  nqu re about the FOIA med at on serv ces they offer. The contact  nformat on for OGIS  s as fo  ows: Office of Government Informat on, Serv ces, Nat ona  Arch ves and Records Adm n strat on, Room 2510, 8601 Ade ph  Road, Co ege Park, Mary and 20740-6001; e-ma  at og s@nara.gov; te ephone at 202-741-5770; to   free at 1-877-684-6448; or facs m  e at 202-741-5769.

If you are not sat sfied w th my response to th s request, you may adm n strat ve y appea  by wr t ng to the D rector, Office of Informat on

Po cy (OIP), Un ted States Department of Just ce, S xth F oor, 441 G Street, NW, Wash ngton, DC 20001, or you may subm t an appea through OIP s FOIAon ne porta by creat ng an account at: https://www.fo aon ne.gov/fo aon ne/act on/pub c/home. Your appea must be postmarked or e ectron ca y transm tted w th n 90 days of the date of my response to your request. If you subm t your appea by ma , both the etter and the enve ope shou d be c ear y marked "Freedom of Informat on Act Appea ."

>>> Rebecca Woodman <rewlaw@outlook.com> 2/3/2020 12:47 PM >>>
>
Dear Sir or Madam: Please see the attached FOIA request for Federal Bureau of Prisons records pertaining to my client, Wesley I. Purkey, along with a signed release and certificate of identity. As detailed in the attached letter, I am requesting expedited processing, as Mr. Purkey is under imminent threat of execution warrant. Please let me know if you have any questions or require further information.

Sincerely,


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 36

# Miller & Chevalier

**Brian J. Fleming**
Member
(202) 626-5871
bfleming@milchev.com

April 14, 2020

## VIA ELECTRONIC MAIL

Brian P. Casey
Assistant United States Attorney
Western District of Missouri
400 E. Ninth Street, Room 5510
Kansas City, MO 64106
Brian.Casey@usdoj.gov

Re:    Defendants' Reply to Mr. Purkey's Opposition to Defendants'
Motion to Dismiss in *Purkey v. Barr, et al.*, C.A. No. 19-03570
(TSC) (D.D.C.) (ECF No. 21)

Dear Brian:

We were disappointed with several statements in Defendants' Reply to Mr. Purkey's Opposition to Defendants' Motion to Dismiss which we believe did not fairly and accurately represent various aspects of this case. We write to request that Defendants refrain from making similar assertions in the future and, as to certain misrepresentations, that Defendants promptly submit a correction to the Court.

As a general matter, we have raised Mr. Purkey's constitutional *Ford* claim in a responsible and consistent fashion, zealously sought information and documents necessary to prove the claim (most, if not all, of which are in the exclusive possession, custody or control of your clients) and pursued adjudication of Mr. Purkey's claim in an expeditious and orderly fashion. In short, we raised a colorable (and we believe meritorious) *Ford* competency claim many months ago and have actively sought reasoned consideration of the merits of that claim. To the extent that Defendants' Reply brief suggests otherwise, and we believe it does, it is incorrect and misleading.

For example, Defendants allege that Mr. Purkey has been inconsistent in his position regarding his competency. *See* Defs.' Reply 9, ECF No. 21 ("Purkey began this litigation by asserting that his condition cannot improve. . . . More recently, in response to Defendants' position that his claims sound only in habeas, Purkey has emphasized what he believes to be the changeable nature of competency. . . . This Court should take note of this late change in position . . . ."). Mr. Purkey has argued since the start that he is not currently competent to be executed, but he has never contended that competency is unrestorable. Defendants' erroneous assertion again misleadingly conflates the distinction between longstanding/irreversible mental illness and

**Miller & Chevalier Chartered** . 900 16th Street NW . Washington, DC 20006

**T** 202.626.5800 . millerchevalier.com

Brian P. Casey
April 14, 2020
Page 2

competency (and uses this conflation to imply that Mr. Purkey's arguments are dishonest). It is *competency* that potentially can be restored, and the focus of any competency determination under the law is *not whether an individual suffers from mental illness* but whether that "mental illness prevents him from 'rational[ly] understanding' why the State seeks to impose that punishment." *Madison v. Alabama*, 139 S. Ct. 718, 722 (2019) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 959 (2007)).

Defendants also assert in their Reply that the many requests for relevant information, documents and testing regarding Mr. Purkey's condition and circumstances, including requests for video surveillance footage, medical and administrative records, and brain imaging, were somehow untimely or delayed and/or were made only for dilatory purposes. *See* Defs.' Reply 4 n.1, ECF No. 21. Defendants further assert that the Bureau of Prisons did not receive "any additional requests for information since Purkey's October 2019 FOIA request." *Id.* These assertions are demonstrably false. As previously shown, Mr. Purkey repeatedly renewed his requests for certain records and footage. *See, e.g.*, Compl. ¶¶ 14, 19, ECF No. 1; Mem. in Supp. of Mot. for Prelim. Inj. 3, 8–11, 20–21, 22–23 (requesting expedited discovery), ECF No. 7-1; Pl.'s Opp. to Mot. to Dismiss or to Transfer 4–5, 7–10, ECF No. 20 (describing requests by plaintiffs counsel on September 17, 2019 and October 9, 2019, and then follow up on October 11, 2019 and November 11, 2019). Indeed, when requests for Mr. Purkey's own personal information and documents went unfulfilled, he had to resort to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, a process designed to provide access to government records, not one's own personal information and records. *See* Compl. ¶ 19, ECF No. 1 (describing submission of FOIA request to the Bureau of Prisons in October 2019); Mem. in Supp. of Mot. for Prelim. Inj. 8–11, ECF No. 7-1.[1] Contrary to Defendants' assertions that October was the last date Mr. Purkey requested records, counsel Rebecca Woodman submitted yet another request for Mr. Purkey's records on February 3, 2020. *See* Letter from R. Woodman to Bureau of Prisons (February 3, 2020). Up to this point, Mr. Purkey's requests have been refused or obstructed by the relevant officials to whom the requests were made, with the result that these requests remain unresolved to this day. At no time, however, has Mr. Purkey or anyone representing him withdrawn, abandoned, rescinded or in any way deferred those requests. If timeliness and delay are matters of concern to Defendants, the simple solution would be for Defendants to ensure that the relevant government officials immediately and fully provide the requested information and documentation, as well as access for testing.

Defendants' argument that we abandoned those requests by allegedly ignoring Defendants' supposed offer of an expedited discovery schedule (*see* Defs.' Reply 4 n.1, ECF No. 21) is similarly wrong and squarely belied by the relevant chronology of events. In our discussions with you following the filing and service of the lawsuit and our Motion for Preliminary Injunction, we, not you, initiated the concept of an agreed, expedited briefing and

---

[1] On October 10, 2019, the Bureau of Prisons promised to "expedite" the processing of Mr. Purkey's FOIA request (*see* Compl. Ex. 16, ECF No. 1-20), but subsequently failed to do so. As a result, on February 3, 2020, Mr. Purkey submitted an updated and renewed FOIA request which the Bureau of Prisons has also failed to process in a complete and timely manner. *See* Letter from R. Woodman to Bureau of Prisons (February 3, 2020).

Brian P. Casey
April 14, 2020
Page 3

discovery schedule. Your December 16, 2020 email to us following a meet and confer call demonstrates that undeniable fact. As you know well, however, circumstances thereafter changed. On December 31, 2019, the Court granted our request to withdraw the Motion for Preliminary Injunction, but ordered further briefing on jurisdictional issues, which did not close until January 28, 2020. While those jurisdictional issues were (and still are) pending before the Court, Defendants filed their Motion to Dismiss on February 24, 2020, contending, in part, that Plaintiff has no right to any discovery, let alone expedited discovery. Then, on the very day Plaintiff's response to the Motion to Dismiss was due, the Court entered Court Operations Standing Order No. 20-9, in which the Court limited its operations to those necessary "to support essential functions" (Para. 1) and deferred all other courthouse-related matters in civil proceedings (Para. 4). Not once during that sequence of events did we ever indicate that we did not want to receive the previously requested information, documents and testing, all of which are potentially relevant to the claims and issues in this case. To the contrary, we have raised the issue of discovery consistently and repeatedly. For Defendants to argue that we abandoned or failed to pursue Mr. Purkey's entitlement to discovery and failed to respond to *Defendants'* alleged proposal for expedited discovery is irresponsible and patently incorrect. It is incumbent on Defendants to file an *errata* with the Court correcting the misrepresentations in footnote 1 of the Defendants' Reply Brief, failing which Plaintiff will bring them to the Court's attention through appropriate means.[2]

Finally, given the recent developments in the D.C. Circuit, the need for you to produce the requisite discovery has become even more acute, especially if the government is intending to seek a new execution warrant for Mr. Purkey on an expedited basis. In these circumstances, it is fair for us to request that the government disclose, without delay, its intended course of action regarding the issuance of new execution warrants so we can make an informed decision about the need to seek immediate judicial intervention to ensure Mr. Purkey's competency claim is fully and fairly heard on the merits.

Sincerely,

Brian J. Fleming
*Counsel for Plaintiff*

cc:    John Hurst (John.Hurst@usdoj.gov)
        Kate Mahoney (Kate.Mahoney@usdoj.gov)
        David Wagner (David.Wagner@usdoj.gov)

---

[2] Defendants also contend that Mr. Purkey is "audacious" for seeking the due process required by *Ford* because he has never "attempted to show why a habeas petition would be a constitutionally inadequate process," all while continuing to ignore that Mr. Purkey's constitutional *Ford* claims are not core habeas. Defs.' Reply 6, ECF No. 21.

# Exhibit 37

**From:** Fleming, Brian
**Sent:** Wednesday, May 20, 2020 4:58 PM
**To:** 'Casey, Brian (USAMOW)' <Brian.Casey@usdoj.gov>
**Cc:** Hurst, John (USAMOW) <John.Hurst@usdoj.gov>; Mahoney, Kate (USAMOW) <Kate.Mahoney@usdoj.gov>; Wagner, David (USAMOW) <David.Wagner@usdoj.gov>; McAleer, Chas <cmcaleer@milchev.com>
**Subject:** RE: PURKEY v. BARR - Case 1:19-cv-03570-TSC (D.D.C.)

Brian,

We are in receipt of your April 22, 2020 email responding to our April 14, 2020 letter.  We are disappointed that you chose not to respond substantively to many of the concerns we raised in detail in our letter.

With respect to the issue of outstanding FOIA requests, we do note, as indicated in our letter, that Ms. Woodman submitted three initial FOIA requests on October 9, 2019—one for medical records and two for BOP death watch protocols and video surveillance of the death watch range, which were confirmed received and promised expedited processing by BOP's Regional Counsel on October 10, 2019.  Thereafter, Ms. Woodman had several communications with responsible attorneys and officials at BOP who acknowledged receipt and committed to expediting the requests in light of the then pending execution date in December 2019.

Ms. Woodman also submitted updated FOIA requests on February 3, 2020 and received confirmation of receipt that same day by a BOP supervisory attorney, who acknowledged that the request updated rather than duplicated the October 9, 2019 requests and indicated that the updated requests would be forwarded to the agency's FOIA processor.  As explained in our April 14 letter, Mr. Purkey has been seeking this information through FOIA and other means since before October of last year.  To date, BOP has produced nothing in response to either the October or the February FOIA requests.  This is unacceptable, particularly given the gravity of this matter.  The record of our requests on behalf of Mr. Purkey for the complete and expedited production of all requested information is clear and indisputable.

Best regards,

Brian

**BRIAN J. FLEMING**
Member | Miller & Chevalier Chartered
bfleming@milchev.com | 202.626.5871

1

**From:** Casey, Brian (USAMOW) <Brian.Casey@usdoj.gov>
**Sent:** Wednesday, April 22, 2020 11:15 AM
**To:** Fleming, Brian <bfleming@milchev.com>
**Cc:** Hurst, John (USAMOW) <John.Hurst@usdoj.gov>; Mahoney, Kate (USAMOW) <Kate.Mahoney@usdoj.gov>; Wagner, David (USAMOW) <David.Wagner@usdoj.gov>; McAleer, Chas <CMcAleer@milchev.com>
**Subject:** RE: PURKEY v. BARR - Case 1:19-cv-03570-TSC (D.D.C.)

**EXTERNAL**

Brian,

We have received your letter of April 14.  Responding to your accusations point-by-point does not seem productive, so suffice it to say that we have reviewed your letter carefully and disagree with your assertions and conclusions.  To the extent you intend to file a motion with the court regarding the issues raised in your letter, please let us know specifically what motion you intend to file and please provide a proposed order so that we can have a full opportunity to decide whether to consent.  We do not view your current reference only to "appropriate relief" as sufficiently specific to satisfy the meet and confer requirement for nondispositive motions under Local Civil Rule 7.

Likewise, if you believe the filings in the case so far have provided an incomplete picture of your attempts to obtain information or documents, we would be willing to discuss the possibility of providing the court with a joint timeline of your various requests.  Your letter mostly references matters already discussed in papers before the court, but if you believe that a single, agreed timeline would be helpful, please let us know.

In response to your point that Ms. Woodman submitted an "updated and renewed FOIA request" dated February 3, 2020, we have specifically inquired about this request, and the BOP has been unable to find any record of it.

Finally, in response to your request that we provide information about the issuance of new execution warrants, we will let you know as soon as we learn of a new execution date, which will be when the Attorney General makes a decision.

Sincerely,
Brian P. Casey
Assistant United States Attorney
Western District of Missouri
400 E. Ninth Street, Room 5510
Kansas City, MO 64106
Phone:  816-426-4138
Fax:  816-426-3126

**From:** Fleming, Brian <bfleming@milchev.com>
**Sent:** Tuesday, April 14, 2020 4:52 PM
**To:** Casey, Brian (USAMOW) <BCasey@usa.doj.gov>
**Cc:** Hurst, John (USAMOW) <JHurst@usa.doj.gov>; Mahoney, Kate (USAMOW) <KMahoney@usa.doj.gov>; Wagner, David (USAMOW) <DWagner@usa.doj.gov>; McAleer, Chas <CMcAleer@milchev.com>
**Subject:** PURKEY v. BARR - Case 1:19-cv-03570-TSC (D.D.C.)

Brian,

I hope you are well.  Please see the attached correspondence relating to the above-referenced matter.

Best regards,

Brian

**BRIAN J. FLEMING**
Member | Miller & Chevalier Chartered
900 16th Street NW | Washington, DC 20006
bfleming@milchev.com | 202.626.5871 | millerchevalier.com

* * *

This electronic message contains information which may be legally confidential and/or privileged. The information is intended solely for the individual or entity named above and access by anyone else is unauthorized. If you are not the intended recipient, any disclosure, copying, distribution, or use of the contents of this information is prohibited and may be unlawful. If you have received this electronic transmission in error, please reply immediately to the sender that you have received the message in error, and delete it. Thank you.

# Exhibit 38

**From:** Casey, Brian (USAMOW) <Brian.Casey@usdoj.gov>
**Date:** June 15, 2020 at 6:43:43 PM EDT
**Subject:** Purkey v. Barr, Case No. 1:19-cv-03570-TSC (D.D.C.)
**To:** McAleer, Chas <CMcAleer@milchev.com>,Fleming, Brian <bfleming@milchev.com>
**Cc:** Hurst, John (USAMOW) <John.Hurst@usdoj.gov>,Wagner, David (USAMOW)
<David.Wagner@usdoj.gov>,Mahoney, Kate (USAMOW) <Kate.Mahoney@usdoj.gov>

**EXTERNAL**

Dear Chas and Brian,

I am writing to let you know that today the Director of the Bureau of Prisons, at the Attorney General's direction, scheduled Purkey's execution for July 15, 2020.  We will shortly be filing a notice alerting the Court to this development.

Regards,
Brian P. Casey
Assistant United States Attorney
Western District of Missouri
400 E. Ninth Street, Room 5510
Kansas City, MO 64106
Phone:  816-426-4138
Fax:  816-426-3126

Exhibit 39

**Subject:** Re: Purkey- expert visitation

**Date:** Monday, June 15, 2020 at 10:54:15 AM Central Daylight Time

**From:** Rebecca Woodman

**To:** Katherine Siereveld

**Attachments:** Purkey FOIA re death watch video 2.3.2020.pdf, Purkey FOIA re medical records 2.3.2020.pdf, Purkey FOIA re death watch protocols and video 2.3.2020.pdf, Purkey FOIA request death watch protocols 10-9-2019.pdf, Purkey FOIA request medical records 10-9-2019.pdf, Purkey limited FOIA request 10-9-2019.pdf

Katherine: I am writing separately to request Mr. Purkey's BOP records. These requests are not new, as we have requested these records several times previously, most recently this past February, but they have not yet been honored. I am attaching copies of all of our previous requests. These records, including Mr. Purkey's mental health, medical, and disciplinary records, are necessary in order for Dr. DeRight to review in his evaluation and assessment of Mr. Purkey, and without them, such assessment will be necessarily incomplete. We are requesting that these records, updated to the present date, be provided to Mr. Purkey's counsel forthwith in order for Dr. DeRight to utilize those records in his evaluation and assessment of Mr. Purkey.

As always, please contact me if you have any questions or wish to discuss these matters.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Rebecca Woodman <rewlaw@outlook.com>
**Date:** Monday, June 15, 2020 at 8:38 AM
**To:** Katherine Siereveld <ksiereveld@bop.gov>
**Subject:** Purkey- expert visitation

Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

Exhibit 40

**From:**     THP/SCU~
**To:**       Michelle Law
**Subject:**  Legal Visit w/ Purkey on 03-20-20 and 03-27-20
**Date:**     Friday, March 13, 2020 1:56:53 PM

Ms. Law,

Due to concerns pertaining to the COVID-19 outbreak, FCC Terre Haute staff have just been advised to postpone all legal visits. Specifically, legal visits will be suspended for 30 days, at which time the suspension will be reevaluated. Case-by-case approval at the local level and confidential legal calls will be allowed in order to ensure access to counsel. If you would like to visit your client in the Special Confinement Unit (SCU) you are strongly encouraged to contact a member of the SCU Unit Team via past practice as soon as possible. All requests will be reviewed in the order received and as timely as possible. If approved, all legal representatives will be screened prior to being admitted inside the facility.

Thank you in advance for your understanding in this matter.

T. Royer
SCU Unit Manager

# Exhibit 41

**From:** Nicole McFarland <nmcfarland@bop.gov>
**Sent:** Friday, March 13, 2020 2:30 PM
**To:** Adam Johnson <a10johnson@bop.gov>; kirshner@clayro.com; David Patton <David_Patton@fd.org>; Deirdre Vondornum <Deirdre_Vondornum@fd.org>; Jennifer Brown <Jennifer_Brown@fd.org>; Peggy Cross-Goldenberg <Peggy_Cross-Goldenberg@fd.org>; nick.lewin@kklllp.com; paul.krieger@kklllp.com; a.robin@londonrobin.com; tracy_miller@nysd.uscourts.gov; dawn_doino@nysp.uscourts.gov; rriopelle@sercarzandriopelle.com; bc@sternheimlaw.com; Jeffrey Oestericher <Jeffrey.Oestericher@usdoj.gov>; dbanders@wlrk.com
**Cc:** Holly Pratesi <hpratesi@bop.gov>; Lee Plourde <lplourde@bop.gov>; lindsaylewis@gmail.com; snecheles@hnrlawoffices.com; richrosenberg@msn.com; edward_friedland@nysd.uscourts.gov; justin.danilewitz@saul.com
**Subject:** MCC and MDC legal visiting

Effective immediately legal visits will be suspended for 30 days, at which time the suspension will be re-evaluated. Case -by-case approval at the local level and confidential legal calls will be allowed in order to ensure access to counsel.

This applies to MDC Brooklyn and MCC NY and across the BOP.

I am attaching a copy of the message going to inmates at both institutions.

# Exhibit 42

| | |
|---|---|
| **Subject:** | Re: COVID-19 Legal Visit Scheduling and Screening Policy |
| **Date:** | Monday, March 16, 2020 at 2:54:35 PM Central Daylight Time |
| **From:** | Katherine Siereveld |
| **To:** | Michelle Law |
| **CC:** | Elizabeth Vartkessian, THP/SCU~@bop.gov, Kathleen Cleary, rewlaw_outlook.com |
| **Attachments:** | ATT00001.png |

Hi Michelle,

As of now, the screening includes self-reporting of symptoms and temperature checks based on current CDC guidance.  When you know the date you would like to visit, we ask that you minimize the number of people you wish to attend, and let us know as soon as possible.  Any approved legal visit will be non-contact.  If any of the individuals are symptomatic based on the guidelines available to the BOP at the time of the visit, they will not be allowed into the institution.  Additionally, please consider whether or not you can conduct the visit by phone conference.  We would be happy to allow additional time if necessary.  Current BOP information is available here:  https://www.bop.gov/resources/news/20200313_covid-19.jsp.

Hope that helps.
Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Michelle Law <Michelle_Law@fd.org> 3/16/2020 3:22 PM >>>

Katherine:

We received notice that our in-person legal visits with Mr. Purkey have been suspended for 30 days due to the COVID-19 virus pandemic.  The notice indicated that during this time, legal visits may be approved at the local level, but visitors will be "screened" before visiting.  In anticipation that it may be necessary to visit Mr. Purkey in person in the coming weeks, I am writing to request a copy of the COVID-19 visitation and screening policy so we can arrange to comply with the policy before visiting.  We do not want to be in a position where an in-person visit with Mr. Purkey is urgently needed, but an unanticipated aspect of the COVID-19 policy prevents us from visiting.

Thank you –

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

# Exhibit 43

| | |
|---|---|
| **Subject:** | Re: Dr. Agharkar visit with Wes Purkey |
| **Date:** | Monday, March 16, 2020 at 8:54:12 AM Central Daylight Time |
| **From:** | Andrew Sutton |
| **To:** | Katherine Siereveld, Michelle Law |
| **CC:** | Elizabeth Vartkessian, Kathleen Cleary, rewlaw_outlook.com |
| **Attachments:** | ATT00001.png |

This was never scheduled and is now not considered under the circumstances.

>>> Andrew Sutton 3/3/2020 6:57 AM >>>
Awaiting response...

A. Sutton
Special Confinement Unit
Correctional Counselor
FCC Terre Haute
812-244-4400
asutton@bop.gov

I have no way of knowing the number of things that I said I would never forget, but have already forgotten.

"This message is intended for official use and may contain SENSITIVE information.  If this message contains SENSITIVE information, it should be properly delivered, labeled, stored, and disposed of according to policy."


>>> Andrew Sutton 2/27/2020 12:26 PM >>>
Do you have a court order for an evaluation?

A. Sutton
Special Confinement Unit
Correctional Counselor
FCC Terre Haute
812-244-4400
asutton@bop.gov

I have no way of knowing the number of things that I said I would never forget, but have already forgotten.

"This message is intended for official use and may contain SENSITIVE information.  If this message contains SENSITIVE information, it should be properly delivered, labeled, stored, and disposed of according to policy."


>>> Michelle Law <Michelle_Law@fd.org> 2/27/2020 8:13 AM >>>
Katherine and Counselor Sutton:

Is March 31, 2020 available for Dr. Agharkar to visit Mr. Purkey?  He would like to visit with Mr. Purkey from 11:30 a.m. – 2:30 p.m., and would require the same items as before -- his brief case, written materials, and pens/pencils.  I will double check with him about a laptop, but I do not think he brought a laptop the last time he visited Wes.  Please let me know soon as Dr. Agharkar is holding open March 31, and would otherwise schedule patient visits on that day.

Please let me know if you have questions for me.

Thanks-

Michelle



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

# Exhibit 44

**From:** Andrew Sutton <asutton@bop.gov>
**Sent:** Monday, March 30, 2020 11:18 AM
**To:** Michelle Law <Michelle_Law@fd.org>
**Subject:** Purkey visits 4-13, 4-22, and 5-1

Good Afternoon,

Due to the ongoing concerns pertaining to the COVID-19 outbreak, FCC Terre Haute staff have been advised to continue to postpone all legal and social visits. Specifically, all visits will be suspended through May 3, 2020, at which time the suspension will be reevaluated. Case-by-case review, upon receiving request, with reasoning why telephone conference is not adequate, and a verified court ordered deadlines, may be considered. If you must request a visit your client in the Special Confinement Unit (SCU), you are strongly encouraged to contact a member of the SCU Unit Team via email as soon as possible. All requests will be reviewed and verified, in the order received, as timely as possible. If approved, all legal representatives will be screened prior to being admitted inside the facility. All approved visits would be non-contact.  We strongly encourage you to utilize telephone and written correspondence during this difficult time.

Thank you in advance for your understanding in this matter.


A. Sutton

**Page 1 of 2**

Special Confinement Unit
Correctional Counselor
FCC Terre Haute
812-244-4400
asutton@bop.gov

I have no way of knowing the number of things that I said I would never forget, but have already forgotten.

"This message is intended for official use and may contain SENSITIVE information.  If this message contains SENSITIVE information, it should be properly delivered, labeled, stored, and disposed of according to policy."

# Exhibit 45



**U.S. Department of Justice**
**Federal Bureau of Prisons**

**FOR IMMEDIATE RELEASE**                     Contact: Office of Public Affairs
March 31, 2020                                202-514-6551

## Bureau of Prisons COVID-19 Action Plan: Phase Five

WASHINGTON – Today, the Director of the Bureau of Prisons (BOP) ordered the implementation of Phase 5 of its COVID-19 Action Plan, effective tomorrow, April 1, 2020.  In response to a growing number of quarantine and isolation cases in our facilities, the BOP will take the following actions immediately to further mitigate the exposure and spread of COVID-19.

- For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus.  This modification to our action plan is based on health concerns, not disruptive inmate behavior.
- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.
- In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.
- After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.
- Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

Starting in January 2020, the BOP implemented its Pandemic Influenza contingency plan, modified as an Action Plan for COVID-19.   The BOP continues to revise and update its action plan in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance from experts at the World Health Organization (WHO), the Centers for Disease Control and Prevention (CDC) and the Office of Personnel Management (OPM).

Background on Phases 1 – 4:

Phase 4:  On March 26, 2020, the BOP implemented revised preventative measures for all institutions.  The agency updated its quarantine

and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check.  This includes all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival.  Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff.  Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

These are the latest measures that follow the first three phases of the Bureau's action plan, which may be found here: www.bop.gov/resources/news/pdfs/20200324 bop press release covid 19 update.pdf

The Bureau will continue to provide daily updates and information on actions related to COVID-19 at www.bop.gov/coronavirus/

                              ###

# Exhibit 46

| **Subject:** | In-person visit follow-up |
|---|---|
| **Date:** | Wednesday, April 8, 2020 at 10:46:16 AM Central Daylight Time |
| **From:** | Michelle Law |
| **To:** | rewlaw_outlook.com |
| **Attachments:** | image001.png |

Checked with Laine and Larry about Kathleen visiting Wes – the answer was a resounding no, as I thought it would be.  I think we should tell Wes that we are re-evaluating as we go, and we will schedule a visit as soon as the experts tell us it is safe for everyone.



## Michelle M. Law

Assistant Federal Public Defender
Western District of Missouri
Springfield, MO 65806

Phone: (417) 873-9022
FAX: (417) 873-9038

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify us by reply e-mail.  Thank you for your cooperation.

# Exhibit 47

| **From:** | Andrew Sutton |
| **To:** | Michelle Law |
| **Subject:** | Purkey Visits Canceled May 8th and 15th |
| **Date:** | Wednesday, April 15, 2020 5:39:32 AM |

Ms. Law,

Due to concerns pertaining to the COVID-19 outbreak, FCC Terre Haute staff have just been advised to further postpone all visits. Specifically, visits will be suspended until at least May 18th, 2020, at which time the suspension will be reevaluated.

Thank you in advance for your understanding in this matter.


A. Sutton
Special Confinement Unit
Correctional Counselor
FCC Terre Haute
812-244-4400
asutton@bop.gov

I have no way of knowing the number of things that I said I would never forget, but have already forgotten.

"This message is intended for official use and may contain SENSITIVE information.  If this message contains SENSITIVE information, it should be properly delivered, labeled, stored, and disposed of according to policy."

Exhibit 48

| | |
|---|---|
| **From:** | Andrew Sutton |
| **To:** | Michelle Law |
| **Subject:** | Purkey Legal Visits 5/20, 5/29, 6/17 |
| **Date:** | Thursday, May 14, 2020 9:53:00 AM |

Good Morning,

Due to ongoing concerns pertaining to the Wuhan Virus outbreak, FCC Terre Haute staff have just been advised to further postpone all visits.  Specifically, the Special Confinement Unit Team has just advised that there will not be a resumption of visitation on May 18th, 2020. There is no date set that visiting will begin to resume. Therefore, all visits scheduled for the rest of May and continuing through June are hereby postponed until further notice.

Thank you in advance for your understanding in this matter.

A. Sutton
Special Confinement Unit
Correctional Counselor
FCC Terre Haute
812-244-4400
asutton@bop.gov

Reference below:

4/15/2020 6:39 AM >>>

Due to concerns pertaining to the COVID-19 outbreak, FCC Terre Haute staff have just been advised to further postpone all visits. Specifically, visits will be suspended until at least May 18th, 2020, at which time the suspension will be reevaluated.

Thank you in advance for your understanding in this matter.

~ 3/13/2020 3:33 PM >>>

Due to concerns pertaining to the COVID-19 outbreak, FCC Terre Haute staff have just been advised to postpone all legal visits. Specifically, legal visits will be suspended for 30 days, at which time the suspension will be reevaluated. Case-by-case approval at the local level and confidential legal calls will be allowed in order to ensure access to counsel. If you would like to visit your client in the Special Confinement Unit (SCU) you are strongly encouraged to contact a member of the SCU Unit Team via past practice as soon as possible. All requests will be reviewed in the order received and as timely as possible. If approved, all legal representatives will be screened prior to being admitted inside the facility.

Thank you in advance for your understanding in this matter.

# Exhibit 49

# Exhibit 50

**Subject:** Re: Execution notice for Wesley Purkey

**Date:**    Tuesday, June 16, 2020 at 12:58:02 PM Central Daylight Time

**From:**    Rebecca Woodman

**To:**      Katherine Siereveld, Michelle Law

Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Monday, June 15, 2020 at 4:48 PM
**To:** Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>
**Subject:** Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey. I will be available tomorrow to discuss legal and social visits going forward. Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

# Exhibit 51

**Wednesday, June 17, 2020 at 22:26:22 Central Daylight Time**

**Subject:** Re: Execution notice for Wesley Purkey

**Date:** Tuesday, June 16, 2020 at 12:59:45 PM Central Daylight Time

**From:** Katherine Siereveld

**To:** Michelle Law, Rebecca Woodman

Hi Rebecca,
We do not have anything written yet but I am working on it.  Is there a number I can call you at and I can let you know what the plan is?
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 1:58 PM >>>
Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Monday, June 15, 2020 at 4:48 PM
**To:** Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>
**Subject:** Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey.  I will be available tomorrow to discuss legal and social visits going forward.  Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

Exhibit 52

**Subject:** Re: Execution notice for Wesley Purkey

**Date:** Tuesday, June 16, 2020 at 2:43:32 PM Central Daylight Time

**From:** Katherine Siereveld

**To:** Michelle Law, Rebecca Woodman

**CC:** Andrew Sutton

We are still working on a plan that will allow as much visitation as possible while still mitigating the risk of exposure to COVID-19.  I will have something in writing for you by tomorrow, but you can begin to schedule your legal visits as soon as you wish. The normal schedule will remain the same (M-F, 8-3), we are working on the additional precautions re: COVID.  Please note that vending will not be available.  Mr. Sutton has been copied on this email and can assist you in scheduling.

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 2:00 PM >>>
Yes, you can call me at the number below.

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 12:59 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Execution notice for Wesley Purkey

Hi Rebecca,
We do not have anything written yet but I am working on it.  Is there a number I can call you at and I can let you know what the plan is?
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 1:58 PM >>>
Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Monday, June 15, 2020 at 4:48 PM
**To:** Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>
**Subject:** Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey.  I will be available tomorrow to discuss legal and social visits going forward.  Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

# Exhibit 53

**Sunday, June 21, 2020 at 22:23:23 Central Daylight Time**

**Subject:** Re: Execution notice for Wesley Purkey

**Date:** Friday, June 19, 2020 at 10:04:23 AM Central Daylight Time

**From:** Rebecca Woodman

**To:** Katherine Siereveld

**CC:** Michelle Law, McAleer, Chas, Fleming, Brian, Casey, Brian (USAMOW)

Dear Katherine:

I wanted to follow up on our telephone conversation and emails of Tuesday, June 16, 2020. Specifically, you indicated both in your emails and on the phone that written policies to ensure full access to our client, Wes Purkey, who is scheduled to be executed on July 15, 2020, for legal, social, and spiritual visitation while also protecting the safety of our team members, Mr. Purkey, and staff from COVID-19, were being developed and would be issued forthwith. In our telephone conversation on Tuesday, you stated that I would have those written policies within the next hour or two. In an email later in the day on Tuesday, you stated that I would have the written policies the following day. However, I have yet to receive any written policy.

The safety measures that you mentioned in our telephone conversation on Tuesday – temperature checks, questions about symptoms, a mask (either one's own or provided by the facility), and a preference for non-contact visits – are the same measures that were instituted at USP Terre Haute back in March 2020 when the impact of the COVID-19 pandemic was beginning to be felt in the United States. These measures were also instituted just before we were first notified on March 13, 2020 that all of our visits were cancelled until further notice and the prison went into full lockdown, and thus are obviously insufficient to ensure our safety and protection from COVID-19. The homepage of USP Terre Haute's website still prominently displays a banner stating that "All visiting at this facility has been suspended until further notice." BOP reports there has been one death from COVID-19 and five positive tests at USP Terre Haute, but I am aware of no regular testing regime of either prisoners or staff at the facility, and the known COVID-19 transmission rates in closed spaces like a prison is extreme.

Under the circumstances, we are concerned about the ability of USP Terre Haute to accommodate full access to our client while protecting the safety of ourselves, Mr. Purkey, and staff during the time up to and including the execution itself. In-person access to Mr. Purkey by ourselves and our experts is an essential part of our ability to effectively represent him, and is critical as he is facing an execution date in less than one month. We have been unable to conduct any in-person visitation with Mr. Purkey since March. At the same time, we have team members who are high risk because they are medically vulnerable to COVID-19 or who care for persons who are vulnerable to the virus.

Please provide by close of business today the written policies of measures to protect our safety and the safety of Mr. Purkey, while ensuring full in-person access to our client for legal, social, and spiritual visitation in the next now less than four weeks, up to and including the execution itself, as we need to schedule expert and legal visits immediately.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 2:43 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Andrew Sutton <asutton@bop.gov>
**Subject:** Re: Execution notice for Wesley Purkey

We are still working on a plan that will allow as much visitation as possible while still mitigating the risk of exposure to COVID-19.  I will have something in writing for you by tomorrow, but you can begin to schedule your legal visits as soon as you wish.  The normal schedule will remain the same (M-F, 8-3), we are working on the additional precautions re: COVID.  Please note that vending will not be available.  Mr. Sutton has been copied on this email and can assist you in scheduling.

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 2:00 PM >>>
Yes, you can call me at the number below.

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 12:59 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Execution notice for Wesley Purkey

Hi Rebecca,
We do not have anything written yet but I am working on it.  Is there a number I can call you at and I can let you know what the plan is?
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 1:58 PM >>>
Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.

1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Monday, June 15, 2020 at 4:48 PM
**To:** Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>
**Subject:** Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey. I will be available tomorrow to discuss legal and social visits going forward. Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

# Exhibit 54

**Subject:** Re: Execution notice for Wesley Purkey

**Date:**  Saturday, June 20, 2020 at 11:55:22 AM Central Daylight Time

**From:**  Rebecca Woodman

**To:**  Katherine Siereveld

**CC:**  Michelle Law, McAleer, Chas, Fleming, Brian, Casey, Brian (USAMOW)

Dear Katherine:

Thank you for your email regarding the issue of access to and visits with Mr. Purkey.  We have several initial reactions.

First and foremost, we believe the decision to schedule Mr. Purkey's execution in the middle of a global pandemic, at a time when many states are experiencing severe outbreaks of the COVID-19 virus and prisons in particular are veritable breeding grounds for the COVID-19 virus, is really outrageous and unreasonable. The decision seems designed to deny Mr. Purkey the basic rights to which he is entitled under the circumstances.  The fact that the decision to do so was made notwithstanding the pendency of litigation over Mr. Purkey's constitutional rights is particularly disturbing.

Second, the relatively short notice given for his execution, i.e., 30 days, is patently unreasonable given all of the visitations, examinations and tests that would need to be completed for purposes of the pending litigation and/or in advance of an execution even were there no pandemic.  The logistical and scheduling complications caused by the coronavirus pandemic make the decision to proceed with the execution on this accelerated timeline unconscionable.

Third, making the decision to execute Mr. Purkey and providing such short notice before the Bureau of Prisons had developed a comprehensive, written plan, policy or procedure to ensure timely and safe visits during the pandemic and thus protect inmates, staff and visitors alike is utterly reckless.  Semantics aside, you repeatedly promised this week to provide us a "writing" that would set forth in detail the precise safety protocol to protect counsel, our experts, spiritual advisors, family members, and any other person for whom access to Mr. Purkey will be crucial in the next few weeks leading up to and including the execution.  You still have not done so.  Sequential comments in emails (such as your reference today to the possible installation of a sheet or sheets of plexiglass in one room of the prison 10 days into the 30-day execution notice period) does not come close to meeting the Bureau's legal, ethical and moral obligations to provide for the safety of inmates, staff and visitors, assuming any safety procedures would be sufficient to do so during this pandemic.  Moreover, your email comments do not even begin to address all logistical and physical aspects implicated by a visitation to an inmate.  Indeed the absence of such a plan, policy or procedure also would seem to render impossible attendance at the execution of all required persons**.**

Fourth, your repeated encouragement this week that we can and should schedule visits seems more like a disingenuous suggestion that visitations are possible, safe and feasible at this time, particularly since your own website adamantly states that "All visiting at this facility has been suspended until further notice."  The last time you made us such assurances, your staff informed us otherwise, cancelling and/or refusing to schedule visits. Are all inmates capable of receiving visitations at this time, or is the decision to allow visits to Mr. Purkey simply a special "accommodation" to him individually to facilitate your desire to execute him on July 15?

Fifth, your statements regarding the availability of visits to Mr. Purkey is further meaningless given the Bureau's continued failure and refusal to provide us the records and information we have been requesting for months (through FOIA and otherwise) – records that would need to be received and reviewed in advance of

visits with and examinations of Mr. Purkey if those visits and examinations are to be meaningful and sufficient in any respect.  By continuing to withhold the requested information from us, you are deliberately ensuring that any visits with and examinations of Mr. Purkey will be impaired and inadequate.

Given the foregoing, your statements regarding the availability of visits with Mr. Purkey are simply not genuine, in good faith, reasonable, practicable, feasible or safe.  But even were it otherwise, we cannot begin to make evaluations about whether counsel and experts can safely visit Mr. Purkey without substantial additional information wholly apart from the safety plan, policy or protocol.  For example, we would immediately need information about the scope of the outbreak at the Terre Haute facility, including information about all testing conducted at Terre Haute within the last 30 days, including the number of individuals who requested tests, the numbers tested, and the results of those tests.  In addition, we need information about where the visitations will occur, the size of the plexiglass, the ventilation in that room, and any other protections the prison plans to offer. These are just two examples of much more information we would need to make informed decisions about whether counsel and experts can safely visit Mr. Purkey, such as the availability of personal protective equipment (beyond a mask) to staff, Mr. Purkey, and visitors from our team; safety precautions taken within the pathways of travel to legal visits with Mr. Purkey generally and on the day of execution; sanitation and cleaning protocols between visits and between visitors; steps taken to ensure adequate ventilation within the prison; and much more.

Given the urgency of this matter and Mr. Purkey's upcoming execution, we request that you respond to this email (including with the information requested above) before Monday, June 22, 2020, at noon.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Rebecca Woodman <rewlaw@outlook.com>
**Date:** Friday, June 19, 2020 at 10:04 AM
**To:** Katherine Siereveld <ksiereveld@bop.gov>
**Cc:** Michelle Law <Michelle_Law@fd.org>, "McAleer, Chas" <CMcAleer@milchev.com>, "Fleming, Brian" <bfleming@milchev.com>, "Casey, Brian (USAMOW)" <Brian.Casey@usdoj.gov>
**Subject:** Re: Execution notice for Wesley Purkey

Dear Katherine:

I wanted to follow up on our telephone conversation and emails of Tuesday, June 16, 2020. Specifically, you indicated both in your emails and on the phone that written policies to ensure full access to our client, Wes Purkey, who is scheduled to be executed on July 15, 2020, for legal, social, and spiritual visitation while also protecting the safety of our team members, Mr. Purkey, and staff from COVID-19, were being developed and would be issued forthwith. In our telephone conversation on Tuesday, you stated that I would have those written policies within the next hour or two. In an email later in the day on Tuesday, you stated that I would have the written policies the following day. However, I have yet to receive any written policy.

The safety measures that you mentioned in our telephone conversation on Tuesday – temperature checks,

questions about symptoms, a mask (either one's own or provided by the facility), and a preference for non-contact visits – are the same measures that were instituted at USP Terre Haute back in March 2020 when the impact of the COVID-19 pandemic was beginning to be felt in the United States. These measures were also instituted just before we were first notified on March 13, 2020 that all of our visits were cancelled until further notice and the prison went into full lockdown, and thus are obviously insufficient to ensure our safety and protection from COVID-19. The homepage of USP Terre Haute's website still prominently displays a banner stating that "All visiting at this facility has been suspended until further notice." BOP reports there has been one death from COVID-19 and five positive tests at USP Terre Haute, but I am aware of no regular testing regime of either prisoners or staff at the facility, and the known COVID-19 transmission rates in closed spaces like a prison is extreme.

Under the circumstances, we are concerned about the ability of USP Terre Haute to accommodate full access to our client while protecting the safety of ourselves, Mr. Purkey, and staff during the time up to and including the execution itself. In-person access to Mr. Purkey by ourselves and our experts is an essential part of our ability to effectively represent him, and is critical as he is facing an execution date in less than one month. We have been unable to conduct any in-person visitation with Mr. Purkey since March. At the same time, we have team members who are high risk because they are medically vulnerable to COVID-19 or who care for persons who are vulnerable to the virus.

Please provide by close of business today the written policies of measures to protect our safety and the safety of Mr. Purkey, while ensuring full in-person access to our client for legal, social, and spiritual visitation in the next now less than four weeks, up to and including the execution itself, as we need to schedule expert and legal visits immediately.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 2:43 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Andrew Sutton <asutton@bop.gov>
**Subject:** Re: Execution notice for Wesley Purkey

We are still working on a plan that will allow as much visitation as possible while still mitigating the risk of exposure to COVID-19.  I will have something in writing for you by tomorrow, but you can begin to schedule your legal visits as soon as you wish.  The normal schedule will remain the same (M-F, 8-3), we are working on the additional precautions re: COVID.  Please note that vending will not be available.  Mr. Sutton has been copied on this email and can assist you in scheduling.

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 2:00 PM >>>
Yes, you can call me at the number below.

Rebecca E. Woodman

Attorney at Law, L.C.

1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 12:59 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Execution notice for Wesley Purkey

Hi Rebecca,
We do not have anything written yet but I am working on it. Is there a number I can call you at and I can let you know what the plan is?
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 1:58 PM >>>
Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.

1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Monday, June 15, 2020 at 4:48 PM
**To:** Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>
**Subject:** Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey. I will be available tomorrow to discuss legal and social visits going forward. Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476