## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WESLEY IRA PURKEY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:19-cv-03570-TSC |
| WILLIAM P. BARR, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY

Pursuant to the Fifth Amendment, Eighth Amendment, and Rule 26 of the Federal Rules of Civil Procedure, Plaintiff Wesley Ira Purkey ("Plaintiff") hereby respectfully moves for expedited discovery in connection with Plaintiff's Complaint filed on November 26, 2019. *See* Compl., ECF No. 1. Based on the evidence already presented before this Court, Mr. Purkey has made a "substantial threshold showing" of incompetency to be executed under *Ford v. Wainwright*, 477 U.S. 399, 426 (1986). He is therefore entitled to procedural due process protections to adjudicate his competency, which "include[] a 'fair hearing' in accord with fundamental fairness." *Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) (quoting *Ford*, 447 U.S. at 426).

In order for the adjudication of a *Ford* claim to comply with the dictates of fundamental fairness, the prisoner facing execution must be afforded access to highly relevant evidence in the Government's possession and control. In other words, the Government cannot obstruct Mr. Purkey's ability to develop evidence of his incompetency, and then argue that he has not met his

burden to show incompetency to be executed. And, while the evidence of incompetency that Mr. Purkey has so far provided demonstrates that he has met the *Ford* threshold showing, he should also be granted expedited discovery even if the Court does not yet hold that he has met that threshold showing. At a minimum, due process in this case requires that Mr. Purkey be granted an opportunity to obtain expedited discovery to supplement his Renewed Motion for a Preliminary Injunction Barring Execution of Wesley Purkey Pending Final Disposition on the Merits (hereinafter "Plaintiff's Renewed Preliminary Injunction Motion"), filed on June 22, 2020 (ECF No. 23). *See Panetti*, 551 U.S. at 952 (distinguishing between procedures required under *Ford* (namely, an impartial decision maker and an opportunity to offer evidence to counter Government evidence of competency) and others that may be required under the Due Process Clause, such as "the opportunity for discovery or for the cross-examination of witnesses").[1]

Mr. Purkey has actively requested this evidence through every possible channel for almost a year. Yet the Government has not produced a single page of requested material to date. Now, the Government aims to put Mr. Purkey to death on July 15, 2020—a mere 22 days away, and on only 30 days' notice.[2] Given the Government has been sitting on evidence supporting Mr. Purkey's *Ford* claim since it was first requested *300 days* ago, *see* R. Woodman Decl. ¶ 9, ECF No. 23-6, and has given no indication that it will comply with these requests at any point, let

---

[1] Should this Court find that, based on the evidence presented to date, Mr. Purkey has not yet met the threshold showing necessary to trigger a fair hearing under *Ford*, Mr. Purkey requests, in the alternative, expedited discovery of the material requested herein prior to the disposition of his preliminary injunction motion. *See* Pl.'s Renewed Prelim. Inj. Mot., ECF No. 23.

[2] On March 16, 2020, Plaintiff raised the concern in Mr. Purkey's Memorandum in Support of Plaintiff Wesley Purkey's Opposition to Defendants' Motion to Dismiss, or in the Alternative, to Transfer (hereinafter "Purkey's Opposition to Motion to Dismiss") that Defendants might attempt to issue a warrant with as little as twenty days' notice. *See* R. Woodman Decl. ¶ 27, ECF No. 23-6; Purkey's Opp. to Mot. to Dismiss 1, 7–9, ECF No. 20. On April 22, 2020, Plaintiff's counsel also requested in an email to the Government notice of when Attorney General Barr would issue a warrant for Mr. Purkey's execution. Counsel was informed that a warrant was being issued only five minutes prior to its issuance. R. Woodman. Decl. ¶¶ 29, 31, Exs. 37–38, ECF No. 23-6.

alone in advance of Mr. Purkey's scheduled execution, Mr. Purkey moves for expedited

discovery of the following:

(1) The Federal Bureau of Prisons ("BOP") medical and mental health records for Mr. Purkey from January 1, 2017 through the present;

(2) A-Range video surveillance of Mr. Purkey's cell since July 25, 2019 through the present; and

(3) Information about the BOP's ability to protect experts and legal visitors from COVID-19.[3]

Mr. Purkey additionally seeks an order for access to testing, including highly probative

neuroimaging previously ordered by Mr. Purkey's experts. This list of necessary testing includes:

(1) An MRI with and without contrast, (Compl. Ex. 1 at 9, ECF No. 1-1; T. Hyde Decl. ¶ 8, ECF No. 23-4);

(2) Two types of PET scans, (Compl. Ex. 1 at 9, ECF No. 1-1; T. Hyde Decl. ¶ 8, ECF No. 23-4);

(3) An EEG (T. Hyde Decl. ¶ 8, ECF No. 23-4);

(4) A variety of blood tests (*Id.*);

(5) A lumbar puncture and cerebrospinal fluid assays (spinal tap) (*Id.*); and

(6) A DTI scan (Compl. Ex. 1 at 9, ECF No. 1-1).

Expedited discovery of all of the above requested material is both necessary and

appropriate at this time because of Mr. Purkey's rapidly approaching execution date and the

significant and irreparable harm he will suffer absent pre-hearing production and adequate time

for review. The information sought is all critical to an evaluation of the constitutionality of the

Government's stated goal of carrying out Mr. Purkey's execution on July 15, 2020.

---

[3] Although this particular request has only been pending for eight days, the request was made promptly to BOP Legal Counsel upon receiving notice of Mr. Purkey's execution date in the midst of the global pandemic, and is narrowly tailored, limited in scope, and does not place a significant burden on Defendants to produce. *See* R. Woodman Decl. ¶¶ 37–39, Exs. 51–54, ECF No. 23-6.

As set forth herein, this Court can and should authorize this discovery on an expedited basis.

ARGUMENT

### I.    THE GOVERNMENT HAS HIGHLY RELEVANT INFORMATION IN ITS POSSESSION AND CONTROL RELATING TO PLAINTIFF'S *FORD* CLAIM

The BOP has in its exclusive possession medical and custodial records that are highly probative of Mr. Purkey's current and recent functioning. These records include medical records relevant to such issues as whether Mr. Purkey has lost weight, experienced balance problems, become incontinent, or suffered strokes. They also include video surveillance and custody records highly like to provide evidence of Mr. Purkey's paranoia, memory loss, and loss of cognitive functioning. Counsel for Mr. Purkey has sought these records since August of 2019 to no avail. R. Woodman Decl. ¶ 9, ECF No. 23-6. Counsel first asked for the records directly from BOP counsel, who suggested using other processes, such as a FOIA request. *Id.* ¶¶ 10–12, Ex. 4. Counsel then submitted the requests through FOIA to the BOP on October 9, 2019. *Id.* ¶ 12, Exs. 6–8. Although the BOP granted "expedited processing" on October 10, 2019, they claimed that the expedited processing might take as long as six months. *Id*. ¶ 13, Ex. 10. Now, in June, 2020, eight months later, the BOP has still failed to produce a single record, despite the fact that counsel have repeatedly renewed the requests and diligently pursued the production. *Id.* ¶ 13, Exs. 11–12 (October 11, 2019 correspondence discussing that a six-month timeframe is untenable); *id.* ¶ 13, Exs. 12–13 (November 11, 2019 repeated request for production and requesting the BOP provide the materials within ten days in light of Mr. Purkey's fast-approaching, then-scheduled execution date); *id.* ¶ 26, Exs. 26–28 (February 3, 2020 renewed request for production).

4

The BOP has further obstructed Mr. Purkey's access to necessary testing and evaluation by his own medical experts. The BOP refused to permit access to Mr. Purkey for imaging ordered by Dr. Agharkar in September 2019.[4] The Government's months-long refusal to provide this access was then exacerbated by the COVID-19 pandemic. The BOP delayed scheduling, and then refused to schedule, an in-person expert evaluation by Dr. Agharkar, requested in the spring of 2020. *Id.* ¶ 34, Ex. 43. Indeed, for the past three months, the BOP has prohibited or cancelled *all* of Mr. Purkey's counsel's in-person meetings, depriving them of any first hand, face-to-face information about Mr. Purkey's continued decline. These visits are critical to understanding the trajectory of his progressive dementia and his present mental state. *See* Pl.'s Renewed Prelim. Inj. Mot., Ex. 1, ECF No. 23-2 (hereinafter "J. DeRight Letter") (Letter from Jonathan DeRight, PhD, ABPP-CN, Woodbridge Psychological Assoc., to Rebecca E. Woodman, Esq., Attorney at Law, L.C. (June 14, 2020)); T. Hyde Decl. ¶ 14, ECF No. 23-4 (noting observations made over time by mitigation specialists Fox and Vartkessian); *see also* E. Vartkessian Suppl. Decl. ¶ 4, 11, 22–25, ECF No. 23-5 (describing the types of relevant information that are only available through in-person, face-to-face visits).

Now, against the time pressure of a ticking warrant date and the fact that the prison where Mr. Purkey is detained has been locked down by the BOP because of active COVID-19 infections, the BOP has suggested that there is, in fact, appropriate and available access to Mr. Purkey for legal and expert visits. However, members of Mr. Purkey's legal team urgently need more information about the level of infection in the prison and the protective measures the

---

[4] On September 26, 2019, Dr. Agharkar ordered brain image testing based on Mr. Purkey's history of cognitive deficits and the need to rule out an intracranial process. *See* Compl. Ex. 1 at 9, ECF No. 1-1; R. Woodman Decl. ¶ 14, Exs. 14–15, ECF No. 23-6.

prison will take to reduce their risk before they can even evaluate whether it is possible to safely visit Mr. Purkey.

BOP Legal Counsel has provided no written procedures to allow for safe visitations or to otherwise address these concerns despite conditions which greatly increase the risk of exposure to or transmission of COVID-19, including close-living quarters, overcrowding, shared facilities, poor ventilation, limited air flow, and difficulty in maintaining social distancing among prisoners, guards, other staff, and visitors. *See* J. Goldenson Decl. ¶¶ 17-31, ECF No. 23-3. These conditions make it "extremely difficult, if not impossible, to implement [current CDC recommendations] in carceral settings." *Id.* ¶31.[5] These circumstances make it impossible to plan for any type of visit, particularly since getting to the prison would require virtually every member of Mr. Purkey's defense team, including experts, to travel hundreds of miles, some necessarily by plane, during a global pandemic, only to arrive to unsafe conditions and evolving protocol at the prison. R. Woodman Decl. ¶ 37, ECF No. 23-6.

## II.      THIS COURT SHOULD ORDER EXPEDITED DISCOVERY FOR PREPARATION AND PRESENTATION OF A *FORD* HEARING

The Federal Rules of Civil Procedure authorize courts to adjust the discovery timeline and order expedited discovery. *Watts v. SEC*, 482 F.3d 501, 507 (D.C. Cir. 2007); *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006); *see* Fed. R. Civ. P. 26. Courts have developed "two common judicial approaches" to assessing requests for expedited discovery: the *Notaro* approach, as stated in *Notaro v. Koch*, 95 F.R.D.

---

[5] BOP Legal Counsel indicated that the prison intended to install Plexiglass in one contact visiting booth on Thursday, June 25, 2020, for possible use during visits, and on Monday, June 22, 2020, BOP Legal Counsel indicated that Plexiglass had in fact been installed in one of the booths. Given the particularly close quarters within the death row visitation booths and limited ventilation and air flow throughout the prison and the booths, the installation of such a minimal protection, in only one contact booth out of several, falls far short of the coordinated and formalized plan necessary to protect Mr. Purkey, his medical experts and counsel, as well as other staff, prisoners, and members of the community. *See* J. Goldenson Decl. ¶¶ 17-31, ECF No. 23-3.

403, 405 (S.D.N.Y. 1982), and the "reasonableness" or "good cause" test. *Humane Soc'y v. Amazon.com, Inc.*, No. 07-623 (CKK), 2007 WL 1297170, at *2 (D.D.C. May 1, 2007) (citing *In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 142–43 (D.D.C. 2005)); *accord Disability Rights Council of Greater Wash.*, 234 F.R.D. at 4–5; *Attkisson v. Holder*, 113 F. Supp. 3d 156 (D.D.C. 2015). While this Court has previously applied the good cause approach as "more suited to the application of the Court's broad discretion in handling discovery," Mr. Purkey is entitled to expedited discovery under either approach. *Attkisson*, 113 F. Supp. 3d at 161–62.

### A.  This Court Should Grant Mr. Purkey's Expedited Discovery Request Under the *Notaro* Approach

The *Notaro* approach requires that the party seeking expedited discovery demonstrate "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *In re Fannie Mae*, 227 F.R.D. at 142 (quoting *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982)).

*First***,** as Mr. Purkey has already demonstrated extensively in his Renewed Motion for a Preliminary Injunction, ECF No. 23 at 31–32, he will undeniably suffer irreparable injury should the Government be allowed to continue obstructing Mr. Purkey from obtaining evidence necessary to his *Ford* claim that is in Defendants' sole possession and control. Without expedited discovery, Mr. Purkey will be executed well before he has the opportunity to review and present evidence relevant to his *Ford* claim. As this Court has previously held, "nearly certain death" is "the ultimate irreparable injury." *Wilson v. Grp. Hospitalization & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992); *see also Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985)

(Mem.) (Powell, J., concurring) (irreparable harm that will result if stay is not granted "is necessarily present in capital cases").

*Second*, as clearly demonstrated in his Renewed Motion for a Preliminary Injunction, ECF No. 23 at 23–29, Mr. Purkey's likelihood of success on the merits is substantial, even on the basis of the evidence currently available to him and without the additional information he has been denied to date. Under the Eighth Amendment, a condemned prisoner is deemed incompetent when he cannot rationally understand his punishment, or the reason for it. *Panetti*, 551 U.S. at 958–60. Mr. Purkey presents this Court with substantial evidence of his incompetency through an expert evaluation finding him incompetent as of the time of the evaluation as well as contemporaneous institutional records and psychiatric evaluations documenting decades of delusional behavior and rapidly progressing dementia.[6] In the face of such evidence, carrying out Mr. Purkey's execution without affording him an opportunity to review and present crucial evidence of his incompetency would violate the Due Process Clause of the Fifth Amendment. U.S. Const. amend. V.

*Third*, a close connection exists between the expedited discovery requested and the avoidance of the irreparable injury—death, in Mr. Purkey's case. The requested discovery is both appropriately tailored and critical to provide this Court the facts necessary to make an informed decision about Mr. Purkey's current competency and, thus, the constitutionality of executing his sentence on July 15, 2020. The reports from Drs. DeRight and Agharkar and declaration from Dr. Hyde highlight the importance of the BOP medical records to questions of fact regarding Mr. Purkey's current competency. For example, before visitation was suspended, Mr. Purkey's legal

---

[6] Mr. Panetti, who was presumed without question to have met the substantial threshold showing, provided the Court "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row." *Panetti*, 551 U.S. at 938, 950. Mr. Purkey, in comparison, has produced multiple expert and counsel declarations and numerous pages of documentary evidence.

team reported that Mr. Purkey appeared to be incontinent. Compl. Ex. 3 at 25, ECF No. 1-1. This is an important marker of Alzheimer's Disease. *Id*. at 28. The medical records may shed light on when Mr. Purkey's incontinence began, and the extent of his loss of this biological function. Dr. Agharkar noted that Mr. Purkey has less movement on the right side of his face, as if he had suffered a stroke. Compl. Ex. 1 at 10, ECF No. 1-1. Without the medical records, counsel lacks information about whether Mr. Purkey has had any strokes over the last three years. Moreover, the video footage of Mr. Purkey's cell and the BOP death watch policies would shed some light on whether Mr. Purkey's complaints that guards were depriving him of sleep for months on end was rooted in reality or delusion. *See* Compl. ¶ 80, ECF No. 1; R. Woodman Decl. ¶ 10, Exs. 1-3, ECF No. 23-6. These examples are merely illustrative, not exhaustive, of the information that can and should be obtained through discovery.

The need for the withheld medical records is especially pressing because no one, including any of Mr. Purkey's counsel, mitigation specialists, or medical experts, has been able to visit Mr. Purkey since March 13, 2020. *See* R. Woodman Decl. ¶¶ 7, 13, 33–35, ECF No. 23-6; E. Vartkessian Supp. Decl. ¶¶ 3, 12, ECF No. 23-5. As Drs. DeRight and Hyde stated, these in-person visits from and ongoing observation by individuals who have known Mr. Purkey for some time and have witnessed his declining functions over the years are critical to understanding the trajectory of his progressive dementia and present mental state. *See* J. DeRight Letter, ECF No. 23-2; T. Hyde Decl. ¶ 14, ECF No. 23-4 (noting observations over time of mitigation specialists Fox and Vartkessian). Yet for the last three months, Mr. Purkey has only had access to his defense team through limited telephone calls, which—due to his paranoia and delusions—have further fostered Mr. Purkey's frustrations with and distrust of his counsel. E. Vartkessian Supp. Decl. ¶¶ 3, 12, 25, ECF No. 23-5.

Additionally, the need for medical examinations and testing is consistent with the standard of care for dementia cases. Appropriate care for an individual such as Mr. Purkey who is suffering from dementia requires repeated neuropsychological examinations, including up-to-date neuroimaging and blood laboratory tests, to assess his current abilities and the progression of his dementia. *Id.* Dr. Hyde has opined that such additional examination and testing of Mr. Purkey is necessary. *See* T. Hyde Decl. at ¶ 8, ECF No. 23-4 (stating that "a complete neurological assessment includes a face-to-face interview and physical neurological examination of Mr. Purkey, and follow-up with relevant diagnostic testing," to include an MRI, EEG, a variety of blood tests, spinal tap, and PET scans). However, because of BOP's COVID-19 response, Dr. Agharkar has not been able to meet with Mr. Purkey since November 8, 2019. *See* R. Woodman Decl. ¶ 34, Ex. 43, ECF No. 23-6 (explaining that, after attempting to schedule an in-person evaluation with Dr. Agharkar, counsel received an email from BOP Legal Counsel on March 13, 2020, stating that the "previously-requested visit with Mr. Purkey by defense expert Dr. Bhushan Agharkar, M.D. 'was not scheduled and is now not considered under the circumstances.'"). Similarly, Dr. DeRight has not been able to meet with Mr. Purkey since his first evaluation of him on August 9, 2019 (Compl. Ex. 3 at 2, ECF No. 1-1, J. DeRight Letter, ECF No. 23-2), while Dr. Hyde has been prevented from meeting with Mr. Purkey entirely (T. Hyde Decl. ¶ 9, ECF No. 23-4).

Because Mr. Purkey has been denied access to counsel and expert assistance both before and during the pandemic, expedited discovery requests relating to the BOP's COVID-19 visitation protocols and policies is also closely connected to avoidance of irreparable injury. COVID-19 is a global pandemic that has sickened over two million people and resulted in over 119,000 deaths in the United States alone. J. Goldenson Decl. ¶ 8, ECF No. 23-3. Cases

10

continue to rise in states across the country, including in the Midwest. *Id.* Prisons and other detention facilities pose heightened risks for exposure and transmission of COVID-19. *Id.* ¶ 17. The lack of adequate ventilation, inability of all prisoners and staff to practice social distancing, inadequate hand washing, and insufficient cleaning practices all contribute to the increased risk of the rapid spread of COVD-19 in prisons. *Id.* ¶¶ 18–31. With limited testing and no published data about the number of tests administered at USP Terre Haute, it is impossible to know the full scale of the infection at the facility. *Id.* ¶ 37.

All three of Mr. Purkey's expert witnesses have made clear how vital it is for Mr. Purkey's legal team to have in-person visits, testing, imaging, and examinations to obtain an accurate assessment of the progression of his dementia. *See* Compl. Ex. 1, ECF No. 1-1; J. DeRight Letter, ECF No. 23-2; T. Hyde Decl. ¶¶ 8–9, 11–12, 15–17, ECF No. 23-4. By fast-tracking Mr. Purkey's execution, the Government ignores the unfortunate realities of the COVID-19 pandemic, creating an impossible choice for Mr. Purkey's medical experts and counsel: in order to meet with their client and fulfill their professional obligations, they must risk their own lives, the lives of family members, or those of medically vulnerable persons for whom they are charged with caring. Mr. Purkey's legal team and medical experts, several of whom are in a high-risk category for COVID-19, are entitled to know what, if any, formal policies BOP has in place to protect them, Mr. Purkey, and others during in person-visits, which are necessary to fill in the over three-month gap of information caused by the BOP's suspension of visitations.

*Fourth* and finally, the injury that will result without expedited discovery looms greater than any alleged injury Defendants will suffer if the expedited relief is granted. Defendants have had nearly a year to prepare and produce Mr. Purkey's BOP medical and mental health records,

the video surveillance of Mr. Purkey's cell, and BOP policies and procedures regarding the day and night watch protocols for death row. Indeed, BOP granted "expedited" processing of these requests in October of 2019, estimating a *maximum* of six months needed to produce the material. Now—eight months later—BOP has had more than ample time by their own calculations to fulfill these requests. Moreover, Mr. Purkey is willing to bear any cost associated with such production. Further, Mr. Purkey's more recent request for the BOP COVID-19 visitation policies and procedures should not place any significant burden on Defendants, who voluntarily opted to schedule his execution during a global pandemic. To the extent no such COVID-19 visitation policies existed previously, Defendants should not have issued the warrant for Mr. Purkey's execution, on 30 days' notice, before ensuring such policies were in place. Defendants previously promised Mr. Purkey's counsel they would disclose these policies by June 17, 2020. R. Woodman Decl. ¶ 38, ECF No.23-6. No disclosure of written policies was ever made. Now, a week later, Defendant should presumably be prepared to do so. For these reasons, disclosure of recently implemented policies that were previously promised should be no more burdensome on Defendants than their email notifying Mr. Purkey's counsel of his new execution warrant.

Mr. Purkey more than satisfies the prongs of the *Notaro* approach, and this Court should grant expedited discovery on all of Mr. Purkey's discovery requests.

**B. This Court Should Grant Mr. Purkey's Expedited Discovery Request Under the Reasonableness Test**

The second approach to evaluating the need for expedited discovery directs that the Court "decide the motion based on the 'reasonableness of the request in light of all of the surrounding circumstances.'" *In re Fannie Mae*, 227 F.R.D. at 142 (quoting *Entm't Tech. Corp. v. Walt Disney Imagineering*, No. Civ.A. 03-3546, 2003 WL 22519440, at *3 (E.D. Pa. Oct. 2, 2003));

12

*accord Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 623–24 (N.D. Ill. 2000). Factors to be considered under this "reasonableness" test may include "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *In re Fannie Mae*, 227 F.R.D. at 142–43; *accord Disability Rights Council of Greater Wash.*, 234 F.R.D. at 4–5. Again, each of these factors weigh in favor of Mr. Purkey.

*First*, Plaintiff has a pending motion for a preliminary injunction of his execution pending final determination on the merits of his claims. The motion was filed on June 22, 2020. *See* Pl.'s Renewed Prelim. Inj. Mot., ECF No. 23.

*Second*, the discovery requests are narrowly tailored to the material necessary to prepare for and present evidence at a *Ford* hearing. Although Plaintiff has made a sufficient showing on the papers to warrant preliminary injunctive relief, this requested discovery would provide additional support for the injunctive relief in the event that the Court does not order it immediately or does not wish to implement an injunction through final disposition on the merits without the presentation of further evidence of incompetency.

*Third*, the purpose for the discovery is that the information requested, as described above, is highly relevant to Plaintiff's incompetency to be executed and is in the Defendants' sole possession, custody and control. *See e.g.*, *Druery v. State*, 412 S.W.3d 523, 527 (Tex. Crim. App. 2013) (after warrant scheduled, court ordered discovery of prison and other agency records that counsel argued were necessary to support the threshold showing of incompetency under *Ford)*; *Commonwealth v. Banks*, 943 A. 2d 230, 232–33 (Pa. 2009) (after appellate court ruled prisoner entitled to *Ford* hearing, trial court ordered the Department of Corrections to produce "all

records in its possession related" to prisoner); *Billiot v. Epps*, 671 F. Supp. 2d 840, 853–54 (S.D. Miss. 2009) (discussing importance of historical medical records for competency determination).

*Fourth*, there is a minimal burden on Defendants, as detailed above, if expedited discovery is granted. Critically, Defendants created any burden that may exist first by failing to respond to reasonable evidence requests for months—even after admitting that the requests were entitled to expedited processing and providing an outside time frame of six months for production, a time frame that has come and gone—and second, by scheduling Mr. Purkey's execution on 30 days' notice, in the middle of a global pandemic, after months of denying in-person visitations.

*Fifth*, and relatedly, the vast majority of the requested information has been pending with Defendants for almost ten months, well in advance of this motion. Defendants have had more than a reasonable timetable to produce relevant materials by any discovery measure.

Thus, under the "reasonableness" test, this Court should grant all of Mr. Purkey's discovery requests on an expedited basis.

## CONCLUSION

For the foregoing reasons, Mr. Purkey respectfully request that the Court grant his Motion for Expedited Discovery and provide him the requested discovery on the timeline included in the Proposed Order, filed herewith, to allow him the due process required to adequately adjudicate his *Ford* competency claim within the bounds of fundamental fairness.

DATED: June 23, 2020                                  Respectfully Submitted,

                                                      */s/Charles F.B. McAleer, Jr.*
                                                      Charles F.B. McAleer, Jr. (DC Bar
                                                      #388681)
                                                      Miller & Chevalier Chartered

900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5963
Email: CMcAleer@milchev.com

*/s/Brian Fleming*
Brian Fleming (DC Bar #974889)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5871
Email: bfleming@milchev.com

*/s/Rebecca E. Woodman*
Rebecca E. Woodman (*pro hac vice*)
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

*/s/Michelle M. Law*
Michelle M. Law, MO Bar No. 45487
(appointment motion to be filed)
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile: (417) 873-9038
Email: michelle_law@fd.org

**Counsel for Plaintiff**