## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

WESLEY IRA PURKEY,

      Plaintiff,

  v.

WILLIAM P. BARR, *et al.*,

      Defendants.

No. 1:19-cv-03570-TSC

### SUPPLEMENTAL DECLARATION OF REBECCA E. WOODMAN, ATTORNEY AT LAW

Rebecca E. Woodman, pursuant to 28 U.S.C. §1746(2), declares as follows:

1.    I am an attorney representing Plaintiff Wesley I. Purkey ("Mr. Purkey" or "Plaintiff") in the above-captioned action ("Civil Action"), admitted to the Court *pro hac vice*. I am over eighteen (18) years old and competent to attest and declare to the matters set forth herein. Unless otherwise stated, I have personal knowledge regarding the facts set forth herein.

2.    On June 22, 2020, I submitted a declaration detailing, in pertinent part, Mr. Purkey's defense team communications with Federal Bureau of Prisons ("BOP") Legal Counsel concerning matters pertaining to Mr. Purkey, including various requests for BOP medical and mental health records, "death watch" surveillance videos, the need for in-person expert visits and evaluations of Mr. Purkey as well as certain medical tests and imaging, and requests for written protocols, policies, and procedures concerning COVID-19 safety measures and testing at USP Terre Haute that would ensure safe access to USP Terre Haute by members of Mr. Purkey's defense team in the weeks leading up to his July 15, 2020 execution date. My previous declaration was filed on June 22, 2020 at ECF No. 23-6 in this matter. This supplemental declaration provides

1

updated information concerning additional correspondence with BOP regarding the above-mentioned matters since the date of my previous declaration. As set forth in my previous declaration, I possess the necessary qualifications to submit this supplemental declaration. R. Woodman Dec. ¶¶ 1-3 (ECF No. 23-6).

3.      As stated in my previous declaration, on June 15, 2020, prior to receiving notice of Mr. Purkey's new warrant, I emailed BOP Legal Counsel Siereveld regarding my outstanding request for Mr. Purkey's BOP records, attaching copies of all of my previous requests and emphasizing the importance of the records to the ability of our expert, Dr. Jonathan DeRight, to accurately assess and evaluate Mr. Purkey's current mental state and the extent of his deterioration, especially given Dr. DeRight last saw Mr. Purkey in August 2019. R. Woodman Dec. ¶¶ 14-15, Ex. 39 (ECF No. 23-6). In a separate email the same day, also prior to receiving notice of Mr. Purkey's new warrant, I emailed BOP Legal Counsel Siereveld about the need for Dr. DeRight to conduct an in-person follow up evaluation of Mr. Purkey. Ex. 1. I attached to the email a letter from Dr. DeRight setting forth the need to review complete records and for an up to date MRI, an EEG, and blood laboratory results which are necessary to assess Mr. Purkey's current abilities and disease progression. *Id.* As of June 22, 2020, the date of my previous declaration, I had received no response from BOP Legal Counsel Siereveld or any other BOP personnel in response to either of these outstanding requests.

4.      On June 23, 2020, BOP Legal Counsel Siereveld emailed a response to my June 15 email regarding the testing set forth in Dr. DeRight's letter, stating that she "went ahead and had our Medical start working on" getting Mr. Purkey scheduled for an MRI, EEG and blood work, and that she would need the specific parameters of the blood work needed. *Id.* The next day, I responded to BOP Legal Counsel, reminding her of our previous requests for the "BOP written

safety plan/protocol/policy relating to COVID-19" in order to determine if and when it is safe to schedule an expert visit, noting that I had requested these materials several times with no response, and that the materials were necessary to make that determination. Ex. 2. I also expressed appreciation for BOP's apparent openness to testing now, after previously refusing to allow this type of testing without a court order. *Id.* Further, I informed BOP Legal Counsel that, to the extent such testing would be performed by BOP personnel, we would first need information about who would be administering the testing, their qualifications, training, and experience, and the equipment that would be used for the testing that we required. *Id.* I also specifically set forth the testing we required in the email. Given the brief window of time before Mr. Purkey's scheduled execution date, I asked BOP Legal Counsel to provide this requested information before the close of business on June 26, 2020. *Id.*

5.    On June 24, 2020, I received a response email from BOP Legal Counsel Siereveld, who referred me to the BOP website for "BOP's plan" for visitation during the COVID-19 pandemic. *Id.* The link BOP Legal Counsel provided for this visitation "plan" merely states that "[s]ocial visits are suspended" and that "[l]egal visits are suspended for 30 days, at which time the suspension will be re-evaluated." *See id.*; https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed July 2, 2020). The information on the webpage, even today, remains unchanged from when BOP first suspended all visitation in mid-March. It provides no information about safety measures for a scheduled and approved visit apart from a link to the form used to screen incoming visitors. The form asks just three questions: 1) have you traveled from or through China, Iran, South Korea, Italy, or Japan; 2) have you had close contact with anyone diagnosed with COVID-19 in the last 14 days; and 3) do you currently have a fever, chills, cough, or shortness of breath. The form is dated March 13,

2020 and contains no indication of having been updated since BOP's original suspension of all visitation on that date. *See* Visitor/Volunteer/Contractor COVID-19 Screening Tool, available at https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf (last accessed July 2, 2020). BOP Legal Counsel's June 24, 2020 email reiterated mask availability at USP Terre Haute and stated that "we have hand sanitizing stations available and plexiglass has been installed in the contact visitation booth." Ex. 2. Apart from this extremely limited information, BOP Legal Counsel provided no explanation for where and to whom the sanitizing stations would be available or how social distancing will be enforced at the various stages of visitation, including the process of checking in, going through security, and moving throughout the facility on the way to and from the visiting rooms. Instead, she ended her communication on the topic of COVID-19-related safety measures by stating, "[i] is unclear what additional protocols you are seeking." *Id.*

6.    Regarding the provision of medical testing, BOP Legal Counsel stated in this same June 24, 2020 email that it remained BOP's position that "any medical or psychological testing which is not clinically indicated (such as this) requires a court order" but that "recogniz[ing] the urgency of the time frame," BOP was willing to make an "exception" to the court order requirement if we did not yet obtain a court order—unless an order was issued denying our request for outside testing. *Id.* BOP Legal Counsel stated further that BOP staff would not be performing any of the tests, which would have to be performed by outside medical personnel, with the possible exception of blood tests. *Id.* In an email sent the next day, June 25, 2020, BOP Legal Counsel Siereveld advised that BOP "cannot order or pay for testing which is not clinically indicated." Ex. 3. Referring to an attached email chain on October 4, 2019 between herself and Michelle Law regarding costs of different tests discussed at that time, BOP Legal Counsel stated she was working

4

to confirm that the estimated costs therein were consistent with what they would be today. She also indicated that the security costs set forth in the earlier email correspondence with Ms. Law would likely remain the same, but that she was "running that to ground as well." *Id.*; *see also* R. Woodman Dec. ¶ 7, Ex. 17 (ECF No. 23-6). BOP Legal Counsel requested that I send her the specific parameters of the additional testing so that she could provide cost estimates and begin scheduling. Ex. 3.

7.      I sent an email response to BOP Legal Counsel Siereveld the same day, June 25, 2020, requesting further information with respect to COVID-19, given that the "plan" outlined in all previous correspondence appeared to be materially unchanged from the plan that was implemented prior to the COVID-19 lockdown and remained insufficient to address our concerns. Ex. 4. I also requested further information regarding the medical testing of Mr. Purkey, including the hospital that would conduct the testing, whether the hospital had the equipment and personnel to conduct the requested testing, the logistics of transporting Mr. Purkey for the testing, and the safety precautions for doing so in light of the ongoing pandemic. I also confirmed the specific blood tests we were requesting. *Id.* Finally, I reminded BOP Legal Counsel of our prior, repeated requests for complete BOP medical records and videos that had been withheld. *Id.*

8.      On June 26, 2020, BOP Legal Counsel responded by email that "sanitizing stations" will be placed "between the front entrance and the SCU [Special Confinement Unit]," but made no mention of the availability of such stations inside the facility. *Id.* BOP Legal Counsel also stated for the first time that "our intent is to assign one visiting room to a particular inmate to further reduce any possibility of cross-contamination" but acknowledged that there are only three non-contact visiting rooms. *Id.* This response fails to account for the possibility that the visiting rooms, even if apportioned in this way, would still be used by an unspecified number of different

individuals, given each prisoner would likely have visits from multiple people. BOP Legal Counsel did not elaborate on how BOP's "intent" would change in the event more than three prisoners have scheduled visits. Additionally, BOP Legal Counsel's email implied this arrangement regarding non-contact visits applied only to "social" visits. *Id.* Given BOP Legal Counsel's email the previous week stating a "preference" for non-contact visits, it is still unclear what if any arrangements the BOP is making for contact visits with members of the defense team, aside from a brief reference to plexiglass having been installed in one contact visitation booth.

9.      With respect to our repeated and renewed requests for medical records and "death watch" surveillance videos, all of which I attached in email correspondence to BOP Legal Counsel as recently as June 15, 2020 (R. Woodman Dec. ¶¶ 14-15, Ex. 39 (ECF No. 23-6)), BOP Legal Counsel claimed in her June 26, 2020 email that she was "unaware of any outstanding requests for medical and psychological records[.]" Ex. 4. Despite having previously and repeatedly advised us that, in order to obtain such records for Mr. Purkey, we should utilize the FOIA process, and despite the fact that we did submit multiple FOIA requests, BOP Legal Counsel this time stated that "the two quickest ways" to obtain "medical and psych" files was to ask our client to request a copy of his own records through BOP staff, or "through the discovery process." *Id.* Regarding the requested testing, BOP Legal Counsel stated that the BOP "cannot provide you with specifics as to the logistics for security reasons," and asked us to let her know how we would like to proceed. *Id.*

10.      On June 30, 2020, I sent an email to BOP Legal Counsel Siereveld advising her that we had identified University Hospital in Indianapolis as a location where all of our requested testing could be performed, and that we were in the process of confirming which days during the week of July 6, 2020 the hospital could perform the tests. Ex. 5. I informed BOP Legal Counsel

that we would provide that information to her once we confirmed it. *Id.* I also again requested information that would assure us that Mr. Purkey's health would be suitably and adequately protected during the process of transferring him to the hospital for the testing and again requested further information about our pandemic-related concerns and inquiries, given that the information we had received thus far remained insufficient to address those concerns regarding the safety of visiting USP Terre Haute and the effort to conduct executions in the midst of the pandemic. *Id.* I further informed BOP Legal Counsel that her stated lack of knowledge of our outstanding records request was neither credible nor made in good faith in light of my prior requests, and that her assertion now that we could obtain these records through our client, whom BOP was seeking to execute in the next two weeks, or through the discovery process, which defense counsel was actively opposing, was not a good faith response. *Id.*

11.     On July 1, 2020, I emailed BOP Legal Counsel Siereveld and attached specific testing orders written by our expert, Dr. Thomas Hyde, M.D., Ph.D., and stated that we were seeking to confirm the testing at Methodist Hospital in Indianapolis for two days next week, on July 7 and July 9, 2020. I further informed BOP Legal Counsel that we would confirm specific scheduling with her so that necessary transportation arrangements for Mr. Purkey could be made. Ex. 6. To date, I have received no further response from BOP Legal Counsel.

I DECLARE PURSUANT TO 28 U.S.C. §1746(2) AND UNDER PENALTY OF PERJURY THAT THE FOREGOING FACTS ARE TRUE AND CORRECT.

DATED: 7-2-2020

REBECCA E. WOODMAN
ATTORNEY AT LAW
COUNSEL FOR MR. PURKEY

# Exhibit 1

**Wednesday, July 1, 2020 at 15:09:24 Central Daylight Time**

---

**Subject:** Re: Purkey- expert visitation

**Date:** Tuesday, June 23, 2020 at 12:48:07 PM Central Daylight Time

**From:** Katherine Siereveld

**To:** Rebecca Woodman

Hi Rebecca,

Just following up on this. I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution? I did not see any follow up information on these specific issues. I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.

Thanks,

Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>

Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,

Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 2

| **Subject:** | Re: Purkey- expert visitation |
| --- | --- |
| **Date:** | Wednesday, June 24, 2020 at 3:25:57 PM Central Daylight Time |
| **From:** | Katherine Siereveld |
| **To:** | Rebecca Woodman |
| **CC:** | Brian Fleming, Chas McAleer, Brian Casey |
| **Attachments:** | WP.pdf, Scanning_Parameters_1.pdf |

Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp. Additionally, the Terre Haute specific numbers you requested can be found here:  https://www.bop.gov/coronavirus/. I also advised that masks are to be worn at all times in the facility.  If you do not have a mask, one will be provided to you.  Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth.  We have already begun successful visiting for the inmates who received execution dates.  It is unclear what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court order.  While it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing.  Did the Court deny your request or was an order not sought?

BOP staff will not perform any of these tests.  All of the requested tests would need to be performed by outside medical personnel.  The only exception might be the blood tests.  BOP personnel would likely draw the blood and then send to an outside lab for the requested tests.  Do you have a list of the tests?  I believe the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me.  I will still have access to email and can step out to call if necessary.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>
Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1.  An MRI with and without contrast,

2. Two types of PET scans

3. An EEG

4. A variety of blood tests

5. A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6. A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this.  I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution?  I did not see any follow up information on these specific issues.  I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>
Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent

**Page 2 of 3**

of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 3

| **Subject:** | Re: Purkey- expert visitation |
|---|---|
| **Date:** | Thursday, June 25, 2020 at 1:01:58 PM Central Daylight Time |
| **From:** | Katherine Siereveld |
| **To:** | Rebecca Woodman |
| **CC:** | Rick Winter, Brian Fleming, Chas McAleer, Brian Casey |
| **Attachments:** | RE: Medical Imaging Tests for Wesley Purkey.eml |

Hi Rebecca,

I have re-attached the email chain between Michelle Law and myself regarding the costs of the different tests which were discussed at that time. As a reminder, the BOP cannot order or pay for testing which is not clinically indicated. I am working to confirm that those costs are consistent with what they would be today. The security costs will likely remain the same, but I am running that to ground as well. Please let me know as soon as possible the specific parameters of the additional testing which was not previously identified so I can get cost estimates to you and we can begin scheduling.

Thanks,

Katherine

>>> Katherine Siereveld 6/24/2020 4:25 PM >>>

Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp. Additionally, the Terre Haute specific numbers you requested can be found here: https://www.bop.gov/coronavirus/. I also advised that masks are to be worn at all times in the facility. If you do not have a mask, one will be provided to you. Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth. We have already begun successful visiting for the inmates who received execution dates. It is unclear what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court order. While it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing. Did the Court deny your request or was an order not sought?

BOP staff will not perform any of these tests. All of the requested tests would need to be performed by outside medical personnel. The only exception might be the blood tests. BOP personnel would likely draw the blood and then send to an outside lab for the requested tests. Do you have a list of the tests? I believe the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me. I will still have access to email and can step out to call if necessary.

Thank you,

Katherine

Katherine N. Siereveld

Senior Attorney

FCC Terre Haute

4200 Bureau Road North

Terre Haute, Indiana 47802

(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>

Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after

previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1.  An MRI with and without contrast,

2.  Two types of PET scans

3.  An EEG

4.  A variety of blood tests

5.  A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6.  A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com


---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this.  I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution?  I did not see any follow up information on these specific issues.  I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802

(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>

Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

Exhibit 4

**Wednesday, July 1, 2020 at 15:06:38 Central Daylight Time**

**Subject:** Re: Purkey- expert visitation

**Date:** Friday, June 26, 2020 at 12:34:12 PM Central Daylight Time

**From:** Katherine Siereveld

**To:** Rebecca Woodman

**CC:** Rick Winter, MichelleLaw, Brian Fleming, ChasMcAleer, Brian Casey

Hi Rebecca,

I think there may be some confusion regarding the COVID-19 testing data you are seeking. You are correct that the BOP webpage did not initially have detailed data about the testing, but that is no longer the case. If you scroll to the section after the facility-by-facility breakdown of active cases, you will see a section which details the numbers of completed tests, pending tests, and positive tests. That data is shown both in the aggregate and for each facility. The data is further explained on the webpage under the heading "About the Data" which I have copied here:

*About the Data*

*These data are compiled from a variety of sources and reviewed by BOP Health Services staff before documented for reporting. **Not all tests are conducted by and/or reported to BOP**. The number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons at the specific facility who have been tested, whether at that site or at a prior facility.*

As for the sanitation stations, yes, those include hand sanitizer and individual sanitizing wipes liberally available at points between the front entrance and the SCU. This is obviously in addition to the soap and water provided in the restrooms, and any additional sanitizer you wish to request from staff. The individual visiting rooms are wiped down before and after visits. Additionally, to the extent possible, we are attempting to assign visiting spaces to each inmate. For example, we have 3 non-contact visiting rooms and have so far only had social visits requested for 3 inmates. Until we have more than those three, our intent is to assign one visiting room to a particular inmate to further reduce any possibility of cross-contamination.

I am unaware of any outstanding requests for medical and psychological records, but if you can let me know when and how you requested them, that can help me track them down. As a general rule, the two quickest ways to receive medical and psych files is for either your client to request a copy of his own records via a request to staff, which he can then forward to you; or, request those records through the discovery process.

With regard to the outside testing you are now requesting, we cannot provide you with specifics as to the logistics for security reasons. Once the tests are confirmed, we will be able to advise that one or more facilities will be able to conduct the testing you have requested within the diagnostic parameters you have outlined. You will receive the results which will have the names of the facilities and medical personnel as part of the records. To that end, I will let you know if any additional information is required to successfully schedule those tests.

The BOP does not pay for unnecessary outside tests on inmates which are not clinically indicated. Per our medical and psychology staff, a review of Mr. Purkey's records reveals no clinical indication for the testing you are requesting. Our medical and psychology staff simply cannot order testing which they do not believe is necessary to the care of that individual. Please let us know how you would like to proceed.

Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/25/2020 8:39 PM >>>
Hi Katherine:

Thank you for your emails dated June 24, 2020 (4:26 p.m.) and today at 1:02 p.m.  In response, and further to my prior emails on this topic, including in particular my email dated June 20, 2020 (12:55 p.m.), I respond as follows.

Once again, your plan for visits at USP Terre Haute, which appears to be materially unchanged from the plan that was implemented prior to the COVID-19 lockdown, remains insufficient to address our concerns.

As I have stated numerous times, in order for us to make informed decisions about the safety of any visitation at USP Terre Haute – whether by Mr. Purkey's legal counsel, expert witnesses, spiritual advisors, friends or family members -- we need much more information. The critical nature of the associated risks and the essential role of data to make safety determinations should come as no surprise to you.  Indeed, the need for extensive information to evaluate COVID-19 related health risks in prisons is the subject of virtually daily court opinions (*see* the attached June 18, 2020, decision by the U.S. District Court for the District of Columbia) and media exposes.  *See* T. Thomas, "How U.S. Prisons Became Ground Zero for Covid-19," *Politico* (June 25, 2020), [https://www.politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022](https://www.politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022).

For example, you still have not provided all the testing data we and our experts need to evaluate the risks associated with visitations and to develop necessary mitigation risks. We are well aware of the COVID-19 statistics reporting the  number of confirmed positive cases posted on BOP's website. We are requesting critical contextual information about those positive numbers, including information about the numbers of tests administered, the number of pending test results, and the numbers of positive and negative results.  We have requested this information from you and in our court filings, but the answers have still not been forthcoming.

Additionally, we have no information from you at this time about sanitation, the frequency of surface cleaning and disinfecting throughout the buildings from the front door entry point to the visitation booths, and I have no idea what you mean when you refer to "sanitizing stations." Is that shorthand for the hand sanitizer you've mentioned in our previous correspondence? Nor is it clear what you mean by "successful visiting for the inmates who have execution dates" – since COVID-19 has a 2-14 day incubation period following exposure to the virus, the mere fact that a visitation has taken place is in no way an indicator of "success," however defined.  (It is worth noting that the apparent continued prohibition on visitations with prisoners at USP Terre Haute who are not facing execution is proof enough of the high risk to which prisoners, staff and visitors are exposed at the prison.  "Excepting" certain prisoners for pre-execution visitations does not preclude that risk.)

Leaving aside what your willingness and apparent ability now to grant Mr. Purkey an exception to be tested

says about your previous insistence on a court order (which we sought but were denied in prior litigation because there was not a *Ford* claim pending, which there now is in federal district court), many questions remain before we can go forward with any testing. Specifically, we need to know the precise logistics of accomplishing the testing in the short time period available. In which hospital will the testing take place? Does the hospital have the equipment and personnel available to conduct the blood tests, MRI, DTI, two types of PET scans (one using a radioactive tracer to measure glucose metabolism in regions of the brain , and a second measuring the deposition of an abnormal protein in the brain called amyloid-b), and EEG that we are requesting? We need to know the logistics of transporting our client for the testing, e.g., how will it be done safely, when it can be done, what steps need to be taken in order to facilitate transportation, such as what sort of paperwork will be required?

With respect to the issue of blood tests, and given that Mr. Purkey will need to be transported to a hospital for the necessary imaging tests, it seems unnecessary for prison staff to conduct the necessary blood tests, which can be performed by hospital staff.  However, to respond to your inquiry, the necessary blood tests would include the following (please excuse any layperson imprecision):

Complete Blood count and differential;
Fasting blood glucose;
Liver function tests AST ALT GGT;
Bilirubin level;
Renal function (BUN and creatine);
Thyroid;
Lyme;
Syphilis;
HIV;
B12; and
Folate.

Finally, we are not prepared to accept your denial of responsibility for the costs of testing, particularly your apparent justification that the requested testing is not "clinically indicated."  We have submitted substantial evidence in the pending *Ford* litigation to demonstrate that such testing is, in fact, warranted and clinically indicated, regardless of how such testing might also inform adjudication of the pending litigation.  That conclusion will become even more evident when we and our experts are able to review Mr. Purkey's complete medical records and video surveillance records, which we have been repeatedly requesting and which have been withheld from us.  Indeed, those records may demonstrate in further detail that the requested testing has been "clinically indicated" for some time but not administered by the Bureau of Prisons.

In closing, having confirmed for you the necessary blood tests and imaging that need to occur, we will await the details regarding how that testing will be implemented.  We will also await the full scope of COVID-19 related information we have requested and, whether extant or not, the details of <u>all</u> of the safety protocols necessary to protect the health of Mr. Purkey, prison staff and visitors given the COVID-19 statistics and conditions of the prison, on the basis of which we and our experts can determine whether and under what circumstances visits with Mr. Purkey can be scheduled and safely conducted.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Thursday, June 25, 2020 at 1:02 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, Brian Fleming <bfleming@milchev.com>, Chas McAleer <CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
I have re-attached the email chain between Michelle Law and myself regarding the costs of the different tests which were discussed at that time.  As a reminder, the BOP cannot order or pay for testing which is not clinically indicated.  I am working to confirm that those costs are consistent with what they would be today.  The security costs will likely remain the same, but I am running that to ground as well.  Please let me know as soon as possible the specific parameters of the additional testing which was not previously identified so I can get cost estimates to you and we can begin scheduling.
Thanks,
Katherine

>>> Katherine Siereveld 6/24/2020 4:25 PM >>>
Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp.  Additionally, the Terre Haute specific numbers you requested can be found here:  https://www.bop.gov/coronavirus/.  I also advised that masks are to be worn at all times in the facility.  If you do not have a mask, one will be provided to you.  Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth.  We have already begun successful visiting for the inmates who received execution dates.  It is unclear what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court order.  While

it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing.  Did the Court deny your request or was an order not sought?

BOP staff will not perform any of these tests.  All of the requested tests would need to be performed by outside medical personnel.  The only exception might be the blood tests.  BOP personnel would likely draw the blood and then send to an outside lab for the requested tests.  Do you have a list of the tests?  I believe the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me.  I will still have access to email and can step out to call if necessary.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>
Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1. An MRI with and without contrast,

2. Two types of PET scans

3. An EEG

4. A variety of blood tests

5. A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6. A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this. I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution? I did not see any follow up information on these specific issues. I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>
Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's

evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 5

**Subject:** Re: Purkey- expert visitation

**Date:** Tuesday, June 30, 2020 at 6:15:34 PM Central Daylight Time

**From:** Rebecca Woodman

**To:** Katherine Siereveld

**CC:** Rick Winter, MichelleLaw, Brian Fleming, ChasMcAleer, Brian Casey

Dear Katherine:

Thank you for your email on June 26, 2020 (1:34 p.m.).  I respond as follows:

1.  With respect to the issue of testing, we have already identified a facility at which all of the testing we have requested can be performed: the University Hospital at Indiana University in Indianapolis.  We have confirmed that the hospital has the staff and the equipment to perform all of the requested tests.  We are also confirming what days next week the hospital can perform the tests.  Once we have that confirmation, we will let you know the days on which Mr. Purkey will need to be transported to the hospital.  (The tests will have to be performed over a two-day period, so Mr. Purkey will need to be returned to the hospital for the second day of testing.)

2.  With respect to the details regarding Mr. Purkey's transportation to the hospital, we understand there may be security issues, which is why we are not requesting those details.  However, we do want details regarding how Mr. Purkey's health will be protected during the transfer given COVID-19 factors and request assurances that his health will be suitably and adequately protected during the process.

3.  Leaving aside whether and to what extent the BOP should be responsible for paying or reimbursing the costs of the requested testing, the fact remains that, as far back as October 2019, Michelle Law made clear to you in repeated conversations and email communications that the Office of the Federal Public Defender would front the costs of the tests.  That remains the case.  Accordingly, the costs of the tests cannot be properly raised by the BOP as an impediment to next week's tests occurring.

4.  With respect to our pandemic-related concerns and inquiries, the limited, general and vague information the BOP has provided regarding COVID-19 testing and results remain insufficient to address the questions and issues we have raised regarding USP Terre Haute.  Indeed, we do not even know from you whether our client has been tested, when he was tested and what the results of any such tests were.

5.  The email descriptions you have provided regarding certain COVID-19 safety measures USP Terre Haute is beginning to implement regarding visitations are similarly insufficient to address the concerns we have raised.  You have not even indicated whether our client and any visitors will be permitted and/or required to utilize full PPE protection during any visits, leaving aside the potential adverse impact on the efficacy of medical examinations and testing performed with full PPE protection.

6.  Your stated lack of knowledge "of any outstanding requests for medical and psychological records" is simply not credible and belies any suggestion of good faith engagement by the Bureau of Prisons on these issues.  At your suggestion, we reiterated prior requests for medical records and surveillance information through FOIA requests in October 2019, and I specifically provided you with a copy of the FOIA requests prior to their submission.  Additionally, on June 15, 2020, I provided you again with copies of all of the written requests we have made.  For you to disclaim any awareness of prior requests from us in your June 26, 2020 email is simply indefensible.

7. Having previously directed us to make our requests through the FOIA process (which we were subsequently told were being processed by the Bureau of Prisons on an expedited basis), your assertion now that our only two available avenues are through our client (whose life the Bureau of Prisons is attempting to terminate in approximately two weeks) or the discovery process in this case (which defense counsel are aggressively and actively opposing) is not a good faith response.

Please let me know if you have any questions regarding the foregoing.


Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com


---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Friday, June 26, 2020 at 12:34 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, MichelleLaw <Michelle_Law@fd.org>, Brian Fleming <bfleming@milchev.com>, ChasMcAleer <CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,

I think there may be some confusion regarding the COVID-19 testing data you are seeking. You are correct that the BOP webpage did not initially have detailed data about the testing, but that is no longer the case. If you scroll to the section after the facility-by-facility breakdown of active cases, you will see a section which details the numbers of completed tests, pending tests, and positive tests. That data is shown both in the aggregate and for each facility. The data is further explained on the webpage under the heading "About the Data" which I have copied here:

*About the Data*
*These data are compiled from a variety of sources and reviewed by BOP Health Services staff before documented for reporting. **Not all tests are conducted by and/or reported to BOP**. The number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons at the specific facility who have been tested, whether at that site or at a prior facility.*
As for the sanitation stations, yes, those include hand sanitizer and individual sanitizing wipes liberally available at points between the front entrance and the SCU. This is obviously in addition to the soap and water provided in the restrooms, and any additional sanitizer you wish to request from staff. The individual visiting rooms are wiped down before and after visits. Additionally, to the extent possible, we are attempting to assign visiting spaces to each inmate. For example, we have 3 non-contact visiting rooms and have so far only had social visits requested for 3 inmates. Until we have more than those three, our intent is to assign one visiting room to a particular inmate to further reduce any possibility of cross-contamination.

I am unaware of any outstanding requests for medical and psychological records, but if you can let me know when and how you requested them, that can help me track them down.  As a general rule, the two quickest ways to receive medical and psych files is for either your client to request a copy of his own records via a request to staff, which he can then forward to you; or, request those records through the discovery process.

With regard to the outside testing you are now requesting, we cannot provide you with specifics as to the logistics for security reasons.  Once the tests are confirmed, we will be able to advise that one or more facilities will be able to conduct the testing you have requested within the diagnostic parameters you have outlined.  You will receive the results which will have the names of the facilities and medical personnel as part of the records.  To that end, I will let you know if any additional information is required to successfully schedule those tests.

The BOP does not pay for unnecessary outside tests on inmates which are not clinically indicated.  Per our medical and psychology staff, a review of Mr. Purkey's records reveals no clinical indication for the testing you are requesting.  Our medical and psychology staff simply cannot order testing which they do not believe is necessary to the care of that individual.  Please let us know how you would like to proceed.

Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/25/2020 8:39 PM >>>
Hi Katherine:

Thank you for your emails dated June 24, 2020 (4:26 p.m.) and today at 1:02 p.m.  In response, and further to my prior emails on this topic, including in particular my email dated June 20, 2020 (12:55 p.m.), I respond as follows.

Once again, your plan for visits at USP Terre Haute, which appears to be materially unchanged from the plan that was implemented prior to the COVID-19 lockdown, remains insufficient to address our concerns.

As I have stated numerous times, in order for us to make informed decisions about the safety of any visitation at USP Terre Haute – whether by Mr. Purkey's legal counsel, expert witnesses, spiritual advisors, friends or family members -- we need much more information. The critical nature of the associated risks and the essential role of data to make safety determinations should come as no surprise to you.  Indeed, the need for extensive information to evaluate COVID-19 related health risks in prisons is the subject of virtually daily court opinions (*see* the attached June 18, 2020, decision by the U.S. District Court for the District of Columbia) and media exposes.  *See* T. Thomas, "How U.S. Prisons Became Ground Zero for Covid-19," *Politico* (June 25, 2020), https://www.politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022.

For example, you still have not provided all the testing data we and our experts need to evaluate the risks associated with visitations and to develop necessary mitigation risks. We are well aware of the COVID-19 statistics reporting the  number of confirmed positive cases posted on BOP's website. We are requesting critical contextual information about those positive numbers, including information about the numbers of tests administered, the number of pending test results, and the numbers of positive and negative results.  We have requested this information from you and in our court filings, but the answers have still not been forthcoming.

Additionally, we have no information from you at this time about sanitation, the frequency of surface cleaning and disinfecting throughout the buildings from the front door entry point to the visitation booths, and I have no idea what you mean when you refer to "sanitizing stations." Is that shorthand for the hand sanitizer you've mentioned in our previous correspondence? Nor is it clear what you mean by "successful visiting for the inmates who have execution dates" – since COVID-19 has a 2-14 day incubation period following exposure to the virus, the mere fact that a visitation has taken place is in no way an indicator of "success," however defined.  (It is worth noting that the apparent continued prohibition on visitations with prisoners at USP Terre Haute who are not facing execution is proof enough of the high risk to which prisoners, staff and visitors are exposed at the prison.  "Excepting" certain prisoners for pre-execution visitations does not preclude that risk.)

Leaving aside what your willingness and apparent ability now to grant Mr. Purkey an exception to be tested says about your previous insistence on a court order (which we sought but were denied in prior litigation because there was not a *Ford* claim pending, which there now is in federal district court), many questions remain before we can go forward with any testing. Specifically, we need to know the precise logistics of accomplishing the testing in the short time period available. In which hospital will the testing take place? Does the hospital have the equipment and personnel available to conduct the blood tests, MRI, DTI, two types of PET scans (one using a radioactive tracer to measure glucose metabolism in regions of the brain , and a second measuring the deposition of an abnormal protein in the brain called amyloid-b), and EEG that we are requesting? We need to know the logistics of transporting our client for the testing, e.g., how will it be done safely, when it can be done, what steps need to be taken in order to facilitate transportation, such as what sort of paperwork will be required?

With respect to the issue of blood tests, and given that Mr. Purkey will need to be transported to a hospital for the necessary imaging tests, it seems unnecessary for prison staff to conduct the necessary blood tests, which can be performed by hospital staff.  However, to respond to your inquiry, the necessary blood tests would include the following (please excuse any layperson imprecision):

Complete Blood count and differential;
Fasting blood glucose;
Liver function tests AST ALT GGT;
Bilirubin level;
Renal function (BUN and creatine):

Thyroid;
Lyme;
Syphilis;
HIV;
B12; and
Folate.

Finally, we are not prepared to accept your denial of responsibility for the costs of testing, particularly your apparent justification that the requested testing is not "clinically indicated." We have submitted substantial evidence in the pending *Ford* litigation to demonstrate that such testing is, in fact, warranted and clinically indicated, regardless of how such testing might also inform adjudication of the pending litigation. That conclusion will become even more evident when we and our experts are able to review Mr. Purkey's complete medical records and video surveillance records, which we have been repeatedly requesting and which have been withheld from us. Indeed, those records may demonstrate in further detail that the requested testing has been "clinically indicated" for some time but not administered by the Bureau of Prisons.

In closing, having confirmed for you the necessary blood tests and imaging that need to occur, we will await the details regarding how that testing will be implemented. We will also await the full scope of COVID-19 related information we have requested and, whether extant or not, the details of <u>all</u> of the safety protocols necessary to protect the health of Mr. Purkey, prison staff and visitors given the COVID-19 statistics and conditions of the prison, on the basis of which we and our experts can determine whether and under what circumstances visits with Mr. Purkey can be scheduled and safely conducted.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Thursday, June 25, 2020 at 1:02 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, Brian Fleming <bfleming@milchev.com>, Chas McAleer <CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
I have re-attached the email chain between Michelle Law and myself regarding the costs of the different tests which were discussed at that time. As a reminder, the BOP cannot order or pay for testing which is not clinically indicated. I am working to confirm that those costs are consistent with what they would be today. The security costs will likely remain the same, but I am running that to ground as well. Please let me know as soon as possible the specific parameters of the additional testing which was not previously identified so I can get cost estimates to you and we can begin scheduling.
Thanks,
Katherine

>>> Katherine Siereveld 6/24/2020 4:25 PM >>>
Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp. Additionally, the Terre Haute specific numbers you requested can be found here: https://www.bop.gov/coronavirus/. I also advised that masks are to be worn at all times in the facility. If you do not have a mask, one will be provided to you. Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth. We have already begun successful visiting for the inmates who received execution dates. It is unclear what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court order. While it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing. Did the Court deny your request or was an order not sought?

BOP staff will not perform any of these tests. All of the requested tests would need to be performed by outside medical personnel. The only exception might be the blood tests. BOP personnel would likely draw the blood and then send to an outside lab for the requested tests. Do you have a list of the tests? I believe the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me. I will still have access to email and can step out to call if necessary.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute

4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>
Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1.  An MRI with and without contrast,

2.  Two types of PET scans

3.  An EEG

4.  A variety of blood tests

5.  A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6.  A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this.  I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution?  I did not see any follow up information on these specific issues.  I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>
Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit 6

**Subject:** Re: Purkey- expert visitation

**Date:** Wednesday, July 1, 2020 at 5:04:54 PM Central Daylight Time

**From:** Rebecca Woodman

**To:** Katherine Siereveld

**CC:** Rick Winter, MichelleLaw, Brian Fleming, ChasMcAleer, Brian Casey

**Attachments:** Compilation of Dr. Hyde Medical Orders[1].pdf

Dear Katherine:

Further to my email yesterday, Thomas M. Hyde, M.D., Ph. D., has issued the attached medical orders for the testing and imaging we have previously identified to you.  My understanding is that the specific facility within the Indiana University Health System at which the testing and imaging will be performed is the Methodist Hospital in Indianapolis.  We are seeking to confirm the scheduling of the testing and imaging for two days next week, possibly Tuesday, July 7 and Thursday, July 9.  We will confirm with you the specific scheduling once we have confirmation so that you can make the necessary transportation arrangements for Mr. Purkey.

In the meantime, please let me know if you have any questions regarding the foregoing.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Friday, June 26, 2020 at 12:34 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, MichelleLaw <Michelle_Law@fd.org>, Brian Fleming <bfleming@milchev.com>, ChasMcAleer <CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,

I think there may be some confusion regarding the COVID-19 testing data you are seeking.  You are correct that the BOP webpage did not initially have detailed data about the testing, but that is no longer the case.  If you scroll to the section after the facility-by-facility breakdown of active cases, you will see a section which details the numbers of completed tests, pending tests, and positive tests.  That data is shown both in the aggregate and for each facility.  The data is further explained on the webpage under the heading "About the Data" which I have copied here:

*About the Data*
*These data are compiled from a variety of sources and reviewed by BOP Health Services staff*

*before documented for reporting.* **Not all tests are conducted by and/or reported to BOP***. The number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons at the specific facility who have been tested, whether at that site or at a prior facility.* As for the sanitation stations, yes, those include hand sanitizer and individual sanitizing wipes liberally available at points between the front entrance and the SCU.  This is obviously in addition to the soap and water provided in the restrooms, and any additional sanitizer you wish to request from staff.  The individual visiting rooms are wiped down before and after visits.  Additionally, to the extent possible, we are attempting to assign visiting spaces to each inmate.  For example, we have 3 non-contact visiting rooms and have so far only had social visits requested for 3 inmates.  Until we have more than those three, our intent is to assign one visiting room to a particular inmate to further reduce any possibility of cross-contamination.

I am unaware of any outstanding requests for medical and psychological records, but if you can let me know when and how you requested them, that can help me track them down.  As a general rule, the two quickest ways to receive medical and psych files is for either your client to request a copy of his own records via a request to staff, which he can then forward to you; or, request those records through the discovery process.

With regard to the outside testing you are now requesting, we cannot provide you with specifics as to the logistics for security reasons.  Once the tests are confirmed, we will be able to advise that one or more facilities will be able to conduct the testing you have requested within the diagnostic parameters you have outlined.  You will receive the results which will have the names of the facilities and medical personnel as part of the records.  To that end, I will let you know if any additional information is required to successfully schedule those tests.

The BOP does not pay for unnecessary outside tests on inmates which are not clinically indicated.  Per our medical and psychology staff, a review of Mr. Purkey's records reveals no clinical indication for the testing you are requesting.  Our medical and psychology staff simply cannot order testing which they do not believe is necessary to the care of that individual.  Please let us know how you would like to proceed.

Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/25/2020 8:39 PM >>>
Hi Katherine:

Thank you for your emails dated June 24, 2020 (4:26 p.m.) and today at 1:02 p.m.  In response, and further to my prior emails on this topic, including in particular my email dated June 20, 2020 (12:55 p.m.), I respond as follows.

Once again, your plan for visits at USP Terre Haute, which appears to be materially unchanged from the plan that was implemented prior to the COVID-19 lockdown, remains insufficient to address our concerns.

As I have stated numerous times, in order for us to make informed decisions about the safety of any visitation at USP Terre Haute – whether by Mr. Purkey's legal counsel, expert witnesses, spiritual advisors, friends or family members -- we need much more information. The critical nature of the associated risks and the essential role of data to make safety determinations should come as no surprise to you.  Indeed, the need for extensive information to evaluate COVID-19 related health risks in prisons is the subject of virtually daily court opinions (see the attached June 18, 2020, decision by the U.S. District Court for the District of Columbia) and media exposes.  See T. Thomas, "How U.S. Prisons Became Ground Zero for Covid-19," Politico (June 25, 2020), https://www.politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022.

For example, you still have not provided all the testing data we and our experts need to evaluate the risks associated with visitations and to develop necessary mitigation risks. We are well aware of the COVID-19 statistics reporting the  number of confirmed positive cases posted on BOP's website. We are requesting critical contextual information about those positive numbers, including information about the numbers of tests administered, the number of pending test results, and the numbers of positive and negative results.  We have requested this information from you and in our court filings, but the answers have still not been forthcoming.

Additionally, we have no information from you at this time about sanitation, the frequency of surface cleaning and disinfecting throughout the buildings from the front door entry point to the visitation booths, and I have no idea what you mean when you refer to "sanitizing stations." Is that shorthand for the hand sanitizer you've mentioned in our previous correspondence? Nor is it clear what you mean by "successful visiting for the inmates who have execution dates" – since COVID-19 has a 2-14 day incubation period following exposure to the virus, the mere fact that a visitation has taken place is in no way an indicator of "success," however defined.  (It is worth noting that the apparent continued prohibition on visitations with prisoners at USP Terre Haute who are not facing execution is proof enough of the high risk to which prisoners, staff and visitors are exposed at the prison.  "Excepting" certain prisoners for pre-execution visitations does not preclude that risk.)

Leaving aside what your willingness and apparent ability now to grant Mr. Purkey an exception to be tested says about your previous insistence on a court order (which we sought but were denied in prior litigation because there was not a Ford claim pending, which there now is in federal district court), many questions remain before we can go forward with any testing. Specifically, we need to know the precise logistics of accomplishing the testing in the short time period available. In which hospital will the testing take place? Does the hospital have the equipment and personnel available to conduct the blood tests, MRI, DTI, two types of PET scans (one using a radioactive tracer to measure glucose metabolism in regions of the brain , and a second measuring the deposition of an abnormal protein in the brain called amyloid-b), and EEG that we are requesting? We need to know the logistics of transporting our client for the testing, e.g., how will it be

done safely, when it can be done, what steps need to be taken in order to facilitate transportation, such as what sort of paperwork will be required?

With respect to the issue of blood tests, and given that Mr. Purkey will need to be transported to a hospital for the necessary imaging tests, it seems unnecessary for prison staff to conduct the necessary blood tests, which can be performed by hospital staff.  However, to respond to your inquiry, the necessary blood tests would include the following (please excuse any layperson imprecision):

Complete Blood count and differential;
Fasting blood glucose;
Liver function tests AST ALT GGT;
Bilirubin level;
Renal function (BUN and creatine);
Thyroid;
Lyme;
Syphilis;
HIV;
B12; and
Folate.

Finally, we are not prepared to accept your denial of responsibility for the costs of testing, particularly your apparent justification that the requested testing is not "clinically indicated."  We have submitted substantial evidence in the pending *Ford* litigation to demonstrate that such testing is, in fact, warranted and clinically indicated, regardless of how such testing might also inform adjudication of the pending litigation.  That conclusion will become even more evident when we and our experts are able to review Mr. Purkey's complete medical records and video surveillance records, which we have been repeatedly requesting and which have been withheld from us.  Indeed, those records may demonstrate in further detail that the requested testing has been "clinically indicated" for some time but not administered by the Bureau of Prisons.

In closing, having confirmed for you the necessary blood tests and imaging that need to occur, we will await the details regarding how that testing will be implemented.  We will also await the full scope of COVID-19 related information we have requested and, whether extant or not, the details of <u>all</u> of the safety protocols necessary to protect the health of Mr. Purkey, prison staff and visitors given the COVID-19 statistics and conditions of the prison, on the basis of which we and our experts can determine whether and under what circumstances visits with Mr. Purkey can be scheduled and safely conducted.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Thursday, June 25, 2020 at 1:02 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, Brian Fleming <bfleming@milchev.com>, Chas McAleer <CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
I have re-attached the email chain between Michelle Law and myself regarding the costs of the different tests which were discussed at that time.  As a reminder, the BOP cannot order or pay for testing which is not clinically indicated.  I am working to confirm that those costs are consistent with what they would be today.  The security costs will likely remain the same, but I am running that to ground as well.  Please let me know as soon as possible the specific parameters of the additional testing which was not previously identified so I can get cost estimates to you and we can begin scheduling.
Thanks,
Katherine

>>> Katherine Siereveld 6/24/2020 4:25 PM >>>
Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp.  Additionally, the Terre Haute specific numbers you requested can be found here:  https://www.bop.gov/coronavirus/.  I also advised that masks are to be worn at all times in the facility.  If you do not have a mask, one will be provided to you.  Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth.  We have already begun successful visiting for the inmates who received execution dates.  It is unclear what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court order.  While it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing.  Did the Court deny your request or was an order not sought?

BOP staff will not perform any of these tests.  All of the requested tests would need to be performed by outside medical personnel.  The only exception might be the blood tests.  BOP personnel would likely draw the blood and then send to an outside lab for the requested tests.  Do you have a list of the tests? I believe the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me.  I will still

have access to email and can step out to call if necessary.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>
Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1. An MRI with and without contrast,

2. Two types of PET scans

3. An EEG

4. A variety of blood tests

5. A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6. A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this.  I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution?  I did not see any follow up information on these specific issues.  I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>
Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com